UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BERNABE ENCARNACION,

                                    Plaintiff,

                                                        9:21-cv-00986-MAD-TWD

v.


LT. CONNORS, et al.,

                                    Defendants.
_____

APPEARANCES:                                OF COUNSEL:

BERNABE ENCARNACION
91-B-0943
Attica Correctional Facility
Box 149
Attica, NY 14011
*Plaintiff, pro se*

LETITIA JAMES                               STEVE NGUYEN, ESQ.
Attorney General of the State of New York   Assistant Attorney General
The Capitol
Albany, NY 12224
*Attorney for Defendants*

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

I.      **INTRODUCTION**

        This matter has been referred for a report and recommendation by the Hon. Mae A.

D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

At all times relevant, Plaintiff was an incarcerated individual in the custody of the New York

State Department of Corrections and Community Supervision ("DOCCS") at Shawangunk

Correctional Facility ("Shawangunk").  (Dkt. No. 1.)  On September 3, 2021, Plaintiff

commenced this action pursuant to 42 U.S.C. § 1983 alleging a First Amendment retaliation claim against Corrections Officer ("CO") Vitarius, and Eighth Amendment conditions of confinement claims against Lt. Connors, CO Olivo, and CO Vitarius.[1]  *Id.*; (*see also* Dkt. No. 8 at 17-21, 27, 33.)

Currently before the Court is Defendants' motion for summary judgment.  (Dkt. No. 24-2.)  For the reasons set forth below, the Court recommends Defendants' motion be granted in part and denied in part.

## II.    LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  The movant may meet this burden by showing the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

---

[1]  Although CO Vitarius' last name is spelled "Vitarious" in previous filings, the Court uses the spelling provided in his declaration.  (Dkt. No. 24-4 at 1, 5.)  The Clerk is directed to correct the spelling to Vitarius on the docket.

If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing there is a genuine issue for trial. *Salahuddin*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

The Second Circuit instructs that on summary judgment motions, "'[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.'" *Jeffreys*, 426 F.3d at 554 (alteration and emphasis in original) (quoting *Anderson*, 477 U.S. at 252). In other words, "a nonmoving party must offer some hard evidence showing that [his] version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). Accordingly, statements "that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen*

3

*v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (internal quotation marks and citation omitted).

In applying the summary judgment standard, the district court should not weigh evidence or assess the credibility of witnesses. *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.")

## III.    DISCUSSION

On July 10, 2018, Plaintiff was placed in a cell in the Special Housing Unit ("SHU") at Shawangunk.  (Dkt. No. 1 at 1, 5.)  Plaintiff claims while he was in the SHU, CO Vitarius, CO Olivo, and "all of the other Officers" in the SHU refused to pick up Plaintiff's laundry, "violated" his kosher meal trays by opening the sealed items on the tray, harassed him as they passed his cell, and did not allow Plaintiff to use his medically prescribed walking boots or cane.[2] *Id.* at 6, 12-13.  Because he was denied access to his boots and cane, Plaintiff could not leave his cell to shower or exercise during his 60 day stay in the SHU.  (Dkt. No. 1 at 6, 53; Dkt. No. 24-3 at 62.)  Plaintiff reported these "violation[s] and deprivations" verbally and in written grievances to Lt. Connors and Supt. Collado, among other supervisors.  (Dkt. No. 1 at 6.)  Supt. Collado responded, in relevant part, Plaintiff was not allowed his cane in the SHU, but could have his medical boots if he had a valid permit.  *Id.* at 6, 53.  Plaintiff then showed Supt. Collado's response along with his medical permit for his boots to Lt. Connors, CO Vitarius, and CO Olivo.  *Id.* at 6, 50.  In response, they began heating up everything in his kosher meal trays

---

[2]  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

including cold cereal, fresh fruit, and "cold saled" making the food "unconsumable." *Id.* at 7. As a result of being "deprive[d]" of his food, he lost 27 pounds while in the SHU. *Id.* Plaintiff also alleges CO Vitarius threw out his medical boots in retaliation for filing grievances against him. *Id.*

**A.    Lt. Connors' Personal Involvement**

Defendants seek summary judgment and dismissal of Plaintiff's Eighth Amendment conditions of confinement claim against Lt. Connors for lack of personal involvement. (Dkt. No. 24-2 at 8-9.) For the reasons set forth below, the Court recommends granting summary judgment as to this claim.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citation omitted). In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks and citation omitted).

The Second Circuit has concluded "there is no special rule for supervisory liability" and has held a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, had violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). To avoid summary judgment, a plaintiff must establish the defendant violated the constitution by his or her

"own conduct, not by reason of [the defendant's] supervision of others who committed the violation" and cannot "rely on a separate test of liability specific to supervisors." *Id.* at 619. Thus, a "supervisor's 'mere knowledge of his subordinate's discriminatory purpose' is not sufficient because that knowledge does not 'amount[ ] to the supervisor's violating the Constitution.'" *Id.* at 616-17 (alteration in original) (quoting *Iqbal*, 556 U.S. at 677). "Failing to correct another officer's violation does not suffice; rather . . . the 'active conduct' standard necessary to impose § 1983 liability on a supervisor requires the supervisor either directly participate in the alleged constitutional violation or create a policy or custom under which the alleged unconstitutional practices occurred." *Harrison v. Broderick*, No. 18-CV-821JLS(F), 2022 WL 16837366, at *11 (W.D.N.Y. Aug. 18, 2022) (quoting *Tangreti*, 983 F.3d at 617 n.4), *report and recommendation adopted*, 2022 WL 16836406 (W.D.N.Y. Nov. 8, 2022).

A personal involvement inquiry on summary judgment "examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct." *Brandon v. Schroyer*, No. 9:13-CV-0939 (TJM/DEP), 2016 WL 1638242, at *14 (N.D.N.Y. Feb. 26, 2016), *report and recommendation adopted*, 2016 WL 1639904 (N.D.N.Y. Apr. 25, 2016), *rev'd on other grounds sub nom. Brandon v. Kinter*, 938 F.3d 21 (2d Cir. 2019).

The record evidence establishes Lt. Connors was not personally involved in any of the constitutional violations Plaintiff allegedly experienced. Due to his rank, Lt. Connors was not responsible for confirming callouts or conducting escorts to showers and recreation. (Dkt. No. 24-3 at 3.) Nor was he responsible for collecting laundry or receiving, delivering, and/or inspecting Plaintiff's food. *Id.* at 3, 6. Moreover, Plaintiff does not assert, beyond general conclusory allegations, Lt. Connors took part in tampering with his food or denying him

showers, recreation, laundry, his medical boots, and his cane.  (*See* Dkt. No. 1 at 6-7); *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) ("Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact.").  Lt. Connors also denies knowledge of any other officers doing as such.  (Dkt. No. 24-3 at 3, 4, 6.)  While Plaintiff claims generally Lt. Connors was aware of this activity due to the grievances Plaintiff had filed, mere knowledge, and even failure to correct such behavior, is not enough to constitute personal involvement in the alleged violations.  (Dkt. No. 1 at 6-7; Dkt. No. 28 at 6-7); *see also Tangreti*, 983 F.3d at 616-17; *Harrison*, 2022 WL 16837366, at *11.  Finally, Plaintiff does not assert Lt. Connors created a policy or custom under which these alleged unconstitutional practices occurred.  (*See generally* Dkt. Nos. 1, 28, 28-1); *see also Harrison*, 2022 WL 16837366, at *11. Therefore, Plaintiff has failed to raise a genuine issue of material fact and Lt. Connors is entitled to summary judgment due to lack of personal involvement.

For these reasons, the Court recommends granting Defendants' motion with regard to Plaintiff's Eighth Amendment claims against Lt. Connors.

## B.    Eighth Amendment Conditions of Confinement Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials.  *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  This includes punishments that "involve the unnecessary and wanton infliction of pain."  *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  "To the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  The Second Circuit has held in order for a plaintiff

> [t]o demonstrate that the conditions of his confinement constitute
> cruel and unusual punishment, the plaintiff must satisfy both an

> objective test and a subjective test.  First, the plaintiff must
> demonstrate that the conditions of his confinement result in
> unquestioned and serious deprivations of basic human needs.
> Second, the plaintiff must demonstrate that the defendants imposed
> those conditions with deliberate indifference.

*McAllister v. Garrett*, No. 10-CIV-3828, 2011 WL 3875423, at *10 (S.D.N.Y. Sept. 1, 2011)

(alteration in original) (quoting *Welch v. Bartlett*, 125 F. App'x 340, 342 (2d Cir. 2005)).

Although the Constitution does not mandate a comfortable prison setting, prisoners are

entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable

safety." *Brown v. Doe*, No. 13 Civ 8409, 2014 WL 5461815, at *6 (S.D.N.Y. Oct. 28, 2014)

(internal quotation marks and citations omitted). "Therefore, to establish the objective element of

an Eighth Amendment violation, a prisoner 'must prove that the conditions of his confinement

violate contemporary standards of decency.'" *Id.* (quoting *Phelps v. Kapnolas*, 308 F.3d 180,

185 (2d Cir. 2002)).

Under the subjective element, deliberate indifference "involves culpable recklessness,

i.e., an act or a failure to act . . . that evinces a conscious disregard of a substantial risk of serious

harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*,

99 F.3d 550, 553 (2d Cir.1996)) (internal quotation marks omitted).  "[T]he subjective element

of deliberate indifference 'entails something more than mere negligence . . . [but] something less

than acts or omissions for the very purpose of causing harm or with knowledge that harm will

result.'" *Hathaway*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825, 826, (1994)).

Put another way, "the officials acted, or omitted to act, with a sufficiently culpable state of mind,

*i.e.*, with deliberate indifference to inmate health or safety." *Phelps v. Kapnolas*, 308 F.3d 180,

185 (2d Cir. 2002) (internal quotation marks and citations omitted).

"Restrictive SHU conditions on their own do not, per se, rise to the level of cruel and

unusual punishment." *Booker v. Maly*, No. 12-CV-246 (NAM/ATB), 2014 WL 1289579, at *16

(N.D.N.Y. Mar. 31, 2014).  "Normal" SHU conditions include being kept in solitary confinement for twenty-three hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week.  *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004).

### 1.    Food Tampering and Kosher Meals

Plaintiff asserts Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius for allegedly tampering with his kosher meals.  (Dkt. No. 1 at 6-7.)  Specifically, Plaintiff claims CO Olivo, CO Vitarius, and other COs "opened his kosher meal trays and each food items in his kosher meals 3 times a day."  (Dkt. No. 1 at 6.)  According to Plaintiff, "[a]s soon as they open it, that food is no longer Kosher."  (Dkt. No. 24-6 at 22.)  Plaintiff further alleges COs Olivo and Vitarius microwaved and heated up "everything inside his kosher tray" including "cold cereal, fresh fruits-banana, apple or orange and cold saled daily" making the food "unconsumable."[3]  (Dkt. No. 1 at 7.)  As a result, he refused to eat the alleged non-kosher food and lost 27 pounds while in the SHU.  *Id.*

"[T]he Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'"  *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)).  "In food tampering claims a plaintiff must allege that he suffered an actual injury, 'the mere allegation of food tampering alone [ ] is insufficient to establish a claim under the Eighth Amendment.'"  *Calvin v. Schmitt*, No. 15 CV-6584 (NSR),

---

[3]  While these allegations primarily relate to the retaliation claim against CO Vitarius, the Court finds they are also relevant to the discussion of the alleged food tampering.  *See infra* Section III.D.

2017 WL 4280683, at *5 (S.D.N.Y. July 7, 2017) (alteration in original) (quoting *Harris v. Ashlaw*, No. 9:07-CV-0358 (LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007)).

To begin, while Plaintiff claims all of his food was microwaved and was therefore "unconsumable," he fails to allege the food provided to him at Shawangunk was prepared and served under conditions which would present an immediate danger to his health and wellbeing. *See Dove v. Broome Cty. Corr. Facility*, No. 9:10-CV-0002 (DNH/DEP), 2011 WL 1118452, at *11 (N.D.N.Y. Feb. 17, 2011), (recommending dismissal of Eighth Amendment claims where plaintiff failed to allege the food provided in prison was prepared and served in a manner that endangered his health), *report and recommendation adopted*, 2011 WL 867072 (N.D.N.Y. Mar. 10, 2011); *see also Robles*, 725 F.2d at 15.

Further, denial of kosher food does not necessarily rise to an Eighth Amendment violation. *See Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301 (KMK), 2018 WL 1626175, at *20 (S.D.N.Y. Mar. 30, 2018); *Ward v. Goord*, No. 9:06-CV-1429 (DNH/DRH), 2009 WL 102928, at *7 (N.D.N.Y. Jan. 13, 2009). Here, on July 16, 2018, Plaintiff filed a grievance complaining COs were tampering with his kosher meals by removing the plastic wrappers "somewhere outside [his] presence" thus making the food non-kosher. (Dkt. No. 1 at 53; Dkt. No. 24-3 at 62.) In response, Supt. Collado explained the cellophane used around the kosher trays is not allowed in the SHU and is removed. (Dkt. No. 1 at 53.) However, the "food inside the tray is still wrapped and the meal is considered Kosher." *Id.* Even if the food was not, in fact, kosher and "plaintiff may claim that he did not eat the non-kosher meals provided to him[,] such a claim, while perhaps cognizable under the First Amendment or the [Religious Land Use and Institutionalized Persons Act], does not also implicate cruel and unusual punishment in violation of the Eighth Amendment." *Dove*, 2011 WL 1118452, at *11. Moreover, Plaintiff

testified he would still sometimes eat the fruit and oatmeal provided to him and "thus[,] the deprivation of kosher meals cannot reasonably be expected to result in plaintiff not eating." *Id.*; (Dkt. No. 24-6 at 24.)  "Indeed, the plaintiff has not [and cannot] provide[ ] any authority for the proposition that denial of [kosher] food in prison would rise to the level necessary to be deemed cruel and unusual under the Eighth Amendment." *Dove*, 2011 WL 1118452, at *11 (internal quotation marks and citations omitted) (alterations in original).

Therefore, the Court recommends granting summary judgment as to the Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius with regard to Plaintiff's food tampering and kosher meal claims.  *See Ackridge*, 2018 WL 1626175, at *20 (finding the plaintiff failed to allege a sufficiently serious deprivation required to state an Eighth Amendment claim when he chose not to eat the non-kosher meals provided to him and failed to plead the denial of kosher meals posed an unreasonable risk of serious damage to his health); *see also Ward*, 2009 WL 102928, at *7 ("In this case, [the plaintiff] has failed to establish an Eighth Amendment claim based upon denial of kosher meals during his transport . . . . he has neither proven the existence of imminent danger to his health and well-being nor an actual injury.")

### 2.    Denial of Laundry

Plaintiff alleges COs Olivo and Vitarius refused to pick up his laundry throughout his stay in the SHU.  (Dkt. No. 1 at 6, 16.)  Defendants assert Unit Officers took requests for laundry service every Monday morning at Shawangunk and once cleaned, the laundry was returned on Thursday.  (Dkt. No. 24-2 at 13.)  Moreover, according to the SHU logs provided by Defendants, CO Olivo only worked one Monday and CO Vitarius only worked two Mondays during Plaintiff's SHU confinement.  (Dkt. No. 24-2 at 13; Dkt. No. 24-4 at 3, 30, 34, 35; Dkt. No. 24-5 at 3, 30.)

"Prisoners are entitled to 'reasonably adequate sanitation' and 'personal hygiene' under the Eighth Amendment, particularly over long periods of time." *Lunney v. Brureton*, No. 04 CIV. 2438 (LAK) (GWG), 2005 WL 121720, at *8 (S.D.N.Y. Jan. 21, 2005) (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)), *report and recommendation adopted*, 2005 WL 433285 (S.D.N.Y. Feb. 23, 2005). This includes the "the right to adequate laundry services." *Id.*

There is no Eighth Amendment violation, however, when inmates are provided the opportunity and the supplies to wash their own clothes. *Id.*; *Benjamin v. Fraser*, 161 F. Supp. 2d 151, 178-79 (S.D.N.Y. 2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in relevant part and vacated in part*, 343 F.3d 35 (2d Cir. 2003); *Lunney v. Brureton II*, 04 Civ. 2438 (LAK) (GWG), 2007 WL 1544629, at *14 (S.D.N.Y. May 29, 2007) (alleging inadequate laundry services without alleging inability to wash clothing did not violate Eighth Amendment), *objections overruled*, 2007 WL 2050301 (S.D.N.Y. July 18, 2007); *Townsend v. Clemons*, No. 12-CV-03434 (RJS) (SN), 2013 WL 818662, at *8 (S.D.N.Y. Jan. 30, 2013) (finding plaintiff had not alleged a sufficiently serious deprivation because he did not plead he could not clean his clothes at all), *report and recommendation adopted*, 2013 WL 868605 (S.D.N.Y. Mar. 4, 2013).

In his complaint, Plaintiff did not allege he could not clean his clothes at all, but only that Defendants would not pick up his laundry.[4] (*See* Dkt. No. 1 at 6-7, 13, 14-15, 16.) According to

---

[4] In his response to Defendants' summary judgment motion, Plaintiff claims he was denied "an alternate opportunity or means to clean-wash his linens and clotheing himself." (Dkt. No. 28-1 at 25.) However, this alleged inability to clean his clothes in his cell is not referenced anywhere in Plaintiff's complaint. (*See* Dkt. No. 1 at 6-7, 13, 14-15, 16.); *see Lunney II*, 2007 WL 1544629 at *14; *Townsend*, 2013 WL 818662 at *8. Moreover, when he testified at his deposition as to the factual bases of this claim, he made no mention he was unable to clean his clothes at all. (Dkt. No. 24-6 at 19-21, 44-45.) Accordingly, the Court has not considered this new fact in analyzing this claim on summary judgment. *See, e.g., Feldman v. Sanders Legal Grp.*, 914 F. Supp. 595, 600 n.5 (S.D.N.Y. 2012) (declining to consider plaintiff's arguments

Lt. Connors, "[o]ftentimes, incarcerated individuals decline[] outside laundry, preferring to wash clothes in their cell sinks." (Dkt. No. 24-3 at 3.) Plaintiff did not allege he was denied the opportunity to do the same.[5] For the reasons discussed herein, the Court recommends granting summary judgment as to the Eighth Amendment claims against COs Olivo and Vitarius with regard to the alleged denial of laundry.

### 3. Denial of Cane and Medical Boots

Plaintiff asserts Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius for denying him use of his cane and medical boots despite having a "valid permit" for them. (Dkt. No. 1 at 6, 7.) As set forth above, Plaintiff filed a grievance on July 16, 2018, requesting, in part, the return of his cane and medical boots after he was denied access to them in

---

in opposition brief that were "based on facts and theories that are not in the Complaint"); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 363 n.9 (S.D.N.Y. 2011) (declining to consider facts raised for the first time in opposition papers, "as they do not form the basis for plaintiff's claims, and the complaint may not be amended simply by raising new facts in opposition to Defendants' motion"); *Scott v. City of N.Y. Dep't of Corr.*, 641 F. Supp. 2d 211, 229 (S.D.N.Y. 2009) (explaining facts and theories raised for the first time in opposition papers should not be considered in resolving a summary judgment motion), *aff'd* 445 Fed. App'x. 389 (2d Cir. 2011); *Southwick Clothing LLC v. GFT (USA) Corp.*, No. 99-cv-10452 (GBD), 2004 WL 2914093, at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion [for summary judgment].").

[5] Even if Plaintiff had been denied laundry all eight Mondays he was in the SHU, "[a] successful § 1983 claim holds an individual personally responsible for the role his or her own acts or omissions played in violating someone's rights." *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 236 (N.D.N.Y. 2021) (alteration in original) (quoting *Dukes v. City of Albany*, 492 F. Supp. 3d 4, 12 (N.D.N.Y. 2020)) (internal quotation marks omitted). The record indicates CO Olivo only worked one Monday and CO Vitarius only worked two Mondays during Plaintiff's SHU confinement. (Dkt. No. 24-2 at 13; Dkt. No. 24-4 at 3, 30, 34, 35; Dkt. No. 24-5 at 3, 30.) Even taking into account the other five Mondays Plaintiff was allegedly denied laundry, there is simply no indication in the record the denial of laundry the weeks of July 9, July 30, and August 6, 2018, posed a serious risk to Plaintiff's health. *Id.*; *Zielinski*, 547 F. Supp. 3d at 236.

the SHU.  (Dkt. No. 24-3 at 62, 64.)  On August 17, 2018, in response to his grievance, Supt.

Collado informed Plaintiff he would be issued his cane if he needed to leave the unit but could

not keep it in the cell with him.  (Dkt. No. 24-3 at 64.)  However, he could keep his medical

boots in his cell if he had a valid permit for them.  *Id.*  Plaintiff did in fact have a valid medical

permit from Shawangunk dated April 3, 2018, authorizing his medical boots and cane.  (Dkt. No.

1 at 54.)  Yet in Plaintiff's grievance filed on September 2, 2018, he claimed when he presented

the "COs in SHU" both Supt. Collado's grievance response and the valid permit for his medical

boots, CO Vitarius refused to allow Plaintiff to keep his medical boots in his cell, telling him

"no[] boots or cane here."  (Dkt. No. 1 at 50.)

### i.    Denial of Medical Boots

The denial of Plaintiff's medical boots does not in and of itself trigger a constitutional

violation.  *See Curtis v. Lucia*, No. 9:15-CV-0718 (GLS/TWD), 2015 WL 13948917, at *7–8

(N.D.N.Y. Aug. 4, 2015) (finding plaintiff's vague allegations he suffered "harsh conditions"

and the SHU staff refused to allow him to wear his medical boots or go to recreation failed to

demonstrate the conditions were objectively serious to trigger constitutional protections);

*Trapani v. Annucci*, No. 9:21-CV-0681 (LEK/ML), 2022 WL 7290107, at *10 (N.D.N.Y. June

21, 2022) (plaintiff's allegations that defendants placed him in punitive segregation, did not

return the bulk of his personal belongings, and denied him his medically prescribed boots were

"insufficient to plausibly suggest that he was incarcerated under conditions that objectively

posed a substantial risk of serious harm."), *report and recommendation adopted*, 2022 WL

4008027 (N.D.N.Y. Sept. 1, 2022).

However, even if denial of his medical boots did meet the objective prong of the Eighth

Amendment test, "Plaintiff's failure to allege any facts indicating that [Defendants] acted, or did

not act, with a wanton state of mind, forecloses any colorable allegation that he was denied his

14

constitutional rights under the Eighth Amendment regarding prison conditions." *See Loadholt v. Lape*, No. 9:09-CV-0658, 2011 WL 1135934, at *4 (N.D.N.Y. Mar. 3, 2011), *report and recommendation adopted*, 2011 WL 1114253 (N.D.N.Y. Mar. 25, 2011); s*ee also Vaughan v. Erno*, 8 F. App'x 145, 146-47 (2d Cir. 2001) (finding complained conditions of confinement did not constitute an Eighth Amendment violation because plaintiff failed to show defendants acted with deliberate indifference, even assuming that he sufficiently alleged a serious harm).

Plaintiff alleges COs Olivo and Vitarius "did not allow[]" Plaintiff to "use his . . . medical boots" inside his cell even though he had a valid permit for them.  (Dkt. No. 1 at 6-7, 50, 53.)  Although Plaintiff did in fact have a valid permit for his medical boots, his conclusory allegations, without more, are not enough to show COs Olivo and Vitarius were deliberately indifferent to Plaintiff's health or safety.  (Dkt. No. 1 at 53); *see Houston v. Wright*, No. 9:10-CV-1009 (NAM/RFT), 2013 WL 5439826, at *10 (N.D.N.Y. Sept. 27, 2013) (quoting *Summerville v. Faciuna*, 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009)) ("Even if the conditions of confinement were found to be unreasonable as a matter of law, a plaintiff cannot survive summary judgment unless he can point to 'record evidence creating a genuine dispute' as to the facts regarding Defendants' culpable mental state") (internal quotation marks omitted); *see also Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir. 2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone."); *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful"); *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) ("[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.").  Therefore, for

the reasons set forth herein, the Court recommends granting summary judgment to COs Olivo and Vitarius on these claims.

**ii.      Denial of Cane**

Similarly, the denial of Plaintiff's cane does not meet the objective standard of the Eighth Amendment.  *See Loadholt*, 2011 WL 1135934, at *4 ("[C]ourts in this Circuit have found the deprivations of better pain medicine, a cane, a mattress, a pillow, or 'better shoes,' as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment.") (citations omitted).

Further, it is undisputed that SHU policy prohibited Plaintiff from having his cane in his cell due to "safety and security reasons."  (Dkt. No. 24-3 at 4; Dkt. No. 24-4 at 3-4; Dkt. No. 24-5 at 3.)  Therefore, the denial of Plaintiff's cane in the SHU does not constitute deliberate indifference because there was a "legitimate penological reason" for doing so.  *Rahman v. Artuz*, No. 95 CIV 0272 MGC, 1999 WL 600520, at *4 (S.D.N.Y. Aug. 10, 1999) (finding plaintiff failed to prove defendants, who would not permit the prisoner to wear his knee braces in the SHU for security reasons, showed deliberate indifference to his medical needs because "[t]here was a legitimate penological reason for not giving him his braces in the SHU"); *Roundtree v. City of New York*, No. 15-CV-8198, 2018 WL 1586473, at *9 (S.D.N.Y. Mar. 28, 2018) (finding prison officials' denial of Plaintiff's request for medical equipment due to security concerns was a "legitimate, penological reason" to do so.).

Because Plaintiff cannot meet the objective or subjective prongs of the conditions of confinement inquiry here, the Court recommends granting summary judgment as to these claims against COs Olivo and Vitarius.

### 4.    Denial of Showers and Recreation

The Court comes to a different conclusion regarding the alleged denial of showers and recreation.  Plaintiff asserts COs Olivo and Vitarius denied him "out-of-cell exercise" and showers throughout the duration of his time in the SHU.  (Dkt. No. 1 at 6-7, 14-15.)  COs Olivo and Vitarius claim they would ask inmates during their daily rounds whether they wanted to exercise and every second or third day, they would also ask the inmates if they wanted to shower.  (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.)  If the inmates wanted to shower or exercise, the COs would escort the inmates to the appropriate area.  (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.)  Normally, if an inmate declined recreation, the COs would mark the inmate's refusal on a "Go Around" slip, which they would maintain for seven days.  (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.)  On days where showers were also offered, any shower or recreation refusals were instead recorded on the SHU logs.  (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.)  Both CO Olivo and CO Vitarius claim Plaintiff "was regularly given the option to shower and exercise, but often refused."  (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.)

The records provided by Defendants reflect that on July 8, 2018, and August 17, 2018, Plaintiff was marked as "Hold Live" for shower and recreation, indicating he was "temporarily off the unit for other reasons (such as medical visits)."  (Dkt. No. 24-1 at 3; Dkt. No. 24-3 at 2, 36.) On July 10, 13, 15, 17, 22, 27, and 29, 2018, and August 5, 14, 21, 24, and 28, 2018, the COs on duty reported Plaintiff "refused" both showers and recreation.  (Dkt. No. 24-3 at 37-42, 44, 45, 51, 54, 55, 57.)  On July 20 and 31, 2018, and August 3, 5, 7, and 12, 2018, the COs on duty recorded Plaintiff "refused" showers.  (Dkt. No. 24-3 at 41, 46-50.)  The Court notes it is unclear whether the refusals for showers also applied to recreation on those days, as the recreation columns were left blank.  *Id.*  On July 24, 2018, and August 26, 2018, both the shower

and outside recreation columns were left blank for Plaintiff.  (Dkt. No. 24-3 at 43, 56.)  On

August 19, 2018, the COs drew a line through the shower column and left the recreation column

blank in Plaintiff's row.  (Dkt. No. 24-3 at 53.)  It is unclear to the Court whether the blank

spaces and lines are equivalent to refusals or something else.

      However, Plaintiff gives a different version of events—mainly, he did not refuse showers

and recreation, but he was unable to take a shower or go to recreation without assistance from his

cane or medical boots.  Plaintiff testified as follows:

> Q.    . . . So you would ask to take a shower.  They would refuse
>     to give your cane and they would refuse to let you take a
>     shower?
> A.    That's correct.
> Q.    Okay.  Approximately how many showers did you take
>     during your time at -- in the box at Shawangunk?
> A.    None.
> Q.    And is that because they refused to let you take a shower?
> A.    Well, first they denied giving me the cane, and then they
>     said that if I couldn't go without the cane that I wasn't
>     going to be able to take a shower.
> Q.    Okay.  So you're saying then that you were unable to walk
>     to the shower because you didn't have a cane?
> A.    That's – that's correct.
> Q.    So is it that they denied your shower because you couldn't
>     walk to the shower?
> A.    Correct.

(Dkt. No. 24-6 at 36-37.)

> Q.    . . .Could you explain why, in your opinion, they did not let
>     you go to recreation?
> A.    Because they told me that they couldn't bring me the cane
>     or the medical boot.
> Q.    Okay.  So was this the same reason as in the -- with the
>     showers?
> A.    That's correct.
> Q.    Okay.  So is it right to say that because you could not walk
>     to recreation or the showers, you were not permitted to go
>     there?
> A.    That's correct, because without the boot or without the
>     cane, I couldn't walk.

> Q.    Did you decline . . . the opportunity to go to recreation, or
>        was it they said you could not go at all?
> A.    They told me that I couldn't go because they weren't going
>        to bring me the boots or the cane.
> Q.    And to confirm, during your time in the box, you never got
>        to go to recreation?
> A.    That's correct.
> Q.    Same with the showers?
> A.    That's correct.

(Dkt. No. 24-6 at 38-39)

### i.    Legal Standards Regarding Exercise and Recreation

"[E]xercise is one of the basic human needs protected by the Eighth Amendment."

*Williams v. Goord I*, 111 F. Supp. 2d 280, 292 (S.D.N.Y. 2000); *McCray v. Lee*, 963 F.3d 110,

120 (2d Cir. 2020) ("In this Circuit the rights of prisoners to a meaningful opportunity for

physical exercise had been clearly established.").  "However, not every deprivation of exercise

amounts to a constitutional violation.  Rather, a plaintiff must show that he was denied all

meaningful exercise for a substantial period of time."  *Williams v. Goord II*, 142 F. Supp. 2d 416,

425 (S.D.N.Y. 2001) (hereinafter *Goord II*).  "Factors to consider in making this determination

are: (1) the duration of the deprivation; (2) the extent of the deprivation; (3) the availability of

other out-of-cell activities; (4) the opportunity for in-cell exercise; and (5) the justification for the

deprivation."  *Id.*

Courts have granted summary judgment to prisoners where the magnitude of the

deprivation of exercise was "patent." *Id.*; *see, e.g., Williams v. Greifinger,* 918 F. Supp. 91, 98

(S.D.N.Y.) (holding plaintiff was entitled to summary judgment on Eighth Amendment claim

because he was deprived of exercise for 589 days), *rev'd on other grounds,* 97 F.3d 699 (1996);

*Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir. 1996) (upholding preliminary injunction requiring

prison officials to release inmate from medical keeplock when inmate was only allowed out of

cell ten minutes per week for over three and a half years); *McCray v. Lee*, 963 F.3d 110, 117-18

(2d Cir. 2020) (finding plaintiff's Eighth Amendment damages claims for denial of physical exercise against certain defendants should not have been dismissed when plaintiff had alleged he did not have room to exercise in his cell and was denied any meaningful exercise opportunity for four months); *Goord II*, 142 F. Supp. 2d at 426-29 (finding genuine issues of material fact precluded summary judgment on inmate's Eighth Amendment claim he was deprived of meaningful exercise for 28 days).

However, depriving a prisoner of exercise for a relatively brief period of time has resulted in summary judgment in defendants' favor. *Goord II*, 142 F. Supp. 2d at 426; *see, e.g.*, *Barnes v. Craft*, No. 04-CV-1269, 2008 WL 3884369 (NAM/GHL), at *9 (N.D.N.Y. Aug. 18, 2008) (denial of outdoor exercise "for six days [was] simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation."); *Gibson v. City of N.Y.*, 96 Civ. 3409, 1998 WL 146688, at *3 (S.D.N.Y. Mar. 25, 1998) (finding the "deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days" was not sufficiently serious); *Davidson v. Coughlin*, 968 F. Supp. 121, 131 (S.D.N.Y. 1997) (deprivation of outdoor exercise for fourteen days did not violate Eighth Amendment). Indeed, "an occasional day without exercise when weather conditions preclude outdoor activities . . . is not cruel and unusual punishment." *Anderson v. Coughlin*, 757 F.2d 33, 36 (2d Cir. 1985).

### ii.    Legal Standards Regarding Showers

Inmates also have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Walker v. Schult,* 717 F.3d 119, 127 (2d Cir. 2013). District courts within the Second Circuit have held a temporary denial of access to showers does not rise to the level of a serious deprivation of a human need. *See George v. McGinnis*, No. 05-

CV-84 (SR), 2008 WL 4412109, at *4-5 (W.D.N.Y. Sept. 23, 2008) (deprivation of showers for thirteen days does not satisfy the objective element of an Eighth Amendment claim); *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) (dismissing Eighth Amendment claims as insufficient under the objective test because "a two-week suspension of shower privileges does not suffice as a denial of 'basic hygienic needs'") (citation omitted); *Waring v. Meachum*, 175 F. Supp. 2d 230, 242 (D. Conn. 2001) ("[T]he prohibition of showers and failure to provide a change of clothing during the seven day lockdown period does not demonstrate that plaintiffs were deprived of a minimum civilized level of life's necessities"); *Rogers v. Faucher*, No. 3:18-cv-01809 (JCH), 2019 WL 1083690, at *5 (D. Conn. Mar. 7, 2019) (five day deprivation of shower use did not constitute sufficiently serious deprivation of a human need).

### iii.    Analysis

Construed liberally, Plaintiff alleges he was constructively denied recreation and showers because he physically could not walk to these activities and COs Olivo and Vitarius refused to give him his medical boots or cane.  (Dkt. No. 1 at 6-7, 53; Dkt. No. 24-6 at 36-39.)  As a result, his inability to walk to these activities was presumed to be a refusal.  (*See id.*; Dkt. No. 24-3 at 37-42, 44-50, 51, 54, 55, 57.)  The Court finds this case to be analogous to the Fourth Circuit case, *Rivera v. Mathena*, 795 F. App'x 169 (4th Cir. 2019), where plaintiff Rivera alleged he was denied a "meaningful opportunity to shower and exercise because he was asleep when corrections officers took the shower and exercise list and [he] was [thus] deemed to have 'refused' the opportunities." *Id.* at 173 (citation omitted).  Rivera was an inmate in segregation who was often alone in his cell for twenty-four hours a day without an alarm clock. *Id.*  Prison staff refused to wake Rivera during shower and recreation callouts or accept his shower and recreation requests made by leaving a note or asking staff in person at a later time. *Id.*

The Fourth Circuit held for Rivera to have waived his right to Eighth Amendment constitutional protections, he would need to have shown an "intentional relinquishment" of these protections because the court does "not presume acquiescence in the loss of fundamental rights." *Id*. (internal quotation marks and citations omitted). While the district court held it was Rivera's choice not to shower and exercise, the Fourth Circuit found Rivera did not "form the intention to waive Eighth Amendment protections against cruel and unusual punishments" while he was sleeping. *Id.* (internal quotation marks and citations omitted).

The Fourth Circuit noted "two months without showers and recreation can be sufficient to support an Eighth Amendment claim." *Id.* at 174 (citing *Brown v. Lamanna*, 304 F. App'x 206, 208 (4th Cir. 2008)). Rivera demonstrated he had received far fewer than the five hours of recreation and three showers each week he should have been permitted while in segregation. *Id.* at 174-75. Notably, at one point, he did not shower for almost eight weeks and did not exercise for about two months. *Id.* at 175. The Court found there was sufficient evidence to establish genuine issues of material fact as to the objective prong of the conditions of confinement claim. *Id*. at 174-75. Specifically, "[t]he combination and duration of the shower and exercise deprivations were sufficiently lengthy and severe over the course of Rivera's four years in segregation to provoke" constitutional concerns. *Id.* at 175. Rivera suffered injuries and "faced a substantial risk of serious harm as a result of long periods without showers and recreation." *Id.*

The Court also found Rivera presented enough evidence to create a genuine issue of fact "as to whether prison staff had notice of both Rivera's shower and exercise deprivations and their impact on Rivera's physical and mental health" and once they were aware, whether they should have taken corrective action. *Id.* at 176. Rivera had filed numerous grievances challenging the denial of showers and recreation—alerting the staff to these issues. *Id.* When

prison staff responded to these complaints, they showed "they knew Rivera was being denied showers and recreation against his will." *Id.* Additionally, Rivera had told prison staff how the denial of showers and exercise was adversely affecting his health; he left notes on his door requesting showers and recreation; and showed certain defendants a doctor's note stating he was required to wash off his fungal medication on the days showers were offered. *Id.* There were also log sheets posted on Rivera's cell door showing he had missed extensive shower and exercise opportunities, which prison staff "would have seen." *Id.* Even if Rivera had not advised certain defendants he was suffering mental and physical harm as a result of the denial of regular recreation and showers, "the risks posed would have been obvious to them." *Id.*

Similarly, here, COs Olivo and Vitarius appear to have offered Plaintiff the opportunity to shower and exercise. (Dkt. No. 24-4 at 2; Dkt. No. 24-5 at 2.) However, there is a genuine issue of material fact whether Plaintiff intentionally relinquished his Eighth Amendment protections when he "refused" showers and recreation due to his inability to walk to those activities and, thus, whether he was given the meaningful opportunity to shower and exercise at all. (Dkt. No. 1 at 6-7; Dkt. No. 24-3 at 62.); *Rivera*, 795 F. App'x at 174-76.

As to the objective prong, the Court finds there is a genuine issue of material fact as to whether the denial of showers and recreation for 60 consecutive days in the SHU posed a substantial risk of serious harm to Plaintiff. The Court also finds the Fourth Circuit's assessment in *Rivera* to be persuasive. In other words, the Court holds that approximately 60 days without showers and exercise is "sufficiently lengthy and severe" to raise constitutional concerns and potentially pose "a substantial risk of serious harm" to Plaintiff.[6] *Rivera*, 795 F. App'x at 175.

---

[6] While Plaintiff did not explicitly allege he could not exercise in his cell, the Court finds Plaintiff's testimony he was unable to walk without his medical boots sufficient to demonstrate he was unable to exercise in his cell. (Dkt. No. 24-6 at 27.) *Contra Brogdon v. City of New*

The Court further finds Plaintiff has presented enough evidence to create a genuine issue of fact as to whether COs Olivo and Vitarius were deliberately indifferent to his health or safety. On July 16, 2018, Plaintiff filed a grievance in which he claimed he had been kept in his cell 24 hours a day since July 7, 2018.  (Dkt. No. 24-3 at 62.)  In said grievance, he requested he be allowed to shower and exercise and for his medical boots and cane to be returned to him.  *Id.*  On August 17, 2018, Supt. Collado responded while Plaintiff was not allowed his cane, he could have his medical boots if he had a valid permit.  (Dkt. No. 1 at 53.)  She also advised Plaintiff "must request recreation, and showers on appropriate days, during the morning go around.  This is his responsibility."  *Id.*  This response demonstrates, at least to some extent, prison staff "knew [Plaintiff] was being denied showers and recreation against his will."  *Rivera*, 795 F. App'x at 176.  Furthermore, in his appeal statement dated August 29, 2018, Plaintiff reported it had been "54 days" in the SHU without being allowed to shower or exercise because "the officers refused to let [him] use[] [his] cane, and medical boots."  (Dkt. No. 1 at 53.)

Plaintiff filed another grievance on September 2, 2018, requesting his medical boots which he needed "for daily activities."  (Dkt. No. 1 at 50.)  He reported showing his medical permit to the COs in the SHU, but CO Vitarius still refused to allow him to keep his medical boots in his cell.  *Id.*  Even if COs Olivo and Vitarius were unaware of Plaintiff's grievances, there appears to have been conversations between Plaintiff and, at least, CO Vitarius where he

---

*York*, No. 16-CV-8076 (LAK)(RWL), 2018 WL 4762981, at *11 (S.D.N.Y. Aug. 8, 2018) (internal quotation marks and citation omitted) ("Courts have found no violation where the inmate has an opportunity for exercise, either in or outside of his cell"), *objections overruled* 2018 WL 4757947 (S.D.N.Y. Oct. 1, 2018); *see also Huggins v. Schriro*, No. 14 Civ. 6468, 2015 WL 7345750, at *6-7 (S.D.N.Y. Nov. 19, 2015) (dismissing claim where plaintiff had not alleged that he could not exercise in his cell), *report and recommendation adopted* 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016).

explained his need for his medical boots or cane to go shower or exercise.  (Dkt. No. 24-6 at 36-39.)  These conversations should have put COs Olivo and Vitarius on notice Plaintiff had not showered or exercised during his time in the SHU.  *Rivera*, 795 F. App'x at 175.  Moreover, the SHU logs showing Plaintiff had not showered or exercised for weeks should have put COs Olivo and Vitarius on notice of this ongoing issue.  *Id.*  Therefore, because there are issues of fact as to whether Plaintiff's lack of showers and recreation was objectively serious and whether COs Olivo and Vitarius were deliberately indifferent to Plaintiff's health or safety, the Court recommends denying summary judgment as to these claims.

### C.    Harassment

Plaintiff alleges COs Olivo and Vitarius "harass[ed] him every time they pass[ed] in front of his cell."  (Dkt. No. 1 at 6.)  He had previously filed a grievance stating CO Olivo referred to him using racial and religious slurs and told him he did not "deserve to live."  (Dkt. No. 24-5 at 44-46.)  During the subsequent investigation, Sgt. Dangelewicz interviewed Plaintiff who "reinforced his statement and provided no witnesses to support his claim."  (Dkt. No. 24-3 at 74, 75.)  CO Olivo also submitted a memorandum denying he threatened or harassed Plaintiff.  (Dkt. No. 24-3 at 76.)  Although CO Vitarius is included in Plaintiff's general allegations, Plaintiff does not appear to make any specific allegations of harassment against CO Vitarius.  (*See* Dkt. No. 1 at 6-7.)

Nonetheless, even if COs Olivo and Vitarius verbally harassed Plaintiff "[i]t is well established in the Second Circuit that verbal harassment of inmates by prison officials, unaccompanied by any injury—no matter how inappropriate, unprofessional, or reprehensible it might seem—does not rise to the level of a violation of the Eighth Amendment."  *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 490 (N.D.N.Y. 2009).  Threats, unaccompanied by any injury, also do not amount to such a violation.  *Id.*  Generally, injuries in these types of claims must be

physical in nature. *Id.* However, "under certain circumstances, a prison official's infliction of psychological pain on an inmate may constitute an Eighth Amendment violation" if the psychological pain is "(1) intentionally inflicted and (2) more than *de minimis* in nature." *Id.* at 491. Psychological injuries considered more than *de minimis* in nature include "depression, nausea, hyperventilation, headaches, insomnia, dizziness, and/or weight loss." *Id.* at 492.

Plaintiff has not demonstrated that, at any point during his stay in the SHU, CO Olivo's and/or CO Vitarius' harassment caused him more than *de minimis* psychological injuries. As a result, "[e]ven when construed with the utmost of special leniency" Plaintiff has not created a question of material fact as to whether CO Olivo's and CO Vitarius' alleged conduct violated the Eighth Amendment. *Id.* Therefore, for the reasons set forth above, the Court recommends granting summary judgment as to these claims.

### D.    Retaliation

Plaintiff alleges CO Vitarius microwaved all the food on his kosher tray and threw out his medical boots in retaliation for Plaintiff filing a grievance against him. (Dkt. No. 1 at 7-8, 14-15, 53.) Plaintiff claims he had his medical boots for "outside medical trips" on August 16, 2018, and August 17, 2018. (Dkt. No. 1 at 50.) However, on August 29, 2018, when Plaintiff was moved from the SHU, he claims CO Vitarius "refused to brought to me the items in my SHU-Box he . . . said that he put them together with the rest of my other property, but my medical boots was not there with my other property." *Id.* When he inquired about his medical boots, CO Vitarius "said that he couldn't found my medical boots in my SHU-box or in the SHU." *Id.* CO Vitarius claims he was unaware of Plaintiff's grievances, he did not destroy or throw away Plaintiff's medical boots, and he did not tamper with Plaintiff's food. (Dkt. No. 24-4 at 4.)

To prove a First Amendment retaliation claim, "a prisoner must show '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'" *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009)).

To demonstrate a prison official took adverse action against him, the plaintiff must show the defendant's retaliatory conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights . . . . Otherwise, the retaliatory act is simply *de minimis,* and therefore outside the ambit of constitutional protection." *Id.* (internal quotation marks and citations omitted). In determining whether there is causal connection between the protected speech and the adverse action, a court may consider a number of factors, including "any statements made by the defendant concerning his motivation" and "the temporal proximity between the protected activity and the defendant's adverse action." *Id.* (internal quotation marks and citations omitted). Prisoners' claims of retaliation must be examined with skepticism and particular care because they are "prone to abuse since prisoners can claim retaliation for every decision they dislike." *Id.* at 367 (internal quotation marks and citations omitted).

Here, Plaintiff has met the first prong of the retaliation inquiry because "[i]t is well settled that the filing of a prison grievance is a protected activity." *Id.* (quoting *Mateo v. Fischer,* 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010)). However, Plaintiff has failed to show CO Vitarius actually took an adverse action against him. *Key v. Toussaint*, 660 F. Supp. 2d 518, 526 (S.D.N.Y. 2009). To prevail on a retaliation claim involving missing property, Plaintiff must show both (1) CO Vitarius "intentionally" or "deliberately" lost or destroyed his property and (2)

27

that CO Vitarius was "personally involved" in doing so.  *Id.* (internal quotation marks and

citations omitted).  In light of the Second Circuit's admonition that retaliation claims must be

examined with skepticism and great care, the evidence in this case is not sufficient to allow a

reasonable jury to find CO Vitarius intentionally lost or destroyed Plaintiff's property.  *Id.*

The record lacks any evidence CO Vitarius took adverse action against Plaintiff for the

grievances he filed by intentionally losing or destroying his medical boots.  Indeed, it is unclear

to the Court whether CO Vitarius ever actually took possession of Plaintiff's medical boots.  (*See*

Dkt. No. at 1 at 50.)  However, even if he had, there is no evidence to suggest CO Vitarius was

the exclusive custodian of the boots; Plaintiff simply claims "[n]o prisoner had access to his box"

containing his boots.  (Dkt. No. 28-1 at 26); *see Roseboro*, 791 F. Supp. 2d at 375; *Key*, 660 F.

Supp. 2d 526.  "The mechanism for storing [Plaintiff's] property and its chain of custody is

simply unknown" and therefore the boots "might have been simply lost or misplaced . . . and not

intentionally destroyed."  *Key*, 660 F. Supp. 2d at 526; *see also Roseboro*, 791 F. Supp. 2d at

375.  Moreover, Plaintiff acknowledged he received his other property when leaving the SHU.

(Dkt. No. 1 at 50; Dkt. No. 28-1 at 26.)  The return of a portion of Plaintiff's property "suggests

that there was no intentional act on any particular person's part to lose or destroy his property."

*Key*, 660 F. Supp. 2d at 526.

In sum, the Court recommends granting summary judgment as to the retaliation claim

because there is insufficient evidence for a reasonable jury to conclude CO Vitarius retaliated

against Plaintiff.  *See Key*, 660 F. Supp. 2d at 526–27 (granting summary judgment to defendant

corrections officers on First Amendment retaliation claim alleging intentional loss or destruction

of property where there "[wa]s no evidence that [the defendants] were the exclusive custodians

of the property after they took possession of it" prior to the plaintiff's transfer to another

correctional facility; "[t]he mechanism for storing [the plaintiff's] property and its chain of custody [wa]s simply unknown"; and the return of a portion of plaintiff's property suggested there was no intentional act to lose or destroy plaintiff's property.)

### E.    Qualified Immunity

Defendants COs Olivo and Vitarius argue, in the alternative, they are entitled to qualified immunity on Plaintiff's claims.  (Dkt. No. 24-2 at 18-19.)  Because the Court has recommended granting summary judgment to all claims except the conditions of confinement claims with respect to Plaintiff's access to showers and recreation, the Court only addresses whether Defendants are entitled to qualified immunity as to those claims.

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first prong "asks whether the facts, taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a federal right" and the second prong "asks whether the right in question was clearly established at the time of the violation."  *Raspardo v. Carlone*, 770 F.3d 97, 113 (2d Cir. 2014).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Garcia v. Univ. of Connecticut Health Care Ctr.*, No. 3:16-CV-852 (JCH), 2018 WL 5830840, at *16 (D. Conn. Nov. 7, 2018) (internal quotation marks and citation omitted).  The Supreme Court has held a court may consider these two questions in either order and, if it determines one prong is not satisfied, it need not reach the other.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Even where a right is clearly established, an officer is entitled to qualified immunity if "it was objectively reasonable for the defendant to believe that his action did not violate such law."  *Poe v. Leonard*, 282 F.3d 123, 133 (2d Cir. 2002).  An officer's actions are objectively

reasonable if "officers of reasonable competence could disagree on the legality of the defendants' actions." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001). "[I]f the court determines that the only conclusion a rational jury could reach is that reasonable officers [at the time of the alleged constitutional violation] would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate." *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995).

Whether a defendant's conduct was objectively reasonable, that is, "whether a reasonable official in the defendant's position would reasonably believe his conduct did not violate a clearly established right," is a mixed question of law and fact. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). "Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts . . . if there is such a dispute, the factual questions must be resolved by the factfinder." *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004) (citations omitted).

Here, COs Olivo and Vitarius argue they are entitled to qualified immunity because their actions were "objectively reasonable" as to Plaintiff's allegation he was denied showers and recreation because "he knowingly refused these opportunities." (Dkt. No. 24-2 at 19.) "The court first addresses whether the facts, viewed in the light most favorable to the [P]laintiff, show that the officers' conduct violated a constitutional right." *Garcia*, 2018 WL 5830840, at *16.

Plaintiff alleges COs Olivo and Vitarius denied him use of his medical boots after he showed them his valid medical permit.[7] (Dkt. No. 1 at 6.) As a result, Plaintiff was unable to

---

[7] As discussed in more detail above, Defendants denying Plaintiff the use of his medical boots or cane did not, in and of itself, violate the Eighth Amendment. *See supra* Section III.B.3. Moreover, because canes were prohibited in the SHU for valid safety and security reasons, the Court will only address the denial of Plaintiff's medical boots, as those were allowed with a valid medical permit. *See id.*

walk to the showers or recreation and, therefore, was constructively denied the meaningful

opportunity to partake in these activities during his entire 60 day stay in the SHU. (Dkt. No. 1 at

6-7, 53; Dkt. No. 24-6 at 36-39.) As noted in more detail above, long periods of time without a

meaningful opportunity to shower or exercise can constitute conditions of confinement which

violate the Eighth Amendment. *See Goord II*, 142 F. Supp. 2d at 426-29; *Rivera*, 795 F. App'x

at 174-75. Defendants contend Plaintiff refused showers and recreation of his own accord. (Dkt.

No. 24-4 at 2; Dkt. No. 24-5 at 2.) However, here, the Court "may not resolve genuine disputes

of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656

(2014). Viewing the evidence in the light most favorable to Plaintiff, the Court concludes a

rational jury could find CO Olivo and CO Vitarius constructively denied Plaintiff a meaningful

opportunity to shower and exercise for 60 days and "[s]uch conduct was sufficiently serious to

constitute a constitutional deprivation at the time." *Garcia*, 2018 WL 5830840, at *16.

    The second prong of the qualified immunity analysis is whether the right that the

defendants allegedly violated was clearly established at the time of their conduct, that is, whether

"the rights that plaintiff asserts were violated [were] clearly established in a particularized sense,

so that a reasonable official would know that his actions violated plaintiff's rights." *P.C. v.

McLaughlin*, 913 F.2d 1033, 1039 (2d Cir. 1990) (internal quotation omitted). As noted above,

clearly established law at the time of the incident provided inmates are entitled to basic human

needs, such as showers and recreation. *See Goord II*, 142 F. Supp. 2d at 426-29; *Rivera*, 795 F.

App'x at 174-75. Thus, the right upon which his claim is based was clearly established at the

time in question.

    As previously mentioned, even where a right is clearly established, a defendant will be

entitled to qualified immunity if, at the time of the alleged acts, it would have been "objectively

reasonable for the defendant to believe that his action did not violate such law." *Poe v. Leonard*, 282 F.3d at 133.  In other words, the defendants are entitled to qualified immunity if reasonable officers at the time would disagree that the defendants' conduct violated Plaintiff's constitutional rights.  *See id.*

The first question in the "objectively reasonable" analysis "is whether it was objectively reasonable for the officers to believe [Plaintiff's] deprivation was not sufficiently serious to meet the objective element of an Eighth Amendment claim." *Garcia*, 2018 WL 5830840, at *17.  At the time of the alleged violations in question, the Second Circuit had held there was "no static test to determine whether a deprivation is sufficiently serious, and that the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)) (alterations and citation omitted).  The Second Circuit had also held "prisoners may not be deprived of their basic human needs," including food, clothing, shelter, and reasonable safety.  *Id.* (quoting *Jabbar*, 683 F.3d at 57.)  The Court concludes, if the jury credits Plaintiff's testimony, the alleged denial of showers and recreation for 60 days would amount to a serious deprivation of basic needs sufficient to meet the first element of an Eighth Amendment claim.

The second question is whether COs Olivo and Vitarius "are entitled to qualified immunity because it was objectively reasonable for the defendants to believe their conduct did not violate [Plaintiff's] Eighth Amendment right." *Id.*  As previously discussed, "to satisfy the subjective deliberate indifference element under the Eighth Amendment, a plaintiff must prove officers knew of, and disregarded, an excessive risk to health or safety." *Id.*  Here, Plaintiff filed multiple grievances and appeals requesting showers and recreation and his medical boots which he needed "for daily activities."  (Dkt. No. 1 at 50, 53; Dkt. No. 24-3 at 62.)  He also reported

showing the COs in the SHU his valid permit for his medical boots, but CO Vitarius still refused to permit him to keep his medical boots in his cell. (Dkt. No. 1 at 50.) Finally, the SHU logs showed Plaintiff had not showered or gone to recreation in weeks. (Dkt. No. 24-3 at 37-42, 44-50, 51, 54, 55, 57.)

As discussed in more detail above, Plaintiff's actions and the SHU logs should have put COs Olivo and Vitarius on notice of this ongoing issue. *Rivera*, 795 F. App'x at 175. Viewing the evidence in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, the Court concludes a rational jury could find COs Olivo and Vitarius denied Plaintiff showers and recreation by denying him access to his medical boots. The Court also concludes a rational jury could find COs Olivo and Vitarius knew of and disregarded an excessive risk to Plaintiff's health and safety when they failed provide Plaintiff with a meaningful opportunity to shower and exercise, or that the risk to Plaintiff's health and safety was "obvious or otherwise must have been known to [the] defendants." *Walker*, 717 F.3d at 125.

Because a reasonable trier of fact could find CO Olivo's and CO Vitarius' actions were objectively unreasonable, the Court recommends denying COs Olivo and Vitarius summary judgment on qualified immunity grounds. *See Lennon*, 66 F.3d at 420 ("If any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment.").

## IV.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 24-2) be **GRANTED** in part and **DENIED** in part as follows: (1) the Eighth Amendment conditions of

33

confinement claims against Lt. Connors be dismissed; (2) the First Amendment Retaliation claim against CO Vitarius be dismissed; (3) the Eighth Amendment harassment claims against COs Olivo and Vitarius be dismissed; (4) the Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius regarding the alleged tampering with of Plaintiff's kosher meals, the denial of laundry, and the denial of Plaintiff's cane and medical boots be dismissed; and (5) the Eighth Amendment conditions of confinement claims against COs Olivo and Vitarius regarding the alleged denial of showers and recreation proceed to trial; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*); and that the Clerk correct the spelling of Defendant Vitarius' last name.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[8]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**SO ORDERED.**

---

[8]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Dated: August 7, 2023
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

Harrison v. Broderick, Slip Copy (2022)

2022 WL 16837366

2022 WL 16837366
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Stoney HARRISON, Plaintiff,

v.

Kelli BRODERICK, Stephany Miller,
James Johnson, Bishme Nelson, Frederick
Kintzel, and Kevin Brown, Defendants.

18-CV-821JLS(F)
|
Signed August 18, 2022

**Attorneys and Law Firms**

STONEY HARRISON, Pro se, 88T1745, Wende
Correctional Facility, Box 1187, Alden, New York
14004-1187

LETITIA A. JAMES, ATTORNEY GENERAL, STATE OF
NEW YORK, Attorney for Defendants, KATHLEEN M.
KACZOR, Assistant Attorney General, of Counsel, Main
Place Tower, Suite 300A, 350 Main Street, Buffalo, New York
14202

REPORT and RECOMMENDATION

LESLIE G. FOSCHIO, UNITED STATES MAGISTRATE
JUDGE

### JURISDICTION

**\*1** This case was referred to the undersigned by Honorable
John L. Sinatra, Jr. on September 16, 2020, for all pretrial
matters including preparation of a report and recommendation
on dispositive motions. The matter is presently before the
court on Defendants' motion for judgment on the pleadings
filed October 14, 2021 (Dkt. 31).

### BACKGROUND

Plaintiff, an inmate in the custody of New York State
Department of Corrections and Community Supervision
("DOCCS") and proceeding *pro se*, commenced this civil
rights action pursuant to 42 U.S.C. § 1983 alleging that upon
being transferred to Wende Correctional Facility ("Wende"),

Defendants, all employees of DOCCS, denied Plaintiff his
rights to the free exercise of his religion, Nation of Islam,
in violation of the First Amendment and the Religious
Land Use and Institutionalized Persons Act of 2000, 42
U.S.C. § 2000cc, *et seq.* ("RLUIPA"), by confiscating a
religious pendant maintaining both the pendant and chain on
which it was hung exceeded the dimensions permitted by
the relevant DOCCS regulations. In an Order filed January
14, 2020 (Dkt. 11) ("January 14, 2020 Order"), District
Judge Lawrence J. Vilardo [1] granted Plaintiff's motion for
leave to proceed *in forma pauperis* (Dkt. 7), and screened
Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2)
(B) and § 1915A, and ordered the Complaint be dismissed
unless Plaintiff, within 45 days, filed an amended complaint
specifically alleging that Defendants' actions substantially
burdened Plaintiff's exercise of his religion, noting that
although Plaintiff was not required to show he was prevented
from doing something expressly required by his religion,
or compelled to do something expressly forbidden by his
religion, Plaintiff "should ground his professed belief in some
Nation of Islam custom or teaching." January 14, 2020 Order
at 7 & n. 1. Judge Vilardo also dismissed with prejudice
Plaintiff's RLUIPA claims for money damages asserted
against Defendants in their official capacities because such
claims are foreclosed by sovereign immunity. *Id.* at 8-9.

[1]     By Text Order entered September 15, 2020, the
action was reassigned to District Judge Sinatra.

On February 3, 2020, Plaintiff filed an Amended Complaint
(Dkt. 13) ("Amended Complaint"), attaching exhibits 1
through 28 ("Plaintiff's Exh(s). __"). Plaintiff names as
Defendants DOCCS Correctional Officer ("C.O.") Kelli
Broderick ("Broderick"), C.O. Stephany Miller ("Miller"),
Correctional Sergeant James Johnson ("Johnson"), Wende
Coordinating Chaplain Bishme Nelson ("Imam Nelson"),
Inmate Grievance Program Sergeant Frederick Kintzel
("Kintzel"), and Wende Deputy Superintendent for Security
Kevin Brown ("Brown") (together, "Defendants"). On
February 7, 2020, Judge Vilardo screened the Amended
Complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and §
1915A, February 7, 2020 Order (Dkt. 14) ("February 7,
2020 Order"), finding Plaintiff's repleaded First Amendment
and RLUIPA claims for injunctive and declaratory relief
could proceed, but that Plaintiff's claims for money damages
against Defendants in their official capacities were barred by
Eleventh Amendment immunity. February 7, 2020 Order at
2-3. On October 13, 2021, Defendants filed an answer to the
Amended Complaint (Dkt. 30).

**\*2**  On October 14, 2021, Defendants filed the instant motion for judgment on the pleadings (Dkt. 30) ("Defendants' Motion"), attaching the Memorandum of Law in Support of Defendants' Motion to Dismiss on the Pleadings Under Rule 12(c) (Dkt. 31-1) ("Defendants' Memorandum"). On November 10, 2021, Plaintiff filed his response generally opposing Defendants' Motion (Dkt. 33) ("Plaintiff's Response"). On November 29, 2021, Defendants filed the Reply Memorandum of Law in Further Support of Defendants' Motion for Judgement on the Pleadings (Dkt. 34) ("Defendants' Reply"). By letter to the undersigned filed February 25, 2022, Plaintiff, without obtaining the court's approval, filed a photograph which Plaintiff maintains depicts the subject pendant. (Dkt. 35) ("Plaintiff's Sur-Reply"). Oral argument was deemed unnecessary.

Based on the following, Defendants' Motion should be GRANTED in part and DENIED in part.

## FACTS [2]

[2]    Taken from the pleadings filed in this action.

On November 19, 2017, Plaintiff Stoney Harrison ("Plaintiff" or "Harrison"), an inmate in the custody of New York State Department of Corrections and Community Supervision ("DOCCS"), was transferred into Wende Correctional Facility ("Wende" or "the correctional facility"), and Plaintiff requested non-party C.O. Wyman ("Wyman") issue Plaintiff a permit for his personal property including, *inter alia*, a religious pendant ("pendant" or "medallion"). [3]    Plaintiff maintains wearing the pendant is central to his exercise of the Muslim religion because certain Islamic symbols, including the star and crescent moon depicted on the pendant, propagate Islamic ideology and distinguish Plaintiff from the many Christian inmates. Wyman advised Plaintiff the requested permits were issued by the package room. On November 21, 2017, Plaintiff was called to Wende's package room, where Plaintiff asked Defendant Broderick for a permit for his pendant and other items, prompting Broderick to request to see the pendant. Plaintiff complied, removing the pendant and the chain ("chain") on which it hung from his neck and handing the pendant and chain to Broderick who advised the chain exceeded the 18″ length permitted by the relevant DOCCS regulation. Plaintiff requested a copy of DOCCS Directive # 4911 ("Directive # 4911"), [4]    and showed Broderick the 18″ length limit pertains only to female

jewelry, and that there was no similar restriction for religious pendants under the "Religious Articles" section of Directive # 4911. At Broderick's request, Defendant Miller joined the discussion, but neither Broderick nor Miller conceded Plaintiff's construction of Directive # 4911 was correct, and Broderick confiscated the pendant and chain, providing Plaintiff with a receipt for both items. Plaintiff completed the required form to request a review of the confiscation, but the confiscation was upheld on review on November 23, 2017, with Plaintiff told Defendant Johnson advised the chain's length of 24″ exceeded the maximum 18″ length permitted.

[3]    Although Plaintiff requested a permit for the pendant, the context of the Amended Complaint establishes Plaintiff was wearing the pendant and the requested permit would permit Plaintiff to continue to wear the pendant at Wende.

[4]    A copy of the relevant portions of DOCCS Directive # 4911 is filed as Plaintiff's Exh. 2 (Dkt. 13 at 20-21). Although Directive # 4911 pertains to "Packages & Articles Sent or Brought to Facilities," DOCCS Directive # 4202 pertaining to "Religious Programs and Practices" specifically provides that the permitted size or design of "religious medallions, beads, and shrines" are "subject to the provisions of Directive # 4911 ...."

Later on November 23, 2017, Plaintiff provided Miller with a copy of a March 16, 2016 decision issued by DOCCSs' Inmate Grievance Program ("IGP") Central Office Review Committee ("CORC") ("March 16, 2016 CORC Decision") [5] finding with regard to a previously filed inmate grievance [6] that Directive # 4911 does not limit the length of a religious chain [7] to 18″; rather, a security review should be conducted to determine whether a religious chain posed a security threat based on its length or thickness. Miller asked why she did not have a copy of the March 16, 2016 CORC Decision, and Plaintiff again asked Miller to return his chain and pendant, but Miller refused, telling Plaintiff to have for a visitor to pick up the chain within 14 days, or to arrange for an alternative method for disposing of the chain and pendant. Amended Complaint ¶ 12. Plaintiff filed an inmate grievance ("the grievance") regarding the confiscation of his chain and pendant on November 23, 2017.

[5]    Plaintiff's Exh. 7 (Dkt. 13 at 30-31).

6    Nothing in the record indicates, nor does Plaintiff argue, that the March 16, 2016 CORC Decision pertained to an inmate grievance filed by Plaintiff. That the March 16, 2016 CORC Decision states the inmate sought restitution for the unwarranted confiscation of a cross and religious chain, suggesting the Plaintiff in the instant action, who alleges he is a Muslim, was not the grievant relative to the March 16, 2016 CORC Decision.

7    The term "religious chain" pertains to a chain on which a religious pendant or medallion is hung.

**\*3**  Plaintiff maintains he was advised by the inmate grievance clerk that Defendants Imam Nelson and Kintzel would investigate the grievance after which Plaintiff's chain would be returned to him. Plaintiff saw Imam Nelson at orientation where Plaintiff asked Imam Nelson if he had seen Plaintiff's grievance. Imam Nelson responded he had seen the grievance and intended to advise Wende's package room staff that Directive # 4911 did not prohibit Plaintiff from possessing the chain. According to Imam Nelson, Wende's package room staff "felt some kind of way [*sic*] because Plaintiff reached over the counter and tried to take the chain out of CO Broderick's hand." Amended Complaint ¶ 18. Imam Nelson further advised Plaintiff the package room staff was then asserting the pendant measured more than the allowed 2″ in diameter. At a hearing on Plaintiff's grievance ("grievance"),[8] Plaintiff was advised by the hearing officer, Defendant Kintzel, that the pendant's diameter exceeded 2″, but Plaintiff's request to have the pendant measured to confirm the pendant's diameter was refused, and Plaintiff was advised that he could have the chain but not the pendant, and the chain would be held by the Inmate Records Coordinator ("IRC") until Plaintiff received a pendant that complied with the permitted dimensions, *i.e.*, a "compliant pendant," and that Plaintiff had to send home the pendant that was confiscated from him. Grievance Decision.[9] Plaintiff did not then arrange for the pendant to be sent home, but appealed the grievance decision to the Superintendent who, on December 12, 2017, upheld the decision ("Superintendent's Decision").[10]

8    The date of the grievance hearing is not in the record.

9    Plaintiff's Exh. 12 (Dkt. 13 at 42).

10    Plaintiff's Exh. 14 (Dkt. 13 at 47).

On April 18, 2018, Plaintiff completed paperwork to have the pendant be sent to the store from which it was purchased, requesting the pendant be measured, and the pendant was mailed out of the correctional facility. On February 27, 2019, CORC, upon further review, issued a decision ("CORC Decision"),[11] affirming the Superintendent's Decision and noting Plaintiff's grievance was granted with regard to the chain which was provided to Plaintiff after Plaintiff was issued a religious pendant that complied with the specifications of Directive # 4911. Additional letters Plaintiff wrote to Defendants Brown and the facility superintendent did not provide Plaintiff with any further relief.

11    Plaintiff's Exh. 15 (Dkt. 13 at 51).

## DISCUSSION

### 1. Judgment on the Pleadings

Defendants move pursuant to Fed.R.Civ.P. 12(c) ("Rule 12__"), for judgment on the pleadings. " 'The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim.' " *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021) (quoting *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020)). " 'To survive a Rule 12(c) motion, [the plaintiff's][12] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (bracketed material in original)). " 'The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief ... calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal conduct.' " *Id.* (quoting *Lynch*, 952 F.3d at 75 (internal quotation marks omitted)). In making this assessment, all reasonable inferences must be drawn in the plaintiff's favor. *Id.* (citing *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009)). Like a motion under Rule 12(b)(6), a motion under Rule 12(c) may be filed before discovery is complete. *See* Fed. R. Civ. P. 12(c) (permitting motion "[a]fter the pleadings are closed —but early enough not to delay trial"). Nevertheless, "[u]ntil both parties have an opportunity to test their evidence at summary judgment or trial, we must accept the non-movant's pleading as true and decline to weigh competing allegations asserted by the moving party." *Lively*, 6 F.4th at 301.

12    Unless otherwise indicated, bracketed material has been added.

" '[J]udgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial.' " *Lively*, 6 F.4th at 301 (quoting *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp.*, 933 F.3d 751, 761 (D.C. Cir. 2019) (internal quotation marks omitted)); *see also Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) (explaining that dismissal under Rule 12(c) is appropriate for self-defeating complaints—*i.e.*, complaints "whose allegations show that there is an airtight defense"). Accordingly, "where a 'question [of fact] is in dispute, it [is] improper for the district court to answer it on a motion for dismissal on the pleadings.' " *Id.* at 302 (quoting *Sheppard v. Beerman*, 18 F.3d 147, 151 (2d Cir. 1994)); and citing 5C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1367 (3d ed. 2021) ("[J]udgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.")). A court thus "may consider undisputed allegations of fact on a Rule 12(c) motion under the same standard as Rule 12(b)(6), but it may not use a motion for judgment on the pleadings to weigh disputed factual allegations." *Id.*

*\*4* In considering a Rule 12(b)(6) motion, the Supreme Court requires application of "a 'plausibility standard,' which is guided by '[t]wo working principles.' " *Harris v. Mills*, 572 F.3d 66, 71-72 (2d Cir. 2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Id.* at 72 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). " 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937). To survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at

570, 127 S.Ct. 1955). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Ashcroft*, 556 U.S. at 678, 129 S.Ct. 1937); *see Twombly*, 550 U.S. at 570, 127 S.Ct. 1955 (the complaint must plead "enough facts to state a claim to relief that is plausible on its face"). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

"In ruling on a 12(b)(6) motion, and thus on a 12(c) motion, a court may consider the complaint as well as 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference.' " *Kalyanaram v. American Ass'n of University Professors at New York Institute of Technology, Inc.*, 742 F.3d 42, 44 n. 1 (2d Cir. 2014) (quoting *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001)) (bracketed material in original). On a motion for judgment on the pleadings, " 'a court may consider ... matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.' " *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted; bracketed material and ellipses in original)).

In the instant case, Plaintiff's claims are asserted pursuant to 42 U.S.C. § 1983 ("§ 1983"), which permits imposing civil liability upon persons who, acting under color of state law, deprive an individual of "rights, privileges, or immunities secured by the Constitution and laws of the United States." *Patterson v. County of Oneida, New York*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting 42 U.S.C. § 1983). Section 1983, however, " 'is not itself a source of substantive rights.' " *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred' ...." *Id.* To succeed on a § 1983 claim, a plaintiff must establish the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). Because Plaintiff's claims assert violations of the First Amendment and the RLUIPA, § 1983 is the proper vehicle for asserting the claims.

Defendants argue in support of judgment on the pleadings that Plaintiff lacks standing to bring claims for prospective relief or any claim against Defendants Broderick, Miller and Johnson against whom Plaintiff fails to allege any injury-in-fact, Defendants' Memorandum at 7-9, sovereign immunity bars Plaintiff's claims for prospective relief, *id.* at 9-10, Plaintiff's claim for money damages fails because no physical injury is alleged, *id.* at 10-11, Plaintiff fails to allege the requisite substantial burden on the exercise of his religion, *id.* at 11-13, Plaintiff's own allegations attribute any alleged violation of his religious freedom to Defendant Nelson, and Defendants Broderick, Miller, and Johnson were, at most, negligent which does not support a § 1983 claim, *id.* at 13-15, no personal involvement is alleged against Defendants Brown, *id.* at 15-17, and Kintzel, *id.* at 17-19, and all of Plaintiff's claims are barred by qualified immunity. *Id.* at 19-22. Plaintiff's Response consists of a general denial of Defendants' arguments in support of judgment on the pleadings, Plaintiff's Response, *passim*. In further support of judgment on the pleadings, Defendants present a summary of their initial arguments. Defendants' Reply, *passim*. The court addresses each of Defendants' arguments in turn.

**\*5**  Preliminarily, insofar as Defendants maintain Plaintiff attaches no religious significance to the chain, because the pendant was hanging from the chain when the chain was confiscated, Defendants' seizure of the chain necessarily included the seizure of the pendant. Accordingly, the court's use of the term "chain" refers the chain with the pendant.

## 2. Standing

Defendants argue that because Plaintiff has received both the chain Broderick confiscated from Plaintiff on November 21, 2017, as well as a religious pendant that indisputably complies with Directive # 4199, Plaintiff has no continuing First Amendment or RLUIPA claim supporting Plaintiff's request for injunctive and declaratory relief, Defendant's Memorandum at 7-8, nor has Plaintiff alleged any injury in fact traceable to Defendants Broderick, Miller, and Johnson insofar as Plaintiff alleges no religious significance to the chain which Broderick, Miller, and Johnson refused to allow Plaintiff to possess, and the records Plaintiff attached to the Amended Complaint show Plaintiff was not allowed to possess the pendant because the pendant exceeded the permitted 2″ in diameter, a determination that was made by Defendant Iman Nelson. *Id.* at 8-9. In opposition, Plaintiff references *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1985), for the proposition that an inmate may assert an Eighth Amendment claim based on the prospect of future harm. Plaintiff's Response at 1 ¶ 1. In further support of judgment on the pleadings, Defendants differentiate that in *Helling*, the inmate plaintiff was alleging both a current health problem based on exposure to cigarette smoke, as well as the possibility of future physical harm in contrast to Plaintiff who has not and cannot allege any physical harm based on the confiscation of his chain and religious pendant. Defendants' Reply at 6-7.

It is basic that standing is required for subject matter jurisdiction by this court. *Strubel v. Comenity Bank*, 842 F.3d 181, 187–88 (2d Cir. 2016) (addressing challenge to constitutional standing raised for the first time on appeal because standing is "necessary" to subject matter jurisdiction). To satisfy the "irreducible constitutional minimum" of Article III standing, a plaintiff must demonstrate (1) "injury in fact," (2) a "causal connection" between that injury and the complained-of conduct, and (3) a likelihood "that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks omitted). "[T]he case-or-controversy prerequisite to federal jurisdiction means that " 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed ....' " *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997))). "[A] case becomes 'moot,' and beyond federal jurisdiction, if there ceases to be an actual controversy...." *Id.* (citing *Chafin v. Chafin*, 568 U.S. 165, 171-72, 133 S.Ct. 1017, 185 L.Ed.2d 1 (2013). In contrast, " 'the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.' " *Id.* (quoting *Davis*, 554 U.S. at 734, 128 S.Ct. 2759).

In the instant case, Defendants argue the Amended Complaint and the exhibits attached thereto establish that Plaintiff fails to allege an injury-in-fact traceable to Defendants Broderick, Miller, and Johnson who are alleged to have confiscated only Plaintiff's chain to which Plaintiff alleges no religious significance. Defendants' Memorandum at 8. Nor did Defendants Broderick, Miller, or Johnson determine the pendant was more than 2″ in diameter, but such determination was made by Defendant Imam Nelson. *Id.* at 9. Accordingly, Defendants maintain Plaintiff lacks standing to pursue his First Amendment Free Exercise Clause and RLUIPA claims

against Broderick, Miller, and Johnson. *Id.* Because the pendant was attached to the chain, it is not clear from the record that the confiscation of the chain by Broderick, Miller, and Johnson did not also include confiscation of the pendant. Accordingly, Defendants' Motion should be DENIED as to this aspect of their argument.

**\*6** With regard to Defendants' argument that Plaintiff is in possession of both his chain and a compliant pendant, although Defendants couch their challenge to subject matter jurisdiction as a lack of standing, it is not clear from the record whether Plaintiff was in possession of the chain and religious pendant when Plaintiff commenced this action on July 27, 2018; rather, Defendants reference in support of their standing argument that when Plaintiff filed the Amended Complaint, he was in possession of his chain and religious pendant the February 27, 2019 Inmate Grievance Committee CORC Decision reviewing Plaintiff's grievance which states that "the chain in question was held until an allowable pendant was received, and [Plaintiff] has since been issued both." Plaintiff's Exh. 15 (Dkt. 13 at 51). Significantly, the CORC Decision does not specify when Plaintiff received the chain and religious pendant such that it is not possible to determine whether Plaintiff had standing to commence the instant action, filed July 27, 2018. Nevertheless, because Plaintiff does not deny he is now in possession of both the chain and a compliant pendant, the court considers whether the case is now moot.

"The federal courts are courts of limited jurisdiction, their powers circumscribed at their most basic levels by the terms of Article III of the Constitution, which state that they may hear only 'Cases' or 'Controversies.' " *Russman v. Board of Education of the Enlarged City School District of the City of Watervliet*, 260 F.3d 114, 118 (2d Cir. 2001) (quoting U.S. Const. art. III, § 2 cl. 1). For the "case or controversy" requirement to be met, "at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Id.* Specifically, "[t]he requisite dispute must persist throughout the litigation ... from first filing in the district court through its many ascents and descents of the appellate ladder—and if the dispute should dissolve at any time due to a change in circumstances, the case becomes moot." *Id.* (citing cases). Whenever a case becomes moot, the court loses jurisdiction over it requiring the case be dismissed. *Id.* As such, "under the mootness doctrine, 'if an event occurs ... that makes it impossible for the court to grant any effectual relief whatever to a prevailing party,' [the court] must dismiss the case, rather than issue an advisory opinion."

" *ABC, Inc. v. Stewart*, 360 F.3d 90, 97 (2d Cir. 2004) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992)).

There exists, however, an exception to the mootness doctrine "where the case is 'capable of repetition, yet evading review.' " *Russman*, 260 F.3d at 119 (quoting *S. Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). "The capable-of-repetition principle applies only 'where the following two circumstances are simultaneously present: (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.' " *Id.* (quoting *Spencer v. Kemna*, 523 U.S. 1, 17, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). "A recurrent dispute will 'evade review' if it could not be entirely litigated before again becoming moot, including prosecution of appeals as far as the Supreme Court." *Id.* (citing *Honig v. Does*, 484 U.S. 305, 322-23, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (noting the likely mooting "by the time review can be had in this Court" of any future lawsuit brought by plaintiff)). "Given these strictures, it has been said that the exception 'applies only in exceptional situations.' " *Id.* (quoting *Spencer*, 523 U.S. at 17, 118 S.Ct. 978). As the party seeking application of the exception, Plaintiff "bears the burden of demonstrating that this controversy is indeed 'capable of repetition, yet evading review.' " *Video Tutorial Services, Inc. v. MCI Telecommunications Corp.*, 79 F.3d 3, 6 (2d Cir. 1996) (citing cases).

In the instant case, Plaintiff does not deny that his receipt of both the chain and compliant religious pendant has rendered moot his claims. Nor does Plaintiff maintain that the alleged wrongful confiscation of his chain and pendant falls within the mootness doctrine exception because there is a reasonable expectation that Plaintiff will again be subject to the same challenged action. Accordingly, Plaintiff has failed to meet his burden of establishing the mootness doctrine exception applies.

**\*7** Accordingly, Defendants' Motion should be GRANTED insofar as Plaintiff's claims are moot, rendering the court without subject matter jurisdiction over them.

## 3. Eleventh Amendment/Sovereign Immunity

Defendants argue that because Plaintiff has already received both his chain and a compliant religious pendant, Plaintiff seeks only prospective relief which is barred by the doctrine of sovereign immunity and is not subject to *the Ex*

*Parte Young* exception to Eleventh Amendment Immunity. Defendants' Memorandum at 9-10. In opposition, Plaintiff argues state officials may be held personally liable for damages under § 1983 based on actions taken in Defendants' official capacities. Plaintiff's Response at 1 ¶ 1. In further support of judgment on the pleadings, Defendants argue even if Plaintiff could proceed on a First Amendment Free Exercise Clause claim, Plaintiff's remedy is limited to nominal damages, which Plaintiff has not requested, because Plaintiff has conceded being issued both his chain and a compliant pendant, such that Plaintiff is not subject to ongoing or prospective harm. Defendants' Reply at 5-6.

As previously stated, Background at 3, after screening the Amended Complaint, Judge Vilardo ordered that Plaintiff's repleaded First Amendment and RLUIPA claims for injunctive and declaratory relief could proceed, but that Plaintiff's claims for money damages against Defendants in their official capacities were barred by Eleventh Amendment immunity. February 7, 2020 Order at 2-3. Accordingly, any money damages for which Plaintiff maintains state officials can be personally liable under § 1983 are limited to nominative or punitive damages, neither of which Plaintiff seeks. *See* Amended Complaint at 16-17 (Relief).

Further, "[t]he Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of 'sovereign immunity' .... This immunity extends not only to the states, but also to state agencies .... The Eleventh Amendment also bars suits for damages against state officials acting in their official capacities." *Bell v. N.Y. State Dep't of Corr.*, 2018 WL 11219948, *3 (N.D.N.Y. Mar. 20, 2018) (citing cases and quoting U.S. Const. amend. XI). This Eleventh Amendment immunity "bars suits against states and their officials unless the state consents to suit, Congress abrogates the state's immunity, or the case falls within the *Ex parte Young* exception." *NAACP v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019). "[A]pplication of the *Young* doctrine is straightforward: A plaintiff may avoid the Eleventh Amendment bar to suit and proceed against *individual state officers, as opposed to the state*, in their official capacities, provided that his complaint (a) 'alleges an ongoing violation of federal law' and (b) 'seeks relief properly characterized as prospective.' " *In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (italics added) (citing *Ex parte Young*, 209 U.S. 123, 155-56, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). In the instant case, because Plaintiff is in receipt of the chain and a compliant pendant, Plaintiff is not alleging an ongoing violation of federal law, requiring dismissal of his claims.

**\*8** Defendants' Motion should be GRANTED on this aspect of Plaintiff's claims.

### 4. Money Damages

Defendants argue Plaintiff's claim for compensatory damages against each Defendant in the amount of $ 500 fails because no physical injury is alleged as required. Defendants' Memorandum at 10-11. Plaintiff's Response does not address this argument.

42 U.S.C. § 1997e(e) ("§ 1997e(e)") "provides that '[n]o federal civil action may be brought by a prisoner confined to a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.' That provision bars recovery of compensatory damages for mental and emotional injuries, absent physical injury, in § 1983 actions." *Nash v. McGinnis*, 2008 WL 4898999, at *6, 585 F.Supp.2d 455 (W.D.N.Y.2008) (quoting 42 U.S.C. § 1997e(e)). " 'Courts have strictly construed this requirement, barring claims by prisoners who demonstrate solely emotional or mental injury and barring physical injury claims where the injury alleged is *de minimis*.' " *Abdur–Raqiyb v. Erie County Medical Center*, 536 F.Supp.2d 299, 304 (W.D.N.Y.2008). "Section 1997e(e) applies to all federal civil actions including claims alleging constitutional violations. Section 1997e(e) is a limitation on recovery of damages for mental and emotional injury in the absence of or showing of physical injury, but does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief." *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir.2002). *See also Amaker v. Goord*, 2015 WL 3603970, at * 1 (W.D.N.Y. June 5, 2015) (holding § 1997e(e) bars awarding compensatory damages for violations of religious rights under the First Amendment unaccompanied by any physical injury). Further, as discussed, Background at 3, Judge Vilardo already dismissed with prejudice Plaintiff's claims for money damages under the RLUIPA as barred by sovereign immunity. January 14, 2020 Order (Dkt. 11) at 8-9.

Accordingly, Defendants' Motion should be GRANTED as to Plaintiff's request for money damages.

### 5. Substantial Burden

Defendants argue in support of judgment on the pleadings that Plaintiff fails to allege the seizure of his religious pendant and chain constituted the requisite substantial burden on the exercise of his religion. Defendants' Memorandum at 11-13. In opposition, Plaintiff argues Defendants' seizure of his pendant constituted a violation of his First Amendment rights. Plaintiff's Response at 1.

Although incarcerated persons within prison facilities are not entitled to the full gamut of rights guaranteed under the United States Constitution, the free exercise clause of the First Amendment, as well as the RLIUPA, do afford them at least some measure of protection, *Pell v. Procunier,* 417 U.S. 817, 822 (1974). *See Salahuddin v. Goord,* 467 F.3d 263, 274–75 (2d Cir. 2006).(citing RLIUPA, 42 U.S.C. § 2000cc-1)a)), and *Ford v.McGinnis,* 352 F.3d 582, 587 (2d Cir. 2003) (discussing requirements under First Amendment Free Exercise Clause). "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (citing cases). Nevertheless, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.* (internal citations and quotation marks omitted). Such limitations "arise both from the fact of incarceration and from the valid penological objectives ...." *Id.* (citations omitted).

**\*9** Accordingly, as a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir. 2004) (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and, in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Upon plausibly alleging the impeded belief was sincerely held, the plaintiff must plausibly allege such belief was subjected to a substantial burden which "exists where the state put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir. 1996) (quotation omitted) (alteration in original). Once a plaintiff satisfies this burden,

defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275,. Whether an inmate's asserted religious beliefs are sincerely held, however, "is subjective and requires a determination of genuine issues of material fact." *Odom v. Dixion,* 2008 WL 466255, at * 7 (W.D.N.Y. Feb. 15, 2008).

In the instant case, Plaintiff alleges that "wearing the Islam pendant is central to Islamic Ideology, and has importance to [Plaintiff's] Islamic Family as pin-pointed at Qur'aanic Verse (sura 12:4) and that it was a gift that was purchased for me by Family during the Holy Month of Ramadhan [*sic*] from the ... Islamic store." Amended Complaint at 13 ¶ 4. Plaintiff further explains the symbolic meaning of the images on the pendant, as well as that the seized pendant bears great sentimental meaning to Plaintiff because it was gifted to him during the month of Ramadhan. *Id.* ¶¶ 2-3, 5. These allegations plausibly allege Plaintiff's sincere belief that wearing the seized pendant was central to his religious belief.

Nevertheless, Plaintiff has not "ground[ed] his professed belief in some Nation of Islam custom or teaching," as Judge Vilardo directed. January 14, 2020 Order at 7 & n. 1 (noting that although Plaintiff was not required to show he was prevented from doing something expressly required or compelled to do something expressly forbidden by his religion, Plaintiff "should ground his professed believe in some Nation of Islam custom or teaching."). Although Plaintiff references "Qur'aanic Verse (sura 12:4)," as the source of his sincere belief that wearing the pendant is central to his religious belief, Amended Complaint at 13 ¶ 4, a plain reading of the referenced verse establishes the verse, as recited by Plaintiff, *id.* at 13 ¶ 3, merely establishes that in the context of Islam, the sun, moon, and stars signify members of the Islamic family including, respectively, the father, mother, and children. The verse does not, however, require any adherent to the faith wear a pendant depicting these symbols. Nor does the article attached as Plaintiff's Exh. 20 to the Amended Complaint explaining that the Flag of Islam depicts the sun, moon, and eleven stars require such flag or any pendant or medallion containing such symbols be worn to practice the faith. Moreover, even if, as Plaintiff suggests, Amended Complaint at 16 ¶ 13, the wearing of the pendant depicting the symbols, allowed Plaintiff to visibly separate himself from the many Christian inmates, not only does Plaintiff fail to allege that separating himself from Christians is a necessary part of his religion, but it is simply implausible that Plaintiff could achieve such ends when he

was required to wear the pendant underneath his clothing as Plaintiff admits. Amended Complaint at 14 ¶ 6. Plaintiff thus has failed to allege Defendants, by denying Plaintiff his religious pendant, substantially burdened Plaintiff's exercise of his religious beliefs. *Jolly,* 76 F.3d at 477. *See also Mitchell v. Annucci,* 2019 WL 3253192, at * 6 (N.D.N.Y. July 19, 2019) (dismissing inmate plaintiff's First Amendment claim based on the plaintiff's failure to allege how his inability to proselytize to other inmates substantially burdened his religious rights).

**\*10** As such, Plaintiff fails to plausibly allege Defendants' confiscation of his chain and religious pendant substantially burdened Plaintiff's sincerely held religious beliefs and Defendants' Motion should be GRANTED on this ground.

### 6. Negligence

Defendants argue Plaintiff's allegations attribute any alleged violation of his religious freedom by Defendant Imam Nelson, and that Defendants Broderick, Miller, and Johnson, by improperly construing Directive # 4911 were, at most, negligent which does not support a § 1983 claim. Defendants' Memorandum at 13-15. Plaintiff does not specifically argue in opposition on this point.

"[A] prison official must *knowingly* place a substantial burden on a prisoner's religious beliefs to incur liability for damages under RLUIPA or the Constitution." *Hamilton v. Countant,* 2016 WL 881126, at *4 (S.D.N.Y. Mar. 1, 2016) (italics in original and citing cases). Therefore, "damages claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable under either the First Amendment or RLUIPA." *Id.* Claims alleging violation of an inmate plaintiff's rights under the First Amendment and the RLUIPA resulting from negligence or mistake have been dismissed. *See, e.g., id.* at *6 (granting summary judgment where the alleged violation of plaintiff's rights was "the result of errant paper work and a miscommunication," which "resulted from, at most, negligence"); *Scott v. Shansiddeen,* 2013 WL 3187071, at *4 (N.D.N.Y. June 20, 2013) (granting summary judgment where defendants' error did not "amount[ ] to anything more than negligence," which is "not actionable under the First Amendment" or "sufficient to support a claim under [RLUIPA]"). Similarly, in the instant case, Plaintiff claims violations of his religious rights under the First Amendment and the RLUIPA based on a mistaken construction of Directive # 4911 regarding the length of a chain permitted for a religious pendant, as well as a mistaken measurement of Plaintiff's religious pendant.

Accordingly, Defendants' Motion should be GRANTED insofar as Plaintiff's claims can be construed as asserting negligence or mistake which does not support a § 1983 claim.

### 7. Personal Involvement

Defendants maintain the action must be dismissed as against Brown and Kintzel against whom Plaintiff fails to allege any personal involvement in the asserted First Amendment and RLUIPA violations. Defendants' Memorandum at 15-17 (Brown), and 17-19 (Kintzel). Plaintiff has not responded in opposition to this argument.

#### A. Defendant Brown

Plaintiff's claims against Defendant Brown are based on Brown's failure to take any corrective action relative to the confiscation of Plaintiff's religious pendant and chain after Plaintiff wrote to Brown regarding the same. Amended Complaint at 12 ¶ 27, and 15 ¶ 11. " 'It is well settled in this circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite' to a section 1983 claim." *Delee v. Hannigan,* 729 Fed.Appx. 25, 31 (2d Cir. 2018) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citations omitted)). Before the Supreme Court decided *Iqbal,* supervisory liability claims for § 1983 claim were analyzed according to the framework set forth in *Colon v. Coughlin,* 58 F.3d 865 (2d Cir. 1995), specifically providing that

> **\*11** The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing

to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873.

The Second Circuit recently clarified that following *Iqbal*, "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachman*, 983 F.3d 609, 618-19 (2d Cir. 2020). Relevantly, "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary," and "[t]he violation must be established against the supervisory official directly." *Id.* (quotations and citations omitted). Failing to correct another officer's violation does not suffice; rather, after *Iqbal*, the "active conduct" standard necessary to impose § 1983 liability on a supervisor requires the supervisor either directly participate in the alleged constitutional violation or create a policy or custom under which the alleged unconstitutional practices occurred, *i.e.*, only the first and part of the third categories of supervisory liability identified in *Colon* survive. *Tangreti*, 983 F.3d at 617 n.4 (citing cases). Since *Tangreti* was decided, courts within the Second Circuit repeatedly have dismissed claims based on an asserted notification to a supervisory official of an alleged wrong by way of a letter, grievance, or appeal of a disciplinary action. *See, e.g.*, *Smart v. Annucci*, 2021 WL 260105, at * 5 (S.D.N.Y. Jan. 26, 2021) (dismissing *pro se* complaint alleging defendants, both high-ranking prison officials who were alleged to have failed to act on the plaintiff's complaints, because such allegations did not support an inference that the defendants, through their own individual actions, violated the Constitution, stating "[f]ailing to correct another officer's violation does not suffice" to establish a supervisor's direct violation of a plaintiff's constitutional rights).

In the instant case, Plaintiff alleges that he wrote to Defendant Brown complaining about the denial of his religious pendant, but that Brown failed to correct the asserted misconduct. Amended Complaint at 12 ¶ 27, and 15 ¶ 11. Accordingly, Plaintiff's sole allegation against Defendant Brown is that Brown failed to remedy a wrong, caused by the actions of others, about which Plaintiff complained in a letter to Brown. The Second Circuit, however, has repeatedly held that alerting a supervisory official to an asserted wrong through correspondence, grievance, or disciplinary appeal

does not state a § 1983 claim against such supervisory official. *See McCrary v. Marks*, 836 Fed.Appx. 73, 74 (2d Cir. 2021) (holding the plaintiff's claim that the defendant supervisory official received the plaintiff's letter complaining of a violation of the plaintiff's First Amendment right to judicial documents was insufficient to state a claim against such defendant) (citing *Tangreti*, 983 F.3d 618-19). *Cf. Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (concluding that the Commissioner of the New York State Department of Correctional Services was not personally involved in an alleged constitutional violation where the plaintiff addressed two letters to the Commissioner, the first of which the Commissioner forwarded to another official, and the second of which was simply a request for a status update).

**\*12** Accordingly, Plaintiff fails to plausibly state a claim against Defendant Brown and Defendants' Motion should be GRANTED as to Defendant Brown.

### B. Defendant Kintzel

Plaintiff's claims Defendant Kintzel, as the hearing officer for Plaintiff's grievance, denied Plaintiff's request that the pendant be measured. Amended Complaint at 15 ¶ 10. Defendants argue that because prison inmates have no constitutional right of access to any internal grievance process, nor to an adequate investigation of a grievance, Plaintiff has not and cannot state a claim against Kintzel. Defendants' Memorandum at 17-19. Plaintiff has not responded to this argument.

"It is well-established that a prison inmate has no constitutional right of access to an internal grievance process, or to an investigation of his grievance that he deems adequate." *James v. Poole*, 2013 WL 132492, at *5 (W.D.N.Y. Jan. 9, 2013) (citing cases). Moreover, the denial of an inmate's grievance has repeatedly been held insufficient to establish personal involvement in the alleged underlying constitutional violation. *See, e.g.*, *Logan v. Graham*, 2021 WL 4440344, at * 5 (N.D.N.Y. Sept. 28, 2021) (dismissing inmate plaintiff's claim that defendant, as inmate grievance hearing officer, was not personally involved in the alleged constitutional deprivation). Accordingly, Plaintiff's allegation that Defendant Kintzel failed to measure the pendant, as Plaintiff requested, during the grievance hearing, fails to plausibly state a constitutional deprivation.

As such, Defendants' motion seeking judgment on the pleadings should be GRANTED as to Defendant Kintzel.

## 8. RLUIPA

Plaintiff's RLUIPA claims also should be dismissed for because the RLUIPA does not provide for a private cause of action for money damages against state official in their official or individual capacities. In particular, the Supreme Court has "held that sovereign immunity forecloses the availability of money damages as a remedy against states and state actors in their official capacities under RLUIPA." *Washington v. Gonyea*, 731 F.3d 143, 145 (2d Cir. 2013) (citing *Sossamon v. Texas*, 563 U.S. 277, 285-86, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011) ("States, in accepting federal funding, do not consent to waive their sovereign immunity to private suits for money damages under RLUIPA because no statute expressly and unequivocally includes such a waiver.")). Plaintiff therefore cannot his sustain his RLUIPA claim against Defendants in their official capacities.

Nor can Plaintiff sustain his RLUIPA against Defendants in their individual capacities because the "RLUIPA does not provide a cause of action against state officials in their individual capacities." *Washington*, 731 F.3d at 145. *See also Tanvir v. Tanzin*, 894 F.3d 449, 465 (2d Cir. 2018) (observing "RLUIPA prohibits both the recovery of money damages from *state* officers sued in their official capacities and in their individual capacities." (citing *Gonyea*, 731 F.3d at 145)), *aff'd*, ⸺ U.S. ⸺; ⸺ U.S. ⸺, 141 S. Ct. 486, 208 L.Ed.2d 295 (2020).

Defendants' Motion should thus be GRANTED insofar as Plaintiff seeks monetary damages for an alleged violation of the RLUIPA.

## 9. Qualified Immunity

Defendants alternatively argue Defendants Broderick, Miller and Johnson are qualifiedly immune from liability on Plaintiff's First Amendment claim.[13] Defendants' Memorandum at 19-22. Plaintiff's Response does not address this argument.

[13]  Insofar as Plaintiff alleges violations of the RLIUPA, qualified immunity does not apply to lawsuits against individuals sued in their official capacity, *Mitchell v. Forsyth*, 472 U.S. 511, 556 n. 10, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (Brennan, J., concurring in part and dissenting in part) (citing *Brandon v. Holt*, 469 U.S. 464, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)). Further, there is

no cognizable private right of action against state officers sued in their individual capacities, and the RLUIPA does not allow for the award of monetary damages against state officers sued in their official capacities. *Washington v. Gonyea*, 731 F.3d 143, 144 (2d Cir. 2013) (citing cases).

**\*13**  "Qualified immunity shields law enforcement officials from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011), and *Harlow v. Fitzgerald*, 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "An officer is entitled to qualified immunity if '*any* reasonable officer, out of the wide range of reasonable people who enforce the laws in this country, *could have* determined that the challenged action was lawful.' " *Muschette ex rel. A.M. v. Gionfriddo*, 910 F.3d 65, 70-71 (2d Cir. 2018) (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (italics in original)). A qualified immunity analysis asks two questions including whether "the facts show that the office's conduct violated plaintiff's constitutional rights," and, if so, whether "the right was clearly established at the time of defendant's actions." *Zalaski*, 723 F.3d at 388 (citing *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074, and *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)). Courts are no longer required to sequentially answer these two questions; rather, it is particularly appropriate to address the second question first where the first question "turns on difficult or novel questions of constitutional or statutory interpretation, but it is nevertheless clear that the challenged conduct 'was not objectively unreasonable in light of existing law.' " *Id.* at 389 (quoting *Coolick v. Hughes*, 699 F.3d 211, 219-20 (2d Cir. 2012)), and citing *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074.

"To determine whether a right was clearly established, we consider 'whether the right in question was defined with reasonable specificity,' 'whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question,' and 'whether under preexisting law a reasonable defendant officer would have understood that his or her acts were unlawful.' " *Barnes v. Furman*, 629 Fed.Appx. 52, 55-56 (2d Cir. Oct. 22, 2015) (quoting *Dean v. Blumenthal*, 577 F.3d 60, 68 (2d Cir. 2009)). Even if the right at issue were clearly established, if it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity.

2022 WL 16837366

*Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 568-69 (2d Cir. 1996). This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on the [legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst*, 101 F.3d 845, 858 (2d Dir. 1991) (internal quotation marks and citation omitted). Also to be considered in determining whether a defendant is qualifiedly immune from personal liability under the First Amendment is whether the defendant had a good faith belief they were carrying out a lawful policy. *See Barnes v. Fedele*, 813 Fed.Appx. 696, 700 (2d Cir. 2020) (affirming district court's determination that state prison officers were qualifiedly immune from liability on Plaintiff's First Amendment and RLUIPA claims asserted under § 1983 based on the defendants' confiscation of the plaintiff's religious head covering in reliance on a DOCCS Directive restricting the wearing of such head coverings to members of certain religions, and the plaintiff identified with a different religion). Where, however, the objective reasonableness of an officer's actions depends on disputed facts, summary judgment based on qualified immunity is properly denied. *Rivera v. United States*, 928 F.2d 592, 607 (2d Cir. 1991).

Accordingly, "qualified immunity provides a broad shield. It does so to ensure 'that those who serve the government do so with the decisiveness and the judgment required by the public good.' " *Zalaski*, 723 F.3d at 389 (quoting *Filarsky v. Delia*, 566 U.S. 377, 390, 132 S.Ct. 1657, 182 L.Ed.2d 662 (2012)). "Toward that end, it affords officials 'breathing room to make reasonable but mistaken judgments' without fear of potentially disabling liability." *Id.* (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546, 132 S.Ct. 1235, 182 L.Ed.2d 47 (2012)). "In sum, qualified immunity employs a deliberately 'forgiving' standard of review," providing " 'ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010), and *Malley*, 475 U.S. at 341, 106 S.Ct. 1092).

**\*14** " '[T]he matter of whether a defendant official's conduct was objectively reasonable, *i.e.*, whether a reasonable official [in the defendant's position] would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact.' " *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) (quoting *Kerman v. City of New York*, 374 F.3d 93, 109 (2d Cir. 2004)) (bracketed material on original). Factual questions material to qualified immunity are to be resolved by the fact finder. *Id.* (citing *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007)). " 'Once the [factfinder] has resolved any disputed facts that are material to the qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court.' " *Id.* (quoting *Zellner*, 494 F.3d at 368).

In the instant case, the court takes judicial notice that Directive # 4202 permits inmates to possess a "pendant" or "medallion" including "[c]rescents with stars and/or moons," which complied with the size and design specified by Directive # 4911.[14] Directive # 4911 does not limit the length of chain on which a religious pendant or medallion may hang, but provides such pendant or medallion may not contain stones, and the diameter may not exceed 2″. Although Directives # 4202 and 4911 do not necessarily establish Defendants Broderick, Miller, and Johnson would have reasonably believed their conduct was not adverse to any of Plaintiff's constitutional rights, the Directives establish the seizure of Plaintiff's religious pendant and chain was not lawful. *See Morse v. Annucci*, 2015 WL 5725046, at * 8 (N.D.N.Y. Sept. 29, 2015) (adopting report and recommendation recommending denying defendants' motion to dismiss inmate plaintiff's First Amendment claim based on seizure of crucifix, which complied with Directive # 4202, as barred by qualified immunity). Accordingly, Defendants Broderick, Miller, and Johnson should have been aware that confiscating Plaintiff's religious pendant was contrary to Directive # 4202, such that it was not objectively reasonable for Broderick, Miller, and Johnson to believe they were not violating Plaintiff's constitutional rights.

14    See *James v. Annucci*, 2021 WL 3367530, at * 6 (W.D.N.Y. Aug. 3, 2021) ("The Court may also take judicial notice of DOCCS directives."). *See also Williams v. Fisher*, 2015 WL 1137644, at * 4 n. 7 (N.D.N.Y. Mar. 11, 2015) (adopting report and recommendation taking judicial notice of Directive # 4202).

Defendants' Motion should be DENIED with regard to the qualified immunity argument.

## 9. Dismissal with Prejudice

Although dismissal of a *pro se* plaintiff's claims for failure to state a claim is generally without prejudice and with

leave to replead, "[w]here it appears that granting leave to amend is unlikely to be productive,...it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Here, the problems with Plaintiff's claims, as pleaded, are substantive such that further pleading cannot cure them and would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (affirming dismissal of *pro se* plaintiff's claim for failure to state a claim with prejudice and without leave to replead where even liberal reading of complaint failed to suggest plaintiff had merely inadequately or inartfully pleaded and plaintiff, speaking through counsel on appeal, suggested no new material that could be pleaded to sufficiently reframe claim, such that repleading would be futile).

Specifically, despite Judge Vilardo's requirement that Plaintiff "ground his professed belief in some Nation of Islam custom or teaching," January 14, 2020 Order at 7 & n. 1, Plaintiff has not done so and, as such, has failed to allege Defendants' confiscation of the religious pendant and chain substantially burdened Plaintiff's religious beliefs, which claim, even if Plaintiff could sufficiently allege, is now moot because Plaintiff is in possession of both the religious pendant and chain such that Plaintiff is without standing to pursue this action. Nor is there any private right of action under the RLUIPA against Defendants in their individual capacity, nor for money damages in their official capacities.

**\*15** Accordingly, the dismissal of Plaintiff's claims should be with prejudice and without leave to replead.

## CONCLUSION

Based on the foregoing, Defendants' Motion (Dkt. 31), should be GRANTED in part and DENIED in part. The Amended Complaint should be DISMISSED with prejudice and without leave to replead. The Clerk of Court should be directed to close the file.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the Plaintiff and the attorneys for the Defendants.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 16837366

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 16836406
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Stoney HARRISON,

v.

Kelli BRODERICK, Stephany Miller,
James Johnson, Bishme Nelson, Frederick
Kintzel, and Kevin Brown, Defendants.

18-CV-821 (JLS) (LGF)
|
Signed November 8, 2022

**Attorneys and Law Firms**

Stoney Harrison, Dannemora, NY, Pro Se.

Kathleen M. Kaczor, Attorney General's Office, Buffalo, NY,
for Defendants.

## DECISION AND ORDER

JOHN L. SINATRA, JR., UNITED STATES DISTRICT
JUDGE

**\*1** Plaintiff Stoney Harrison commenced this action on July
27, 2018. Dkt. 1. Pursuant to an Order issued by District
Judge Lawrence J. Vilardo on January 14, 2020 (Dkt. 11),
Plaintiff filed an Amended Complaint on February 3, 2020.
Dkt. 13. The Amended Complaint asserts claims under 42
U.S.C. § 1983 and alleges that Defendants violated his rights
under the First Amendment and the Religious Land Use and
Institutionalized Persons Act ("RLUIPA") in confiscating his
religious pendant. *Id.*

On February 7, 2020, Judge Vilardo issued an Order
dismissing Plaintiff's claims for money damages against
Defendants in their official capacities as barred by Eleventh
Amendment immunity. Dkt. 14. The case was reassigned

to the undersigned on September 15, 2020. Dkt. 21. On
September 16, 2020, this Court referred the case to United
States Magistrate Judge Leslie G. Foschio for all proceedings
under 28 U.S.C. §§ 636(b)(1)(A), (B), and (C). Dkt. 22.

On October 14, 2021, Defendants filed a Motion for Judgment
on the Pleadings. Dkt. 31. Plaintiff opposed the motion, and
Defendants replied. Dkt. 33, 34. On August 18, 2022, Judge
Foschio issued a Report and Recommendation ("R&R")
recommending that this Court grant Defendants' motion (Dkt.
31) and dismiss the Amended Complaint with prejudice and
without leave to amend. Dkt. 36. On September 12, 2022,
Plaintiff objected to the R&R. Dkt. 39. Defendants responded
to the objections, and Plaintiff replied. Dkt. 41, 42.

A district court may accept, reject, or modify the findings or
recommendations of a magistrate judge. 28 U.S.C. § 636(b)
(1); Fed. R. Civ. P. 72(b)(3). A district court must conduct
a *de novo* review of those portions of a magistrate judge's
recommendation to which a party objects. See 28 U.S.C. §
636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). But neither 28 U.S.C. §
636 nor Federal Rule of Civil Procedure 72 requires a district
court to review the recommendation of a magistrate judge to
which no objections are raised. *See Thomas v. Arn*, 474 U.S.
140, 149–50 (1985).

This Court carefully reviewed the R&R, the objection,
response, and reply, and the materials submitted by the
parties. Based on its *de novo* review, the Court accepts Judge
Foschio's recommendation.

For the reasons stated above and in the R&R, the Court
GRANTS Defendants' Motion (Dkt. 31). As a result, the
Amended Complaint is DISMISSED without leave to amend.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 16836406

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

🚩 KeyCite Red Flag - Severe Negative Treatment
Affirmed in Part, Vacated in Part, Remanded by  Brandon v. Kinter,  2nd
Cir.(N.Y.),  September 10, 2019

2016 WL 1638242
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Chamma K. BRANDON, Plaintiff,
v.
Dr. Glen SCHROYER, et al., Defendants.

Civil Action No. 9:13-CV-0939 (TJM/DEP)
|
Signed February 26, 2016

**Attorneys and Law Firms**

Chamma K. Brandon, Ossining, NY, pro se.

Kelly M. Monroe, Andrew L. McNamara, Molly C. Casey,
Thuillez, Ford Law Firm, Albany, NY, Bradley J. Stevens,
Lemire, Johnson Law Firm, Malta, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is an action brought by *pro se* plaintiff Chamma K.
Brandon, a prison inmate formerly confined in the Clinton
County Jail ("CCJ"), pursuant to 42 U.S.C. §§ 1983, 1985,
and 1986, against several individuals working at the facility
alleging that they deprived him of his civil rights during his
period of incarceration there. Plaintiff's claims fall into three
groups, complaining of (1) a one-month hiatus in a low-fat,
low-cholesterol ("heart-healthy") diet; (2) the failure to honor
his religious diet by serving him pork products; and (3) the
failure to otherwise accommodate his religious beliefs as a
Muslim. Plaintiff contends that, by their actions, defendants
violated his rights under the First, Eighth, and Fourteenth
Amendments to the United States Constitution, as well as the
Religious Land Use and Institutionalized Persons Act of 2000
("RLUIPA"), 42 U.S.C. § 2000cc.

Now that discovery in the action is complete, all of the
defendants, including Dr. Glen Schroyer, who is separately
represented, have moved for the entry of summary judgment
dismissing plaintiff's claims. For the reasons set forth below, I
recommend that the motions be granted in part but otherwise
denied.

*I. BACKGROUND*

Plaintiff was confined in the CCJ beginning on January 14,
2012, and again following his re-arrest on March 2, 2012,
until December 28, 2012, when he was transferred into the
custody of the New York State Department of Corrections
and Community Supervision ("DOCCS"). *Dkt. No. 17 at 3,*
*12–, 3.* Upon his entry into the CCJ for the first time in
January 2012, Brandon was five-feet, eleven-inches in height,
weighed 250 pounds, and was considered clinically obese. [1]
*Dkt. No. 77–6 at 2; Dkt. No. 77–10 at 4.* Plaintiff alleges
that, while he was incarcerated at the CCJ, the defendants
(1) deprived him of constitutionally adequate medical care
by removing him from a heart-healthy diet for one month;
(2) deprived him of his rights under the First Amendment
and RLUIPA to freely exercise his Muslim religion by (a)
repeatedly providing him with meals that contained pork
products, (b) denying him the opportunity to participate in
Ramadan, and (c) denying him access to worship space
and congregate religious services; and (3) retaliated against
him by denying him adequate medical care and depriving
him of his right to freely exercise his religion in response
to grievances and complaints he filed against them during
his incarceration at the CCJ. [2] *See generally Dkt. No. 17.*
Additionally, plaintiff's amended complaint asserts a failure-
to-protect claim against defendants Clancy and Blaise, a
corrections sergeant and a corrections officer, respectively, at
the CCJ. *Id.*

[1]     In his amended complaint, plaintiff alleges that
he weighed 275 pounds upon his initial entry
into the CCJ, and 225 pounds upon his transfer
into the custody of the DOCCS. *Dkt. No. 17 at*
*11.* In a memorandum submitted in opposition to
defendants' motions, however, plaintiff claims to
have lost "about 175 lbs to 130 lbs" while confined
in the CCJ due to the deprivation of meals. *Dkt. No.*
*93–2 at 62.*

[2]     A more precise description of the claims asserted
against the defendants is included below in Part II.
of this report.

*A. Plaintiff's Diet*
**\*2** When he first arrived at the CCJ, Brandon reported that
he was allergic to shellfish. *Dkt. No. 17 at 4; Dkt. No. 75–6 at*

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

*2. A special diet notification form reflecting that food allergy was forwarded to the facility's kitchen.[3] *See Dkt. No. 17 at 47; Dkt. No. 75–1 at 37.* In March 2012, plaintiff reported that tomatoes and tomato by-products cause him to experience severe acid reflux. *Dkt. No. 17 at 4; Dkt. No. 75–6 at 2.* As a result, a notification was sent by medical personnel to the CCJ kitchen indicating "no tomato or tomato products per MD." *Dkt. No. 17 at 48; Dkt. No. 75–1 at 38.*

[3]    The order was later reiterated on July 5, 2012. *Dkt. No. 17 at 50; Dkt. No. 75–1* at 40.

In May 2012, defendant Dr. Glen Schroyer, the jail physician at the CCJ, placed plaintiff on a heart-healthy diet due to his high cholesterol levels. *Dkt. No. 17 at 4–5,* 49; *Dkt. No. 75–1 at 39; Dkt. No. 75–6 at 2.* Plaintiff's heart-healthy diet restriction was later lifted on October 16, 2012, after a review of plaintiff's commissary purchases, which were being monitored by medical staff, revealed the purchase of many items that were inconsistent with plaintiff's dietary restrictions, including products that were high in fat and cholesterol.[4] *Dkt. No. 17 at 8–9,* 52; *Dkt. No. 75–1 at 41; Dkt. No. 75–6 at 3.* For example, the record reveals that, during the relevant period, plaintiff's commissary purchases included a wide array of candy, cookies, snacks, and sugared drinks. *Dkt. No. 75–1 at 60–62.* Plaintiff also purchased Ramen chili, which contains tomato powder, and is therefore inconsistent with his previously alleged sensitivity to tomatoes and tomato by-products. *Id.*

[4]    In his affidavit, defendant Schroyer states that plaintiff was repeatedly counseled by medical staff concerning his non-compliance with his restrictive diets, and was warned, prior to October 16, 2012, that continued non-compliance would result in removal of the dietary restrictions. *Dkt. No. 75–6 at 3.* This assertion is sharply contested by plaintiff, who contends that the restrictions were lifted without warning. *Dkt. No. 83 at 3–4.* Plaintiff notes, moreover, that defendant Schroyer responded as follows to one of his interrogatories:

    *Interrogatory No. 15:*

    Did Dr. Schroyer or anyone else within the Medical–Staff notify Plaintiff that purchasing or consuming certain items from commissary would result in the removal (cancellation) of his dietary restriction at anytime [sic] on or before October 16, 2012?

    *Answer to Interrogatory No. 15:*

    The applicable medical records indicate that a discussion was held between the defendant and plaintiff on October 16, 2012 regarding plaintiff's non-compliance with his low fat/low cholesterol diet. The records further indicate that the proposed plan discussed in response to such noncompliance and plaintiff's assertion that he would, 'not be compliant with any diet' was the removal of such diet.

    *Dkt. No. 83–3 at 25.* While this presents a disputed question of fact, as will be discussed below in Part III.B.1. of this report, it is not material to plaintiff's deliberate medical indifference claims against defendant Schroyer.

Plaintiff's heart-healthy diet was restored on or about November 21, 2012, after plaintiff promised not to purchase certain designated items from the commissary. *Dkt. No. 17 at 10,* 53, 188; *Dkt. No. 75–1 at 42.* Following that restoration, plaintiff's restrictive diet remained in place until his transfer out of the CCJ. *Dkt. No. 17 at 10.*

**\*3** In addition to raising concerns about health-related dietary restrictions implemented at the CCJ, as part of his religious accommodation claim, plaintiff alleges that defendants served him food that was inconsistent with his religion, as a Muslim. Plaintiff alleges that he informed prison officials at the CCJ upon his arrival on January 14, 2012, and again when he was rearrested on March 2, 2012, that, because of his Muslim religion, he cannot eat pork. *Dkt. No. 17 at 12–13; Dkt. No. 83 at 6.* According to plaintiff, despite prison officials' awareness of this restriction, he was served food containing pork on numerous occasions. *Dkt. No. 17 at 17–18,* 20–22. Plaintiff alleges that between the time of his entry into the CCJ through May 28, 2012, he was routinely served pork against his religious beliefs. *Dkt. No. 17 at 13,* 17. He further claims that on May 28, 2012, he filed a complaint with medical staff concerning the failure to receive a religious diet, and that in response, defendant Nurse Kinter stated that the kitchen was aware of his dietary restrictions.[5] *Id.* at 13.

[5]    Plaintiff's amended complaint makes reference, in this regard, to Exhibit E. *Dkt. No. 17 at 13.* Relevant portions of the referenced document, however, are illegible. *Id.* at 65. The document is reproduced at *Dkt. No. 83–3 at 2* and *Dkt. No. 93–4 at 68,* and again, half of the document cannot be deciphered.

On June 21, 2012, plaintiff submitted a sick-call request inquiring about a knee brace and complaining of being served

pork. *Dkt. No. 17 at 13,* 66. The only response to that sick-call request was recorded as "given knee brace." *Id.* at 66. Plaintiff submitted an additional sick-call request raising concerns about his diet on July 4, 2012. *Id.* at 13, 67. In response, a nurse [6] wrote, "Done – for no fish/shell fish. Need to ask security staff to submit diet slip for *pork* medical does not do religious diets." *Id.* at 67 (emphasis in original).

[6]   Plaintiff alleges that defendant Kinter authored the response to this sick-call request. *Dkt. No. 17 at 14.* It is not clear, however, that this is accurate because in response to other sick-call requests, defendant Kinter would sign "SK." *See, e.g. id.* at 65. The sick-call response dated July 5, 2012 was signed, "S.F. RN." *Id.* at 67.

Plaintiff cites eight additional instances when he was served pork and raised complaints. The first and second occurred on September 24, 2012, during lunch and dinner. *Dkt. No. 93–4 at 82–82.* The next two instances occurred on October 9 and 10, 2012. *Id.* at 94–99. On October 17, 2012, plaintiff contends he was served pork, after which he filed a grievance and was provided a new meal. *Dkt. No. 17 at 18; Dkt. No. 93–4 at 116–17.* Plaintiff was again allegedly served pork on October 29, 2012, although a grievance filed regarding that incident purportedly "disappeared." *Dkt. No. 17 at 20.* Plaintiff was also allegedly served a meal containing pork on November 5, 2012, and although he claims to have lodged a grievance concerning that matter it is not included within his submissions. *Dkt. No. 17 at 21.* The last occurrence of allegedly being served pork was on December 25, 2012, and plaintiff again filed a grievance concerning the matter. *Dkt. No. 17 at 22; Dkt. No. 93–4 at 16465.*

The record evidence raises a number of questions regarding when the CCJ kitchen staff learned of plaintiff's religious dietary restrictions. According to defendant Laurin, when plaintiff first arrived at the CCJ on January 14, 2012, he did not declare any religious affiliation. *Dkt. No. 7714 at 2.* Although plaintiff disputes this, *Dkt. No. 17 at 12; Dkt. No. 83 at 6,* his initial booking intake record does not reflect any religious designation. [7] *Dkt. No. 77–6 at 2.* There is no dispute, however, that when plaintiff was rebooked on March 2, 2012, he stated that he was a Muslim, and this was reflected on his booking sheet. [8] *Dkt. No. 17 at 210; Dkt. No. 83–3 at 36.*

[7]   The record is unclear as to how long plaintiff was confined in the CCJ after his initial intake on January 14, 2012. Plaintiff's amended complaint does not state whether he received any meals containing pork between that initial intake and his re-arrest in March and, if so, how many.

[8]   Plaintiff's booking sheet from his rearrest in March 2012 also includes a note that reads, "Cautionary: Muslim Diet." *Dkt. No. 17 at 210.*

**\*4** Defendant Laurin explained that "it is the practice of the CCJ that any religious diets to be issued to inmates are initiated by the Booking Officer after an inmate requests such accommodation and demonstrates that he has a sincerely held belief. Notifications of any religious diets have been forwarded to the kitchen." *Dkt. No. 77–14 at 2.* Defendant Laurin contends that, in light of plaintiff's declaration of his religion in March 2012, a notification was placed in his file indicating that he should be provided with a diet consistent with his religious beliefs. *Dkt. No. 77–14 at 3.* In support of that contention, defendant Laurin cites to a document in the record entitled "SPECIAL DIET NOTIFICATION," reflecting that plaintiff, as a Muslim, was not to receive pork or pork products. *Dkt. No. 77–3 at 7.* Notably, the copy of that notice that is included by defendant Laurin in support of his motion is not dated. *Id.* As an attachment to his amended complaint and in response to defendants' motion, however, plaintiff has submitted copies of the same notice, except his copies both include a date of "10/5/12," which is written in what appears to be defendant Laurin's handwriting. *Dkt. No. 17 at 51; Dkt. No. 83–3 at 42.* Plaintiff contends, and the court finds it plausible, that the version of this notice produced by defendants in support of their motion has been "falsified ... by removing the date written on the notification[.]" [9] *Dkt. No. 93–3 at 11.*

In any event, a careful review of the chronology, including plaintiff's grievances and responses to those grievances by CCJ staff, buttresses the conclusion that it was not until at least late-September 2012 that the CCJ kitchen staff was notified of plaintiff's religious dietary restrictions. *See, e.g., Dkt. No. 77–5 at 21* (entry dated 9/27/12 authored by defendant Laurin stating, "[A]s of 9/27/12 the kitchen was reviewed [sic] of your diet ... and that you are Muslim"); *Dkt. No. 93–4 at 81* (entry dated 9/27/12 and authored by defendant Laurin stating that the "kitchen ... did not have that you were Muslim. You will get no pork or pork products"); *id.* at 94 (entry dated 10/10/12 and authored by Corrections Officer Couture stating, "I talked to Michelle in the kitchen

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 53 of 380

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**
2016 WL 1638242

and she told me that until recently they had nothing stating that Inmate Brandon was a no pork diet."); *id.* at 104 (entry dated 10/15/12 and authored by defendant Laurin stating, "Inmate Brandon was not marked in the kitchen as Muslim diet. That was corrected 10/5/12").

9    Defendants characterize plaintiff's accusation as "eccentric" and "evidence of his paranoia." *Dkt. No. 95–3 at 6.* While the court takes no position on these characterizations, it is worth noting that defendants do not dispute plaintiff's contention that the notice was altered. *Id.*

From the evidence in the record, two things are clear. First, until September 27, 2012, the CCJ kitchen staff was unaware of plaintiff's religious dietary restrictions, giving rise to the inference that, until that date, plaintiff was being served pork and pork products on occasion. Secondly, even after the kitchen learned of plaintiff's religious dietary restriction, plaintiff believes that he was served pork or pork products on six occasions, including (1) October 9, 2012; (2) October 10, 2012; (3) October 17, 2012; (4) October 29, 2012; (5) November 5, 2012; and (6) December 25, 2012.[10] *Dkt. No. 17 at 18,* 20, 21, 22; *Dkt. No. 93–4 at 9499,* 116–17, 164–65.

10    Defendants contest whether some of those meals included pork or pork products. *See, e.g., Dkt. No. 77–19 at 9.*

### B. *Other Religious Accommodation*

Plaintiff's complaint also alleges that he was denied a location to practice his religion and the opportunity to celebrate Ramadan between July 20, 2012 and August 19, 2012. *Dkt. No. 17 at 14–15,* 17. According to plaintiff, his requests to accommodate his observation of the holiday were denied by CCJ security because he was one of the only detainees requesting to honor the holiday and there were only a few Muslim detainees at the CCJ. *Id.* at 14. Plaintiff was further advised that, due to staffing and funding shortages, the CCJ was unable to cater to a specific religious group consisting of only a few participants. *Id.* Plaintiff further claims that his request for the opportunity to engage in congregational prayer, referred to as "Jummah," which is allegedly obligatory to all male Muslims, was denied by prison officials. *Id.* at 15. Plaintiff alleges that he filed grievances concerning these issues within the CCJ and additionally sought redress through outside sources. *Id.* at 15–16.

### C. *Assault by a Fellow Inmate*

**\*5** On or about November 17, 2012, plaintiff alleges that defendants Blaise and Clancy housed a mentally ill inmate, referred to by plaintiff as "Tiny," in the cell next door to him. *Dkt. No. 17 at 31.* Defendant Clancy apparently could be heard by plaintiff to say, " '[L]ets [sic] see if he tries that shit on Brandon!' " *Id.* According to plaintiff, two days later, defendant Blaise directed him to "exit [his] cell and collect all of the trays[.]" *Id.* Plaintiff, however, informed defendant Blaise that, the night before, Tiny had verbally assaulted plaintiff and that he "would rather not pick-up [Tiny]'s tray." *Id.* Defendant Blaise responded by saying to plaintiff, " '[D]on't worry about him, he's a punk. Besides, from what I heard, I'm sure if I let him out, you'd kick his ass.' " *Id.* Tiny thereafter became hostile towards plaintiff and spat on him while defendant Blaise observed. *Id.* Defendant Blaise responded by laughing at plaintiff. *Id.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about August 8, 2013, and later filed an amended complaint, the currently operative pleading, on August 15, 2014. Dkt. Nos. 1, 17. In his amended complaint, plaintiff names the following defendants:

| *Defendant* | *Position* |
| --- | --- |
| Dr. Glen Schroyer | CCJ Jail Doctor |
| Suzanne Kinter | CCJ Nurse |
| Lawrence Bedard | CCJ Food Service Manager |
| Jim Alger | CCJ Corrections Officer |
| Joshua Wingler | CCJ Corrections Officer |
| Thomas Perry | CCJ Corrections Officer |

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 54 of 380

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)
2016 WL 1638242

| Robert Web | CCJ Corrections Officer |
| Eric Blaise | CCJ Corrections Officer |
| Margaret Clansy | CCJ Corrections Sergeant |
| Kevin Laurin | CCJ Corrections Lieutenant |
| County of Clinton. [11] | |

[11]   Defendants County of Clinton and Alger were dismissed from the action by District Judge Gary L. Sharpe in a decision and order dated August 15, 2015. *Dkt. No. 16.*

For purposes of this report, the following defendants will be collectively referred to as the "county defendants": (1) Suzanne Kinter, (2) Lawrence Bedard, (3) Joshua Wingler, (4) Thomas Perry, (5) Robert Web, (6) Eric Blaise, (7) Margaret Clancy, and (8) Kevin Laurin.

In his amended complaint, which spans forty-four pages comprised of 336 paragraphs, and is accompanied by approximately 177 pages of exhibits, plaintiff chronicles in detail the occurrences at the CCJ giving rise to his claims. The causes of action set forth in that pleading include deliberate medical indifference, failure to permit plaintiff to freely exercise his chosen religion, retaliation, conspiracy, and failure to protect plaintiff from harm. For the sake of clarity, I have included below a table that reflects the court's understanding of the claims asserted against each of the specific defendants.

| Defendant | Claims Asserted |
| --- | --- |
| Bedard | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Blaise | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Clancy | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); (5) First Amendment retaliation (direct theory of liability only); and (6) Eighth Amendment failure-to-protect (direct theory of liability only) |
| Kinter | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

2016 WL 1638242

| Laurin | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct and conspiracy theories of liability); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
|---|---|
| Perry | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |
| Schroyer | (1) First Amendment regarding diet (direct theory of liability only); (2) Eighth Amendment (direct and conspiracy theories of liability); and (3) First Amendment retaliation (direct theory of liability only) |
| Web | (1) First Amendment regarding diet (direct and conspiracy theories of liability); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct and conspiracy theories of liability); and (5) First Amendment retaliation (direct theory of liability only) |
| Wingler | (1) First Amendment regarding diet (direct theory of liability only); (2) First Amendment regarding Ramadan and congregational services (direct theory of liability only); (3) Eighth Amendment (direct theory of liability only); (4) RLUIPA (direct theory of liability only); and (5) First Amendment retaliation (direct theory of liability only) |

**\*6** On August 3, 2015, defendant Schroyer filed a motion for summary judgment dismissing plaintiff's complaint. *Dkt. No. 75.* On the same date, the county defendants submitted a separate summary judgment motion, also seeking dismissal of plaintiff's claims. *Dkt. No. 77.* The defendants' motions are now fully briefed, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*7** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

2016 WL 1638242

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. *Defendant Schroyer's Motion*

In his amended complaint, plaintiff claims that defendant Schroyer was deliberately indifferent to his serious medical needs by discontinuing his heart-healthy diet for a period of approximately one month, and that the discontinuation was in retaliation for plaintiff's many grievances concerning his diet at the facility. Plaintiff also alleges that defendant Schroyer conspired with others at the facility to violate his rights under the First and Eighth Amendments.

### 1. *Deliberate Medical Indifference*

Plaintiff's deliberate indifference claim is properly analyzed under the Eighth Amendment, which prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society or which involve the unnecessary and wanton infliction of pain[.]" (*Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, ... neither does it permit inhumane ones[.]" *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment through deliberate indifference to the inmate's serious medical needs must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer,* 511 U.S. at 844; *see also Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin,* 467 F.3d at 280 (quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir. 2003).

**\*8** To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer,* 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Based upon the record now before the court, I conclude that plaintiff cannot meet either element of the governing deliberate indifference test. The only tangible effect of

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 57 of 380

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

the month-long hiatus in plaintiff's heart-healthy diet was a modest increase in his cholesterol level from 249 to 264. *Dkt. No. 17 at 25–26,* 62, 63; *Dkt. No. 83 at 5.* According to defendant Schroyer, however, such a fluctuation is within normal limits "and does not place a patient at an increased risk for coronary artery disease, ischemia or stroke." *Dkt. No. 75–6 at 4.* The only "evidence" offered to counter defendant Schroyer's medical opinion is plaintiff's unsupported contention that he was placed at an indiscernible amount of risk for coronary heart disease, ischemia, and stroke as a result of the changed diet. *Dkt. No. 17 at 36; Dkt. No. 83 at 5.* While plaintiff's high cholesterol may constitute a serious medical need – an assertion not disputed by defendants – there is no evidence aside from plaintiff's sheer speculation that defendant Schroyer's decision to remove plaintiff from the heart-healthy diet for one month was objectively sufficiently serious for purposes of a deliberate medical indifference claim.

Moreover, plaintiff has also failed to adduce any evidence to give rise to a genuine dispute of material fact with respect to whether defendant Schroyer removed plaintiff from the heart-healthy diet with the requisite deliberate indifference. In his affidavit, defendant Schroyer states that plaintiff's heart-healthy diet was discontinued on October 16, 2012, because he repeatedly made commissary purchases that were inconsistent with his diet restrictions. *Dkt. No. 75–6 at 4.* Although the parties dispute whether plaintiff was warned ahead of time that his commissary purchases could result in his removal from the diet, *compare Dkt. No. 17 at 27 with Dkt. No. 75–6 at 3,* there is no record evidence that suggests defendant Schroyer's decision on October 16, 2012 was reckless or executed with a disregard to plaintiff's health.

Plaintiff surmises that defendant Schroyer was complicit in a conspiracy to punish him for filing grievances. Specifically, plaintiff contends that, in retaliation for his filing of grievances up through October 15, 2012, regarding his meal trays, defendant Laurin rendered a medical assessment based on plaintiff's commissary purchases and thereafter instructed defendant Schroyer to remove plaintiff from his heart-healthy diet. *Dkt. No. 17 at 25–27.* Aside from plaintiff's sheer conjecture in this regard, however, he has submitted no evidence from which a reasonable factfinder could conclude that defendant Schroyer was aware of the existence of plaintiff's grievances and took action to discontinue plaintiff's heart-healthy diet for punitive reasons.

Because the record before the court, even when construed most favorably toward the plaintiff, fails to contain evidence from which a reasonable factfinder could conclude that plaintiff has met both the objective and subjective requirements for establishing a claim of deliberate medical indifference, I recommend that it be dismissed.

### 2. *Free Exercise*

**\*9** In addition to claiming deliberate medical indifference, plaintiff contends that defendant Schroyer is responsible for denying him an appropriate religious diet, and specifically, one that conformed to his Muslim faith and did not include pork or pork products. [12] Undeniably, plaintiff was entitled to receive a diet that was consistent with his sincerely held religious beliefs. *See, e.g., Johnson v. Guiffere,* No. 04–CV–0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct. 17, 2007)* (Hurd, J., *adopting report and recommendation by* Peebles, M.J.). [13] The record, however, demonstrates that at the CCJ, accommodating diet restrictions in accordance with an inmate's religious beliefs is the responsibility of security staff, rather than medical personnel. *See, e.g., Dkt. No. 75–6 at 2; see also Dkt. No. 75–1 at 44,* 50. To counter this, and in an attempt to implicate defendant Schroyer, plaintiff offers only his speculation based upon the fact that, at one point, in response to a sick-call complaint by plaintiff that he was being served pork, defendant Kinter, a nurse at the facility, informed him that his religious diet was still in effect and that she had checked with the kitchen regarding the matter. *Dkt. No. 83 at 3; Dkt. No. 83–3 at 11.* Because this assertion does not contradict defendant Schroyer's contention that medical staff is not responsible for accommodating prisoners' religious dietary needs, it does not suffice to raise a genuine issue of material fact that precludes the entry of summary judgment. In short, I find that no reasonable factfinder could conclude that defendant Schroyer was involved in any violation of plaintiff's religious rights through the failure to provide him a diet consistent with his religious beliefs. I therefore recommend that plaintiff's First Amendment free exercise claim asserted against defendant Schroyer be dismissed.

[12]    Even liberally construed, plaintiff's amended complaint does not assert a First Amendment free exercise cause of action against defendant Schroyer with respect to plaintiff's allegations that he was denied the opportunity to participate in Ramadan and/or congregational services. For that reason, I

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**

2016 WL 1638242

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 58 of 380

have not analyzed that claim in the context of defendant Schroyer's motion.

13    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

### 3. *Retaliation*

In his motion, defendant Schroyer does not address the retaliation cause of action asserted against him. Accordingly, while I have not addressed that claim in this report, and therefore recommend it survive defendant's motion, I also recommend that defendant Schroyer be permitted to file a second motion for summary judgment addressing it.

### 4. *Conspiracy*

Plaintiff's amended complaint includes a conspiracy claim against defendant Schroyer in connection with his deliberate medical indifference cause of action. In light of my recommended finding that the underlying constitutional claim lacks merit and should be dismissed, however, I also recommend that the accompanying conspiracy claim be dismissed. *See Droz v. McFadden,* 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.").

### C. *County Defendants' Motion*

### 1. *RLUIPA* [14]

14    While plaintiff's amended complaint mentions in passing the RLUIPA, it does not expressly state a claim under that provision. *See, e.g., Dkt. No. 17 at 16,* 36–42. Nonetheless, mindful that the court is required to construe a *pro se* litigant's pleadings to raise the strongest arguments suggested, *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013), I have considered plaintiff's amended complaint to assert a cause of action under that provision, as well.

To the extent plaintiff intended to assert RLUIPA claims against any of the county defendants in both their official and individual capacities, they are subject to dismissal. As relief, plaintiff's complaint seeks both money damages and declaratory relief. *Dkt. No. 17 at 42–44.* It is now firmly established, however, that the "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland v. Goord,* 758 F.3d 215, 224 (2d Cir. 2014). While plaintiff could ordinarily pursue a claim for injunctive and declaratory relief under the RLUIPA against defendants in their official capacities, *Williams v. Fisher,* No. 11–CV–0379, 2015 WL 1137644, at *17 (N.D.N.Y. Mar. 11, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.), such claims are now moot based upon plaintiff's transfer out of the CCJ. *See Shepherd v. Goord,* 662 F.3d 603, 610 (2d Cir. 2011) ("In this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."). Accordingly, I recommend that plaintiff's RLUIPA claim asserted against the county defendants be dismissed.

### 2. *Conspiracy*

**\*10**  Plaintiff alleges that there was a "meeting of the minds" among some of the defendants to deprive him of his civil rights. *See, e.g., Dkt. No. 17 at 25,* 27–29. Specifically, he contends that defendant Laurin evaluated plaintiff's commissary purchases on or about October 15, 2012, and decided that plaintiff's purchases were inconsistent with his heart-healthy diet. *See Dkt. No. 17 at 24* ("Said conspiracy was initiated on October 15, 2012, as Laurin made a medical assessment stating my commissary buys is a form of non-compliance to my special diet."). Defendant Laurin thereafter allegedly communicated his "assessment" to defendants Schroyer and Kinter and the three arrived at an agreement to remove plaintiff from the heart-healthy diet. *See id.* at 25 ("Kinter concurred [with] said assessment [and] Schroyer rubber-stamped it into effect.... Thus, on October 16th, 2012, said conspiracy went into effect; Kinter informed me of the removal of all previously issued diets, stating I'm not complying to said diets based on my commissary purchases."). Plaintiff also specifically implicates defendant Bedard in his conspiracy claim, accusing him of "enforc[ing]" the decision by defendants Schroyer and Kinter to remove him from his special diets and intentionally accelerating the conspiracy by mislabeling his food thereafter to reflect that his meals did not contain pork. *Id.* at 25, 27. To further defendant Bedard's alleged "viciousness," he "established a meeting of the minds with Clansy and Web." *Id.* at 27. According to plaintiff, defendant Clansy furthered the

conspiracy by admitting to plaintiff that the CCJ kitchen made a mistake on October 17, 2012, by serving plaintiff a meal containing pork products. *Id.* at 28. On November 5, 2012, defendant Web allegedly fielded a concern by plaintiff that his food contained pork by reaching out to the CCJ kitchen, who told Web that the meat was actually turkey. *Id.* at 29. Plaintiff contends that defendant Web's refusal to disclose who he spoke to in the kitchen perpetuated the conspiracy initiated by defendants Laurin, Kinter, and Schroyer. [15] *Id.*

[15]    To be clear, then, in light of all of the allegations described above, I have construed plaintiff's amended complaint as asserting (1) a deliberate medical indifference claim against defendants Schroyer, Laurin, Kinter, and Bedard based on a conspiracy theory of liability; and (2) free exercise and RLUIPA claims regarding plaintiff's religious dietary restrictions against defendants Bedard, Clancy, and Web based on a conspiracy theory of liability. In addition, although plaintiff contends that defendants Clancy and Blaise conspired to violate his rights with respect to the incident involving another inmate on or about November 17, 2012, *see, e.g, Dkt. No. 17 at 31,* I have construed and analyzed those allegations as giving rise to an Eighth Amendment failure-to-protect cause of action, which I will address more completely below in Part III.C.5.c. of this report.

"To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights are not sufficient to support a cognizable claim under section 1983. *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983); *Pinaud v. Cnty. of Suffolk,* 52 F.3d 1139, 1156 (2d Cir. 1995).

In this case, although plaintiff's allegations regarding the extent of the conspiracy are detailed, there is no evidence in the record to support them. While defendant Kinter confirms that she discussed the decision to remove plaintiff from his heart-healthy diet with defendants Laurin and Schroyer prior to October 16, 2012, there is no record evidence to suggest that the decision was motivated by plaintiff's previously filed grievances or any other reason

aside from plaintiff's commissary purchases. *Dkt. No. 77–10 at 3–4.* According to defendant Kinter, plaintiff's commissary purchases were monitored by medical staff from July 25, 2012 until September 30, 2012, because "[p]laintiff showed little medical improvement after [his] dietary restrictions had been implemented." *Id.* at 3. A review of plaintiff's commissary purchases, submitted by way of commissary receipts in support of the county defendants' motion, supports defendants' assertion that plaintiff was purchasing foods that were inconsistent with a low-fat, low-cholesterol diet during the relevant time period. *Dkt. No. 77–4 at 2–5.* Plaintiff's bare allegation with respect to the alleged "meeting of the minds" in this respect is not sufficient to defeat the county defendants' motion.

Similarly, plaintiff's allegations in his amended complaint are insufficient to give rise to a genuine dispute of material fact regarding whether defendant Bedard furthered any conspiracy by mislabeling his food. Aside from plaintiff's own allegation, there is no evidence that defendant Bedard did, in fact, mislabel any of plaintiff's meals. In addition, there is no evidence in the record to suggest that defendant Bedard acted maliciously in preparing plaintiff's meals, and he states that the CCJ kitchen staff prepared plaintiff's food "in accordance with the records and notifications [they] had on file for him." *Dkt. No. 77–11 at 4.* Defendant Bedard also explained that, "[t]o the extent the Plaintiff grieved of being served pork he would either be provided a replacement meal, or as was most often the case, be instructed that the food being served was not pork at all, but rather a different type of food such as turkey." *Id.*

 **\*11**  With respect to plaintiff's allegations that defendant Clancy conspired with defendant Bedard to maliciously mislabel plaintiff's food, again, aside from plaintiff's own contentions in his amended complaint, there is no evidence in the record to support this claim. While plaintiff contends that "a meeting of the minds was established when [defendant Clancy] admitted to speaking to the Kitchen staff" on October 18, 2012, regarding plaintiff having received a meal containing pork in it the day prior, there is no evidence regarding the identity of the person with whom she spoke. *Dkt. No. 17 at 28.* Any contention by plaintiff that defendant Clancy spoke to defendant Bedard or that the two agreed to violate plaintiff's rights at that time is pure conjecture. In any event, plaintiff alleges that defendant Clancy explained to him that he received the meal from the day prior by mistake due to a new CCJ staff employee's error. *Id.* at 19. Contrary to plaintiff's allegations of a large-scale conspiracy to violate

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**

2016 WL 1638242

plaintiff's rights, defendant Clancy immediately provided him with a new meal. *Dkt. No. 775 at 26.*

There is also no evidence that defendants Bedard and Web conspired. While plaintiff speculates in his amended complaint that "[a] meeting of the minds was established by Web and Bedard" regarding a meal plaintiff was provided on November 5, 2012, there is no other evidence to suggest that those two individuals ever spoke. *Dkt. No. 17 at 29.* According to plaintiff's own allegations, in response to his complaint that his meal on that date contained pork, defendant Web contacted the CCJ kitchen and then informed plaintiff the meat product was turkey, not pork. *Id.* at 21–22. There is no record of the identity of the person with whom defendant Web spoke, rendering plaintiff's allegation that it was defendant Bedard (and the allegation that the two agreed to violate plaintiff's rights) mere speculation.

For all of the reasons discussed above, I find no evidence from which a reasonable factfinder could conclude that defendants Laurin, Kinter, Bedard, Web, and Clancy conspired to violate plaintiff's constitutional rights.

In addition, plaintiff's conspiracy claim appears to be precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides "the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together." [16] *Little v. City of N.Y.,* 487 F.Supp.2d 426, 441–42 (S.D.N.Y. 2007).* Because defendants Laurin, Kinter, Bedard, Clancy, and Web are all employees of the County of Clinton, and plaintiff's own allegations suggest that each of them was acting within the scope of his or her employment at the relevant times, plaintiff's conspiracy claims are precluded by virtue of the intra-corporate conspiracy doctrine.

[16]    The doctrine is rooted in the Sherman Antitrust Act, 15 U.S.C. § 1, and, although it was developed in the context of business entities, since its inception has been expanded to apply to business corporations and public entities, as well. *Everson v. N.Y. City Transit Auth.,* 216 F.Supp.2d 71, 75–76 (E.D.N.Y. 2002)

Although plaintiff's amended complaint mentions, in passing, 42 U.S.C. § 1985, there is no record evidence to support a conspiracy claim against the defendants under section 1985(3). To sustain a cause of action for conspiracy to violate civil rights under that provision, a plaintiff must demonstrate

that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his equal protection of the laws, or of equal privileges and immunity secured by law. *United Bhd. of Carpenters & Joiners, Local 610, AFL–CIO v. Scott,* 463 U.S. 825, 835 (1983); *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994). "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." *Gagliardi,* 18 F.3d at 193. A plaintiff asserting a claim under section 1985(3) need not necessarily offer proof of an explicit agreement; a conspiracy can be demonstrated through circumstantial evidence that "shows the parties have a tacit understanding to carry out the prohibited conduct." *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1995) (quotation marks omitted).

**\*12** In this case, there is no record evidence, including any allegations in plaintiff's amended complaint, regarding race-based animus or that plaintiff's membership in a suspect class provided motivation for the defendants' conduct. Indeed, the plaintiff's theory appears to be that it was his filing of grievances, and not his race, that motivated the defendants to take adverse action against him. Accordingly, I recommend plaintiff's section 1985(3) cause of action be dismissed on the merits.

### 3. *Free Exercise (Regarding Plaintiff's Ramadan and Congregational Prayer Allegations) and Retaliation*

Citing plaintiff's alleged failure to exhaust the available administrative remedies prior to filing this lawsuit, defendants seek dismissal of plaintiff's (1) free exercise claims to the extent they are based on allegations that plaintiff was deprived of the opportunity to participate in (a) Ramadan during July and August 2012, and (b) congregational Jummah services; and (2) retaliation claims.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) ("Exhaustion is ... mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley,*

2016 WL 1638242

No. 04–CV–4587, 2007 WL 389003, at *5–6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy,* No. 04–CV– 0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95;

*accord, Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir. 2007). [17]

[17]  While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion " 'in a substantive sense,' " an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir. 2004) (emphasis omitted)).

As an inmate at the CCJ, plaintiff had available to him a grievance process for use in complaining of prison conditions. *Dkt. No. 77–14 at 3.* In accordance with the prescribed grievance procedure, an inmate complaining of prison conditions must first request a grievance form from one of the corrections officers on duty. *Id.* At that point the corrections officer must make an attempt to resolve the grievance informally. *Id.* If those efforts are unsuccessful, a formal grievance must be filed, and the matter is then investigated by defendant Laurin, as the inmate grievance coordinator, who, following his investigation, makes a decision concerning the matter. *Id.* In the event the inmate is dissatisfied with defendant Laurin's decision, he may appeal it to the Citizens Policy and Complaint Review Council ("CPCRC"). *Id.* If a plaintiff fails to follow each of the required steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he

PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

**\*13**  The record reflects that plaintiff availed himself of the grievance process on several occasions during the course of his incarceration at the CCJ. [18] *Dkt. No. 17 at 78–161; Dkt. No. 77–5 at 2–47; Dkt. No. 93–4 at 76170.* None of those grievances, however, appear to relate to the alleged failure of prison officials to permit him to observe Ramadan, to engage in congregate prayer, or retaliation by any defendants. *Id.* In his response to the county defendants' motion, plaintiff argues that, with "respect to Ramadhan and Congregational Prayer, not only did Plaintiff grieve these deprivates [sic], but for exhaustion purposes, he went to the extent of appealing to the direct attention of CPCRC – just as he did all of his other claims." *Dkt. No. 93–2 at 40.* The grievances to which plaintiff cites in support of this contention, however, do not relate to being deprived access to religious services, the right to participate in Ramadan, or retaliation. *Dkt. No. 93–4 at 167–171.* Thus, it appears that plaintiff has failed to exhaust the available administrative remedies with respect to these causes of action.

[18]  Plaintiff contends that some of his grievances were intentionally lost or destroyed by CCJ staff. *See, e.g., Dkt. No. 17 at 20.*

Plaintiff's failure to exhaust, however, does not warrant dismissal of the amended complaint without further inquiry. In a series of decisions rendered since enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias,* 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the exhaustion defense survives these first two levels of scrutiny,

2016 WL 1638242

the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

Plaintiff contends that he should be excused from the exhaustion requirement because, on the morning that Ramadan began in July 2012, the "Shift Officer" threatened plaintiff with physical violence. *Dkt. No.* 93–2 *at* 40. There is no evidence in the record, aside from plaintiff's allegations, however, that this threat actually occurred or that the assault of another Muslim inmate from the previous day, to which the Shift Officer referred in threatening plaintiff, actually occurred. In any event, according to plaintiff's own amended complaint, on a different occasion, when he was allegedly threatened by defendant Clancy on or about October 18, 2012 about filing a grievance concerning a meal, he, in fact, complained to defendant Laurin "about Clansy's [sic] threat." *Dkt. No.* 17 *at* 19. This demonstrates that plaintiff had a history of ignoring threats by some corrections officers and suggests he did not find the threats of CCJ security staff necessarily compelling. Most persuasive to me in recommending that the court find that there are no circumstances that exist to excuse plaintiff's failure to exhaust, however, is that courts in this circuit have concluded that the type of vague threat, allegedly directed toward plaintiff by an unidentified individual, cannot serve as a basis for finding an inmate excused from the PLRA exhaustion requirement. *See Singh v. Lynch,* 460 Fed.Appx. 45, 4748 (2d Cir. 2012) ("The test for determining the availability of grievance procedures to a prisoner is objective.... Singh's subjective fear of retaliatory physical harm derives from two facts: the unreported June 6, 2005 assault and other inmates' warnings that Lynch was out to get him. The former fact cannot, by itself, support an objective finding that grievance procedures were unavailable.... As for the alleged inmate warnings, in the absence of any particulars indicating that Lynch was looking to do more than harass Singh ..., this fact cannot support a finding that grievance procedures for an assault claim were effectively unavailable."); *Harrison v. Stallone,* No. 06–CV–0902, 2007 WL 2789473, at *6 (N.D.N.Y. Sept. 24, 2007) (Kahn, J., *adopting report and recommendation by* DiBianco, M.J.) (concluding that the plaintiff was not excused from exhausting available administrative remedies even where the plaintiff alleged in his complaint that he did not file a grievance because he was " 'afraid of retaliation' " and he stated in opposition to the defendants' motion for summary judgment that "he had a 'legitimate fear' of retaliation because his substantive claim

is one for retaliation"). To hold otherwise would permit an exception that would be easily and often incanted by inmates, and would potentially eviscerate the PLRA's exhaustion rule. *Harrison,* 2007 WL 2789473, at *6.

### 4. *Personal Involvement*

**\*14** Defendants seek dismissal of the claims asserted against defendants Bedard, Blaise, Clancy, Perry, Web, and Wingler, arguing that there is no evidence in the record from which a reasonable factfinder could conclude that any of those individuals were personally involved in the alleged unconstitutional conduct.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Iqbal,* 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.,* No. 91–CV–8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

In the event the recommendations above are adopted, the remaining claims for consideration against the county defendants in this regard are plaintiff's deliberate medical indifference claim and his free exercise claim regarding his dietary restrictions. At the outset of my analysis, it is worth noting that the thrust of defendants' arguments with respect to whether the defendants considered below were personally involved is aimed at whether they are in fact *responsible* for the conduct alleged by plaintiff. *See, e.g., Dkt. No.* 77–19 *at* 24 ("Although these Defendants had interactions with the Plaintiff, they did not have any authority to alter Plaintiff's medical/dietary restrictions. They simply attempted to ensure that Plaintiff was provided a proper meal and provided him with a replacement meal if need be."). Because a personal involvement inquiry on summary

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

judgment examines only whether there is record evidence to support a factfinder's conclusion that the individual under consideration was involved in the alleged conduct, I have limited my analysis to that particular question in this part of the report.

### a. Defendant Bedard

Plaintiff contends that defendant Bedard violated his rights by (1) enforcing the decision by defendants Schroyer and Kinter to remove him from his heart-healthy diet in October 2012, and (2) serving him meals that contained pork. Defendant Bedard's own affidavit discloses that he was personally involved by admitting that he discussed the status of plaintiff's meal restrictions with some of the other named defendants. *Dkt. No. 77–11 at 4.* In addition, defendant Bedard stated that, "[w]hen asked, [he] would discuss the components or ingredients of meals with the [corrections officers], and how this related to any restrictions the kitchen had on file for various inmates, in attempts to resolve any issues regarding an inmate being served a non-compliant meal." *Id.* In light of these statements, and considered in conjunction with plaintiff's allegations that CCJ corrections officers phoned the CCJ kitchen following his complaints about his food containing pork (and some of the grievances reflecting the same), I find that reasonable factfinder could conclude that defendant Bedard was personally involved in the alleged conduct giving rise to plaintiff's deliberate medical indifference cause of action and free exercise claim regarding his religious dietary restrictions.

### b. Defendant Blaise

**\*15** There is no record evidence that defendant Blaise was involved in either plaintiff's medical indifference or free exercise claim. Indeed, there are no allegations in the amended complaint, nor has plaintiff subsequently alleged, that defendant Blaise was involved in providing or denying him meals at any time. [19] Plaintiff has acknowledged this in his response to the county defendants' motion. *See Dkt. No. 93–2 at 54* ("For the purpose of clarity, nowhere within the Amended Complaint is it alleged that Blaise deprived Plaintiff of meals or any of his various diets."). Accordingly, I recommend that plaintiff's medical indifference claim and free exercise claim regarding his religious diet be dismissed.

[19] Instead, plaintiff has maintained that defendant Blaise is responsible for housing a mentally ill inmate next door to plaintiff's cell and asking plaintiff to retrieve the inmate's meal tray knowing that plaintiff may be assaulted by the inmate. *Dkt. No. 17 at 31–32; see also Dkt. No. 93–2 at 54–56.* Those allegations will be addressed in Part III.C.5.c. of this report.

### c. Defendant Clancy

Turning first to plaintiff's deliberate medical indifference cause of action, there is no record evidence from which a reasonable factfinder could conclude that defendant Clancy was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Clancy.

Plaintiff alleges, however, and there is evidence in the record confirming that defendant Clancy responded to at least one of plaintiff's complaints regarding whether his meal contained pork. *Dkt. No. 17 at 1819; Dkt. No. 93–4 at 116–17.* As a CCJ Corrections Sergeant, defendant Clancy is considered a supervisory official, and, in that capacity, she may be found personally liable for a constitutional violation in the event she learned of a constitutional violation through a report or appeal and failed to remedy the wrong. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal,* 556 U.S. 554 (2009); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright,* 21 F.3d at 501. Because there is evidence in the record that reflects defendant Clancy learned that plaintiff received a meal that did not comport with his religious dietary restrictions, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Clancy on the basis of personal involvement.

### d. Defendant Perry

Turning first to plaintiff's deliberate medical indifference cause of action against this defendant, there is no record evidence from which a reasonable factfinder could conclude that defendant Perry was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Perry.

As to plaintiff's free exercise claim, plaintiff contends that, on December 25, 2012, defendant Perry responded to his complaint that his meal consisted of "pork rib-eye." *Dkt. No. 17 at 22–23.* Plaintiff requested a grievance form from defendant Perry, and the copy of the completed form that is in the record confirms that defendant Perry responded to plaintiff's request for a new meal. *Dkt. No. 93–4 at 164.* Thus, the record establishes that defendant Perry was involved in the alleged violation of plaintiff's free exercise rights on at least one occasion. For this reason, I recommend defendants' motion be denied to the extent that it seeks dismissal of plaintiff's free exercise claim asserted against defendant Perry on the basis of personal involvement.

### e. *Defendant Web*

**\*16** Like defendants Blaise, Clancy, and Perry, there is no record evidence from which a reasonable factfinder could conclude that defendant Web was involved in denying plaintiff any of his heart-healthy meals to which he was entitled. Accordingly, I recommend this claim be dismissed as against defendant Web.

Turning to plaintiff's free exercise claim, the amended complaint alleges that, on November 5, 2012, plaintiff complained to defendant Web that his meal contained pepperoni. *Dkt. No. 17 at 21.* In response, defendant Web allegedly told plaintiff that the meat was turkey ham, not pork, and thereafter called the CCJ kitchen to confirm that the meat was not pork. *Id.* at 21–22. Although plaintiff alleges that he field a grievance regarding this incident, there is no copy of the grievance in the record before the court. *Id.* at 22; *Dkt. No. 93–4 at 76–171.* In his affidavit submitted in support of the county defendants' motion, defendant Web admits to "recall[ing] an occurrence of which the Plaintiff was complaining that he was served pork in contradiction to his religious diet. However the food he claimed was pork was actually turkey." *Dkt. No. 77–16 at 2.* In light of this additional record evidence supporting plaintiff's version of the events on November 5, 2012 as alleged in his amended complaint, I find there is a dispute of material fact as to whether defendant Web was personally involved in depriving plaintiff of a meal consistent with his religious diet on that date.

### f. *Defendant Wingler*

Plaintiff's claims against defendant Wingler stem from allegations that, on two occasions, defendant Wingler ignored plaintiff's complaints that his meals contained tomatoes in violation of his medical dietary restrictions. *Dkt. No. 17 at 7; Dkt. No. 93–2 at 58.* The record evidence includes two grievances, one dated October 3, 2012 and the second October 28, 2012, that confirm, at least, that (1) plaintiff complained of being served tomato products on those dates and (2) defendant Wingler addressed those complaints. *Dkt. No. 93–4 at 92, 139.* Therefore, I find there is sufficient evidence from which a reasonable factfinder could conclude that defendant Wingler was personally involved plaintiff's allegations that he was deprived of medically compliant meals.

With respect to plaintiff's free exercise claim asserted against defendant Wingler, however, there are no allegations in the amended complaint, and plaintiff has failed to subsequently submit any proof, reflecting that defendant Wingler was ever involved in providing or depriving plaintiff of any meals that were not in accordance with his religion. For that reason, I recommend plaintiff's free exercise claim in this regard against defendant Wingler be dismissed.

### 5. *Remaining Claims/Defendants*

### a. *Plaintiff's Deliberate Medical Indifference Claim Asserted Against Defendants Laurin, Kinter, Bedard, and Wingler*

As discussed above in Part III.B. of this report with respect to defendant Schroyer, I find that there is no record evidence from which a reasonable factfinder could conclude that the alleged conduct of defendants Laurin, Kinter, Bedard, and Wingler was sufficiently serious to satisfy the objective element of a deliberate medical indifference cause of action. In particular, there is no record evidence, aside from plaintiff's allegation that he suffered an indiscernible amount of risk for a heart attack and stroke, that removing him from his heart-healthy diet for one month is constitutionally significant. *See, e.g., Cleveland v. Eagleton,* No. 14–CV–2444, 2015 WL 8911463, at \*5 (D.S.C. Nov. 12, 2015) (finding that removing the plaintiff from his cholesterol medicine and his heart-healthy diet does not satisfy the objective element of a medical indifference claim). Because plaintiff cannot establish one of the required elements of the claim, I recommend that his deliberate medical indifference cause of action be dismissed as to defendants Laurin, Kinter, Bedard, and Wingler.

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1638242

b. *Plaintiff's Free Exercise Claim (Regarding his Religious Dietary Restrictions) Asserted Against Defendants Laurin, Kinter, Bedard, Clancy, Perry, and Web*

**\*17** While inmates confined within prison facilities are by no means entitled to the full gamut of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection, including their right to "a diet consistent with [their] religious scruples." *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir. 1992); *see also Pell v. Procunier,* 417 U.S. 817, 822 (1974) ("In the First Amendment context ... a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348–49 (1987); *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir. 1990).

As a threshold matter, "[t]he prisoner must show ... that the disputed conduct substantially burdens his sincerely held religious beliefs." [20] *Salahuddin,* 467 F.3d at 274–75. In evaluating this factor, the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford,* 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin,* 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.' " *Ford,* 352 F.3d at 595 (quoting *Fromer v. Scully,* 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

[20]     The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme

Court's decision in *Emp't Div. v. Smith,* 494 U.S. 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.' " *Ford v. McGinnis,* 352 F.3d 582, 592 (2d Cir. 2003) (quoting *Emp't Div.,* 494 U.S. at 887); *see also Holland v. Goord,* 758 F.3d 215, 220–21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

In this case, there is evidence in the record to support a factfinder's conclusion that plaintiff was initially served a meal that contained pork, which is inconsistent with his religious beliefs, on only ten occasions between March 28, 2012 and December 25, 2012. Specifically, a review of the record evidence, including the allegations in plaintiff's amended complaint, reveal that plaintiff was initially served meals containing pork on (1) June 21, 2012; (2) July 4, 2012; (3) September 24, 2012 at lunch; (4) September 24, 2012 at dinner; (5) October 9, 2012; (6) October 10, 2012; (7) October 17, 2012; (8) October 29, 2012; (9) November 5, 2012; and (10) December 25, 2012. *Dkt. No. 17 at 13,* 18, 20, 21, 22, 66, 67; *Dkt. No. 93–4 at 82–85,* 94–99, 116–17, 164–65. On September 24, 2012, plaintiff learned that the meat in his meals was vegetarian bacon. *Id.* at 83, 85. Similarly on October 10, 2012, plaintiff was told that the meat was turkey ham, not pork. *Id.* at 99. Nevertheless, there is evidence suggesting that on October 10, 2012 and December 25, 2012, his meal was replaced. *Id.* at 96, 164. While there is a dispute in the record regarding precisely when the CCJ learned of plaintiff's religious dietary restrictions, it is clear from the record that plaintiff may have been served pork only on ten dates during his one-year incarceration at the CCJ. This is not constitutionally significant and does not give rise to a dispute of fact regarding whether his First Amendment rights were substantially burdened. *See Norwood v. Strada,* 249 Fed.Appx. 269, 272 (3d Cir. 2007) (finding that the denial of seven consecutive religious meals did not substantially burden the plaintiff's free exercise rights); *Washington v. Afify,* 968 F.Supp.2d 532, 538 (W.D.N.Y. 2013) ("Courts have generally held that incidents that are isolated, or few in number, involving religiously-mandated food, do

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 66 of 380

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)
2016 WL 1638242

not give rise to a First Amendment claim." (citing cases));
*Evans v. Albany Cnty. Corr. Facility*, No. 05–CV–1400, 2009
WL 1401645, at *8 (N.Y.N.D. May 14, 2009) (Suddaby,
J.) (finding the plaintiff's allegations that he was served
eighteen "wrong meals" out of an approximate 354 meals
was constitutionally de minimis); *Odom v. Dixion*, No. 04–
CV–0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15,
2008) (finding the plaintiff's allegation that the defendants
failed to provide him with kosher meals on five of the
fifteen days he was in keeplock confinement did not give
rise to a cognizable constitutional violation). Accordingly, I
recommend this claim be dismissed as to defendants Laurin,
Kinter, Bedard, Clancy, Perry, and Web.

### c. *Plaintiff's Failure–to–Protect Claim Asserted Against Defendants Blaise and Clancy*

**\*18** The county defendants do not seek dismissal of this
claim in their summary judgment papers. For that reason,
I recommend that the claim survive this motion but that
defendants Blaise and Clancy be permitted an opportunity to
file a second motion for summary judgment specific to this
remaining claim.

### IV. *SUMMARY AND RECOMMENDATION*
A careful review of the evidence currently before the court
demonstrates that no reasonable factfinder could conclude
that any of the defendants were deliberately indifferent to
plaintiff's medical needs, based upon a decision to remove
him from his heart-healthy diet for a period of one month.
Addressing plaintiff's religious claims, his assertion that his
religious rights were violated when prison officials failed
to permit him to celebrate Ramadan and to engage in
congregational prayer are precluded based upon his failure
to exhaust available administrative remedies before filing
this action. Similarly, his retaliation claims are also not
properly exhausted. Plaintiff's free exercise claim regarding
his religious diet is also subject to dismissal in light of the
absence of any evidence from which a reasonable factfinder
could conclude that his rights were substantially burdened.
Because defendant Schroyer did not seek dismissal of the
plaintiff's retaliation claim, I recommend that cause of action
survive defendant Schroyer's motion but he be permitted to
file a second motion for summary judgment addressing it.

Similarly, the county defendants did not address plaintiff's
failure-to-protect claim asserted against defendants Blaise
and Clancy and, accordingly, I recommend that claim survive
but that those individuals be permitted to file a motion for
summary judgment regarding that single claim.

Based upon the foregoing, it is hereby respectfully

RECOMMENDED that defendant Schroyer's motion for
summary judgment (*Dkt. No. 75*) be GRANTED to the extent
it seeks dismissal of plaintiff's claims against him, with the
exception of plaintiff's retaliation claim and that the motion
be DENIED as to that claim; and it is further

RECOMMENDED that the motion for summary judgment
submitted by defendants Bedard, Blaise, Clancy, Laurin,
Kinter, Perry, Web, and Wingler (*Dkt. No. 77*) be GRANTED
to the extent it seeks dismissal of plaintiff's claims asserted
against all defendants, with the exception of plaintiff's
failure-to-protect claim not asserted against defendants Blaise
and Clancy and that the motion be DENIED as to that claim;
and it is further

RECOMMENDED that defendant Schroyer be permitted to
file a second motion for summary judgment addressing the
retaliation claim not addressed in his first motion, and that
defendants Blaise and Clancy be permitted to file a second
motion for summary judgment addressing the failure-to-
protect claim not addressed in their first motion.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties
may lodge written objections to the foregoing report. Such
objections must be filed with the clerk of the court within
FOURTEEN days of service of this report. FAILURE
TO SO OBJECT TO THIS REPORT WILL PRECLUDE
APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P.
6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a
copy of this report and recommendation upon the parties in
accordance with this court's local rules.

### All Citations

Not Reported in Fed. Supp., 2016 WL 1638242

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 67 of 380

Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)

2016 WL 1639904

KeyCite Red Flag - Severe Negative Treatment

Affirmed in Part, Vacated in Part, Remanded by  Brandon v. Kinter,  2nd Cir.(N.Y.),  September 10, 2019

2016 WL 1639904

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Chamma K. BRANDON, Plaintiff,

v.

Dr. Glen SCHROYER, et al., Defendants.

9:13-CV-939 (TJM/DEP)

|

Signed 04/25/2016

**Attorneys and Law Firms**

Chamma K. Brandon, Ossining, NY, pro se.

Kelly M. Monroe, Andrew L. McNamara, Molly C. Casey, Thuillez, Ford Law Firm, Albany, NY, Bradley J. Stevens, Lemire, Johnson Law Firm, Malta, NY, for Defendants.

**DECISION & ORDER**

Thomas J. McAvoy, United States District Judge

**\*1**  This action, brought pursuant to 42 U.S.C. §§ 1983, 1985 and 19 86, as well as the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, alleges that Defendants violated the Plaintiff's rights by denying him access to food appropriate to his religion and preventing him participating in religious ceremonies during his incarceration, and by failing to protect him from an assault by a fellow inmate. The action was referred to the Hon. David E. Peebles, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

The Report-Recommendation, dated February 26, 2016, recommends that Defendants' motions for summary judgment be granted in part and denied in part, and that Defendant Glen Schroyer be permitted to file a supplemental motion for summary judgment to address Plaintiff's claims of retaliation. See dkt. # 99. Defendant Schroyer subsequently filed such a motion. See dkt. # 100.

Plaintiff filed objections to the Report-Recommendation. When objections to a magistrate judge's Report-Recommendation are lodged, the Court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." See 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." Id.

Having reviewed the record *de novo* and having considered the issues raised in the Plaintiff's objections, this Court has determined to accept and adopt the recommendation of Magistrate Judge Peebles for the reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that the Plaintiff's objections to the Report-Recommendation of Magistrate Judge Peebles, dkt. # 111, are hereby OVERRULED. The Report-Recommendation, dkt. # 99, is hereby ADOPTED, and:

1.  Defendant Schroyer's motion for summary judgment, dkt. # 75, is hereby GRANTED in part and DENIED in part. The motion is denied with respect to Plaintiff's retaliation claims against Plaintiff and GRANTED in all other respects;

2.  Defendant Schroyer's second motion for summary judgment is hereby accepted as filed. The Clerk of Court shall refer the motion to Magistrate Judge Peebles for a Report and Recommendation; and

3.  The motion of summary judgment of Defendants Bedard, Blaise, Clancy, Laurin, Kinter, Perry, Web and Wingler, dkt. # 77, is hereby GRANTED in part and DENIED in part. The motion is DENIED with respect to Plaintiff's failure-to-protect claim against Defendants Blaise and Clancy and GRANTED in all other respects.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1639904

**Brandon v. Schroyer, Not Reported in Fed. Supp. (2016)**

2016 WL 1639904

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 69 of 380
McAllister v. Garrett, Not Reported in F.Supp.2d (2011)
2011 WL 3875423

2011 WL 3875423
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Owen Q. McALLISTER, Sr., Plaintiff,

v.

Officer P. GARRETT, # 703; Officer Gibbs,
Booking Officer; Sergeant Yankowski, Booking
Sgt.; Captain Ray Rhodes, Disciplinary Hearing
Officer; Anthony Amicucci, Warden; Sergeant
Paradiso, # 150; Officer Robinson; Officer Kalidis;
E.R.T.; Valhalla Correctional Facility, Defendants.

No. 10 Civ. 3828(RJH)(HBP).
|
Sept. 1, 2011.

*MEMORANDUM OPINION AND ORDER*

PITMAN, United States Magistrate Judge.

I. *Introduction*

 **\*1** Plaintiff, a *pro se* prisoner, commenced this action under 42 U.S.C. § 1983, alleging violations of his due process rights and his right to be free from cruel and unusual punishment while he was incarcerated at Westchester County Department of Correction ("WCDOC") in Valhalla, New York. By motion dated August 18, 2010 (Docket Item 5), petitioner seeks to have counsel appointed to represent him pursuant to 28 U.S.C. § 1915(e)(1). + For the reasons set forth below, the motion is denied without prejudice to renewal.

II. *Background*

The WCDOC is a prison consisting "of a Jail Division, which houses individuals 16 years and older (including males accused of a crime or awaiting sentencing ... ) and a Penitentiary Division, which houses males sentenced to terms of one year or less." WCDOC, About Us, *available at* h ttp:// correction.westchestergov.com/about-us. Plaintiff's claims arise from an incident that allegedly occurred on December 17, 2009, when plaintiff was told he would be moved into the Penitentiary Division (Complaint, filed May 10, 2010 (Docket Item 2), at II.D.). Plaintiff alleges he was moved out of the Penitentiary Division in April 2009 because he had previously submitted grievances against Officers

Wyatt and Garrett (Complaint at II.D.). Plaintiff does not identify these officers by first name or otherwise explain why he filed grievances against them, except to say there was an "ongoing situation" (Complaint at II.D.). Plaintiff claims an altercation with Garrett in April 2009 resulted in a disciplinary charge and his move out of the Penitentiary Division (Complaint at II.D.). From April 2009 to December 17, 2009, plaintiff lived in the "old part" of the WCDOC rather than the Penitentiary Division, which presumably means the Jail Division (Complaint at II.D.).

On December 17, 2009, plaintiff allegedly told several officers that he should not be moved back to the Penitentiary Division (Complaint at II.D.). One officer told him his situation with Garrett was not documented (Complaint at II.D.). While being escorted to the Penitentiary Division, plaintiff informed another officer about his situation with Garrett. Upon reaching the main corridor, Garrett allegedly said, "here comes that asshole McAllister, get the fuck in the Bullpen" (Complaint at II.D.). Plaintiff responded by calling Garrett a "pussy" (Complaint at II .D.). As plaintiff was informing Sergeant Paradiso that he should not be in the Penitentiary Division, Garrett grabbed plaintiff's right arm "very aggressively" (Complaint at II.D.). Plaintiff yanked his arm away from Garrett, who grabbed the front of plaintiff's shirt and tried to wrestle plaintiff to the ground (Complaint at II.D.). An Emergency Response Team ("ERT") responded, and plaintiff was moved to the Special Housing Unit ("SHU") of WCDOC (Complaint at II.D.). Plaintiff claims he remained in SHU from that day until the time he signed his complaint on March 16, 2010, 89 days after the incident (Complaint at II.D. & 7).

 **\*2** Later on the day of December 17, 2009, three disciplinary charges were leveled against plaintiff: (1) acting with intent to cause inconvenience, annoyance or harm; (2) disobedience of orders, and (3) interference with a staff member's performance of duties or functions by physical intimidation, including but not limited to menacing a staff member (Complaint at II.D.). [1] On December 18, 2009, plaintiff claims he received a second copy of the disciplinary report that was similar to the copy he had previously received except that it did not state that the ERT had responded, added that Garrett sustained a fractured wrist and added a fourth charge of causing substantial bodily injury to a correctional officer (Complaint at II.D.). Plaintiff claims both reports are procedurally flawed and erroneous (Complaint at II.D.). He states that he was charged in New York State court with

2011 WL 3875423

assault in the second degree following the altercation with Garrett (Complaint at II.D.).

1    Plaintiff claims four disciplinary charges were initially leveled against him, but I conclude that what he believes to be the third and fourth charges are really only one charge.

Plaintiff claims that a subsequent disciplinary hearing conducted by Captain Ray Rhodes on December 30, 2009, was "very bogus and non impartial" and violated his due process right to a fair and impartial hearing (Complaint at II.D.). Plaintiff contends that he was not able to call witnesses on his behalf, was denied the right to introduce videotaped evidence of the altercation and was denied the right to have a hearing in a secluded area or private setting. He states that Rhodes found him guilty of the original charges in the disciplinary hearing but found plaintiff not guilty of causing substantial bodily injury to a correctional officer on a "technicality" (Complaint at II.D.). Plaintiff claims numerous witnesses saw the incident, and that cameras in the main corridor recorded the incident on videotape.

Plaintiff claims he suffered an eye injury in the altercation with Garrett (Complaint at III). In his complaint, plaintiff states that the damage consists of "pain, cloudy vision, not being able to focus, objects are distorted" (Complaint at III). In his motion for counsel, plaintiff states that he underwent surgery to have his retina reattached (Application for the Court to Request Counsel, dated August 18, 2010 (Docket Item 5), at ¶ 2).

Based on the narratives from his complaint and motion to obtain counsel, plaintiff appears to be alleging four categories of constitutional violations: (1) that officers Robinson, Kalidas, Gibbs, Sergeants Yankowski and Paradiso, Captain Rhodes and Superintendent Amicucci were deliberately indifferent to conditions that posed a substantial risk of serious harm to his physical well-being, given their knowledge of prior harassment of plaintiff by Garrett; (2) that Garrett used excessive force in violation of plaintiff's Eighth Amendment right against cruel and unusual punishment; (3) that plaintiff's Due Process rights were violated by the administrative hearing, and (4) that plaintiff's confinement in SHU represented cruel and unusual punishment (*see* Complaint at II.D.; Application for the Court to Request Counsel at 4). Plaintiff seeks compensation for his pain and suffering, for being falsely accused of a crime, for being confined in the SHU and for restitution in the amount of $25

from the guilty verdicts in the disciplinary charges against him (Complaint at V.).

**\*3** By notice of motion filed July 29, 2011, defendants move to dismiss on the following grounds: (1) plaintiff failed to serve defendants within 120 days of filing the complaint, pursuant to Federal Rule of Civil Procedure 4(m); (2) plaintiff failed to state a claim of a constitutional deprivation; (3) plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"); (4) plaintiff fails to state a claim under the Eighth Amendment; (5) plaintiff failed to allege personal involvement of Gibbs, Robinson, Kalidas, Yankowski, Paradiso, Rhodes and Amicucci; (6) plaintiff failed to state a claim of a Due Process violation; (7) defendants are entitled to qualified immunity, and (8) plaintiff failed to allege that any constitutional rights violation resulted from a municipal policy or custom of the county (Memorandum of Law in Support of County Defendants' Motion to Dismiss, dated July 29, 2011 (Docket Item 17) (Defs.' Memo).

## III. *Analysis*

### A. *Applicable Legal Standards for the Appointment of Counsel*

Pursuant to 28 U.S.C. § 1915(e)(1), "[t]he court may request an attorney to represent any person unable to afford counsel." However, "[t]here is no requirement that an indigent litigant be appointed *pro bono* counsel in civil matters, unlike most criminal cases." *Burgos v. Hopkins,* 14 F.3d 787, 789 (2d Cir.1994) (citing 28 U.S.C. § 1915). The factors to be considered in ruling on a motion for *pro bono* counsel are well settled and include "the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, [the plaintiff's] efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." *Cooper v. A. Sargenti Co.,* 877 F.2d 170, 172 (2d Cir.1989) (*per curiam* ). Of these, "[t]he factor which command[s] the most attention [is] the merits." *Cooper v. A. Sargenti Co., supra,* 877 F.2d at 172. *Accord Odom v. Sielaff,* 90 Civ. 7659(DAB), 1996 WL 208203 at \*1 (S.D.N.Y. Apr. 26, 1996) (Batts, D.J .); *see Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2004). As noted over twenty years ago by the Court of Appeals:

> Courts do not perform a useful service if they appoint a volunteer lawyer to a case which a private lawyer would

McAllister v. Garrett, Not Reported in F.Supp.2d (2011)

2011 WL 3875423

not take if it were brought to his or her attention. Nor do courts perform a socially justified function when they request the services of a volunteer lawyer for a meritless case that no lawyer would take were the plaintiff not indigent.

*Cooper v. A. Sargenti Co., supra,* 877 F.2d at 174; *see also Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997) ("In deciding whether to appoint counsel ... the district judge should first determine whether the indigent's position seems likely to be of substance." (citation and internal quotation marks omitted)).

The Court of Appeals for the Second Circuit has stated in various ways the applicable standard for assessing the merits of a pro se litigant's claim. In *Hodge [v. Police Officers,* 802 F.2d 58 (2d Cir.1986) ], [the Court of Appeals] noted that "[e]ven where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim," and advised that a district judge should determine whether the pro se litigant's "position seems likely to be of substance," or showed "some chance of success." *Hodge,* 802 F.2d at 60–61 (internal quotation marks and citation omitted). In *Cooper v. A. Sargenti Co.,* [the Court of Appeals] reiterated the importance of requiring indigent litigants seeking appointed counsel "to first pass the test of likely merit." 877 F.2d 170, 173 (2d Cir.1989) (*per curiam* ).

**\*4** *Ferrelli v. River Manor Health Care Ctr.,* 323 F.3d 196, 204 (2d Cir.2003).

**B.** *Application of the Foregoing Principles to Plaintiff's Motion*

Petitioner has already established that he lacks the resources to obtain counsel, as his leave to proceed *in forma pauperis* was granted on May 7, 2010, by the Honorable Loretta A. Preska, United States District Judge (Docket Item 1), Plaintiff claims he needs an attorney because he is not well versed in civil litigation, the retina in his right eye needed to be reattached-which presumably indicates a difficulty or discomfort in reading documents with respect to this lawsuit-and he was in "keeplock status" at the time of the present motion (Application for the Court to Request Counsel at ¶ 2). Furthermore, plaintiff claims the recovery from eye surgery

and his uncontrolled high blood pressure has kept him from finding an attorney.

However, it does not appear at this time that petitioner's claims are sufficiently meritorious to warrant the appointment of counsel. Given the record before me, however, I conclude that even if plaintiff's claim cannot quite be described as frivolous, his "chances of success are extremely slim." *Ferrelli v. River Manor Health Care Ctr., supra,* 323 F.3d at 204, *quoting Hodge v. Police Officers, supra,* 802 F.2d at 60 (internal quotation marks and citation omitted). As a threshold matter, it appears unlikely that plaintiff has exhausted his administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a), with respect to the deliberate indifference and excessive force claims. Plaintiff's Due Process and cruel and unusual punishment claims appear similarly unlikely to succeed because of a failure to state a claim.

1. *Claims Unlikely to Succeed Because of a Lack of Administrative Exhaustion*

The PLRA, 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." "The purpose of the PLRA is 'to reduce the quantity and improve the quality of prisoner suits ... [and to afford] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006), *quoting Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004); *see Marvin v. Goord,* 255 F.3d 40, 42 (2d Cir.2001) (*per curiam* ); *Johnson v. Bendheim,* 00 Civ. 720(JSR), 2001 WL 799569 at *4 (S.D.N.Y. July 13, 2001) (Rakoff, D.J.) (adopting Report and Recommendation of Fox, M.J.); *Grey v. Sparhawk,* 99 Civ. 9871(HB), 2000 WL 815916 at *1 (S.D.N.Y. June 23, 2000) (Baer, D.J.).

Courts have interpreted the [PLRA] to require complete exhaustion in accordance with institutional procedures. *See, e.g., Sulton v. Greiner,* 2000 WL 1809284 (S.D.N.Y. Dec.11, 2000) (granting summary judgment where prisoner failed to appeal to the CORC); *Petit v. Bender,* 2000 WL 303280, at *2–3

2011 WL 3875423

(S.D.N.Y. March 22, 2000) (prisoner who only partially complied with the grievance procedures failed to exhaust his administrative remedies.); *Santiago v. Meinsen,* 89 F.Supp.2d 435 (S.D.N.Y.2000) (prisoners must challenge the conditions of their confinement through the highest level of available administrative avenues prior to filing suit. This requirement applies even when plaintiffs seek a remedy that cannot be awarded by the administrate body hearing the complaint.

**\*5** *Graham v. Cochran,* 96 Civ. 6166(LTS)(RLE), 2002 WL 31132874 at \*6 (S.D.N.Y. Sept. 25, 2002) (Swain, D.J.) (adopting Report & Recommendation of Ellis, M.J.); *see also Vidal v. Gorr,* 02 Civ. 5554(LAK), 2003 WL 43354 at \*1 (S.D.N.Y. Jan. 6, 2003) (Kaplan, D.J .); *Beatty v. Goord,* 210 F.Supp.2d 250, 252–53 (S.D.N.Y.2000) (Berman, D.J.).

The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle, supra,* 534 U.S. at 532. In addition, the PLRA applies to claims asserted by pretrial detainees as well as sentenced prisoners. *See United States v. Al–Marri,* 239 F.Supp.2d 366, 367–68 (S.D.N.Y.2002) (Marrero, D.J.); *Rivera v. State of* New York, 96 Civ. 7697(RWS), 1999 WL 13240, at \*4–\*5 (S.D.N.Y. Jan. 12, 1999) (Sweet, D.J.). The PLRA's exhaustion requirement must be met *before* plaintiff's complaint is filed. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) ( "[G]rievances must now be fully pursued prior to filing a complaint in federal court."), *overruled in part on other grounds, Porter v. Nussle, supra,* 534 U.S. at 532; *Pugh v. Goord,* 571 F.Supp.2d 477, 490 (S.D.N.Y.2008) (Sullivan, D.J.); *Schwartz v. Dennison,* 518 F.Supp.2d 560, 568 (S.D.N.Y.2007) (Holwell, D.J.), *aff'd,* 339 F. App'x 28 (2d Cir.2009).

"While 'our circuit has recognized that ... the PLRA's exhaustion requirement is mandatory, certain caveats apply.' " *Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004), *quoting Giano v. Goord, supra,* 380 F.3d at 677 (citation and internal quotation marks omitted).

[A] three-part inquiry is appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust all administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 2004 WL 1842647. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 2004 WL 1842669, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba [v. Wezner],* 366 F.3d [161, 163 (2d Cir.2004) ]. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d 670, 2004 WL 1842652 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

**\*6** *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see Macias v. Zenk,* 495 F.3d 37, 41 (2d Cir.2007); *Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006).

"Where a plaintiff alleges that the defendant made misrepresentations that inhibited the plaintiff from participating in the grievance process, dismissal of the complaint for failure to exhaust is not appropriate." *Sereika v. Patel,* 411 F.Supp.2d 397, 403 (S.D.N.Y.2006) (Marrero, D.J.), *citing Feliciano v. Goord,* 97 Civ. 0263, 1998 WL 436358 at \*2 (S.D.N.Y. July 27, 1998) (Cote, D.J.) *and Davis v. Frazier,* 98 Civ. 2658(HB), 1999 WL 395414 at \*4 (S.D.N.Y. June 15, 1999) (Baer, D.J.). Indeed, "a plaintiff may assert estoppel, and exhaustion may be excused, if he has been led to believe that an incident was not a grievance matter and would be otherwise investigated or that filing a grievance would be futile." *Rivera v. Goord,* 253 F.Supp.2d 735, 747 (S.D.N.Y.2003) (Chin, D.J.). Similarly, "where a prisoner has made a 'reasonable attempt' to file a grievance, and prison officials have prevented the prisoner from filing that grievance, the grievance procedures are not 'available' to the defendant, and thus the [PLRA] does not preclude

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 73 of 380
McAllister v. Garrett, Not Reported in F.Supp.2d (2011)
2011 WL 3875423

the prisoner from suing in federal court." *Thomas v. New York State Dep't of Corr. Servs.,* 00 Civ. 7163(NRB), 2002 WL 31164546 at *3 (S.D.N.Y. Sept. 30, 2002) (Buchwald, D.J.) (citations omitted); *see Hollman v. Lindsay,* 08–CV–1417 (NGG), 2009 WL 3112076 at *10 (E.D.N.Y. Sept. 25, 2009); *Gayle v. Benware,* 08 Civ. 8017(RMB)(FM), 2009 WL 2223910 at *5 (S.D.N.Y. July 27, 2009) (Berman, D.J.) (adopting Report & Recommendation of Maas, M.J.).

In the Second Circuit, " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute 'proper exhaustion.' " *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007), *quoting Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005), *and Woodford v. Ngo,* 548 U.S. 81, 94–95, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); *accord Bennett v. Onua,* 09 Civ. 7227(SAS), 2010 WL 2159199 at *2 (S.D.N.Y. May 26, 2010) (Scheindlin, D.J.) (footnotes omitted). Even where a plaintiff states broadly that he submitted letters or made oral requests or complaints about the issues underlying an action, such measures also fail to satisfy the PLRA's exhaustion requirement. *Harrison v. Goord,* 07 Civ. 1806(HB), 2009 WL 1605770 at *8 (S.D.N.Y. June 9, 2009) (Baer, D.J.); *Arce v. Keane,* 01 Civ. 2648(BSJ), 2004 WL 439428 at *4 (S.D.N.Y. Mar. 9, 2004) (Jones, D.J.); *see Singh v. Goord,* 520 F.Supp.2d 487, 495 (S.D.N.Y.2007) (Robinson, D.J.). Additionally, even an allegation that prison staff never responded to a prisoner's complaints does not excuse the exhaustion requirement. *Harrison v. Goord, supra,* 2009 WL 1605770 at *8; *Clarke v. Thornton,* 515 F.Supp.2d 435, 440 (S.D.N.Y.2007) (Marrero, D.J.); *Lashlev v. Artuz,* 01 Civ. 11542(SAS), 2004 WL 1192090 at *2 (S.D.N.Y. May 27, 2004) (Scheindlin, D.J.).

**\*7** The WCDOC has an established Inmate Grievance Procedure ("IGP"), in accordance with Part 7032 of the New York State Commission of Correction ("NYSCOC") Minimum Standards (WCDOC Policy and Procedure at 1). A "grievance" is defined as "a written inmate complaint concerning either written or unwritten facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility. Dispositions and sanctions resulting from disciplinary hearings and administrative segregation housing decisions shall not be the subject of a grievance" (WCDOC Policy and Procedure at III.A.). According to the WCDOC Inmate Handbook Rules and Regulations, a prisoner may begin the grievance process by speaking to the Housing Unit Officer, who will log a complaint in the Complaint Log and attempt to resolve the matter on his own. If the Housing Unit

Officer cannot resolve the complaint, he will refer it to a supervisor for resolution. If the supervisor is unable to satisfy the complaint, he will provide the prisoner with a grievance form. However, WCDOC permits inmates to "request a grievance form at any time and not take part in the informal process. Also[,] in an effort to provide a measure of 'confidentiality' to the process, inmates may submit a grievance in a sealed envelope" (WCDOC Inmate Handbook Rules and Regulations at 14–15). The WCDOC grievance policy then proceeds through a seven-step process that includes written determinations and appeals (WCDOC Policy and Procedure at 4).

I conclude that plaintiff did not, in all likelihood, exhaust his administrative remedies with respect to the deliberate indifference and excessive force claims. The assault by Garrett and the deliberate indifference by the other defendants clearly appear to be grievable matters because these alleged behaviors constitute "action or inaction of any person within the facility" (WCDOC Policy and Procedure at III.A.). Moreover, plaintiff's description of his efforts to file a grievance is inconsistent and incomplete. In one part of his complaint, plaintiff claims he filed a grievance while in the SHU (Complaint at IV.F.). He claims the grievance was filed about "[t]he entire incident. The incident itself and the damage to my eye" (Complaint at IV.F.1.). However, plaintiff also claims that his "grievance was never filed nor taken into account" nor was it logged (Complaint at IV.F.2, IV.F.3.). Plaintiff also claims he attempted to bring the situation to Warden Amicucci's attention but received no response (Complaint at IV.G.1.). Plaintiff states that he made "unsuccessful attempts" to have his grievance processed, alerted his doctor about his eye and also "made a complaint" to numerous officers in the SHU, which he assumes were written (Complaint at IV.I).

Based on the record presently before me, it appears likely that plaintiff, at most, complained informally as part of WCDOC procedure. Plaintiff never states that he attempted to submit a written grievance form. As noted above, the WCDOC has procedures to allow prisoners to bypass the informal procedure or to seek further relief if their complaints are not satisfied. Plaintiff apparently never took the necessary steps to follow up and file a formal grievance as required under the PLRA. Furthermore, plaintiff at one point claims he "submitted documented grievances" against Wyatt and Garrett in the past, prior to April 2009. Therefore, it appears that plaintiff had some knowledge of the formal grievance procedure. Broad claims that a prisoner submitted letters or

made oral requests or complaints about the issues underlying an action fail to satisfy the PLRA's exhaustion requirement. *Harrison v. Goord, supra,* 2009 WL 1605770 at *8; *Arce v. Keane, supra,* 2004 WL 439428 at *4; *see Singh v. Goord, supra,* 520 F.Supp.2d at 495. Similarly, even if plaintiff is alleging that prison staff never responded to his complaints, this does not excuse the exhaustion requirement, either. *Harrison v. Goord, supra,* 2009 WL 1605770 at *8; *Clarke v. Thornton, supra,* 515 F.Supp.2d at 440; *Lashley v. Artuz, supra,* 2004 WL 1192090 at *2. Furthermore, plaintiff provides no evidence that defendants' "own actions inhibiting the inmate's exhaustion of remedies [ ] estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill v. New York, supra,* 380 F.3d at 686 (citation omitted). He submits no evidence that he was prevented from filing a grievance by prison officials or that misrepresentations were made to inhibit his filing of a grievance. Finally, plaintiff has not shown that special circumstances exist that would justify his "failure to comply with administrative procedural requirements" *Hemphill v. New York, supra,* 380 F.3d at 686 (citation omitted). Plaintiff's physical condition does not qualify, because despite his vision problems and high blood pressure, he was able to file a complaint, a request to proceed *in forma pauperis* and a motion for counsel in this Court. Therefore, his deliberate indifference claims and excessive force claims are likely to be dismissed for failure to exhaust administrative remedies. Because I conclude that plaintiff's claims seem unlikely to be of substance or have "some chance of success," *Ferrelli v. River Manor Health Care Ctr., supra,* 323 F.3d at 204 (citation omitted), his motion with respect to these claims is denied.

### 2. *Claims Likely to Fail For Failure to State a Claim*

**\*8** Plaintiff's claims that are likely to survive the exhaustion analysis are (1) his claim that the administrative hearing violated his Due Process rights, and (2) his claim that confinement in SHU represented cruel and unusual punishment. According to the WCDOC Policy and Procedure, "[d]ispositions or sanctions from disciplinary hearings" and "[a]dministrative segregation housing decisions" are not grievable issues (WCDOC Policy and Procedure at 3–4). Therefore, administrative remedies were not available to the plaintiff under the PLRA for these claims. *Hemphill v. New York, supra,* 380 F.3d at 686 (citation omitted). However, I conclude that plaintiff has likely failed to state a claim for both issues, and, therefore, plaintiff's motion is denied with respect to these remaining claims.

#### a. *Due Process Claim*

To establish a deprivation of Due Process during a disciplinary hearing, a prisoner "must show: (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Thomas v. Calero,* 09 Civ. 5209(LTS)(MHD), 2011 WL 1532058 at *7 (S.D.N.Y. Mar. 17, 2011) (Dolinger, M.J.) (Report and Recommendation), *adopted,* 2011 WL 1532061 (S.D.N.Y. Apr.20, 2011) (Swain, D.J.), *quoting Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citations and internal quotation marks omitted). "States may under certain circumstances create liberty interests which are protected by the Due Process Clause.... But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

In *Sandin v. Conner, supra,* 515 U.S. at 486, the United States Supreme Court held that a prisoner's "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest" where "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." The Second Circuit, in applying *Sandin v. Conner, supra,* has stated that

> [f]actors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998).

Our cases 'make clear that duration is not the only relevant factor. The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of 'atypical and severe hardship....' " *Ortiz v. McBride,* 323 F.3d 191, 195 (2d Cir.2003) (per curiam). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999)

(citation omitted). Accordingly ... we have explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, our cases establish the following guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. Where the plaintiff was confined for an intermediate duration-between 101 and 305 days-'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required. *Colon,* 215 F.3d at 232; *accord Sims,* 230 F.3d at 23 ("[W]e have characterized segregative sentences of 125–288 days as relatively long, and thus necessitating specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant." (citations and internal quotation marks omitted)). In those situations, a district court must "make a fact-intensive inquiry," *Sims,* 230 F.3d at 22, examining "the actual circumstanced of SHU confinement" in the case before it without relying on its familiarity with SHU conditions in previous cases, *Kalwasinski v. Morse,* 201 F.3d 103, 106 (2d Cir.1999) (per curiam).

**\*9** *Palmer v. Richards,* 364 F.3d 60, 64–65 (2d Cir.2004); *Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) (*per curiam* ).

"[R]estrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009), *citing Colon v. Howard,* 215 F.3d 227, 231–32 & n. 5 (2d Cir.2000). However, the Second Circuit has concluded "that SHU confinements of fewer than 101 days 'could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical.' " *Davis v. Barrett, supra,* 576 F.3d at 133, *quoting Palmer v. Richards, supra,* 364 F.3d at 65.

I conclude that plaintiff's claim that his Due Process rights were violated by the administrative hearing is unlikely to succeed. First, plaintiff's alleged stay in SHU, as of the time he signed his complaint, was 89 days—short of the 101 days that are considered of "intermediate duration." [2] Moreover, plaintiff has failed to allege any facts whatsoever showing his confinement represented an atypical hardship. Plaintiff does

not state what penalty was imposed by the guilty verdicts, and he does not put forth any evidence as to the conditions of his confinement. Thus, I conclude that plaintiff's confinement in SHU was likely not an atypical hardship, and I therefore conclude that plaintiff's Due Process rights were likely not violated. [3]

[2]     By the time he moved for the appointment of counsel, on August 18, 2010, plaintiff alleged he was on "keeplock status," which is a less restrictive status than confinement in SHU (Application for the Court to Request Counsel, at ¶ 2). *Webster v. Fischer,* 694 F.Supp.2d 163, 176 n. 11 (N.D.N.Y.), *aff'd,* 398 F. App'x 683 (2d Cir.2010)

[3]     To the extent plaintiff is alleging the deprivation of a property interest in the $25.00 he was ordered to pay in restitution because of the guilty verdicts, at least one court has held this could "constitute[ ] an atypical and significant hardship under". *See Barone v. Hatcher,* 984 F.Supp. 1304, 1311–12 (D.Nev.1997). In such situations, the due process mandated under *Wolff v. McDonnell,* 418 U.S. 539, 564–65, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), is the requirement that prison officials provide plaintiff "a statement of the evidence and reasons relied upon by the disciplinary panel that ordered restitution." *Barone v. Hatcher, supra,* 984 F.Supp. at 1312 (citation omitted). Because plaintiff did receive disciplinary reports detailing the charges against him and has offered no evidence that defendants failed to provide a statement of the evidence or failed to provide the reasons the disciplinary panel ordered restitution, I conclude that plaintiff is also unlikely to prevail on this claim.

To the extent that plaintiff is alleging a violation of Due Process because the disciplinary charges were false, I conclude that this claim is unlikely to succeed based on the present record. Plaintiff claims that he was "falsely accused of a crime" (Complaint at V.). However, it is unclear if he is referring to the assault charge in New York State court or the disciplinary charges of which he was found guilty. In any event, plaintiff contends that the disciplinary reports were procedurally flawed and erroneous (Complaint at II.D.). He claims that in a subsequent hearing, he was unable to call any witnesses on his behalf or offer videotaped evidence.

If an inmate is "afforded a fair opportunity to refute" disciplinary charges, an allegation that such charges were false cannot support a Due Process claim. *Livingston v. Kelly,* 2011 WL 2006882 at *1 (2d Cir. May 24, 2011) (unpublished), *citing Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *see also Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995). However, a Due Process claim based on the filing of false misconduct charges may lie where an inmate "was unfairly denied the right to call key witnesses in defense of the charges against him." *Livingston v. Piskor,* 153 F. App'x 769, 771 (2d Cir.2005), *quoting Jones v. Coughlin, supra,* 45 F.3d at 679; *accord Livingston v. Kelly, supra,* 2011 WL 2006882 at *1.

*10 Plaintiff has not offered any evidence concerning how the disciplinary hearing was conducted. Although plaintiff claims he was unable to call witnesses, he acknowledges that he was found not guilty of one of the four charges—causing substantial bodily injury to a correctional officer—albeit on a "technicality." He vaguely states that "[e]very one who had witnessed that incident ... are [*sic* ] aware of what had really taken place" during his altercation with Garrett (Complaint at II.D.). He also states in conclusory fashion that "Captain Rhodes and Warden Amicucci both know that I am not guilty of any of the charges" and that "I have the proof to substantiate my innocence of *all* the charges that were written against me" (Complaint at II.D.). Based on the present record, I conclude that plaintiff is also unlikely to succeed here. His statements are vague or conclusory as to what potential witnesses know or would testify to, and, thus, I cannot conclude that he was unfairly denied the right to call key witnesses. Furthermore, the disciplinary hearing's finding that plaintiff was not guilty on one of the four charges suggests that plaintiff was able to refute the charges. Taken together, the evidence plaintiff offers at this time cannot demonstrate that he was denied "a fair opportunity to refute" all charges against him.

In summary, because I conclude that plaintiff's Due Process claim seems unlikely to be of substance or to have "some chance of success," *Ferrelli v. River Manor Health Care Ctr., supra,* 323 F.3d at 204 (citation omitted), his motion is denied with respect to this claim.

b. *Cruel and Unusual Punishment Claim*

I conclude that plaintiff's final claim, that confinement in SHU represented cruel and unusual punishment, is also unlikely to succeed. It is well-established that segregated confinement is not, in and of itself, a cruel and unusual punishment. *Hutto*

*v. Finney,* 437 U.S. 678, 686, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ("It is perfectly obvious that every decision to remove a particular inmate from the general prison population for an indeterminate period could not be characterized as cruel and unusual."); *Sostre v. McGinnis,* 442 F.2d 178, 192 (2d Cir.1971) (*en banc* ), *overruled on other grounds as recognized by Davidson v. Scully,* 114 F.3d 12, 15 (2d Cir.1997) (*per curiam* ) ("It is undisputed ... that segregated confinement does not itself violate the Constitution."). The Second Circuit has held that in order for a plaintiff

> [t]o demonstrate that the conditions of his confinement constitute cruel and unusual punishment, plaintiff must satisfy both an objective test and a subjective test. First, the plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs. Second, the plaintiff must demonstrate that the defendants imposed those conditions with deliberate indifference.

*Welch v. Bartlett,* 125 F. App'x 340, 342 (2d Cir.2005), *quoting Jolly v. Coughlin,* 76 F.3d 468, 480 (2d Cir.1996) (internal citations and quotation marks omitted).

*11 Plaintiff offers no evidence that he suffered serious deprivation of his basic human needs, nor does he offer evidence that defendants subjected him to such conditions wi indifference. His description of his confinement in SHU is limited to the statement that he was placed there following the altercation with Garrett and another conclusory statement that "they refuse to release me from the S.H.U. and endanger[ ] my health and safety" (Complaint at II.D.). He appears to be arguing that his segregation alone represents cruel and unusual punishment, which is contrary to controlling authority. Because plaintiff does not describe how his health and safety are endangered, I conclude that this claim is unlikely to succeed. Because I conclude that plaintiff's claim seems unlikely to be of substance or have "some chance of success," *Ferrelli v. River Manor Health Care Ctr., supra,* 323 F.3d at 204 (citation omitted), his motion is denied with respect to this claim.

2011 WL 3875423

IV. *Conclusion*

Accordingly, for all the foregoing reasons, petitioner's motion for the appointment of counsel is denied without prejudice to renewal. Any renewed application should be accompanied by an affidavit establishing the merits.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 3875423

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Doe, Not Reported in F.Supp.3d (2014)

2014 WL 5461815

KeyCite Yellow Flag - Negative Treatment

Distinguished by   Hunter v. City of New York,   S.D.N.Y.,   September 28, 2015

2014 WL 5461815
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Sean BROWN, Plaintiff,
v.
John DOE and the City of New York, Defendants.

No. 13 CIV. 8409(ER).
|
Signed Oct. 28, 2014.

### OPINION AND ORDER

RAMOS, District Judge.

**\*1**  *Pro se* plaintiff Sean Brown ("Plaintiff" or "Brown") brings this suit against John Doe and the City of New York ("Defendant" or "the City") pursuant to 42 U.S.C. § 1983. Plaintiff alleges that he was held in the Segregated Housing Unit ("SHU") for over fifteen months while in the custody of the New York City Department of Correction ("DOC") in violation of his constitutional rights. The City brings the instant motion to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that Plaintiff has failed to state any plausible claims of entitlement to relief. Def.'s Mem. L. Support. Mot. Dismiss, Doc. 11 ("Def.'s Mot. Dismiss"). For the reasons set forth below, Defendant's Motion is GRANTED.

### I. Factual Background

The Court accepts the following allegations as true for purposes of this motion. [1]

[1]
    Some of the allegations appear in documents attached to the Complaint and in Plaintiff's subsequent letters to the Court. "[I]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they are consistent with the allegations

in the complaint." *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (quotation marks omitted) (collecting district court cases), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004); *see also Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering allegations in *pro se* plaintiff's opposition to motion to dismiss).

Plaintiff alleges that, starting May 25, 2012 and continuing for fifteen months thereafter, he was placed in the SHU "for no apparent reason" while awaiting trial. [2] Compl. 2–3, Doc. 2 ("Compl."). Plaintiff states that he was released from the SHU after his criminal trial. Compl. 9. Repeatedly throughout the Complaint and its attachments, Plaintiff refers to his period in the SHU as a "court ordered lockdown." *Id.* at 8–9, 11. However, in other instances, Plaintiff appears to contradict himself by stating that no court ever ordered his confinement in the SHU. *Id* . at 3, 4. He further claims that the judge assigned to his criminal case denied issuing such an order. *Id.* at 3.

[2]
    Given the numerous unnumbered attachments to the Complaint, the Court's citations to them refer to the page numbers reflected on ECF.

Liberally construed, the Complaint alleges that Plaintiff suffered unconstitutional conditions of confinement and a violation of his due process rights in connection with being placed in the SHU. *Id.* at 5, 8. Plaintiff asserts that, during his time in the SHU, his mail was confiscated and his phone and visitation privileges were denied. *Id.* at 8. He contends that, as a result, he was unable to reach witnesses who he presumably wanted to testify on his behalf and was not "properly ready for trial." *Id.* at 8, 9. He was not denied access to his attorney, however . [3] *Id.* at 5. According to Plaintiff, he suffered mental anguish while in the SHU, namely "many psychological problems" which included nightmares and trouble sleeping. *Id.* at 3. Plaintiff indicates that he saw a psychologist who advised against taking medication for his condition. *Id.* Plaintiff is currently incarcerated pursuant to multiple convictions associated with the state's criminal case against him. [4]

[3]
    In the Complaint, the Plaintiff states, "I contacted my attorney in the matter. [ ... ] He said it was a New York City Department of Corrections situation. It was out of his hands." Compl. 5.

4    The Court takes judicial notice of the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Lookup System results for Plaintiff Sean Brown. *See Rosario v. New York City,* No. 12 CIV. 4795(PAE), 2013 WL 2099254, at *1 n. 1 (S.D.N.Y. May 15, 2013) (taking judicial notice of DOCC search results); *Williams v. City of New York,* No. 07 CIV. 3764(RJS), 2008 WL 3247813, at *2 (S.D.N.Y. Aug. 7, 2008) (same). According to DOCCS, Plaintiff was convicted of sex trafficking, promoting prostitution, and criminal contempt. DOCCS Inmate Population Information Search ("N.Y. Inmate Lookup"), http:// nysdoccslookup.doccs.ny.gov (last visited Oct. 14, 2014).

The suit was originally brought against John Doe and the New York City Department of Correction (DOC). *Id.* at 1. On December 17, 2013, the Court dismissed Plaintiff's claims against the DOC because it is not an entity that can be sued. Order 1–2, Dec. 17, 2013, Doc. 6. The Court instructed the Clerk of the Court to replace the DOC with the City of New York. *Id.* at 2.

On March 18, 2014, the City filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Def.'s Mot. Dismiss 1. Plaintiff failed to file his opposition papers by the original deadline of April 4, 2014. Order, April 23, 2014, Doc. 14. Given Plaintiff's *pro se* status and his current incarceration, the Court *sua sponte* granted Plaintiff until May 30, 2014 to file his opposition. *Id.* In the same Order, the Court advised Plaintiff that if he failed to respond by the deadline, the motion to dismiss could be decided based solely on Defendant's papers. *Id.* On May 6, 2014, Plaintiff requested an extension of time due to his transfer to a new correctional facility and request for discovery of documents. Pl. Ltr., April 30, 2014, Doc. 15. The Court granted his request and ordered Plaintiff to file his opposition papers by July 21, 2014. Order, May 9, 2014, Doc. 16. During that time, Plaintiff submitted four letters to the Court. Pl. Ltrs., Docs. 18–21. The first letter advised the Court that Plaintiff was attempting to obtain the minutes from his trial to prove that Supreme Court Justice Bonnie Wittner stated that she never ordered his detention in the SHU. Pl. Ltr. Doc. 18. Plaintiff also forwarded the Court a copy of the Freedom of Information Act request that he filed in an attempt to retrieve the mail he alleges was confiscated while he was in the SHU. Pl. Ltr. Doc. 21. Plaintiff's letters otherwise simply reiterated the allegations contained in the Complaint and accused the DOC of covering

up "a scandal," without further specification. Pl. Ltrs. Docs. 18–20. Since none of the subsequent letters appear intended to constitute opposition papers to Defendant's motion, the Court therefore considers the Defendant's motion unopposed.

## II. Discussion

### A. 12(b)(6) Motion to Dismiss Standard

**\*2** When ruling on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir.2014). The court is not required to credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly,* 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Twombly,* 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570; *Iqbal,* 556 U.S. at 680.

The question in a Rule 12 motion to dismiss " 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Sikhs for Justice v. Nath,* 893 F.Supp.2d 598, 615 (S.D.N.Y.2012) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 278 (2d Cir.1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b) (6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits," and without regard for the weight of the evidence that might be offered in support of Plaintiff's claims. *Halebian v. Berv,* 644 F.3d 122, 130 (2d Cir.2011) (quoting *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 155 (2d Cir.2006)).

The same standard applies to motions to dismiss *pro se* complaints. *See Zapolski v. Fed. Republic of Germany,* 425 F. App'x 5, 6 (2d Cir.2011). The Court remains obligated

2014 WL 5461815

to construe a *pro se* complaint liberally, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006). In order to survive a motion to dismiss, a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal,* 566 U.S. at 678. A complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks omitted); *see also Triestman,* 470 F.3d at 477 ("[*P* ]ro se status 'does not exempt a party from compliance with relevant rules of procedural and substantive law." (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

**\*3** In addition to confining its consideration of a Rule 12(b)(6) motion to the facts stated in the complaint and in documents appended or incorporated by reference, a court may also take into account matters of which judicial notice can be taken. *Leonard F. v. Israel Disc. Bank of New York,* 199 F.3d 99, 107 (2d Cir.1999) (quoting *Allen v. WestPoint– Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991)); *see also* Fed.R.Evid. 201. In order for a court to take judicial notice of a public document on a dismissal motion, the plaintiff must have relied on the terms and effect of the document in drafting the complaint. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (citing *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)). Accordingly, it is routine for courts to take judicial notice of court documents, "not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see, e.g., Kendall v. Cuomo,* No. 12 CIV. 3438(ALC), 2013 WL 5425780, at \*6 (S.D.N.Y. Sept. 27, 2013) (taking judicial notice of a valid court order Plaintiff claimed was "false, fake, and nonexistent").

Defendant asks the Court to take judicial notice of the May 25, 2012 order issued by Justice Wittner of the New York State Supreme Court, New York County ("May 25, 2012 Order"), which states in its relevant part:

> [I]t is hereby ORDERED that the Commissioner, New York City Department of Correction, or whosoever shall have supervision or control of the defendant ... should otherwise prevent the defendant

> by any means necessary, including 24 hour lockdown, from making telephone calls except to the defendant's attorney [.] [ ... ] This order shall remain in effect as long as the defendant is in the custody of the Department of Corrections [sic].

Def.'s Mot. Dismiss, Ex. A. Although Plaintiff appears to contend that no such order exists, his Complaint states that he was told by DOC personnel that he was in the SHU "by the court" and repeatedly refers to his segregation as a "court-ordered lockdown." Compl. 3, 8, 9, 11. Given Plaintiff's reliance on the terms and effect of the May 25, 2012 Order, the Court may appropriately take judicial notice of it.

Finally, the Court notes that Plaintiff has failed to submit a memorandum in opposition to the motion. While a party must be given a reasonable opportunity to respond to an opponent's motion, "the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law." *McCall v. Pataki,* 232 F.3d 321, 322–323 (2d Cir.2000). Failure to oppose a Rule 12(b)(6) motion is not in itself sufficient to justify dismissal of a complaint. *Id.* at 322.

### B. Constitutionality of Confinement

In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50 (1999). "Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source." *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970)). Thus, a civil rights action brought under § 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Id.*

#### i. The Fact of Confinement

**\*4** The Second Circuit has stated that whether a judge's orders are "correct or erroneous," they are a source of immunity for prison officers who do "nothing other than perform them." *Ravenscroft v. Casey,* 139 F.2d 776, 778 (2d Cir.1944); *see also Young v. Canfield,* No. 11–CV–6007

(FPG), 2014 WL 3385186, at *7–8 (W.D.N.Y. July 9, 2014) (plaintiff could not maintain his § 1983 claim for excessive force against state medical staff carrying out a facially valid court order); *Miller v. Dir., Middletown State Hosp., Middletown, N.Y.,* 146 F.Supp. 674, 680 n. 3 (S.D.N.Y.1956) *aff'd,* 243 F.2d 527 (2d Cir.1957) (state hospital officers confronted with a facially valid court order had "a duty to yield obedience to it"). Relying in part on Second Circuit authority, the Ninth Circuit subsequently observed that "the courts of appeals that have addressed whether prison officials are absolutely immune from § 1983 liability for enforcing facially valid court orders have uniformly concluded that they are." *Engebretson v. Mahoney,* 724 F.3d 1034, 1039 (9th Cir.2013) (listing, in addition to the Second Circuit, First, Third, Eighth, and Tenth Circuit case law affirming absolute liability for prison officials executing valid court orders). In reaching its decision, the Ninth Circuit reasoned that its outcome was in line with the common-law tradition of granting absolute immunity to those performing functions necessary to the judicial process and consistent with Supreme Court law. *Id* . at 1039–40. Furthermore, it explained that "absolute immunity is necessary to free prison officials from the fear of litigation" and "ensures the public's trust and confidence in courts' ability to completely, effectively and finally adjudicate the controversies before them." *Id.* at 1040 (internal quotations and citations omitted).

Having taken judicial notice of the May 25, 2012 Order that authorized Plaintiff's confinement in the SHU, this Court concludes that the prison officials charged with executing the Order are entitled to absolute immunity. *See Ravenscroft,* 139 F.2d at 778. Plaintiff was not placed in the SHU "for no apparent reason," Compl. 3; his segregated confinement was pursuant to a court order that explicitly sanctioned a "24 hour lockdown" to limit his ability to communicate with anyone other than his attorney. Def.'s Mot. Dismiss, Ex. A. To the extent that the prison officials were complying with the Order, they cannot be held liable for simply doing their job by following a court's decree. Thus, Plaintiff's due process challenge can be dismissed on this basis alone.

Moreover, even in the absence of a facially valid court order, Plaintiff's § 1983 claims would still fail because they implicate the validity of his conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–487 (1994). In *Heck,* the plaintiff brought suit under § 1983 claiming that the defendants "engaged in an 'unlawful, unreasonable, and arbitrary investigation' " which lead to his arrest; knowingly destroyed exculpatory evidence; and were responsible for the

use of an "illegal" voice identification procedure at his trial. *Id.* at 479. The Supreme Court analogized the defendant's claims to the common-law cause of action for malicious prosecution and cited the lower courts' findings that his claims challenged the legality of his conviction. *Id.* at 484, 489. The Court further concluded that, in order to recover damages under § 1983 for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid," a state prisoner must demonstrate that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486–487.

**\*5** Plaintiff claims that, in conjunction with his confinement in the SHU, he was unable to reach witnesses and not "properly ready for trial." Compl. 8, 9. More specifically, the Complaint accuses the DOC of confiscating "important mail ... needed for trial," including a letter authored by Plaintiff's alleged victim. Compl. 5, 9. Hence, Plaintiff asserts that "the judgment should be vacated." Compl. 9. If in fact Plaintiff is arguing that a ruling in his favor necessarily entails that his conviction should be overruled, he must demonstrate that said conviction was already invalidated. *Heck,* 512 U.S. at 487. The Complaint suggests nothing of the sort. Therefore, Plaintiff is barred by *Heck* from seeking monetary relief under § 1983 based on his alleged wrongful conviction. *See Antrobus v. City of New York,* No. 11 CIV. 2524(RA), 2014 WL 1285648, at *3 (S.D.N.Y. Mar. 27, 2014) (prisoner's claims that interference with his mail caused him to be wrongfully convicted dismissed on the basis of *Heck* ).

### ii. Conditions of Confinement

The Supreme Court has held that the Government may commit someone to pretrial detention to ensure his presence at trial, provided that the conditions and restrictions of detention do not amount to punishment or violate the Constitution. *Bell v. Wolfish,* 441 U.S. 520, 536–37 (1979). "Absent a showing of an expressed intent to punish," if the circumstances surrounding a pretrial detainee's confinement are "reasonably related to a legitimate nonpunitive governmental objective, it does not, without more, amount to 'punishment[.]'" *Id.* at 520. Aside from determining "whether an alternative purpose to which [the pretrial restriction] may rationally be connected is assignable for it," a court must also establish "whether it appears excessive in relation to the alternative purpose assigned[.]" *Id.* at 538 (internal quotations and citations omitted). "[I]f a condition or restriction is arbitrary or purposeless, a court may permissibly infer that the purpose

of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* at 520–21.

Plaintiff neither alleges punitive intent behind his placement in the SHU nor any facts that would support an inference of such an intent. From the City's perspective, Plaintiff's confinement in the SHU was motivated by a legitimate nonpunitive objective: enforcing a valid court order. *See* Def.'s Mot. Dismiss, Ex. A. To the extent Plaintiff's duration in the SHU might appear "excessive in relation to the alternative purpose assigned," *Bell,* 441 U.S. at 538, the May 25, 2012 Order itself authorized Plaintiff's lockdown for the duration of his confinement by the DOC. *Id.*

Plaintiff states that he suffered "cruel and unusual punishment for no apparent reason" in violation of his Eighth Amendment rights. Compl. 5. Since the violations allegedly occurred prior to conviction, the Eighth Amendment does not directly apply, because "as a pre-trial detainee [the plaintiff is] not being 'punished[.]' " *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (quoting *Cuoco v. Moritsugu,* 222 F.3d 99, 106 (2d Cir.2000)). Rather, the application of the Due Process Clause of the Fourteenth Amendment is appropriate in this case. *Id.* Nevertheless, the analysis is identical to that of the Eighth Amendment. *Id.* at 71–72; *see also Ortiz v. Dep't of Correction of City of New York,* No. 08 CIV. 2195(RJS)(HBP), 2011 WL 2638137, at *4 (S.D.N.Y. Apr. 29, 2011) *report and recommendation adopted sub nom. Ortiz v. Hernandez,* No. 08 CIV. 2195(RJS)(HBP), 2011 WL 2638140 (S.D.N.Y. July 5, 2011) ("[T]he Fourteenth Amendment provides substantially the same protection to pretrial detainees that the Eighth Amendment provides to sentenced prisoners."). The Eighth Amendment provides that "cruel and unusual punishments [shall not be] inflicted," U.S. Const. amend. VIII, and "[t]hat rule, applicable to the states through the Fourteenth Amendment, ... is violated by unnecessary and wanton inflictions of pain and suffering." *Walker v. Schriro,* No. 11 Civ. 9299(JPO), 2013 WL 1234930, at *11 (S.D.N.Y. Mar. 26, 2013) (internal citations omitted). Prison officials are deemed to have violated the Eighth Amendment only when two conditions are satisfied: (1) the alleged deprivation must objectively be "sufficiently serious," and (2) the alleged perpetrator must subjectively possess a "sufficiently culpable state of mind." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal citation omitted).

**\*6** An objective analysis of the seriousness of the conduct at issue requires an examination of the alleged unconstitutional conditions. Although the Constitution does not mandate a comfortable prison setting, *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), prisoners are entitled to "basic human needs —e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 199–200 (1989)). Therefore, to establish the objective element of an Eighth Amendment violation, a prisoner "must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (citing *Helling v. McKinney,* 509 U.S. 25, 35–36 (1993)). More specifically, the inmate must demonstrate that "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) (citing *Rhodes,* 452 U.S. at 347).

Plaintiff's Complaint is entirely void of details concerning the conditions of his confinement. *See* Compl. Although Plaintiff maintains that he suffered an emotional injury, he does not specify a particular aspect of his confinement that caused him to suffer emotional harm. *Id.* at 3. While "conditions that prevent sleep have been held to violate the Eighth Amendment," *Walker,* 717 F.3d at 126, Plaintiff simply alleges that he was "[u]nable to sleep in the dark" and suffered from nightmares at night while in the SHU. Compl. 3. Sleeping in the dark hardly suggests that there has been an objective interference with a basic human need. In his May 16, 2014 letter, Plaintiff states that a corrections officer tried to "get him help" for his "mental anguish," but "the doctors kept refusing to help." Ltr., May 16, 2014, Doc. 19. Nonetheless, the Complaint admits that Plaintiff visited a psychologist, who apparently advised Plaintiff against taking medicine for his psychological symptoms because it would make him sick. *Id.* In and of itself, the psychologist's advice does not conflict with basics standards of decency. Nowhere else in the Complaint does Plaintiff claim that the conditions of his confinement, aside from the fact that he was in lockdown, were sub-standard. *See* Compl. Thus, Plaintiff fails to assert that the conditions of his confinement were objectively unreasonable.

To satisfy the subjective element, which hinges upon the accused prison official's subjective intent, the plaintiff must allege "something more than mere negligence." *Cuoco,* 222 F.3d at 106 (internal quotation marks omitted). An injured prisoner can recover only if the injury was a product of the prison official's "purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's

deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d. Cir.1997) (quoting *Farmer,* 511 U.S. at 834). An official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Cuoco,* 222 F.3d at 107 (internal citations and quotation marks omitted).

**\*7** To the extent Plaintiff expressly ascribes blame, he refers to the alleged DOC conduct as "negligent." Ltr., May 19, 2014, ECF No. 20. Plaintiff does not allege any specific conduct by prison officers, let alone acts that could be construed as reckless or purposeful, other than he was kept in the SHU. *See* Compl. However, being confined to the SHU, without more, does not offend the Constitution. "The conditions of special housing units do not per se constitute cruel and unusual punishment in violation of the Eighth Amendment," *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) (citing *Anderson v. Coughlin,* 757 F.2d 33, 36 (2d Cir.1985)), and therefore do not violate the Fourteenth Amendment under the parallel analysis. *See also Branch v. Goord,* No. 05 CIV 6495(WHP)(KNF), 2006 WL 2807168, at \*5 (S.D.N.Y. Sept. 28, 2006) (Eighth Amendment claim dismissed where Plaintiff failed to "explicitly allege [ ] that his SHU confinement conditions were anything out of the ordinary"). Thus, the Complaint does not put forth sufficient facts to assert a claim of unconstitutional conditions of confinement.

To be sure, under different circumstances Plaintiff's substantial confinement in the SHU, which exceeded 450 days, would likely have triggered further factual inquiry by this Court. Compl. 3, 11. Generally, in cases involving convicted detainees claiming due process violations, the Court considers: (1) whether the plaintiff had a protected liberty interest; and (2) whether the deprivation of that liberty interest occurred without due process. *Tellier v. Fields,* 280 F.3d 69, 80 (2d Cir.2000) (quoting *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997)). Certainly, "a confinement longer than an intermediate one, and under 'normal SHU conditions,' is 'a sufficient departure from the ordinary incidents of prison life to require procedural due process protections[.]' " *Palmer v. Richards,* 364 F.3d 60, 65 (2d Cir.2004) (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)). The Second Circuit has required a "detailed factual record," unless the period of time spent in the SHU was under thirty days and there is no indication that the prisoner experienced unusual SHU conditions. *Davis v. Barrett,* 576 F.3d 129, 135 (2d

Cir.2009) (quoting *Palmer,* 364 F.3d at 65–66). It has further characterized segregated sentences of 125 to 288 days as long enough to require a "fact intensive inquiry." *Palmer,* 364 F.3d at 65 (citing *Sims v. Artuz,* 230 F.3d 14, 22–23 (2d Cir.2000)).

However, unlike the other cases in which the duration of a prisoner's confinement in the SHU gave rise to a claim, *see J.S. v. T'Kach,* 714 F.3d 99, 106 (2d Cir.2013) (administrative detention for 188 days sufficient to allege Fifth Amendment claim); *Tellier,* 280 F.3d at 80, 82 (same, further noting that a warden's discretion to place a prisoner in the SHU for 514 days is "not boundless and continuing"), Plaintiff's 24 hour lockdown was non-punitive and authorized by a court order. The May 25, 2012 Order was expressly intended to remain in effect "as long as the defendant is in the custody of the Department of Corrections." Def .'s Mot. Dismiss, Ex. A. Indeed, that appears to be the case. Plaintiff's Complaint affirms that he was released from lockdown after his trial. Compl. 9. All of his allegations are directed at the DOC and nothing in the Complaint suggests that he was in the SHU while outside of DOC's custody. Thus, while Plaintiff's duration in the SHU is certainly considerable, his Complaint is misdirected to the extent it faults DOC officials for the amount of time he spent there. [5]

[5]     Even in the absence of a court order, it is not readily apparent that Defendant was denied due process protections. A pretrial detainee confined for non-punitive, administrative purposes is entitled to "the minimal procedures outlined in *Hewitt* [.]" *Taylor v. Comm'r of New York City Dep't of Corr.,* 317 F. App'x 80, 82 (2d Cir.2009) (quoting *Benjamin v. Fraser,* 264 F.3d 175, 190 (2d Cir.2001)). Under *Hewitt,* an inmate "must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt v.. Helms,* 459 U.S. 460, 476 (1983). The right to be heard is fulfilled when the inmate in administrative detention is afforded an opportunity to write to the responsible prison official concerning the propriety of his confinement, even if the official does not respond. *Lowrance v. Achtyl,* 20 F.3d 529, 536 (2d Cir.1994).
       Although nothing in the Complaint suggests that Plaintiff lacked notice, he does assert that he was held in the SHU without a hearing. Compl. 3. However, the Complaint also acknowledges that

Plaintiff filed a grievance in the facility where his claim arose. Compl. 4. The response from the DOC, which Plaintiff "kept appealing," indicated that he was in the SHU pursuant to a court order. *Id.*

### C. Failure to Allege Personal Involvement

**\*8** It is the well settled law of this Circuit that a claim brought under § 1983 must allege the personal involvement of each defendant. *See, e.g., Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir.2013) (listing Second Circuit cases). "Conclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient, and supervisors cannot be held liable based solely on the alleged misconduct of their subordinates." *Kee v. Hasty,* No. 01 Civ. 2123(KMW)(DF), 2004 WL 807071, at \*2 (S.D.N.Y. Apr. 14, 2004) (internal citations omitted).

Although Plaintiff named "John Doe" as a defendant in the caption of the Complaint, he never identifies who John Doe might be or otherwise mentions him again. Compl. 2. In fact, the Complaint does not contain a single reference to any particular individual whose acts could possibly be attributable to the unnamed Defendant. *See* Compl. Therefore, dismissal as to Defendant John Doe is appropriate. *See Ferrer v. Superintendent Orange Cnty. Jail,* No. 08 CIV. 6527(SCR)(PED), 2010 WL 306977, at \*4 (S.D.N.Y. Jan. 26, 2010) (complaint that does not reference any "John Doe" fails to state a claim for relief that is "plausible on its face" as to those unidentifiable defendants); *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 435 (S.D.N.Y.2004) (dismissal warranted as to defendant who was not mentioned in complaint).

### D. Municipal Liability ("*Monell* Claim")

A municipality cannot be held liable under § 1983 solely on a theory of *respondeat superior. Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691 (1978). A § 1983 claim can only be brought against a municipality if the action that is alleged to be unconstitutional was the result of an official policy or custom. *Id.* at 690–91. Thus, a plaintiff must allege that such a municipal policy or custom is responsible for his injury. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997); *see also Connick v. Thompson,* 131 S.Ct. 1350, 1360 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell,* 436 U.S. at 692)).

The Second Circuit has established a two prong test for § 1983 claims brought against a municipality. First, the plaintiff must prove " 'the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official].' " *Johnson v.. City of New York,* No. 06 CV 09426, 2011 WL 666161, at \*3 (S.D.N.Y. Feb. 15, 2011) (quoting *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.* Suits brought against state officials in their official capacity are treated as suits against the State and "the entity's 'policy or custom' must have played a part in the violation of federal law." *Hafer v. Melo,* 502 U.S. 21, 25 (1991).

**\*9** To satisfy the first prong of the test on a motion to dismiss, a plaintiff must allege the existence of:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials, or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York,* 705 F.Supp.2d 261, 276–77 (S.D.N.Y.2010) (quoting *Moray* and updating citations to cases).

Plaintiff has failed to assert any of the requisite bases to satisfy the first prong of a *Monell* claim under the Second Circuit's municipal liability test. First of all, as previously established, Plaintiff is unable to assert that he suffered a

violation of his constitutional rights. *See supra* Part II. B. Even if Plaintiff had successfully asserted a constitutional claim, his Complaint never alleges that a single aspect of his confinement in the SHU was pursuant to a City policy or a custom that "is so widespread as to have the force of law." *See Bd. of Cnty. Commis of Bryan Cnty.,* 520 U.S. at 404. *See* Compl. Plaintiff's subsequent letters to the Court reference a "scandal" and "so many violations it is an eye sore." Pl. Ltrs., Docs. 18–21. However, he does not indicate that the scope of the alleged violations expands beyond his case. In many of the same letters, Plaintiff accuses the DOC of failing to adhere to its own protocol. Pl. Ltrs., Docs. 19, 20. Furthermore, the Complaint acknowledges in various sections that Plaintiff's segregated confinement was court-ordered. *See supra* Part II. B. i. As opposed to being pursuant to a DOC practice or policy, his placement in the SHU was determined by a judge. Nothing in the Complaint goes beyond describing Plaintiff's alleged experience. *See Johnson,* 2011 WL 666161 at *3–4 (dismissing *Monell* claims where Plaintiff failed to "allege sufficient facts about his or similar others' experiences"). Therefore, Plaintiff's claims against the City and John Doe, to the extent he is being sued in his official capacity, are dismissed.

### E. Limitations of Damages Under the Prison Litigation Reform Act

The Prison Litigation Reform Act (PLRA) indicates that "[n]o federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). A "plaintiff cannot recover damages for mental or emotional injury for a constitutional violation in the absence of a showing of actual physical injury." *Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002). Section 1997e(e) only limits the *recovery* for emotional and mental injury in the absence of physical injuries; it does not bar the Plaintiff from bringing the lawsuit or from obtaining nominal or punitive damages, or injunctive and declaratory relief. *Id.* at 418. Nonetheless, a Court may dismiss a complaint that seeks compensatory damages "solely for an emotional injury without any claim of physical injury." *Id.* at 419.

**\*10** The Plaintiff fails to plausibly allege any type of physical injury. *See* Compl. The only harm that Plaintiff claims he sustained—ranging from having nightmares, talking to himself, and an inability to sleep in the dark

—cannot plausibly be construed as amounting to physical harm. *See Rosado v. Herard,* No. 12 CIV. 8943(PGG) (FM), 2014 WL 1303513, at *12–13 (S.D.N.Y. Mar. 25, 2014) (complaint alleging psychological episodes of mental anguish—including insomnia—dismissed under § 1997e(e)). The Complaint specifically seeks $200,000 in damages to "compensate" the Plaintiff "for all of the mental anguish" he suffered. *Id.* at 5. Although Section 1997e(e) does not bar other forms of relief, Plaintiff's claim is dismissed insofar as he requests compensatory damages for mental or emotional harm because he failed to allege physical injury. *See Rosado,* 2014 WL 1303513, at *12–13; *Howard v. City of New York,* No. 11 CIV. 5899(CM), 2012 WL 5816976, at *2 (S.D.N.Y. Nov. 14, 2012) (complaint purely alleging emotional distress dismissed under Section 1997e(e)).

### F. Stay of Discovery Request

The Defendant also asks the Court to stay discovery pending the disposition of this Rule 12(b)(6) motion. Def.'s Mot. Dismiss 12. Given that the motion to dismiss is granted, Defendant's request to stay discovery is denied as moot. *See McManamon v. Shinseki,* No. 11 CIV. 7610(PAE), 2013 WL 3466863, at *14 (S.D.N.Y. July 10, 2013), *appeal dismissed* (Dec. 30, 2013) (motion to stay discovery denied as moot after motion to dismiss granted); *Schoolcraft v. City of New York,* No. 10 CIV. 6005(RWS), 2011 WL 1758635, at *5 (S.D.N.Y. May 6, 2011) (same).

### III. Conclusion

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 10, to mail a copy of this Opinion and Order to Plaintiff, and to close the case.

Furthermore, the Court certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Opinion and Order would not be taken in good faith; therefore, *in forma pauperis* status is denied for purposes of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

It is SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 5461815

**Brown v. Doe, Not Reported in F.Supp.3d (2014)**

2014 WL 5461815

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1289579

2014 WL 1289579
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Amin B. BOOKER, Plaintiff,

v.

J. MALY, Deputy Superintendent of Security,
Shawangunk Correctional Facility, et al., Defendants.

No. 9:12–CV–246 (NAM/ATB).
|
Signed March 31, 2014.

**Attorneys and Law Firms**

Amin B. Booker, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Douglas J. Goglia, Esq., Assistant New York State
Attorney, Albany, NY, for Defendants.

## MEMORANDUM–DECISION AND ORDER

Hon. NORMAN A. MORDUE, Senior District Judge.

**\*1** Upon referral pursuant to 28 U.S.C. § 636(b)(1)(B)
and Local Rule 72.3(c), United States Magistrate Judge
Andrew T. Baxter issued an excellent and thorough Report–
Recommendation and Order (Dkt. No. 113) addressing a
number of motions in this *pro se* inmate civil rights case.
Magistrate Judge Baxter recommended the following: that
plaintiff's motion for summary judgment (Dkt. No. 69) be
denied; that defendants' motion for summary judgment (Dkt.
No. 103) be granted and the complaint dismissed in its entirety
as against all defendants; that plaintiff's motion for sanctions
(Dkt. No. 107) be denied; and that defendants' cross-motion
for sanctions (Dkt. No. 108) be denied. Magistrate Judge
Baxter further denied plaintiff's motion for appointment of
counsel (Dkt. No. 109).

Plaintiff has submitted an objection (Dkt. No. 114) to the
Report–Recommendation and Order. Pursuant to 28 U.S.C.
§ 636(b)(1) (C), this Court reviews *de novo* those parts of
a report and recommendation to which a party specifically
objects. In view of the comprehensive nature of plaintiff's
objections, the Court considers all issues *de novo*. The Court
has reviewed the record in its entirety, including plaintiff's

deposition testimony. Upon *de novo* review, the Court
adopts Magistrate Judge Baxter's Report–Recommendation
and Order in all respects. Reading plaintiff's papers liberally
and interpreting them to raise the strongest arguments that
they suggest, *see McPherson v. Coombe,* 174 F.3d 276,
280 (2d Cir.1999), the Court grants summary judgment to
defendants and dismisses the case.

Plaintiff also moves (Dkt. No. 115) for permission to submit
late exhibits. He states that he is awaiting the arrival of
weather reports, which he says are relevant to his Eighth
Amendment claim of cruel and unusual punishment and
his claim that his confinement in the special housing unit
at Upstate Correctional Facility imposed an atypical and
significant hardship because the cell was cold. David A. Rock,
Superintendent of Upstate Correctional Facility, submitted
a declaration regarding conditions at the facility, and stated
that the cells were maintained at temperatures between 70
and 74 degrees. Weather reports establishing cold outdoor
temperatures would not aid plaintiff in resisting summary
judgment on this issue. The Court assumes that the early
winter of 2010 was cold in Malone, New York; nevertheless,
summary judgment dismissing plaintiff's claim based on
allegedly cold temperatures in his cell is warranted based on
a number of factors. These include the undisputed evidence
that plaintiff had been issued warm clothing including a
sweatshirt, a winter coat, and a hat; the fact that plaintiff
alleges only mild negative effects which are insufficient to
support an inference that the cell was unreasonably cold; and
plaintiff's testimony that there was a heating system and that
some days he could feel the heat coming in. [1] Leave to submit
late exhibits is denied.

[1]    Plaintiff testified:

> Some days it would be you would feel the
> heat, actually you could feel the heat coming
> in there sometime and it was just so cold you
> could feel the cold as well, and they did have
> a heating system in there, but because it was
> more cold than hot, it didn't balance out.

**\*2** It is therefore

ORDERED that plaintiff's motion (Dkt. No. 115) for leave to
submit late exhibits is denied; and it is further

ORDERED that the Report and Recommendation (Dkt. No.
113) of United States Magistrate Judge Andrew T. Baxter is
adopted and accepted; and it is further

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 88 of 380
**Booker v. Maly, Not Reported in F.Supp.3d (2014)**
2014 WL 1289579

ORDERED that defendants' cross-motion for sanctions (Dkt. No. 108) is denied; and it is further

ORDERED that plaintiff's motion for sanctions (Dkt. No. 107) is denied; and it is further ORDERED that defendants' motion for summary judgment (Dkt. No. 103) is granted; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 69) is denied; and it is further

ORDERED that the action is dismissed with prejudice; and it is further

ORDERED that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

IT IS SO ORDERED.

### ORDER and REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In his amended civil rights complaint plaintiff alleges that his due process rights were denied in conjunction with a misbehavior report and disciplinary hearing, after which he was sentenced to a term in the Special Housing Unit ("SHU"). (Amended Complaint "AC") (Dkt. No. 73). Plaintiff also alleges that while he was in SHU, he was housed under conditions which violated his constitutional rights to be free from cruel and unusual punishment, his right to privacy, and his right to practice his religion. Plaintiff seeks declaratory and injunctive relief in addition to a substantial amount of compensatory and punitive damages. (AC at 51–53, ¶¶ A–C). [1]

[1]   The court will cite to the pages of the amended complaint as were assigned by the court's electronic filing system (CM/ECF) in addition to the paragraph number or letter assigned by plaintiff, if one exists.

Several motions are presently pending before this court. Prior to filing his amended complaint, plaintiff filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 69). In his amended complaint, plaintiff has included a motion for class certification. (See Dkt. No. 73, ¶¶ 1–41). After plaintiff filed his amended complaint, the defendants responded in opposition to plaintiff's motion for summary judgment and made a cross-motion for summary judgment. (Dkt. No. 103). Plaintiff responded in opposition to the defendants' cross-motion. (Dkt. No. 106). Plaintiff also moved for "sanctions" because he was not satisfied with defendants' response to his summary judgment motion. (Dkt. No. 107). Defendants have responded in opposition to plaintiff's motion for sanctions. (Dkt. No. 108). Plaintiff has filed a reply to the defendants' "sanctions" response, and plaintiff has also moved for appointment of counsel. [2] (Dkt.Nos.109, 110).

[2]   The court notes plaintiff originally moved for appointment of counsel and class certification, together with his original complaint. (Dkt. No. 1). Defendants argue that Judge Mordue has already denied the motion for class certification, and that only the plaintiff's individual claims have been allowed to proceed. (Def.s' Mem. of Law at 5) (Dkt. No. 103–4). However, on May 22, 2012, the court denied plaintiff's motions for appointment of counsel and for class certification *without prejudice*. (Dkt. No. 7 at 4–7). Thus, the court will address both of these motions.

For the following reasons, this court agrees with the defendants and will recommend denying plaintiff's motions for class certification and summary judgment and will recommend granting defendants cross-motion for summary judgment. The court will order the denial of plaintiff's motion for sanctions and his motion for appointment of counsel.

### I. *Complaint*

**\*3** The court will briefly review the facts as stated in the amended complaint [3] and as outlined in Judge Mordue's May 22, 2012 Order as a basis for further discussion of the additional evidence presented by the defendants.

[3]   The amended complaint did not change plaintiff's claims or his recitation of the facts. Plaintiff amended his complaint to name Corrections Officers Lance Taylor and Daniel Dumas, two individuals who he originally named as "John Does." (AC at ¶¶ 155–61).

2014 WL 1289579

Plaintiff alleges that on March 24, 2010, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow"), he was approved for a "satisfactory behavior preference transfer" to Shawangunk Correctional Facility. ("Shawangunk") (AC ¶¶ 42–43). Plaintiff states that prior to his transfer our of Great Meadow on March 26, 2010, his "draft bags" were searched by Great Meadow staff and approved for transfer with him. (AC ¶ 42). Plaintiff claims that a corrections officer viewed all of plaintiff's photos for "security clearance," and determined that none of plaintiff's property was contraband. (*Id.*)

Notwithstanding this alleged approval, upon plaintiff's arrival at Shawangunk, his property was searched outside of his presence by defendant Kavanaugh in violation of Department of Corrections and Community Supervision ("DOCCS") policy. (AC ¶ 45). Although defendant Kavanaugh was not "trained or certified" by DOCCS in identifying gang insignia, he selected five (5) of plaintiff's personal photographs, and he concluded that they contained "Blood Gang hand signs," in violation of an "unpublished departmental rule # 105.13 Gangs." (*Id.*) Based upon these photographs, on March 27, 2010, defendant Kavanaugh issued plaintiff a misbehavior report for violating the "unconstitutionally vague prison gang rule ." (AC ¶¶ 22, 45–48). [4]

[4]    The court notes that plaintiff has omitted a paragraph # 46.

Plaintiff claims that, in furtherance of a conspiracy to violate plaintiff's civil rights, defendant Smith [5] assigned defendant Maly [6] as the hearing officer for plaintiff's disciplinary hearing. (AC ¶ 51). Plaintiff claims that he possessed all of the photographs in question for many years, and the pictures had been viewed by countless officers, during searches at various facilities. (AC ¶¶ 88–93) (description of the photographs). Plaintiff claims that some of the pictures were taken inside DOCCS facilities as part of the "inmate photo program," which is conducted and monitored by corrections officers, and thus the pictures should not have been found to be "gang" materials. (AC ¶ 88). Plaintiff alleges that defendant Maly denied plaintiff due process at the hearing by denying him witnesses, being biased, and finding plaintiff guilty on insufficient evidence. (AC ¶¶ 52–87).

[5]    Defendant Joseph Smith was the Superintendent of Shawangunk at the time of the incidents in question.

[6]    Defendant J. Maly was the Deputy Superintendent of Security at Shawangunk.

Plaintiff alleges that defendant Kober, a Counselor at Shawangunk and a witness, called by hearing officer Maly, testified that the people in the photographs were making "gang signs." Plaintiff claims that, after the hearing, defendant Kober admitted to plaintiff that he lied at the hearing and "confirm [ed the] conspiracy." (AC ¶¶ 94–100). Kober allegedly implied to plaintiff that he lied because there was a "recession," and officers were getting laid off, so the "higher ups" needed SHU cells filled. He told plaintiff not to worry because he could try to get his disciplinary sentence reduced for good behavior. (AC ¶¶ 95, 97). Plaintiff claims that while he was housed in the SHU at Shawangunk, he witnessed three other African–American inmates "get falsely charged with this same prison gang rule." (AC ¶ 100). Although plaintiff wrote to Superintendent Smith complaining of the denial of due process and of defendant Kober's "confession," plaintiff's administrative appeals were denied at both the facility and the Commissioner's level. (AC ¶ 101–103).

 **\*4**  On April 23, 2010, plaintiff was transferred to Upstate Correctional Facility ("Upstate") to serve his SHU sentence. The amended complaint states that plaintiff was taken to Downstate Correctional Facility prior to his transfer to Upstate. (AC ¶ 105). Plaintiff complains that the bus ride from Downstate to Upstate was unreasonably slow and that the inmates' meals were unsatisfactory. (AC ¶ 106). He complaints about the guards stopping at too many rest areas. Although plaintiff does not make any claims regarding the trip itself, it appears that this transportation issue is part of plaintiff's claim that defendants are conspiring to keep inmates guilty of misbehavior to keep the SHU facilities open, and the guards are getting overtime pay for the transportation. (AC ¶ 39). The longer it takes to bring the inmates to the SHU facility, the more money spent in overtime.

As part of the class action argument, plaintiff also alleges that the defendants are trying to keep their Aggression Replacement Therapy ("ART") program funded by increasing the number of inmates who are assigned to the program. The increase in inmate participants is allegedly accomplished by falsely charging inmates with misbehavior that is associated with violence, such as gang activity and then forcing those inmates to participate in ART at the risk of having "a negative effect on his conditional release date, his good time credits, his family reunion participation, and other department privileges and work options." (AC ¶¶ 33–35). Plaintiff adds defendant

Cook to the list of defendants who are responsible for forcing inmates to participate in ART. (AC Twelfth Cause of Action ¶ 1(a), (2)(f)).

While at Upstate, plaintiff alleges that he was subjected to "atypical and significant" as well as cruel and unusual conditions of confinement. Plaintiff claims that he was forced to share a small cell with another inmate, and that his right to privacy was denied while showering, using the toilet, and dressing. (AC ¶¶ 120–24). Plaintiff also alleges that the lights were left on continuously, making it very difficult for him to sleep (AC ¶¶ 114–19); the showers were dirty and he was given insufficient cleaning materials (AC ¶¶ 125–30); he was denied proper winter garments (AC ¶¶ 131–36); he was handcuffed when outside of his cell; was only allowed one visit per week in unsatisfactory conditions; had to request his "necessities;" had no contact with other human beings outside of his cell mate; was served extremely small portions of food; was deprived of 97% of his personal property; and was denied the opportunity to work. (AC ¶ 137(a)-(f)). Plaintiff outlined various other restrictions to which he was subjected in SHU. (AC ¶¶ 138(a)-(f)).

Plaintiff states that while he was confined in SHU, his First Amendment right to practice his religion was violated. Plaintiff is Muslim, and he was not allowed to attend any congregate religious services (for which there is no substitute); he was not allowed to perform fithra (hair removal); he was not afforded access to an Imam; and was "daily" subjected to viewing another individual's nudity, as well as others viewing his nudity, in direct violation of the tenets of Islam. (AC ¶¶ 139–47). Plaintiff claims that defendants Rock and Fischer condoned and controlled a policy which forced plaintiff to share a cell with another individual without providing a partition to shield the inmates from "indecent exposure ." (AC ¶ 148).

**\*5** Plaintiff claims that defendants Maly, Smith, Kavanaugh, Kober, Fischer, [7] Prack, [8] Rock, [9] and Cook [10] entered into a civil conspiracy to violate plaintiff's (and other inmates') First, Fourth, Eighth, and Fourteenth Amendment rights. Plaintiff claims that these defendants have conspired to charge African–American and LatinoAmerican inmates with gang activity under an unconstitutionally vague rule, find them guilty, [11] and sentence them to serve time in SHU and requiring their participation in the federally funded Aggression Replacement Training program ("ART").

[7] Defendant Brian Fischer is the Commissioner of DOCCS.

[8] Defendant Albert Prack is the Director of Special Housing, who is, among other things, responsible for deciding appeals from facility disciplinary determinations.

[9] Defendant Rock was the Superintendent of Upstate. He retired on October 30, 2013. (Rock Decl. ¶ 1) (Dkt. No. 103–19).

[10] Defendant Cook is a Corrections Counselor at Upstate, who put plaintiff on a list for the ART program, notwithstanding that plaintiff told her that he already completed the program and did not need to take it again. (AC ¶¶ 108–112).

[11] Plaintiff states that the defendants are "in agreement" to have staff members who are not "certified or trained in gang identification" write misbehavior reports, falsely accusing AfricanAmerican and Latino inmates, based on their innocuous cultural expressions, use of slang or ebonics, poetry, writing, skipping holes in lacing their shoes, and wearing their hair in particular braids. (AC ¶ 23).

Plaintiff alleges that defendants have intentionally failed to publish the rule in the DOCCS rule book, "although they received the funding to print the rule inside the rule book...." (AC ¶ 24). Plaintiff claims that the defendants have conspired to withhold adequate notice of the prohibited conduct so that they may continue to write false misbehavior reports. (AC ¶ 25). Plaintiff alleges that the hearings are conducted in isolated locations so that inmates may be intimidated into pleading guilty. (AC ¶ 29). Plaintiff alleges that there are no criteria used to distinguish between gang materials and non-gang materials. (AC ¶ 27).

Plaintiff states that as a result of this conspiracy, (1) DOCCS receives additional money from the government because the defendants have inflated the number of inmates who "need" the ART program; (2) the need for SHU facilities has been manipulated by increasing the capacity/occupancy of SHU cells unnecessarily through the "prison gang rule scam," and (3) more overtime, and consequently more money, is generated for DOCCS staff who must transport the inmates to SHU facilities. (AC ¶¶ 22–41).

Plaintiff has again asked for class action status. (AC ¶¶ 1–7). In this request, plaintiff alleges that he wishes to bring this action "on behalf of himself and other identified and unidentified inmates incarcerated in the New York State [DOCCS]." (AC ¶ 1). Plaintiff alleges that his claims are typical of the "class," and that he will fairly represent the members of the class because he is a "direct victim," but he also asks the court to appoint a class counsel. (AC ¶¶ 3–6).

Plaintiff alleges that for years, plaintiff and other inmates have complained about the lack of procedural safeguards at disciplinary hearings wherein violations of the "vague" prison gang rule are charged. (AC ¶ 7). Plaintiff alleges that the rule unfairly characterizes their "cultural expressions" as amounting to "gang activity." (Id.) Plaintiff alleges that the injunctive relief that he has requested will affect all the class members, and therefore, class certification should be granted.

The amended complaint contains twelve causes of action. As Judge Mordue found, construed liberally, in addition to the civil conspiracy noted above by defendants Maly, Smith, Kavanaugh Kober, Fischer, Prack, Rock, and Cook (Twelfth Cause of Action), plaintiff also alleges that (1) defendants Maly, Smith, Prack, and Fischer denied plaintiff due process in violation of the Fourteenth Amendment (First and Second Causes of Action); (2) defendants Maly, Smith, Prack, Fischer, and Rock subjected plaintiff to cruel and unusual conditions of confinement in violation of his rights under the Eighth Amendment (Third, Fourth, Fifth and Sixth Causes of Action); (3) defendant Rock caused a violation of plaintiff's right to privacy in violation of the Fourth Amendment (Seventh Cause of Action); and (4) defendants Maly, Smith, Prack, Fischer, Rock, Rokace, Taylor and Dumas interfered with plaintiff's ability to freely practice his religion in violation of his First Amendment rights and his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Eighth, Ninth, Tenth, and Eleventh Causes of Action).

## II. *Class Action*

**\*6** Plaintiff has simply repeated the paragraphs of his original complaint that request the court to grant class actions status under Fed.R.Civ.P. 23. (*Compare* Compl. ¶¶ 1–7, 18–41 *with* AC ¶¶ 1–7, 18–41). Judge Mordue has already denied plaintiff's motion for class certification based upon the same facts. Although Judge Mordue denied plaintiff's motion "without prejudice," plaintiff has cited nothing that would change Judge Mordue's analysis. Thus, to the extent that plaintiff is again requesting class certification, this court

recommends that it be denied, and will proceed based upon plaintiff's individual claims. [12]

[12] The court does note that if plaintiff were to succeed individually on his claim that the challenged rule was unconstitutionally vague, to the extent that plaintiff seeks injunctive relief, the ruling would affect all inmates, including those that plaintiff alleges form his "class." *See Forts v. Ward,* 621 F.2d 1210, 1217–18 (2d Cir.1980) (in certain circumstances when order benefits all members of the alleged class, class certification would be a mere formality); *Galvan v. Levine,* 490 F.2d 1255, 161 (2d Cir.1973) (certification of class unnecessary when prospective relief would benefit all members of a proposed class to such an extent that the certification of a class would not further the implementation of the judgment); *Daniels v. City of New York,* 198 F.R.D. 409, 421–21 (S.D.N.Y.2001) (citing cases). Thus, class certification is unnecessary to obtain the prospective relief that plaintiff seeks.

## III. *Summary Judgment*

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,*

475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc. .,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

### IV. *Due Process (First and Second Causes of Action)*

#### A. Legal Standards

#### 1. Procedural Due Process

To begin a due process analysis, the court must determine whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges, and then determine whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). In *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court held that although states may create liberty interests for inmates that are protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

**\*7** The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit ("SHU") automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir.2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir.2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin." Colon v. Howard,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia, Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985)).

#### 2. Notice/Vagueness

"Due process requires prison officials to provide inmates with adequate notice of what conduct is prohibited." *Collins v. Goord,* 581 F.Supp.2d 563, 578 (S.D.N.Y.2008) (citing, *inter alia, Chatin v. Coombe,* 186 F.3d 82, 87 (2d Cir.1999). " 'Courts have recognized prisoners' substantive due process claims that allege that prison rules failed to provide adequate notice of prohibited conduct. The underlying rationale ... [is that] inmates must be free to avoid prohibited conduct, and prison regulations must therefore place them on notice....' " *Williams v. Fischer,* 08–CV–413 (TJM/DRH), 2010 WL 3910129, at * 10 (N.D.N.Y. Aug. 17, 2010) (quoting *Leitzsey v. Coombe,* 998 F.Supp. 282, 289 (W.D.N.Y.1998)). A disciplinary rule "is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and differ as to its application, or if it fails to give a person of ordinary intelligence fair notice of conduct proscribed or required by the regulation and encourages arbitrary and erratic behavior on the part of the officials charged with enforcing the rule." *Id.* (citing *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995)).

#### B. Application

#### 1. Liberty Interest

In this case, plaintiff was found guilty of the possession of gang-related material, but was found not guilty of possessing another inmate's legal work. (Goglia Decl. Ex. B at 4). He was sentenced to one year in SHU for the possession of gangrelated photographs. Even though plaintiff only served 264 days of his one year sentence in SHU, defendants do not contest, and this court will assume for purposes of this recommendation, that plaintiff had a protected liberty interest. Thus, the court need not engage in a lengthy analysis of whether plaintiff suffered an atypical and significant hardship,[13] and instead, may proceed to an analysis of whether plaintiff was afforded the requisite procedural safeguards.

13    The court notes that plaintiff spends a great deal of time arguing that the restrictions imposed on him in SHU were "atypical and significant." He seems to confuse this standard for finding a liberty interest with the standard for cruel and unusual punishment which is different and which the court will discuss below.

### 2. Advance Notice of Charges

*8 Plaintiff was served with his misbehavior report on March 27, 2010. (Kober Aff. Ex. B at 1) (Hearing Transcript ("HT")) (Dkt. No. 103–15); (Goglia Decl. Ex. B at 4, 5) (indicating delivery date and time). His hearing commenced on April 1, 2010. (*Id.*) The misbehavior report specified the rules that plaintiff was alleged to have violated. (Goglia Decl. Ex. A). The explanation in the misbehavior report was quite clear that Officer Kavanaugh had been assigned to search plaintiff's personal property, and that during the course of that search, found the five photographs that were said to be "gang-related material," in violation of Rule 105.13. (*Id .*) Officer Kavanaugh also stated that he found legal material belonging to another inmate in violation of Rule 113.27. (*Id.*) Thus, plaintiff had "advance notice of the charges" as required for **procedural due process.**

### 3. Witnesses/Documentary Evidence

Plaintiff was given a choice of employee assistants for the hearing, and he chose Sergeant Checcia, who met with plaintiff on March 27, 2010. (HT at 1); (Goglia Decl. Ex. B at 5) (Dkt. No. 103–9). Sergeant Checcia determined that plaintiff wished to call Inmate Perez as a witness, and during the hearing, defendant Maly confirmed plaintiff's request. (*Id.* at 1–2). Inmate Perez, the law library clerk at Great Meadow, was called to testify telephonically on plaintiff's behalf relative to the unauthorized possession of another inmate's legal work. (*Id.* at 12–16). Inmate Perez was the only witness who plaintiff requested prior to the hearing.[14] (Goglia Decl. Ex. B at 5) (Hearing Record Sheet).

14    Defendant Maly called Inmate Perez as a witness for plaintiff. Perez testified that he was an inmate law clerk and made a mistake in sending plaintiff another inmate's papers. (Kober Aff. Ex. B at 15–16) (Dkt. No. 103–15). As a result of Inmate Perez's testimony, plaintiff was found not guilty of possession of another inmate's legal work. (*Id.* at 33).

Plaintiff spent a great deal of time at the hearing, arguing that he never received the memorandum amending Rule 105.13, that the rule was not in the rule book, and that there were no specific criteria to establish whether an inmate's property contained "gang-related" material or depicted gang signs. Plaintiff was given the opportunity to argue that he did not receive the memorandum. (HT at 24–28). When plaintiff told defendant Maly that he had not received the memorandum updating Rule 105.13, defendant Maly adjourned the hearing in order to obtain evidence regarding the plaintiff's receipt of this document. (HT at 8–10). When defendant Maly recommenced the hearing, plaintiff was provided with copies of pages of the "Locator System," a two page copy of the memorandum updating Rule 105.15 that was issued in 2008; and a copy of the redacted Green Haven Log Book for A–Block on May 17, 2008,[15] the time when the memorandum was distributed to all inmates. (*Id.*)

15    Plaintiff was housed in A–Block at Green Haven at the time that the Rule 105.13 amendment was distributed.

However, when plaintiff requested to call the individual who actually "gave" him the memorandum 2008, the hearing officer denied that "unknown" witness. The hearing officer explained the reason for the denial. (HT at 28–30). There was no indication that anyone in particular gave plaintiff the amended rule. (HT at 29). The document produced by defendant Maly stated that the amendments were "passed out at twenty-two hundred." (*Id.*) Defendant Maly assumed that the floor officers were responsible for passing out the rules. (*Id.*) Thus, defendant Maly's denial of plaintiff's unknown witness, who gave plaintiff the amendment to Rule 105.13 two years prior to the hearing in this case was reasonable, given the documentary evidence supporting the finding that plaintiff received the memorandum when it was distributed to all inmates on the unit. The denial was not a violation of plaintiff's right to present witnesses.

*9 What plaintiff does not state in his complaint, or anywhere in his papers, is that he was well aware of the rule and the 2008 memorandum because he brought a lawsuit, making identical claims in 2010, after a prior misbehavior report, charging him with similar behavior. *Booker v. Tokarz, No. 10–CV–4796, 2012 WL 5431008 (E.D.N.Y. Nov.7, 2012).* Defendants have filed a copy of plaintiff's amended complaint in *Tokarz* as Exhibit D to the Goglia Declaration. In *Tokarz,* plaintiff even made similar claims about the conditions in SHU. (*Id.*)

In *Tokarz,* the plaintiff was charged with the possession of photographs that were considered gang-related material. The hearing officer produced the same documentary evidence as defendant Maly, showing that plaintiff was given the rule amendment in May of 2008. In *Tokarz,* plaintiff made the same argument that he never personally signed for the rule amendment, and he was given a copy of the memorandum by the hearing officer. (*See Tokarz,* No. 10–CV–4796, Dkt. No. 54–12, Def.s' Ex. I, Pt. 1 at 11–12, 23–24). [16] Clearly, plaintiff is, and was, well-aware of the rule amendment. Even if plaintiff had not received a copy when the rule was distributed to all inmates in 2008, he received a copy of the rule during his disciplinary hearing in *Tokarz.* Plaintiff's argument in this case that he did not receive the memorandum regarding the rule amendment is disingenuous at best. [17]

[16]   This court has examined the documents filed in *Tokarz.* However, the review of those documents was not necessary to determine that plaintiff knew about the rule since he brought the same claim as he brings in this case, and defendants have filed plaintiff's own amended complaint in *Tokarz* as an exhibit in this case. The review of the disciplinary hearing transcript in *Tokarz* merely confirms that plaintiff received the memorandum at that hearing.

[17]   The court notes that even if it were not so obvious that plaintiff received a copy of the rule at the hearing in *Tokarz,* the evidence that he was housed in A–Block, and the log book entry, indicating that "all" inmates on A–Block received copies of the memorandum, would have been sufficient evidence *at a prison disciplinary hearing* to show that he received the memorandum. Defendant Maly's denial of unknown witnesses from a different facility, whose conduct occurred two years prior to the disciplinary hearing was quite reasonable and justified as lacking necessity. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (hearing officer may refuse to call a witness due to lack of necessity or irrelevance).

Plaintiff's request to call the officer who packed his property at Great Meadow was also denied. (HT at 31–32). Defendant Maly denied that witness because plaintiff did not dispute his ownership of the photographs. (HT at 32). Plaintiff did not deny that he owned the photographs, he was trying to show that the unknown officer who packed the photographs did not find that they were gang related. The fact that an officer packed plaintiff's property without noticing or finding that the photographs were gang-related material would not change the fact that defendant Kober found them to be so. Thus, the denial of the "unknown" witness who packed plaintiff's belongings at Great Meadow was not a violation of plaintiff's right to present evidence.

Finally, defendant Maly refused to call defendant Kavanaugh, the author of the misbehavior report to explain why he determined the photos to be gang-related. The court finds that the refusal to call defendant Kavanaugh was reasonable, given that defendant Kober was called to testify about the photographs. The misbehavior report is only a charge that plaintiff has violated a facility rule, and defendant Kavanaugh simply wrote the misbehavior report. The determination of whether plaintiff was guilty of that misbehavior is based upon the evidence presented at the hearing.

### 4. Sufficiency of Evidence

Defendant Maly called Corrections Counselor Kober to testify about gangrelated material. (HT at 17–23). Plaintiff alleges that the evidence was insufficient to find him guilty of the misbehavior because Kober was not qualified to testify about gang signs and was not specific about his reasoning at the hearing. Plaintiff also claims that defendant Maly and defendant Kober "discussed" what Kober was going to say, also showing that defendant Maly was biased.

**\*10**  As stated above, the quantum of evidence required for a guilty finding in a prison disciplinary hearing is "some," "reliable" evidence, nowhere near the amount of evidence required for conviction in a criminal case. *Sira v. Morton, supra.* First, in this case, there is absolutely no basis for plaintiff's conclusory statement that defendant Maly prejudged plaintiff's guilt or conspired to have defendant Kober give false testimony at the hearing, even if Maly did ask defendant Kober to testify. [18] Defendant Kober has submitted an affidavit explaining his testimony and why additional specificity is contrary to security concerns. (Kober Aff.) (Dkt. No. 103–13).

[18]   Defendant Kober states that he was called as a witness by defendant Maly and was asked at the hearing to look at the five photographs to determine whether they contained gang-related material. (Kober Aff. ¶¶ 14, 18).

In his affidavit, defendant Kober states that his job as Corrections Counselor includes reviewing the records of "each inmate [who] is transferred into Shawangunk...." (Kober Aff. ¶ 4). Defendant Kober states that he reviewed plaintiff's records prior to meeting him when he was transferred to Shawangunk and noticed that plaintiff had identified himself to corrections officials as a member of the "Bloods." Defendant Kober also noticed that plaintiff was previously charged in misbehavior reports involving gangs or gang-related materials. (*Id.* ¶ 5). Defendant Kober has included plaintiff's disciplinary record as Exhibit A to his affidavit. (Dkt. No. 103–14). The disciplinary record shows that plaintiff has been charged with, and found guilty of, various misbehavior related to gangs and possession of gang-related material. In addition to the misbehavior adjudicated in this case, he was found guilty of behavior dealing with "unauthorized organizations" on June 6, 2002 (Kober Ex. A at 2); on July 26, 2000 (*Id.* at 3); on November 15, 1999. (*Id.* at 4); and on July 7, 1999 (*Id.* at 5).

In addition to defendant Kober's job as a Corrections Counselor, he has been designated to receive training relative to gangs and their activities in the correctional system. (Kober Aff. ¶¶ 6–7). This designation involved initial training as well as continuing education of four hours per month. (*Id.* ¶ 7). However, there are no textbooks for this training, and it is not a course of study that leads to a "certification" as a "gang expert ." [19] Instead, defendant Kober states that the training involves dissemination and discussion of intelligence material about gangs which is obtained from a number of different confidential sources. (*Id.* ¶ 8).

[19]    At his disciplinary hearing, plaintiff was attempting to determine whether Kober had a "certification." (Kober Aff. Ex. B, Hearing Transcript ("HT") at 22–23).

One of the important parts of defendant Kober's training is to learn the means by which gangs identify themselves because a significant number of inmates come into the correctional system with gang affiliations and retain these affiliations while incarcerated. (*Id.* ¶ 9). These methods of identification serve to enable gang members to identify each other for protection as well as warning to members of rival gangs. (*Id.* ¶ 10). Gang presence and activity within the correctional system presents "a real potential for danger because of their ability to bring about and coordinate organized violence at any time." (*Id.* ¶ 11). The correctional staff must be able to identify the gangs and their members in order to prevent any problems.

(*Id.* ¶ 12). Defendant Kober states that it is also important for security to keep confidential the information that he receives as well as the sources from which that information is received in order for the staff to be effective in preventing the problems that can arise because of the gangs. (*Id.* ¶ 13). Once the inmates who belong to the gangs are aware that the staff knows their means of identification, they develop new ways to identify themselves. (*Id.*) This is why defendant Kober does not go into much detail when he is called to serve as a witness at an inmate's disciplinary hearing. (*Id.* ¶ 13).

**\*11** Defendant Kober explains his rationale for determining that the photographs in question depicted gang signs. (Kober Aff. ¶¶ 19–22). Defendant Kober explains that the hand signs in at least four of the five photographs are associated with the Bloods. (*Id.*) Defendant Kober also states that, although he was not asked at the hearing, the Bloods also use the color red as a "common identifying sign," and that in addition to the hand signs, both inmates in one of the photographs are dressed in red from head to toe. (*Id.* ¶ 22). Defendant Kober's testimony was sufficient to constitute "some" evidence at the disciplinary hearing, supporting the hearing officer's determination of guilt.

### 5. Hearing Officer Bias

Plaintiff argues that defendant Maly was not impartial. "An inmate subject to a disciplinary proceeding is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d at 253, 259 (2d Cir.1996). An impartial hearing officer is "one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well settled, however, "that prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* An inmate's own subjective belief that the hearing officer was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010).

Plaintiff believes defendant Maly was "biased" because he did not allow plaintiff to "test" the reliability of the evidence showing that plaintiff received the memorandum regarding

rule 105.13. As stated above, plaintiff's entire challenge regarding his "knowledge" of the rule is specious because he brought a law suit in 2010, making the same claim about not getting the memorandum. Defendant Maly's refusal to call witnesses to "test" the evidence was reasonable and did not show that he was biased against plaintiff.

There is nothing in the record to which plaintiff refers that would show bias by defendant Maly sufficient to rise to the level of a constitutional violation. Plaintiff believes defendant Maly was biased because he did not allow plaintiff to call defendant Kavanaugh to testify and instead called defendant Kober to testify about the gang signs depicted in the photographs and appears to claim that Maly and Kober "discussed" the case prior to his testimony. There is absolutely no evidence that any discussion that occurred between Maly and Kober was more than a request that Kober review the photographs for gang-related material and testify to his opinion at the hearing. This does not indicate that defendant Maly "prejudged" the evidence. The fact that Maly called a "trained" officer to testify shows that he was wanted to make sure of the facts, not that he prejudged them.

 **\*12** Plaintiff was given a written copy of the disposition and the reasons for the guilty finding. (*Id.* at 6). At the hearing, defendant Maly read, to the plaintiff, the statement of the evidence upon which he relied. (HT at 33). Plaintiff's appeal rights were explained to him, and he was given an appeal form. (HT at 34). Thus, plaintiff's procedural due process rights were not violated in his disciplinary hearing.

### 5. Vagueness

The question remains whether Rule 105.13 itself is vague. The memorandum circulated by DOCCS in 2008 was an amendment to the "Standards of Inmate Behavior." The amendment was meant to clarify the existing rules with respect to gang related materials. (Goglia Decl. Ex. B at 25; Copy of Amendment Memorandum) (Dkt. No. 103–9). The memorandum contained amendments to both Rules 105.13 and 105.14. The amendment to Rule 105.13 read as follows:

> 105.13—An inmate shall not engage in or encourage others to engage in gang activities or display, wear, possess, distribute or use gang insignia or materials, including, but not limited to, printed or handwritten gang or gang-related material. I, II, III
>
> Note: For purposes of this rule, a gang is a group of individuals, having a common identifying name, sign,

symbol or colors, who have individually or collectively engaged in a pattern of lawlessness (e.g., violence, property destruction, threats of harm, intimidation, extortion or drug smuggling) in one or more correctional facilities or that are generally recognized as having engaged in a pattern of lawlessness in the community as a whole. For purposes of this rule, printed or handwritten gang or gang related material is written material that, if observed in the inmate's possession, could result in an inference being drawn about the inmate's gang affiliation, but excludes published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the media review process.

(*Id.*) Contrary to plaintiff's allegation, the amendment has been published in the Rule Book. *See* 7 N.Y.C.R.R. § 270.2, Rule 105.13 (2012). A review of the amendment shows that the prohibited conduct is clear to a person of average intelligence.

Plaintiff challenges the rule because he claims that it does not set forth specific criteria for determining whether a gesture is a gang sign or whether it is simply "cultural expression." This court disagrees. It is quite clear, according to the rule, that a gang sign is something that another inmate would recognize as creating an inference of a particular gang affiliation. More specificity in the prison context would be impossible because, as stated by defendant Kober, individuals could change the signs to avoid detection, interfering with the security and order of the facility.

In *Klimas v. Lantz,*[20] the inmate challenged a similar Connecticut rule on both First Amendment and Substantive Due Process grounds. Prior to his incarceration, Klimas was a Sergeant–at–Arms of the Hell's Angels Motorcycle Club ("HAMC").[21] 2012 WL 3611018, at \*1. The Connecticut Department of Corrections had a "zero tolerance" policy toward gangs and gang-related materials, and viewed the HAMC connection and alignment with "white supremacy groups" as a threat to the safety and security of the inmates and staff. *Id.* at \*2. The Directive at issue in *Klimas* provided for the rejection of correspondence that included "letters written in code" or information that would create a clear and present danger of violence and physical harm, or threats to safety and security. *Id.*

2014 WL 1289579

20    *Klimas v. Lantz,* No. 3:08–CV–694, 2012 WL 3611018 (D.Conn. Aug.21, 2012), *aff'd,* 531 F. App'x 6 (2d Cir.2013).

21    The court would point out that this plaintiff makes much of the fact that the gang rules target African American and Latino inmates; however, HAMC members were required to be Caucasian. 2012 WL 3611018 at * 1. Thus, gang-related material can apply to any unauthorized organization, and there is no indication in the New York rule cited above that it would target any particular race. It is plaintiff who assumes that gangs are either African American or Latino.

**\*13** Another directive defined a "Security Risk Group" as a group of inmates designated by the Commissioner as possessing common characteristics, which serve to distinguish them from other inmates and "which as a discrete entity, jeopardizes the safety of the public, staff, or other inmate(s) and/or the security and order of the facility." *Id.* The rule contained also defined a "Disruptive Group," with general factors for the determination of each type of group. HAMC was designated as a Disruptive Group. *Id.*

The Connecticut Department of Corrections rejected Klimas's correspondence because the materials contained references to HAMC; HAMC-related symbols; and words which contained coded meanings. *Id.* at \*3. Klimas was informed that any of his correspondence that contained HAMC logos or insignia would continue to be rejected based upon security concerns. *Id.*

The court in *Klimas v. Lantz* held that "the challenged practice is reasonably related to legitimate penological interests and is not an exaggerated response to prison concerns." *Id.* at \*6. With respect to a vagueness challenge, the court held that the vagueness doctrine does not require perfect precision in the drafting of rules. *Id.* at \*7 (citing *Rose v. Locke,* 423 U.S. 48, 49, 96 S.Ct. 243, 46 L.Ed.2d 185 (1972). The degree of vagueness that is tolerated depends upon the nature of the enactment, and in reviewing challenged regulations, the court should look to the words of the regulation, the interpretation given to analogous regulations, and the interpretation of the statute given by those who are charged with enforcing it. *Id.* (citing *Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). The court held that although the Connecticut Directive implicated an inmate's First Amendment rights, it "gave reasonable notice of the proscribed speech by enumerating the specific circumstances

where correspondence would be disapproved." *Id.* The court also stated that the fact that plaintiff may have received or sent correspondence in the past bearing the HAMC indicia "does not undermine the legitimacy of the defendants' rationale for rejecting his mail." *Id.* at \*5 n. 4.

The reasoning of *Klimas v. Lantz* supports the defendants' position that the disciplinary rule in this case is not unconstitutionally vague. Rule 105.13 gives inmates the definition of gangs and of gang-related materials. As stated above, more specificity is not required, and would be very difficult, given the number of gangs [22] and the different methods of symbolic communication that exist. The fact that plaintiff may have been able to possess those pictures at other facilities does not undermine the defendants' desire to regulate gang-related material at their facility. *Klimas v. Lantz,* at \*5 n. 4.

22    Exhibit E to defendant Kober's affidavit is an extract from an FBI document, entitled: "2011 National Gang Threat Assessment—Emerging Trends." (Kober Aff. Ex. E) (Dkt. No. 103–18). This document discusses the development of the "National Gang Intelligence Center" ("NGIC"), lists definitions of different types of gangs, and lists the names of many of the gangs that currently exist, including the Bloods, together with the trend in their criminal behavior. (*Id.* at 3–4). In New York State alone, there are *29* different gangs listed. (*Id.* at 4).

The court would also point out that plaintiff is not as naive as he implies. Contrary to his allegations, he has had other issues with gang-related items, including photographs. The court notes that in the 2010 case, he made some of the same challenges to the disciplinary hearing as he makes in this case. The disciplinary hearing was reversed, but the court stated that the reversal was for " 'failure to maintain evidence for review.' " *Booker v. Tokarz,* 2012 WL 5431008 at \*2. Plaintiff has identified himself to DOCCS officials as a member of the Bloods, holding the rank of Enforcer. (*See* Dechick Aff. ¶¶ 8–9 & Ex. A) (plaintiff's records show that his gang membership and rank were "self-reported"). Thus, plaintiff is well aware that gangs may communicate through signs and symbols. Even if such communication could also be considered "cultural expression," it is the type of "cultural expression" that may be reasonably regulated. *See Turner v. Safely,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (a regulation that burdens a protected right withstands

a constitutional challenge if that regulation is reasonably related to legitimate penological interests); *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (same).

 **\*14** In his response to defendants' motion for summary judgment, plaintiff has attached a photograph of Haile Selassie I, purportedly making the same hand sign that was found to be a gang sign in plaintiff's disciplinary hearing. (Dkt. No. 106–3 at CM/ECF p. 8). Under the photograph is an explanation that the sign is the "Sign of the Holy Trinity," and the "triangle pointing downwards is an esoteric symbol representing the material phase of the Seal of Solomon...." (*Id.*)

Plaintiff has also attached a memorandum, dated February 26, 2001 from Lucien J. Leclaire, Jr., Deputy Commissioner. (*Id.* at 9). The memorandum is addressed to Father James C. Hayes, Chief of Chaplains and is in response to a memorandum sent by Father Hayes. The memorandum states that Deputy Commissioner Leclaire met with Don Selsky, who was then the Director of Special Housing and Inmate Discipline, and with Dale Artus, who was then the Director of the Crisis Intervention Unit. (*Id.*) These individuals met to discuss that it was "inappropriate for an inmate to be disciplined for *possession of a picture of this nature." (Id.*) Deputy Commissioner Leclaire also stated that "Rule 105.12 of the Standards of Inmate Behavior, in no way, addresses hand signals," and that "[a]ny misbehavior report dealing solely with the displaying of hand signals [was] being dismissed by Mr. Selsky's office." The memorandum also states that "the issuance of this type of misbehavior report appears to be at a minimum." (*Id.*)

Plaintiff points out that the hand signal in his photographs was the same as that in the Haile Selassie photo. However, the court would note that the misbehavior report to which the memorandum refers was issued for "a picture of this nature,"-a picture of a well-known individual, published in what appears to be a book, where it is specifically stated that the hand symbol has historical or religious meaning. The court also notes that the disciplinary rule cited in Deputy Commissioner Leclaire's memorandum is not the rule that plaintiff was charged with violating, and the amendment to the Standards of Behavior was issued in 2008, seven years after the Leclaire memorandum. The Haile Selassie photo is, in no significant way, comparable to the pictures possessed by the plaintiff in this case.

In fact, the photo in plaintiff's exhibit would probably be acceptable under the 2008 amendment because the amendment excludes "published material that the inmate has obtained through the facility library or that has been approved for the inmate to possess through the medium review process." Rule 105.13. In addition, the fact that a gang may have adopted a symbol that is also a religious or historical symbol as a method of identification does not make that symbol any less gang-related. The regulation is not unconstitutionally vague. Thus, plaintiff's due process claims, both procedural and substantive may be dismissed as against defendants Kavanaugh, Maly, Kober, Smith, Prack, and Fischer. [23]

[23]     In his first "cause of action," plaintiff names defendant Maly as responsible for the procedural due process violations, and in plaintiff's second cause of action, he states that defendants "Smith, Prack, and Fischer" "condoned and ratified" defendant Maly's violations by refusing to overturn the disciplinary findings. The court notes that in the body of his amended complaint, plaintiff has also named defendants Kavanaugh and Kober as being responsible for the due process violations. Other than writing the misbehavior report, defendant Kavanaugh is not alleged to have participated in the disciplinary hearing. Plaintiff alleges only that defendant Kavanaugh was not qualified to make the gang-related determination and that defendant Maly refused to call him as a witness. Plaintiff claims that defendant Kober "withheld" evidence because he withheld the criteria that he used for determining whether plaintiff's photographs were gang-related materials, making the evidence "insufficient" to find plaintiff guilty. The court has discussed defendant Kober's involvement above. Because plaintiff's procedural and substantive due process claims may be dismissed, they may be dismissed as against all defendants that plaintiff associated with the due process violations.

## V. *SHU Conditions (Third, Fourth, Fifth, and Sixth Causes of Action)*

### A. Legal Standards
 **\*15** The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Hathaway v. Coughlin,*

37 F.3d 63, 66 (2d Cir.1994). Prison officials "must 'take reasonable measures to guarantee the safety of inmates.' " *Farmer v. Brennan,* 511 U.S. at 832 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). A defendant must have known of a substantial risk to inmate safety that he or she could have easily prevented but did not. *Hall v. Bennett,* 379 F.3d 462, 464 (7th Cir.2004).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835.

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Carlson v. Parry,* No. 06–CV–6621, 2012 U.S. Dist. LEXIS 44292, at *20–21, 2012 WL 1067866 (W.D.N.Y. Mar.29, 2012) (collecting cases). "A risk can be so obvious that a jury may reasonably infer actual knowledge on the part of the defendant[ ] sufficient to satisfy the subjective component of the deliberate indifference standard. *Id.* (citing *Farmer,* 511 U.S. at 842; *Proffitt v. Ridgeway,* 279 F.3d 503, 506 (7th Cir.2002); *Bagola v. Kindt,* 131 F.3d 632, 646 (7th Cir.1997)). Common sense is relevant to deciding the obviousness of the risk. *See Hall v. Bennett,* 379 F.3d at 465 (citing *Fruit v. Norris,* 905 F.2d 1147, 1150–51 (8th Cir.1990)).

A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin,* 467 F.3d at 281.

### B. Application

#### 1. General Conditions in SHU

 *16 The court would first point out that plaintiff's Third Cause of Action names only defendant Maly as "responsible" for the unconstitutional conditions of confinement because he found plaintiff guilty and sentenced him to SHU. (AC at CM/ECF p. 45). Plaintiff's Fourth Cause of Action names defendants Smith and Prack as being responsible for the unconstitutional conditions in SHU because they affirmed defendant Maly's disciplinary finding. However, plaintiff made the same claim about the hearing officer in *Tokarz,* and the court held that at most, the hearing officer intended that plaintiff be confined in SHU. There was no intention or awareness that plaintiff would be exposed to unconstitutional conditions while in SHU. Thus, the Eighth Amendment claims were dismissed as against the individuals responsible for the disciplinary determination. 2012 WL 5431008, at *7.

This court agrees. Restrictive SHU conditions on their own do not per se rise to the level of cruel and unusual punishment. *Inesti v. Hogan,* No. 11 Civ. 2596, at *24 (S.D.N.Y. Mar. 5, 2013) (normal conditions of SHU confinement are not violations of the Eighth Amendment); *Dixon v. Goord,* 224 F.Supp.2d 739, 752 (S.D.N.Y.2002). In addition, defendants are not responsible for conditions in SHU because of any alleged improprieties in the disciplinary hearing that caused the sentence to be imposed. *Id.* Thus, to the extent that plaintiff blames defendants Maly, Smith, Prack, and Fischer [24] for the SHU conditions only to the extent that they were involved in the disciplinary hearing at or its review, [25]

any Eighth Amendment claim regarding the subsequent SHU conditions may be dismissed because there is no allegation that any of the three defendants were personally involved in maintaining the conditions in SHU or expected plaintiff to be subjected to anything more than the "normal" conditions in SHU. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003)* (personal involvement in the violation required to establish liability under section 1983); *Green v. Bauvi,* 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

> 24    Defendant Fischer, the Commissioner of DOCCS, is named in the Fifth Cause of Action as responsible for the conditions in SHU in relation to his handling of plaintiff's disciplinary appeal. Plaintiff claims that defendant Fischer violated the Eighth Amendment by continuing the authorization of "cruel and unusual punishment after learning of the due process violations and conditions of confinement under atypical and significant hardship." (AC at 46). Plaintiff also complained that Fischer delegated his decision making to defendant Prack, who was the Director of Special Housing. Passing the decision making on to a subordinate does not rise to the level of personal involvement required to establish liability under section 1983. *Rivera v. Fischer,* 655 F.Supp.2d 235, 238 (W.D.N.Y.2009).

> 25    In addition, defendants Maly and Smith work at Shawangunk. They would certainly not be responsible for any unconstitutional SHU conditions at Upstate.

Plaintiff's sixth cause of action states that defendant Rock, the former Superintendent of Upstate is also responsible for the unconstitutional conditions of the SHU at Upstate. Plaintiff claims that the cells and the showers were dirty and the cleaning supplies were unsatisfactory. He states that he was forced to inhale "sour odors." (AC ¶¶ 125–29). Plaintiff claims that his cell was "uninsulated," and he was denied thermal clothing, boots, a scarf, and gloves for the winter. (AC ¶ 131). Plaintiff also alleges that he was tormented by the illumination in his cell during the night, resulting in burning, watery eyes and fatigue due to lack of proper sleep. (AC ¶ 114–19). Plaintiff alleges that he was assigned to a double cell, and that there were no curtains to shield inmates from

each other while they performed their daily hygiene such as showering or using the toilet. (AC ¶¶ 120–24).

**\*17** Plaintiff also claims that he was frisked when leaving his cell and that restraints were always applied, even when he had a medical appointment. (AC ¶ 137). He lost doctor-patient confidentiality because there were always guards present, he had to be locked in his cell 24–hours per day, seven days per week, with only one hour of daily recreation in a small caged area with no exercise equipment and no sunlight. He was only allowed to receive one visit per week behind a waist-high partition, with no ability to hug, kiss, or embrace his visitors. Plaintiff claims that his wife left him because of the "SHU hardship [and] lengthy sentence." (AC ¶ 137(a)). Plaintiff claims that he had to wake up at odd hours to mail his letters and to request necessities from officers who were making rounds. (AC ¶ 137(b)). Plaintiff claims that he had no contact with other human beings outside of his cell-mate; had to receive meals from corrections officers; his food rations were unreasonably small; he was deprived of 97% of his personal property; there was no opportunity for him to work, to study, or to attend programs. (AC ¶ 137(c)-(f)).

Most of the restrictions and limitations that plaintiff states he suffered in the Upstate SHU are normal restrictive, and perhaps, harsh, conditions of SHU. Plaintiff refers to these conditions as atypical and significant. However, as stated above, atypical and significant conditions, compared to the ordinary incidents of prison life, may be sufficient to create a liberty interest, but do not establish an Eighth Amendment violation. The fact that plaintiff had to be shackled when leaving his cell, was confined 23 hours per day; had to receive meals from corrections officers, had to wake up at "odd" hours to mail letters or request "necessities," had limited contact with other inmates, was limited in his visitation rights, or did not have an opportunity to attend programs do not rise to the level of a serious deprivation of basic human needs. *See Beckford v. New York State Office of Mental Health,* No. 06–CV–561, 2010 WL 1816689, at \*12 (W.D.N.Y. May 3, 2010)* (citing, *inter alia, McNatt v. Unit Manager Parker,* No. 3:99CV1397, 2000 WL 307000, at \*4 (D.Conn. Jan.18, 2000)* (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to the level of Eighth Amendment violation); *Shannon v. Selsky,* No. 04 Civ.1939, 2005 WL 578943, at

*6 (S.D.N.Y. Mar. 10, 2005) ("normal" SHU conditions do not violate the Eighth Amendment) (citing *Graham v. Perez,* 121 F.Supp.2d 317, 322–23 (S.D.N.Y.2000) (finding no serious deprivation resulting from limiting out-ofcell exercise; deprivation of job opportunity; limiting location and content of meals; denying in-cell hot water and electrical outlets; providing inadequate lighting; limiting recreation; limited "stamp buying opportunities;" limiting access to newspapers; personal telephone calls; and requiring them to wear prison-issue clothing)). Thus, plaintiff's general claims that the conditions in SHU violated the Eighth Amendment may be dismissed.

**2. Nighttime Cell Illumination**

*18 There are some conditions of which plaintiff complains that require further analysis. Plaintiff alleges that the lights in SHU were kept on from 7:00 or 8:00 p.m. until 8:00 a.m. the next morning, causing him to suffer from fatigue and causing his eyes to burn and water. (AC ¶ 114). In *Holmes v. Grant,* No. 03 Civ. 3426, 2006 WL 851753, at *3, 11 (S.D.N.Y. Mar. 31, 2006), the court denied a motion to dismiss on a similar cell illumination issue, [26] brought by defendants pursuant to Fed.R.Civ.P. 12(b)(6), before transferring the case to the Northern District of New York. Plaintiffs in *Holmes* alleged that defendants' 24–hour per day illumination of their cells at Eastern Correctional Facility, caused fatigue, loss of appetite, migraine headaches, and other physical and mental problems. *Id.* The court simply stated that if these allegations were true, the claim would sustain both the objective and the subjective prongs of an Eighth Amendment analysis. After the case was transferred to the Northern District of New York, the parties voluntarily dismissed the action after coming to a settlement agreement. *Holmes v. Corrections Officers,* No. 9:06–CV–462 (LEK/DRH) (Dkt.Nos.76, 77).

[26]   There were many other issues in *Holmes* that are not relevant herein. Many of the plaintiff's claims were dismissed prior to transfer.

Other cases have upheld the defendants' maintenance of 24–hour security lighting in prison cells, based upon the facts presented to the court. In a Vermont class action, the district court held that the low wattage security lighting used in Vermont facilities was "of an intensity ... that courts have generally found permissible under the constitution." *McGee v. Gold,* No. 1:04–CV–335, 2010 WL 5300805, at *5 (D.Vt. August 3, 2010) [27], *Report–Recommendation adopted,* 2010 WL 5389996 (D.Vt. Dec.20, 2010), *vacated and remanded on*

other grounds sub nom. *Kimber v. Tallon,* No. 11–1430, 2014 WL 715661 (2d Cir. Feb.26, 2014). Although the district court approved the report-recommendation, the Second Circuit has recently vacated the opinion and remanded the case for further proceedings because the court found that class counsel was inadequate. *Id.* The court made no comment upon the merits of the plaintiffs' claims.

[27]   The court in *McGee* cited *Vasquez v. Frank,* 290 F. App'x 927, 929 (7th Cir.2008) (24–hour lighting with a single 9–watt fluorescent bulb does not objectively constitute an "extreme deprivation"); *McBride v. Frank,* No. 05–C–1058, 2009 WL 2591618, at *5 (E.D.Wis.Aug.21, 2009) (constant illumination from a 9–watt fluorescent bulb does not objectively deny "the minimal civilized measure of life's necessities"); *Wills v. Terhune,* 404 F.Supp.2d 1226, 1230–31 (E.D.Cal.2005) (holding that 24–hour illumination by 13–watt bulb was not objectively unconstitutional); *Pawelski v. Cooke,* No. 90–C–949–C, 1991 WL 403181, at *4 (W.D.Wis. July 18, 1991) ("Having a single 40 watt light bulb on 24 hours a day for security purposes amounts to no more than an inconvenience to the segregation inmates."), *aff'd,* 972 F.2d 352 (7th Cir.1992) (table); *compare Keenan v. Hall,* 83 F.3d 1083, 1090–91 (9th Cir.1996) (lighting from "large fluorescent lights" was unconstitutional where plaintiff alleged that he "had no way of telling night or day"); *Shepherd v. Ault,* 982 F.Supp. 643, 646–50 (N.D.Iowa) (summary judgment denied where inmates claimed harm from 60–watt bulbs).

In the cases cited by the Magistrate Judge in *McGee* the court noted that the analysis of this issue was "fact-driven," based upon the degree of illumination, the discomfort that it caused, and the penological concern for the lighting. *See e.g. Vasquez,* 290 F. App'x at 929 (refusal to turn off the light had a valid penological concern); *Shepherd,* 982 F.Supp. at 645 (finding that constant illumination of a jail cell with bright light, which deprived the inmate of normal sleep, violated the inmate's basic rights) (citing *Zatko v. Rowland,* 835 F.Supp. 1174, 1181 (N.D.Cal.1993)); *Wills,* 404 F.Supp 2d at 1230–31 (plaintiff admitted that the security light was not even bright enough for him to read or write without straining his eyes).

In this case, defendant Rock states in his declaration that each cell in SHU is equipped with an overhead lighting fixture that houses a day-time overhead light and "a separate 3 watt LED night light." (Rock Decl. ¶ 9). The day-time light may

be turned on and off by the inmates in the cell, while the night light is controlled by security staff. (*Id.*) The night lights are kept on between 11:00 p.m. and 6:00 a.m. (*Id.*) Defendant Rock states that the night lights are unobtrusive, but do allow the security staff to see into the cells in order to protect the security of the facility by making sure that inmates are not causing harm to themselves or to their cell mates. (*Id.*) This court notes that a 3–watt LED bulb is much less bright than the 9 or 13–watt illumination that was found acceptable in *Vasquez, McBride,* and *Wills* cited above. Three watts is far from the blinding bright light that plaintiff claims to have endured, causing his burning and watery eyes and rashes.

**\*19** Defendant Rock has also submitted photographs of an SHU cell, depicting a solid door with a very small window. The low wattage night light helps the officers see into the cell *without* disturbing the inmates. The ability to maintain the safety of the inmates and the officers is a legitimate penological interest. Based upon the very low wattage of the light and the fact that the cell would normally be very dark because of the small window in the door, this court finds that plaintiff cannot meet either prong of the Eighth Amendment analysis.[28] Plaintiff's claim that the lighting in his cell amounted to cruel and unusual punishment may be dismissed.

[28]     In any event, even if the court were to find a constitutional violation, defendants would be entitled to qualified immunity from damages on this issue. Plaintiff has finished his sentence in the Upstate SHU, and other than in his "class" claims, he cannot ask for injunctive relief. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v.*

*Abromaitis,* 294 F.3d 355, 360 (2d Cir.2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991) (citing *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990)). Based upon the cases cited above, it is apparent that the low wattage lighting violates no "clearly established" constitutional right of which a reasonable person would have known. The cases are fact-specific, there are many cases finding that all-night lighting does not violate an inmate's Eighth Amendment rights, and the lower and less obtrusive the lighting, the more likely that it will pass constitutional muster. Thus, even if this court were to find a violation, defendants would be entitled to qualified immunity for this claim.

### 3. Clothing and Temperature

Plaintiff alleges that he was not issued "thermols [sic] upon request for the winter season," and that he was also denied boots, a scarf, and gloves. (AC ¶ 131). He also claims that his cell was "uninsulated." (*Id.*) Plaintiff claims that there is a window and a recreation yard door in each cell, but that neither is insulated, and the cold air comes through, keeping the cell "irregularly cold or freezing." (*Id.* ¶ 132). Plaintiff claims that as a result, he suffered from "common colds" and "unreasonable discomfort." (*Id.* ¶ 133). Plaintiff states that he could not take advantage of his recreation time because he was "underdressed," causing an old injury to become stiff, impairing his mobility and causing pain.

Defendant Rock states that every inmate who is admitted to Upstate is issued three shirts; four pairs of pants; three pairs of undershorts/undershirts; three pairs of socks; a pair of sneakers; and a winter coat for outdoor exercise.[29] (Rock Decl. ¶ 13) (citing Rock Decl. Ex. C, SHU Manual at 5) (Dkt. No. 103–23). The manual also states that each cell will be "heated adequately for comfort, as well as lighted adequately to permit reading." (*Id.* ¶ G). Defendant Rock has submitted photographs of the cells, the exercise areas outside of each cell and the visiting areas. (Rock Decl. Exs. A(1), A(2), D(1), D(2)).

[29]     The SHU manual also states that inmates will be issued one sweatshirt in addition to the items

mentioned by defendant Rock. (Rock Decl. Ex. C at 5, ¶ D).

The Second Circuit has held that proof that an inmate was subjected "for a prolonged period to bitter cold" will raise a triable issue of fact relative to the objective prong of the constitutional analysis. *Gaston v. Coughlin,* 249 F.3d 156, 164–65 (2d Cir.2001) (citing *inter alia Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (inmate deliberately exposed to bitter cold in his cell block for three months); *Wright v. McMann,* 387 F.2d 519, 527 (2d Cir.1967)). However, summary judgment is appropriate when the inmate has not been exposed to bitter cold for "a prolonged period." *Louis–Charles v. Courtwright,* No. 9:11–CV–147, 2014 WL 457951, at *7–8 (N.D.N.Y. Feb.4, 2014) (adopting Rep't–Rec.) (sua sponte dismissing claims in which the inmate testified that on three occasions, he was subjected to cold conditions for, at most, ten hours) (citing *Trammell v. Keane,* 338 F.3d 155, 159, 165 (2d Cir.2003) (plaintiff was deprived of his clothing and confined to his cell for a few weeks, but the temperature was not such as to pose a threat to his health and safety of the sort that would prevent summary judgment in defendants' favor).

**\*20**  The court would point out that plaintiff arrived at Upstate on April 26, 2010 and left upstate on January 20, 2011. (Rock Decl. ¶ 6). Chances are that plaintiff would not have been subjected to the extremely cold temperatures of which he complains during most of that time period. Plaintiff does not contest that he was issued a winter coat and other clothing that he could use to mitigate the effects of any cold temperatures, even if he was denied some of the winter clothing he requested.[30] *See, e.g., Thompson v. Carlsen,* 9:08–CV–965 (FJS/ATB), 2010 WL 3584409, at *10 (N.D.N.Y. Aug. 16, 2010) (Rep't–Rec.), *adopted,* 2010 WL 3584396 (N.D.N.Y. Sept.7, 2010) ("Even assuming plaintiff's allegations are not exaggerated, he was not subjected to freezing temperatures for prolonged periods, and he was permitted to wear heavy winter clothes to maintain warmth."); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (confining INS detainee in a cold room for a prolonged time period did not meet the objective criteria for an Eighth Amendment violation because he apparently had clothing and was able to get some warmth with blankets, and provide himself with livable conditions). Plaintiff's statement that he caught "common colds" and was uncomfortable "regularly" is not sufficient to rise to the level of an Eighth Amendment claim. His allegation that an old injury stiffened up because he was cold also does not rise to the level of an Eighth Amendment violation, given the short period of time that he was actually in cold weather at Upstate.

**30**

During plaintiff's deposition, he testified that he was issued a hat. (Goglia Aff. Ex. E ("DT") at 88. He testified that he suffered dry, cracked lips and an occasional blister on his face. (DT at 91–92). However, he also testified that "some days" you "would feel the heat, actually you could feel the heat coming in and it was 'just so cold you could feel the cold as well, ... it didn't balance out." (DT at 92). The fact that the temperatures "didn't balance out" does not rise to the level of cruel and unusual punishment.

Moreover, plaintiff's conclusory claims that one or more of the defendants were acting with deliberate indifference to the inmates' need for warmth is not supported by the record. The DOCCS staff who worked in the SHU presumably experienced the same temperatures as the inmates. As noted above, former Upstate Superintendent Rock understood that SHU cells were adequately heated and that inmates were provided with sufficient clothing, including a winter coat, to mitigate the effects of any cold temperatures. *See Thompson v. Carlsen,* 2010 WL 3584409, at *11.

## VI. *Privacy (Seventh Cause of Action)*

Shielding one's unclothed figure from the view of strangers is "impelled by elementary self-respect an personal dignity." *Jean Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *8 (S.D.N.Y. Mar.19, 2013) (citing *Michenfeler v. Sumner,* 860 F.2d 328, 333–34 (9th Cir.1988)). However, while an inmate's right to privacy does not vanish altogether when he is imprisoned, that right must yield to a penal institution's need to maintain security. *Id.* (citing *Cumbey v. Meachum,* 684 F.2d 712, 714 (10th Cir.1982). In *Jean–Laurent,* the court noted that " ' recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex'—which would include possible glimpses on the way to the shower—'may be permissible.' " *Id.* (citing *Correction Officers Benev. Ass'n of Rockland Cnty. v. Kralk,* No. 04 Civ. 2199(PG), 2011 WL 1236135, at *11 (S.D.N.Y. Mar.30, 2011) (citations omitted); *Israel v. City of New York,* No. 11 Civ. 7726(JMF), 2012 WL 4762082, at *3 (S.D.N.Y. Oct.5, 2012) (finding intake strip searches permissible, notwithstanding the presence of other inmates and officers, males and females); *Baker v. Welch,* No. 03 Civ. 2267(JSR)(AJP), 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) (stating that a balance should be struck, which would allow occasional viewing but that would

2014 WL 1289579

prohibit regular viewing); *Miles v. Bell,* 621 F.Supp. 51, 67 (D.Conn.1985) (explaining that cases finding a violation of privacy rights have looked to the frequency or regularity of such viewing, and finding violations only in those cases in which the guards "regularly" watch inmates undressing, using toilet facilities, or showering).

**\*21** Plaintiff alleges that he was forced to conduct his private functions daily "in clear view" of his cell mate (who was of the same sex) and of male and female personnel who might be walking by the cell. (AC ¶¶ 120–24). Defendants have submitted photographs of the cells in SHU. (Rock Decl. Exs. A(1) & A(2)). The pictures show that the cell door is solid with a very small window opening that is on the top half of the door, [31] with the toilet toward the front, left side of the cell. (*Id.* Ex. A(1)). Even with the door open, an individual looking straight through the cell cannot see the toilet. With the door closed, it would be almost impossible to see someone using the toilet unless the guard actually walked up to the door to look inside the cell, and even then, the guard would have to specifically look down to see the toilet. (*Id.*) While it is true that the shower does not have a door or a curtain, defendant Rock states that Muslim inmates are allowed to wear boxer shorts in the shower if they wish to avoid being completely nude. (Rock Decl. ¶ 33).

[31]   Defendant Rock states that the window measures 12″ by 12″. (Rock Decl. ¶ 30).

Plaintiff states in his response to the defendants' summary judgment motion, that any attempt to "shield himself" while housed in Upstate was met with the threat of a misbehavior report, and he cites the defendants' memorandum of law at pp. 27–28. However, that section of the defendants' memorandum of law says just the opposite—that "while inmates generally may not obstruct the view into their cells for security reasons, they are permitted to hang a sheet across their cells to obtain privacy while actually showering or using the toilet." (Dkt. No. 103–4 at 28 & Rock Decl. ¶ 31). Additionally, defendants state that the water to the cell showers is only turned on during recreation time, and "any inmate wishing to shower in private may ask his cellmate to go into the adjoining outdoor recreation area." (Rock Decl. ¶ 32). Thus, plaintiff had ready alternatives to protect his right to privacy, and any occasional viewing by members of the same or opposite sex did not rise to the level of a constitutional violation.

## VI. *Religious Rights (Eighth, Ninth, Tenth, and Eleventh Causes of Action)*

### A. Legal Standards

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). The right is not extinguished simply because the inmate is in SHU or keeplock. *Id.* (citing *Salahudin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993)). However, the right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04–CV–57, 2007 WL 3046703, at \*4 (N.D.N.Y. Oct.17, 2007).

**\*22** To succeed on a claim under the Free Exercise Clause, the plaintiff must show at the threshold, that the defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). The issue of whether a "substantial burden" is required has been discussed at length, and although not specifically decided, recent cases still apply the requirement to Free Exercise cases. *See Walker v. Artus,* No. 9:10–CV–1431(MAD/DEP), 2013 WL 564909, at \*8–9 (N.D.N.Y. Sept. 30, 2013) (citing *Salahuddin,* 467 F.3d at 274–75).

The Religious Land Use and Institutionalized Persons Act ("RLUIPA") also protects inmates' religious rights. RLUIPA prohibits the government from imposing a substantial burden on a prisoner's religious exercise unless the burden is the least restrictive means of furthering a compelling governmental interest. [32] *See* 42 U.S.C. § 2000cc-l(a). For a burden to be substantial, a plaintiff must demonstrate that the government's action pressures him to commit an act forbidden by his religion or prevents him from engaging in conduct or having a religious experience mandated by his faith. In addition, this interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine. *Pugh v. Goord,* 571 F.Supp.2d at 504–05; *Graham v. Mahmood,* No. 05–10071, 2008 WL 1849167, at \* 14 (S.D.N.Y. Apr.22, 2008); *Gill v. Defrank,* No. 98 Civ. 7851, 2000 WL 897152, at \*1 (S.D.N.Y. July 6, 2000) (citing *Boomer v. Irvin,* 963 F.Supp.2d 227, 230 (W.D.N.Y.1997)).

32

However, RLIUPA does not provide for damages against defendants in their official capacities, and although the Second Circuit has not spoken on the issue, numerous district courts have held that RLIUPA does not provide for damages in the defendant's individual capacity. *See Jean Laurent v. Lawrence,* No. 12 Civ. 1502, 2013 WL 1129813, at *7 n. 9 (S.D.N.Y. Mar.19, 2013) (citing cases).

**B. Application**

Plaintiff alleges that his First Amendment right to practice his religion was violated because he was not able to attend religious services, study groups, or engage in fithea (hair removal). (AC ¶ 139). Plaintiff claims that there is no substitute for his weekly Juma services, he was not afforded any access to the Imam, and he was forced to view his cell-mate's nudity, as well as appear nude before his cell-mate, both of which are forbidden by plaintiff's religion. (AC ¶¶ 142–47). Plaintiff claims that his celebration of Ramadan was disrupted because he was denied access to the appropriate food, and defendants Taylor, Rakoce, and Dumas denied plaintiff his entire Eid ul Fitr meal on September 18, 2010. (AC ¶ 153–55). On September 17, 2010, defendant Taylor and Dumas did not give plaintiff the proper food because they were not responsible for "NOI" [33] food. (AC ¶¶ 157–58).

33

"NOI" stands for Nation of Islam, a Muslim sect that is different from Shia or Sunni Muslims.

With respect to the issue of nudity, the court has discussed the constitutional "privacy" issue in the section above. With respect to the religious implications, the court assumes that the practice burdens the inmate's religious beliefs, however, there are valid penological objectives for prohibiting complete shielding of inmates at all times or for allowing the occasional viewing of male inmates in various states of undress by female correctional officers. Defendants' accommodation involves allowing Muslim inmates to wear boxer shorts or a towel around their waists in the shower, allowing a brief shielding of the cell during the time that the water is turned on for showers, or allowing inmates to ask their cell mates to step out into the recreation pen while the inmate showers or uses the toilet. [34] The court finds that these alternatives are reasonable and finds that the defendants' policy serves a legitimate penological objective. Even if the court were considering the RLUIPA standard, the defendants' alternatives are the least restrictive measure, given the increased security issues in SHU.

34

Defendant Rock states that each cell at Upstate has a door accessing its own exercise area, and that the inmates are given more than the one hour minimum required exercise time per day. In fact the outdoor exercise areas are unlocked "for at least two hours per day pursuant to the SITU manual, and at least half an hour additional time is afforded to inmates who have displayed good behavior and have advanced to "PMS Level III status." (Rock Decl. ¶ 25). PIMS stands for Progressive Inmate Movement System. (*Id.*) There are three different levels of PIMS status for inmates who maintain good behavior while incarcerated at Upstate. Level III affords the most desirable conditions and extent of privileges. (*Id.* & n. 1).

**\*23** Inmates in SHU are not allowed to attend congregate services pursuant to Directive 4933; 7 N.Y.C.R.R. § 304.9(d); and SHU Manual at 45. (Rock Decl. ¶ 35). However, these inmates may obtain religious counseling by making a written request to the facility's ministerial staff. (*Id.*) Each SHU inmate is also allowed to have a Qu'ran, a prayer rug, and similar "devotional articles" in his SHU cell. DOCCS Directive No. 4933; 7 N.Y.C.R.R. § 302.3(e) (2); and SHU Manual at 7. Defendant Rock states that an Imam visits Upstate monthly, or whenever an Islamic inmate requests a visit or religious counseling. (Rock Decl. ¶ 36).

In *Walker v. Artus,* the court held that notwithstanding the regulations prohibiting SHU inmates from attending congregate services, DOCCS provides "several accommodations" to Muslim inmates in SHU so that they may practice their religion. *Walker v. Artus,* No. 9:10–CV–1431, 2014 WL 675815, at *18 (N.D.N.Y. Sept.27, 2013) (Rep't–Rec.), *adopted,* 2014 WL 675815, at *6–10 (N.D.N.Y. Feb.21, 2014). [35] The accommodations cited in *Walker* are the same as cited by defendants in this action. Plaintiff in *Walker* had requested that, in addition to the other accommodations, he be allowed to watch the congregate services by video or to listen to a tape recording. The court denied plaintiff's claim, and based its decision both on the First Amendment and RLUIPA, finding that neither was violated.

35

The court notes that the Westlaw citation for this decision does not differentiate between the date of the report-recommendation and the date of the district court's adoption. Both decisions are printed together on Westlaw. In this citation, I have

indicated the date of the report-recommendation from this court's docket sheet.

Defendant Rock states that SHU inmates are not allowed to attend congregate services based upon the risk they pose to institutional security. (Rock Decl. ¶ 37). Defendant Rock states that because of plaintiff's known gang affiliation and his disciplinary history, he is viewed as an increased security risk in addition to being in SHU, and states that releasing plaintiff from confinement to attend congregate services "clearly would have posed a threat to the safety of other prisoners and to the security of Upstate CF." (*Id* .)

Plaintiff alleges that an Imam did not visit the SHU while he was there. (AC ¶ 143). However, defendant Rock notes that, even if an Imam had not been available at Upstate, DOCCS Directive 4202 expressly provides that an inmate may encourage outside clergy to contact the coordinating chaplain and apply to become a "registered religious volunteer." (Rock Decl. ¶ 38 & Ex. E (copy of Directive 4202)). The plaintiff in *Walker* also alleged that the Imam did not visit the SHU regularly. In adopting Magistrate Judge Peebles's recommendation, District Judge D'Agostino found that even assuming that the religious leader did not visit as often as required, "that would not change the fact that Plaintiff received numerous other accommodations to practice his religion...." 2014 WL 675815, at *8.

Plaintiff alleges that he was unable to perform his religious hair removal. (AC ¶ 139). There is no indication that plaintiff was not allowed to shave while he was in SHU. Defendant Rock states in his declaration that SHU inmates may obtain shaving cream and razors daily before each scheduled exercise period. (Rock Decl. ¶ 43). Plaintiff has not indicated why he may not use the issued razors for shaving purposes, and defendant Rock states that other Muslim prisoners "routinely do this." (*Id.*)

**\*24** Finally, plaintiff alleges that defendants Rakoce, Taylor, and Dumas denied plaintiff his Suhoor Bag[36] during Ramadan on September 17, 2010 and his Eid ul Fitr meal on September 18, 2010. (AC ¶¶ 155–57). Plaintiff alleges that defendant Taylor was giving out the Suhoor bags, but told plaintiff that Taylor only served Shia Muslims, but no "second" officer came by with plaintiff's Suhoor bag. (AC ¶ 157). Plaintiff went without breakfast that day, and he states that when defendant Dumas came by to serve the evening feast, he told plaintiff that he did not have plaintiff's meal because Dumas was "doing only orthodox sunni meals ." (*Id.*)

Once again, he went without a meal, and the area Sergeant never came along to "rectify the matter."

[36]   The Suhoor bag contains an early morning religious meal, eaten during Ramadan before fasting.

These are the only claims that plaintiff makes against defendants Rakoce, Taylor, and Dumas. Plaintiff does not allege that these individuals intentionally denied him his religious meals. Even according to plaintiff's version of the events, it appears as though these defendants delivered the religious meals for other Muslims, but somehow plaintiff was left out. Defendant Rock states that plaintiff was on the list of Muslim inmates who were participating in the 2010 Ramadan fast, and states that to defendant Rock's knowledge, plaintiff was always given his appropriate meals. (Rock Decl. ¶¶ 39–40). Exhibit F to defendant Rock's declaration shows that plaintiff was on the list of inmates participating in the Ramadan fast. (Rock Aff. Ex. F at 2) (Dkt. No. 103–28). Exhibit F also contains a memorandum from Sergeant Rakoce to FSA D. Haug, stating that defendant Rakoce was the Block Sergeant on September 18, 2010, and that plaintiff never complained to him or advise him that he did not receive his lunch meal.[37] (Rock Aff. Ex. F at 2).

[37]   This memorandum is apparently the investigation of plaintiff's internal grievance, complaining that he did not receive his lunch on September 18, 2010. (Rock Decl. ¶ 42). The court also notes that defendant Rock indicates that there is an Exhibit G, which is the Ramadan Menu for 2010. (Rock Decl. ¶ 40). There is no Exhibit G filed, however, the court does not doubt that there was a Ramadan Menu since plaintiff alleges that other inmates got their food. Thus, the absence of that exhibit is not relevant to the court's findings.

At worst, the amended complaint indicates that defendants Taylor and Dumas made a mistake, thinking that they were serving meals only for other Muslim sects or that someone who was supposed to serve plaintiff's meal did not come afterward. Mistakes, even those amounting to negligence, are not actionable under the First Amendment. *Daniels v. Williams,* 474 U.S. 327, 331–33 (1986) (injuries inflicted by governmental negligence are not addressed by the U.S. Constitution); *Scott v. Shansiddeen,* No. 9:12–CV–84, 2013 WL 3187071, at *4 (N.D.N.Y. May 28, 2013) (Rep't–Rec), *adopted,* 2013 WL 3187071, at *1 (N.D.N.Y. June 20, 2013) (citing *Tafari v. Brown,* No. 9:10–CV–1065, 2012 WL

1098447, at *6 (N.D.N.Y. Mar.30, 2012); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 498 (N.D.N.Y.2009)). In *Shansiddeen,* the court dismissed a First Amendment claim by a plaintiff who missed only two religious meals, in part because plaintiff's claims sounded in negligence, alleging that the defendant failed to catch a mistake made by a clerk regarding the plaintiff's location for delivery of the religious meals, and in part because missing two meals did not "substantially burden" plaintiff's ability to freely exercise his religion.

**\*25** The same is true in this case. Any mistakes made by defendants did not violate plaintiff's constitutional rights, and as defendant Rock states, as the Superintendent, he is not responsible for serving food to inmates. Defendant Rakoce's memorandum shows that plaintiff was on the list and should have been served his religious meals. If a mistake were made, and plaintiff missed his meals, defendant Rock would have no way of "rectifying" the situation.

Thus, this court finds that plaintiff's religious claims may be dismissed.

## VII. *Conspiracy*

### A. Legal Standards
In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d at 468. An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action are insufficient. *See Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). Thus, plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Warren v. Fischl,* 33 F.Supp.2d 171, 177 (E.D.N.Y.1999) (citations omitted). Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. *Ciambriello,* 292 F.3d at 325.

### B. Application
In this case, because the court has found no constitutional violations, any claim that plaintiff has based upon a "conspiracy" by defendants must fail. First, plaintiff's conspiracy claims all appear to be related to his "class action." To the extent that he claims that anyone conspired to violate his individual constitutional rights, plaintiff has not set forth anything but conclusory allegations that the defendants participated in such a conspiracy. [38] The disciplinary hearing that placed plaintiff into SHU was at one facility, while the "conditions of confinement" that plaintiff claims were unconstitutional were at another facility. There is no indication that the defendants somehow "agreed" on any constitutional or other violations. Even if plaintiff had made a proper vagueness challenge, none of the individuals at Shawangunk would have participated in any conspiracy since they had nothing to do with the charges or the hearing that placed plaintiff in SHU.

[38]  The court notes that with respect to defendant Counselor Cook, it is the only claim in which he has been named.

Plaintiff sets forth various conclusory statements about a conspiracy to charge African–American and Latino inmates with gang-related violations in order to force them to participate in the ART program. Plaintiff claims that this is a violation of his First and Fourteenth Amendment rights. He claims that in the ART program inmates are "forced" to admit that their "ethnical [sic]" culture is "unauthorized gang, violent, [and] un-american [sic]." (AC ¶ 36). Plaintiff has absolutely no basis for this statement, and as the court has found above, ethnicity is not relevant to the rule prohibiting gangs and gang-related materials. Plaintiff does not claim any other due process violations regarding his placement in the ART program. [39] Thus, any conspiracy claim would have to have been dismissed.

[39]  The court has already rejected plaintiff's claims that inmates' placement in ART is somehow related to an effort by DOCCS to obtain federal funding and to keep SHU facilities open by falsely charging inmates with misbehavior. In fact, during plaintiff's deposition in this case on January 8, 2013, he testified that he still had not re-taken the ART program because Upstate did not offer the program. (DT at 61).

**\*26 WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 103) be **GRANTED,** and the complaint

2014 WL 1289579

be **DISMISSED IN ITS ENTIRETY AS AGAINST ALL DEFENDANTS,** and it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 69) be **DENIED,** and it is

**RECOMMENDED,** that plaintiff's motion for sanctions (Dkt. No. 107) be **DENIED,** and it is

**RECOMMENDED,** that defendants' cross-motion for sanctions (Dkt. No. 108) be **DENIED,** and it is

**ORDERED,** that plaintiff's motion for appointment of counsel (Dkt. No. 109) is **DENIED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Filed March 6, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 1289579

---

**End of Document**                                                                 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Calvin v. Schmitt, Not Reported in Fed. Supp. (2017)

2017 WL 4280683

2017 WL 4280683
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Michael CALVIN, Plaintiff,

v.

Keith SCHMITT; Anthony Annucci; Anne Marie
Sullivan; Maureen Bosco; Williams Collins, Defendants.

No. 15 CV-6584 (NSR)

|

Signed 07/07/2017

**Attorneys and Law Firms**

Michael Calvin, Comstock, NY, pro se.

David John Galalis, Julinda A. Dawkins, New York State
Office of the Attorney General, New York, NY, for
Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** Plaintiff Michael Calvin ("Plaintiff"), proceeding
*pro se,* brought this action pursuant to 42 U.S.C. §
1983 against Department of Corrections and Community
Supervision ("DOCCS") Acting Commissioner Anthony
Annucci ("Annucci"); Office of Mental Health ("OMH")
Commissioner Dr. Ann Marie T. Sullivan ("Sullivan");
Former Executive Director of Central New York Psychiatric
Center ("CNYPC") Maureen Bosco ("Bosco"); Lieutenant
Keith Schmitt ("Schmitt"); and Former Green Haven OMH
Unit Chief William Collins ("Collins") (the "Defendants,"
collectively). Plaintiff alleges that Defendants violated his
rights under the Eight Amendment of the United States
Constitution by tampering with his food. In particular,
Plaintiff states that Schmitt has been violating his rights
since 2011; that Collins was aware of Schmitt's actions
and failed to report him to the Inspector General; and
that Bosco and Sullivan also failed to act upon learning
about Schmitt's actions. Annucci is not directly mentioned
in the complaint for either contributing or neglecting to do
something that allegedly perpetuated the violation of Plaintiff
rights. Defendants now move to dismiss the complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6) on the
grounds that Plaintiff has failed to state a claim for relief.

For the following reasons, Defendant's motion to dismiss is
GRANTED.

**BACKGROUND** [1]

[1]  The following facts derived from Plaintiff's
Complaint (ECF No. 2) and are taken as true for the
purposes of this motion.

According to Plaintiff, since July of 2011 Defendant Schmitt
has violated his rights by tainting his food with bodily fluids.
(Compl. Doc. 2 at 10; Compl. Doc. 2-2 at 4). Within his
complaint, Plaintiff describes a number of instances in which
Schmitt contaminated his food. [2]

[2]  Plaintiff contends that since 2000, his food was
contaminated by various correctional officers.
However, as noted by the Order of Service, any
claims arising from the attached letter dated March
29, 2011, are dismissed because they are untimely.
(ECF No. 9).

On May 1, 2013, Plaintiff asserts that Schmitt "influenced"
an inmate to place "bodily fluids" in his food. (Compl. Doc.
2 at 4). He consumed the tainted food which caused him to be
ill and go to the hospital. (*Id.*). Plaintiff admits, though, that
he did not file a grievance concerning this incident. (*Id.*).

Plaintiff describes several other incidents that occurred in
2014. In a letter to Assistant Attorney General Michael
McCartin, Plaintiff alleges that on March 20 Schmitt
instructed an unidentified doctor in Fishkill Correctional
Facility, where the Plaintiff was receiving medical attention,
to hurt him during a procedure. (Compl. Doc. 2-2 at 10).
Plaintiff states that the doctor complied with Schmitt's orders
by causing Plaintiff pain when he was injecting his back with
a needle. (*Id.* at 10-11).

On August 13, 2014, Plaintiff alleges that he sustained injuries
to the left side of his mouth after ingesting a contaminated
"coffee cake" in the "mess hall" of the Green Haven
Correctional Facility. (Compl. Doc. 2 at 2-4). According to the
Plaintiff, Schmitt influenced an unknown inmate, through an
unknown officer, to contaminate his coffee cake with "bodily
fluids." (*Id.* at 4). After consuming said coffee cake, Plaintiff
became ill and the side of his mouth began to "burn" until
he went to bed at approximately 9 PM. (*Id.* at 4-5). The

Calvin v. Schmitt, Not Reported in Fed. Supp. (2017)

2017 WL 4280683

following morning, Plaintiff woke up with a swollen face and experiencing pain inside of his mouth. (*Id.* at 5).

 **\*2** About two weeks later, Plaintiff filed a grievance where he indicated the aforementioned facts from August 13, 2014, and requested that Schmitt stop placing "things" in his food. (Compl. Doc. 2-1 at 25-26). The Inmate Grievance Resolution Committee (IGRC) purportedly concluded that the Plaintiff should be allowed a "Feed Up Short" position with the permission of the area supervisor, but were split in regards to investigating the allegations made against Schmitt. (*Id.* at 27).

Plaintiff appealed the above grievance to the Superintendent, but his grievance was denied because the "PA P," [3] presumably medical staff, evaluated Plaintiff and concluded that he suffered an allergic reaction. (*Id.* at 28). Again, Plaintiff appealed this decision contending that he was not allergic to coffee cake because he had consumed at least nine pieces of coffee cake since the August 13 incident and he did not get sick. (*Id.* at 29). Furthermore, in his appeal documents Plaintiff contends other instances of inmates placing "cold" on his bread and bodily fluids on his cornbread. (*Id.* at 31). In a letter dated October 16, 2014 to Superintendent William Lee, Plaintiff wrote that inmates wiped their hands on his bread after wiping their noses with it on two separate occasions on October 8, 2014. (*Id.*). Also, inmates placed "bodily fluids" in his cornbread on October 13, 2014 which caused him to get sick. (*Id.*).

[3]    "PA" is a typical acronym for "Physician's Assistant" and "P" is likely the initial of the medical staff.

In a hearing on April 1, 2015, the Central Office Review Committee (CORC) unanimously denied Plaintiff's grievance. (*Id.* at 33). During the hearing, CORC indicated that the Plaintiff suffered an allergic reaction but the cause could not be determined. (*Id.*). CORC also noted that Schmitt denied tampering with Plaintiff's food or conspiring against him. (*Id.*). In addition, the report notes that Plaintiff has been diagnosed with a paranoid type of Schizophrenia, and that his request to be assigned to the "Feed Up Short" position was reviewed and denied by the ICP treatment team. (*Id.*). CORC also concluded that it was not "presented with any compelling reason to revise present procedures or with sufficient evidence of malfeasance by staff." (*Id.*).

In another letter to Superintendent Lee, dated October 23, 2014, Plaintiff recounts an instance that occurred on October

17, 2014, where an inmate went into his cell and tainted his peanut butter with bodily fluids. (*Id.* at 34-39). Plaintiff alleges that the peanut butter was contaminated because the contents of the jar seemed to be tampered with and, afterwards, he became ill upon consuming the peanut butter. (*Id.* at 36). Almost four months later, in a letter dated February 18, 2015 and addressed to Maureen Bosco, Plaintiff states that the incident involving his contaminated peanut butter was in fact perpetuated by Schmitt who persuaded an officer to influence two inmates to put feces in Plaintiff's peanut butter. (*Id.* at 14-15). Plaintiff elaborates by stating that the DOCCS Senior Counselor of Green Haven, Ms. E. Knapp, was herself swayed by Schmitt to give the peanut butter spread to Plaintiff. (*Id.* at 18). According to Plaintiff, the motive behind this action was for Schmitt to then have Officer Menna persuade the two inmates, J-6-5 cell and J-6-17 cell, to place feces in his peanut butter. (*Id.*). He then proceeds to state that all of the counselors and OMH staff that work in the ICP program are aware of what Schmitt is doing, but that they are unwilling to inform the Inspector General Office. (*Id.* at 18-19).

 **\*3** Within that same letter, Plaintiff alleges that on October 23, 2014, Officer Tokart came to his cell with a tray of food and told him that the tray was from Schmitt. (*Id.* at 14). Then Officer Tokart threaten to place the Plaintiff in the "box" and ensure that every meal he gets contains urine, if he does not stop talking about the feces in the peanut butter. (*Id.*). Later that evening, Plaintiff alleges that Officer Tokart threatened him once again and told him that "they" are able to kill him at any time because Plaintiff is a "crazy person." (*Id.* at 15). Officer Tokart allegedly reiterated what he previously said about putting him in the "box" and making him relocate facilities if he did not stop talking about the feces in his peanut butter. (*Id.*). After this exchange, Plaintiff contends that Officer Tokart hit him in the back of his head, which caused him to bleed from his nose the following morning. (*Id.* at 16-17). [4] He also mentions that he heard that Officer Tokart "will set [him] up with weed, drugs, or weapons if [Plaintiff] wrote him up." (*Id.* at 21).

[4]    Plaintiff mentions that he reported his injuries to Mr. Lahey about a month after the incident and further elaborates that a Black officer witnessed Officer Tokart hitting him in the back of his head. (*Id.* at 17, 21).

In 2015, Plaintiff recalls similar incidents in which Schmitt contaminated his food. (*Id.* at 20). On January 17, Plaintiff

2017 WL 4280683

alleges that one of his waffles was injected with blood by an unnamed inmate who was influenced to do so by an unnamed officer who himself was persuaded to do so by Schmitt. (*Id.*). In a different day, January 20, Plaintiff alleges that Schmitt, similar to the events above, influenced an unnamed officer who then influenced an unnamed inmate to "put cold from his nose" into Plaintiff's evening meal. (*Id.*). About two weeks later, on February 5, Plaintiff alleges that he consumed four slices of bread that had been tainted with feces by an unnamed inmate that was persuaded to do so by Schmitt. (*Id.*). No allegations of injury were alleged to have resulted from these events.

On March 10, 2015, the Plaintiff states that Schmitt called Great Meadow Correctional Facility and told someone, presumably an unidentified staff member, to urinate in the Plaintiff's meals. (Compl. Doc. 2-2 at 12). Plaintiff contends Schmitt's orders were followed because he vomited after consuming several meals at Great Meadow. (*Id.*). About a month later, on April 7, Officer Tokart allegedly "knocked-out" the Plaintiff because of Schmitt. (Compl. Doc. 2-1 at 38). Furthermore, Plaintiff contends that Officer Bell and three other male officers witnessed this interaction, and on April 9, two days after the incident, he showed his injuries to Mr. Lahey. (*Id.*).

In two separate letters, one directed to the Inspector General and the other to ICP Supervisor Collins, Plaintiff claimed that he stopped consuming his food because Schmitt continued to tamper with his meals. (Compl. Doc. 2-2 at 1-5). As an example, he stated that on May 14 an unnamed inmate placed bodily fluids on his food after Schmitt persuaded an officer to instruct the inmate to contaminate the Plaintiff's meal. (*Id.*). In a letter to Mr. Collins, the Plaintiff indicated that he has not been eating enough food because he is picking and choosing what to eat since Schmitt has been tainting his meals. (*Id.* at 3-4). Additionally, Plaintiff listed other dates in which his food was tainted: May 28, May 30, June 4, June 8, June 29, and July 27. (*Id.* at 6-7, 12). Like the previous cases, Plaintiff alleges that Schmitt instructed an unnamed officer, who then influenced an unnamed inmate to place semen, feces, or other bodily fluids in the Plaintiff's meals. (*Id.*).

According to Plaintiff, the staff from Green Haven has treated him poorly because they blame him for the lock-down that occurred in Green Haven in 2000. (Compl. Doc. 2-1 at 29). He contends "lieutenants and captains throughout the state of New York are out to get me for the incident in Green Haven Correctional Facility in 2000." (Compl. Doc. 2 at 18). Plaintiff

states that the lock-down occurred because he "made friends with over a thousand inmates" and a group of these inmates were inspired by his action,[5] which led them to "lock the facility down and ask[ ] the governor of New York State at the time for good time and better medical treatment...." (*Id.*). Because of this incident, Plaintiff suggests that the staff of Green Haven have been persuading inmates to contaminate his meals with bodily fluids. (Compl. Doc. 2-1 at 29).

5      Throughout his complaint. Plaintiff never clarifies what his action was.

**\*4** Plaintiff seeks relief against Defendants in their individual and official capacities. As to Schmitt, Plaintiff requests an injunction to stop him from continuing to taint his food, substantial monetary damages from Schmitt and the other Defendants, and to be released from the correctional system.

## STANDARD ON A MOTION TO DISMISS

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its facts." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). *In Ashcroft v. Iqbal*, the Supreme Court established a two-prong test for courts to decide a motion to dismiss. 556 U.S. 662, 679 (2009). First, a trial court must identify "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* While the court must accept all of the plaintiff's allegations as true, it cannot accept "legal conclusions" as true. *Id.* at 678. Second, when a complaint contains well-pleaded allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. A claim is plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly,* 550 U.S. at 556-57) (internal citations omitted).

Because the plaintiff in this case is a pro se litigant, the Court is obligated to construe the pleadings liberally. *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009). The Court must also interpret the pleadings "to raise the strongest arguments that

Calvin v. Schmitt, Not Reported in Fed. Supp. (2017)

2017 WL 4280683

[it] suggest[s]." *Harris v. City of N.Y.*, 607 F.3d 18, 24 (2d Cir. 2010) (internal quotations and citation omitted). However, a *pro se* plaintiff's pleading must contain factual allegations that sufficiently "raise a right to relief above the speculative level." *Jackson v. N.Y.S. Dep't of Labor,* 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010). The presumption of truth does not extend to "legal conclusions, and threadbare recitals of the elements of the cause of action." *Harris,* 572 F.3d at 72 (quoting *Iqbal,* 556 U.S. 662) (internal quotations marks omitted). A plaintiff must provide "more than labels and conclusions" to show he is entitled to relief—mere conclusory statements are insufficient. *Twombly,* 550 U.S. at 555.

### DISCUSSION

### I. Section 1983 Claims

Defendants first argue that the present action should be dismissed because Plaintiff failed to plead plausible facts that would give rise to a § 1983 claim. However, Defendants focus solely on the August 13, 2014 incident and fail to consider the other documents and incidents described in the complaint.[6] Taking into consideration the allegations asserted in the entirety of the complaint, Plaintiff's allegations fails to plausibly give rise to a § 1983 claim.

[6]     A court may "consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matter of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing suit." *Thomas v. New York City Dep't of Educ.,* 15-CV-8934(JMF), 2016 WL 4544066, at *1 (S.D.N.Y. Aug. 31, 2016). *See also Kleinman v. Elan Corp.,* 706 F.3d 145, 152 (2d Cir. 2013) (stating that the court has discretion to consider other documents attached to the complaint when assessing a motion to dismiss). For this reason, it is appropriate for this Court to include the letters and other documents attached to the complaint as part of the complaint.

**\*5** In order to state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) a deprivation of a right secured by the Constitution or laws of the United States, and (2) that the person who deprived plaintiff of that right acted under the color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988).[7]

As discussed further below, Plaintiff's allegations fails to give rise to a claim of cruel and unusual punishment.

[7]     At this stage it seems plausible that the second prong of the § 1983 claim is satisfied. Given the facts, it appears that Defendants were acting under "the color of the state" when the alleged violations occurred. As the Supreme Court explained, "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West,* 487 U.S. at 49-50. Furthermore, Defendants do not dispute this issue in their motion and, therefore, it is not further addressed.

### a. Eighth Amendment Violation

As to the first prong of a § 1983 claim, Plaintiff alleges his Eighth Amendment right was violated because the contamination of his food constitutes a cruel and unusual punishment. "The Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.' " *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir. 1983) (quoting *Ramos v. Lamm,* 639 F.2d 559, 571 (10th Cir. 1980)). For a prisoner to prevail on a claim asserting that he was subjected to cruel and unusual punishment, he must prove both "an objective element—that the prison officials' transgression was 'sufficiently serious'—and a subjective element—that the officials acted, or failed to act, with a 'sufficiently culpable state of mind,' *i.e.*, with 'deliberate indifference to inmate health or safety.' " *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)) (citations and internal quotation marks omitted).

### i. Objective Element

For the first element—the objective requirement, the Supreme Court has stated, "while the Constitution 'does not mandate comfortable prisons,' prisoners may not be denied 'the minimal civilized measure of life's necessities.' " *Id.* (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 349 (1981)). To establish the objective element, a plaintiff must allege that "the conditions of his confinement violate contemporary

2017 WL 4280683

standards of decency." *See Id.* The State is obligated to provide prisoners with "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32 (1993). In food tampering claims a plaintiff must allege that he suffered an actual injury, "the mere allegation of food tampering alone [ ] is insufficient to establish a claim under the Eighth Amendment." *Harris v. Ashlaw,* No. 9:07-CV-0358(LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007). *See M.F. v. Reish,* No. 95-CV-4904(SAS), 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996) (holding that a plaintiff must allege a "distinct and palpable injury").

Taking Plaintiff's allegations as true, the objective element is not satisfied because Plaintiff's allegations failed to plausibly show that any of the named Defendants' actions constituted an Eighth Amendment violation. *See Guilbert v. Sennet,* 235 Fed. Appx. 823, 826 (2d Cir. 2007) (holding that a plaintiff must allege that a defendant's actions constituted a constitutional violation to satisfy the objective prong); *see, e.g., Gray v. Metropolitan Detention Ctr.,* No. 09-CV-4520, 2011 WL 2847430, at * 11 (E.D.N.Y. July 15, 2011) (finding that the objective prong was satisfied after plaintiff alleged that the named defendants tampered with the food); *Pagan v. Westchester Cty.,* No. 12-CV-7669(PAE)(JCF), 2014 WL 982876, at *16 (S.D.N.Y. Mar. 12, 2014) (holding that the complaint satisfied the objective prong by sufficiently stating defendants created a "serious deprivation"). While courts in the Second Circuit have recognized that the contamination of an inmate's food can be an Eighth Amendment violation,[8] courts have also granted a defendant's motion to dismiss if the plaintiff's allegations "are so conclusory and fantastic as to rise to the level of factually frivolous." *Brown v. Eagen,* No. 9:08-CV-0009(TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009). *See also Dorsey v. Fisher,* No. 9:09-CV-1011 (GLS)(DEP), 2010 WL 2008966, at *7 (N.D.N.Y. May 19, 2010) (dismissing a claim that alleges in "conclusory fashion" that prison officials have conspired to contaminate the plaintiff's food). Similar to *Brown,* where the plaintiff alleges that the defendants coordinated with inmates to contaminate his food with blood, feces, urine, semen and other chemicals, Plaintiff in this case has not plausibly alleged a sufficient connection between the named Defendants and the purported violations. 2009 WL 815724, at *2-5. Instead Plaintiff has made improbable allegations that both inmates and prison officers conspired to tamper with his food. In essence, Plaintiff has failed to allege a tangible link between the Defendants and the contaminated food. There are two incidents within the complaint wherein Plaintiff attempts to connect Defendant Schmitt to the tainted meals, but both fall short of plausibly demonstrating that Schmitt's actions caused the violations.

8      *E.g., Varricchio v. Cty. of Nassau,* 702 F. Supp. 2d 40, 56 (E.D.N.Y. 2010) (finding that the plaintiff's allegations that his food was tainted with bodily waste, soap, metal pins, and staples constituted an Eighth Amendment violation); *White v. Olivar,* No. 11-CV-3725(GBD)(MHD), 2012 WL 2878641, at *2 (S.D.N.Y. July 12, 2012) (finding that plaintiff's complaint alleging that defendants contaminated his food with human hair and avian fecal matter was an Eighth Amendment violation). *See also Reid v. Nassau Cty. Sherriff's Dep't,* No. 13-CV-1192 (SJF)(SIL), 2014 WL 4185195, at *15 (E.D.N.Y. Aug. 20, 2014) ("Allegations that a prisoner was served food contaminated or 'tainted' by foreign object, e.g., rocks, glass, human waste, soap, metal pins, staples, etc., are sufficient to plead a constitutional violation").

*6 In the "peanut butter incident" that transpired on October 17, 2014, Plaintiff tenuously connects the actions of two inmates[9] to Schmitt. In a convoluted tale, Plaintiff asserts that the sole purpose of him receiving the peanut butter was for Schmitt to contaminate it through the assistance of those two inmates. (Compl. Doc. 2-1 at 18). The other attempt to link Schmitt to the food contamination incident on October 23, 2014 involves Officer Tokart.[10] As he sat in his cell, Plaintiff contends he was threaten by Officer Tokart, and he surmises that Schmitt sent Officer Tokart to threaten Plaintiff with food tampering if he did not stop talking about the prior peanut butter incident. (*Id.* at 14). Under current case law, both incidents fall short of plausibly demonstrating that it was Schmitt's actions that caused Plaintiff's alleged Eighth Amendment violation. Food tampering cases in which a defendant's allegations have been deemed sufficient to meet the plausible standard require a connection between the defendant's actions, or omission, and the purported violation. *See, e.g., Thaxton v. Simmons,* No. 9:10-CV-1318 (MAD/RFT), 2012 WL 360104, at *1 (N.D.N.Y. Jan. 5, 2012) (noting that defendants would make direct comments to plaintiff regarding his food); *Pagan,* 2014 WL 982876, at *1 (alleging that defendants were responsible for proving the contaminated food to the plaintiff). *But see, e.g., Justice v. McGovern,* No. 11-CV-5076(JS)(WDW), 2012 WL 2155275, at *3 (E.D.N.Y. June 12, 2002) (dismissing a plaintiff's case because "Plaintiff failed to plead that [defendant's] threats

Calvin v. Schmitt, Not Reported in Fed. Supp. (2017)

2017 WL 4280683

resulted in any injury"). Because Plaintiff's allegations are conclusory in nature and based on nothing more than pure conjecture, they fail to meet the requisite objective prong standard. Of noteworthy, Plaintiff fails to assert that the food delivered by Officer Tokart was contaminated and resulted in an injury. Thus, Plaintiff does not indicate any wrongdoing by Schmitt or the other named Defendants.

9   It should be noted that Officer Menna, who allegedly persuaded the inmates to taint Plaintiff's food, is not a named defendant.

10   It should be noted that Officer Tokart is not a named defendant in this suit.

### ii. Subjective Element

As to the subjective requirement, the Supreme Court has noted that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Phelps,* 308 F.3d at 185-86 (quoting *Farmer,* 511 U.S. at 837). To satisfy the subjective element, a plaintiff must show "that the defendant acted with reckless disregard to a known substantial risk." *Thaxton,* 2012 WL 360104, at *4.

Drawing all reasonable inferences in favor of the Plaintiff and accepting the factual allegations set forth in the complaint as true, Plaintiff fails to satisfy the subjective element required to support an Eighth Amendment claim. The complaint falls short of adequately naming the defendants that contaminated Plaintiff's meals and, thus, cause the injuries that he alleges. The only tenuous connection that Plaintiff makes between the purported instances of contamination and any of the Defendants is his conclusory assertion that Schmitt orchestrated the tampering of his peanut butter on October 17, 2014 and the alleged interaction with Officer Tokart on October 23, 2014. In both instances, Plaintiff has failed to plausibly allege that Defendants were aware that their actions were creating an "excessive risk" to Plaintiff's health. Due to not alleging a plausible connection between Defendants and the contaminated food, it follows that Defendants were unaware of the tainted meals. *See, e.g., Pagan,* 2014 WL 982876, at *18 (finding that named defendants that had a connection to the alleged violations and were "generally aware" of the violations, was enough to satisfy the subjective prong). Comparable to *Hudson v. City of New York,* where the court found that the plaintiff's allegations only rise to the level of negligence because the complaint had not alleged that the defendants knew of the violations, the complaint does not adequately allege that Defendants knew that Plaintiff's food was being tampered. No. 15-CV-4920(PAC)(HBP), 2016 WL 3976399, at *6 (S.D.N.Y. June 23, 2016). *See also Calhoun v. N.Y.C. Dep't of Corr.,* No. 10-CV-182(LAK)(HBP), 2014 WL 144659, at *8 (S.D.N.Y. Jan. 14, 2014) (dismissing a complaint that fails to allege that any of the defendants were aware of the risk the plaintiff was being placed under). *But see, e.g., Varricchio v. Cty. of Nassau,* 702 F. Supp. 2d 40, 56 (E.D.N.Y. 2010) (finding that plaintiff satisfied the subjective prong after informing the defendants that his rights were being violated by their actions). For these reasons, Plaintiff has failed to satisfy the subjective prong.

### b. Personal Involvement

**\*7** Defendants argue that even if an Eighth Amendment violation exists, there is a lack of personal involvement. Courts in this Circuit have historically dismissed § 1983 claims at this stage of litigation if the complaint fails to demonstrate some tangible connection between the defendant and the alleged violation. *See, e.g., White v. Olivar,* No. 11-CV-3725(GBD)(MHD), 2012 WL 2878641, at *2 (S.D.N.Y. July 12, 2012); *Banks v. Annucci,* 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2014); *Young v. Tryon,* No. 12-CV-6251(CJS), 2015 WL 309431, at *12 (W.D.N.Y. Jan. 23, 2015); *Dorsey,* 2010 WL 2008966, at *5. Because a plaintiff cannot rely on the principle of *respondeat superior,* [11] he must contend that the defendant had some direct involvement in the alleged violation. *See Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006). *See also Austin v. Pappas,* No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) ("[A] Section 1983 plaintiff must allege a tangible connection between the acts of the defendant and the injuries suffered.") (internal quotations and citations omitted).

11   See *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award under § 1983.' ") (citing *Moffitt v. Town Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)).

2017 WL 4280683

The personal involvement of supervisory officials may be established if: "(1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir. 1986)). [12] "Any complaint that fails to allege personal involvement is fatally defective on its face." *Brown,* 2009 WL 815724, at 6 (internal quotations and citations omitted).

[12]     Within the Second Circuit, there is a debate on whether the five factors that are delineated in *Colon* are still applicable since *Iqbal. See, e.g., Reynolds v. Barrett,* 685 F.3d 193, 205 no. 14 (2d Cir. 2012) (noting that *Iqbal* has "engendered conflict" with the liability test set forth in *Colon*). Several courts in the Circuit believe that the *Colon* test is still good law as long as the claim does not require a showing of discriminatory intent. *See, e.g., Thomas v. Calero,* No. 09-CV-5209, 2011 WL 153059, at *13 (S.D.N.Y. Mar. 17, 2011); *D'Olimpio v. Crisafi,* 718 F. Supp. 2d 340, 346-47 (S.D.N.Y. 2010); *but see Bellamy v. Mount Vernon Hosp.,* No. 07-CV-1801, 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster— a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred.").

### iii. Defendant Schmitt

Plaintiff contends that Defendant Schmitt had a direct involvement in the purported contamination of his food. However, as previously mentioned, Plaintiff's allegations are insufficient. The tenuous connection that is alleged on the October 23, 2014 incident fails to adequately demonstrate that Schmitt actively participated in the contamination of Plaintiff's food. Even if the allegations of food tampering are

taken as fact, Plaintiff's conclusory statement does not create a tangible connection between Schmitt and the alleged Eighth Amendment violations. *See Costello v. City of Burlington,* 632 F.3d 41, 48-49 (2d Cir. 2011) (finding that a complaint that fails to establish personal involvement of a defendant is "fatal" for a claim under § 1983).

### iv. Defendants Annucci, Sullivan. Bosco, and Collins

**\*8** In regards to the other Defendants—Annucci, Sullivan, Bosco, and Collins—all claims asserted against them are dismissed on the basis Plaintiff failed to allege any personal involvement. First, any Eighth Amendment claim against Annucci is dismissed because there are no wrongful acts or omissions attributed to him. His name only appears in the caption of the complaint. When a complaint fails to allege any wrongdoing by the defendant, dismissal is proper. *Armstrong v. Miller,* No. 9:16-CV-0478(GLS/CFH), 2016 WL 3149733, at *5 (N.D.N.Y. June 3, 2016). *See also Cipriani v. Buffardi,* No. 9:06-CV-0889(LEK/DRH), 2007 WL 607341, at *1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (internal citations omitted).

The claims against the remaining Defendants must also be dismissed. Regardless of whether the *Colon* categories remain good law after *Iqbal* as discussed *supra* note 7, Plaintiff has not properly established the personal involvement of Sullivan, Bosco, and Collins. Plaintiff's sole contention is that he informed them via a letter of the alleged violations and they never responded to him. (Compl. Doc. 2 at 10-11). Such assertions are insufficient to establish personal involvement. "[A]s a matter of law, a defendant's mere 'receipt of a letter or grievance, without personally investigating or acting [thereon], is insufficient to establish personal involvement.' " *Alvarado v. Westchester Cty.,* 22 F. Supp. 3d 208, 215 (S.D.N.Y. 2014) (quoting *Burns v. Fischer,* No. 13-CV-486(LEK/CFH), 2014 WL 1413387, at *5 (W.D.N.Y. Feb. 3, 2014)). *See also Sharma v. D'Silva,* 157 F. Supp. 3d 293, 306 (S.D.N.Y. 2016) ("[A]n individual defendant's supervisory role does not automatically translate into that defendant's personal involvement.").

### II. **Qualified Immunity**

In their motion to dismiss, Defendants contend that they are entitled to qualified immunity. Qualified immunity is

2017 WL 4280683

designed to "protect[ ] officials from liability for civil damages as long as 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Gilles v. Repicky*, 511 F.3d 239 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). According to the Second Circuit, a government official is entitled to qualified immunity "unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *McGowan v. United States*, 825 F.3d 118, 124 (2d Cir. 2016) (quoting *Wood v. Moss*, 134 S. Ct. 2056, 2059 (2014)). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Therefore, because Plaintiff has not plausibly alleged sufficient facts that any of the Defendants violated his constitutional rights, there is no need to further address the issue of qualified immunity.

### III. Eleventh Amendment

Unless the State waives its immunity or a valid congressional override, the Eleventh Amendment precludes the award of damages under § 1983 in federal courts against States. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). *See also Weill v. Michigan Dep't of State Police*, 491 U.S. 58, 67 (1989) (holding that under § 1983 Congress did not intend to "disregard the well-established immunity of a State from being sued without its consent."). This immunity extends to officials that are being sued in an official capacity. *Id.* at 69. Therefore, any claims against the Defendants in their official capacity are deemed dismissed.

**CONCLUSION**

**\*9** For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. On the basis Plaintiff fails to allege any plausible facts that create a tangible connection between Schmitt and the purported contamination of Plaintiff's meals, Plaintiff's Eighth Amendment violation claim(s) against Schmitt is dismissed without prejudice. Similarly, all claims against Annucci, Sullivan, Bosco, and Collins are dismissed without prejudice. Plaintiff fails to allege any personal involvement by any of these individuals in the alleged violations. Furthermore, all claims asserted against Defendants—Schmitt, Annucci, Sullivan, Bosco, and Collins, in their official capacity are deemed dismissed with prejudice because they are barred under the Eleventh Amendment. The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 23.

Plaintiff shall have thirty-five days from the date of this Order to amend the Complaint as to those claims that are dismissed without prejudice. If Plaintiff elects to file an amended complaint, Defendants shall have thirty days from the date of Plaintiff's filing to respond. If Plaintiff does not file an amended complaint within thirty-five days, the case will be deemed closed.

In accordance to 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal from this Opinion and Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4280683

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4324106
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donnell HARRIS, Plaintiff,
v.
T. ASHLAW, B. Snell, S. Thompson, et al., Defendants.

No. 9:07-CV-0358 (LEK/DEP).
|
Dec. 5, 2007.

**Attorneys and Law Firms**

Donnell Harris, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Meghan M. Brown, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on November 14, 2007, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S .C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 20).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peeble's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Additional grounds for dismissal of this matter are provided by Local Rule 41.2(b) of the Northern District of New York which states that "Failure to notify the court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action." N.D.N.Y. L.R. 41.2(b). Local Rule 10.1(b)(2) states that "... pro se litigants must

immediately notify the court of any change of address. The notice of change of address is to be filed with the clerk...." N.D.N.Y. L.R. 10.1(b)(2). Copies of the Report-Recommendation were mailed to the parties, with Petitioner's copy postmarked November 14, 2007. On November 19, 2007 the Report-Recommendation that had been mailed to Petitioner was returned to the Clerk of the Court, with the notation that Plaintiff had been discharged. *See* Dkt. No. 21. The Clerk had no forwarding address from Petitioner, who has failed to notify the Court of his change of address. Thus, in accordance with the Local Rules, this action is dismissed.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 20) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to Dismiss (Dkt. No. 19) is **GRANTED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION AND ORDER*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Donnell Harris, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. At the center of plaintiff's complaint is his assertion that certain of the defendants tampered with one of his meals, and that when he complained and requested to see a high ranking corrections official in order to register a complaint regarding the matter he was ordered to exit his cell and, after refusing to do so, was forcibly extracted through the use of a chemical agent. Plaintiff's complaint asserts claims of cruel and unusual punishment, in violation of the Eighth Amendment, based both upon the defendants' alleged tampering with his food and their purported use of excessive force, and seeks injunctive relief as well as an award of compensatory and punitive damages.

**\*2** Currently pending before the court is a motion by the defendants seeking dismissal of plaintiff's claims for failure

to state a cause of action upon which relief may be granted. Having carefully reviewed plaintiff's complaint, in the light of defendants' motion-which plaintiff has failed to oppose-I recommend that the motion be granted.

I. *BACKGROUND* [1]

[1]

> In light of the procedural posture of this case, the following recitation is drawn from plaintiff's complaint, the contents of which for now must be accepted as true. *See Erickson v. Pardus,* ---U.S. ----, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* ---U.S. ----, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

Plaintiff is a prison inmate entrusted to the custody of the New York State Department of Correctional Services (the "DOCS"); at the times relevant to his claims, plaintiff was designated by the DOCS to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. Complaint (Dkt. No. 1) at pp. 1, 7. Upstate is a maximum security prison comprised exclusively of special housing unit ("SHU") cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

On the morning of December 27, 2006, while at Upstate, plaintiff received a meal delivered to his cell by defendants T. Ashlaw and B. Snell, two corrections officers employed at the facility. Complaint (Dkt. No. 1), ¶ 6 A. After observing the two corrections officers "do something" to his water in the process, plaintiff requested a replacement water. *Id.* That request was denied, plaintiff's water was knocked off the feed-up slot and, apparently after delivery of his food tray, his milk and juice were placed on the floor in front of his cell. *Id.* After Corrections Officers Ashlaw and Snell left the area, plaintiff noticed that the spoon on his tray was broken, the seal on his peanut butter was compromised, and his bread had what appeared to be finger holes in it. Complaint (Dkt. No. 1) ¶ 6 B. When plaintiff attempted to complain to defendants Ashlaw and Snell regarding the matter, his complaints were ignored. *Id.*

Matters apparently escalated when plaintiff once again complained to defendant Ashlaw, who had come to retrieve his tray, and, after not receiving satisfactory response from the officer, demanded to see a higher ranking officer in order to complain regarding his food. *Id.* ¶¶ C-F. While in the process of voicing complaints to a corrections lieutenant and corrections captain who had arrived on the scene, plaintiff was directed to exit his cell and advised that corrections officers intended to conduct a search of his cell. *Id .* ¶¶ F, G. In defiance over the refusal of corrections officers to listen to his complaints, plaintiff placed his tray on his table and walked to the back of his cell, ignoring the orders of corrections officers to exit. *Id.*

As a result of plaintiff's refusal to exit his cell, corrections officers contacted Upstate Superintendent R. Woods for the purpose of requesting permission to use gas to assist in extricating the plaintiff from his cell. Complaint (Dkt. No. 1) ¶ 6 H. After the requisite authorization was given by defendant Woods, a chemical substance was introduced into plaintiff's cell, eventually forcing him to come to the front, where he was handcuffed and removed. *Id .* ¶ H.

II. *PROCEDURAL HISTORY*

**\*3** Plaintiff commenced this action on April 4, 2007. Dkt. No. 1. Named as defendants in plaintiff's complaint are Upstate Superintendent R. Woods; Corrections Captain Quinn; Corrections Lieutenant Anctil; Corrections Sergeant S. Thompson; and T. Ashlaw and B. Snell, two corrections officers at the facility.

In response to plaintiff's complaint, defendants moved on August 9, 2007 seeking dismissal of his complaint pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, arguing that plaintiff's claims fail to rise to a level of constitutional significance. Dkt. No. 19. Plaintiff has since failed to submit any papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [2] *See also* Fed.R.Civ.P. 72(b).

[2]

> Plaintiff's failure to respond to the pending motion does not preclude me from recommending its disposition without the benefit of his submission. *See, e.g., White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan. 18, 2001). Such a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine

2007 WL 4324106

the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir.2000). It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance; under this court's local rules, a party's failure to respond to a properly filed motion can constitute consent to the granting of that motion, so long as the court determines that the moving party has met its burden demonstrating entitlement to the relief requested. N.D.N.Y.L.R. 7.1(b)(3); *see also McCall,* 232 F.3d at 322-23 (holding that plaintiff's failure to respond to a motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall* ).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99 (1957), "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974.

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however in artfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

### B. *Cruel and Unusual Punishment*

The two components of plaintiff's complaint, asserting constitutional deprivations growing out of defendants' tampering with his food and their use of excessive force to remove him from his cell, both implicate the Eighth Amendment's prohibition against cruel and unusual punishment. In their motion, defendants challenge the sufficiency of both aspects of plaintiff's Eighth Amendment claim.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976) (citations and quotations omitted); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be " 'sufficiently serious' " from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with " 'deliberate indifference.' " *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-24 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

1. *Food Tampering*

**\*5** It is by now well-accepted that an inmate's Eighth Amendment rights may be abridged through service of food, either in insufficient quantity or which is contaminated, provided that through their actions prison officials create an imminent danger to the inmate's health and well-being. *See, e.g., Robles v. Coughlin,* 725 F.2d 12, 15-16 (2d Cir.1983) (allegations that defendant refused to feed the plaintiffs on twelve days, three of which were consecutive within a fifty-three day period, and additionally contaminated inmate meals with "dust, rocks, glass and human waste," found sufficient to withstand routine, *in forma pauperis* scrutiny under 28 U.S.C. § 1915(d)); *see also, e.g., Griffin v. Smith,* 493 F.Supp.

129, 131 (W.D.N.Y.1980) (allegations of "unsanitary food utensils, including cigarette burns and hair on food trays" found sufficient to state a cognizable claim); *Murphy v. Weaton,* 381 F.Supp. 1252, 1261 (N.D.Ill.1974) (allegations involving spoiled, rotted and foul food served in uncleaned wagon used to dispose of garbage found sufficient to state a claim).

The mere allegation of food tampering alone, however, is insufficient to establish a claim under the Eighth Amendment. To state a cognizable claim under the Eighth Amendment in such circumstances, a plaintiff must allege he or she suffered " 'distinct and palpable injury.' " *M.F. v. Reish,* No. 95 CIV 4904, 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996) (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206 (1975)). Accordingly, inmate suits predicated upon claims of adulterated food brought under the Eighth Amendment are subject to dismissal where the plaintiff fails to allege he or she was actually harmed by food tampering. *McNatt v. Unit Manager Parker,* No. 3:99 CV 1397, 2000 WL 307000, at *6 (D.Conn. Jan. 18, 2000) (inmates failed to state a cognizable claim when failing to allege ill effects from reduced food portions); *Reish,* 1996 WL 345953, at *4 (no actual injury where plaintiffs allege numerous incidents of food tampering by defendants and that defendants served food "riddled with rodent excrement", but did not allege that they were actually harmed by such food) (quotations omitted); *but see Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *6-7 (N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that defendants denied the plaintiff food on six occasions and on at least two others contaminated his food with spit or perfume found sufficient to raise issue of fact regarding Eighth Amendment violation for purposes of summary judgment motion).

In this instance plaintiff's food tampering claim has as its focus one incident, occurring on December 27, 2006, although he additionally asserts in passing that he experienced similar "foul play' [to his] food" on four other occasions during the period between approximately September 21, 2006 and November 14, 2006. Complaint (Dkt. No. 1) ¶ 6 I. Because plaintiff has not alleged in his complaint that he received nutritionally inadequate food, or that it was prepared or served in a manner presenting an imminent danger to his health and well-being, this aspect of his Eighth Amendment claim is legally deficient. *Quintana v. McCoy,* No. 9:03-CV-0924, 2006 WL 2827673, at *6 (N.D.N.Y. Sept. 29, 2006) (McAvoy, S.J. and Treece, M.J.). Accordingly, I find that plaintiff's food tampering claim, although alleging conduct

which is both despicable and surely remediable through other channels, fails to rise to a level of constitutional significance, and therefore recommend its dismissal.

### 2. *Excessive Force*

**\*6** As was previously noted, Eighth Amendment analysis requires both objective and subjective examinations. *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 999 (1992); *Wilson,* 501 U.S. at 298-99, 111 S.Ct. at 2324; *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000 (quoting *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290).

The primary focus of defendant's motion addressing plaintiff's excessive force claim is upon the subjective element of the prescribed analysis. Under that test, a plaintiff's constitutional right against cruel and unusual punishment is violated by an *"unnecessary and wanton"* infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (emphasis added) (citations and quotations omitted); *Griffen,* 193 F.3d at 91. The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 6-7, 112 S.Ct. at 998 (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)).

To prevail on his excessive force claim, the plaintiff must therefore establish that defendants acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson,* 481 F.2d at 1033). When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not

necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) (McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." [3] *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 (citations and quotations omitted).

[3]   It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action."); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*7** In this instance, the plaintiff himself acknowledges that the use of chemicals to extract him from his cell was the direct result of his refusal to obey an order issued by corrections officials to exit his cell. While plaintiff may have believed that his defiance of defendants' direct order was justified, it does not shield him from the consequences associated with his refusal to comply. *See generally* Inmate Rule 106.10[4] (stating that "[a]n inmate shall obey all orders of department personnel promptly and without argument"); *Holmes v. Taylor,* No. 04-CV-1299, 2007 WL 965440, at \*6 (N.D.N.Y. Mar. 30, 2007) (Kahn, D.J. and Di Bianco,

M.J.) (noting that the requirement that inmates obey direct orders serves a legitimate penological interest). Plaintiff's complaint itself plainly reflects that it was in response to his insubordination, and the corresponding need of prison officials to enforce their directive and maintain discipline and order within the facility, that force was applied to remove him from his cell. Plaintiff's complaint does not allege that the measures taken to insure his compliance with the order that he exit his cell were excessive or unwarranted, or that less drastic measures would have served to accomplish the same purpose. Under the circumstances, plaintiff is not well-positioned to assert that prison officials violated his constitutional rights through the use of relatively modest force to obtain his compliance with a lawful directive that he exit his cell. *See Brown v. Busch,* 954 F.Supp. 588, (W.D.N.Y.1997) (determining that prison officials had not used excessive force against inmate, who had refused to comply with a direct order and was housed in the most secure unit of maximum security prison, where officials forced inmate back into his cell by allegedly pushing, shoving, and striking him). Accordingly, I conclude that plaintiff's complaint fails to allege the use by prison officials of force rising to a level sufficient to establish an Eighth Amendment violation.[5]

4    Inmate Rules are part of the Standards of Inmate Behavior in All Facilities, published as Part 270 of Title 7 of the New York Code of Rules and Regulations, 7 N.Y.C.R.R. § 270.2(B).

5    In light of my recommendation regarding plaintiff's Eighth Amendment claims, I find it unnecessary to address defendants' contention that they are entitled to qualified immunity. *See* Defendants' Memorandum (Dkt. No. 19-2) at 8-10.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint, which alleges that his food was modestly tampered with by prison officials on roughly five separate occasions over a four month period, fails to allege that he suffered any injury or adverse consequences

associated with that tampering, and thus fails to establish an Eighth Amendment claim of cruel and unusual punishment. The second prong of plaintiff's complaint, alleging the unlawful use of excessive force to remove him from the cell, similarly fails to state a cognizable claim in light of the fact that, by his own account, it was his own refusal to obey a proper order of prison officials that precipitated defendants' response and necessitated the use of force to remove him from his cell after he refused to exit voluntarily. Under these circumstances, I recommend that defendants' motion be granted and plaintiff's complaint be dismissed, though with leave to replead. *See Branum,* 927 F.2d at 704-05.

**\*8** Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion to dismiss plaintiff' complaint (Dkt. No. 19) be GRANTED, and that plaintiff's complaint be DISMISSED in all respects, with leave to replead; and it is further

ORDERED that defendants' request to stay discovery in this matter pending the court's final determination of this motion, as articulated in their memorandum of law in support thereof, is GRANTED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4324106

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by Parkell v. Senato, D.Del., December 13, 2016

2011 WL 1118452
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald Mack DOVE, Plaintiff,

v.

BROOME COUNTY CORRECTIONAL

FACILITY; [1] K. Moore, Captain; Timothy
Hill, Lieutenant; Daniel Snyder, Correction
Officer; and C. Mogenson, Chaplain, Defendants.

[1]     The Broome County Correctional Facility is listed
as a defendant in both the caption of plaintiff's
complaint, and on the court's records. The facility
is not, however, identified as a defendant in the
body of the complaint. See Complaint (Dkt. No. 1)
section 3. In any event, as defendants have argued,
the Broome County Correctional Facility is not
a separate entity with its own legal identity and
amenable to suit. See Legett–Edwards v. City of
Syracuse, No. 5:06–CV–892, 2007 WL 2891774,
at *2 (N.D.N.Y. Sept. 28, 2007) (Mordue, C.J.)
(citing Loria v. Town of Irondequot, 775 F.Supp.
599, 606 (W.D.N.Y.1990)). Accordingly, if this
case survives the pending motion the Broome
County Correctional Facility should be removed as
a defendant in the action.

Civil Action No. 9:10–CV–0002 (DNH/DEP).
|
Feb. 17, 2011.

**Attorneys and Law Firms**

Donald Mack Dove, Albany, NY, pro se.

Broome County Attorney's Office, Aaron J. Marcus, Esq., of
Counsel, Binghamton, NY, for Broome County Defendants.

Lynch Schwab, PLLC, Louis U. Gasparini, Esq., of Counsel,
White Plains, NY, for Defendant C. Mogenson.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** *Pro se* plaintiff Donald Mack Dove, a New York State
prison inmate who at the relevant times was confined locally
at the Broome County Correctional Facility ("Broome CCF"),
has commenced this action pursuant to 42 U.S.C. § 1983,
alleging that the defendants deprived him of his civil rights
during the period of his incarceration at the facility. In his
complaint, plaintiff maintains that while in the Broome CCF
he was unlawfully denied kosher food for a period of thirty
days after having been observed eating a non-kosher meal,
and that the denial constituted 1) an unlawful interference
with his right to freely exercise his chosen religion, as
guaranteed under the First Amendment; 2) a deprivation
of due process and equal protection, in violation of the
Fourteenth Amendment; 3) cruel and unusual punishment, as
prohibited by the Eighth Amendment; and 4) a violation of
the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.
§ 2000bb *et seq.* [2] As relief, plaintiff seeks an injunction
directing that he be provided with kosher meals as well as a
monetary award. [3]

[2]     The RFRA was invalidated by the Supreme Court
in *City of Boerne v. Flores,* 521 U.S. 507, 117
S.Ct. 2157 (1997). In deference to his *pro se*
status, I have chosen to analyze plaintiff's statutory
religious claims under the Religious Land Use and
Institutionalized Persons Act of 2000 ("RLUIPA"),
42 U.S.C. § 2000cc, which was in enacted by
Congress to rectify the perceived constitutional
infirmity of the RFRA. See *Pugh v. Goord,* 571
F.Supp.2d 477, 504 n. 11 (S.D.N.Y.2008).

[3]     Since it appears that plaintiff is no longer confined
in the Broome CCF, his request for injunctive relief
is subject to denial as moot. *Prins v. Coughlin,*
76 F.3d 504, 506 (2nd Cir.1996) (citing *Young v.
Coughlin,* 866 F.2d 567, 568 n. (2d Cir.), *cert.
denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989),
and *Beyah v. Coughlin,* 789 F.2d 986, 988 (2d
Cir.1986)); *Candelaria v. Greifinger,* No. 96–CV–
0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8,
1998) (Pooler, J. and Scanlon, M.J.).

Currently pending before the court in connection with the
action are two motions. In the first one of the named

Dove v. Broome County Correctional Facility, Not Reported in F.Supp.2d (2011)

2011 WL 1118452

defendants, C. Mogenson, who is identified in plaintiff's complaint as a prison chaplain, requests dismissal of Dove's claims against him on a variety of grounds including, *inter alia,* lack of personal involvement and lack of personal jurisdiction, as well as on the merits. [4] The second motion is brought on behalf of the remaining defendants in the action seeking the entry of summary judgment dismissing plaintiff's claims, arguing that the record now before the court fails to disclose the existence of evidence upon which a reasonable factfinder could conclude that any of the constitutional or statutory rights referenced in plaintiff's complaint were violated. For the reasons set forth below, I recommend that both motions be granted, and that plaintiff's complaint be dismissed in its entirety.

[4]    In his motion, defendant Mogenson initially also sought dismissal of plaintiff's claims based upon his alleged failure to exhaust available administrative remedies before commencing suit. Dkt. No. 16. After having reviewed plaintiff's submissions in opposition, *see* Dkt. No. 27, however, defendant Mogenson has now withdrawn that portion of his motion. *See* Defendant's Reply Memorandum (Dkt. No. 25–1) at p. 3.

I. *BACKGROUND* [5]

[5]    When addressing defendant Mogenson's motion I have considered the contents of plaintiff's complaint and deemed the material allegations of that complaint to be true. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007). I have also considered and incorporated into the background description facts derived from the exhibits attached to the plaintiff's complaint, which may also be properly considered in connection with the dismissal motion. *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504,* 992 F.2d 12, 15 (2d Cir.1993). For purposes of the remaining defendants' summary judgment motion the following recitation is derived from the record now before the court. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). In both instances, all reasonable inferences have been drawn in favor of the plaintiff and any conflicts and ambiguities have been resolved in his favor. *Papelino v. Albany*

*College of Pharmacy of Union University,* ——F.3d ——, 2011 WL 199124, *12 n. 1 (2d Cir. Jan. 24, 2011) (citing *Pena v. DePrisco,* 432 F.3d 98, 107 (2d Cir.2005)).

The circumstances giving rise to plaintiff's claims in this action are neither complex nor controversial. Plaintiff, a follower of the Kashrut of Judaism religious tenets, was confined in the Broome CCF at the times relevant to his claims. *See generally* Complaint (Dkt. No. 1) § 6 and Exhs. at p. 12 of 13. While there, plaintiff requested and was provided kosher meals in accordance with his religious beliefs. *Id.*

On September 30, 2009, it was discovered that plaintiff's dinner time kosher meal was missing from the prison meal cart. Snyder Aff. (Dkt. No. 28–14) ¶ 4. Defendant Daniel J. Snyder, a corrections officer at the facility, reported the missing meal to the facility's kitchen staff, and was informed that plaintiff's meal would be delivered shortly to the pod in which he was confined at the time. *Id.*

While awaiting delivery of the missing kosher meal plaintiff consumed a non-kosher meal, advising Corrections Officer Snyder that he had "bought" the meal and needed to eat it, adding in substance that when he works hard he can eat more, and while it is his right to receive kosher meals he is also entitled to eat more when he needs to. *Id.* at ¶¶ 5– 7. Plaintiff's scheduled kosher meal was ultimately delivered and also consumed by the plaintiff. *Id.* at ¶ 8.

  **\*2** Corrections Officer Snyder reported the fact of plaintiff's consumption of a non-kosher meal to medical and kitchen personnel at the facility, as well as to the jail chaplain. Snyder Aff. (Dkt. No. 28–14) ¶ 9. After reviewing Corrections Officer Snyder's report of the incident, prison officials at the Broome CCF ordered the discontinuance of plaintiff's kosher diet for a period of thirty days, and plaintiff was informed that he could reapply for kosher meals at the end of the thirty-day period. Complaint (Dkt. No. 1) § 6 and Exhs. p. 12 of 13; Hill Aff. (Dkt. No. 28–15) ¶ 6. Although the discontinuance was not effectuated pursuant to a formal written policy, it followed the practice of the New York State Department of Correctional Services ("DOCS") and is consistent with a prior suspension of kosher meals to another inmate at the Broome CCF under similar circumstances. Hill Aff. (Dkt. No. 28–15) ¶¶ 6–7; Moore Aff. (Dkt. No. 28–16) ¶¶ 4–6.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 4, 2010. Dkt. No. 1. In his complaint Dove has named the Broome CCF, Corrections Captain K. Moore, Corrections Lieutenant Timothy Hill, Corrections Officer Daniel Snyder, and Chaplain C. Mogenson as defendants, and claims interference with his right of free religious exercise under both the First Amendment and the RFRA, cruel and unusual punishment, deprivation of equal protection, and the denial of procedural due process. [6] *Id.*

[6] As was previously noted, plaintiff's complaint is equivocal as to whether the Broome CCF was intended to be a defendant in the action. *See* p. 1, n. 1, *ante.*

In response to plaintiff's complaint, while defendants Hill, Moore, and Snyder have answered, generally denying plaintiff's allegations and additionally interposing a series of affirmative defenses, Dkt. No. 17, defendant C. Mogenson, who is separately represented, instead has moved seeking its dismissal pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 16. In his motion defendant Mogenson argues that 1) the complaint does not sufficiently allege his personal involvement in the conduct giving rise to plaintiff's constitutional claims; 2) the complaint fails to establish that plaintiff's religious beliefs are sincerely held, warranting dismissal of his free religious exercise claims; 3) plaintiff's equal protection and cruel and unusual punishment claims are without merit; and 4) the court lacks personal jurisdiction over him based upon the fact that he has not been properly served in the action. *Id.* In response to defendant Mogenson's motion, plaintiff has submitted an opposition which is comprised wholly of a series of exhibits, many of which were attached to his original complaint. Dkt. No. 27. Defendant Mogenson has since replied in response to that opposition and in further support of his dismissal motion. Dkt. Nos. 25, 26.

On January 21, 2011, defendants Broome County CCF, K. Moore, Timothy Hill, and Daniel Snyder moved for entry of summary judgment dismissing plaintiff's complaint in its entirety. Dkt. No. 28. In their motion those defendants argue that 1) plaintiff's claims against the Broome CCF should be dismissed since it is not a separate entity amenable to suit; 2) plaintiff's request for injunctive relief is moot based upon his transfer out of the facility; 3) plaintiff's religious freedom statutory claim, which should be analyzed under the RLUIPA, and First Amendment free exercise claim are deficient based upon the insincerity of plaintiff's beliefs in

subscribing to an exclusively kosher diet and the claim that in any event the penological interests giving rise to the temporary suspension of plaintiff's kosher meals outweigh the burden to plaintiff's religious beliefs resulting from the thirty-day suspension; 4) plaintiff's equal protection, due process and Eighth Amendment claims are deficient as a matter of law; and 5) in any event they are entitled to qualified immunity based upon their good faith reliance upon a standard DOCS practice. Despite the fact that his response to defendants' summary judgment motion was due on February 8, 2011, the plaintiff has not opposed the motion.

**\*3** Both motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

A. *Personal Jurisdiction Over Defendant Mogenson*
A review of the court's records in this matter reflects that on April 6, 2010 the summons issued by the clerk was returned unexecuted as to various of the named defendants, including Chaplain Mogenson. Dkt. No. 11. While there are subsequent acknowledgment of service forms on file with regard to the various other defendants, *see* Dkt. Nos. 18–21, there is no record of defendant Mogenson having been served or waived service in the action. He therefore asserts that the court lacks personal jurisdiction over him and should dismiss plaintiff's claims against him on this basis.

There is no proof in the record now before the court that Mogenson has been served in the action or has acknowledged or waived service, nor has plaintiff supplied any evidence regarding the issue in opposing defendant's motion. This court therefore lacks jurisdiction over defendant Mogenson. [7] *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.,* 526 U.S. 344, 350, 119 S.Ct. 1322, 1327 (1999) (citation omitted). The question remains whether this fact entitles defendant Mogenson to dismissal at this juncture, or instead whether more time should be allotted in order to allow for further efforts to obtain jurisdiction over him.

[7] By appearing in the action for the limited purpose of making the instant motion defendant has not submitted to the court's jurisdiction for all purposes and waived the requirement of service. *Louring v.*

*Kuwait Boulder Shipping Co.,* 455 F.Supp. 630, 634 (D.Conn.1977) (citing *Orange Theatre Corp. v. Rayherstz Amusement Corp.,* 139 F.2d 871 (3d Cir.1944), *cert. denied sub nom., Orange Theatre Corp. v. Brandt,* 322 U.S. 740, 64 S.Ct. 1057 (1944)).

The summons in this case was issued on January 6, 2010. *See* Dkt. No. 5. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons be made within 120 days of its issuance, absent a court order extending that period. [8] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007) ("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the prescribed period for service, a district court is afforded broad discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

[8]   That rule provides that

[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period....

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

A *pro se* litigant such as the plaintiff is entitled to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* as is the case in this instance, the court is obligated to forward the plaintiff's process to the United States Marshal's Service, which must in turn effect service upon the defendants, thereby relieving the plaintiff of

the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996). That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshal's Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin,* 304 F.Supp.2d 934, 938–43 (E.D.Mich.2004). In such circumstances it is incumbent upon the plaintiff to develop, through pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshal's Service. *See VanDiver,* 304 F.Supp.2d at 942.

**\*4** In this case I recommend that if the court finds all or some of plaintiff's claims should survive the pending motions, in its discretion it should also reject the suggestion that plaintiff's complaint be dismissed as against Chaplain Mogenson, without prejudice, as neither serving the interest of justice nor promoting judicial economy, and instead order that the United States Marshal for the Northern District of New York personally serve Chaplain Mogenson with the summons and complaint in this matter. [9]

[9]
In the event plaintiff's claims survive and this action goes forward, defendant Mogenson and his counsel could ultimately decide that it is more expeditious to accept service in this matter and avoid the necessity and embarrassment of having the United States Marshal's Service effectuate personal service upon him.

### B. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* 129 S.Ct. at 1950.

2011 WL 1118452

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

### C. *Summary Judgment Standard*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620–21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### D. *Plaintiff's Failure To Oppose Defendants' Summary Judgment Motion*

**\*6** Although he has properly and timely opposed defendant Mogenson's dismissal motion, the plaintiff has not responded to the summary judgment motion subsequently filed by the remaining defendants.[10] Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose the pending summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

10      The notice of defendants' summary judgment motion was accompanied by a notification to the plaintiff of the consequences of failing to oppose

the motion, as required pursuant to the court's local rules. *See* N.D.N.Y.L.R. 56.2.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado,* No. 96–CV–169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95–CV–1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp.106, 106–07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.).[11] Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000) (Kahn, J.).

[11]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[12] *See Elgamil v. Syracuse Univ.,* No. 99–CV–611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[13]

[12]   Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* *See* N.D.N.Y .L.R. 7.1(a)(3) (emphasis in original).

[13]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Based upon plaintiff's failure to oppose defendants' motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.

### E. *Personal Involvement*

**\*7** At the heart of defendant Mogenson's motion is his claim that plaintiff's complaint fails to disclose a sufficient degree of involvement in the constitutional deprivations alleged to support a finding of liability against him.

It is well-established that personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages against that party under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A defendant may only be held accountable for his or her role in a constitutional deprivation, and not for the actions of others on the basis on *respondeat superior* or otherwise. *Iqbal,* 129 S.Ct. at 1952.

Here, plaintiff's complaint and supporting exhibits, interpreted in a light most favorable to him, state a plausible claim of personal involvement in the constitutional

deprivations alleged on defendant Mogenson's part. In the body of his complaint plaintiff asserts that defendant Mogenson was in the direct chain of communication between corrections officials and prison kitchen personnel concerning the report of plaintiff having consumed non-kosher food, directing that his kosher meals be discontinued for a period of thirty days. *See* Complaint (Dkt. No. 1) § 6. Chaplain Mogenson's role in the suspension of kosher meals is also disclosed in a memorandum dated October 15, 2009, which he wrote to the plaintiff and copied to Corrections Lieutenant Hill, Corrections Captain Moore, and the prison kitchen, explaining to Dove why his kosher meals were being temporarily discontinued. Complaint (Dkt. No. 1) Exhs. at p. 12 of 13. That Chaplain Mogenson appears to have played an integral role in the decision-making process is further confirmed by plaintiff's statement describing the relief sought in his inmate grievance concerning the matter, in which he requested the opportunity "to see Reverend Mogenson concerning this matter ASAP ...". *Id.* Exhibits at p. 10, 13.

Drawing all inferences and resolving all ambiguities in plaintiff's favor, I conclude that his complaint adequately states a plausible claim of personal involvement on the part of defendant Mogenson in the conduct giving rise to plaintiff's claims, and therefore recommend denial of the portion of that defendant's motion challenging the sufficiency of plaintiff's allegations regarding that defendant's personal involvement.

### F. *Merits of Plaintiff's Claims*

In their motions defendants challenge the sufficiency of plaintiff's religious exercise claims under the First Amendment and the RLUIPA, arguing that plaintiff's professed religious beliefs are not genuinely held, and that in any event the burden upon his religious beliefs resulting from defendants' actions is far outweighed by the legitimate penological interests at stake. Defendants additionally argue that plaintiff's equal protection, due process, and Eighth Amendment claims lack merit.

### 1. *First Amendment*

**\*8** Plaintiff asserts that the defendants unlawfully interfered with the exercise of his religious beliefs by denying him kosher meals for a period of thirty days. The First Amendment to the United States Constitution guarantees the right to free exercise of religion. [14] U.S. CONST. AMEND. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 2020 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to

appropriate limiting factors. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974).) Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

[14]   That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I.

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); *Salahuddin,* 993 F.2d at 308. A determination of whether the refusal to permit attendance at a religious service, for example, has abridged an inmate's constitutional rights hinges upon the balancing of the inmate's First Amendment free exercise right against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services to other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d 197, 204–05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily, the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is on occasion narrowed by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597;

see also *Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203.

 **\*9**  Pivotal to his First Amendment claim is a showing that plaintiff's religious beliefs, leading to the need for an exclusively kosher diet, are sincerely held. *Salahuddin,* 467 F.3d at 274–75. In their motions defendants challenge the genuineness of plaintiff's stated religious beliefs and invite the court to dismiss plaintiff's free religious exercise claims on this basis. The Second Circuit has had occasion to address this element—the bonafides of a plaintiff's sincerely held religious beliefs—in the context of a religious dietary restriction request made by an inmate in *Ford.* 352 F.3d 582. Noting the difficulties inherent in casting upon the judiciary the task of probing the extent of a plaintiff's legitimately held beliefs, the court observed that "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Id.* at 588 (citations omitted).

In the end, analysis of plaintiff's First Amendment claim requires a balancing of the legitimate penological interests advanced by prison officials for taking the challenged action against the resulting burden upon plaintiff's religious beliefs. In this instance, defendants note that the average daily cost of feeding an inmate is $2.69, while the cost of feeding an inmate participating in a religious meal plan can range from $7.82 to $9.91 per day. Moore Aff. (Dkt. No. 28–16) ¶ 8 and Exh. H. Accordingly, the financial burden of providing plaintiff with a kosher meal as opposed to making available food ordinarily provided to other inmates is not inconsequential. Turning to the burden, it appears that by plaintiff's own actions and admissions he has signaled that while he may hold sincere beliefs in the Kashrut of Judaism tenets, his beliefs do not extend to requiring him *exclusively* to eat kosher food. Under these circumstances no reasonable factfinder could conclude that by depriving him of his kosher diet for a period of thirty days plaintiff's sincerely held religious beliefs were unlawfully impinged and that legitimate penological concerns did not justify the defendants' actions. *See Tapp v. Stanley,* No. 04–CV–6400, 2008 WL 4934592, at \*7–9 (W.D.N.Y. Nov. 17, 2008). Accordingly, I recommend dismissal of plaintiff's First Amendment claim.

### 2. *RLUIPA*

The RLUIPA provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person —1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a). The familiar principles which inform the analysis of plaintiff's free exercise claim are similar to those applicable to the potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks. *See Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006). Like the First Amendment's free exercise clause, the RLUIPA prohibits governmental entities subject to its reach from imposing a substantial burden on religion even where it stems from a generally applicable law, practice, or policy.[15]

[15]  The RLUIPA, enacted by Congress under authority of the Spending Clauses of the Constitution, applies only to programs and for activities receiving federal financial assistance. *Pugh v. Goord,* 571 F.Supp.2d 477, 504 n. 11 (S.D.N.Y.2008) (citing *Marria v. Broaddus,* No. 97 Civ. 8297(NRB), 2003 WL 21782633, at \*12 (S.D.N.Y. July 31, 2003); *Fluellen v. Goord,* No. 06 Civ. 602E (HKS), 2007 WL 4560597, at \*5 (W.D.N.Y. Mar. 12, 2007)). While defendants assert that the Broome CCF does not in general receive federal funding they do not acknowledge that it has received federal funds to the extent of being reimbursed for housing federal prison inmates. In light of my determination on the merits, I find it unnecessary to address this issue. It should also be noted, as defendants have argued, that although there is not uniformity on this issue, the weight of authority appears to be that under the RLUIPA does not allow for recovery of damages against defendants, either individually or in their official capacities. *Singh v. Goord,* No.

05–Civ. 9680(SCR)(LMS), 2010 WL 1875653, at * 6 (S.D.N.Y. March 9, 2010); *Sweeper v. Taylor,* No. 906–CV–379, 2009 WL 815911, at *9 (N.D.N.Y. Mar. 27, 2009) (Mordue, C.J.); *Pugh,* 571 F.Supp.2d at 503; *but see Hankins v. New York State Dep't of Corr.,* No. 07 CV 408, 2008 WL 2019655, at *6 (N.D.N.Y. March 10, 2008) (Lowe, M.J.) (concluding in *dicta,* that by accepting federal funds New York effectively has waived its sovereign immunity thereby allowing for damages against defendants in their official capacities). In light of my determination on the merits I also find it

**\*10** To establish a violation of the RLUIPA a plaintiff must prove that prison officials, through their actions, have substantially burdened his or her religious exercise through actions not found to promote a compelling governmental interest advanced through the least restrictive means. *Pilgrim v. Artus,* No. 9:07–CV–1001 (GLS/RFT), 2010 WL 3724883, at *10 (N.D.N.Y. March 18, 2010) (Treece, M.J.). The RLUIPA places a higher burden on the defendants than does the First Amendment, which requires only a burden that is "reasonably related to legitimate penological interests". *Id.*

Despite these differences, I conclude the record in this case fails to disclose evidence from which a reasonable factfinder could find that plaintiff's religious beliefs were substantially burdened by defendants' actions and that those actions were not prompted by a compelling governmental interest advanced through the least restrictive means. Once again, plaintiff has demonstrated by his own conduct that his religious beliefs do not require him to exclusively consume kosher meals. Accordingly, by their actions the defendants did not unreasonably burden plaintiff's religious beliefs by denying him access to kosher meals for a period of thirty days based upon a determination that his religious beliefs allegedly requiring the kosher meals are not sincerely held and in light of the substantial increase in cost in providing kosher meals as compared to those given to other inmates. I therefore recommend dismissal of plaintiff's RLIUPA claims on the merits.

### 3. *Eighth Amendment*

In his complaint plaintiff alleges that by their failure to provide him with a kosher diet defendants have caused him to suffer stomach pain and discomfort in violation of his right under the Eighth Amendment to be free of cruel and unusual punishment. [16] Defendants argue that this claim, which is distinct from plaintiff's free exercise causes of action, lacks merit.

[16]      It is unclear from the record now before the court whether, while confined at the Broome CCF, plaintiff was a convicted and sentenced prisoner, or instead in pretrial confinement. If at the relevant time plaintiff had yet to be convicted and sentenced, then his food deprivation claim would be more appropriately analyzed under the Fourteenth Amendment since he would not be subject to the Eighth Amendment's prohibition against cruel and unusual punishments. *Benjamin v. Fraser,* 343 F.3d 35, 49–50 (2d Cir.2003). In addressing that claim I have nonetheless applied an Eighth Amendment analysis since there does not appear to be a material difference in the legal principles governing the provision of food to prison inmates under either provision. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009).

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement—the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. [17] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both

be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing Farmer); *Waldo,* 1998 WL 713809, at *2 (same).

17      Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. unnecessary to stake out a position regarding this complex issue.

**\*11** To establish an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of " 'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus,* No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010) (quoting *Alvarez v. County of Cumberland,* Civil No. 07–346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May,* 2010 WL 1286800, at *4 (quoting *Alvarez,* 1009 WL 750200, at *2).

The Second Circuit has recognized that the Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Couglin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *Brown v. Eagen,* No. 9:08–CV–0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (McAvoy, S.J.) (citations omitted); *Midalgo v. Bass,* No. 9:03–CV1128, 2006 WL 2795332, at * 11 (N.D.N.Y. Sept. 26 2006) (Mordue, C.J.) (citations omitted). In this instance, plaintiff has failed to allege that the food at the Broome CCF was prepared and served in a manner that endangered his health. While plaintiff may claim that he did not eat the non-kosher meals provided to him such a claim, while perhaps cognizable under the First Amendment or the RLUIPA, does not also implicate cruel and unusual punishment in violation of the Eighth Amendment, particularly since it appears plaintiff did not hesitate to consume a non-kosher meal on September 30, 2009 even knowing his replacement kosher meal would be provided, and thus the deprivation of kosher meals cannot reasonably be expected to result in plaintiff not eating. *Modlenaar v. Liberatore,* No. 07–CV–6012 CJS, 2009 WL 2179661, at * 5 (W.D.N.Y. July 22, 2009). Indeed, the plaintiff " 'has not [and cannot] provide[ ] any authority for the proposition

that denial of [kosher] food in prison would rise to the level necessary to be deemed cruel and unusual under the Eighth Amendment.' " *Perez v. Westchester Cnty. Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at * 5 (S .D.N.Y. Apr. 30, 2007) (quoting *Wesley v. Kalos,* No. 97 CIV 1598, 1997 WL 767557, at *4 (S.D.N.Y. Dec. 11, 1997)); *see also Modlenaar v. Liberatore,* No. 07–CV–6012, 2009 WL 2179661, at * 5 (W.D.N.Y.2009). I therefore recommend dismissal of plaintiff's Eighth Amendment cruel and unusual punishment claim.

### 4. *Equal Protection*

Without any specificity concerning the classifications drawn by the defendants, plaintiff asserts in his second cause of action that the suspension of his daily kosher meals represented a deprivation of equal protection. In their motions defendants seek dismissal of that claim.

**\*12** The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

Plaintiff's complaint fails to allege facts demonstrating a plausible claim of denial of equal protection. Plaintiff does not identify the classifications drawn by the defendants, nor does he assert that he was treated differently than other similarly situated inmates as a result of intentional or purposeful discrimination. Accordingly, I recommend dismissal of plaintiff's equal protection claim.

### 5. *Procedural Due Process*

In his complaint, plaintiff also purports to assert a procedural due process claim based upon the thirty-day deprivation of

kosher meals. In their motion defendants similarly challenge the legal sufficiency of this claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 901, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

As a threshold matter, a party asserting such a claim must demonstrate the deprivation of a cognizable liberty interest. *Tellier,* 280 F.3d at 80. While the provision of a kosher diet may implicate free exercise concerns under the First Amendment and the RLUIPA, it does not rise to the level of a cognizable liberty interest giving rise to the procedural safeguards guaranteed under the Fourteenth Amendment. *George v. Conway,* No. 05–CV–510A, 2009 WL 1449046, at *16 (W.D.N.Y. May 21, 2009). I therefore recommend dismissal of plaintiff's due process claim on this basis.

### 6. *Retaliation*

Finally, in the margin of his complaint, though not in the body of that claim, plaintiff's second cause of action also refers to "retaliation". Such a claim, if indeed it was intended to be set forth, is facially lacking in merit.

**\*13** When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 346–47 (N.D .N.Y.2010). In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001).

In this case, plaintiff does not allege that the suspension of his kosher meals was in response to his having engaged in activity protected under the First Amendment. Accordingly, to the extent that his complaint could be construed as asserting a retaliation claim, that claim should be dismissed.

### E. *Whether to Grant Leave to Amend*

If the recommendations contained in this report are adopted all of plaintiff's claims will be dismissed. The next issue to be addressed, then, is whether plaintiff should be afforded an opportunity to amend his complaint to assert additional facts demonstrating the existence of plausible constitutional claims.

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991) (emphasis added); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). This hold true regardless of whether dismissal comes pursuant to a Rule 12(b) dismissal motion, or instead by way of the entry of summary judgment. *See Kilgore v. Kaufman,* 374 Fed. App'x 89, 91 (2d Cir.2010) (cited in accordance with Fed. R.App. Proc. 32.1). The court must therefore determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

In this instance, having reviewed the entire record associated with the pending summary judgment motion, I conclude that plaintiff cannot assert a plausible constitutional claim under the facts disclosed in that record. Accordingly, I recommend that plaintiff not be afforded an opportunity to amend his complaint in this action. *Clarke v. Max Advisors, LLC,* 235 F.Supp.2d 130, 151 (N.D.N.Y.2002) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230 (1962)).

## IV. *SUMMARY AND RECOMMENDATION*

**\*14** Plaintiff's complaint, though succinct and addressed to a finite and modest set of facts, alleges in general terms a variety of constitutional claims against the moving defendants. Because plaintiff's complaint is bereft of facts demonstrating the existence of plausible cruel and unusual punishment, equal protection, procedural due process, and retaliation

2011 WL 1118452

claims, I recommend dismissal of those causes of action, without leave to amend. I further recommend dismissal of plaintiff's First Amendment and RLUIPA free religious exercise claims based upon a finding that no reasonable factfinder could conclude that plaintiff's sincerely held beliefs were substantially impinged by defendants' failure to provide a kosher diet for thirty days, and that the remaining penological interests associated with that deprivation were neither compelling nor substantially outweighed by the *de minimis* interference with plaintiff's religious exercise stemming from that deprivation. Accordingly, it is hereby respectfully

RECOMMENDED that the motion of defendant Mogenson to dismiss plaintiff's complaint (Dkt. No. 16) be GRANTED, and further that the motion of the remaining defendants for summary judgment dismissing plaintiff's complaint (Dkt. No. 28) also be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

ORDERED the clerk is also serve a copy of the Report and Recommendation upon the parties in accordance with this court's local

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1118452

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 867072
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Donald Mack DOVE, Plaintiff,
v.
BROOME COUNTY CORRECTIONAL FACILITY;
K. Moore, Captain; Timothy Hill, Lt.; Daniel Snyder,
Correction Officer; and C. Mogenson, Defendants.

No. 9:10–CV–02.
|
March 10, 2011.

**Attorneys and Law Firms**

Donald Mack Dove, Attica, NY.

Broome County Attorney's Office, Aaron J. Marcus, Esq., of Counsel, Binghamton, NY, for Defendants Broome County CF, Moore, Hill, and Snyder.

Lynch, Schwab, PLLC, Louis U. Gasparini, Esq., of Counsel, White Plains, NY, for Defendant Mogenson.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Donald Mack Dove, commenced this civil rights action in January 2010, pursuant to 42 U.S.C. § 1983. By Report–Recommendation dated February 17, 2011, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendant Mogenson's motion to dismiss plaintiff's complaint (Dkt. No. 16) be granted; that the remaining defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 28) also be granted; and that plaintiff's complaint be dismissed in its entirety, without leave to replead. The plaintiff has filed objections to the report-recommendation.

Based upon a de novo review of the entire file, including the portions of the Report–Recommendation to which plaintiff has objected, and the recommendations of Magistrate Judge Peebles, the Report–Recommendation is accepted and adopted in all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant C. Mogenson's motion to dismiss plaintiff's complaint (Dkt. No. 16) is GRANTED;

2. The remaining defendants' motion for summary judgment dismissing plaintiff's complaint (Dkt. No. 28) is GRANTED; and

3. Plaintiff's complaint is DISMISSED in its entirety, without leave to replead.

4. The Clerk is directed to enter judgment accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 867072

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.  1

Case 9:21-cv-00986-MAD-TWD  Document 32  Filed 08/07/23  Page 136 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Currytto v. Doe,  D.Conn.,  May 9, 2019

2018 WL 1626175
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ronald M. ACKRIDGE, Plaintiff,

v.

ARAMARK CORRECTIONAL FOOD SERVICES;
County of Westchester; Captain Roberts;
Sergeant Tosi; Chaplain Office, Defendants.

No. 16-CV-6301 (KMK)
|
Signed 03/30/2018

**Attorneys and Law Firms**

Ronald M. Ackridge, Carmel, NY, pro se.

Richard D. Lane, Esq., Marshall Dennehey Warner Coleman & Goggin, New York, NY, Counsel for Defendants Captain Roberts, Chaplain Office, Sergeant Tosi, and County of Westchester.

Joseph P. Wodarski, III, Esq., Bradley L. Wilson, Esq., Wilson Elser Moskowitz Edelman & Dicker LLP, Stamford, CT, Counsel for Defendant Aramark Correctional Services, LLC.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1**  Pro se Plaintiff Ronald M. Ackridge ("Plaintiff") brought the instant Action against the County of Westchester ("Westchester County"), Captain Roberts, the Chaplain Office, Sergeant Tosi (together, "County Defendants"), and Aramark Correctional Food Services ("Aramark," and together with County Defendants, "Defendants") alleging violations of his constitutional and state law rights for denial of kosher meals and regular Jewish services. (See Am. Compl. (Dkt. No. 27).) [1] Specifically, Plaintiff brings federal claims under 42 U.S.C. § 1983 alleging Defendants violated his First, Fifth, Eighth, and Fourteenth Amendment rights; federal claims under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§

2000cc-1, et seq.; state law claims under New York Civil Rights Law, N.Y. Civ. Rights Law § 40-c; state law claims alleging violation of Article 1 § 3 of the New York State Constitution, N.Y. Const. art. I, § 3; state law claims under the Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"), N.Y. Comp. Codes R. & Regs. Tit. 9 §§ 7009.4, 7024.6 ("N.Y.C.R.R."); and state law claims for "[h]arassment, intentional infliction of emotional and mental stress, wanton disregard and indifference in wrongfully denying Plaintiff his customary religious kosher dietary meals and wrongfully and unlawfully denying Plaintiff his rights to attend and worship with [the] fellowship of Jewish Services." (See id.) Before the Court is County Defendants' Motion To Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "County Defendants Motion"), (see Notice of Motion (Dkt. No. 43); Cty. Defs.' Mem. of Law in Supp. of Mot. To. Dismiss ("Cty. Defs.' Mem.") (Dkt. No. 44)), and Aramark's Motion To Dismiss the Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Aramark Motion"), (see Notice of Motion (Dkt. No. 45); Def. Aramark's Mem. of Law in Supp. of Mot. To. Dismiss ("Def. Aramark's Mem.") (Dkt. No. 48)). For the following reasons, the Motions are granted in part and denied in part.

[1]     Plaintiff's initial pleading named Westchester County Department of Correction as a Defendant. (See Compl. 1 (Dkt. No. 2).) Pursuant to an Order issued September 7, 2017, Westchester County was substituted for Westchester County Department of Correction. (See Dkt. No. 8).

Plaintiff also sued the "Chaplain Office." (Am. Compl. 1.) The Chaplain Office is an administrative arm of the County of Westchester. As such, it does "not have a legal identity separate and apart from the municipality, and cannot sue or be sued." Carroll v. City of Mount Vernon, 707 F. Supp. 2d 449, 450 n.2 (S.D.N.Y. 2010) (quoting Warner v. Vill. of Goshen Police Dep't, 256 F. Supp. 2d 171, 175–76 (S.D.N.Y. 2003)). Plaintiff's claims against the Chaplain Office must therefore be dismissed. In light of Plaintiff's pro se status and clear intention to assert claims against the County of Westchester, the Court construes the Complaint as asserting claims against the County of Westchester, and directs the Clerk of Court to amend the caption of this Action to replace the Chaplain Office with the County of Westchester.

2018 WL 1626175

Plaintiff also sued "Aramark Correctional Food Service." (Am. Compl.) However, Aramark points out this was in error and the proper defendant is "Aramark Correctional Services, LLC." (Def. Aramark's Mem. 1.) The Clerk of the Court is instructed to update the caption accordingly.

## I. Background

### A. Factual Background

**\*2** The following facts are drawn from the Amended Complaint and are taken as true for the purpose of resolving the instant Motions. At the time of the events described herein, Plaintiff was an inmate at Westchester County Department of Correction ("WCDOC"). (Am. Compl. ¶ 9.)

Plaintiff arrived at WCDOC on February 4, 2016, at approximately 8:27 p.m. (*Id.*) WCDOC "processed [Plaintiff] to be of the Jewish faith" and Plaintiff "filled out [a] religious diet request for [k]osher meals." (*Id.*) For 18 days, from his February 4, 2016 date of admission until dinner on February 23, 2016, Plaintiff did not receive kosher meals. (*Id.* ¶ 11.) [2] Plaintiff filed a grievance on February 22, 2016 requesting kosher meals "without further delay." (Am. Compl. Ex. D ("Feb. 22, 2016 Grievance").) On February 23, 2016, Sergeant Orness had Plaintiff approved to receive kosher meals, and a kosher meal was delivered that day. (Am. Compl. Ex. E ("Feb. 29, 2016 Grievance Response").)

[2]  Occasional words and phrases in Plaintiff's Amended Complaint are written in all capital letters or in parenthesis. Here and elsewhere, when quoting such words and phrases, this Opinion reverts to conventional capitalization for ease of readability.

According to Plaintiff, "Aramark, the Chaplain Office, and [WC]DOC systemically [sic] and routinely practice discrim[in]atory acts against Jewish inmates/detaine[e]s [by] denying Jewish detainees their request for kosher meal[s]." (*Id.* ¶ 10.) Additionally "[WC]DOC and [Westchester] County [were] well aware of the fact that Aramark has in the past, systemically [sic] denied Jewish inmates/detainees their religious [k]osher dietary meals, [b]ecause Plaintiff ha[d] on other prior occasions had to file grievances[ ] before Aramark would provide Plaintiff with his religious [k]osher dietary meals." (*Id.* ¶ 12.) [3] Plaintiff alleges that "[WC]DOC took no steps to assure that incoming Jewish

inmate/detainees receive their [k]osher dietary meals upon entry." (*Id.*) Instead, WCDOC "sys[y]temically and routinely ma[d]e Jewish detainees wait 3 to 6 weeks before providing them with [k]osher dietary meals." (*Id.*)

[3]  Plaintiff attaches various grievances and letters sent regarding these issues to the Amended Complaint. (*See* Compl. Ex. D–L.)

Plaintiff also alleges that he was denied "regular, weekly, Jewish services." (*Id.* ¶ 10.) Specifically, Plaintiff alleges he was permitted to attend only one Jewish religious service for Passover since his arrival at WCDOC on February 4, 2016, in violation of RLUIPA. (*Id.* ¶ 13.) According to Plaintiff, "[WC]DOC and [Westchester] County allow[ ] [the] Chaplain Office to disregard Jewish inmates/detainees rights to regular and/or weekly Jewish religious services." (*Id.*) Plaintiff made numerous requests and filed grievances regarding the lack of regular Jewish services. (*Id.*) Tosi denied Plaintiff's grievance, quoting § 7024.1(d) of the Minimum Standards, requiring that "equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs, except when such exercise results in facility expenditures which are unreasonable or disproportionate to those extended to other prisoners for similar purposes." (Am. Compl. Ex. G ("Apr. 9, 2016 Grievance Response") (quoting 9 N.Y.C.R.R. § 7024.1(d)).) The response noted that WCDOC "does not house enough Jewish [i]nmates to warrant separate Jewish services," and that Rabbi Horowitz was instructed "to see to Plaintiff's religious needs." (*Id.*)

**\*3** Plaintiff alleges that WCDOC, Westchester County, Aramark, and the Chaplain Office "knowingly [and] with total disregard pursued a policy and custom of deliberate indifference[ ] of the rights, needs[,] and laws of Jewish detainees/inmates ... including Plaintiff, in its procedures for supervising and assuring that Jewish inmates/detainees are provided with religious [k]osher dietary meals and religious Jewish services." (*Id.* ¶ 14.) And, WCDOC and Westchester County "failed to institute a bona fide procedure and policy in which [D]efendants investigated Aramark and [the] Chaplain Office for wrongful[ly] and unlawfully denying Jewish inmates/detainees their religious kosher dietary meals and Jewish [s]ervices." (*Id.* ¶ 15.) According to Plaintiff, Westchester County and WCDOC "act[ ] as [m]unicipal policymakers in the hiring, contracting, training[,] and supervision of [D]efendants Aramark and [the] Chaplains Office; and have pursued a policy and custom of deliberate indifference to the religious rights, laws[,] and practice[s] of Jewish detainees, including Plaintiff," and "knowingly

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 138 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

violat[ed] Plaintiff's rights to observe, practice[,] and worship his religious belief." (*Id.* ¶ 26.)

Plaintiff requests a judgment that Defendants violated his rights under federal and state law. (*Id.* 6.) Plaintiff also seeks $5,000,000 in compensatory damages and $5,000,000 in punitive damages, as well as attorney's fees and litigation expenses. (*Id.*) [4]

[4]    The Court denies Plaintiff's request for attorney's fees, because "a pro se litigant who is not a lawyer is not entitled to attorney's fees." *Kay v. Ehrler*, 499 U.S. 432, 435 (1991) (italics omitted).

    B. Procedural History

Plaintiff filed his initial Complaint on August 8, 2016 against Aramark Correctional Food Service, Westchester County Department of Correction, and Captain Roberts. (Compl. (Dkt. No. 2).) That same day, he filed a request to appear in forma pauperis, (Dkt. No. 1), which the Court granted, (Dkt. No. 5).[5] On September 7, 2016, the Court issued an Order of Service, directing service on the named Defendants. (Dkt. No. 8.) On September 13, 2016, Plaintiff sought leave to file an amended complaint. (Dkt. No. 11.) That same day, Plaintiff filed a copy of the proposed Amended Complaint and requested that the Court direct service of the proposed Amended Complaint. (Dkt. No. 12.) On September 19, 2016, Plaintiff wrote the Court asking that the Amended Complaint be accepted. (Dkt. No. 13.)

[5]    On August 16, 2016, August 30, 2016, and September 9, 2016, Plaintiff wrote the Court asking about the status of his case. (Dkt. Nos. 4, 6, 10.)

On October 14, 2016, Plaintiff filed a "Notice of Motion for Summary Judgment," (Dkt. No. 19), along with a memorandum of law, supporting exhibits, and statement of material facts, (Dkt. Nos. 20, 21). On October 19, 2016, Plaintiff filed a supplemental memorandum of law. (Dkt. No. 22.) Pursuant to a memo endorsement, on October 20, 2016, the Court denied the Motion for Summary Judgment without prejudice, as discovery had not yet been conducted, and for failure to follow the Court's individual practices before filing a motion. (Dkt. No. 23.) In response to the denial, Plaintiff wrote to the Court on October 25, 2016 asking that the case proceed. (Dkt. No. 24.) Pursuant to a memo endorsement, on October 27, 2016, the Court informed Plaintiff that a Rule 16 conference would be scheduled once service was complete. (Dkt. No. 25.)

On October 27, 2016, the Court granted Plaintiff leave to file the Amended Complaint pursuant to a Memo Endorsement. (Dkt. No. 26.) On October 31, 2016, the Amended Complained was docketed, alleging claims against Westchester County Department of Correction, Captain Roberts, the Chaplain Office, Sergeant Tosi, and Westchester County. (Dkt. No. 27.) On January 19, 2017, Plaintiff wrote the Court requesting a Rule 16 Conference and renewed his demand for summary judgment. (Dkt. No. 33.) The Court scheduled a conference for February 15, 2017. (Dkt. No. 34.) [6] County Defendants submitted a premotion letter on February 14, 2017, indicating the grounds on which County Defendants would move to dismiss. (Dkt. No. 40.) Aramark also submitted a premotion letter on February 14, 2017, indicating the grounds on which they would move to dismiss. (Dkt. No. 41.) The Court held a conference on February 15, 2017, and set a briefing schedule for the Motions to Dismiss. (Mot. Scheduling Order (Dkt. No. 42).)

[6]    On January 26, 2017, Counsel for Aramark informed the Court that Aramark had not yet been served, but that Counsel was willing to accept service on behalf of Aramark in the interest of expediting the matter. (Dkt. No. 36.)

**\*4** In accordance with the Scheduling Order, County Defendants filed their Motion To Dismiss and accompanying Memorandum of Law on March 15, 2016. (Dkt. No. 43; Cty. Defs.' Mem.) Defendant Aramark also filed their Motion to Dismiss and an accompanying Memorandum of Law, declaration, and affidavit on March 15, 2017. (Dkt. Nos. 45–47; Def. Aramark's Mem.) [7] On April 3, 2017, Plaintiff filed his Opposition to Defendants' Motions. (Pl.'s Opp. To Defs.' Mot. To Dismiss ("Pl.'s Opp.") (Dkt. No. 50).) On March 8, 2017, County Defendants and Defendant Aramark filed their respective Replies. (Cty. Defs.' Reply Mem. of Law in Supp. of Mot. To. Dismiss ("Cty. Defs.' Reply Mem.") (Dkt. No. 53); Def. Aramark's Reply Mem. of Law in Supp. of Mot. To. Dismiss ("Def Aramark's Reply Mem.") (Dkt. No. 52).) [8]

[7]    On March 24, 2017, Plaintiff filed an application requesting the Court appoint pro bono counsel. (Dkt. No. 49.) On April 26, 2017, the Court denied the request without prejudice. (Dkt. No. 51.)

[8]    On July 11, 2017 and August 3, 2017, Plaintiff wrote the Court inquiring about the status of his case and requesting that the case be heard for

2018 WL 1626175

settlement or placed on the trial calendar. (Dkt. Nos. 57–58.) The Court informed Plaintiff that the Court would decide the pending motions in due course and that settlement or trial, if necessary, would be addressed following decision on these motions. (Dkt. No. 59.)

## II. Discussion

### A. Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

(per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations...." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we ... accept all factual allegations in the complaint as true...." (alteration and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court ... draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

**\*5** Where, as here, a plaintiff proceeds pro se, the Court must "construe[ ] [his complaint] liberally and interpret[ ] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted); *see also Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217, 2013 WL 6231615, at \*12 (S.D.N.Y. Dec. 2, 2013) (same), *aff'd sub nom. Farzan v. Genesis 10*, 619 Fed.Appx. 15 (2d Cir. 2015). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at \*4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at \*4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at \*2

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 140 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

(E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[ ] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

### B. Analysis

County Defendants move to dismiss Plaintiff's Amended Complaint on several grounds: (1) that Plaintiff failed to allege that his sincerely held religious beliefs were substantially burdened as is required to state a First Amendment claim; (2) that Plaintiff failed to allege the personal involvement of Roberts and Tosi; (3) that Roberts and Tosi cannot be sued in their official capacities; (4) that Plaintiff failed to allege a violation of the Establishment Clause, Fifth Amendment, Eighth Amendment, or Fourteenth Amendment; (5) that Plaintiff failed to allege the existence of any policy or practice that caused the alleged harms under *Monell v. Department of Social Services*, 436 U.S. 658 (1978); (6) that Plaintiff's RLUIPA claim fails because RLUIPA does not provide for monetary damages; (7) that the Court should decline to exercise supplemental jurisdiction over the state law claims; (8) that Plaintiff has failed to state a claim for violation of the New York Constitution; (9) that Plaintiff's claim under the Minimum Standards §§ 7009.4 and 7024.6 fails because the Minimum Standards do not provide a private right of action; (10) that Plaintiff's claims pursuant to New York Civil Rights Law 40-c fails because prisons are not covered by the statute; (11) that Plaintiff's claim for a declaratory judgment is moot; and (12) Westchester County Department of Correction and the Chaplain Office are not entities subject to suit. (*See generally* Cty. Defs.' Mem.)

**\*6** Aramark also moves to dismiss Plaintiff's Amended Complaint on several grounds: (1) that Plaintiff failed to allege a custom or policy under which to find Aramark liable; (2) that Aramark was not acting in concert with or as a state actor and cannot be sued under § 1983; (3) that Plaintiff failed to exhaust administrative remedies as to Aramark; (4) that Plaintiff failed to allege that his sincerely religious beliefs were substantially burdened as is required to state a First Amendment claim; and (5) that Plaintiff's state law claims should be dismissed. (*See generally* Def. Aramark's Mem.)

Due to the significant overlap in the claims regarding the delay in receiving kosher meals against County Defendants and Aramark, the Court first determines whether Aramark was acting under the color of state law and can be sued under § 1983. Then, the Court addresses the claims against County Defendants and Aramark together where appropriate.

### 1. Aramark Acting Under Color of State Law

Aramark argues that Plaintiff's claims against it must be dismissed because it is not a state actor. (Def. Aramark's Mem. 7–9.)[9] To state a claim for any constitutional violation under § 1983, a plaintiff must allege that "a person acting under color of state law deprived him or her of a right secured by the Constitution or laws of the United States." *Oliveira v. Price Law Firm*, No. 14-CV-4475, 2014 WL 4088199, at \*2 (S.D.N.Y. July 30, 2014); *see also McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014) ("To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law."); *Schiff v. Suffolk Cty. Police Dep't*, No. 12-CV-1410, 2015 WL 1774704, at \*5 (E.D.N.Y. Apr. 20, 2015) (same). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes state action." *Flagg v. Yonkers Sav. & Loan Ass'n, FA*, 396 F.3d 178, 186 (2d Cir. 2005) (internal quotation marks omitted). "State action requires *both* an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, *and* that the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* (alteration and internal quotation marks omitted). Thus, in order to survive a motion to dismiss, "a plaintiff must allege he was injured by either a state actor or private party acting under the color of state law." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002).

9    The Court notes that Aramark does not cite any case law when arguing that the test for whether a private entity is a state actor has not been satisfied as to Aramark. (Def. Aramark's Mem. 8–9.) This is problematic for Aramark in light of the Court's decision in *Torres v. Aramark Food*, No. 14-CV-7498, 2015 WL 9077472 (S.D.N.Y. Dec. 16, 2015), holding that Aramark is a state actor when providing food to inmates in a state prison. *Id.* at \*4–6.

Here, Plaintiff brings suit alleging constitutional violations against Aramark, a private entity. Therefore, the Court must assess whether Plaintiff has adequately alleged that he was injured by a private party acting under color of state law. In

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 141 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)
2018 WL 1626175

the Second Circuit, there are three circumstances under which a private entity is said to act under color of state law. The Second Circuit has described these circumstances as follows:

> **\*7** For the purposes of [§] 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)). "The fundamental question that underlies each of these tests is whether the challenged actions of the private actor are 'fairly attributable' to the state." *Watson v. Grady*, No. 09-CV-3055, 2015 WL 2168189, at \*9 (S.D.N.Y. May 7, 2015) (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)). Although Plaintiff has arguably offered little in terms of facts that bear upon the question directly, the Amended Complaint nonetheless includes sufficient allegations for the Court to find the presence of state action under either the close nexus or public function tests. Specifically, Plaintiff alleges that Defendant prepared meals for WCDOC, including kosher meals. (Am. Compl. ¶¶ 9–10, 12.) [10]

[10]  Aramark includes with its Motion To Dismiss the agreement between Aramark and Westchester County to provide food services, a document that is outside the Amended Complaint. (Decl. of Joseph Wodarski, Esq. Ex. A (Dkt. No. 46).) As the agreement is not "appended to the complaint or incorporated in the complaint by reference," it is inappropriate for consideration on a motion to dismiss. *Leonard*, 199 F.3d at 107.

### a. Close Nexus Test

To satisfy a claim under the "close nexus" test, a plaintiff must allege "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (internal quotations omitted). In determining whether such a nexus exists, courts

must "analyze whether the state can be fairly held responsible for private conduct by virtue of the ties between the state and private actor." *Pagan*, 2014 WL 982876, at \*24 (internal quotation marks omitted); *see also Preston v. New York*, 223 F. Supp. 2d 452, 465 (S.D.N.Y. 2002) (same), *aff'd sub nom. Preston v. Quinn*, 87 Fed.Appx. 221 (2d Cir. 2004). Courts have found such a nexus where a private organization performs services that "flow[ ] directly from the obligations of the government entity and [are] performed under its supervision." *Pagan*, 2014 WL 982876, at \*25; *see also West v. Atkins*, 487 U.S. 42, 54–55 (1988) (finding state action where a physician provided medical services to inmates pursuant to a contract with the state); *Wilson v. Phoenix House*, No. 10-CV-7364, 2011 WL 3273179, at \*3 (S.D.N.Y. Aug. 1, 2011) (concluding that the defendant in-patient substance abuse treatment center was state actor under the close nexus test). Perhaps unsurprisingly, a number of courts have found that, where Aramark contracts with a prison to provide food to inmates, a sufficiently close nexus exists. *See, e.g., Torres*, 2015 WL 9077472, at \*4–6 (finding close nexus satisfied for First Amendment claims regarding Aramark's provision of Ramadan meals); *Best v. Aramark Corr. Servs., LLC*, No. 14-CV-243, 2014 WL 4980553, at \*3 (S.D. Ind. Oct. 6, 2014) (applying close nexus test in context of the plaintiff's claim that Aramark "failed to provide him with constitutionally adequate meals" and concluding that it "[could not] hold that Aramark is not a state actor in these circumstances subject to liability under § 1983"); *Pagan*, 2014 WL 982876, at \*24 ("[T]here is a sufficiently close nexus between the County ... and Aramark's actions such that the conduct of Aramark is attributable to the state itself."); *Jubeh v. Dart*, No. 11-CV-3873, 2011 WL 6010267, at \*2 (N.D. Ill. Nov. 29, 2011) ("Aramark has voluntarily assumed the function of providing nutritionally adequate food to inmates and may be subject to [§] 1983 liability if its conduct violated the inmate's constitutional right to adequate food."); *Jones v. Aramark Food Servs.*, No. 11-CV-15, 2011 WL 3203524, at \*5 n.3 (D. N.J. July 27, 2011) (describing the close nexus test and concluding that "[t]he [c]omplaint appears to allege facts that Aramark ... may have been acting under color of state law, as required to state a § 1983 claim"); *but see James v. Correct Care Solutions*, No. 13-CV-19, 2013 WL 5730176, at \*8–9 (S.D.N.Y. Oct. 21, 2013) (concluding Aramark was not a state actor where employed to provide food services at Westchester County Jail).

**\*8** Here, a sufficiently close nexus exists because it would be fair to hold the state responsible for the private conduct at issue by virtue of the ties between the WCDOC and Aramark.

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

*See Torres*, 2015 WL 9077472, at \*4–6; *Pagan*, 2014 WL 982876, at \*25. Aramark, apparently acting pursuant to a contract, prepared the kosher and non-kosher meals for the WCDOC. (*See* Am. Compl. ¶¶ 9–10, 12.) Moreover, jail personnel allegedly were prepared to field Plaintiff's complaints about the food. (*See* Jan. 29, 2016 Grievance Response.) Consequently, because the arrangement between the jail and Aramark allowed the jail, in effect, to shift one of its obligations to Aramark, the Court finds that the nexus between the two is sufficient to plausibly impute state action to Aramark.

### b. Public Function Test

Even if state action could not be found under the close nexus test, it would nonetheless exist due to the public function test. Under that test, the conduct of an otherwise private party will be treated as state action if it is "so clearly governmental in nature as to amount to a public function." *Jordan v. Fed. Bureau of Prisons*, No. 09-CV-8561, 2013 WL 1143617, at \*12 (S.D.N.Y. Mar. 19, 2013) (internal quotation marks omitted). "The mere fact that a private actor is paid by state funds, or is hired by a state actor, is insufficient to establish state action" under the public function test. *Emanuel v. Griffin*, No. 13-CV-1806, 2013 WL 5477505, at \*5 (S.D.N.Y. Oct. 2, 2013). "The public function test as applied is quite stringent and under the doctrine an extraordinarily low number of ... functions have been held to be ... public." *Doe v. Harrison*, 254 F. Supp. 2d 338, 343 (S.D.N.Y. 2003) (internal quotation marks omitted). Nevertheless, a number of courts to have considered the question have concluded that "[p]roviding food service ... to ... incarcerated people is one part of the government function of incarceration," thus rendering food service providers state actors for purpose of § 1983 analysis. *McCullum v. City of Phila.*, No. 98-CV-5858, 1999 WL 493696, at \*3 (E.D. Pa. July 13, 1999); *see also Sutton v. City of Phila.*, 21 F. Supp. 3d 474, 482 (E.D. Pa. 2014) (same); *Pagan*, 2014 WL 982876, at \*24 (same). Indeed, many—although not all—courts to have considered the question have concluded that Aramark, when it feeds prisoners, is a state actor under the public function test. *See, e.g.*, *Torres*, 2015 WL 9077472, at \*6 (finding public function satisfied for First Amendment claims regarding Aramark's provision of Ramadan meals); *Pagan*, 2014 WL 982876, at \*24 ("Aramark is serving a public function in providing daily meals to inmates."); *Smego v. Aramark Food Servs. Corp.*, No. 10-CV-3334, 2013 WL 1987262, at \*6 (C.D. Ill. May 13, 2013) ("The Aramark [d]efendants are state

actors because they have voluntarily assumed the obligation to fulfill an essential state function: feeding detainees in a state facility."); *Jubeh*, 2011 WL 6010267, at \*2 (finding that a county "has a duty to provide nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to detainees' health and well being," and concluding Aramark was a state actor where that duty was outsourced to it (alterations and internal quotation marks omitted)); *but see James*, 2013 WL 5730176, at \*9 (noting the public function test but concluding that the complaint offered no basis to treat Aramark as a state actor).

Because providing food to inmates is a public function, *see Torres*, 2015 WL 9077472, at \*6; *Pagan*, 2014 WL 982876, at \*24, and because Plaintiff's Amended Complaint relates to the meals that Aramark, acting as the state's culinary surrogate, provided to the prisoners, (*see* Am. Compl. ¶¶ 9–10, 12), the Court concludes that Plaintiff has plausibly alleged that Aramark is a state actor for purposes of this case.

### 2. PLRA Exhaustion as to Aramark

**\*9** Aramark argues that Plaintiff failed to exhaust administrative remedies with respect to Aramark pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), (Def. Aramark's Mem. 9–10), which provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement applies to all personal incidents while in prison, *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (holding exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes"); *see also Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012) (same), including actions for monetary damages despite the fact that monetary damages are not available as an administrative remedy, *Booth v. Churner*, 532 U.S. 731, 741 (2001) (holding exhaustion is required "regardless of the relief offered through administrative procedures"). Moreover, the PLRA mandates " 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly,' ... [which] entails ... 'completing the administrative review process in accordance with the applicable procedural rules.' " *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (alteration omitted) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88, 90 (2006)); *see also Jones v. Bock*, 549 U.S. 199, 211 (2007) ("There is no question that exhaustion is mandatory

2018 WL 1626175

under the PLRA and that unexhausted claims cannot be brought in court.").

The PLRA does, however, "contain[ ] its own, textual exception to mandatory exhaustion." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently explained:

> Under § 1997e(a), the exhaustion requirement hinges on the "availab[ility]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones. And that limitation on an inmate's duty to exhaust ... has real content.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

*Id.* at 1858–59 (quoting *Booth*, 532 U.S. at 737–38).

There are "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* at 1859. First, an "administrative procedure is unavailable when ... it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. These three circumstances "do not appear to be exhaustive," *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), but they do "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

A plaintiff need not plead that one of these three circumstances exists or that he did in fact exhaust her administrative remedies, because the "[f]ailure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement." *Williams*, 829 F.3d at 122. Defendants bear the burden of proving that Plaintiff failed to exhaust any available administrative remedies. *See McCoy v. Goord*, 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003) ("[The] defendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity."); *see also Williams*, 829 F.3d at 122 ("[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." (internal quotation marks omitted)). Thus, a

motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted only if "nonexhaustion is clear from the face of the complaint." *Lovick v. Schriro*, No. 12-CV-7419, 2014 WL 3778184, at *4 (S.D.N.Y. July 25, 2014) (alterations and internal quotation marks omitted); *see also Lee v. O'Harer*, No. 13-CV-1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014) ("Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents."); *Sloane v. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) ("[B]y characterizing non-exhaustion as an affirmative defense, the Second Circuit suggests that the issue of exhaustion is generally not amenable to resolution by way of a motion to dismiss." (internal quotation marks omitted)).

**\*10** While Aramark is correct that Plaintiff does not allege he commenced administrative remedies with respect to Aramark and that none of the grievances Plaintiff attached to his Amended Complaint references Aramark, at the motion to dismiss stage, Plaintiff "need not plead exhaustion with particularity." *McCoy v*, 255 F. Supp. 2d at 248. Aramark has not met its burden of proof in demonstrating that Plaintiff failed to exhaust his administrative remedies merely by pointing to a lack of allegations of exhaustion or a lack of exhibits demonstrating exhaustion in the Amended Complaint. Accordingly, because non-exhaustion is not "clear from the face of the [Amended C]omplaint," *Lovick*, 2014 WL 3778184, at *4 (internal quotation marks omitted), the Court declines to grant Aramark's Motion on this ground.

### 3. *Monell* Claims

Westchester County and Aramark argue that the Amended Complaint should be dismissed for failure to allege a municipal policy, custom, or practice that caused the alleged constitutional violations. (Cty. Defs.' Mem. 15; Def. Aramark's Mem. 5–7.)

#### a. Standard of Review

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of

2018 WL 1626175

law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008). The fifth element reflects the notion that a *Monell* defendant "may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted).

Although, as discussed above, a private actor like Aramark may be treated as a state actor for purposes of a claim brought pursuant to § 1983, "[p]rivate employers are not liable under § 1983 for the constitutional torts of their employees unless the plaintiff proves that action pursuant to official policy of some nature caused a constitutional tort." *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (alterations, citations, and internal quotation marks omitted); *Mora v. Camden County*, No. 09-CV-4183, 2010 WL 2560680, at *10 (D. N.J. June 21, 2010) ("[I]n order for an entity such as Aramark to be liable under § 1983, [the p]laintiffs must show that the entity had a relevant policy or custom, and that the policy caused the constitutional violation"); *cf. Salvatierra v. Connolly*, No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing claim against municipal agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *adopted by* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011); *Arnold v. Westchester Cty.*, No. 09-CV-3727, 2010 WL 3397375, at *9 (S.D.N.Y. Apr. 16, 2010) (dismissing claim against the county because the complaint did "not allege the existence of an unconstitutional custom or policy"), *adopted sub nom. Arnold v. Westchester Cty. Dep't of Corr.*, 2010 WL 3397372 (S.D.N.Y. Aug. 25, 2010). In determining whether a private employer may be liable in a § 1983 claim, courts are guided by the principles articulated in *Monell* and its progeny. *See Rojas*, 924 F.2d at 409 ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses."); *see also Gitter v. Target Corp.*, No. 14-CV-4460, 2015 WL 5710454, at *3 n.4 (S.D.N.Y. Sept. 29, 2015) ("The Second Circuit has extended *Monell*'s rationale to private businesses"); *Dilworth v. Goldberg*, No. 10-CV-2224, 2011 WL 3501869, at *24 (S.D.N.Y. July 28, 2011) ("[C]ase law has extended the

*Monell* doctrine to private § 1983 defendants acting under color of state law." (alterations and internal quotation marks omitted)), *adopted by* 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011).

**\*11** A plaintiff may satisfy *Monell's* "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (citations omitted); *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (describing methods of establishing *Monell* liability); *see also Ryan v. Cty. of Nassau*, No. 12-CV-5343, 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018) ("In order for a municipality ... to be liable for deliberate indifference to medical needs under *Monell* ... the plaintiff must show that the action that caused the constitutional violation was undertaken pursuant to an official policy." (citation and internal quotation marks omitted)). Moreover, a plaintiff also must establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See City of Okla. v. Tuttle*, 471 U.S. 808, 824 n. 8 (1985) ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a *constitutional* violation. There must be at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue."); *Simms v. City of N.Y.*, 480 Fed.Appx. 627, 629 (2d Cir. 2012) (the plaintiff

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 145 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

"must 'demonstrate that, through its deliberate conduct, the [entity] itself was the moving force behind the alleged injury.' " (internal quotation marks and alteration omitted)). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271 (S.D.N.Y. 2008); *see also Tuttle*, 471 U.S. at 823–24 ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." (plurality opinion)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

At this stage, of course, Plaintiff need not prove these elements, but he must still plead them sufficiently to make out a plausible claim for relief. Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, *see Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), a complaint does not "suffice if it tenders naked assertion[s] devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (alteration in original) (internal quotation marks omitted). Thus, to survive the Motions, Plaintiff cannot merely allege the existence of a policy or custom but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

### b. Claims Against Westchester County

**\*12** Westchester County argues that the Amended Complaint should be dismissed for failure to allege a municipal policy, custom, or practice that caused the alleged constitutional violations. (Cty. Defs.' Mem. 15.) The Court agrees.

### 1. Delay in Receiving Kosher Meals

Plaintiff has failed to plausibly allege that the delay in receiving kosher meals was the result of a policy, custom, or practice that violated Plaintiff's Free Exercise rights.

There are at least two circumstances that courts have expressly identified as constituting a municipal policy: "where there is an officially promulgated policy as that term is generally understood," and "where a single act is taken by a municipal employee who, as a matter of [s]tate law, has final policymaking authority in the area in which the action was taken." *Newton*, 566 F. Supp. 2d at 271. "A municipal 'custom,' on the other hand, need not receive formal approval by the appropriate decisionmaker," *id.*, but "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law," *Kucharczyk v. Westchester County*, 95 F. Supp. 3d 529, 539 (S.D.N.Y. 2015) (internal quotation marks omitted). "To prevail on this theory of municipal liability, ... a plaintiff must prove that the custom at issue is permanent and well-settled," *Tieman*, 2015 WL 1379652, at \*16, which is to say, that it is "a longstanding practice or custom which constitutes the standard operating procedure of the local government entity," *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (internal quotation marks omitted). "Widespread means that [the unconstitutional acts in question] are common or prevalent throughout the [municipality]; well-settled means that the [unconstitutional acts in question] have achieved permanent, or close to permanent, status." *Davis v. City of New York*, 228 F. Supp. 2d 327, 346 (S.D.N.Y. 2002).

Here, Plaintiff alleges Westchester County "pursued a policy and custom of deliberate indifferences of the rights, needs[,] and laws of Jewish detainees/inmates." (Am. Compl. ¶ 14; *see also* ¶ 26 (same).) Plaintiff also alleges that WCDOC "systemically [sic] and routinely ... den[ies] Jewish detainees their request[s] for kosher meal[s]," (Am. Compl. ¶ 10), and "sys[ ]temically and routinely make[s] Jewish detainees wait 3 to 6 weeks before providing them with [k]osher dietary meals," (*id.* ¶ 12.) Additionally, Plaintiff asserts that the "procedures for supervising and assuring that Jewish inmates/detainees are provided with religious [k]osher dietary meals" is insufficient, (*id.* ¶ 14), and WCDOC "took no steps to assure that incoming Jewish inmates/detainees receiv[d] their [k]osher dietary meals upon entry," (*id.* ¶ 12.) Finally, Plaintiff alleges that Westchester County "was well aware of the fact that Aramark ... denied Jewish inmates/detainees" and took no "steps to prevent Aramark from deny[ing] giving Jewish inmates/detainees their [k]osher dietary meals, in a timely fashion, upon entry into [WC]DOC." (*Id.*)

Plaintiff neither cites nor describes any official municipal policy or practice, nor does he allege that any individual had official policymaking authority and took action pursuant

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

to that authority. Additionally, the Complaint is devoid of *any* facts that support the existence of a tacit, widespread custom sufficient to sustain a claim for relief under *Monell*. "Conclusory allegations that there was such a policy or custom, without identifying or alleging supporting facts, is insufficient to state a claim." *Maynard v. City of New York*, No. 13-CV-3412, 2013 WL 6667681, at *4 (S.D.N.Y. Dec. 17, 2013); *see also Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 124 (2d Cir. 1991) (reaffirming "that an allegation of municipal policy or custom would be insufficient if wholly conclusory"); *Guerrero v. City of New York*, No. 12-CV-2916, 2013 WL 673872, at *2 (S.D.N.Y. Feb. 25, 2013) ("At the pleading stage, the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." (alteration and internal quotation marks omitted)); *5 Borough Pawn, LLC v. City of New York*, 640 F. Supp. 2d 268, 300 (S.D.N.Y. 2009) (dismissing a *Monell* claim where the "plaintiffs fail[ed] to allege any facts showing that there is a [c]ity policy—unspoken or otherwise—that violates the Federal Constitution"); *cf. Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (holding that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").

**\*13** Aside from the eighteen days Plaintiff personally experienced without kosher food, (Am. Compl. ¶ 11), the Complaint fails to allege specific facts regarding Jewish inmates being denied kosher meals. While the Complaint "details an incident that Plaintiff finds objectionable, it does not plead the existence of a municipal policy or custom." *Vasquez v. Vill. of Haverstraw*, No. 15-CV-8845, 2017 WL 4296701, at *6 (S.D.N.Y. Sept. 26, 2017); *see also Pittman v. City of New York*, No. 14-CV-4140, 2014 WL 7399308, at *7 (E.D.N.Y. Dec. 30, 2014) ("A *Monell* claim cannot go forward based on conclusory claims regarding a single incident without more evidence that connects th[e] incident to a municipal policy or practice."); *Gordon v. City of New York*, No. 10-CV-5148, 2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case") Accordingly, Plaintiff's claims against Westchester County alleging a policy or custom of denying kosher meals are dismissed.

#### 2. Lack of Regular Jewish Services

Plaintiff has also failed to plausibly allege that the lack of regular Jewish services was the result of a policy, custom, or practice that violated Plaintiff's Free Exercise rights. (*See* Compl. ¶¶ 10, 13–15.) Plaintiff alleges that the decision not to hold regular Jewish services, as outlined in the April 9, 2016 response to his grievance, (April 9, 2016 Grievance Response), was unconstitutional, (Am. Compl. ¶ 10), and that Westchester County has "allow[ed the] Chaplain Office to disregard Jewish inmates/detainees[s] right to regular and/or weekly Jewish religious services," (*id.* ¶ 13). According to Plaintiff, Westchester County did not prevent the Chaplain Office from "wrongful[ly] and unlawfully denying Jewish inmates/detainees ... regular Jewish services." (*Id.* ¶ 15.) A municipality may be subject to § 1983 liability for acts of its officials "who have final policymaking authority" in the area in which the action was taken. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (internal quotation marks omitted). However, Plaintiff fails to allege who made the decision to not hold regular Jewish services. Sergeant Tosi responded to Plaintiff's grievance, but Plaintiff does not suggest he was "a municipal employee who, as a matter of State law, has final policymaking authority in the area in which the action was taken." *Newton*, 566 F. Supp. 2d at 271. And, to the extent the "Chaplain Office" was responsible for the decision, Plaintiff fails to allege the Chaplain Office is considered a policymaker under state law or to identify an individual in the Chaplain Office with policymaking authority that was responsible for the decision. *See Pignone v. Vill. of Pelham Manor*, No. 10-CV-2589, 2014 WL 929805, at *4 (S.D.N.Y. Mar. 6, 2014) (noting that "[a] plaintiff bears the burden of establishing an official's status as a final policymaker with proof of the official's scope of employment and his role within the municipal or corporate organization"). Accordingly, Plaintiff's claims against Westchester County alleging a policy or custom of not holding regular Jewish services are dismissed.

#### c. Claims Against Aramark

Apart from Aramark's arguments that it is not acting in concert with a state actor or a state actor such that *Monell* does not apply to its actions, (*see* Def. Aramark's Mem. 7–9), Aramark further argues that Plaintiff has failed to allege a causal link between the alleged § 1983 violation and an alleged Aramark

2018 WL 1626175

policy or custom sufficient to support a *Monell* claim, (*see id.* at 5–6).

The Amended Complaint asserts that Aramark "systemically [sic] and routinely practices discrim[in]atory acts against Jewish inmates/detaine[e]s in denying Jewish detainees their request[s] for kosher meal[s]," (Am. Compl. ¶ 10), and that "Aramark has in the past, systemically [sic] denied Jewish inmates/detainees their religious [k]osher dietary meals[,] [b]ecause ... Plaintiff ha[d] on other prior occasions had to file grievances, before Aramark would provide Plaintiff with his religious kosher dietary maels [sic]." (*Id.* ¶ 12.) Plaintiff does not allege the existence of an Aramark policy or custom under any of the prongs identified in *Brandon,* 705 F. Supp. 2d at 276–77. In fact, the Amended Complaint indicates that WCDOC was responsible for Plaintiff's intake and religious registration process and that WCDOC policy determines what meals prisoners were served based on the information provided at registration. (Am. Compl. ¶ 9.) The Amended Complaint makes no allegation that Aramark was involved in ensuring Plaintiff was registered to receive the religious dietary accommodations he was constitutionally due or had any independent ability to give Plaintiff kosher meals if the prison has not yet approved him to receive them. Additionally, Plaintiff does not allege that Aramark even knew about Plaintiff's religious dietary restrictions and nonetheless failed to serve him kosher meals. These allegations are insufficient to allege that an Aramark policy was "the 'moving force' behind a constitutional violation." Accordingly, Aramark's Motion is granted as to the § 1983 claims.

### 4. Personal Involvement of Tosi and Roberts [11]

[11]   Plaintiff sues Roberts and Tosi in their official and individual capacities. Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself. *See Hafer v. Melo,* 502 U.S. 21, 25 (1991) (claim against a municipal employee in his official capacity is deemed brought against the municipality itself). "[W]hen the defendant ... [is an] individual sued in his official capacity ... the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." *Patterson v. Cty. of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir. 2004). The Court addressed

Westchester County's *Monell* liability above. *See supra* Part II.B.3.b.

**\*14**  Tosi and Roberts argue that the Amended Complaint should be dismissed against them because they were not personally involved in the alleged Constitutional violations. (Cty. Defs.' Mem. 8–9.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted). In other words, "because vicarious liability is inapplicable to ...§ 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. Therefore, Plaintiff must plausibly allege conduct by Roberts and Tosi that falls into one of the five categories identified above. *See Lebron v. Mrzyglod,* No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017) (holding that the five categories "still control[ ] with respect to claims that do not require a showing of discriminatory intent" post-*Iqbal*).

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 148 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

### a. Roberts

Plaintiff has failed to plausibly allege Roberts' personal involvement in the alleged constitutional deprivations. The gravamen of the claims against Roberts is that he "denied Plaintiff's grievance about his failure to receive kosher meals for eighteen days." (Am. Compl. ¶ 16(e) (citing Feb. 29, 2016 Grievance Response.)) In reality, Roberts responded to Plaintiff's request on February 22, 2016 for a written decision regarding Plaintiff's grievance filed on February 15, 2016. ("Feb. 22, 2016 Grievance"). The written response stated that "[o]n February 23, 2016 Sgt. Omess contacted Father Paul Tolve [ ("Father Tolve") ] and had it approved for you to receive a kosher meal which was delivered later that day and continues to be delivered on a daily basis." (Feb. 29, 2016 Grievance Response.) Accordingly, because Plaintiff was approved for kosher meals and continued to receive kosher meals, the grievance was "accepted" and the "complaint rectified." (Id.) Thus, Plaintiff could not appeal the decision and the matter was deemed completed. (Id.) The Amended Complaint contains no allegations whatsoever that Roberts was involved in or somehow permitted Plaintiff to be denied kosher meals prior to his grievance being rectified, or that he even knew Plaintiff was denied kosher meals. To the extent Roberts was even informed of the violation through the February 15, 2016 grievance, Roberts did not "fail[ ] to remedy the wrong," *Grullon*, 720 F.3d at 139 (internal quotation marks omitted),—rather, the February 22, 2016 grievance response indicates the wrong was remedied.

**\*15** Moreover, Roberts cannot be held personally liable for constitutional violations by others in WCDOC merely "because he was in a high position of authority in the prison system." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (affirming summary judgment ruling in favor of the Commissioner of the New York Department of Correctional Services); *see also Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (explaining that "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority" (alteration and internal quotation marks omitted)). "Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." *Fortunato v. Bernstein*, No. 12-CV-1630, 2015 WL 5813376, at \*6 (S.D.N.Y. Sept. 1, 2015) (internal quotation marks omitted). Personal involvement "requires a showing of more than the linkage in the prison chain of command." *Ayers*

*v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (same).

Additionally, the Amended Complaint lacks any allegation that Roberts failed to intervene in the denial of kosher meals by failing to remedy a known wrong or "exhibit[ing] deliberate indifference" to Plaintiff's rights "by failing to act on information indicating that unconstitutional acts were occurring." *Grullon*, 720 F.3d at 139 (italics and internal quotation marks omitted). Nor does Plaintiff allege that Roberts personally was aware that WCDOC had a history of denying inmates kosher meals, such that the Court could reasonably infer that Roberts knew Plaintiff would be denied kosher meals. *See id.* at 139 (listing as categories of personal involvement when a defendant allows "a policy or custom" of unconstitutional practices to continue or when he "was grossly negligent in supervising subordinates who committed the wrongful acts") (internal quotation marks omitted). The Court therefore grants Roberts' Motion to Dismiss for lack of personal involvement.

### b. Tosi

Plaintiff has plausibly alleged Tosi's personal involvement in the alleged constitutional deprivations. The gravamen of the claims against Tosi is that Tosi denied Plaintiff's grievance seeking separate Jewish services. (Am. Compl. ¶ 16(f) (citing Apr. 9, 2016 Grievance Response).) Relying on Minimum Standard § 7024.1(d), which provides that "equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs, except when such exercise results in facility expenditures which are unreasonable or disproportionate to those extended to other prisoners for similar purpose," Tosi's grievance response states that "[t]he Westchester County Department of Correction does not house enough Jewish Inmates to warrant a separate Jewish service. The director of Pastoral Care Father Paul Tolve is aware of your issue and has instructed Rabbi Horowitz to see to your religious needs." (Apr. 9, 2016 Grievance Response).

The Second Circuit noted in dictum some years ago that it is "questionable whether an adjudicator's rejection of an administrative grievance would make him liable for the conduct complained of." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). Since then, "courts in t[he Second] Circuit are divided regarding whether review and denial of a grievance constitutes personal involvement in the underlying alleged unconstitutional act." *Burton v. Lynch*, 664 F. Supp.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 149 of 380

*Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)*

2018 WL 1626175

2d 349, 360 (S.D.N.Y. 2009); *see also Thomas v. Calero,* 824 F. Supp. 2d 488, 507–08 (S.D.N.Y. 2011) (discussion division and collecting cases); *Garcia v. Watts,* No. 08-CV-7778, 2009 WL 2777085, at *15–16 (S.D.N.Y. Sept. 1, 2009) (same). [12] Other courts have typically considered three factors to determine whether a prison official was personally involved based on the denial of a grievance:

> **\*16** The first factor was the distinction between simply affirming the denial of a grievance and review[ing] and respond[ing] to a prisoner's complaint by undertaking some kind of investigation ... Second, some courts drew a distinction between a *pro forma* denial of a grievance and a detailed and specific response to a grievance's allegations. Finally, some courts looked to whether the alleged constitutional violation complained of in a grievance [was] ongoing ... such that the supervisory official who reviews the grievance can remedy [it] directly, finding personal involvement only in cases dealing with ongoing violations.

*Thomas,* 824 F. Supp. 2d at 507 (internal quotation marks and citations omitted).

[12]   Oddly, County Defendants rely on *Joseph v. Fischer,* No. 08-CV-2824, 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009) (holding after "*Iqbal,* a government official's act of affirming the denial of a grievance that alleges the deprivation of a constitutional right, without more, is insufficient to establish that the defendant was personally involved in depriving plaintiff of that right"), without even acknowledging the clear divide among the district courts in the Second Circuit on this question.

Here, Plaintiff has sufficiently alleged an "ongoing" constitutional violation regarding his lack of access to regular Jewish services at the time he filed the grievances. *See infra* Part II.B.5. And, Tosi, as the supervisory official who reviewed the grievance, could have remedied it directly.

*Thomas,* 824 F. Supp. 2d at 507; *see also Young v. Choinski,* 15 F. Supp. 3d 172, 192 (D. Conn. 2014) (noting that "if the supervisory official is confronted with an ongoing constitutional violation and reviews a grievance or appeal regarding that violation, that official is "personally involved" if he or she can remedy the violation directly" (internal quotation marks omitted)); *Phillip v. Schriro,* No. 12-CV-8349, 2014 WL 4184816, at *5 (S.D.N.Y. Aug. 22, 2014) (contact from grievance committee to wardens regarding repeated denial of attendance at religious services sufficiently alleged ongoing violation defendant could remedy); *cf. Burton v. Lynch,* 664 F. Supp. 2d 349, 363 (S.D.N.Y. 2009) (finding no ongoing violation for grievance regarding alleged beating that "relates to a past harm which has ceased"). Thus, the Court cannot say that Plaintiff's claim against Tosi fails as a matter of law. The Court therefore denies Tosi's Motion to Dismiss for lack of personal involvement.

### 5. Free Exercise Claims [13]

[13]   Because the Court has dismissed Westchester County, Aramark, and Roberts, the only Defendants alleged to be responsible for the lack of Kosher meals, the Court only addresses the Free Exercise claim regarding the lack of Jewish services.

#### a. Standard of Review

Defendants argue that the Amended Complaint fails to state a Free Exercise claim under the First Amendment. (Cty. Defs.' Mem. 4–9; Def. Aramark's Mem. 10–11.) The Free Exercise Clause of the First Amendment is an "unflinching pledge to allow our citizenry to explore ... religious beliefs in accordance with the dictates of their conscience." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003), which includes "a constitutional right to participate in congregate religious services," *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir. 1993) (citing *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.), *cert. denied,* 492 U.S. 909 (1989)); *see also Pugh v. Goord,* 571 F. Supp. 2d 477, 511 (S.D.N.Y. 2008) (finding that prisoners "are entitled to a reasonable opportunity to worship").

2018 WL 1626175

**\*17**  A prisoner's First Amendment rights, however, are "[b]alanced against ... the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford*, 352 F.3d at 588 (internal quotation marks omitted); *see also Benjamin v. Coughlin*, 905 F.2d 571, 579 (2d Cir. 1990) ("Prisoners have a right to receive diets consistent with their religious scruples," but "[c]ourts ... are reluctant to grant dietary requests where the cost is prohibitive, or the accommodation is administratively unfeasible." (citations and internal citations omitted)). Accordingly, a prisoner's Free Exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (internal quotation marks omitted).

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at \*9 (S.D.N.Y. Mar. 30, 2015) (internal quotation marks omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–45 (2d Cir. 2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs."). [14] "[A]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (internal quotation marks omitted). The relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir. 1996).

[14]    The Second Circuit has acknowledged that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014); *see also Williams v. Does*, 639 Fed.Appx. 55, 56 (2d Cir. 2016) ("Assuming" but not deciding "that the substantial burden requirement applies.") The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Holland*, 758 F.3d at 220. This Court has already chosen to follow the analysis in *Holland* and thus will proceed under the assumption that the substantial burden test is

still valid. *See Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at \*4 n.5 (S.D.N.Y. Feb. 2, 2017).

"[A] substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* at 477 (alterations and internal quotation marks omitted); *Gilliam*, 2017 WL 476733, at \*4 (same). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593–94. Once the plaintiff satisfies this burden, the defendants then "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (alterations and internal quotation marks omitted). The burden then shifts back to the plaintiff "to show that these articulated concerns were irrational." *Id.* (alteration and internal quotation marks omitted).

### b. Sincerely Held Beliefs

**\*18**  County Defendants argue that Plaintiff has failed to allege that his beliefs are sincerely held. (County Defs.' Mem. 6.) Rather, Plaintiff has only alleged that he was "processed" as Jewish and requested regular Jewish religious services. (*Id.*) County Defendants argue the Amended Complaint has no allegations that Plaintiff's beliefs were sincerely held. (*Id.*) While Plaintiff has not explicitly plead that his religious beliefs are "sincerely held," he has alleged that he listed his religious preference as Jewish, (Am. Compl. ¶ 9), participated in the kosher meal program when he was previously incarcerated, (Pl.'s Opp. ¶¶ 5–6), and chose not to eat the non-kosher food and "los[t] unwanted weight and fe[lt] weak and tired." (Feb. 22, 2016 Grievance.) The Second Circuit has found similar allegations sufficient to plea this element. *See Jackson v. Mann*, 196 F.3d 316, 320 (2d Cir. 1999) (finding sufficient evidence to raise a genuine issue of material fact as to sincerity of religious beliefs where Plaintiff "submitted prison documentation that: (1) listed his religious preference as Jewish; (2) showed his participation in kosher meal programs in several other correctional facilities; and (3) showed that he had actually gone without food for several days to avoid eating non-kosher food. He also submitted an affidavit from his mother, in which she stated that she had

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 151 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

raised [the plaintiff] according to the Jewish faith and dietary laws."). Construing Plaintiff's allegations liberally, the Court holds that he has sufficiently alleged that his religious beliefs are sincerely held at this stage of the proceedings to survive the Motions To Dismiss.

c. Lack of Regular Jewish Services [15]

[15]     Aramark is only responsible for providing prison meal services, and Plaintiff does not allege Aramark was in any way involved in the lack of regular Jewish services at WCDOC. (Def. Aramark's Mem. 3 n.2.) Thus, to the extent Plaintiff alleges a First Amendment Free Exercise claim against Aramark regarding the lack of regular Jewish services, that claim is dismissed.

Defendant argues that "the legitimate penological interests pertaining to cost ... justified the lack of regular Jewish services at WCDOC." (Cty. Defs.' Mem. 7.) More specifically, County Defendants point out that in response to Plaintiff's grievance, Plaintiff was informed that WCDOC does not house enough Jewish inmates to warrant a separate Jewish service, and doing so would result in a cost that is unreasonable or disproportionate to those extended to other prisoners for similar purposes. (*Id.*)

While keeping prison operating costs down may be a "legitimate governmental objective," *see, e.g., Simmons v. Robinson,* No. 07-CV-7383, 2010 WL 5538412, at *10 (S.D.N.Y. Jan. 28, 2010) ("[I]t is well established that [the state] has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups."), *adopted,* 2011 WL 31066 (S.D.N.Y. Jan. 4, 2011), the record at this point does not allow a thorough review of the other relevant factors the Court must consider in determining whether there is a penological interest that justified the burden, such as "alternative means of [receiving Jewish services]; the impact on guards, inmates, and prison resources of accommodating [regular Jewish services]; and the existence of alternative means of facilitating [regular Jewish services] that have only a de minimis adverse effect on valid penological interests," *Holland v. Goord,* 758 F.3d 215, 222–23 (2d Cir. 2014) (quoting *Salahuddin,* 467 F.3d at 274 (stating courts must consider these four factors in evaluating the legitimate penological interest)). [16] For example, based on the exhibits Plaintiff attaches to the Complaint, the instruction that Rabbi Horowitz "see to [Plaintiff's] religious needs"

does not appear to have been an adequate "alternative means of exercising the burdened right." (Apr. 9, 2016 Grievance Response.) *Id.* Plaintiff wrote to Father Tolve on March 6, 2016 stating he had still "not been advised of any Jewish Services" despite having "written to Rabbi Horowitz." (Am. Compl. Ex. H ("Mar. 6, 2016 Letter").) On March 23, 2016, Plaintiff again wrote to Father Tolve stating he had "not heard anything" about Jewish services from him or Rabbi Horowitz. (Am. Compl. Ex. I ("Mar. 23, 2016 Letter").) On March 31, 2016, Plaintiff wrote to Rabbi Horowitz stating that he had now "written to both [him] and Father Tolve concerning Jewish services" and that "[n]o one ... called [him] for, or notified [him] ... in spite of [his] many request[s] for Jewish Services." (Am. Compl. Ex. J ("Mar. 31, 2016 Letter") (emphasis omitted).) On June 6, 2016, Plaintiff again wrote Rabbi Horowitz and Father Tolve stating that in mid-April, "Father [Tolve] told Plaintiff that the Rabbi would visit [him] on Tuesdays or Thursdays," but he had "not seen the Rabbi once since [his] incarceration at WCDOCS except for one Passover ceremony." (Am. Compl. Ex. K ("June 9, 2016 Letter").) Finally, on September 9, 2016, Plaintiff filed a grievance regarding the lack of Jewish services or ability to meet with the Rabbi. (Am. Compl. Ex. L ("Sept. 9, 2016 Grievance").) Thus, based on the allegations in the Amended Complaint, County Defendants have failed to identify a legitimate penological interest that would justify dismissing Plaintiff's Free Exercise Claim. *See Washington v. Chaboty,* No. 09-CV-9199, 2011 WL 102714, at *10 (S.D.N.Y. Jan. 10, 2011) ("The Second Circuit has cautioned that evaluation of penological interests is a fact-intensive inquiry that is not ordinarily amenable to resolution on a motion to dismiss.") (citing *Shakur v. Selsky,* 391 F.3d 106, 115 (2d Cir. 2004)), *rev'd in part on other grounds sub nom. Washington v. Gonyea,* 538 Fed.Appx. 23 (2d Cir. 2013); *Salahuddin,* 993 F.2d at 309 (finding that "discovery could help determine whether use of a suitable room or the recreation yard could accommodate [the plaintiff's] right to congregate religious services and satisfy the government's security interests"). Therefore, this claim survives the Motions To Dismiss.

[16]     Courts in other circuits have dismissed Free Exercise claims alleging a lack of regular religious services for every religion. *See, e.g., Smith v. Kyler,* 295 Fed.Appx. 479, 481–82 (3d Cir. 2008) (holding that the First Amendment was not violated by a prison policy that only provided chaplains for "the largest major faith groups" and prohibited "group worship in the absence of an approved, volunteer [f]aith [g]roup [l]eader," because the prison "ha[d]

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

a legitimate interest in managing limited financial resources and in maintaining prison security," and the plaintiff "ha[d] alternative means of practicing his religion," including "maintain[ing] religious books and materials in [his] cell[ ]" and "elect[ing] to have a Personal Religious Advisor worship with [him]").

### 6. Establishment Clause Claims

**\*19** County Defendants argue the Plaintiff has failed to allege an Establishment Clause violation. (Cty. Defs.' Mem. 10.) "The Establishment Clause forbids 'excessive government entanglement with religion.' " *Rweyemamu v. Cote,* 520 F.3d 198, 208 (2d Cir. 2008) (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 613 (1971)). The Supreme Court has repeatedly made clear that "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so." *Lee v. Weisman,* 505 U.S. 577, 587 (1992) (alteration and internal quotation marks omitted). The "principle at the heart of the Establishment Clause" is that "government should never prefer one religion to another, or religion to irreligion." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 703 (1994). Here, Plaintiff has not alleged that Defendants coerced him to support or participate in a particular religion or no religion. Plaintiff also does not allege that the state established a religion in WCDOC. *See, e.g., Jackson,* 196 F.3d at 321 (dismissing Establishment Clause claim for lack of kosher meals because "it essentially restates [the plaintiff's] Free Exercise claim— that the prison officials unconstitutionally refused to provide him with a kosher diet ... This argument is more properly anchored in the Free Exercise Clause than the Establishment Clause."). The Court therefore grants County Defendants' Motion to Dismiss the Establishment Clause claim. [17]

[17]     To the extent Plaintiff alleges an Establishment Clause claim against Aramark, that claim is dismissed for the same reason.

### 7. Fifth Amendment Claims

County Defendants argue Plaintiff's Fifth Amendment claims should be dismissed, because the Fifth Amendment does not apply to claims against state actors. (Defs.' Mem. 11.) County Defendants are correct that "[t]he Fifth Amendment ...

applies only to proceedings by the Federal Government." *United States v. Ng,* 699 F.2d 63, 69 (2d Cir. 1983) (internal quotation marks omitted). Accordingly, the Court grants County Defendants' Motion to Dismiss the Fifth Amendment claims. [18]

[18]     To the extent Plaintiff alleges a Fifth Amendment claim against Aramark, that claim is dismissed for the same reason.

Were the Court to liberally construe Plaintiff's Fifth Amendment claims as a Fourth Amendment Due Process Claim, that too would fail. In *Graham v. Connor,* 490 U.S. 386 (1989), the Supreme Court held that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.' " *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (quoting *Graham,* 490 U.S. at 395); *see also Medeiros v. O'Connell,* 150 F.3d 164, 169 (2d Cir. 1998) (same). Here, Plaintiff's claims are covered by the First and Eighth Amendments. Accordingly, any Fourteenth Amendment Due Process Claim, to the extent one has been pled, is dismissed.

### 8. Eighth Amendment Claims

Defendants argue that Plaintiff has failed to state an Eighth Amendment claim for cruel or unusual punishment. [19] (Defs.' Mem. 11–13.) The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It is axiomatic that "[t]he conditions of a prisoner's confinement can give rise to an Eighth Amendment violation." *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir. 2002) (per curiam). "[T]he Eighth Amendment requires that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Little v. Mun. Corp.,* 51 F. Supp.3d 473, 489 (S.D.N.Y. 2014) (alterations and internal quotations omitted). "Although the Constitution does not require 'comfortable' prison conditions, the conditions of confinement may not 'involve the wanton and unnecessary infliction of pain.' " *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)). To state an Eighth Amendment claim relating to conditions of confinement, Plaintiff must plausibly allege "both an

2018 WL 1626175

objective element—that the prison officials' transgression was 'sufficiently serious'—and a [mens rea prong]—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or safety.' " *Phelps*, 308 F.3d at 185 (italics omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).[20]

[19]

County Defendants note that it is unclear from the Complaint whether Plaintiff was a pre-trial detainee or convicted prisoner while incarcerated at WCDOC. (Cty. Defs.' Mem. 11.) The Second Circuit recently held that deliberate indifference claims under the Due Process Clause of the Fourteenth Amendment are analyzed differently than the same claims under the Eighth Amendment. *See Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017). However, the Second Circuit limited its holding to pretrial detainees, who "have not been convicted of a crime and thus may not be punished in any manner." *Id.* at 29 (internal quotation marks omitted); *see also id.* at 33–34 (relying on the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which analyzed excessive force claims by pretrial detainees under the Fourteenth Amendment); *McCray v. Lee*, No. 16-CV-1730, 2017 WL 2275024, at *4 n.1 (S.D.N.Y. May 24, 2017) ("The status of a plaintiff as either a convicted prisoner or pretrial detainee dictates whether his conditions of confinement are analyzed under the Eighth or Fourteenth Amendment.... While the decision in *Darnell* sets forth a new analysis for claims brought by pretrial detainees, the analysis under the Eighth Amendment remains intact." (citations omitted)). Because the Court finds Plaintiff has failed to satisfy the objective prong, which is evaluated the same way under both the Eighth Amendment and Fourteenth Amendment, *Darnell*, 849 F.3d at 30, the Court need not resolve Plaintiff's status at this juncture. However, because the information is likely to become relevant at a later date, the Parties are hereby ordered to inform the Court by no later than April 30, 2018 whether Plaintiff was a convicted prisoner or a pretrial detainee at WCDOC on February 4, 2016.

[20]

In *Darnell*, the Second Circuit indicated that this prong should be referred to the "mens rea prong," rather than the "subjective prong," to prevent confusion. *See Darnell*, 849 F.3d at 29 (italics omitted).

**\*20** "To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125. "Thus, prison officials violate the Constitution when they deprive an inmate of his basic human needs such as food, clothing, medical care, and safe and sanitary living conditions." *Id.* (internal quotation marks omitted). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (alteration and internal quotation marks omitted). The Court must consider the "severity and duration, on a case-by-case basis." *Darnell*, 849 F.3d at 30. Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting that "low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation).

Plaintiff has failed to plead that the conditions he faced—both the denial of kosher meals and religious services—alone or in combination, "pose[d] an unreasonable risk of serious damage to his health." *Walker*, 717 F.3d at 125. Plaintiff chose not to eat the non-kosher meals provided to him. (Feb. 22, 2016 Grievance.) However, "[h]e has not been denied the meals by ... [D]efendants. While ... [P]laintiff's allegations regarding preparation of the meals and compliance with Jewish dietary law are relevant to concerns under the First Amendment and RLUIPA," addressed elsewhere in this opinion, "the allegations do not suggest that the meals were not nutritionally adequate or were dangerous to [P]laintiff's health." *Hayes v. Bruno*, 171 F. Supp. 3d 22, 34 (D. Conn. 2016), *reconsideration denied,* No. 14-CV-1203, 2016 WL 10545502 (D. Conn. Dec. 22, 2016); *see also Ward*, 2009 WL 102928, at *7 ("In this case, [the plaintiff] has failed to establish an Eighth Amendment claim based upon denial of kosher meals during his transport ... he has neither proven the existence of imminent danger to his health and well-being nor an actual injury ... Additionally, when [the plaintiff] brought the situation to an officer's attention, the officer ... attempted to remedy the problem." (footnote and citation omitted)). And, lack of access to religious services is not a sufficiently serious denial of a "basic human need" and did not expose Plaintiff to sufficiently serious risk of harm. *See*

2018 WL 1626175

*Walker*, 717 F.3d at 125 (describing "basic human needs" as "food, clothing, medical care, and safe and sanitary living conditions"); *see also Seymore v. Dep't of Corr. Servs.*, No. 11-CV-2254, 2014 WL 641428, at *3 (S.D.N.Y. Feb. 18, 2014) ("[T]he Second Circuit ... has explained that because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a conditions-of-confinement claim." (alteration and internal quotation marks omitted)). Thus, Plaintiff fails allege a sufficiently serious deprivation required to state an Eighth Amendment claim. *See Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *1–2 (N.D.N.Y. Sept. 30, 2015) (denial of hot, low sodium kosher meals does not violate Eighth Amendment); *see also Modlenaar v. Liberatore*, No. 07-CV-6012, 2009 WL 2179661, at *5 (W.D.N.Y. July 22, 2009) (denial of kosher food for six days does not violate the Eighth Amendment) (citing cases). Accordingly, the Court grants County Defendants' Motion to Dismiss the Eighth Amendment claims. [21]

[21]   To the extent Plaintiff alleges an Eighth Amendment claim against Aramark, that claim is dismissed for the same reasons.

### 9. Equal Protection Claims

County Defendants argue Plaintiff's Equal Protection claim should be dismissed because the Amended Complaint does not allege discriminatory intent. (Defs.' Mem. 13–15.) "The Equal Protection Clause of the Fourteenth Amendment requires that all persons similarly situated be treated in the same manner." *Allen v. Cuomo*, 100 F.3d 253, 260 (2d Cir. 1996). In other words, "the Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (internal quotation marks and emphasis omitted); *see also Bailey v. Town of Evans*, 443 F. Supp. 2d 427, 430 (W.D.N.Y. 2006) (same). To state a violation of the Equal Protection Clause, a plaintiff must allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *see also Barrow v. Van Buren*, No. 12-CV-1268, 2015 WL 417084, at *22 (N.D.N.Y. Jan. 30, 2015) (same);

*Nash v. McGinnis*, 585 F. Supp. 2d 455, 462 (W.D.N.Y. 2008) ("In order to plead a facially valid equal protection claim ... [a] plaintiff must allege: (1) that he has been treated differently from similarly-situated inmates, and (2) that the discrimination is based upon a constitutionally impermissible basis, such as race, religion, national origin, or some other protected right.").

**\*21**   Plaintiff claims that Defendants systematically discriminated against him (and other Jewish inmates) by denying him kosher meals for eighteen days and limiting the amount of Jewish services. (Am. Comp. ¶¶ 8, 11–12.) The deficiency in Plaintiff's equal protection claim is that it "does not allege that [Plaintiff] was treated differently from *any* identified individuals, let alone individuals who he claims were similarly situated to him in any respect," and "is completely devoid of any reference to 'similarly situated' or 'substantially similar' individuals." *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 434 (S.D.N.Y. 2013); *see also id.* at 433 (dismissing the plaintiff's equal protection claim under theories of selective enforcement and class of one where the plaintiff "simply" alleged that the defendants "singled out [the] plaintiff, in part, because of his exercise of constitutional rights" (internal quotation marks omitted)); *Butler v. Bridgehampton Fire Dist.*, No. 14-CV-1429, 2015 WL 1396442, at *5 (E.D.N.Y. Mar. 25, 2015) (dismissing the plaintiff's equal protection claim under the selective enforcement and class of one theories because the complaint "only discuss[ed] the harmful actions [the defendants] took with respect to [the] [p]laintiff, but there [was] no discussion whatsoever of any similarities between [the] [p]laintiff and others"). Indeed, Plaintiff does not identify any particular inmates with religious dietary needs who were treated better than Jewish inmates seeking kosher meals. And, Plaintiff does not allege that inmates of other particular religious affiliations with the same population size as Jewish inmates were provided regular or weekly religious services. *See Jackson*, 196 F.3d at 321 (dismissing claim "because [the plaintiff] presented no evidence whatsoever that he was treated differently from similarly situated members of other religions."). "The absence of comparators is fatal to this claim and, therefore, Plaintiff's equal protection claim is dismissed." *Gilliam*, 2017 WL 476733, at *8.

Additionally, Plaintiff does not sufficiently allege that the denial of kosher meals and regular Jewish services was the "result of intentional or purposeful discrimination." *Phillips*, 408 F.3d at 129. "Proof that discriminatory intent was a motivating factor is required to show a violation of the Equal

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 155 of 380

Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)

2018 WL 1626175

Protection Clause." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 438 (2d Cir. 2009). Plaintiff alleges "the Chaplain Office, and [WC]DOC systemically [sic] and routinely practice discrim[in]atory acts against Jewish inmates/detaine[e]s [by] denying Jewish detainees their request for kosher meal[s]." (Compl. ¶ 10.) This type of conclusory allegation is insufficient to state a claim. *Collins v. Sovereign Bank*, 482 F. Supp. 2d 235, 240 (D. Conn. 2007) ("Conclusory allegations of discrimination, without evidentiary support or allegations of particularized incidents and absent allegations of discriminatory intent, do not state a valid claim and so cannot withstand a motion to dismiss." (alteration and internal quotation marks omitted)). Moreover, the fact that County Defendant rectified Plaintiff's lack of kosher meals upon receiving his grievance suggests a lack of any such intent. (Feb. 29, 2016 Grievance Response.) And, Plaintiff also does not offer any factual allegations that County Defendants acted with discriminatory intent in denying him regular or weekly Jewish religious services. As is clear from responses to his grievances attached to the Amended Complaint, regular or weekly Jewish religious services were not provided because the number of Jewish inmates in WCDOC was insufficient to justify the cost of a separate Jewish services. (Apr. 9, 2016 Grievance Response.) This belies Plaintiff's claim that the dearth of Jewish religious services was the result of intentional or purposeful discrimination. Accordingly, the Court grants County Defendants' Motion to Dismiss the Fourteenth Amendment claims.[22]

[22]    To the extent Plaintiff alleges a Fourteenth Amendment claim against Aramark, that claim is dismissed for the same reasons.

### 10. RULIPA Claims

County Defendants seek dismissal of Plaintiff's allegations pursuant to RLUIPA because RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities. (*See* Cty. Defs.' Mem. 16.) RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). "RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland*, 758 F.3d at 224 (citing *Washington*, 731 F.3d at 145–46); *see*

*also Keitt v. Hawk*, No. 13-CV-850, 2015 WL 1246058, at *11 (N.D.N.Y. Jan. 8, 2015) (same). Instead, a plaintiff may only seek injunctive relief. *See Holland*, 758 F.3d at 224; *see also Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 520 (S.D.N.Y. 2010) ("It is readily apparent that injunctive relief constitutes appropriate relief under RLUIPA." (internal quotation marks omitted)). Because Plaintiff only seeks money damages under RLUIPA, this claim is dismissed.[23] *See Gilliam*, 2017 WL 476733, at *7 (dismissing claim for monetary damages under RLUIPA).[24]

[23]    To the extend Plaintiff is invoking RLUIPA to obtain injunctive relief against Defendants, it is denied for the reasons discussed below.

[24]    To the extent Plaintiff alleges a RLUIPA claim against Aramark, that claim is dismissed for the same reason.

### 11. Claims for Declaratory Relief

**\*22**  To the extent Plaintiff seeks declaratory relief, any claim for such relief is moot. (*See* Compl. 6.) Plaintiff was released from WCDOC custody sometime after the filing of the Complaint. (*See* Dkt. Nos. 14, 18, 54 (notifying the Court of Plaintiff's change of address from WCDOC).) "Where a prisoner has been *released* from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot." *Pugh*, 571 F. Supp. 2d at 489; *Salahuddin*, 467 F.3d at 272 ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility."); *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility."); *McAlpine v. Thompson*, 187 F.3d 1213, 1217–18 (10th Cir. 1999) (noting that eight other "circuit[s that have] consider[ed] the issue ha[ve] decided that release to parole moots a claim regarding prison conditions and regulations" and so holding (italics omitted)); *Pugh*, 571 F. Supp. 2d at 490 (denying injunctive and declaratory relief for former inmate's RLUIPA claims as moot).[25] Accordingly, Plaintiff's claim for injunctive and declaratory relief is moot.

[25]    As of December 26, 2017, Plaintiff appears to be incarcerated at Putnam County Correction Facility. (*See* Dkt. No. 60.) Even if Plaintiff is incarcerated, his claims regarding his time at WCDOC are

2018 WL 1626175

nonetheless still moot as he is incarcerated at a different facility. *See Salahuddin, 467 F.3d at 272* ("[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility.").

### 12. State Law Claims

Defendants contend that the Court should decline to exercise jurisdiction over the state law claims if the federal claims are dismissed, or in the alternative, that the state law claims lack merits. (*See* Cty Defs.' Mem. 17–19; Def. Aramark's Mem. 12–13.) Because the Court has not dismissed all of federal claims, the Court maintains supplemental jurisdiction over the state law claims and turns to the merits.

#### a. New York Constitutional Claims

County Defendants argue that Plaintiff's Free Exercise Claim under Article I § 3 of the New York Constitution should be dismissed on the same grounds as the First Amendment Free Exercise Claim. (Cty. Defs.' Mem. 17.) While "the issue of identicality between federal and New York State constitutional protection [is] an open one," *New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y., No. 99-CV-460, 2004 WL 1498190, at \*79* (W.D.N.Y. July 2, 2004), *aff'd sub nom.* 164 Fed.Appx. 5 (2d Cir. 2005), there is significant overlap between the two claims.

Pursuant to Article I § 3 of the New York Constitution, "[t]he free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all humankind." N.Y. Const. art. I, § 3. "This free exercise right has expressly been extended to those incarcerated in New York correctional facilities by section 610 of the Correction Law." *Rivera v. Smith*, 472 N.E.2d 1015, 1019–20 (N.Y. 1984) (citing N.Y. Correct. Law § 610). "Notwithstanding the importance of this right, it does not prevent the imposition of reasonable restrictions by prison officials, but rather such restrictions must be weighed against the institutional needs and objectives being promoted." *Id.* "The nature of a correctional facility, where confinement and order are necessary, is such that inmates cannot be afforded free exercise rights as broad as those enjoyed outside the prison setting." *Id.* Thus, in evaluating a claim under Article I § 3 of the New York Constitution, the Court must balance "the interest of the individual right of religious worship against the

interest of the State which is sought to be enforced." *People ex rel. DeMauro v. Gavin*, 706 N.E.2d 738, 739 (N.Y. 1998).

For the same reasons the Court found the allegations sufficient to state a violation of Plaintiff's Free Exercise rights for the delay in receipt of kosher meals and lack of regular Jewish religious services, the Court finds Plaintiff has alleged a violation of Article I § 3 of the New York Constitution. However, at this stage in the proceeding, for the same reasons as the federal claims, the Court cannot properly balance Plaintiffs "interests of ... religious worship against the interest of" Westchester County. *Gavin*, 706 N.E.2d at 739. What "institutional needs and objectives [are] being promoted," *Rivera, 472 N.E.2d at 1020*, by the restrictions Plaintiff complains of are open questions that can be discussed at a later date in a motion for summary judgment. Thus, County Defendants' Motion is denied as to this claim. [26]

[26]    Aramark does not argue the New York Constitutional claim against it fails on the merits or explain how the Court should evaluate Aramark's private entity statutes in regards to the claim. The Court declines to sua sponte resolve this issue without briefing, and thus, will not dismiss that claim at this time. Aramark is free to address the applicability of the New York State Constitution to claims against it as a private entity and the merits of the claim in any subsequently filed motions.

#### b. Minimum Standards §§ 7009.4 and 7024.6 Claims

**\*23** Defendants argue that Minimum Standards §§ 7009.4 and 7024.6 do not provide a private right of action. 9 N.Y.C.R.R. §§ 7009.4 & 7024.6 (Cty. Defs.' Mem. 19; Def. Aramark's Mem. 11–12.) They are right. *See generally Powlowski v. Wullich*, 479 N.Y.S.2d 89, 95 (App. Div. 1984) ("Because of the limitations on the power of the judiciary in such matters ... enforcement of [the minimum] standards is a matter for the Commission of Corrections or others in the executive branch of government and not for the courts.") (citing *Jones v. Beame*, 380 N.E.2d 277, 279 (N.Y. 1978)). Thus, the Court grants County Defendants' and Aramark's Motions to Dismiss these claims.

#### c. New York Civil Rights Law § 40-c Claims

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 157 of 380
Ackridge v. Aramark Correctional Food Services, Not Reported in Fed. Supp. (2018)
2018 WL 1626175

County Defendants argue that Plaintiff's reference to New York Civil Rights Law § 40-c fails to state a claim for relief under the statute. (Cty. Defs.' Mem. 19.) The Court agrees that jails and prisons are not defined as "places of public accommodation" or "amusement" under the statute. N.Y. Civ. Rights Law § 40. Thus, the Court grants County Defendants' Motions to Dismiss this claim. [27]

[27] To the extent Plaintiff alleges a claim pursuant to New York Civil Rights Law § 40-c against Aramark, that claim is dismissed for the same reason.

### d. Intentional Infliction of Emotional Distress Claims

Defendant Aramark argues that Plaintiff fails to state a claim for intentional infliction of emotional distress. (Def. Aramark's Mem. 11.) "The state-law tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of N.Y.*, 78 F.3d 787, 790 (2d Cir. 1996). Plaintiff has not alleged any of these elements in the Amended Complaint, and thus, the Court grants Defendant Aramark's Motions to Dismiss this claim. [28]

[28] To the extent Plaintiff alleges a claim of intentional infliction of emotional distress against County Defendants, that claim is dismissed for the same reason.

### III. Conclusion

For the foregoing reasons, as to Westchester County, the Motion to Dismiss the Amended Complaint is granted as to all the claims.

As to the claims against Roberts in his official and individual capacity, the Motion to Dismiss the Amended Complaint is granted as to all the claims.

As to the claims against Tosi in his individual capacity, the Motion to Dismiss the Amended Complaint is

granted as to the First Amendment Establishment Clause, Fifth Amendment, Eighth Amendment, and Fourteenth Amendment claims; RLUIPA claims; state law claims pursuant to Minimum Standards §§ 7009.4 and 7024.6; state law claims pursuant to New York Civil Rights Law 40-c; and state law claims for intentional infliction of emotional distress. Tosi's Motion to Dismiss the Amended Complaint is denied as to the First Amendment Free Exercise Claim.

As to the claims against Aramark, the Motion to Dismiss the Amended Complaint is granted as to the First Amendment Free Exercise Clause, First Amendment Establishment Clause, Fifth Amendment, Eighth Amendment, and Fourteenth Amendment claims; RLUIPA claims; state law claims pursuant to Minimum Standards §§ 7009.4 and 7024.6; state law claims pursuant to New York Civil Rights Law 40-c; and state law claims for intentional infliction of emotional distress. Aramark's Motion to Dismiss the Amended Complaint is denied as to the New York Constitutional claims.

However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissals are without prejudice. Should Plaintiff choose to file a Second Amended Complaint, he must do so within 30 days of this Opinion. Plaintiff should include within that Second Amended Complaint any changes to correct the deficiencies identified in this Opinion that Plaintiff wishes the Court to consider. The Second Amended Complaint will replace, not supplement, the Amended Complaint. The Second Amended Complaint must contain all of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations contained in supplemental letters, declarations, or memoranda. If Plaintiff fails to abide by the 30-day deadline, this Action may be dismissed with prejudice.

**\*24** The Clerk of the Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 43, 45.)

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1626175

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 102928
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth WARD, Plaintiff,

v.

Glenn GOORD, Commissioner; Lucien LeClaire,
Jr., Deputy Commissioner of Facility Operations;
R. Woods, Superintended, UpState Correctional
Facility; C. Gregory, Grievance Program Supervisor;
and Thomas G. Eagen, Director of Central
Office Review Committee (CORC), Defendants.

No. 9:06–CV–1429.
|
Jan. 13, 2009.

West KeySummary

1    **Prisons** 🔑 Diet and Meals

**Prisons** 🔑 Food and Drink

**Sentencing and Punishment** 🔑 Food

An inmate failed to proffer sufficient facts
alleging deprivation to his health from being
denied kosher meals while being transported and
thus was unable to maintain claim for cruel
and unusual punishment. The inmate claimed
that he was offered non-kosher, rotten, and stale
food for three days and only ate the soup at
night while he was being transferred from one
facility to another. 42 U.S.C.A. § 1983; U.S.C.A.
Const.Amend 8.

8 Cases that cite this headnote

**Attorneys and Law Firms**

Kenneth Ward, Rochester, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, James B. McGowan, Esq., Adrienne J. Kerwin,
Esq., Risa L. Viglucci, Esq., of Counsel, Albany, NY, for the
Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Kenneth Ward, brought this civil rights action
pursuant to 42 U.S.C. § 1983. By Report–Recommendation
dated December 1, 2008, the Honorable David R.
Homer, United States Magistrate Judge, recommended that
defendants' motion for summary judgment be granted as to
all claims and all defendants. No objections to the Report–
Recommendation have been filed.

Based upon a careful review of the entire file and the
recommendations of Magistrate Judge Homer, the Report–
Recommendation is accepted and adopted in all respects. *See*
28 U.S.C. 636(b) (1).

Accordingly, it is

ORDERED that

1. The defendants' motion for summary judgment is
   GRANTED;

2. The plaintiff's complaint is DISMISSED as to all claims
   and all defendants; and

3. The Clerk is directed to enter judgment accordingly and
   close the file.

IT IS SO ORDERED.

**REPORT–RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for
       report and recommendation pursuant to 28 U.S.C.
       § 636(b) and N.D.N.Y.L.R. 72.3(c).

DAVID R. HOMER, United States Magistrate Judge.

Plaintiff pro se Kenneth Ward ("Ward"), formerly an inmate
in the custody of the New York State Department of
Correctional Services ("DOCS"), brings this action pursuant
to 42 U.S.C. § 1983 alleging that defendants, five DOCS
employees, violated his constitutional rights under the First,
Eighth, and Fourteenth Amendments. Compl. (Docket No.
1). Presently pending is defendants' motion for summary

judgment pursuant to Fed.R.Civ.P. 56. Docket No. 35. Ward failed to respond to the motion. For the following reasons, it is recommended that defendants' motion be granted.

## I. Background

### A. Failure to Respond

Ward did not oppose defendants' motion.[2] "Summary judgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default." *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996). Defendants provided such notice in the attachment to their Notice of Motion here. Docket No. 35. Despite this notice, Ward failed to respond.

[2]  Defendants' motion was filed on March 26, 2008. Docket No. 35. At that time, Ward's motion to compel discovery was pending decision. *See* Docket No. 31. An order was then entered extending the deadline for Ward to respond to defendants' motion without date pending decision on his motion to compel. Docket No. 37. Ward's motion to compel was denied in an order filed August 14, 2008. Docket No. 39. That same order set September 15, 2008 as the deadline for Ward to respond to the instant motion. *Id,* Ward has filed no response.

"The fact that there has been no response to a summary judgment motion does not ... mean that the motion is to be granted automatically." *Champion,* 76 F.3d at 436. Even in the absence of a response, defendants are entitled to summary judgment only if the material facts demonstrate their entitlement to judgment as a matter of law. *Id.;* Fed.R.Civ.P. 56(c). Because Ward has not responded to raise any question of material fact, the facts as set forth in defendants' Statement Pursuant to Rule 7.1(a)(3) (statement of material facts not in dispute) (Docket No. 35–6) [hereinafter "Defs. Statement"] are accepted as true. *Adirondack Cycle & Marine, Inc. v. American Honda Motor Co.,* No. 00–CV–1619, 2002 WL 449757, at \*1 (N.D.N.Y. Mar.18, 2002) (McAvoy, J.) (citing *Lopez v. Reynolds,* 998 F.Supp. 252, 256 (W.D.N.Y.1997)).

### B. Statement of Facts

Prior to March 9, 2006, Ward was incarcerated at Gowanda Correctional Facility ("Gowanda"). Defs. Statement ¶ 7. On March 9, 2006, Ward left Gowanda in a transfer to Upstate Correctional Facility ("Upstate"). *Id.* ¶ 8. While at Gowanda, Ward received a kosher breakfast.[3] *Id.* Em route to Upstate, DOCS briefly placed Ward at Wende Correctional Facility ("Wende") in a transit area. *Id.* ¶¶ 10, 12. While there, Ward did not receive a kosher lunch. *Id.* ¶ 11. Ward was then transported to Auburn Correctional Facility ("Auburn") where he remained for the evening. *Id.* ¶¶ 12, 14. Ward was not provided a kosher dinner but was provided kosher cereal and milk for breakfast the next morning. *Id.* ¶¶ 13–14.

[3]  Ward has "been an Israelite for [twenty] years." Ward Dep. (Docket No. 35–3) at 75.

**\*2** Ward left Auburn on the morning of March 10, 2006 and arrived at Downstate Correctional Facility ("Downstate") that evening. *Id.* ¶¶ 15, 17. Ward was not provided a kosher lunch on the bus from Auburn to Downstate. *Id.* ¶ 16. Once at Downstate, Ward was placed in the Special Housing Unit ("SHU").[4] *Id.* ¶ 18. Ward was not given a kosher dinner. *Id.* ¶ 19. Ward spent the following three days at Downstate. *Id.* ¶¶ 20–27. From March 11–13, Ward "did not receive any food that he considered kosher for [breakfast,] lunch[, or dinner]." *Id.* The meals which Ward received were comprised of "hard, unwrapped bread [and] rotten vegetables," which Ward claimed were not nutritional. Compl., Ex. A at 2. The only food which he ate was the soup provided at night. Ward Dep. at 27. Ward arrived at Upstate on the morning of March 13, 2006. Defs. Statement ¶ 27. Ward did not receive a kosher lunch on the transit bus or kosher dinner upon arrival at Upstate. *Id.* ¶¶ 28, 30. On the morning of March 14, 2006, Ward received a kosher breakfast. *Id.* ¶ 31. [Ward] continued to receive kosher meals thereafter. *Id.* ¶ 32.

[4]  SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (1995). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

On March 17, 2006, Ward "filed [a] grievance ... complaining about not receiving kosher meals during his transport from Gowanda to Upstate from March 9, 2006 to March 13,

2006." *Id.* ¶ 37.[5] The grievance was investigated and denied by a decision dated March 28, 2006. *Id.* ¶¶ 38–39. The denial stated that "[t]here is no provision[ ] in the NYSDOCS transportation [sic] manual for Kosher meals to be provided to inmates on transportation buses." Compl. ¶ 10; *see also* Compl., Ex. B. The denial was appealed on April 3, 2006. Defs. Statement ¶ 40–41. Ward was transferred from Upstate on May 2, 2006. *Id.* ¶ 42. Defendant Woods, the Upstate Superintendent, affirmed the decision of the IGRC in a decision dated May 10, 2006 and that decision was automatically appealed to CORC[6] on Ward's behalf since he had recently been transferred. *Id.* ¶¶ 43–44.

[5]   "he IGP [Inmate Grievance Program] is a three-step process that requires an inmate to: (1) file a grievance with the IGRC [Inmate Grievance Resolution Committee]; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

[6]   Ward claims to have filed a notice on April 17, 2006 to appeal the IGRC's denial based upon Woods' refusal to respond timely to his appeal,. Compl. ¶ 12. Ward contends that defendant Gregory, the grievance program supervisor, failed to Ward's appeal to CORC. *Id .* ¶ 13.

On June 13, 2006, CORC received the appeal and affirmed the decision on July 12, 2006. *Id.* ¶¶ 45–46.

DOCS policy, as it existed in March 2006 required that kosher meals for inmates on approved kosher diets were to be provided by the facility from which the inmate was departing when that inmate would be in-transit at the times of the breakfast and/or lunch meals. Inmates on approved kosher diets were then to be served kosher dinners, upon request, at the facility at which they arrived. [Additionally, i]f a transport involved an overnight stay, an in-transit inmate on an approved

kosher diet, upon request, was to be served a kosher breakfast prepared by the facility at which he slept....

*Id.* ¶¶ 48–49. Even though Ward was deprived of his kosher lunches during transport, he saw other inmates receive such lunches. Ward Dep. at 22–23. This action followed.

## II. Discussion

**\*3**  In his complaint, Ward alleges that his First and Eighth Amendment rights were violated when defendants failed to provide him with kosher meals during his transport from Gowanda to Upstate. Additionally, Ward claims that his First Amendment, due process, and equal protection rights were violated by the way in which defendants handled his grievances. Defendants move for summary judgment on the grounds that (1) the Eleventh Amendment bars all claims against defendants in their official capacities, (2) there is no merit to Ward's First, Eighth, and Fourteenth Amendment claims, and (3) defendants are entitled to qualified immunity.

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. *Skubel v. Fuoroli,* 113 F.3d 330, 334 (2d Cir.1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving

party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.* 22 F.3d 1219, 1223–24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson,* 477 U.S. at 247–48.

### B. Eleventh Amendment

Ward sues the five defendants in both their individual and official capacities. Compl. at ¶ 4. Defendants first seek summary judgment on Ward's claims against them in their official capacities.

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "[D]espite the limited terms of the Eleventh Amendment, a federal court [cannot] entertain a suit brought by a citizen against his [or her] own State ." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (citing *Hans v. Louisiana,* 134 U.S. 1, 21, 10 S.Ct. 504, 33 L.Ed. 842 (1890)). Regardless of the nature of the relief sought, in the absence of the State's consent or waiver of immunity, a suit against the State or one of its agencies or departments is proscribed by the Eleventh Amendment. *Halderman,* 465 U.S. at 100. Section 1983 claims do not abrogate the Eleventh Amendment immunity of the states. *See Quern v. Jordan,* 440 U.S. 332, 340–41, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

A suit against a state official in his or her official capacity is a suit against the entity that employs the official. *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) (citing *Edelman v.*

*Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself," rendering the latter suit for money damages barred even though asserted against the individual officer. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Here, Ward seeks monetary damages against defendants in their official capacities for acts occurring within the scope of their duties with DOCS. Thus, the Eleventh Amendment bar applies and serves to prohibit Ward's claim for monetary damages against defendants in their official capacities.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### C. Personal Involvement [7]

[7]
> Defendants do not explicitly argue this point, although they do contend that there is no merit to Ward's constitutional claims as defendants had no involvement in the provision of Ward's meals during his transport. Defs. Mem. of Law (Docket No. 35–7) at 2–3. Ward has failed to name any of the corrections officers to whom he made requests for kosher meals or who were directly involved in the provision of his food during transit and at the holding facilities. Instead, Ward's allegations concern an unenforced DOCS policy. As discussed *supra,* DOCS had a policy concerning kosher meals during inmate transport. Thus, any of Ward's requests for creation of a policy are moot.

Defendants contend that Ward has failed to establish their personal involvement. " '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Id.; Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). However, supervisory personnel may be considered "personally involved" if:

(1)[T]he defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*5** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

### 1. Goord, LeClaire, and Eagen

Ward claims that there was a non-existent or dysfunctional DOCS policy concerning the provision of kosher meals to prisoners during transport. However, there was in fact a policy in place during Ward's transport to Upstate. Defs. Statement ¶¶ 48–49. Thus, to the extent that Ward asserts that a policy should have been created, those arguments fail.

Also, failing to "receive a response to a complaint ... is insufficient to establish personal involvement [especially when] there is no other showing that [defendant] knew of or directly participated in any alleged violation." *Abbas v. Senkowski,* No. 03–CV–476 (GLS/DRH), 2005 WL 2179426, at *2 (N.D.N.Y. Sept.9, 2005). Thus, the failure of any individual defendant to respond to Ward's grievances and letters, [8] without more, does not suffice to establish that they were personally involved.

[8]      In his deposition, Ward testified that he never "had any conversations or correspondence or any kind of communication with [any defendant] ...," as they have either not been approached or contacted by

Ward or have failed to respond to Ward's letters. Ward Dep. at 61–63.

Additionally, an individual defendant cannot be held liable solely because he or she held a supervisory position over other defendants. Ward does not specifically contend that defendants were directly involved or had knowledge of the alleged constitutional violations. However, even when reading the complaint in the light most favorable to Ward, any conclusory allegations of direct involvement and knowledge would still lack any factual basis. Additionally, Ward fails even to assert a conclusory allegation, that there was any negligent supervision by any defendant, the creation of a hiring or retention policy which allowed constitutional violations to continue, or gross negligence in managing subordinates.

Accordingly, defendants' motion on this ground should be granted.

### 2. Woods

Woods also contends that he "had no personal involvement in the preparing or serving of meals to the plaintiff ... and had no personal involvement in any decisions concerning what meals would be served to the plaintiff...." However, Woods did deny Ward's grievance after concurring with the IGRC determination and was the Superintendent of Upstate at the time the alleged events occurred. Woods Decl. (Docket No. 35–5) ¶¶ 1, 7, 9.

Even if Woods did personally affirm the IGRC decision, "[t]here can be ... no claim that [the superintendent] either created the policy [concerning religious meals during transport] or allowed it to continue as there is no allegation that he had the power to create or to terminate the policy." *Hatzfield v. Goord,* No. 04–CV–159, 2007 WL 700961, at *3 (N.D.N.Y. Feb. 28, 2007); *see also Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at *15–16 (S.D.N.Y. Jan.23, 2004) (dismissing similar claims against prison superintendent based on failure to allege facts indicating personal involvement).

However, even though Woods cannot be held liable solely because he held a supervisory position over other defendants, he may be held personally responsible if he negligently supervised Upstate's corrections officers in carrying out the aforementioned policy. However, other than alleging Woods's official position, Ward fails to allege or prove any facts which

2009 WL 102928

would permit the conclusion that Woods was negligent, let alone grossly so, in any way or that any such negligence contributed in any way to the failure to afford kosher meals to Ward during his transport.

**\*6** Accordingly, defendants' motion on this ground should be granted.

### 3. Gregory

Gregory contends that he had no personal involvement in the preparation or decision regarding what meals were served and to whom. However, Gregory did conduct the initial investigation report which denied Ward's grievance. Defs. Statement ¶¶ 38, 59–60. After completing the investigation, Gregory had no further involvement with the processing of subsequent appeals. *Id.* ¶ 60. Since Gregory was directly involved in authoring the original denial of Ward's grievance, and Ward claimed that his involvement "deliberately and knowingly den[ied] and violated [his] due process and equal protection ... rights by interfering with [the] Constitutional right to redress grievances and delay [his] ... access [to the appellate process]," Ward has alleged sufficient facts to raise an issue whether Gregory was personally involved in the alleged denial of due process.

Accordingly, defendants' motion on this ground should be denied.

### D. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[ ], privilege[ ], or immunit[y] secured by the Constitution" or laws of the federal government. 42 U.S.C. § 1983. Thus, no action lies under § 1983 unless a plaintiff has asserted the violation of a federal right. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

### 1. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. "It is ... accepted that an inmate's Eighth Amendment rights may be abridged through service of food, either in insufficient

quantity or which is contaminated [9], provided that through their actions prison officials create an imminent danger to the inmate's health and well-being." *Harris v. Ashlaw,* No. 07–CV–358 (LEK/DEP), 2007 WL 4324106, at \*5 (N.D.N.Y. Dec.5, 2007) (citing *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). Thus, "[t]o state a cognizable claim ... a plaintiff must allege he or she was actually harmed by food tampering." *Harris,* 2007 WL 4324106, at \*5 (citations omitted).

[9]      Conditions such as the service of "food [that] was spoiled, rotted and possessive of a foul smell when served ..." may suffice to demonstrate "unsanitary conditions [to] transcend mere unpleasantness" and create a triable issue of fact. *Murphy v. Wheaton,* 381 F.Supp. 1252, 1261 (N.D.Ill.1974).

There has been no "authority for the proposition that denial of [a kosher meal] in prison would rise to the level necessary to be deemed cruel and unusual under the Eighth Amendment." *Wesley v. Kalos,* No. 97–CV–1598 (RWS), 1997 WL 767557, at \*4 (S.D.N.Y. Dec.11, 1997); *see also Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120(RMB), 2007 WL 1288579, at \*5 (S.D.N.Y. April 30, 2007). (*quoting Robles,* 725 F.2d at 15 (internal quotations and citations omitted)). However, "[w]hile no court has explicitly held that denial of food is a per se violation of a prisoner's Eighth Amendment rights ... under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles,* 725 F.2d at 15.

**\*7** In this case, Ward has failed to establish an Eighth Amendment claim based upon denial of kosher meals during his transport. While Ward repeatedly claims that he was offered non-kosher, rotten, and stale food, he has neither proven the existence of imminent danger to his health and well-being [10] nor an actual injury. *See* Ward Dep. at 28–29. Ward also does not allege that the unnamed corrections officer that provided him with his meals were aware that the food that they were serving was allegedly inedible. Additionally, when Ward brought the situation to an officer's attention, the officer contacted the kitchen and attempted to remedy the problem. *Id.* Thus, despite Ward's contentions that the meals were sparse and non-nutritional and viewing the facts in the light most favorable to Ward, he has not proffered sufficient facts to create a triable issue of fact as to the effect of the deprivation on his health and well-being.

[10] Ward makes one fleeting, conclusory reference to his health, stating that the deprivation created "physical and mental anguish and physically drain[ed his] body...." Compl. ¶ 9.

Moreover, the service of the alleged rotten food was not at Upstate but at Downstate. Assuming that the alleged fatigue Ward suffered as a result of missing three days of meals constituted an actual injury, Ward may have offered facts sufficient to allege an Eighth Amendment violation. However, as Ward has failed to name any individual corrections officers or superintendents from Downstate where any deprivation would have occurred, he has failed to name a proper party and thus failed to state an actionable claim.

Accordingly, defendants' motion on this ground should be granted.

## 2. Fourteenth Amendment

### a. Due Process

Ward contends that Woods and Gregory interfered with his ability to engage in the grievance process by denying and delaying his grievance. [11]

[11] To the extent that Ward's claims allege that Woods did not conduct an adequate investigation into Ward's grievance, "[t]he mere failure to investigate an allegation of unconstitutional activity, without more, ... does not provide a basis for finding liability under section 1983." *Toole v. Connell,* No. 04–CV–724 (LEK/DEP), 2008 WL 4186334, at *7 (N.D.N.Y. Sept.10, 2008) (citations omitted).

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). "It is well-established, however, that a prison inmate has no constitutional right of access to ... an internal grievance process." *Toole v. Connell,* No. 04–CV–724 (LEK/DEP), 2008 WL 4186334 at *8 (N.D.N.Y. Sept.10, 2008) (*citing Rhodes v. Hoy,* No. 05–CV–836, 2007 WL 1343649, at *2 (N.D.N.Y. May 5, 2007) (holding that "[p]rison grievance procedures ... do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment.") (internal quotations and citations omitted)); *see also Shell v. Brzezniak,* 365 F.Supp.2d 362, 370 (W.D.N.Y.2005) ("[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim.") (citations omitted); *Cancel v. Goord,* No. 00–CV–2042 (LMM), 2001 WL 303713, at *3 (S.D.N.Y. Mar.29, 2001) ("[I]nmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983.") (citations omitted).

**\*8** Whether or not a defendant denied Ward access to the grievance process, Ward may find

> redress [for] the alleged injuries he suffered as a result of his encounter with [d]efendants ... [by] appeal[ling] the determination of the ... hearing officer and, ultimately, ... hav[ing] this Court review the ... final determination [to decide] if that decision violated his constitutional rights and the prison grievance system did not satisfactorily redress the wrong about which he complain[ed]. Therefore, [Ward's] claims regarding the incident itself, i.e. [the Constitutional deprivation] against [d]efendants ..., are properly before this Court for review.

*Rhodes,* 2007 WL 1343649, at *2; *see also Shell,* 365 F.Supp.2d at 370 ("If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim.") (citations omitted).

In this case, Ward cannot establish that he had a liberty interest which required constitutional protection. However, because the underlying facts of the grievance concerned deprivations under other constitutional amendments and established constitutional grounds, the substance of ward's grievance is addressed *infra.*

Accordingly, defendants' motion for summary judgment on this ground should be granted.

### b. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. 95–CV–1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar.28, 1997) (Pooler, J.). "To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

In this case, Ward makes at best only vague and conclusory allegations that he was treated differently than other prisoners who received religious meals during transportation. This is insufficient to show an equal protection violation. *See De Jesus v. Sears Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Additionally, even assuming that Ward's allegations constitute a sufficient claim, Ward cannot and has not identified any of the individuals who treated him differently nor established or alleged any facts which demonstrate that the treatment was the result of intentional and purposeful discrimination.

Accordingly, defendants' motion for summary judgment on this ground should be granted.

### 3. First Amendment

**\*9** Ward alleges that his First Amendment right to the free exercise of his religion were violated when defendants failed to provide him with kosher meals and pursuant to DOCS policy.

"The First Amendment ... guarantees the right to the free exercise of religion." *Johnson v. Guiffere,* No. 04–CV–57 (DNH), 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007) (*citing Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional

protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (*citing Pell v. Procunier,* 417 U.S. 817, 822 (1974)). This right "is not absolute or unbridled, and is subject to valid penological concerns...." *Johnson,* 2007 WL 3046703, at *4.

The Free Exercise Clause extends "into other aspects of prison life including, pertinently, that of an inmate's diet...." *Id* . The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples...." *Ford,* 352 F.3d at 597 (citations omitted). Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith ... unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir.2004).

> A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.... [T]he burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision ... [and i]n the event such a[n] interest is articulated, its reasonableness is then subject to analysis under ... *Turner* ....

*Johnson,* 2007 WL 3046703, at * 4–5 (citations omitted).

In this case, Ward has articulated a First Amendment violation as he was not provided with kosher meals during transport as directed by DOCS regulations. However, Ward was only deprived one kosher meal that Upstate was supposed to provide during his transit. The failure to provide a single meal is insufficient to allege a constitutional violation. *See Peterson v. Price,* No. 06–CV–106, 2007 WL 2893009, at *6 (N.D.W.Va. Sept. 28, 2007) (holding that "the failure to provide inmates with one or two kosher meals does not rise to the level of a constitutional claim."). The other denials of kosher meals occurred at Wende, Auburn, and Downstate. The majority of the denials occurred during transport to, from, and while temporarily incarcerated at Downstate. However, Ward has failed to name any individuals at Downstate who were involved, directly or indirectly, with the alleged deprivation of his meals during transport. Therefore, even

though Ward has asserted a First Amendment claim, he has failed to assert it against the proper defendant.

Accordingly, defendants' motion for summary judgment should be granted on this ground.

### E. Qualified Immunity

**\*10** Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229–30 (N.D.N.Y.2002) (McAvoy, J.), *aff'd,* 80 Fed .Appx. 146 (2d Cir. Nov.10, 2003). However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the ... official to believe that his [or her] acts did not violate those rights." *Smith v. City of Albany,* No. 03–CV–1157, 2006 WL 839525 \*16 (N.D.N.Y. Mar. 27, 2006) (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991); *Magnotti v. Kuntz,* 918 F.2d 364, 367 (2d Cir.1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights, of which a reasonable person would have known, were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, the second prong of the inquiry need not be reached because, as discussed *supra,* accepting all of Ward's allegations as true, he has not shown that any defendant violated his constitutional rights.

Accordingly, it is recommended in the alternative that defendants' motion on this ground be granted.

### III. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion for summary judgment (Docket No. 35) be **GRANTED** as to all claims and all defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2009 WL 102928

---

**End of Document** 

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 121720
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

George LUNNEY, Plaintiff,

v.

Lieutenant BRURETON, Donald
Selsky, and Brian Fischer, Defendants.

No. 04 Civ. 2438 LAK GWG.
|
Jan. 21, 2005.

**Attorneys and Law Firms**

George Lunney, Collins Correctional Facility, Collins, NY,
pro se.

*REPORT AND RECOMMENDATION*

GORENSTEIN, Magistrate J.

 **\*1** George Lunney, currently an inmate at the Collins
Correctional Facility, has brought this suit *pro se* under
42 U.S.C. § 1983 against three employees of the Sing
Sing Correctional Facility ("Sing Sing"), where Lunney was
previously housed. Lunney alleges that defendants Lieutenant
Brureton, [1] Donald Selsky, and Brian Fischer violated his
Due Process rights by improperly conducting a disciplinary
hearing which resulted in his confinement in the Special
Housing Unit ("SHU") of Sing Sing. He further alleges
that Brureton and Fischer were deliberately indifferent to
inhumane conditions of confinement in the SHU in violation
of his Eighth Amendment rights, that he was the victim of an
assault, and that he was retaliated against for filing grievances
with respect to conditions in the SHU in violation of his
rights under the First Amendment. Defendants have moved
to dismiss Lunney's complaint pursuant to Fed.R.Civ.P. 12(b)
(6). For the following reasons, the defendants' motion should
be granted in part and denied in part.

1     This name is spelled "Brereton" in the defendants'
      submissions.

I. *BACKGROUND*

   A. *Facts*

For the purposes of deciding this motion, the Court assumes
that the facts alleged in Lunney's complaint and his
memorandum of law are true. *See, e.g., Donahue v. United
States Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990)
("The policy reasons favoring liberal construction of *pro se*
pleadings warrant the Court's consideration of the allegations
contained in plaintiffs' memorandum of law, at least where
those allegations are consistent with the allegations in the
complaint."); *accord Torrico v. IBM Corp.,* 213 F.Supp.2d
390, 400 n.4 (S.D.N.Y.2002). In addition, Lunney's complaint
may be deemed "to include any written instrument attached to
it as an exhibit or any statements or documents incorporated
in it by reference, as well as ... documents that [Lunney]
either possessed or knew about and upon which [he] relied in
bringing the suit." *Rothman v. Gregor,* 220 F.3d 81, 88-89 (2d
Cir.2000) (internal citations omitted).

On May 21, 2002, Lunney returned to his cell following
a "medical shower" to find Correction Officer Hadzovic
leaving the cell. Complaint, filed March 29, 2004 (Docket #
2) ("Compl."), ¶ 1. Hadzovic informed Lunney that he had
just searched his cell. *Id* . After conducting a pat frisk on
Lunney, Hadzovic reentered the cell and came out with a box
of spaghetti. *Id.* Hadzovic announced that he would confiscate
the box, which appeared to be altered, and locked Lunney in
his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction
Sergeant Guadagno came to Lunney's cell with two other
corrections officers. *Id.* ¶ 2. Guadagno informed Lunney that
a "shank type weapon" was discovered in the confiscated
spaghetti box. *Id.* Lunney asserted that the weapon was not
his and that he had merely purchased the spaghetti from the
commissary. *Id.* Nonetheless, he was escorted to the SHU to
await disciplinary action. *Id.*

 **\*2** Lunney received a "Tier III" misbehavior report on May
22, 2002. *Id.* ¶ 3; Inmate Misbehavior Report (reproduced as
Ex. A to Motion to Dismiss, filed June 10, 2004 (Docket #
15) ("Motion to Dismiss")). Following a disciplinary hearing
on June 13, 2002, Lunney was found guilty of possession
of a weapon and sentenced to nine months' confinement in
the SHU. Compl. ¶ 3. Lunney filed an administrative appeal
with Donald Selsky, the Director of Special Housing for the
New York State Department of Correctional Services, who
affirmed the disposition on August 22, 2002. *Id.*

Lunney then filed a petition pursuant to Article 78 of the
New York Civil Practice Law and Rules in the New York

State Supreme Court, Albany County. *Id.* ¶ 4. On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 5.

The rehearing commenced on October 15, 2002. *Id.* ¶ 6; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Correction Lieutenant Brureton, and Lunney. Compl. ¶ 6; Transcript at 29-37. Lunney requested permission to leave the hearing, Brureton granted him permission to do so, and Lunney was escorted out. Compl. ¶ 6, Transcript at 36-37. Lunney was again convicted for possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Compl. ¶ 6; Transcript at 59.

Lunney subsequently filed a request for review with Brian Fischer, the Superintendent of Sing Sing. Compl. ¶ 7. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. *Id.* An appeal to the Commissioner of the New York State Department of Correctional Services followed. *Id.* ¶ 8. In the appeal, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. *Id.* The Acting Director of Special Housing denied the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing, (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002 with respect to the rehearing. Article 78 Petition, dated November 19, 2002 (reproduced as Ex. E to Motion to Dismiss). On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed the misbehavior report and ordered the Department of Correctional Services to expunge all references to the incident from Lunney's institutional record. Decision, Order and Judgment, dated August 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl.Opp.")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was

a violation of Due Process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.*

**\*3** Lunney was confined to the SHU for six months, from May 21, 2002 until November 21, 2002. Compl. ¶ 10. During this period, Lunney filed a number of grievances alleging, *inter alia,* cold, spoiled, or poorly prepared food, an inadequate law library, insufficient reading materials, inadequate laundry services, lack of medical attention, and harassment by SHU staff. *Id.* ¶ 16. In his grievances, Lunney also alleged that he was criticized and threatened for filing grievances related to prison conditions by SHU staff, particularly by Brian Fischer. *Id.* ¶¶ 17, 19. On one occasion, Lunney asserts that he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Memorandum of Law, dated June 28, 2004 (annexed to Pl. Opp.) ("Pl.Mem."), at 9-10.

### B. *Procedural History*

The complaint in this action was filed March 29, 2004. *See* Compl. In his complaint, Lunney alleges that his Due Process rights were violated by two "faulty disciplinary hearings." *Id.* at 7 (¶ 1). The first violation occurred when Selsky convened a new disciplinary hearing while an Article 78 review of the first hearing was pending, and Lunney alleges that his Due Process rights were violated a second time when Brureton failed to provide a timely written disposition of the second hearing and neither Selsky nor Fischer corrected the error. *See* Pl. Mem. at 18. He also alleges that he was subject to "inhumane" conditions of confinement in the SHU of Sing Sing, *id.* at 17, including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material. Compl. ¶ 16, Pl. Mem. at 6-9. He also alleges that he was assaulted, Pl. Mem. at 9-10, and that he was retaliated against for filing grievances with respect to conditions in the SHU, Compl. ¶¶ 17, 19; *id.* at 7 (¶ 2); Pl. Mem. at 18, in violation of his rights under the First Amendment. Lunney seeks $10 million in punitive and compensatory damages. Compl. at 8.

Defendants filed a motion to dismiss on June 10, 2004 arguing that Lunney failed to state any constitutional claims. Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16) ("Def.Mem"), at 2. Defendants also argue sovereign immunity under the Eleventh Amendment, qualified immunity, and the lack of personal involvement of the defendants. *Id.* Lunney

filed opposition papers on July 6, 2004. *See* Pl. Mem. Defendants thereafter submitted a reply memorandum of law. *See* Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss, filed August 4, 2004 (Docket # 19) ("Def.Reply"). This Court also received a letter from Lunney dated December 18, 2004, which attached copies of several of Lunney's grievances and responses to the grievances. *See* Letter from George Lunney, dated December 18, 2004.

C. *Law Governing a Motion to Dismiss*

**\*4** In resolving a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir.2004); *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In making this determination, complaints drafted by *pro se* plaintiffs are held " 'to less stringent standards than formal pleadings drafted by lawyers," ' *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam)), and they "should be interpreted 'to raise the strongest arguments that they suggest," ' *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

II. *DISCUSSION*

The defendants have moved to dismiss the complaint on the following grounds: (1) Lunney has failed to allege that defendants Fischer and Brureton subjected him to inhumane conditions of confinement, or knew of and disregarded an excessive risk to Lunney's health and safety in violation of his Eighth Amendment rights; (2) Lunney failed to state a claim under the First Amendment because he does not allege adverse action in retaliation for his grievances; (3) Lunney has failed to state a Due Process claim with respect to his second disciplinary hearing; (4) because Lunney cannot show personal involvement; all claims should be dismissed as to Selsky; the First and Eighth Amendment claims should be dismissed as to Brureton; and the Due Process claim should be dismissed as to Fischer; (5) all defendants are entitled to qualified immunity; and (6) the defendants have sovereign immunity in their official capacities under the Eleventh Amendment. Def. Mem. at 6-13.

In his responsive papers, Lunney clarified that he was raising a Due Process claim against Selsky, Due Process and Eighth Amendment claims against Brureton, and Due Process, First and Eighth Amendment claims against Fischer. Affirmation of George Lunney, dated June 28, 2004 (included as first pages to Pl. Opp.) ("Affirm."), ¶ 3(d); Pl. Mem. at 17. These grounds are discussed below to the extent necessary for disposition of the defendants' motion.

A. *Sovereign Immunity*

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While the language of the Eleventh Amendment is not literally applicable to suits brought by citizens of the state being sued, the Supreme Court has long held that it bars such suits as well. *See, e.g., Employees of Dep't of Pub. Health and Welfare v. Dep't of Pub. Health and Welfare,* 411 U.S. 279, 280 (1973). Thus, "[i]t is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) (citations omitted). The same rule applies to suits for money damages against individual employees of the State named in their official capacities. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003). The Supreme Court has also explicitly held that 42 U.S.C. § 1983 is not a statute that abrogates the States' sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 340-45 (1979). A finding of sovereign immunity under the Eleventh Amendment deprives a federal court of jurisdiction. *See Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 73 (2000) (citations omitted); *Atl. Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993) (citations omitted), *cert. denied,* 510 U.S. 1043 (1994).

**\*5** Lunney's complaint names the three defendants in both their individual and official capacities. Although the Eleventh Amendment does not bar suit against the defendants in their individual capacities, it does bar this suit insofar as it is brought against the defendants in their official capacities.

B. *Analysis of Lunney's Claims Under 42 U.S.C. § 1983*

Lunney has brought this action under 42 U.S.C. § 1983. *See* Compl. at 1. In order to assert a claim under section 1983, a plaintiff must show that he has been deprived of a right

secured by the Constitution or federal law by a defendant acting under the color of state law. 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 does not grant any substantive rights, but rather "provides a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. *See Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240 (1994).

Because the defendants do not dispute that their actions were under the color of state law, the only issue presented is whether Lunney has alleged any violations of a constitutional right. Lunney has presented three different claims in which he alleges: (1) violations of the Eighth Amendment with respect to the conditions of his confinement; (2) that he was the victim of retaliation in violation of the First Amendment; and (3) Due Process violations under the Fourteenth Amendment based on the conduct of his disciplinary hearing and his confinement in the SHU. Each claim is discussed separately.

### 1. *Eighth Amendment Claims*

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities," ' *Wilson v. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state is "deliberate indifference." *Wilson,* 501 U.S. at 302-03.

Lunney's Eighth Amendment claims relate to five distinct areas: food, laundry services, physical assault, regular library services and law library services. Each is discussed below.

### a. *Cold, spoiled and improperly prepared food*

**\*6** i. *Merits of the Claim.* Lunney maintains that he was served food that was "cold, spoiled and poorly prepared" "on a near daily basis" during his detention in the SHU. Pl.

Mem. at 6. Lunney asserts that he and other inmates regularly refused the meals-or portions of meals-that "were clearly spoiled and or poorly prepared." *Id.* at 7. On one occasion, Lunney describes how he and other SHU inmates became ill after a meal of chili and rice, began vomiting violently, and required treatment by medical staff. *Id.* Lunney and other inmates filed formal grievances with the Inmate Grievance Committee and sent informal letters to the Director of Inmate Nutritional Services and the State Commission of Correction, but the authorities found no problems with the food service. *Id.* at 6. As a result of regularly having to refuse meals, Lunney states that he suffered "weight loss, muscle atrophy, lethargy and the inability to maintain mental focus." *Id.* at 7.

Under Eighth Amendment case law, prisoners are entitled to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 14 (2d Cir.1983) (per curiam) (citation omitted) (claim that food was purposely contaminated with dust, rocks, glass, and human waste sufficient to withstand dismissal of § 1983 complaint); *see also Griffin v. Smith,* 493 F.Supp. 129, 131 (W.D.N.Y.1980) (allegation of "[u]nsanitary food utensils, including cigarette burns and hair on food trays" sufficient to sustain an Eighth Amendment claim); *Murphy v. Wheaton,* 381 F.Supp. 1252, 1261 (N.D.Ill.1974) ("spoiled, rotted and foul" food served in a wagon used to dispose garbage indicates "existence of unsanitary conditions which transcend mere unpleasantness").

Insofar as Lunney alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a cause of action. *See Waring v. Meachum,* 175 F.Supp.2d 230, 238 (D.Conn.2001) (Report and Recommendation) ("The provision of cold food is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") (citation and quotation omitted); *see also Hutto v. Finney,* 437 U.S. 678, 683, 686 (1978) (1000 calorie per day diet of "grue," a substance "created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste" and baking it, "might be tolerable for a few days and intolerably cruel for weeks or months").

Here, however, Lunney alleges that his meals were regularly spoiled and/or improperly prepared on "numerous

occasions." Pl. Mem. at 7. Thus, eating the meals caused him to get sick and not eating them caused him to suffer the effects of malnutrition. *See id.* Because Lunney's allegations are sufficient to support the inference that prison officials were aware of the risk to his health and safety created by the condition of the food served but disregarded the excessive risk of harm, his allegations are sufficient to state an Eighth Amendment claim.

**\*7** ii. *Qualified Immunity.* To hold an individual defendant liable, however, it is not sufficient merely to state a constitutional claim. Prison officials are entitled to qualified immunity if their actions either "did not violate clearly established law," or "it was objectively reasonable for the defendant [s] to believe that [their] action[s] did not violate such law." *Anderson,* 317 F.3d at 197 (citations and internal quotations omitted). Prison officials performing discretionary functions thus "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). To determine whether defendants are entitled to qualified immunity, the court must decide whether a constitutional right was violated, whether the law clearly established the right alleged to have been violated, and whether a reasonable person under the same circumstances would have understood that his conduct was unlawful. *See Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (per curiam) (citing *Vega v. Miller,* 273 F.3d 460, 466 (2d Cir.2001)).

A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle" given that all inferences must be drawn in plaintiff's favor. *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004). Here, defendants have argued the applicability of the qualified immunity defense only in the most general terms. *See* Def. Mem. at 13-15; Def. Reply at 9-10. Significantly, they make no specific argument with respect to whether the case law regarding serving spoiled food was "clearly established," stating only that "[t]here is no clearly established constitutional right to perfectly prepared meals." Def. Reply at 10. Lunney, of course, is not asserting a right to "perfectly prepared meals" and thus defendants have not asserted a qualified immunity defense with respect to these allegations.

iii. *Personal Involvement.* Lunney seeks to sue only Brian Fischer and Lieutenant Brureton for Eighth Amendment violations. *See* Affirm. ¶ 3(d); Pl. Mem. at 17. An individual defendant's liability under 42 U.S.C. § 1983 is predicated on his or her personal involvement in the constitutional deprivation. *See, e .g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). A plaintiff may prove personal involvement by supervisory defendants by showing one of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

**\*8** *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Fischer does not contest that he meets the *Colon* test with respect to the conditions in the SHU and thus he remains a proper defendant on this claim. With respect to Lieutenant Brureton, however, Lunney makes no allegation that Brureton had any role in creating the conditions of confinement in the SHU or that his involvement satisfied any of the other *Colon* factors. Accordingly, Brureton cannot remain as a defendant as to this or any other claim relating to conditions at the SHU.

b. *Laundry services*

Lunney alleges that the laundry services in the SHU were inadequate. In his memorandum of law, Lunney describes how the staff would collect inmates' soiled laundry and place it outside the "Officer's In Charge station" but never send it to the laundry. Pl. Mem. at 9. The day staff would not advise later shifts that the clothing had not been sent to be cleaned

and the laundry would be returned to the inmates unwashed. *Id.* Furthermore, the soiled laundry of all the inmates would be mixed together and the inmates would have to sort through the piles of clothing to look for their own clothes. *Id.*

Prisoners are entitled to "reasonably adequate sanitation" and "personal hygiene" under the Eighth Amendment, particularly over long periods of time. *Howard v. Adkison,* 887 F.2d 134, 137 (8th Cir.1989). Courts have held that these rights encompass the right to adequate laundry services. *Id.* (denial of laundry service for five months, followed by service in which laundry was returned wet and dirty sufficiently serious under the circumstances to state a claim); *Divers v. Dep't of Corr.,* 921 F.2d 191, 194 (8th Cir.1990) ("inmates are ... entitled to adequate laundry facilities") (citation omitted).

There is no Eighth Amendment violation, however, in instances where inmates are provided the opportunity and the supplies to wash their own clothes. *Green v. Ferrell,* 801 F.2d 765, 771 (5th Cir.1986) (no constitutional violation where inmates were permitted to wash their clothes in sinks and were provided with laundry detergent); *Benjamin v. Fraser,* 161 F.Supp.2d 151, 178-79 (S.D .N.Y.2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in part and vacated in part,* 343 F.3d 35 (2d Cir.2003). Thus Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services.

### c. *Assault*

Lunney asserts that he was routinely subject to threats and harassment by the SHU staff-an allegation discussed below as a First Amendment retaliation claim-but he also describes a specific incident of assault which is more properly addressed here. Lunney alleges that, three days after entering the SHU on May 21, 2002, he complained that his cell lacked, *inter alia,* a toothbrush, toothpaste, and a working sink. Pl. Mem. at 9. He says that after "shouting to" an officer regarding the missing items, two unnamed officers came to the cell and told him to "shut the fuck up or we [are] coming in there and you will not like the results." *Id.* at 10. Lunney claims that one officer became increasingly hostile, and eventually the officers ordered the cell open, "began punching [him] in the head and body," and put him in a choke hold. *Id.*

**\*9** Defendants argue that Lunney's claim for assault should be dismissed for failure to exhaust administrative remedies.

Def. Reply at 4. It is not necessary to reach this argument, however, as Lunney's claim cannot proceed in its current form because he has not alleged that any of the three named defendants were personally involved in the assault under any of the prongs of the *Colon* test. Accordingly, the assault claim must be dismissed against the existing defendants. Obviously, Lunney would be free to file an amended complaint that names the officers involved, though he is cautioned that he should do so only if he meets the exhaustion requirements of 42 U.S.C. § 1997e(a) or has a basis for being relieved of the obligation to meet those requirements.

### d. *Inadequate library services*

Lunney alleges that library services in the SHU were inadequate. He asserts that in spite of inmate grievance complaints, the general library cart was not "properly stocked" as it was "void of magazines, newspapers and periodicals." Pl. Mem. at 7. These allegations, however, fail to state a claim under the Eighth Amendment because magazines, newspapers and periodicals are not considered one of life's "basic necessities" within the meaning of the Eighth Amendment. *See, e.g., Loe v. Wilkinson,* 604 F.Supp. 130, 136 (M.D.Pa.1984) (diminished access to the general library while prisoner was in administrative detention not an Eighth Amendment violation); *see also May v. Baldwin,* 109 F.3d 557, 565 (9th Cir.1997) (prisoner's First Amendment rights were not violated when his confinement to the special housing unit prevented him from using the general prison library); *cf. Boyd v. Anderson,* 265 F.Supp.2d 952, 966 (N.D.Ind.2003) (no equal protection violation where prisoners confined to detention unit could not use general prison library).

### e. *Inadequate law library services*

Lunney's final claim under the Eighth Amendment relates to the inadequacy of the "mini law library" in Sing Sing's SHU. Pl. Mem. at 8. Lunney alleges that Sing Sing is under a consent degree issued by a court in the Southern District of New York and is obligated to stock the mini law library within SHU with legal books and materials. *Id.* He contends that these materials were often missing and had to be ordered from the prison's main law library. *Id.* He alleges that there were "extensive delays" in getting books from the main law library and, as a result, he was unable to do legal research with respect to the Article 78 petition he filed in the New York State Supreme Court in a timely fashion and was forced to seek extensions from the court. *Id.*

The adequacy of law library services does not implicate the Eighth Amendment, however, but rather the right of access to the courts. *See Bounds v. Smith,* 430 U.S. 817, 828 (1977) (establishing that "the fundamental constitutional right of access to the courts requires prison authorities" to provide adequate law libraries or adequate assistance with filing legal papers from a person trained in the law); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right is grounded "in the constitutional guarantees of equal protection and due process." *Bourdon,* 386 F .3d at 92 (citations omitted). A prisoner, however, must allege more than inadequate facilities to state a constitutional claim. Rather, the prisoner "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). The examples in *Lewis* used to demonstrate a cognizable injury-for example, that a complaint was dismissed because the plaintiff failed "to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known" or was unable to file a complaint at all because he was "so stymied by inadequacies of the law library"-all show a real and prejudicial effect arising from the denial of legal material. *Id.*

**\*10** Here, by contrast, Lunney alleges no such denial. Although he alleges delays in conducting research for his lawsuits in the State Supreme Court and the need to request extensions on deadlines, Pl. Mem. at 8, he does not allege that he was not granted the extensions or suffered any harm from having to request extensions. We note that "if an inmate experienced delays in pursuing a civil claim, but files acceptable legal pleadings within court deadlines, he cannot claim that he was prejudiced by shortcomings in a prison facility's law library, because he has sustained no relevant actual injury." *Benjamin v. Kerik,* 102 F.Supp.2d 157, 164 (S.D.N.Y.2000) (citing *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir.1996)), *aff'd Benjamin v. Fraser,* 264 F.3d 175 (2d Cir.2001). The fact that Lunney not only successfully filed his claims in the State Supreme Court but even won a favorable judgment obviously cannot support any inference of injury resulting from inadequate access to the law library. *See id.* at 166-67 (dismissing claims of four inmates complaining of an inadequate law library because each inmate was able to properly file a claim in court); *Amaker v. Coombe,* 1998 WL 637178, at \*1 (S.D.N.Y. Sept. 16, 1998) ("[T]he very fact that the plaintiff has been able to proceed on this motion (as well as the numerous other motions filed in this case) tends to indicate that he has not been prejudiced by any lack of access to the law

library."). Accordingly, Lunney has not stated a constitutional violation of his right of access to the courts under the Fifth and Fourteenth Amendments.

   2. *First Amendment Claim of Retaliation*
Lunney states that he filed "numerous grievance complaints" regarding the conditions of his confinement in the SHU as well as the Inmate Grievance Committee's perceived lack of proper attention to inmate complaints. Compl. ¶ 16. Lunney claims that he "was often criticized and threatened by S.H.U. staff and defendant Fischer" in retaliation for filing these grievances. *Id.* ¶ 17. Specifically, Lunney asserts that he was "threatened with physical violence on several occasions by S.H.U. staff for his writing of grievances," *id.* ¶ 19, that he was denied recreation and showers by staff who knew of his complaints, Pl. Mem. at 11, and that Fischer threatened to transfer him to Attica for writing grievances, Compl. ¶ 19. As mentioned above, Lunney also describes being assaulted by two corrections officers after complaining about the conditions in his cell, an assault he did not report "fearing for his life and not wanting to receive another ticket." Pl. Mem. at 10.

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). To establish a prima facie case of retaliation, an inmate must show: 1) that his speech or conduct was constitutionally protected; 2) that the defendant took adverse action against the plaintiff; and 3) a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). However, only those acts that are likely to " 'chill a person of ordinary firmness from continuing to engage' in activity protected by the First Amendment" will support a claim of retaliation. *Rivera v. Goord,* 253 F.Supp.2d 735, 749 (S.D.N.Y.2003) (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999)); *accord Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (per curiam); *Crawford-El v. Britton,* 93 F.3d 813, 826 (D.C.Cir.1996) (en banc), *vacated on other grounds,* 523 U.S. 574 (1998).

2005 WL 121720

**\*11**  Lunney's general allegations of threats and harassment are insufficient to state a claim because comments that are merely "insulting" or "disrespectful" do not give rise to a constitutional violation. *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)) (sarcastic comments do not rise to the level of retaliatory action); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam) ("name calling" insufficient to state a constitutional claim); *Montero v. Crusie,* 153 F.Supp.2d 368, 376 (S.D.N.Y.2001) ("Verbal threats or harassment, unless accompanied by physical force or the present ability to effectuate the threat, are not actionable under § 1983.") (citations omitted). In addition, "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (internal citations and quotations omitted) (alterations in original). Thus, Lunney's general allegations regarding improper behavior by staff against other inmates that he is alleged to have witnessed while confined in the SHU, Pl. Mem. at 11, do not state a claim.

Lunney makes an additional claim that defendant Fischer threatened to transfer Lunney to another facility for writing grievances. Compl. ¶ 19. Although prisoners have no liberty interest in remaining at a particular facility, prison officials may not transfer inmates in retaliation for exercising their constitutional rights. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) (internal citation omitted). At least one circuit has held that threats to transfer an inmate who complained about the administration of the law library can constitute the basis of a retaliation claim, even if the inmate is never transferred. *Gomez v. Vernon,* 255 F.3d 1118, 1127 (9th Cir.2001). In *Gomez,* the Ninth Circuit held that because threats to transfer a prisoner had a "chilling effect" on the prisoner's exercise of his First Amendment rights, the threats were sufficient to sustain a retaliation claim. *Id.* at 1127-28

Even under the standard of *Gomez,* however, Fischer's threats cannot be said to constitute retaliation. Although Lunney is no longer at Sing Sing, he does not allege that he was transferred because he filed grievances against prison officials. In addition, Lunney does not allege that he was actually deterred from filing grievances because of Fischer's threats. Consequently, Lunney's retaliation claim against Fischer must fail with respect to the threatened transfer.

Nonetheless, Lunney does assert that he was threatened with physical violence for filing grievances, Compl. ¶ 19; Pl. Mem. at 11, and thus he has stated a claim under the First

Amendment. *See, e.g., Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim); *but see Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995) (threats of "disciplinary action, physical violence, an extension of his time in keeplock, and possible segregation" in retaliation for seeking dental care do not state a claim where plaintiff does not suffer an injury). No "greater level of detail," Def. Reply at 5, is required for Lunney's pleading. *See Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002). While Lunney does not allege that Selsky and Brureton had any responsibility for these retaliatory practices, he does allege that Fischer was responsible, Affirm. ¶ 3(b), and thus he has stated a claim against Fischer. Fischer does not appear to attempt to raise a qualified immunity defense at this time with respect to the First Amendment claim. *See* Def. Reply at 9-10. Nor does he allege a lack of personal involvement to the extent a claim is stated. *See id.* at 8-9. Consequently, the First Amendment claim remains against Fischer with respect to Lunney's claims of threats of physical violence.

### 3. *Fourteenth Amendment Due Process Claim*

**\*12**  Lunney argues that his right to Due Process was violated by two separate actions. First, he argues that the defendants' failure to provide him with a timely written disposition of his second disciplinary hearing was a violation of his Due Process rights. Compl. at 7 (¶ 1); Pl. Mem. ¶¶ 18, 26, 27, 28. Second, Lunney claims that Selsky improperly ordered a second disciplinary hearing after an Article 78 proceeding had been filed with respect to the first hearing. Compl. ¶ 8; Pl. Mem. at 6. Each claim will be analyzed separately. Although Lunney mentions a dispute with the hearing officer over the hearing officer's alleged bias in the second hearing, Compl. ¶ 6, he does not appear to raise it as an additional basis for his Due Process claim.

#### a. *Law governing disciplinary proceedings*

A party asserting a Due Process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giant v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). "Factors

relevant to determining whether the plaintiff endured an atypical and significant hardship include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement." ' *Palmer v. Richards,* 364 F.3d 60, 66 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

There is no bright line rule in determining whether a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating Due Process protection. *Palmer,* 364 F.3d at 64 (citations omitted). Defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU-which was later reduced to six months-under the standard established in *Sandin.* It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, the issue is whether Lunney was denied Due Process when he was not provided with a written disposition of his disciplinary hearing and when the second hearing was scheduled.

b. *Written disposition of disciplinary hearing*
Under the Fourteenth Amendment, the following procedural protections are required in disciplinary hearings when the length or conditions of confinement trigger due process protections: "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (citing *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999)); *accord McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL 362776, at *2 (S.D.N.Y. Mar. 6, 2002); *Silva v. Sanford,* 1998 WL 205326, at *6 (S.D.N.Y. Apr. 24, 1998). The importance of providing inmates with a detailed written disposition is well established. "Without a detailed statement of the [decisionmaker's] findings and conclusions, a reviewing court or agency cannot determine whether the finding of guilt was based on substantial evidence or whether it was sufficiently arbitrary so as to be a denial of the inmate's due process rights." *Chavis v. Rowe,* 643 F.2d 1281, 1287 (7th Cir.1981) (citation omitted). Without a written disposition of a charge, an "inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others." *Wolff,* 418 U.S. at 565.

*13 Defendants contend that there is no Due Process violation, in part, because Lunney admits that he requested, and was granted, permission to leave the hearing. *See* Def. Mem. at 10. It is unclear why this circumstance should have any bearing on the right to receive a "written statement of the disposition," *Luna,* 356 F.3d at 487, a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell. See* 418 U.S. at 563.

Defendants assert that Lunney eventually received a transcript of the disposition on or about April 16, 2003, prior to the conclusion of his Article 78 proceeding. Def. Mem. at 10. The transcript does contain the required elements of the written disposition, *see* Transcript, at 59-60, but it hardly satisfies Due Process to receive such a transcript five months following the prisoner's release from the SHU. *See generally Walker v. Bates,* 23 F.3d 652, 658-59 (2d Cir.1994) ("[O]nce prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the prison official responsible for the due process deprivation must respond in damages...."). The defendants may have a stronger argument that any Due Process violation was mitigated, or perhaps obviated, based on the allegation that Lunney was informed of the results of the disposition, or was otherwise given the opportunity to obtain the written disposition, but no such facts are available to the Court on this motion to dismiss. *See McKenna,* 386 F.3d at 436 ("[T]he plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.").

Finally, defendants argue that New York law provides that the remedy for failure to provide a written disposition is an order that the disposition be served, not that the penalty be expunged. Def. Mem. at 10-11 (citing *Vargas v. Coughlin,* 168 A.D.2d 917 (4th Dep't 1990) and *Matter of Ramos v. Herbert,* 256 A.D.2d 1191 (4th Dep't 1998)). The defendants' argument is irrelevant, however, as Lunney is seeking damages for a violation of the federal constitution, not for a violation of state law.

The defendants' argument on qualified immunity for this claim is confusing. They assert that the "plaintiff has failed to identify any Supreme Court or Second Circuit case law that clearly establishes a right to receive a written copy of a disciplinary hearing decision." Def. Reply at 9. This may be literally true inasmuch as Lunney notes that "the

State of New York and the [Department of Correctional Services] have promulgated regulations and procedures governing disciplinary hearings in prison so as to comply with those minimal due process requirements established by the Supreme Court in *Wolff v. McDonnell,"* but only claims that "these regulations and procedures were not followed." Pl. Mem. at 16. The issue, however, is not what legal argument Lunney has been able to muster but whether or not there is clearly established law requiring a written disposition of disciplinary charges. Tellingly, defendants make no reasoned argument that this right is not clearly established. While they assert that *Ramos* and *Vargas* have cast doubt on whether an inmate is entitled to a written disposition of the charges, both cases in fact explicitly affirm the existence of such a right and *Ramos* actually identifies the entitlement as a requirement of "due process." 256 A.D.2d at 192.

**\*14** As already noted, *Wolff* unambiguously established the right to receive a written notice of the disposition. *Wolff,* 418 U.S. at 563-65. Second Circuit case law has reaffirmed this requirement. *See Luna,* 356 F.3d at 487; *Kalwasinski,* 201 F.3d at 108; *McCann,* 698 F.2d at 121-22. Further, courts have rejected other claims that procedural rights set forth under *Wolff* are not clearly established. *See, e.g., Pino v. Dalsheim,* 605 F.Supp. 1305, 1314 n.9 (S.D.N.Y.1985) (decisions in *Wolff* and in subsequent litigation put Department of Corrections staff on notice with respect to constitutional principles at stake in disciplinary proceedings). While additional specifics regarding the circumstances under which defendants did not supply Lunney with this written disposition might show that "a reasonable person, acting under the circumstances then confronting [the] defendant, would [not] have understood that his actions were unlawful," *Hanrahan,* 331 F.3d at 98 (internal citation and quotation omitted), that determination cannot be made in the context of this motion to dismiss. Accordingly, Lunney's claim must stand.

### c. *Validity of the second disciplinary hearing*
Lunney claims that his Due Process rights were violated when Selsky ordered a rehearing after Lunney exhausted his administrative appeals and had commenced an Article 78 proceeding. *See* Compl. ¶ 8, *id.* at 7 (¶ 1). Lunney argues that because Justice Sheridan of the New York Supreme Court found that the rehearing was invalid under New York law, he should be entitled to collateral estoppel. Pl. Mem. at 14.

The collateral estoppel doctrine "prevents a party from relitigating an issue decided against that party in a prior adjudication." *Curry v. City of Syracuse,* 316 F.3d 324, 331 (2d Cir.2003) (citation and quotation omitted). Lunney's argument is rejected because no determination was made by the State Supreme Court of any issue of federal law, let alone the issue of "qualified immunity." *See id.* (collateral estoppel "may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate") (citation and quotation omitted). Indeed, as a general matter, the Second Circuit has held that Article 78 judgments may not be used to estop defendants from litigating the same claims in § 1983 lawsuits because the incentive to litigate is not the same and the defenses available in § 1983 suits are not available in Article 78 proceedings. *See Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (per curiam).

Lunney's argument on the merits is also unavailing. Whatever violation Lunney claims of New York law is not relevant because violations of state procedural rules are not necessarily violations of the federal constitution. *See, e.g., Shakur v. Selsky,* 391 F.3d 106, 118-19 (2d Cir.2004); *Russell v. Coughlin,* 910 F.2d 75, 78 n.1 (2d Cir.1990). The Court is not aware of any cases suggesting that the federal Due Process clause bars the ordering of a second hearing and it is not clear why this should even be the case. As long as the essential requirements of Due Process were met-such as notice of the charges and a hearing conducted in accordance with Due Process, *see, e.g., Luna,* 356 F.3d at 487-there is no basis on which to conclude that Lunney's constitutional rights were violated.

### d. *Personal involvement*
**\*15** Lunney charges Brureton, Fischer, and Selsky with violations of his Due Process rights at the prison disciplinary hearing. *See* Pl. Mem. ¶ 3(d). Each defendant's personal involvement is examined in turn.

The basis for Lunney's Due Process claim against Lieutenant Brureton is Brureton's role as a hearing officer in the rehearing that began October 15, 2002 at which Lunney was eventually sentenced to SHU confinement. Compl. ¶¶ 6, 21; Pl. Mem. at 18. Defendants do not contest that Brureton's involvement in the disciplinary hearing is sufficient to allege personal involvement and thus he remains as a defendant on this claim.

Lunney's Due Process claim against Fischer stems from Fischer's failure to correct Brureton's procedural error when the plaintiff applied for a Superintendent's Review immediately after the disciplinary hearing. Compl. ¶

7; Pl. Mem. at 18. With respect to his Due Process claims, Lunney has not adequately alleged Brian Fischer's personal involvement. Although Lunney filed a Request for Superintendent's Review with Brian Fischer, the review of the second hearing was conducted by the First Deputy Superintendent of Sing Sing, Paul Kikendall. Compl. ¶ 7. Lunney does not allege that Fischer himself had any involvement with deciding the appeal or reviewing Kikendall's disposition of the appeal. Mere "linkage in the prison chain of command" is insufficient to ground a claim of personal involvement, *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam) (citations omitted), and submitting an appeal or complaint to a subordinate for disposition is not sufficient to find personal involvement, *see Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (referring an appeal from an administrative segregation hearing to another official for determination and responding to an inquiry regarding the status of the appeal insufficient to create personal involvement); *Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (no personal involvement where a prisoner's petition was received by defendant but "sent ... down the chain of command for investigation"). Therefore, the Due Process claims against Fischer must be dismissed.

With respect to Selsky, he is sued only because he ordered the second hearing-a claim that we have determined is subject to a qualified immunity defense-and for "failing to provide plaintiff with a written copy of the hearing disposition." Pl. Mem. at 18. But no facts are alleged showing his involvement in this latter failure. Lunney asserts that he appealed to the Commissioner of the Department of Correctional Services and that, while the appeal was "turned over" to Selsky for review and consideration, Compl. ¶ 8, it was ultimately decided by Robert J. Murphy, *id.* ¶ 9; Hearing Review, who has not been named as a defendant. Accordingly, the claim against Selsky cannot proceed. *Cf. Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) (personal involvement stated where defendant superintendent of prison either affirmed improper disciplinary conviction, was directly responsible for the conduct of prison disciplinary hearings, or permitted the challenged unconstitutional practice to occur as a matter of custom or policy).

III. *CONCLUSION*

 **\*16**  For the foregoing reasons, the defendants' motion should be granted in part and denied in part. Specifically, the following claims should remain in the case: (1) the Eighth Amendment claim against Fischer with respect to improperly prepared food; (2) the First Amendment claim against Fischer alleging that Lunney was threatened with physical retaliation for filing grievance complaints; and (3) the Due Process claim against Brureton regarding the failure to receive a written disposition of his disciplinary hearing. The remaining claims should be dismissed. Lunney should be given the opportunity to file an amended complaint in the event that he can cure any of the defects in his original complaint. *See, e.g., Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead") (citing cases), *cert. denied,* 503 U.S. 960 (1992).

*PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 121720

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 433285

2005 WL 433285
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

George LUNNEY, Plaintiff,

v.

Lieutenant BRURETON, et al., Defendants.

No. 04 Civ. 2438(LAK).
|
Feb. 23, 2005.

ORDER

KAPLAN, J.

**\*1**  Plaintiff's objections to the report and recommendation of Magistrate Judge Gabriel W. Gorenstein are overruled. Defendants' motion to dismiss is granted to the extent set forth at page 29 of the report and recommendation and otherwise denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 433285

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Tolliver v. Skinner,  S.D.N.Y.,  August 10, 2017

2007 WL 1544629

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

George LUNNEY, Plaintiff,

v.

Lieutenant BRURETON, et al., Defendants.

No. 04 Civ. 2438(LAK)(GWG).

|

May 29, 2007.

**Attorneys and Law Firms**

George Lunney, Elmira, NY, pro se.

Benjamin Lee, Assistant Attorney General, New York, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

### *TABLE OF CONTENTS*

| | | |
|---|---|---|
| I. | *BACKGROUND* ................... | 2 |
| | A. *Facts* ..................... | 2 |
| | B. *Procedural History* ............... | 5 |
| II. | *APPLICABLE LAW* ............... | 8 |
| | A. *Standard of Review on Summary Judgment Motions* ............... | 8 |
| | B. *Exhaustion* ................ | 10 |
| | 1. *PLRA* .............. | 10 |
| | 2. *New York's Inmate Grievance Program% i* ......... | 11 |
| III. | *DISCUSSION* ................... | 12 |
| | A. *Eighth Amendment Claim Relating to Food in the SHU* .............. | 12 |
| | B. *Eighth Amendment Claim of Excessive Force* ........ | 16 |
| | 1. *Exhaustion* ................ | 16 |
| | 2. *Merits* ................... | 21 |
| | C. *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items* ..................... | 26 |
| | 1. *Laundry Services* ............... | 2 7 |
| | 2. *Plumbing Problems and Failure to Provide Personal Hygiene Items* ..... | 28 |
| | 3. *Personal Involvement* ................. | 30 |
| | D. *First Amendment Retaliation Claims* .............. | 30 |

| | 1. | *Law Governing First Amendment Retaliation* ............ | 31 |
| | 2. | *Claims against Fischer* ............... | 32 |
| | 3. | *Claims against Blot* .............. | 34 |
| | | a. | Exhaustion of Claims Against Blot% i .......... | ........... 34 |
| | | b. | *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation* ............ | ........... 37 |
| | | | i. | Adverse Action.......................................... | 38 |
| | | | ii. | Causal Connection.................................... | 40 |
| | | c. | *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report* ............... | ........... 41 |
| | | d. | *The Merits of Lunney's Allegation that Blot Threatened Physical Violence* .............. | ........... 43 |
| | | e. | *The Merits of Lunney's Allegation of Retaliatory Assault* ..... | ........... 45 |
| | 4. | *First Amendment Claim Against Frazier* .......... | 47 |
| | 5. | *First Amendment Claim Against Brereton* ........ | 47 |
| E. | *Unfiled Grievances* ............... | | 4 8 |
| F. | *Fourteenth Amendment Due Process Claims* .......... | | 50 |
| | 1. | *Law Governing Disciplinary Proceedings* .......... | 50 |
| | 2. | *Written Disposition of Disciplinary Hearing* .......... | 51 |

Conclusion ........................ 55

**\*1** George Lunney, currently an inmate at the Elmira Correctional Facility, has brought this suit *pro se* under 42 U.S.C. § 1983 against employees of the Sing Sing Correctional Facility ("Sing Sing"), where Lunney was previously housed. Lunney alleges that certain defendants violated his due process rights by improperly conducting a disciplinary hearing that resulted in his confinement in the Special Housing Unit ("SHU") of Sing Sing. He further alleges that various defendants were deliberately indifferent to inhumane conditions of confinement in the SHU in violation of his Eighth Amendment rights, that he was the victim of an assault, and that he was retaliated against for filing grievances with respect to conditions in the SHU in violation of his rights under the First Amendment.

Defendants now move for summary judgment. As described below, the defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Correction Officers Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Officer Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers and (b) against Officer Frazier for his participation in the retaliatory assault.

## I. *BACKGROUND*

The facts described below and later in this Report are drawn largely from Lunney's affidavit. *See* Plaintiff's Affidavit, filed June 13, 2006 (Docket # 88) ("Lunney Aff."). In many places, Lunney's affidavit cites to allegations contained in his amended complaint. *See* Amended Complaint, filed Mar. 24,

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 181 of 380

2005 (Docket # 34) ("Am.Compl."). That is, the affidavit cites the allegations of the amended complaint without repeating the substance of the incorporated matters under oath or penalty of perjury. Because defendants have not objected to this approach, we proceed as if any such incorporated matters in the Amended Complaint were admissible under Fed.R.Civ.P. 56(e).

A. *Facts*

On May 21, 2002, Lunney returned to his cell following a "medical shower" to find Correction Officer Hadzovic leaving the cell. *See* Lunney Aff. ¶ 1 (incorporating Am. Compl. at 3 ¶ 1). Hadzovic informed Lunney that he had just searched his cell. *Id.* After conducting a pat frisk on Lunney, Hadzovic reentered the cell and came out with a box of spaghetti. *Id.* Hadzovic announced that he would confiscate the box, which appeared to be altered, and locked Lunney in his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction Sergeant Guadagno came to Lunney's cell with two other correction officers. *Id.* (incorporating Am. Compl. ¶ 2). Guadagno informed Lunney that a "shank type weapon" was discovered in the confiscated spaghetti box. *Id.* Lunney asserted that the weapon was not his and that he had merely purchased the spaghetti from the commissary. *Id.* Nonetheless, he was escorted to the SHU to await disciplinary action. *Id.*

**\*2** Lunney received a "Tier III" misbehavior report on May 22, 2002. *Id.* (incorporating Am. Compl. ¶ 3); Inmate Misbehavior Report (reproduced as Ex. A to Notice of Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Lunney Aff. ¶ 2 (incorporating Am. Compl. ¶ 4). Lunney filed an administrative appeal with Donald Selsky, the Director of Special Housing/Inmate Disciplinary Program for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. Lunney Aff. ¶ 2; Am. Compl. at 2.

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. Lunney Aff. ¶ 2. On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* ¶ 4. On October 3, 2002, Selsky rescinded the

disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. *Id.* ¶ 5. Lunney subsequently withdrew his Article 78 petition. *Id.* ¶ 9.

The rehearing commenced on October 15, 2002. *Id.* ¶ 11; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Lieutenant Brereton,[1] and Lunney. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 29-37. Lunney requested permission to leave the hearing, Brereton granted him permission to do so, and Lunney was escorted out. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 34-37. Lunney was again found guilty of possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Lunney Aff. ¶ 11 (incorporating Am. Compl. ¶ 7); Transcript at 59.

[1]     This officer is identified as Lieutenant "Brureton" in the complaint.

Lunney subsequently filed a request for discretionary review with Brian Fischer, at that time the Superintendent of Sing Sing. Lunney Aff. ¶ 13; Am. Compl. at 2. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. Lunney Aff. ¶ 13; Am. Compl. at 2. In an appeal to the Commissioner of the New York State Department of Correctional Services, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action in state court had been filed. Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). The Acting Director of Special Housing rejected the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the SHU. *Id.;* Review of Superintendent's Hearing (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002, with respect to the rehearing. *See* Article 78 Petition (reproduced as Ex. E to Motion to Dismiss); Lunney Aff. ¶ 15. On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed the misbehavior report and ordered the Department of Correctional Services ("DOCS") to expunge all references to the incident from Lunney's institutional record. *See* Decision, Order and Judgment, dated Aug. 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants'

Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl. Opp. to Mot. to Dismiss")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.* at 3.

**\*3**  Lunney was confined to the SHU for 180 days, Lunney Aff. ¶ 17, from May 21, 2002, to November 21, 2002. As is described in greater detail below, during this period Lunney asserts that he was served with cold, spoiled, or poorly prepared food, given inadequate laundry services, and denied hygiene items, showers, meals, and recreation by SHU staff. *Id.* ¶¶ 18, 21-23, 29 (incorporating Am. Compl. ¶ 15(a)-(d), (g)). Lunney also asserts that he was criticized and threatened by SHU staff for filing grievances related to prison conditions, and threatened with transfer by Superintendent Fischer. *Id.* ¶¶ 28, 30, 31 (incorporating Am. Compl. ¶ 15(f)-(h)). Lunney asserts that, on one occasion, he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)-(2)).

### B. *Procedural History*

The original complaint in this action was filed on March 29, 2004. *See* Complaint (Docket # 2) ("Compl."). It alleged the following claims: (1) violation of due process when Selsky convened a new disciplinary hearing while the Article 78 review of the first hearing was pending, Compl. at 7 (¶ 1); (2) violation of due process based on the failure to provide Lunney with a timely written disposition of the second hearing, Compl. ¶ 8; (3) that in violation of the Eighth Amendment, Lunney was subject to "overall poor" conditions of confinement in the Sing Sing SHU, *see id.* at 7 (¶ 3), including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material, Compl. ¶ 16; and (4) that he was retaliated against for filing grievances with respect to conditions in the SHU, *id.* ¶¶ 17, 19; *id.* at 7 (¶ 2), in violation of his rights under the First Amendment. Lunney sought $10 million in punitive and/or compensatory damages. *Id.* at 8.

Defendants filed a motion to dismiss. *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16). On February 23, 2005, this Court dismissed all of Lunney's claims except for: (1) his Eighth Amendment claim against Fischer with regard to improperly prepared food; (2) his First Amendment claim

against Fischer alleging that he was threatened with physical retaliation for filing grievances; and (3) his due process claim against Brereton regarding the failure to receive a written disposition of his disciplinary hearing. *See Lunney v. Brureton,* 2005 WL 121720, at *16 (S.D.N.Y. Jan.21, 2005) (*"Lunney I"* ), *adopted by,* 2005 WL 433285, at *1 (S.D.N.Y. Feb.23, 2005). Lunney was given the opportunity to replead his claims. *Lunney I,* 2005 WL 121720, at *16.

Lunney then filed an amended complaint, which restated most of the allegations included in his original complaint. *See Id.* ¶¶ 15. It also contained new claims. Significantly, Lunney amended his original complaint to include as defendants Officers Michael Blot and Parrish Frazier. *See* Am. Compl. ¶ 16(h), (i). The claims in the amended complaint are as follows: (1) Selsky deprived Lunney of his First and Fourteenth Amendment rights by ordering a new disciplinary hearing and "depriving [him] of his right to challenge the original hearing in a court of law," *see id.* ¶ 16(a); (2) Brereton violated Lunney's due process rights by failing to provide him with a written copy of the disposition for the hearing on October 17, 2002, *id.* ¶ 16(f); (3) Robert Murphy, Fischer, and Kikendall violated Lunney's due process rights by failing to remedy Lieutenant Brereton's failure to provide a copy of the disposition, *id.* ¶¶ 16(b)-(d); (4) Fischer violated Lunney's First Amendment rights by threatening to transfer him in retaliation for filing grievances, *id.* ¶ 16(c); (5) Fischer failed to remedy the "numerous sub-standard conditions of confinement in the S.H.U.," and subjected him to "forced labor without pay," *id.;* (6) Sean Kober violated Lunney's First and Eighth Amendment rights by failing "to operate the Sing Sing I.G.R.C. in accordance with D.O.C.S. policy and thus[ ] deprived plaintiff of his means to petition the government for the redress of grievances," *id.* ¶ 16(e); (7) Anthony Chu violated Lunney's Eighth Amendment rights by failing to remedy "the many problems that existed with the S.H.U. food service program and for failing to provide plaintiff with wholesome, nutritious and properly prepared meals," *id.* ¶ 16(g); (8) Blot violated Lunney's First, Eighth, and Fourteenth Amendment rights by (a) assaulting him, threatening and harassing him, and depriving him of showers, meals and recreation, all in retaliation for Lunney's filing of grievances; (b) by co-signing a misbehavior report against Lunney for an incident in which Blot was not involved; (c) by threatening Lunney for making complaints against other staff members; (d) by depriving Lunney of access to clean clothing and/or failing to ensure that the clothing was laundered; (e) by failing to provide Lunney with basic hygiene items; and (f) by failing to remedy the plumbing problems in Lunney's

SHU cell, *id.* ¶ 16(h); and (9) Frazier violated Lunney's First and Eighth Amendment rights by assisting Blot in the aforementioned violations. *Id.* ¶ 16(i).

**\*4** On April 24, 2006, defendants moved for summary judgment on all claims. [2] On June 13, 2006, Lunney filed opposition papers. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment (Docket # 87) ("Pl.Mem."); Lunney Aff. Lunney's papers did not include a statement made in response to the Defendants' 56.1 Statement as required by Local Civil Rule 56.1. Defendants subsequently filed reply papers. *See* Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment, filed July 28, 2006 (Docket # 91) ("Def. Reply Mem."); Lee Reply Declaration, filed July 28, 2006 (Docket # 92) ("Lee Reply Decl."). Lunney then submitted a sur-reply memorandum with an additional affidavit. Plaintiff's Sur-Reply Memorandum, filed Sept. 12, 2006 (Docket # 96) ("Pl.Sur-Reply"); Affidavit, dated Sept. 7, 2006 (Docket # 97) ("Sur-Reply Aff.").

[2]  *See* Notice of Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 72); Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 73) ("Def.Mem."); Defendants' Rule 56.2 Statement, filed Apr. 24, 2006 (Docket # 74); Declaration of Brian Fischer, filed Apr. 24, 2006 (Docket # 75) ("Fischer Decl."); Declaration of Paul Kikendall, filed Apr. 24, 2006 (Docket # 76); Declaration of Robert Murphy, filed Apr. 24, 2006 (Docket # 77); Declaration of Michael Blot, filed Apr. 24, 2006 (Docket # 78) ("Blot Decl."); Declaration of Parrish Frazier, filed Apr. 24, 2006 (Docket # 79) ("Frazier Decl."); Declaration of Sean Kober, filed Apr. 24, 2006 (Docket # 80); Rule 56.1 Statement, filed Apr. 24, 2006 (Docket # 81) ("Def.56.1"); Chu Declaration in Support of Defendants' Motion for Summary Judgment, filed Apr. 24, 2006 (Docket # 82); Declaration of Thomas G. Eagen, filed Apr. 24, 2006 (Docket # 83) ("Eagen Decl."); Declaration of Donald Selsky, filed Apr. 24, 2005 (Docket # 84) ("Selsky Decl."); Declaration of Benjamin Lee, filed Apr. 24, 2006 (Docket # 85) ("Lee Decl.").

## II. *APPLICABLE LAW*

### A. *Standard of Review on Summary Judgment Motions*

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the nonmovant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial,*' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P 56(e)) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial," summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex,* 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247-48).

### B. *Exhaustion*

#### 1. *PLRA*

**\*5** The Prison Litigation Reform Act ("PLRA") provides in relevant part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Accordingly, "[c]omplete exhaustion of ... administrative remedies through the highest level for each claim is required." *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.), *aff'd,* 178 Fed. Appx. 39 (2d Cir.2004); *see also Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) ("All 'available' remedies must now be exhausted; those remedies need not meet federal standards, nor must they be 'plain, speedy, and effective.' ") (citations omitted). In addition, the exhaustion must be "proper"- that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo,* --- U.S. ----, ---- - ----, 126 S.Ct. 2378, 2386-87, 165 L.Ed.2d 368 (2006) (internal citation and quotation omitted). Further, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532. The exhaustion requirement applies even when a plaintiff seeks relief not available in prison administrative proceedings, such as monetary damages. *See Booth v. Churner,* 532 U.S. 731, 740-41, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). Nonetheless, an inmate is not required to use this process where it "was reasonable for the inmate to conclude that his administrative remedies had been exhausted by [a] positive disposition" of some informal complaint. *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005); *accord Dixon v. Goord,* 224 F.Supp.2d 739, 749 (S.D.N.Y.2002) ("The exhaustion requirement is satisfied by resolution of the matter, i.e., an inmate is not required to continue to complain after his grievances have been addressed."); *Perez v. Blot,* 195 F.Supp.2d 539, 546 (S.D.N.Y.2002).

In this Circuit, when a plaintiff advances a plausible explanation for his failure to exhaust, a court engages in a three-part analysis:

First, the court must ask: whether administrative remedies were in fact "available" to the prisoner. [Second], [t]he court should also inquire ... whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. [Third], [i]f the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether *special circumstances* have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements.

**\*6** *Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)) (emphasis and alterations in original); *accord Curry v. Mazzuca,* 2006 WL 250487, at \*6 (S.D.N.Y. Feb.2, 2006).

Finally, in *Jones v. Bock,* --- U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), the Supreme Court held that courts must consider claims in a § 1983 complaint that have been exhausted despite the presence of unexhausted claims. 127 S.Ct. at 923-26.

2. *New York's Inmate Grievance Program*

In New York, formal exhaustion for state prisoners generally requires complying with the three-step grievance and appeal procedure outlined in the Inmate Grievance Program. *See* N.Y. Comp.Codes R. & Regs. tit. 7 ("7 N.Y.C.R.R."), § 701.5. In brief, an inmate must first file a complaint with the Inmate Grievance Resolution Committee ("IGRC"). 7 N.Y.C.R.R. § 701.5(a). Next, after receiving a response from the IGRC, the inmate may appeal to the superintendent of the facility. *Id.* § 701.5(b). Finally, after receiving a response from the superintendent, the prisoner may seek any review of

2007 WL 1544629

the superintendent's decision with the Central Office Review Committee ("CORC"). *Id.* § 701.5(c). *See Hemphill,* 380 F.3d at 682. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at *7 (S.D.N.Y. Aug.10, 2006) (citing cases).

III. *DISCUSSION*

In his opposition papers, Lunney did not submit a statement in response to the defendants' statement under Local Civil Rule 56.1. In light of Lunney's *pro se* status, and in light of the fact that he submitted an affidavit setting forth his disagreements with the defendants' version of the facts, *see* Lunney Aff., the Court will exercise its discretion not to penalize Lunney for this failure. *See, e.g., Phoenix Global Ventures, LLC v. Phoenix Hotel Assocs., Ltd.,* 422 F.3d 72, 75 (2d Cir.2005) ("district court has inherent authority to determine when to overlook or excuse a departure from its own local rules").

We now address the claims made in Lunney's amended complaint.

A. *Eighth Amendment Claim Relating to Food in the SHU*
Lunney maintains his Eighth Amendment rights were compromised when he was served food that was "cold, spoiled and poorly prepared" on "a near daily basis" during his detention in the SHU. *See* Lunney Aff. ¶ 18; Affirmation of A. Franco, DIN # 01-A-5104, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (milk often spoiled, fruits and vegetables rotten, appearance and quality of meals poor and unpalatable, inmates forced to refuse meals on numerous occasions); Affirmation of Johnny Casaigne, DIN # 04-A-2867, undated (reproduced in Ex. E to Lunney Aff.), ¶ 3(a) (same); Deposition of Johnny E. Casaigne, dated June 24, 2005 (reproduced as Ex. F to Lunney Aff.), at 27 ("I rarely ate the food because when it did come it was ... either spoiled, ice cold or wasn't even cooked right."); Deposition of Alisjandro Franco, dated June 24, 2005 (reproduced as Ex. G to Lunney Aff.), at 19 (refused meals "a few times"). Lunney states that he and other inmates "were often forced to refuse meals due to the poor quality of the food." *See* Lunney Aff. ¶ 18. Lunney also states that complaints and grievances about these problems were ignored, and that inmates "had to resort to refusing entire meals so as so as to get the attention of" defendants. *See id.* ¶ 19 (incorporating Am. Compl. ¶ 15(a)(1)). Finally, Lunney alleges that he suffered "[w]eight loss and muscle atrophy as a result of not receiving adequate meals." *See Id.* ¶ 18 (incorporating Am. Compl. at 18 (¶ 2)), and that on

one occasion he and other inmates "became ill after eating," *see Id.* ¶ 18. He states that the illness consisted of "stomach cramping, nausea, slight fever, chills and diarrhea," and that the inmates received antacid tablets for their discomfort. *See id.* (incorporating Am. Compl. at 18 (¶ 2)); Ambulatory Health Record, dated Aug. 20, 2002 (reproduced as Ex. H to Lunney Aff.) (medical records reflecting a doctor's assessment of "upset stomach," for which Lunney was given antacid tablets). Defendants note that Lunney "acknowledged that other than one alleged incident involving a dinner of rice and beans, [he] was never treated for food poisoning or spoiled food and that he did not know other inmates in the S.H.U. who were treated for food poisoning or spoiled food." *See* Def. 56.1 ¶ 20 (citing Deposition of George Lunney, dated June 23, 2005 (reproduced as Ex. A to Lee Decl.) ("Lunney Dep."), at 123).

**\*7** Defendants argue that Lunney has failed to exhaust his claim that the food in the SHU posed a threat to him and the other SHU inmates. *See* Def. Mem. at 11. With respect to this claim, Lunney does not argue that the grievance process was unavailable to him, that there is a basis for estopping defendants from relying on the exhaustion doctrine, or that there are other special circumstances excusing his failure to exhaust, *see* Pl. Mem. at 9-10-though, as described further below, he does make such an argument with respect to the excessive force and other retaliation claims. *See id.* at 6-7, 12-13. Rather, to support his contention that the food claim is exhausted, Lunney cites to grievances SS-35888-02 and SS-36314-02, as well as to "a grievance dated Sept. 29, 2002 and the letters sent to D.O.C.S. officials." *See id.* at 9 (citing Ex. K to Lunney Aff.). Grievance SS-35888-02, however, complains only that SHU inmates "received only one cup of milk" and that the inmates "do not get what we're supposed to" in terms of "healthy food items." *See* Grievance SS-35888-02, dated July 20, 2002 (reproduced in Ex. K to Lunney Aff.). It mentions nothing about spoiled food or food that posed an immediate health risk to the inmates. Grievance SS-36314-02 mainly states that Lunney received Rice Krispies for breakfast even though the menu called for Bran Flakes, and thus that he was not receiving the proper amount of fiber in his diet. *See* Grievance SS-36314-02, dated Sept. 24, 2002 (reproduced in Ex. K to Lunney Aff.). It then also makes a brief reference to his food being "ice cold." *Id.* Thus, neither of these grievances support the broad claims now being made in the complaint.

Lunney also provides a copy of a purported grievance dated September 29, 2002. *See* Grievance (reproduced in Ex. K

2007 WL 1544629

to Lunney Aff.). This grievance-which defendants contend was considered as part of SS-36314-02, *see* Def. Reply Mem. at 8 n. 2-contains a fleeting reference to "spoiled or rotten food" but gives no specifics on when the serving of such food occurred. This generic and unexplained reference to "spoiled or rotten food"-included at the end of a grievance that focuses largely on whether the fiber content of the food met dietary guidelines-was not sufficient to alert the prison officials as to the claims now being made in this complaint. While inmates are held only to a standard of "notice pleading" in grievances, *see Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004), Lunney's grievance statement was far too vague to provide the defendants with notice of when such spoiled food was served, in what manner, and with what frequency. It is thus insufficient to have exhausted this claim.

In any event, Lunney has not met his burden of showing he made the required appeals of even this grievance or that he should be excused from having done so. Although he asserts that this grievance was denied and appealed to the Superintendent, he concedes that he did not appeal it to the CORC, stating only that, based on the Superintendent's reply, "an appeal to the C.O.R.C. was unnecessary." Pl. Sur-Reply at 14. Lunney's general allegations that his grievances "proved ineffective in correcting the problems with the food" and that he made additional verbal complaints, *see* Lunney Aff. ¶ 19, do not excuse his failure to exhaust. *See, e.g., Curry v. Fischer,* 2004 WL 766433, at *6 (S.D.N.Y. Apr.12, 2004) ("Since informal channels did not lead to the resolution of his complaints, Curry cannot be deemed to have informally exhausted his remedies." (citing *Hernandez v. Coffey,* 2003 WL 22241431, at *3 n. 4 (S.D.N.Y. Sept.29, 2003) (informal exhaustion cannot be found where no resolution is reached)); *see also Williams v. City of New York,* 2005 WL 2862007, at *10 (S.D.N.Y. Nov.1, 2005) ("It is well settled that complaint letters to DOCS or prison officials do not satisfy the PLRA's exhaustion requirements.").

**\*8** Lunney makes general claims about the alleged mismanagement of the grievance process, *see* Pl. Mem. at 71-75, which are discussed further in section III.E below. However, there is no reason why these alleged failures should have excused his obligation to exhaust his claims regarding food. Nor has he shown that he was otherwise prevented from filing grievances on food-a fact most obviously demonstrated by the fact that he filed various food-related grievances as has just been noted. Notably, Lunney asserts that between February 2002 and March 2004 he filed "more than 100 grievances and more than a dozen complaints with outside

agencies and D.O.C.S. officials regarding nearly every aspect of his confinement." Pl. Sur-Reply at 19.

In sum, Lunney's claim that his Eighth Amendment rights were violated by the failure of the prison system to provide him with safe food, *see* Am. Compl. ¶ 16(g), is unexhausted and must be dismissed.

B. *Eighth Amendment Claim of Excessive Force*
Lunney claims that he was assaulted by Officers Blot and Frazier "[d]uring his first week in the S.H.U." after he attempted to notify another officer that his sink and toilet were broken and he was missing certain personal hygiene items. *See* Lunney Aff. ¶ 24. He states that as a result of this assault, he suffered a "[s]mall cut to lip and another to left side of jaw with bruises and contusions to face and body." *See id.* ¶ 25 (incorporating Am. Compl. at 18 (¶ 1)). The defendants argue that this claim is unexhausted and that it fails on the merits. *See* Def. Mem. at 10-11, 30-32. [3]

[3]
> Lunney has also asserted that the assault occurred in retaliation for complaints he has made. The retaliation claim with respect to the assault is discussed separately below in sections III.D.3.e (with respect to Blot) and III.D.4 (with respect to Frazier).

1. *Exhaustion*
Lunney states that he did not file a grievance against Blot and Frazier for this assault until after he was transferred to Cayuga Correctional Facility nearly two years later, because Blot threatened him with retaliation if he did so, stating that "he would receive a misbehavior report for assault on staff if he ... filed a complaint and claimed any injuries." *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e)(2)). Blot also told him that if he did file a grievance, "his time in S.H.U. would be longer and harsher." *See id.* Lunney argues that under cases such as *Ziemba v. Wezner,* 366 F.3d 161 (2d Cir.2004), his failure to file a timely grievance was "justifiable." *See* Pl. Mem. at 5-7.

Defendants argue that Lunney's failure to exhaust the excessive force complaint in a timely fashion should not be excused for several reasons: (1) the grievances and appeals Lunney filed in 2004 at Cayuga were untimely, and regardless, made no reference to any instance of excessive force by Officers Blot and Frazier, but only to the Tier III hearing and "conditions of confinement" in the SHU, *see*

2007 WL 1544629

Def. Reply Mem. at 6; (2) Lunney never mentioned any excessive force by Officers Blot and Frazier until he filed his amended complaint, *id.* at 7; and (3) the Second Circuit excuses failures to exhaust based on threats or retaliation only where "the record contain[s] documented proof of an inmate's prior complaints about the misconduct in a form other than a grievance along with allegations that an inmate was prevented from making these same complaints in the form of a grievance." *See id.* at 6 (citing *Ziemba* and *Hemphill* ).

**\*9** The first question is whether administrative remedies were in fact "available" to Lunney. *Brownell,* 446 F.3d at 311 (citing *Hemphill,* 380 F.3d at 686). To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738; *accord Abney v. McGinnis,* 380 F.3d 663, 667 (2d Cir.2004). There is no dispute that the prison "provided grievance procedures that inmates claiming excessive force could utilize," *see Hemphill,* 380 F.3d at 686-specifically, the three-step process outlined in 7 N.Y.C.R.R. § 701.5. Nor is there any dispute that Lunney used these procedures frequently both before and after the alleged incident with Blot and Frazier. *See* Eagen Decl., Exs. A & B. Indeed, Lunney concedes that he "has an extensive history of prosecuting grievances." *See* Pl. Sur-Reply at 4.

The availability inquiry does not end here, however. In *Hemphill,* the Second Circuit held that the test for deciding whether ordinary grievance procedures were "available" is an "objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." 380 F.3d at 688 (citing *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). The court went on to note that "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *See Hemphill,* 380 F.3d at 688.

Lunney's affidavit suggests that he failed to file a grievance regarding the assault by Officers Blot and Frazier until 2004 because Blot threatened him with retaliation if he did so. *See* Lunney Aff. ¶ 25 (incorporating Am. Compl. ¶ 15(e) (2)). Specifically, Lunney has asserted that Blot told him if he filed a grievance about the assault, "he would receive a misbehavior report for assault on staff" and that "his time in S.H.U. would be longer and harsher." *See id.* Lunney states

that this threat led him to avoid seeking medical attention or filing a complaint regarding the assault by Blot and Frazier until nearly two years later, when he was transferred to Cayuga Correctional Facility. *See id.* Because on this motion for summary judgment, we accept as true the admissible evidence of Lunney, we must assume that Blot did in fact threaten Lunney in the manner Lunney has claimed.

Applying the "ordinary firmness" standard, it is certainly plausible that a reasonable factfinder could conclude that a prisoner in Lunney's situation would be deterred from complaining about an assault that had just occurred. Here, Lunney alleged that he was beaten and that the beating was followed immediately by specific threats, some impliedly physical, if he filed a grievance. *See Hemphill, e.g.,* 380 F.3d at 688-89 (remanding for determination of availability of remedies where officer told plaintiff he had "better drop" his complaint regarding injuries sustained in a beating and not seek any medical attention or the officer would "make your life a living hell"); *McCullough v. Burroughs,* 2005 WL 3164248, at \*4 (E.D.N.Y. Nov.29, 2005) (plaintiff excused from failing to exhaust remedies after he was assaulted by officers in retaliation for prior grievances and during the assault, officer expressly threatened that he would "get [him]") (alteration in original); *accord Hepworth v. Suffolk,* 2006 WL 2844408, at \*4-7 (E.D.N.Y. Sept.29, 2006) (exhaustion excused where inmate was threatened for filing a grievance); *Larry v. Byno,* 2006 WL 1313344, at \*4 (N.D.N.Y. May 11, 2006) (inmate subject to physical assault and threats of violence excused from filing grievance); *cf. Benjamin v. Comm'r New York State Dep't of Corr. Servs.,* 2006 WL 783380, at \*4 (S.D.N.Y. Mar.28, 2006) (suggesting in dictum that administrative remedies would be rendered unavailable where "the complaint specifically recounted threatening statements made by correctional officers and plaintiff's 'acquiescence' to those threats") (citing *Hemphill,* 380 F.3d at 683-84, 687). Thus, Lunney has established a genuine issue of material fact with regard to the availability of administrative remedies for his claim of excessive force.

**\*10** Defendants contend that because Lunney "has no corroborated documentation of previously complaining about unconstitutional conduct in some form," this Court should not excuse his failure to exhaust this claim. *See* Def. Reply Mem. at 7. They argue that *Hemphill* and *Ziemba* "require[ ] this result. *See id.* at 6-7. However, neither *Hemphill* nor *Ziemba* held that a plaintiff alleging threats or retaliation in relation to an excessive-force claim is required to have "corroborated documentation of previously complaining"

about such force. Each merely noted that there had been some such documentation. For example, in *Hemphill,* the plaintiff alleged that he failed to exhaust his administrative remedies with regard to an excessive-force claim because an officer had told him, "I'll make your life a living hell throughout this penal system because I have friends all over." *See* 380 F.3d at 684. The Second Circuit held that the district court was required to consider whether "some seemingly available remedies were rendered unavailable by the threats Hemphill received" or alternatively, whether the defendants' exhaustion defense was estopped by the threats the officer had allegedly made to the plaintiff. *See id.* at 688-89. While the court noted that the plaintiff had written a letter to the superintendent of the prison, *see id.* at 688, the court's holding with respect to these questions did not rely on this fact, *see id.* at 688-89, and specifically noted that his letter to the superintendent did not necessarily mean that administrative remedies were "available" to him. *Id.*

Nor does it help defendants' argument that Lunney waited until his transfer to another facility, nearly two years later, to submit a grievance of any kind. First, such a delay is consistent with the actions of someone in fear of retaliation by Blot. Second, if Lunney was justified in not filing a grievance at all, he should not be penalized for filing an untimely one.

In sum, construing the record in the light most favorable to Lunney, a factfinder could conclude that administrative remedies were not "available" to Lunney with respect to his claim of excessive force. Accordingly, summary judgment cannot be granted on this question. [4]

4     Defendants assert that "in the event that the Court finds that there is a genuine dispute of material fact concerning exhaustion, and that plaintiff's claims cannot otherwise be dismissed, the proper procedure would be to hold an evidentiary hearing," Def. Reply Mem. at 10, rather than "proceed directly to trial." *Id.* There is certainly case law that supports the view that exhaustion should be determined by the Court rather than by a jury. *See, e.g., Wyatt v. Terhune,* 315 F.3d 1108, 1119-20 (9th Cir.) (in motion to dismiss for failure to exhaust administrative remedies under PLRA, court may "decide disputed issues of fact"), *cert. denied,* 540 U.S. 810 (2003); *Priester v. Rich,* 457 F.Supp.2d 1369, 1377 (S.D.Ga.2006) (same); *see also Dukes v. Doe,* 2006 WL 1628487, at *6 (S.D.N.Y. June 12, 2006) (ordering without

discussion an "evidentiary hearing" on the question of exhaustion under the PLRA); *cf. Pauling v. Sec'y of Dep't of Interior,* 71 F.Supp.2d 231, 232-33 (S.D.N.Y.1999) (issues of fact with respect to equitable tolling of statute of limitations to be decided by the court). As the Supreme Court has recently affirmed, however, exhaustion is an "affirmative defense," much like a statute of limitations defense. *See Jones v. Bock,* --- U.S. ----, ---- - ----, 127 S.Ct. 910, 919-921, 166 L.Ed.2d 798 (2007). Where there are disputed factual questions regarding an affirmative defense such as a statute of limitations defense, the Second Circuit has stated that "issues of fact as to the application of that defense must be submitted to a jury." *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 243 n. 2 (2d Cir.1984). Thus, it is not clear that factual disputes regarding the exhaustion defense should ultimately be decided by the Court.

*2. Merits*

Lunney asserts that after he attempted to notify another officer about his plumbing problems and lack of personal hygiene items, Officer Blot approached his cell and told him to "shut the fuck up or we are coming in there and you will not like the results." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(e) (1)). After further discussion between Lunney and Officers Blot and Frazier, Blot called for Lunney's cell door to be opened, and then "rushed into [his] cell and began punching [him] in the head and body." *Id.* Frazier then entered the cell "and placed [Lunney] in a choke hold for several minutes." *See id.* Lunney adds that he sustained "some bruises" from the attack, specifically that his "throat was bruised where Frazier had grabbed" him and that he had a "couple [of] black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See id.* ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")).

**\*11** Defendants argue that any injuries Lunney sustained were *de minimis* and thus not actionable under the Eighth Amendment. *See* Def. Mem. at 30-32; Def. Reply Mem. at 26-27.

To establish an Eighth Amendment violation based on a claim of excessive force, "an inmate must meet both an objective and a subjective requirement." *See Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). To meet the objective

requirement, "the alleged violation must be 'sufficiently serious' by objective standards." *See id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). The objective component is "context specific, turning upon 'contemporary standards of decency.' " *See Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (quoting *Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). To meet the subjective requirement, the inmate must show that the prison officials involved "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *See Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994). "[T]he 'wantonness' inquiry turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *See Blyden,* 186 F.3d at 262 (quoting *Hudson,* 503 U.S. at 7). "Thus, [t]he key inquiry under *Hudson* and its precedents is whether the alleged conduct involved unnecessary and wanton infliction of pain." *Sims v. Artuz,* 230 F.3d 14, 21 (2d Cir.2000) (citing *Davidson,* 32 F.3d at 30) (internal quotation marks omitted).

"However, the malicious use of force to cause harm constitutes an 'Eighth Amendment violation[ ] per se ... whether or not significant injury is evident.' " *Griffin,* 193 F.3d at 91 (quoting *Blyden,* 186 F.3d at 263). This result follows because " '[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.' " *Blyden,* 186 F.3d at 263 (quoting *Hudson,* 503 U.S. at 9). Nevertheless, "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

Furthermore, courts in this circuit have held that "although the subjective component is 'inherently an inquiry into [the] defendant's state of mind, plaintiff need not offer particular evidence of defendant's mental state. For purposes of opposing defendants' summary judgment motion, plaintiff has satisfied his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith.' " *See Watson v. Delgado,* 2006 WL 1716869, at *5 (S.D.N.Y. June 20, 2006) (quoting *Santiago v. Campisi,* 91 F.Supp.2d 665, 673 (S.D.N.Y.2000)); *see also Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself

may, in some circumstances, be sufficient evidence of a culpable state of mind.").

**\*12** In this case, Lunney states that Blot and Frazier first threatened him and then entered his cell and attacked him without provocation. *See* Lunney Aff. ¶¶ 24-25 (incorporating Am. Compl. ¶ 15(e)(1)). Because under Lunney's version of the facts, the officers' alleged use of force could not have been in good faith, he has provided sufficient evidence of the subjective component of an Eighth Amendment violation. *See, e.g., United States v. Walsh,* 194 F.3d 37, 50 (2d Cir.1999) ("the subjective element is satisfied in this case as there was absolutely no reasonably perceived need for the application of force"); *Santiago,* 91 F.Supp.2d at 673 ("Assuming plaintiff's story to be true, defendant's alleged conduct is clearly unrelated to any 'good-faith effort to maintain or restore discipline.' ") (citation omitted).

With regard to the objective component, Lunney has alleged that as a result of the assault by Blot and Frazier, he sustained "some bruises," specifically, his "throat was bruised where Frazier had grabbed" him and he had a "couple black and blues on my side," and that "about a week later bruises, you know, swelling went down." *See* Lunney Aff. ¶¶ 24-25 (citing Lunney Dep. at 171-74); *see also id.* (citing Lunney Dep. at 180-81 ("I could have used [medical attention], yeah. I had some bruises. I was pretty banged up.")). While defendants argue that any injuries Lunney suffered were *de minimis* and not documented by medical records, *see* Def. Mem. at 30-32, they point to no case where alleged injuries of this kind were considered outside the protection or the Eighth Amendment. Indeed, *Griffin* held that an inmate's Eighth Amendment claim survived summary judgment where "the only injuries he suffered were a bruised shin and swelling over his left knee," and "the only evidence he intended to offer in support of his claims was his own testimony." *See Griffin,* 193 F.3d at 91. The court explained that although the inmate's claim of excessive force was "weak and his evidence extremely thin, dismissal of the excessive-force claim was inappropriate because there are genuine issues of material fact concerning what transpired after appellant was handcuffed and whether the guards maliciously used force against him." *See id.* Thus, one court has concluded that "bruising or equivalent injuries may be found by a reasonable fact-finder to constitute minor rather than de minimis harm." *See Watson,* 2006 WL 1716869, at *7 (citing *McCrory v. Belden,* 2003 WL 22271192, at *6 (S.D.N.Y. Mar.22, 2004)) (internal quotation omitted).

Lunney's alleged injuries-involving bruising and contusions-are quite different from the claim of the prisoner in *Boddie,* who had alleged only that he had been "bumped, grabbed, elbowed, and pushed." *See Boddie,* 105 F.3d at 862. In dismissing the claim, *Boddie* noted that the plaintiff "does not maintain that he experienced any pain or injury as a result of the physical contact," and that he did not "allege facts that show that the defendants used force 'maliciously and sadistically to cause harm,' rather than 'in a good-faith effort to maintain or restore discipline.'" *See id.* Both these circumstances are present in Lunney's case, however.

**\*13** In *Espinal v. Goord,* 2001 WL 476070 (S.D.N.Y. May 7, 2001), the court found the plaintiff's injuries to be *de minimis* where he was hit in the face two or three times, making his face turn red. 2001 WL 476070, at \*13. However, the plaintiff in that case described these injuries as "really nothing." *Id.* In *Perkins v. Brown,* 285 F.Supp.2d 279 (E.D.N.Y.2003), a prisoner was not permitted to base an excessive force claim on allegations of a "broken lip," swollen nose, eye, fingers, and wrists, jaw pain, chest bruising, and "stress disorder" resulting from being struck, where the only evidence was the plaintiff's testimony and it was contradicted by prior statements of the plaintiff and medical evidence *Id.* at 284. The district court also pointed to a number of factors reflecting that such injuries were in fact *de minimis,* including the plaintiff's assertion that his pain was "nothing major" or "nothing serious." *Id.* In contrast, Lunney has stated that his throat was bruised from being put in choke hold, that he had bruises on his side as well, and that the swelling from these injuries did not subside for about a week.

To the extent the defendants argue that the lack of medical records showing treatment is grounds for dismissing Lunney's claim, the Court rejects this argument inasmuch as there is no requirement that the claim of injury be substantiated in contemporaneous medical records. *See Griffin,* 193 F.3d at 91 (Eighth Amendment claim permitted to proceed to trial even though only evidence supporting it was plaintiff's testimony). Thus, cases have frequently denied summary judgment for excessive-force violations while noting the absence of corroborating medical records. *See, e.g., Atkins v. County of Orange,* 372 F.Supp.2d 377, 399 (S.D.N.Y.2005); *Davis v. Patrick,* 2000 WL 1154065, at \*1 (S.D.N.Y. Aug.14, 2000); *Baskerville v. Goord,* 2000 WL 897153, at \*1-2 (S.D.N.Y. July 6, 2000).

Finally, Blot and Frazier are not protected by qualified immunity on this claim. Qualified immunity attaches where

(1) a constitutional right would have been violated on the facts alleged; but (2) it would have been objectively reasonable for the defendant to have believed that his actions did not violate clearly established law. *See Saucier v. Katz,* 533 U.S. 194, 200-201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Lunney has a constitutional right to be free from a correction officer's use of excessive force, and it could not be objectively reasonable for Officer Blot or Officer Frazier to have believed that the use of excessive force is allowed under the law. *See Calamia v. City of New York,* 879 F.2d 1025, 1036 (2d Cir.1989) ("The right of an individual not to be subjected to excessive force has long been clearly established."); *Johnson v. City of New York,* 2006 WL 2354815, at \*5 (S.D.N.Y. Aug.14, 2006) (citing cases).

C. *Eighth Amendment Claims Based on Lack of Laundry Services and Personal Hygiene Items*

**\*14** Lunney claims that prison officials violated his Eighth Amendment rights based on the existence of inadequate laundry services, plumbing problems, and the deprivation of personal hygiene items. *See* Lunney Aff. ¶¶ 20-23. While the defendants argue that these claims are unexhausted, *see* Def. Mem. at 11, it is unnecessary to reach this question because the claims fail on the merits.

The Supreme Court has held that "[t]he Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state for the prison officials is "deliberate indifference." *Wilson,* 501 U.S. at 302-03.

1. *Laundry Services*

Lunney re-alleges the claim from his original complaint that the laundry services in the SHU were inadequate. *See* Lunney Aff. ¶¶ 20-21. In rejecting this claim on the motion to dismiss, this Court held that there "is no Eighth Amendment violation ... in instances where inmates are provided the opportunity and the supplies to wash their own clothes." *See Lunney I,* 2005 WL 121720, at *8 (citing *Green v. Ferrell,* 801 F.2d 765, 771 (5th Cir.1986) (no constitutional violation where inmates were permitted to wash their clothes in sinks and were provided with laundry detergent)); *Benjamin v. Fraser,* 161 F.Supp.2d 151, 178-79 (S.D.N.Y.2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth Amendment), *aff'd in relevant part and vacated in part,* 343 F.3d 35 (2d Cir.2003). The Court thus concluded that "Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services." *See Lunney I,* 2005 WL 121720, at *8. Lunney asserts that his sink was small and that he was not given soap specifically for laundry purposes. Lunney Dep. at 167. But he has not submitted evidence that would allow a reasonable to jury to conclude that he could not achieve some level of cleanliness with the materials he had. *See generally Benjamin,* 161 F.Supp.2d at 178-79. That Lunney asserts he was without soap for eight days and had a clogged sink for five, as described in the next section, shows at most that he lacked the means to clean his own clothing for a relatively brief period. As such, there was no Eighth Amendment violation.

### 2. *Plumbing Problems and Failure to Provide Personal Hygiene Items*

**\*15** Lunney alleges that he "was placed in a cell where the sink was clogged and there was no running water." *See* Lunney Aff. ¶ 22. He states that he made "verbal complaints" and that the sink was repaired "on about plaintiff's fifth day in S.H.U." *See id.* (incorporating Am. Compl. ¶ 15(c)). He also states that he did not receive "soap, toothpaste, a toothbrush, and other hygiene items." *See Id.* ¶ 23. While he states that his verbal complaints were ignored, he adds that the problem "was informally resolved on May 29, 2002 when C.O. Lebron of the I.G.R.C. corrected the problem." *See id.*

With regard to toiletries and hygiene items, Lunney fails to show that such a denial rose to the level of deliberate indifference to his health or safety. Courts have typically held that temporary deprivations of toiletries do not violate the Eighth Amendment. *See Trammell v. Keane,* 338 F.3d 155, 165 (2d Cir.2003) (deprivation of "toiletries for

approximately two weeks-while perhaps uncomfortable-does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference' ") (quoting *Farmer,* 511 U.S. at 837) (alterations in original); *Fernandez v. Armstrong,* 2005 WL 733664, at *5-6 (D.Conn. Mar.30, 2005) (up to 16-day deprivation of toothbrush, toothpaste, soap, and shampoo did not violate the Constitution).

With regard to Lunney's claim of no running water, defendants have pointed to evidence that Lunney filed a grievance on May 23, 2002, regarding the plumbing problems in his cell, Grievance SS-35563-02, dated May 23, 2002 (reproduced as Ex. J to Lunney Aff.), and that it was repaired the next day. *See* SHU Activity Log, dated May 24, 2002 (reproduced as Ex. D to Lee Reply Decl.). Even if Lunney's cell sink lacked running water for five days, as he claims, he does not show an Eighth Amendment violation given that there is no evidence that he was deprived of water entirely during this period. The "[l]ack of access to running water, by itself, does not constitute the denial of the minimal civilized measure of life's necessities." *James v. Monroe County Jail,* 2005 WL 2030730, at *3 (W.D.N.Y. Aug.23, 2005) (no constitutional violation where inmates claimed they lacked running water from cell sinks for several hours every night for over four months); *see also Johnson v. Comm'r of Corr. Servs.,* 699 F.Supp. 1071, 1074 (S.D.N.Y.1988) (plaintiff confined for one week in a cell with an inoperable sink did not suffer a constitutional violation because he was provided drinks with meals); *Castro v. Chesney,* 1998 WL 767467, at *4 (E.D.Pa. Nov.3, 1996) (no constitutional violation where plaintiff placed in a "dry cell" without running water for several days, given water "sometimes" when he asked for it and water was turned on every other day so he could wash his face and brush his teeth).

### 3. *Personal Involvement*

**\*16** In any event, even if some constitutional deprivation had been shown, Lunney's submission does not provide facts that would show that any particular defendant sued here was personally involved in committing the violation. As the Second Circuit has noted, "[a]n individual cannot be held liable for damages under § 1983 'merely because he held a high position of authority.' " *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996)). He can only be held liable if he was "personally involved in the

alleged deprivation." *Id.* While there are number of ways in which such involvement can be shown, *see, e.g., Back,* 365 F.3d at 127 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)), Lunney has not provided evidence (as opposed to speculation) as to any of them.

In sum, defendants are entitled to summary judgment on Lunney's claims of a temporary lack of running water, plumbing problems, and denial of personal hygiene items.

### D. *First Amendment Retaliation Claims*

Lunney asserts that he was assaulted by Blot and Frazier because he made verbal complaints about SHU conditions, *see* Lunney Aff. ¶ 24; that Blot threatened him with physical violence on several occasions for his writing of grievances, *see id.* ¶¶ 30-31; that Blot denied him recreation, meals, and showers because of his complaints, *see id.* ¶ 29; and that Fischer threatened to transfer him to Attica for writing grievances, *see id.* ¶ 28 (incorporating Am. Compl. ¶ 15(f)). He also asserts in his amended complaint that Brereton fired him from his position as a porter "as a means of retaliation." Am. Compl. at ¶ 15(g)(2). The defendants argue that these claims are unexhausted and fail on the merits. *See* Def. Mem at 9-12, 12-17; Def. Reply Mem. at 9-10, 11-15.

In its prior ruling, the Court dismissed Lunney's general allegations of threats and harassment because "comments that are merely 'insulting' or 'disrespectful' do not give rise to a constitutional violation." *See Lunney I,* 2005 WL 121720, at *11 (citations omitted). The Court also dismissed Lunney's claim that Fischer threatened to transfer him to another facility for writing grievances because, *inter alia,* Lunney did not allege that he was transferred because he filed grievances against prison officials. *See id.* However, the Court did not dismiss Lunney's claim that he was threatened with physical violence for filing grievances. *See id.* (citing *Hernandez v. Goord,* 312 F.Supp.2d 537, 545 (S.D.N.Y.2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim)). Lunney's retaliation claims re-appeared in somewhat different form in his amended complaint, *see* Am. Compl. ¶ 16(c), which also contains new retaliation claims against Blot, Frazier and Brereton. *See id.* ¶¶ 15(g)(2), 16(h), (i).

### 1. *Law Governing First Amendment Retaliation*

**\*17** The First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996)

("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988)). "[I]ntentional obstruction of a prisoner's right to seek redress of grievances 'is precisely the sort of oppression that ... section 1983[is] intended to remedy.' " *Id.,* 89 F.3d at 80 (quoting *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987)) (alterations in original). A prisoner asserting a retaliation claim must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

Moreover, in the prison context, the Second Circuit has recognized "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated." *Colon,* 58 F.3d at 872 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). Thus, courts "examine prisoners' claims of retaliation with skepticism and particular care." *Colon,* 58 F.3d at 872.

### 2. *Claims against Fischer*

In his affidavit, Lunney alleges that Fischer "repeatedly threatened" him "in retaliation for his filing of grievances and complaints regarding S.H.U. conditions." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)) (Lunney "subjected to threats of being transferred to Attica" by Fischer, who "made it quite clear to plaintiff that he did not like the fact that plaintiff was writing grievances and complaints to outside agencies."). He further states that his prison records reflect that Fischer attempted to transfer him "under the reason that plaintiff's behavior in Sing Sing was unsuitable." *See* Lunney Aff. ¶ 28 (incorporating Am. Compl. ¶ 15(f)). While defendants argue that Lunney's claim should be dismissed because he did not properly exhaust the claim in accordance with the PLRA, it is not necessary to reach this question because the claim fails on the merits.

Lunney's First Amendment claim against Fischer is based on his claim that Fischer "threaten[ed]" him in response to his grievance writing. Am. Compl. ¶ 16(c); Lunney Aff. ¶ 28. But Lunney's only specific allegation on this point is that Fischer "did ... *try* to transfer plaintiff but D.O.C.S. officials in Albany, New York cancelled the transfer." Lunney Aff. ¶ 28 (emphasis added); *see also* Pl. Mem. at 14-17.

Lunney v. Brureton, Not Reported in F.Supp.2d (2007)

2007 WL 1544629

This allegation cannot meet the requirement that the plaintiff experience an "adverse action." *Pidlypchak,* 389 F.3d at 380. While "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492-93 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis v. Goord,* 320 F.3d 346 (2d Cir.2003)).

 **\*18** The allegation in the complaint regarding the threats of transfer cannot be objectively viewed as deterring a person of ordinary firmness from exercising First Amendment rights. This is particularly true where Lunney's allegations are devoid of any dates or descriptions of the manner in which Fischer made the alleged threats. Moreover, the lack of dates also makes it impossible to determine whether there was a causal connection between the filing of grievances and the adverse action. Accordingly, summary judgment on this claim should be granted. It is, therefore, unnecessary to reach the question of qualified immunity. *See* Def. Mem. at 34; Def. Reply Mem. at 25. [5]

[5]    Lunney was transferred some time later, in 2004, to Cayuga Correctional Facility, long after the grievances and alleged threats by Fischer were made. *See* Lunney Aff. ¶ 26. Lunney has not alleged any facts regarding this transfer and also has not provided evidence that Fischer caused this transfer. Notably, there is an affidavit from Fischer stating that he was not involved in Lunney's transfer. *See* Fischer Decl. ¶¶ 5-7; *see generally Davidson v. Donnelly,* 2004 WL 1941349, at *3 (W.D.N.Y. Aug.29, 2004) (no claim for retaliatory transfer where plaintiff provided no evidence on reason for transfer and prison officials gave reasons).

3. *Claims against Blot*

Lunney asserts that (1) Officer Blot denied him showers, meals, and recreation in retaliation for his grievances, *see* Lunney Aff. ¶ 29; (2) that Blot co-signed a misbehavior report against him stemming from an incident to which Blot was not a party; and that Blot subsequently told Lunney, "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," *see id.* ¶ 31 (incorporating Am. Compl. ¶ 15(h)); (3) that Blot threatened to harm Lunney physically if Lunney refused Blot's offer of a bribe to stop writing grievances, *see id.* ¶ 30; and (4) Blot assaulted him in retaliation for verbal complaints about the conditions in the SHU. *See id.* ¶¶ 24-25.

Defendants contend that each of these claims should be dismissed because Lunney failed to exhaust them and also dismissed on the merits. *See* Def. Reply Mem. at 5-7, 10. Defendants further contend that Blot is entitled to qualified immunity "from plaintiff's retaliation claim involving an alleged false misbehavior report ...." Def. Mem. at 34; Def. Reply Mem. at 29-30.

 a. *Exhaustion of Claims Against Blot*
As to the four claims with respect to which the exhaustion defense has been raised, we have already discussed why Lunney should be excused from having failed to grieve the assault claim, *see* section III.B.1, and the same reasons that excuse the failure to grieve the assault apply equally to the claim that the motive for the assault was to retaliate for protected activity. Accordingly, there is no need to discuss exhaustion with respect to this aspect of the retaliation claim against Blot.

In addition, we conclude, for the reasons discussed in section III.D.3.c below, that Lunney's claim with respect to the false misbehavior report would fail on the merits. Accordingly, our discussion of exhaustion relates only to claims (1) and (3): that is, the claim regarding the denial of showers, meals, and recreation and the claim regarding the threat of physical violence.

Lunney alleges that Blot said: "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time." Am. Compl. ¶ 15(h). He also states that "[Blot] would come in and threaten guys and tell guys 'listen, I'm going to write you up and you will get a new charge,' " Lunney Aff. ¶ 30 (citing Lunney Dep. at 190); and generally, that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he ... continued to write grievances." Am. Compl. ¶ 15(g).

More specifically, in his deposition, Lunney states that Blot became "offended and upset about my writing grievances and he said he didn't like people that wrote grievances"; that he "would complain that he didn't like people writing grievances" and would "criticiz[e]" him for it. Lunney Dep. at 187. Lunney recounts one conversation as follows:

**\*19** [H]e came to me one day and said "listen, I want you to stop writing grievances." And I said "listen, you guys are doing a lot of things wrong down here." He said "listen, if you don't stop writing grievances I'm going to break your fuckin' neck." He said "you're going to have a hard time in the SHU."

*Id.*

As already discussed in the context of Lunney's excessive-force claim, *see* section III.B the Second Circuit has held that "seemingly available remedies [may be] rendered unavailable by threats," *Hemphill,* 380 F.3d at 688, if a "similarly situated individual of ordinary firmness" would not have "deemed them available." *Id.* (citations and quotations omitted). Likewise, the Second Circuit has held that threats by prison authorities may provide grounds for estoppel if defendants "took affirmative action to prevent [the prisoner] from availing himself of grievance procedures." *Ruggiero v. County of Orange,* 467 F.3d 170, 178 (2d Cir.2006) (citing cases). [6]

[6]     The Second Circuit has recognized that "the case law on the PLRA's exhaustion requirement does not always distinguish clearly between (a) cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense, (b) situations in which administrative remedies are not 'available' to the plaintiff ...." *Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

Liberally construed, Lunney's argument can be read as asserting both that (1) his failure to follow the formal exhaustion process should be excused because Blot's threats rendered the formal grievance process effectively unavailable to him and (2) that Blot's exhaustion defense was estopped by Blot's alleged threats.

Lunney's general assertions regarding threats-without the specific of dates or content of threats-might not be sufficient to permit a finding on these points. But his assertion that Blot stated "if you don't stop writing grievances I'm going to break your fuckin' neck," Lunney Dep. at 187, coupled with the allegation that Blot had actually assaulted him previously, would be sufficient to allow a factfinder to conclude that a "similarly situated individual of ordinary firmness" would not have deemed the inmate grievance process available with respect to grievances that involve conduct by Blot. *See, e.g., Hepworth v. Suffolk County,* 2006 WL 2844408, at \*4-7 (E.D.N.Y. Sept.29, 2006) (inmate beaten and threatened with further violence after testifying against correction officers); *Larry v. Byno,* 2006 WL 1313344, at \*4 (N.D.N.Y. May 11, 2006) (physical assault coupled with threat to kill inmate after inmate mailed a complaint); *McCullough,* 2005 WL 3164248, at \*3-4 (assault with threat to "get [him]" if he filed another grievance). It also raises questions regarding estoppel as to any claim against Blot. Thus, a genuine issue of material fact exists as to (1) whether administrative remedies, though nominally "available," were functionally available to Lunney to grieve these claims-the deprivation of meals, showers and recreation and the threat of physical violence by Blot-against Blot and/or (2) whether Blot's alleged threats estop defendants from raising exhaustion as an affirmative defense.

We now address the merits of the four claims against Blot.

### b. *The Merits of Lunney's Allegation that Blot Denied Him Showers, Meals, and Recreation*

**\*20**  Lunney states that he was deprived of showers "at least twice a week." Lunney Dep. at 182. He asserts that this occurred "[b]ecause of problems I was having with Blot and my being vocal about the problems, the conditions of SHU." *Id.* at 183. He asserts that he was supposed to get three showers a week. *See* Pl. Mem. at 22. As to recreation, Lunney states that at least "three or four times a week [ ] Blot would come ... by with the list. He'd ask guys if they want recreation. We'd be brought down for breakfast. He'd tell me 'you're staying here.' " *Id.* (citing Lunney Dep. at 185-86). Lunney makes no specific statements as to Blot's depriving him of meals. While Blot denies ever depriving Lunney of meals, showers or recreation, *see* Blot Decl. ¶ 4, we accept Lunney's assertions as true for purposes of this motion.

Defendants challenge whether Lunney has established the second and third prongs of a prima facie case of retaliation: namely, whether (1) the deprivations constitute "adverse action," and (2) there is a causal connection between these deprivations and his grievance writing. Def. Mem. at 15.

*i. Adverse Action.* As an initial matter, defendants argue that Lunney's claim lacks sufficient specificity. Def. Reply Mem. at 13. As is true in response to any motion for summary

judgment, Lunney was required to provide evidence sufficient to allow a jury to find in his favor. Thus, "[c]onclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998). Lunney's allegations regarding denial of meals are completely lacking in any such specifics. His allegations regarding the denials of showers and recreation, however, are sufficiently detailed to allow a trier of fact to conclude that such denials occurred. Accordingly, we limit our discussion to the issue of whether the denial of showers and recreation constitute "adverse action."

As noted, the Second Circuit has held that while "the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes,* 239 F.3d at 492-93. Only retaliatory conduct which would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" may support such a claim. *Id.* at 493. Thus, the conduct must be "specifically directed at plaintiff[] and substantial enough to deter legitimate grievances against prison officers." *Salahuddin v. Mead,* 2002 WL 1968329, at *5 (S.D.N.Y. Aug.26, 2002). Conduct that is *de minimis* does not provide this deterrent effect and does not give rise to actionable retaliation. *Dawes,* 239 F.3d at 493; *see also Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999) (citing *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("[S]ince there is no justification for harassing people for exercising their constitutional rights [, harassment] need not be great in order to be actionable. Yet, ... [i]t would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise ....")) (alterations in original). What is *de minimis* varies according to context. *See Dawes,* 239 F.3d at 493 ("[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a[ retaliatory] action taken against them is considered adverse") (alteration in original) (citing *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir.1999)). Thus, in the prison context, not all harms constitute legally sufficient grounds for retaliation claims. *See Salahuddin,* 2002 WL 1968329, at *4-5 (citing cases).

**\*21** Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation. *Chestnut,* 193 F.3d at 150 (remanding to district court on interlocutory appeal where "there [was] a serious

question as to whether ... [plaintiff's] asserted one-day denial of an opportunity to exercise, w[as] more than *de minimis"*); *Snyder v. McGinnis,* 2004 WL 1949472, at *11 (W.D.N.Y. Sept.2, 2004) (deprivation of meal on two occasions is *de minimis* and does not state a claim for retaliation); *Lyons v. Wall,* 2006 WL 2945256, at *5 (D.R.I. Oct.13, 2006) (sporadic cold showers are *de minimis* ). Here, however, Lunney alleges a routine denial of showers and recreation such that he regularly had one shower a week instead of two, and three to four hours of recreation a week instead of the normal seven. Pl. Mem. at 22 (citing Lee Decl. Ex. J §§ 304.2, 304.3, 304.5; Lunney Aff. Ex. M at 140-142); *see also Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004) (discussing normal conditions of the SHU as two showers a week and one hour of recreation a day). Defendants have pointed to no case where a constant denial of showers and recreation, in the proportions alleged here, was deemed to be *de minimis* as a matter of law. [7]

[7] While defendants argue that "the alleged denial of meals, recreation and showers did not deter the exercise of plaintiff's rights as evidenced by his many grievances," Def. Mem. at 15, as noted, the test for adverse action is an "objective test [which] applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Pidlypchak,* 389 F.3d at 381 (citing *Davis,* 320 F.3d at 353).

In sum, defendants are not entitled to summary judgment on this point.

*ii. Causal Connection.* Lunney must also show that there was "a causal connection between the protected speech and the adverse action." *Pidlypchak,* 389 F.3d at 380. *Colon* discusses a number of factors relevant to whether a causal connection exists, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. 58 F.3d at 872-73; *accord Sloane v. Mazzuca,* 2006 WL 3096031, at *14 (S.D.N.Y. Oct.31, 2006); *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002).

Here, a reasonable factfinder might view Blot's decision to deny Lunney recreation and shower privileges as being prompted by Lunney's grievance writing. Lunney states that

Lunney v. Brureton, Not Reported in F.Supp.2d (2007)

2007 WL 1544629

upon arrival to the SHU, he immediately complained about the conditions of his cell, both verbally and through the filing of written grievances. Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶ 15(c)-(e)). On his third day in the SHU, Officers Blot and Frazier assaulted him, and Blot warned him that he would suffer consequences if he filed a grievance. *Id.* (incorporating Am. Compl. ¶ 15(e)(1)-(2)). Nonetheless, Lunney continued to file grievances in the SHU. *See, e.g.,* Ex. K to Lunney Aff. Blot stated to him that he "didn't like people that wrote grievances" and told him "listen, I want you to stop writing grievances" and that "if you don't stop writing grievances I'm going to break your fuckin' neck" and that "you're going to have a hard time in SHU." Lunney Dep. at 187. At the same time, Lunney states that he was routinely denied showers and recreation. Lunney Aff. ¶ 29. Thus, the evidence for causation centers on (1) the fact that there is no explanation provided for the denial of showers and recreation and (2) the evidence that Blot complained to Lunney about his writing grievances and specifically threatened Lunney about them during the same time period that the denial of showers and recreation was taking place. Lunney Dep. at 186-87. While it may also be reasonable to infer, as defendants argue, that the deprivations, if they did occur, were a result Lunney's "extensive disciplinary history," Def. Mem. at 15, on a motion for summary judgment, the Court must draw "all justifiable inferences" in favor of the non-moving party. *Anderson,* 477 U.S. at 255. Thus, Lunney has raised a genuine issue of material fact as to whether Blot denied showers and recreation in retaliation for Lunney's grievances. [8]

[8]    Defendants have made only a conclusory argument as to qualified immunity on this point, *see* Def. Mem. at 33-34, and thus we do not consider it here.

### c. *The Merits of Lunney's Allegation that Blot Filed a False Misbehavior Report*

**\*22** The filing of a false misbehavior report in response to constitutionally protected activity can constitute actionable retaliation. *See Graham,* 89 F.3d. at 79-81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Jones v. Coughlin,* 45 F.3d 677-78, 680 (2d Cir.1995) (per curiam) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation).

Lunney asserts that a misbehavior report dated June 22, 2003- approximately six months after he left the SHU-"stemmed

from plaintiff having sent letters to several facility staff members"-not including Blot-"complaining about being harassed by another staff member, C.O. Davis." *See* Am. Compl. ¶ 15(h); *see also* Misbehavior Report (reproduced in Ex. G. of Lee Decl.). Officer Gary, one of the officers to whom Lunney had sent the letter, wrote the misbehavior report because Lunney's letters violated facility correspondence rules that prohibit "correspond[ence] with dep[artment] employees [without] the express permission of the superintendent." *See* Lee Decl. Ex. G (citing DOCS Directive 4422). Blot "endorsed" the misbehavior report. *See* Def. 56.1 ¶ 22. Lunney was subsequently found guilty of this charge based on "[his] admissions that [he] willfully wrote to a total of 15 officers including officer Gary," *see* Lee Decl. Ex. G, and sentenced to 30 days' keeplock, loss of packages, loss of commissary, and loss of phone privileges. [9] *See id.* Defendants argue that Lunney has not met the elements of a retaliation claim. Def. Mem. at 16-17; Def. Reply Mem. at 14.

[9]    This finding of guilt was "apparently overturned," or at least "modified" on appeal, though to what extent and the reason for such action is not clear from the record. *See* Def. Mem. at 16 (citing Lee Decl. Ex. I).

Lunney's claim is simply disposed of based on the evidence that the misbehavior report had a legitimate justification. The Second Circuit has held that, "[r]egardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show dual motivation, *i.e.,* that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287-88 (2d Cir.2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Thus, where a plaintiff has met his "initial burden of showing that an improper motive played a substantial part in defendant's action," the defendant may still obtain summary judgment if the defendant can "show it would have taken exactly the same action absent the improper motive." *Id.; see also Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (affirming dismissal on summary judgment because correction officer's actions were of mixed motives and "would have been issued on proper grounds alone."); *see also Sher v. Coughlin,* 739 F.2d 77, 81-82 (2d Cir.1984) (affirming summary judgment dismissal of prisoner's retaliation claim where dual motivation existed for prisoner's transfer to another facility).

**\*23**  Assuming without deciding that Lunney had met his initial burden of showing that an improper motive played a substantial part in the decision to discipline him, Lunney concedes that the misbehavior report "stemmed from" a letter he wrote to Officer Gary. Am. Compl. ¶ 15(h). It is undisputed that writing letters to prison guards violates DOCS's policy. *See* DOCS Directive 4422. Lunney has provided no evidence of instances in which prisoners wrote letters to prison guards without receiving disciplinary action. Based on the evidence in the record, it would be purely speculative for a factfinder to conclude that the prison would not have taken the same action against Lunney regardless of any motive it had to punish him for writing grievances. Accordingly, defendants are entitled to summary judgment on this claim.

d. *The Merits of Lunney's Allegation that Blot Threatened Physical Violence*

Lunney states that Blot threatened him physically, both generally in response to his continued filing of grievances, *see* Lunney Aff. ¶¶ 29-30, and specifically in response to his complaint about another officer. *See id.* ¶ 31. Lunney's most specific allegations consist of two statements: (1) "If I ever hear about you complaining about another officer you'll be sorry. You won't be so lucky next time," Am. Compl. ¶ 15(h), and (2) "[I]f you don't stop writing grievances I'm going to break your fuckin' neck." Lunney Aff. ¶ 30 (citing Lunney Dep. at 186-87). He also states more generally that Blot "threaten[ed] [Lunney] with misbehavior reports, physical beatings and deprivations of privileges if he [ ] continued to write grievances." Am. Compl. ¶ 15(g). Defendants do not address this claim in their papers, although they argue that Blot is entitled to qualified immunity on it. *See* Def. Reply Mem. at 30.

Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered. *Compare Hepworth,* 2006 WL 2844408, at \*8-9 (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence ... such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] ... for exercising his First Amendment"); *Brown v. Coughlin,* 965 F.Supp. 401 (W.D.N.Y.1997) (threat to inmate that when officers were "done with him" he would not want to "file any more complaints" sufficient for First Amendment retaliation claim); *Thaddeus-X,* 175 F.3d at 396, 398 ("In the prison context ... [h]arassment, physical threats" would "certainly be adverse" action), *with Bartley v. Collins,*

2006 WL 1289256, at \*6 (S.D.N.Y. May 10, 2006) (threats such as "we going to get you, you better drop the suit," do not rise to the level of adverse action); *Alicea v. Howell,* 387 F.Supp.2d 227, 237 (W.D.N.Y.2005) ("[Defendant's] alleged statements to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] do not give rise to a First Amendment retaliation claim," especially considering the fact that the threat was never carried out); *Cruz v. Hillman,* 2002 WL 31045864, at \*7 (S.D.N.Y. May 16, 2002) (allegation that correction counselor expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said "Green Haven is an open battlefield, so be careful," insufficient to state a retaliation claim). Given the directness and specificity of the alleged threats here, a factfinder could permissibly decide that the threats were such that it would deter an inmate of "ordinary firmness" from engaging in protected activity.

**\*24**  Nor should Blot be entitled to qualified immunity. It would not have been "objectively reasonable" for Blot to have believed that it did not violate "clearly established" law regarding retaliation to tell Lunney that he would "break [his] fuckin' neck" if Lunney continued to write grievances. In other words, the contours of the right to be free from First Amendment retaliation were "sufficiently clear that [Blot] would [have] underst[ood] that what he [was] doing violate[d] that right." *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

e. *The Merits of Lunney's Allegation of Retaliatory Assault*

We have already discussed Lunney's claim that the assault by Blot and Frazier constituted an Eighth Amendment violation. *See* section III.B above. In addition, Lunney asserts that this same assault occurred "because of a verbal complaint he made to another officer regarding his not having hygiene items and the problems with his sink and toilet." Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). In his amended complaint, Lunney specifically pleads this as a First Amendment claim as well. *See* Am. Compl. at ¶ 16(h).

Defendants do not make any arguments regarding this claim specifically. Nonetheless, because they moved for summary judgment as to "plaintiff's First Amendment retaliation claim" generally on the ground that there is no "causal relationship between protected activity and adverse action," Def. Mem. at 2, Lunney was obligated to "come forward with admissible

evidence supporting [his] claim" on this point. *Feurtado v. City of New York,* 337 F.Supp.2d 593, 599 (S.D.N.Y.2004) (citing cases) (internal quotation marks omitted).[10]

10    Because defendants' motion does not contend that verbal complaints cannot constitute constitutionally protected activity, it is unnecessary to reach this question. The Court notes that some case law indicates that a prisoner's oral complaints to prison guards may provide the basis for a retaliation claim under § 1983. *See Smith v. Woods,* 2006 WL 11312347, at *10 (N.D.N.Y. Apr. 24, 2006), *aff'd,* 2007 WL 756410, at *1 (2d Cir. Mar.12, 2007); *Gill v. Riddick,* 2005 WL 755745, at *10 (N.D.N.Y. Mar.31, 2005) (citing cases); *Gaston v. Coughlin,* 81 F.Supp.2d 381, 386 (N.D.N.Y.1999); *Malik'El v. New York State Dept. of Corr. Servs.,* 1998 WL 187459, at *4 (N.D.N.Y. Apr.8, 1998); *but see Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) ("verbal confrontation" not protected activity).

Lunney details that after "attempting to inform another officer, who was confined to a control room at least 45 feet away from plaintiff's cell," *see* Am. Compl. ¶ 15(e), that he lacked certain hygiene items,

[d]efendants Blot and Frazier approached plaintiff's cell and began to state that plaintiff had better "shut the fuck up or we are coming in there and you will not like the results." After attempting to explain his problems to [them] Officer Frazier appeared to become calm and attempted to resolve plaintiff's complaints. However, defendant Blot stated "I don't give a shit about your fucking problems. File a fucking grievance." Defendant Blot proceeded to yell to the officer in the control booth to have plaintiff's cell opened.

Lunney Aff. ¶ 24 (incorporating Am. Compl. ¶¶ 15(e)(1)-(2)). According to Lunney, Blot then entered Lunney's cell and assaulted him, *id.,* though Blot denies that this assault ever took place. Blot Decl. ¶ 3.

Here, the sequence of events-a complaint followed by an immediate assault, accompanied by remarks referring to his complaint-would be sufficient for a jury to find that there was a causal connection between Lunney's complaints and the assault. Accordingly, summary judgment cannot be granted to defendants on this claim.[11]

11    Defendants make no arguments with respect to qualified immunity on this claim or with respect to the First Amendment claim against Frazier (discussed in the next section), and thus we do not consider the doctrine's applicability with respect to these claims.

### 4. *First Amendment Claim Against Frazier*

**\*25** Lunney alleges that Frazier assisted Blot "in assaulting plaintiff in retaliation for plaintiff making complaints." Am. Compl. ¶ 16(i). Once again, defendants argue only generally that plaintiff's First Amendment retaliation claim should be dismissed for failure to establish a causal relationship. Def. Mem. at 2. As to Frazier's particular actions, Lunney claims that he "entered the cell and placed [Lunney] in a choke hold for several minutes." Am. Compl. ¶ 15(e)(1). Frazier, like Blot, denies Lunney's allegations of unnecessary physical force. Frazier Decl. ¶ 3. For the same reasons just stated, Lunney's allegations are sufficient to allege a causal connection between his complaints and the assault. Thus, defendants must be denied summary judgment as to the claim against Frazier.

### 5. *First Amendment Claim Against Brereton*

Lunney's amended complaint states that he "filed a formal grievance complaint with the I.G.R.C. arguing that he had been fired [from his job as a porter] as a means of retaliation by defendant Brureton." Am. Compl. ¶ 15(g)(2). No further information is provided on this issue. While Lunney makes reference to it in his memorandum of law, Pl. Mem. at 30, he does not address it in his affidavit. Given the conclusory reference in the amended complaint, there is no admissible evidence before the Court that would allow a jury to conclude that Lunney had made out each of the elements of a retaliation claim.

Accordingly, this claim must be dismissed.

### E. *Unfiled Grievances*

Lunney claims that defendant Kober violated his First and Eighth Amendment rights by denying him "access to an effective Inmate Grievance Program," *see* Lunney Aff. ¶ 32, and thus that Kober "deprived plaintiff of his means to petition the government for the redress of grievances." *See* Am. Compl. ¶ 16(e). Specifically, he alleges that "[g]rievances were not timely filed or they were completely ignored," and that Kober stated they "were never received by his office." *See*

Lunney Aff. ¶ 32 (incorporating Am. Compl. ¶ 15(i)). He adds that the Sing Sing IGRC "was not operating in accordance with policy," that grievances "were not being timely filed and responded to," that "investigations were biased and or incomplete," and that "appeals were not timely filed." *See* Am. Compl. ¶ 15(i). While defendants argue that this claim is unexhausted, *see* Def. Reply Mem. at 10, it is unnecessary to reach that issue because the claim fails on the merits.

It is well established that a claim of violation of a state grievance procedure is not cognizable in an action under 42 U.S.C. § 1983. *See Cancel,* 2001 WL 303713, at *3 ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983"); *accord Davis v. Castleberry,* 364 F.Supp.2d 319, 323 (W.D.N.Y.2005); *Fernandez,* 2005 WL 733664, at *9; *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 n. 3 (W.D.N.Y.1998) (citing *Buckley v. Barlow,* 997 F.2d 494, 495 (8th Cir.1993)).

 ***26** It does not help Lunney's claim if it is construed as one for denial of access to the courts. To state a claim for denial of access to the courts under § 1983, Lunney must demonstrate that defendants "took or [were] responsible for actions that hindered [plaintiff's] efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003) (internal quotation marks omitted). Only those actions which rise to the level of " 'deliberate and malicious interference' " and which " 'actually impeded his access to the court or prejudiced an existing action' " are sufficient to present a claim. *Green v. Phillips,* 2006 WL 846272, at *11-12 (S.D.N.Y. Mar.31, 2006) (quoting *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar.29, 2001)); *accord Rivera v. Pataki,* 2005 WL 407710, at *17-18 (S.D.N.Y. Feb.7, 2005). The evidence presented by Lunney, however, does not satisfy this standard. The operation of the grievance process is relevant to any access-to-the-courts claim only insofar as the procedure is a prerequisite for the filing of a civil suit under the PLRA. Lunney has not shown how the operation of the grievance procedure denied him such access. Moreover, in light of the fact that prisoners are excused from filing grievances where prison officials prevent them from doing so or make the grievance process not "available," *see, e.g., Brownell,* 446 F.3d at 311-12, any such actions-even if they had been demonstrated-could not be shown to have deprived Lunney of his ability to bring any lawsuit. Thus, this claim too must be dismissed.

*F. Fourteenth Amendment Due Process Claims*

As in his original complaint, Lunney asserts that his right to due process was violated by two separate actions. First, Lunney claims that Selsky improperly ordered a second disciplinary hearing after the Article 78 proceeding had been filed with respect to the first hearing. *See* Lunney Aff. ¶ 14 (incorporating Am. Compl. ¶ 10). Second, he argues that defendants' failure to provide him with a timely written disposition of his disciplinary hearing was a violation of his due process rights. *See* Am. Compl. ¶¶ 10, 12. This first claim is identical to one the Court dismissed on the merits in its original ruling, *see Lunney I,* 2005 WL 121720, at *14, and thus the Court will not reconsider it here. Accordingly, we address only the second claim. [12]

[12]     The defendants and Lunney discuss the matter of "hearing officer bias" in their summary judgment papers. *See* Def. Mem. at 23-24; Pl. Mem. at 50-52; Def. Reply Mem. at 21-22. However, Lunney did not raise this claim in his amended complaint or in his affidavit and thus we do not consider it.

 *1. Law Governing Disciplinary Proceedings*
A party asserting a due process claim "must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz,* 380 F.3d at 654 (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *See Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

 ***27** There is no bright-line rule in determining whether a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating due process protection. *See id.* (citations omitted). However, as in the original motion, defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU-which was

later reduced to six months-under the standard established in *Sandin.* It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, we consider whether Lunney was denied due process when he was not provided with a written disposition of his disciplinary hearing and when the second hearing was scheduled.

2. *Written Disposition of Disciplinary Hearing*
As noted above, *see* section I.A, Lunney's first disciplinary hearing, in June 2002, resulted in a finding of guilt for which he was sentenced to nine months in the SHU. Lunney appealed this ruling, which was affirmed in August 2002. Lunney then filed an Article 78 petition in the state Supreme Court, which led to an order to show cause directing Selsky to respond to the petition. In October 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his defense. The rehearing was held in October 2002, and Lunney was again found guilty and sentenced to nine months in the SHU. He again appealed, arguing this time that he had not received a copy of the hearing disposition. His appeal was denied, although his sentence was reduced to six months because the original sentence had exceeded the guidelines "without further justification." *See* Memorandum, dated Nov. 7, 2002 (reproduced in Ex. J to Selsky Decl., filed July 12, 2005 (Docket # 84) ("Selsky Decl.")). Lunney filed a second Article 78 petition with respect to the rehearing, and in August 2003, a judge of the State Supreme Court dismissed the original misbehavior report and concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of due process.

With regard to the timing and manner of notifying Lunney about the hearing disposition, Lunney acknowledges that he received oral notification of the result on October 17, 2002. *See* Def. 56.1 ¶ 12; Lunney Aff. ¶ 12. It is undisputed that he also received a tape recording of the hearing on this date, and that the tape "contained all [of] the information contained in the written decision including the evidence relied upon and reasons for the penalty imposed." *See* Def. Reply Mem. at 23.[13]

[13]     Lunney wrote a letter to Donald Selsky, *see* Letter, dated Nov. 14, 2002 (reproduced in Ex. K to Selsky Decl.), stating that the original tape he received was defective, and requesting a new one. Defendants

state, and Lunney does not dispute, that he received a new tape around that time. *See* Def. Mem. at 24.

The written disposition stated that it was based on "the written report by Officer Hadzovic and because it was recovered in the locker which was lock [sic]. Also from the testimony of Sgt. Guadagno who stated that the showers are normally completed by 7:15-7:30 PM." *See* Superintendent Hearing Disposition Rendered, dated Oct. 17, 2002 (reproduced in Ex. H to Selsky Decl.). It noted the reasons for the disposition as: "to impress upon this person the seriousness of this act and to act as[a] a deterrent to other[s]. Also that the possession of illegal weapons in a correctional facility is very detrimental to the safety and security of all those that work and live [h]ere, and this will not be tolerated." *See id.* Lunney makes no allegations regarding what was or was not on the tape. Nor does he allege that the written decision contained any information that was not on the tape.

 ***28**  In its original ruling on this claim, this Court allowed Lunney's claim regarding his failure to receive a written disposition of his disciplinary hearing to proceed because "the right to receive a 'written statement of the disposition' [is] a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell* [418 U.S. 539, 563 (1974) ]." *See Lunney I,* 2005 WL 121720, at *13 (citing *Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004)); *see also Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999); *McCann v. Coughlin,* 698 F.2d 112, 121-22 (2d Cir.1983); *Higgins v. Coombe,* 2002 WL 362776, at *2 (S.D.N.Y. Mar.6, 2002); *Silva v. Sanford,* 1998 WL 205326, at *6 (S.D.N.Y. Apr.24, 1998). The Court noted at that time that the defendants might be able to defeat the due process claim based upon additional facts (not contained in the complaint) showing, for example, that Lunney was informed of the disposition or was otherwise given the opportunity to obtain it. *Lunney I,* 2005 WL 121720, at *13. In addition, the Court left open the possibility that the defendants could show entitlement to qualified immunity. *Id.*

Prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prior prison rules infraction despite a harmless error in adjudicating the violation.") (internal citations omitted); *Louis v. Ricks,* 2002 WL 31051633, at *11 (S.D.N.Y. Sept.13, 2002) (citing *Powell,* 953 F.2d at 750). Defendants now argue that any

failure to provide Lunney with a written disposition of the result of his disciplinary hearing in a timely fashion was harmless, because: (1) "there was no information contained in the written hearing decision not provided to plaintiff before his final challenge to the hearing decision and penalty," *see* Def. Reply Mem. at 23; (2) after receiving a tape recording of the hearing which contained the rationale, "he did not add any new substantive arguments related to the rationale ... because he had already made the best arguments possible," *see* Def. Mem. at 26; and (3) his sentence was reduced for exceeding the guidelines, despite his failure to raise the issue on appeal. *See* Def. Reply Mem. at 23. Thus, defendants argue, the claim must fail. *See* Def. 56.1 ¶¶ 12, 35; Def. Mem. at 22-23; Def. Reply Mem. at 25-27.

Lunney does not contradict any of the relevant facts asserted by defendants on this point. Rather, he states that although his punishment at the second disciplinary hearing was in the end reduced for exceeding the guidelines, he never made this challenge on appeal. *See* Pl. Mem. at 57. He uses this fact to argue that "[p]erhaps if plaintiff had received a copy of the disposition paperwork, he could have argued on appeal that the penalty ... exceeded the guidelines." *See id.* This is the only harm Lunney points to based on his not having received the written disposition.

**\*29** Lunney's argument fails for two reasons. First, he was aware of his nine-month sentence following the disciplinary hearing. *See* Def. 56.1 ¶ 12 (citing Lunney Dep. at 93, 100-101). Thus, nothing prevented Lunney from raising the alleged illegality of the nine-month sentence even without a copy of the actual written disposition. Second, Lunney has not shown that there was any potential for any other outcome had he been provided with a copy of the written disposition. For example, he makes no argument that he could have received an even greater sentence reduction had he had access to the written hearing disposition. Given that the error in the sentence was remedied in November 2002 prior to his serving six months in confinement, any failure on his part to raise the argument that his sentence was incorrect was necessarily harmless.

*Conclusion*

For the foregoing reasons, defendants' motion should be granted, with the exception of the portion of their motion concerning Lunney's claim of (1) excessive force against Blot and Frazier and (2) his First Amendment retaliation claims (a) against defendant Blot based on the allegedly retaliatory assault, threats, and deprivation of recreation and showers (b) against defendant Frazier for his participation in the retaliatory assault. [14]

14      Lunney asserts in his amended complaint that Fischer subjected him to "forced labor without pay" while he was in the SHU, *see* Am. Compl. ¶ 16(c). However, this claim is not explained in his affidavit. Nor is any evidence supplied to support it. Accordingly, it is too vague to constitute the basis for a claim and it has not been discussed herein.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 144-45, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1544629

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2050301

2007 WL 2050301
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

George LUNNEY, Plaintiff,
v.
Lieutenant BRURETON, et al., Defendants.

No. 04 Civ. 2438(LAK).
|
July 17, 2007.

**ORDER**

LEWIS A. KAPLAN, District Judge.

**\*1** In a painstaking report and recommendation dated May 25, 2007, Magistrate Judge Gorenstein recommended that defendants' motion for summary judgment dismissing the complaint be granted in part and denied in part. Both sides have objected.

The Court finds no error of law or fact. Accordingly, the motion is decided in accordance with the report and recommendation. The objections all are overruled.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2050301

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 203 of 380
Townsend v. Clemons, Not Reported in F.Supp.2d (2013)
2013 WL 818662

2013 WL 818662
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Floyd TOWNSEND, Plaintiff,
v.
William CLEMONS, et al., Defendants.

No. 12–CV–03434 (RJS)(SN).
|
Jan. 30, 2013.

### *REPORT AND RECOMMENDATION*

SARAH NETBURN, United States Magistrate Judge.

**\*1  TO THE HONORABLE RICHARD J. SULLIVAN:**
*Pro se* plaintiff Floyd Townsend ("Townsend") brings this action pursuant to 42 U.S.C. § 1983, alleging violation of his constitutional rights based on the conditions of his confinement while in the custody of the New York City Department of Correction ("DOC").

Townsend is suing three defendants: (1) William Clemons ("Clemons"), Warden of the Robert N. Davoren Center ("RNDC"); (2) "Mr. Gumsdere" ("Gumsdere"), Deputy Warden of Security at RNDC; and (3) the City of New York (the "City"). These defendants have moved to dismiss Townsend's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The Court's task is to weigh the plausibility of Townsend's allegations and determine to what extent the defendants may be tied to the violations that he alleges. Because I conclude that Townsend cannot state a plausible claim for violation of his constitutional rights under § 1983, I recommended that defendants' motion to dismiss be GRANTED in its entirety.

### FACTUAL BACKGROUND

The following facts are assumed to be true for the purposes of this motion to dismiss. According to Townsend's complaint, the events giving rise to his claim occurred at the RNDC, in the "[M]ess Hall, Clinic, Intake Pens and 6 Lower," on October 14, 2011. (Complaint ("Compl.") at 2.) [1] This is the only date in Townsend's complaint.

1    Because Townsend's complaint has inconsistent pagination, citations to the complaint will refer to the actual order of pages instead of the number that might be written on the bottom of a page.

Townsend's general allegations can be grouped into three categories. First, Townsend complains about food. He alleges that there is "often not enough [ ] food in the Mess Hall to accommodate the vast amount of detainees housed at [RNDC]." (Id at 4.) Diabetic detainees, moreover, "are not issued the [necessary] low sugar diet foods to supplement their needs." (*Id.*)

Second, Townsend complains about sanitation. He alleges that, although linen sheets are exchanged every week, the blankets issued to detainees "are never washed or exchanged during the winter months," and are a "magnet for dust [,] bugs and other infectious germs." (*Id.*) When detainees are transferred from one housing area to another, their "belongings and property" are placed in those blankets, and dragged to the new area, accumulating dirt along the way. (*Id.*) Personal clothing, "which detainees ... wear [throughout their] stay at the [RNDC]," also is "not allowed to be cleaned at [the] facility [laundry]." (*Id.* at 5.) Furthermore, "[m]any housing area showers are not [industrial-cleaned] due to [the] lack of cleaning agents that will combat bacteria." (*Id.*) Townsend also states that the "New York City Department of Corrections has failed to enforce The Environmental Health that was stated by Judge Harold Baer Jr." (*Id.* at 4.)

Third, Townsend complains about living conditions, alleging that the "pre-trial detainees['] living conditions are deplorable." (*Id.*) Detainees are "compel[led] to sleep close" to each other. (Id at 5.) There is overcrowding. (*Id.*) When detainees are awoken for court appearances, "we are [constantly] being housed in jail cells that are extremely [overcrowded]," which is a "security issue." (*Id.*) Although "several dorms ... have air conditioners," some detainees are "housed in fifty[-]man dorm[s] with one [oscillating] fan." (*Id.*). This creates a "hostile environment that is [waiting] to happen." (*Id.*)

**\*2**  Townsend states that his allegations violate the DOC's "Minimum Standards" for hygiene, overcrowding and access to the courts. (*Id.*) He alleges that he did not sustain any injuries related to these events, (*id.* at 3), and requests as relief that the DOC implement corrective policies and procedures, as well as provide $9,000,000 in compensatory damages

and punitive damages for emotional distress and pain and suffering (*id.* at 7).

## PROCEDURAL BACKGROUND

Townsend filed his complaint on April 30, 2012. (Docket Number ("Doc.No.") 2.) On June 11, 2012, the Honorable Richard J. Sullivan referred this case to a magistrate judge for general pretrial supervision and dispositive motions requiring a report and recommendation. (Doc. No. 11.) On July 12, 2012, defendants filed a motion to dismiss Townsend's claims. (Doc. No. 12.) Townsend did not timely oppose this motion, and so on August 14, 2012, the Honorable James L. Cott directed defendants to serve Townsend with their moving papers and ordered Townsend to file his opposition by September 11, 2012. (Doc. No. 15.) Judge Cott warned Townsend that if he did not file an opposition the Court would consider defendants' motion to be unopposed. (*Id.*) Townsend did not file opposition papers, and therefore the motion was fully briefed on September 11, 2012. [2] On November 8, 2012, the referral was reassigned to my docket. (Doc. Nos.17–18.)

[2]     The docket website confirms that Townsend is still incarcerated at the address on record, and defendants' moving papers and Judge Cott's order were mailed to him there. (*See* Doc. No. 16.)

## DISCUSSION

Defendants argue that Townsend's complaint should be dismissed because Townsend: (1) does not allege Clemons or Gumsdere were personally involved in a constitutional violation; (2) lacks standing because he does not plead he was personally aggrieved; (3) does not allege constitutional violations; (4) does not adequately plead municipal liability; and (5) cannot claim compensatory relief because he has not suffered physical injury. (Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def.Br.") at 1.)

### I. Statement of Law

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must take "factual allegations [in the complaint] to be true and draw[ ] all reasonable inferences in the plaintiff's favor." *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009) (citation omitted). To state a legally sufficient claim, a complaint must allege "enough facts to state a claim for relief that is

plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted). But a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555.) If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly,* 550 U.S. at 570.

**\*3** *Pro se* litigants "are entitled to a liberal construction of their pleadings," and therefore their complaints "should be read to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (citation and internal quotation marks omitted). But "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

In determining the sufficiency of a complaint, the Court may consider "the factual allegations in [the] ... complaint, ... documents attached to the complaint as an exhibit or incorporated in it by reference, ... matters of which judicial notice may be taken, [and] documents either in plaintiffs' possession or of which the plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993).

Furthermore, when a court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is sufficient bases for granting the motion. *See Kinlaw v. Walsh,* 10 Civ. 7539(RMB)(JLC), 2012 WL 2548437, at \*1 (S.D.N.Y. June 29, 2012) (reviewing record when considering defendants' unopposed motion to dismiss *pro se* plaintiff's complaint); *see also Vermont Teddy Bear Co. v. 1–800 Beargram Co.,* 373 F.3d 241, 246 (2d Cir.2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.") (citation and internal quotation marks omitted).

### II. Standing Through Personal Injury

2013 WL 818662

As a threshold issue, defendants argue that Townsend fails to allege personal injury. The Constitution limits the judicial power of federal courts to decide cases or controversies. *See* U.S. Const. art. III, § 2, cl. 1. To bring a claim for relief, a plaintiff must allege a concrete and particularized "injury in fact" fairly traceable to the challenged actions of defendants. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see ARKO Ivesticni Spolecnost, A.S. v. A.B. Watley, Inc.,* 01 Civ. 7693(LAP), 2003 WL 1108135, at *2 (S.D.N.Y. Mar. 12, 2003) ("A party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.' ") (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Indeed, personal injury is necessary to bring suit under § 1983. *Oliver v. Powell,* 250 F.Supp.2d 593, 601 (E.D.Va.2002) (prisoner could not maintain § 1983 action when he failed "to specify any defendants[ ] whose actions were fairly traceable to an actual injury"); *see Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (prisoner could not bring § 1983 claim when placed in "keeplock" for disciplinary charges because he had no liberty interest, and thus suffered no injury).

**\*4** Townsend's claims do not establish personal injury. He pleads that there is not enough food to accommodate all the detainees, (Compl. at 4), but not that he went hungry. He pleads diabetic detainees are not provided with "[necessary] low sugar diet foods," (*id.*), but not that he is diabetic. He complains that the blankets are dirty and are dragged from place to place, (*id.*), that personal clothing is not allowed to be cleaned at the facility laundry, (*id.* at 5), and that many showers are not industrial cleaned, (*id.*), but does not plead that he was injured by the dirt. He pleads that living conditions are deplorable, (*id.* at 4), detainees must sleep close together, (*id.* at 5), there is overcrowding, (*id.*), and some dorms do not have air conditioners, (*id.*), but likewise does not plead that he was affected by these conditions. Indeed, the only potential personal injury that Townsend alleges is that when detainees are awoken for court appearances, "we are [constantly] being housed in jail cells that are extremely [overcrowded]." (*Id .*) (emphasis added). But although this allegation suggests Townsend's personal involvement, it does not suggest any injury suffered because of that overcrowding beyond an unspecified "security issue." (*Id.*) Indeed, when given the chance to describe the injuries that he suffered, Townsend writes that he suffered "none." (*Id.* at 3.) Townsend's claims fail because he has not alleged a legally cognizable personal injury.

### III. Personal Involvement of Individual Defendants

Defendants also argue that Townsend has not alleged the personal involvement of defendants in any alleged constitutional deprivations. "An individual cannot be held liable for damages under § 1983 merely because he held a high position of authority, but can be held liable if he was personally involved in the alleged deprivation." *Back v. Hastings on Hudson Union Free School Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (citation and internal quotation marks omitted). Personal involvement can be shown by:

> evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

Dismissal of a defendant is warranted when a plaintiff fails to allege how that particular defendant was personally involved in any of the actions or inactions that purportedly led to a violation of the plaintiff's constitutional or federal rights. *Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998); *Schwartz v. Dennison,* 518 F.Supp.2d 560, 573 n. 11 (S.D.N.Y.2007) (no personal involvement found when complaint was devoid of allegations "from which it can be reasonably inferred that [defendants] created, or allowed to continue, [an impermissible] policy").

**\*5** Outside of naming them as defendants, Townsend does not mention Clemons or Gumsdere anywhere in his complaint or allege their personal involvement in any of the actions that led to the alleged deprivations of his

constitutional rights. Clemons and Gumsdere, therefore, should be dismissed from the complaint. *Carrasquillo v. City of New York,* 324 F.Supp.2d 428, 435 (S.D.N.Y.2004) (dismissing *pro se* complaint against individual named defendants not mentioned in body of complaint); *Mabery v. Keane,* 95 Civ. 1093(JFK), 1998 WL 148386, at *3 (S.D.N.Y. Mar. 30, 1998) (mentioning defendants "only ... in the caption of the Complaint ... is not enough to establish personal involvement for § 1983 purposes"); *see Back,* 365 F.3d at 127–28 (granting summary judgment when there was no allegation that individual defendant engaged directly in any discriminatory conduct under § 1983).

Clemons and Gumsdere also cannot be held liable solely because of their supervisory capacities as Warden and Deputy Warden of Security at RNDC. The "bare fact that [a defendant] occupies a high position in the New York prison hierarchy" does not suffice to sustain a claim. *Colon,* 58 F.3d at 874. Townsend must allege their personal involvement, which he has not done. *Collins v. Goord,* 438 F.Supp.2d 399, 420 (S.D.N.Y.2006) (dismissing plaintiff's claims against DOC Commissioner when plaintiff did not allege sufficient personal involvement). Townsend also is foreclosed from arguing supervisory liability under a theory of *respondeat superior. Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior";* proof of linkage in prison chain of command similarity is insufficient) (citations omitted).

## IV. Sufficiency of Constitutional Violation

Turning to the substance of the complaint, Defendants argue that Townsend's allegations do not rise to the level of constitutional deprivations. To allege a constitutional violation, a plaintiff must bring a claim pursuant to 42 U.S.C. § 1983. Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Newton v. City of New York,* 566 F.Supp.2d 256, 269–70 (S.D.N.Y.2008) (citing *Morris–Hayes v. Bd. of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005)). To state a claim under § 1983, "a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution." *Newton,* 566 F.Supp.2d at 270 (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)).

It is unclear if Townsend was a pre-trial detainee or a post-conviction prisoner during the period giving rise to his claim. For constitutional purposes, however, the analysis is the same. *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) ("Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."). To allege a constitutional violation, a plaintiff must plead an objectively "serious deprivation," and that the officials who caused the harm acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 302, 305, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002).

**\*6** To allege the first prong, a "serious deprivation," a plaintiff must plead the denial of "the minimal civilized measure of life's necessities," *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), including the "basic human needs" of "food, clothing, shelter, medical care and reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 32, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (citation and internal quotation marks omitted); *see Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006).

To allege the second prong, "deliberate indifference," a plaintiff must plead that a prison official knew of and disregarded an "excessive risk to inmate health or safety," which requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see Caiozzo,* 581 F.3d at 71 (plaintiff must show "that the government-employed defendant disregarded a risk of harm to the plaintiff of which the defendant was aware").

Townsend's allegations can be grouped into three potential violations: complaints about food, sanitation and living conditions. None of his complaints, however, alleges "sufficiently serious" deprivations or the "deliberate indifference" of a defendant.

### A. Temporary Deprivations

As an initial matter, Townsend provides little in the way of temporal context as to when the violations occurred. He pleads various general allegations, but indicates that the "events giving rise to [his] claim(s)" occurred on October 14, 2011, without clarifying whether or not all of his allegations

2013 WL 818662

actually occurred on that day. (Compl. at 2.) Defendants argue that this suggests that Townsend is pleading temporary deprivations only, and temporary deprivations do not amount to the denial of "the minimal civilized measure of life's necessities." (Def. Br. at 10–12.)

Defendants cite to cases when temporary deprivations did not create constitutional deprivations. (*Id.*) But defendants' citations are not articulating a general rule; indeed, the length of the deprivation is not in itself dispositive. *See Channer v. Mitchell,* 43 F.3d 786, 787–88 (2d Cir.1994) (remanding suit when district court did not address allegations that the deprivation of bed linen, pillow, or comfortable place to rest for two evenings violated the Eighth Amendment because "there is no *per se* bar to such a suit") (collecting cases); *see also Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003) ("In a case like this, however, where the prisoner is receiving appropriate on-going treatment for his condition, but, instead brings a narrower denial of medical care claim based on a temporary delay or interruption in treatment, the serious medical need inquiry can properly take into account the severity of the temporary deprivation alleged by the prisoner."); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (five days in "strip cell [fell] below the irreducible minimum of decency required by the Eighth Amendment"); *Moss v. Ward,* 450 F.Supp. 591, 596–97 (W.D.N.Y.1978) (withholding food for four consecutive days violated Eighth Amendment). To the extent defendants argue that the temporary nature of the deprivation by itself warrants dismissal of Townsend's complaint, (Def. Br. at 12), without looking into what was deprived, they are incorrect.

### B. Food and Diabetes

**\*7** Turning to his allegations, Townsend takes general issue with the food at RNDC, complaining that there is not enough food for "the vast amount of detainees," and that diabetics are not issued "the [necessary] low sugar diet foods." (Compl. at 4.) The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well[-]being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983). But a conclusory allegation that there is not enough food simply is not a "substantial deprivation" absent an allegation of actual harm. *McNatt v. United Manager Parker,* 99 Civ. 1397(AHN), 2000 WL 307000, at \*5–6 (D.Conn. Jan. 18, 2000) (allegation of small food portions, absent evidence that prisoners suffered ill effects from these reduced portions, fails to state Eighth Amendment claim)

(collecting cases). Townsend does not allege that he went without food. Moreover, he does not allege that a general lack of food was caused by any defendant's "deliberate indifference." *Singh v. Fuller,* 93 Civ. 5937(CSH), 1999 WL 777872, at \*3 (Sept. 30, 1999) (dismissing complaint when plaintiff failed to show alleged deprivation of food was caused by "deliberate indifference" of defendant).

Refusing a prisoner a necessary "special diabetic diet" could create a sufficiently serious condition. *See Edmonds v. Cent. NY. Psychiatric Ctr.,* 10 Civ. 05810(DAB)(KNF), 2011 WL 2207527, at \*3–6 (S.D.N.Y. May 31, 2011), *adopted by* 2011 WL 3809913 (S.D.N.Y. Aug 25, 2011); *Johnson v. Harris,* 479 F.Supp. 333, 337 (S.D.N.Y.1979). But Townsend simply alleges that "low sugar diet foods" were not issued. (Compl. at 4.) He does not allege that he actually was denied such foods, or indeed, that any defendant was "deliberately indifferent" to his actual dietary needs. *Cf. Edmonds,* 2011 WL 2207527, at \*5–6.

### C. Sanitation

Townsend also complains about sanitation. First, Townsend alleges that the RNDC's linen sheets are a "magnet for dust[,] bugs and other infectious germs." (Compl. at 4.) But dust, bugs and germs do not create a "serious deprivation" without additional pleadings Townsend has not provided. *See Bess v. R.N.D.C. C–74,* 11 Civ. 6272(WFK), 2012 WL 34100, at \*1–2 (E.D.N.Y. Jan. 6, 2012) ("vague allegations of unsanitary conditions," including that unit where prisoner was moved was "filthy to the core, ... [with] dust & corrosion all over, [and] mildew & mice all over" did not create constitutional deprivation) (citation and internal quotation marks omitted); *McCoy v. Goord,* 255 F.Supp.2d 233, 243, 260 (S.D.N.Y.2003) (dismissing complaint although plaintiff alleged cell was infested with roaches).

Second, Townsend alleges that the blankets are dirty. (Compl. at 4.) But this also is insufficient to establish a constitutional violation absent any allegation of harm. *McGee v. Pallito,* 10 Civ. 11, 2011 WL 6291954, at \*14 (D.Vt. Aug.3, 2011) ("allegations of ants on [prisoner's] bedding are insufficient to state a constitutional violation, particularity when there is no accompanying allegation of harm or injury") (collecting cases); *Myers v. City of New York,* 11 Civ. 8525(PAE), 2012 WL 3776707, at \*8 (S.D.N.Y. Aug. 29, 2012) (alleging prisoner "had to sleep on 'rust laden sheets for over a month' " did not amount to constitutional violation when prisoner did not allege lack of opportunity or means to clean his sheets) (collecting cases).

**\*8** Third, Townsend alleges that personal clothing is "not allowed to be cleaned at [the] facility laundry." (Compl. at 5.) To the extent he is alleging inadequate laundry services, he has not alleged a sufficiently "serious deprivation" because he has not plead he could not clean his clothes at all. *See Myers,* 2012 WL 3776707, at \*8 (no due process violation when prisoner claimed laundry service had ceased, and clean clothes were in short supply, but did not allege he was denied opportunity or means to clean linens or clothes himself); *Lunney v. Brureton,* 04 Civ. 2438(LAK)(GWG), 2007 WL 1544629, at \*14 (S.D.N.Y. May 29, 2007) (alleging inadequate laundry services without alleging inability to wash clothing did not violate Eighth Amendment), *adopted by* 2007 WL 2050301 (S.D.N.Y. July 17, 2007). Townsend similarly has failed to allege a sufficiently "serious deprivation" to the extent he is complaining about the dirtiness of clothing. *McGee,* WL 6291954, at \*8 ("allegation that [plaintiff] had to wear the same clothes for a significant period of time while at [prison] does not rise to the level of a constitutional violation") (collecting cases).

Indeed, courts have found more particular and severe allegations have not established a constitutional violation of sanitary conditions. *See, e.g., Mabery,* 1998 WL 148386, at \*8 (conclusory allegations of unsanitary conditions "due to a lack of cleaning supplies, infrequent extermination of housing units (only one or two times yearly), poor ventilation in the shower and bathroom areas resulting in the seepage of 'stink' and moisture into the housing areas, and the nearby burning of raw sewage ... that results in inmates having to breathe these fumes" do not state Eighth Amendment violations). Townsend, moreover, has not linked any of these alleged deprivations to defendants' "deliberate indifference."

### D. Living Conditions

Townsend next complains about the living conditions at RNDC, but similarly fails to plead constitutional deprivations. First, Townsend complains about overcrowding, alleging that detainees are "compel[led] to sleep close[ ] to other detainees," and some are housed in fifty-men dorms. (Compl. at 5.) But this level of overcrowding does not create a "serious deprivation" absent additional allegations Townsend does not provide. *Myers,* 2012 WL 3776707, at \*6–8 (complaints about overcrowding where 60 detainees were housed in areas designed to hold only 50, and insufficient sinks and toilets were available, did not reach level of constitutional violation of due process rights); *D'Attore v. New York City,* 10 Civ. 3102(JSR)(MHD), 2011 WL 3629166, at \*6 (S.D.N.Y. June 2, 2011) ("overcrowding" of "less than sixty square feet of bed space" did not constitute "serious deprivation" absent specific allegations of deprivation), *modified by* 2011 WL 3629018 (S.D.N.Y. Aug.17, 2011) (clarifying that dismissal of overcrowding claim was without prejudice). Temporary overcrowding in jail cells for court appearances, (Compl. at 5), similarly, is not a "serious deprivation." *See Myers,* 2012 WL 3776707, at \*6.

**\*9** Second, Townsend alleges that, although several dorms have air conditioners, other dorms must "bear the hot [humidity] with one fan." (Compl. at 5.) But uncomfortable dorms do not create a "serious deprivation" absent additional pleadings of actual injury. *See, e.g., Hall v. Perilli,* 03 Civ. 4635(RCC)(AJP), 2004 WL 1068045, at \*8 (S.D.N.Y. May 13, 2004) (report and recommendation collecting cases where temperature discomfort did not amount to constitutional violation). Finally, Townsend does not allege that any defendant was "deliberately indifferent" to his living conditions.

## V. Additional Allegations

Townsend also makes three other potential claims for relief: (1) a denial of access to court; (2) violations of the DOC's "Minimum Standards;" and (3) that the DOC has failed to enforce a consent decree.

### A. Denial of Access to Court

First, Townsend alleges a denial of access to court when he pleads that detainees are placed in crowded jail cells when they are taken for court appearances. (Compl. at 5.) But to state a claim for denial of access to the courts under § 1983, a prisoner "must demonstrate that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Green v. Phillips,* 04 Civ. 10202(TPG), 2006 WL 846272, at \*5 (S.D.N.Y. Mar 31, 2006) (citation and internal quotation marks omitted). Townsend does not allege that he was prevented from attending his court appearances, and therefore, he cannot state a claim for denial of access to court.

### B. Department of Correction Minimum Standards

Second, Townsend alleges that the conditions of his confinement violate the DOC's "Minimum Standards" regarding hygiene, overcrowding, and access to the Courts. (Compl. at 5.) But the violation of City Minimum Standards does not, on its own, violate a prisoner's constitutional rights.

*Gamble v. City of New York ex rel. N.Y.C. Dep't of Corr.,* 04 Civ. 10203(TPG), 2009 WL 3097239, at *5 (S.D.N.Y. Sept. 25, 2009); *see Myers,* 2012 WL 3776707, at *6 (finding violation of minimum City occupancy standards did not, on its own, violate prisoner's due process rights) (collecting cases).[3]

[3]    Moreover, the DOC's Minimum Standards expressly allow for occupancy of 50 detainees or 60 sentenced inmates in a housing area. (Minimum Standards, Rules of the City of New York Bd. of Corr. (40 RCNY) § 1–04(c)(5)). Absent additional pleadings, Townsend's allegation that detainees are housed in a 50–man dorm, (Compl. at 5), does not allege a violation of DOC standards.

### C. "Baer" Standards

Third, Townsend also states that the "New York City Department of Corrections has failed to enforce The Environmental Health that was stated by Judge Harold Baer Jr." (Compl. at 4.) Reading this as a request for injunctive relief, the Court notes that Townsend is no longer in DOC custody at the RNDC, but rather is incarcerated in the Great Meadow Correctional Facility. Under the Prison Litigation Reform Act, "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation." 18 U.S.C. § 3626(a)(1). The Court of Appeals for the Second Circuit has held that "a transfer from a prison facility moots an action for injunctive relief against the transferring facility." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996). Townsend's allegation of a violation of Judge Baer's consent decree fails because he is no longer at RNDC. *See Hallett v. Davis,* 11 Civ, 4646(WHP), 2012 WL 4378020, at *1, *6 (S.D.N.Y. Sept. 25, 2012) (finding that prisoner's allegation that the DOC "failed to enforce environmental health standards stated by Judge Harold Baer Jr" did not state claim for injunctive relief when defendant was transferred out of DOC facility) (citation and internal quotation marks omitted). Townsend's concerns about the treatment of other detainees also do not entitle him to relief. *See Hinck v. United States,* 550 U.S. 501, 510 n. 3, 127 S.Ct. 2011, 167 L.Ed.2d 888 (2007) ("[It is a] general rule that a party must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.") (citation and internal quotation marks omitted).

### CONCLUSION

**\*10**  For these reasons, I recommend that defendants' motion to dismiss be GRANTED in its entirety. Because I recommend dismissal based on several alternative grounds, I have not addressed defendants' remaining arguments. Because Townsend is a *pro se* plaintiff, I recommend that the dismissal of his complaint be with prejudice, but with leave to reopen within 30 days by filing an amended complaint that addresses the defects in his original complaint.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 818662

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 868605

2013 WL 868605
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Floyd TOWNSEND, Plaintiff,
v.
William CLEMONS, et al., Defendants.

No. 12 Civ. 03434 RJS SN.
|
March 4, 2013.

*ORDER ADOPTING REPORT AND RECOMMENDATION*

SULLIVAN, J.

**\*1** Plaintiff filed a Complaint on April 30, 2012 seeking injunctive relief and monetary damages relating to the allegedly unconstitutional conditions he experienced while in the custody of the New York City Department of Correction ("DOC"). The three named Defendants are William Clemons, Warden of the Robert N. Davoren Center ("RNDC"), Mr. Gumsdere, Deputy Warden of Security at RNDC, and the City of New York.

On June 11, 2013, this matter was referred to Magistrate Judge James L. Cott for general pretrial supervision and dispositive motions requiring a report and recommendation. On July 21, 2012, Defendants filed a motion to dismiss the Complaint. Despite Judge Cott's reminder and extension of time, Plaintiff never filed any opposition to Defendants' motion. On November 8, 2012, the case was reassigned to Magistrate Judge Sarah Netburn's docket. On January 30, 2013, Judge Netburn issued a Report and Recommendation (the "Report") concerning Defendants' motion to dismiss the Complaint.

In her Report, Judge Netburn advised the parties that failure to file timely objections to the Report would constitute a waiver of those objections. *See* 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b). No party has filed objections to the Report, and the time to do so has expired. *See Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1993). When no objections to a report and recommendation are made, the court may adopt the report if there is no clear error on the face of the record. *Adee Motor Cars, LLC v. Amato,* 388 F.Supp.2d 250, 253 (S.D.N.Y.2005); *La Torres v. Walker,* 216 F.Supp.2d 157, 159 (S.D.N.Y.2000).

After reviewing the record, the Court finds that Judge Netburn's well-reasoned Report is not facially erroneous. Accordingly, the Court adopts the Report in its entirety and, for the reasons set forth therein, GRANTS Defendants' motion to dismiss the Complaint with prejudice, but grants Plaintiff leave to reopen the case within 30 days by filing an amended complaint that addresses the defects in his original complaint.

The Clerk of the Court is respectfully requested to terminate the motion at Doc. No. 12.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 868605

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 13948917

2015 WL 13948917
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Donald Lee CURTIS, Plaintiff,

v.

Captain LUCIA et al., Defendants.

9:15-CV-0718 (GLS/TWD)
|
Signed August 4, 2015

**Attorneys and Law Firms**

DONALD LEE CURTIS, 86-A-3111, Plaintiff, pro se,
Upstate Correctional Facility, P.O. Box 2001, Malone, NY
14902.

**DECISION and ORDER**

GARY L. SHARPE, Chief United States District Judge

**I. INTRODUCTION**

 *1  The Clerk has sent to the Court for review a pro se civil
rights complaint filed by plaintiff Donald Lee Curtis pursuant
to 42 U.S.C. § 1983 ("Section 1983"), together with an in
forma pauperis application. [1] Dkt. No. 1 ("Compl."); Dkt. No.
2 ("IFP Application").

[1]     Plaintiff is a frequent litigator. Based on the court's
        review of his litigation history on the Federal
        Judiciary's Public Access to Court Electronic
        Records ("PACER") Service, it appears that
        plaintiff has filed more than twelve cases in
        courts in the Second Circuit since 1989. See U.S.
        Party/Case Index <http://pacer.uspci.uscourts.gov/
        cgi-bin/dquery.pl> (last visited July 22, 2015).

**II. IFP APPLICATION**

Upon review of plaintiff's IFP Application, the Court finds
that plaintiff has demonstrated sufficient economic need and
filed the inmate authorization form required in the Northern
District of New York. Therefore, plaintiff's IFP Application
(Dkt. No. 2) is granted.

**III. INITIAL SCREENING**

Having found that plaintiff meets the financial criteria for
commencing this action in forma pauperis, and because
plaintiff seeks relief from an officer or employee of a
governmental entity, the Court must consider the sufficiency
of the allegations set forth in the complaint in light of 28
U.S.C. §§ 1915(e) and 1915A. Section 1915(e) of Title 28 of
the United States Code directs that, when a plaintiff seeks to
proceed in forma pauperis, "the court shall dismiss the case at
any time if the court determines that – ... (B) the action ... (i)
is frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C. §
1915(e)(2)(B). [2]

[2]     To determine whether an action is frivolous, a court
        must look to see whether the complaint "lacks an
        arguable basis either in law or in fact." Neitzke v.
        Williams, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review
any "complaint in a civil action in which a prisoner seeks
redress from a governmental entity or officer or employee of
a governmental entity" and must "identify cognizable claims
or dismiss the complaint, or any portion of the complaint,
if the complaint ... is frivolous, malicious, or fails to state a
claim upon which relief may be granted; or ... seeks monetary
relief from a defendant who is immune from such relief." 28
U.S.C. § 1915A(b); see Carr v. Dvorin, 171 F.3d 115, 116 (2d
Cir. 1999) (per curiam) (noting that Section 1915A applies to
all actions brought by prisoners against government officials
even when plaintiff paid the filing fee).

Additionally, when reviewing a complaint, the Court may also
look to the Federal Rules of Civil Procedure. Rule 8 of the
Federal Rules of Civil Procedure provides that a pleading
which sets forth a claim for relief shall contain, inter alia,
"a short and plain statement of the claim showing that the
pleader is entitled to relief." See Fed. R. Civ. P. 8(a)(2). The
purpose of Rule 8 "is to give fair notice of the claim being
asserted so as to permit the adverse party the opportunity to
file a responsive answer, prepare an adequate defense and
determine whether the doctrine of res judicata is applicable."
Hudson v. Artuz, No. 95 CIV. 4768, 1998 WL 832708, at *1
(S.D.N.Y. Nov. 30, 1998) (quoting Powell v. Marine Midland
Bank, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.)
(other citations omitted)).

 *2  A court should not dismiss a complaint if the plaintiff
has stated "enough facts to state a claim to relief that is

2015 WL 13948917

plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

## IV. SUMMARY OF THE COMPLAINT

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in plaintiff's complaint with the utmost leniency. *See, e.g., Haines v. Kerner*, 404 U.S. 519, 521 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

Plaintiff is a prison inmate currently being held at Upstate Correctional Facility ("Upstate C.F."). [3] The complaint contains allegations related to plaintiff's confinement at Clinton Correctional Facility ("Clinton C.F."). Compl. at 6. During the first week of January 2014, defendant D. G. DuBrey ("DuBrey"), a guard a Clinton C.F., began serving plaintiff Kosher meals without gloves. *Id.* DuBrey ignored

plaintiff's request that he use gloves before touching plaintiff's Kosher meals. *Id.* Plaintiff complained to defendant, R. Bola ("Bola"), a food service worker, and asked Bola to direct DuBrey to use gloves. *Id.* at 7. Bola "laughed" and stated, "you Jews are always complaining" and informed plaintiff that DuBrey would "serve[ ] the Kosher meals as he ... sees fit." Compl. at 7. Plaintiff refused to accept the Kosher tray and returned to his cell to write a complaint. *Id.* Plaintiff wrote to David Timmons ("Timmons"), the Food Service Administrator, and informed Timmons that DuBrey was serving Kosher food without gloves. [4] *Id.*

[3]   Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

[4]   Timmons is not a named defendant. Plaintiff's complaint is sixty pages in length with 152 pages of exhibits. However, plaintiff's letter to Timmons is not annexed as an exhibit to the complaint.

**\*3** On January 4, 2014 and every day thereafter (except weekends), DuBrey continued to serve plaintiff's Kosher meal tray and hot water without gloves. *Id.* Plaintiff continued to ask DuBrey to use gloves before handling his Kosher food tray. Compl. at 9. DuBrey told plaintiff that if he did not like the way the food was served, "then he should get off the Kosher meal." *Id.*

On January 14, 2014, plaintiff received a Memorandum from Timmons regarding plaintiff's correspondence. *Id.*; Dkt. No. 1-3 at 11. Timmons confirmed that plaintiff was on the Kosher list and stated, "I do not know who you are talking about when you say an officer is out to get you off the kosher list, you will have to take that up with Security." Dkt. No. 1-3 at 11. Timmons also advised plaintiff that he should not be taking his food tray to his cell to eat at a later time. *Id.*

On January 15, 2014, DuBrey served plaintiff's Kosher food and hot water without gloves. Compl. at 10. Plaintiff ignored

DuBrey and began to drink his tea, that he made with the hot water. *Id.* Plaintiff noticed "an odor" emitting from the cup of tea. *Id.* Later that evening, plaintiff's "body broke out" with "welts" and he experienced swelling in his ankles and legs. *Id.* at 11.

The next morning, plaintiff woke up and noticed that the swelling and hives subsided. *Id.* Plaintiff went to breakfast and lunch and was again served by DuBrey without gloves. *Id.* Plaintiff told DuBrey that, as a Jew, he must eat food properly prepared and handled, "per Kosher tenets." *Id.* DuBrey ignored plaintiff and plaintiff sat to consume his meal. Compl. at 11-12. When plaintiff removed the cover from his tray, he noticed that someone "made a mess of the food inside." *Id.* at 12. Plaintiff looked up to see Dubrey laughing at him. *Id.* Plaintiff could not eat the food and began to consume the tea. *Id.* Again, plaintiff noticed an odor. *Id.* Later that evening, plaintiff noticed welts and hives on his body and swelling in his feet. Compl. at 12.

On January 17, 2014, plaintiff was treated for hives and prescribed medication. Dkt. No. 1-3 at 12. Plaintiff informed the medical staff that he believed he was poisoned. Compl. at 12. Plaintiff was sent back to his cell but began to vomit and experienced excessive bowel movements. *Id.*

On January 21, 2014, plaintiff was treated for vomiting, burning and itching from a "continued allergic reaction from January 17, 2014." Dkt. No. 1-3 at 13. Plaintiff received injections because his forehead had "swollen to the size of a football." Compl. at 14. Plaintiff was "temporarily admitted" to the infirmary for two hours and then returned to his cell for bed rest. *Id.* On February 4, 2014, plaintiff was treated for complaints of "hives at night." Dkt. No. 1-3 at 14. The medical personnel noted that no hives were present at the examination. *Id.* Plaintiff was advised to return when he experienced an outbreak and received a prescription for Benadryl. *Id.* On February 9, 2014, plaintiff received an emergency sick call visit at his cell. *Id.* at 30. The medical staff noted that plaintiff was "covered in hives, back, face, legs, stomach." Dkt. No. 1-3 at 30. Plaintiff received medication and was told to request sick call for Tuesday and an emergency visit if he had issues with his breathing. *Id.* On February 14, 2014, February 24, 2014, March 14, 2014 and March 17, 2014, plaintiff requested and received emergency sick call for hives. [5] *Id.* at 30-31, 33, 34.

[5]    During that time, plaintiff received other emergency sick call visits for injuries/conditions unrelated to the issues addressed in this complaint.

**\*4**  On February 20, 2014, plaintiff went to the mess hall and was threatened by DuBrey, with physical harm, if he did not "get off the Kosher meals." Compl. at 16. Plaintiff immediately returned to his cell and wrote a complaint to Superintendent LaValley and Ms. D. Amo ("Amo"), a food service administrator. [6] *Id.* Plaintiff informed LaValley and Amo that due to DuBrey's threats, "[plaintiff] was removing himself from the Kosher meal effective 3-4-14." *Id.* Plaintiff reiterated his suspicion that DuBrey poisoned his food and water and stated that he would no longer accept any food served by DuBrey with "ungloved hands." *Id.* at 16-17.

[6]    LaValley and Amo are not defendants herein.

On February 25, 2014, Amo interviewed plaintiff about his complaints, grievances, and issues with DuBrey. *Id.* at 15; Dkt. No. 1-3 at 15. Plaintiff told Amo that he suspected that DuBrey tampered with his food and water. Dkt. No. 1-3 at 15. Amo assured plaintiff that she would speak with DuBrey and direct him to wear gloves. *Id.* Plaintiff claimed that he had an affidavit from another inmate who saw DuBrey, "spray some cleaning solution into two [S]tyrofoam cups at the Kosher counter." [7]

[7]    Plaintiff claims that the affidavit "disappeared" when he sent it to the facility mailroom. However, plaintiff retained a copy and annexed the affidavit as an exhibit to this complaint. *See* Compl. at 17.

On March 9, 2014, plaintiff went to the mess hall and executed a form removing himself from the Kosher meal due to DuBrey's threats. Compl. at 19; Dkt. No. 1-3 at 44.

On March 10, 2014, plaintiff entered the mess hall and went to the opposite line for breakfast. Compl. at 20. Bola and DuBrey immediately approached plaintiff and told plaintiff that he was "suppose to be in the Kosher line." *Id.* Another employee and guard told DuBrey and Bola that plaintiff "signed off" yesterday and that the sign-off sheet was in the office. *Id.* Five minutes later, an officer approached plaintiff and told plaintiff that, on DuBrey's and Bola's orders, plaintiff was going to keeplock confinement. Compl. at 21. On March 10, 2014, plaintiff filed a grievance with respect to DuBrey's "retaliatory adverse action" and sent a letter to LaValley entitled "Harassment Keeplock". *Id.* Plaintiff

informed LaValley that DuBrey was retaliating against him for his complaints. *Id.*; Dkt. No. 1-3 at 46-51.

Plaintiff was served with a Tier III Misbehavior Report, dated March 10, 2014, prepared by DuBrey and "endorsed" by Bola. *Id.* at 22. The report charged plaintiff with threats, disturbing conduct, harassment, and refusing a direct order. Dkt. No. 1-3 at 53. On March 11, 2014, plaintiff gave his employee assistant a list of documents and witnesses that plaintiff would need to prepare for his disciplinary hearing. Compl. at 22. Specifically, plaintiff asked for copies of the following documents: grievances filed; letters to LaValley; the CAD "sign off form;" CAD sign in sheets; and plaintiff's disciplinary records. Dkt. No. 1-3 at 54-55. Plaintiff asked the hearing officer to "call two inmate witnesses at random who are unknown to me, but were present at breakfast on 3-10-14 ... and ask these witnesses what, if anything seen [sic] me do." *Id.*

On March 14, 2014, plaintiff attended a disciplinary hearing with respect to the March 10, 2014 Misbehavior Report. Compl. at 24. Defendant Captain Lucia ("Lucia"), presided over the hearing. *Id.* Plaintiff told Lucia that his employee assistant failed to provide him with the requested documents and told plaintiff that his witnesses refused to testify. *Id.* Plaintiff was permitted to testify and the hearing was adjourned. *Id.* at 25.

**\*5** On March 24, 2014, Lucia found plaintiff guilty of the charges in the March 10, 2014 Misbehavior Report and sentenced plaintiff to two months in the SHU. *Id.* at 25; Dkt. No. 1-2 at 56.

Plaintiff appealed Lucia's March 24, 2014 determination. Compl. at 41. On May 27, 2014, the decision was reviewed and reversed. Dkt. No. 1-3 at 68. However, plaintiff served the entire two-month sentence in the SHU. Compl. at 41.

Construing the complaint liberally, plaintiff asserts claims against defendants for violations of his constitutional rights guaranteed by the First, Eighth, and Fourteenth Amendments. *See generally* Compl.

## V. ANALYSIS

### A. Freedom of Religion

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. U.S. Const. amend. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).

The free exercise clause applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). To assess a free exercise claim, "a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith*, 850 F.2d 917, 926 (1988) (citations omitted). "Prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Ford*, 352 F.3d at 597. "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin v. McGuinnis*, 357 F.3d 204-05 (2d Cir. 2004).

Plaintiff claims that he was "threatened with physical harm," "forc[ing] [plaintiff] off [his] religious meal" and therefore "chilling plaintiff from exercising his rights to freedom of religion." Compl. at 17, 38; Dkt. No. 1-2 at 5. Plaintiff has sufficiently plead that he had sincerely held religious beliefs and was entitled to receive Kosher meals. [8] Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g.*, *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's First Amendment free exercise claims against DuBrey and Bola survive *sua sponte* review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment. [9]

[8]   On the bottom for the CAD "sign off" form, there is the following notation: "Do not remove until you hear from DSP Proulx. He is on a court order to receive CAD. Proulx will check with legal." The notation is unsigned. Dkt. No. 1-3 at 44.

[9]   To the extent that plaintiff's complaint could be interpreted as alleging a cause of action for a violation of his right to religious freedom due to being served his Kosher meal without gloves, that claim is subject to dismissal. Plaintiff has failed to plead any facts suggesting that serving his meals without gloves substantially burdened the

exercise of his religion. *See Odom v. Dixion*, No. 04-CV-889, 2008 WL 466255, at *8 (W.D.N.Y. Feb. 15, 2008) (the plaintiff's allegation that the manner in which kosher meals were provided, i.e., without proper utensils or in hermetically sealed food packs, failed to establish that defendants' substantially burdened a key tenet of his religion).

### B. Eighth Amendment Claims

**\*6** The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).

### a. Food Tampering

Plaintiff claims that DuBrey tampered with his food and water in violation of his constitutional rights. Compl. at 37. As a result, plaintiff suffered hives, welts, and swelling, and required medical treatment. The Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen*, No. 08-CV-0009 (TJM/DRH), 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (citations omitted); *Midalgo v. Bass*, No. 03-CV-1128 (NAM/RFT), 2006 WL 2795332, at *11 (N.D.N.Y. Sept. 26, 2006) (citations omitted). "Depriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck*, No. 86-CV-253 (NAM), 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles*, 725 F.2d at 15). Allegations of food tampering alone do not suffice to establish an Eighth Amendment violation; in addition, a plaintiff must allege that he suffered "distinct and palpable injury." *M.F. v. Reish*, No. 95 Civ 4904, 1996 WL 345953, at *4 (S.D.N.Y. June 21, 1996) (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Here, plaintiff claims that he suffered from hives, welts, an allergic reaction, and swelling as a result of DuBrey "poisoning" his water. Plaintiff has sufficiently plead an Eighth Amendment food tampering claim to require a response from DuBrey. *See Lipsey v. Schwarzenegger*, No. 08-CV-1726, 2009 WL 5030136, at *4 (E.D. Cal., Dec. 15, 2009) (the plaintiff sufficiently plead an Eighth Amendment claim with allegations that his throat swelled and he "got sick to his

stomach" after ingesting a plate of contaminated food). At this time, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### b. Deliberate Indifference to Serious Medical Needs

Plaintiff alleges that in January 2014, "a doctor" ordered plaintiff to undergo a blood test, but each time plaintiff was scheduled for the test, a "co-worker of DuBrey would not let plaintiff go to the callout." Compl. at 18. In July 2014, the blood test was administered. *Id.* at 36. To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer*, 511 U.S. at 825, 834. Deliberate indifference has two necessary components, one objective and the other subjective. *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). The objective component of an Eighth Amendment deliberate indifference claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway*, 99 F.3d at 553) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66. To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835.

**\*7** "Although a delay in providing necessary medical care may in some cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a 'life-threatening and fast-degenerating' condition for three days, or delayed major surgery for over two years." *Culp v. Koenigsmann*, No. 99 Civ. 9557, 2000 WL 995495, at *7-8 (S.D.N.Y. July 19, 2000)

(quoting *Demata v. NYS Dep't of Correctional Servs.*, No. 99-0066, 198 F.3d 233, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999)); *see Amaker v. Coombe*, No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("A delay in medical treatment does not by itself violate an inmate's Eighth Amendment rights unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.") (citing cases); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, No. 00 Civ. 4968, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) (noting that some delays in receiving medical treatment are common even outside the prison context). On a claim based upon a significant delay in receiving treatment, "a plaintiff must allege that the individuals causing the delay had the requisite state of mind, which ... is the equivalent of criminal recklessness." *Jones v. Vives*, 532 F. App'x 48, 50 (2d Cir. 2013).

Here, the complaint lacks any facts establishing that the delay in administering the blood test caused plaintiff any injury. *See Jefferson v. Alves*, No. 06-5479, 2007 WL 4209444, at *8 (W. D. Wash. Nov. 26, 2007) (the allegation that the defendant interfered with medical treatment because she confiscated the plaintiff's orthopedic shoes failed to state a cause of action as the plaintiff failed to show that the denial of his shoes caused any injury). The complaint, as presently written, does not contain any allegation that plaintiff's daily activities were significantly affected or that his condition caused substantial pain. *See Smith v. Carpenter*, 316 F.3d 178, 185–86 (2d Cir. 2003).

Even assuming that the delay in administering the blood test resulted in a serious condition, plaintiff has failed to satisfy the second prong of the analysis. The complaint lacks any information with respect to who ordered the blood test; when it was ordered; or how many times it was delayed. More importantly, plaintiff has not identified any individual who was personally involved in delaying the test. It is well settled in this Circuit that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "a *Section 1983* plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). Plaintiff summarily states

that DuBrey, Bola, and "others" conspired to delay his blood test but fails to sufficiently allege how the defendants were personally involved in any alleged constitutional deprivation.

Plaintiff's Eighth Amendment deliberate indifference claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) f or failure to state a claim upon which relief may be granted.

### c. Conditions of Confinement

Plaintiff claims that Lucia violated plaintiff's Eighth Amendment rights because he suffered "harsh conditions" during his sixty-day SHU confinement. Compl. at 37, 40. Plaintiff claims that SHU staff refused to allow plaintiff to wear his medical boots and claims that he was denied recreation. Compl. at 37, 40; *see also* Dkt. No. 1-2 at 12.

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). "To the extent that [prison] conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Second Circuit has held that in order for a plaintiff to demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test:

> **\*8** First, the plaintiff must demonstrate that the conditions of his confinement result in unquestioned and serious deprivations of basic human needs. Second, the plaintiff must demonstrate that the defendants imposed those conditions with deliberate indifference.

*McAllister v. Garrett*, No. 10-CIV-3828, 2011 WL 3875423, at *10-11 (S.D.N.Y. Sept. 1, 2011) (citing *Welch v. Bartlett*, 125 F. App'x 340, 342 (2d Cir. 2005)).

"Restrictive SHU conditions on their own do not, per se, rise to the level of cruel and unusual punishment." *Booker v. Maly*, No. 12-CV-246 (NAM/ATB), 2014 WL 1289579, at *16 (N.D.N.Y. Mar. 31, 2014). "Normal" SHU conditions include being kept in solitary confinement for twenty-three hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004).

Here, as presently pleaded, plaintiff's complaint does not contain any allegations to plausibly suggest that plaintiff suffered from a deprivation of any basic human need. Plaintiff complains that his two-month SHU confinement was "harsh." However, plaintiff's vague allegations fails to demonstrate that the conditions were objectively serious to trigger constitutional protections. *McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at *4 (D. Conn. January 18, 2000) (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation); *see also Thomas v. Smith*, No. CIV-83-33, 559 F.Supp. 223, 224 (W.D.N.Y. Feb. 3, 1983) (complaint alleging unconstitutional denial of basic hygiene items such as deodorant, soap, shampoo while confined in Attica's SHU dismissed as frivolous). Essentially, plaintiff takes issue with the normal conditions of SHU confinement. Courts in this Circuit have consistently held that such claims fail to state a constitutional cause of action. *See Sealey v. Giltner*, 197 F.3d 578, 581 (2d Cir. 1999) (valid conditions for confinement include situations where the "inmate is confined to his cell 23 hours per day, can take no more than three showers per week, has limited library privileges and no telephone privileges"); *see also Shannon v. Venettozzi*, No. 13 Civ. 4530, 2015 WL 114179, at *9 (S.D.N.Y. Jan. 8, 2015) (allegation that inmate was denied access to special events and programs, restricted to cell for twenty-three hours per day, denied phone privileges and suffered mental anguish and stress were insufficient to suggest a claim for unconstitutional confinement) (citations omitted).

Moreover, plaintiff has not alleged that any defendant was personally involved in any condition he suffered while in the SHU. Plaintiff refers to "SHU staff" but has not identified any individual by name and has not alleged that any named defendant was assigned to the SHU or responsible for the conditions of his confinement in that area. Plaintiff does not assert that any named defendant was aware of his SHU conditions or responsible for addressing the issues. Thus, plaintiff's Eighth Amendment conditions of confinement claims will be dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### d. Excessive Force

**\*9** Plaintiff claims that SHU staff refused to honor plaintiff's "front cuff pass" and repeatedly handcuffed plaintiff behind his back. Compl. at 41. Plaintiff claims that he suffered from a documented medical condition and had a "pass" indicating that he "should never be handcuffed behind his back." *Id.*

The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). In this regard, while "a *de minimis* use of force will rarely suffice to state a constitutional claim," *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993), the malicious use of force to cause harm constitutes an Eighth Amendment violation per se because in such an instance "contemporary standards of decency are always violated." *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 321-22 (1986)); *see Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973); *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam) ("[t]he Supreme Court has emphasized that the nature of the force applied is the core judicial inquiry in excessive force cases —not whether a certain quantum of injury was sustained."). "Accordingly, when considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness." *Wynter v. Ramey,*

No. 11-CV-0257 (DNH/DEP), 2013 WL 5465343, at *5 (N.D.N.Y. Sept. 30, 2013) (citations omitted).

Here, the complaint lacks any information regarding the date, time, or location of any specific incident. More importantly, plaintiff does not identify any individual involved in any incident related to handcuffing nor has plaintiff provided any facts suggesting that there was any motive for the use of force or that force was applied force in a malicious or sadistic manner so as to cause plaintiff harm. See Meeks v. Kartan, No. 08-CV-1037 (GLS/DEP), 2010 WL 3909356, at *4 (N.D.N.Y. Sept. 30, 2010) (the plaintiff did not allege a motive for the defendants actions and thus, the court could not infer a malicious intent); see also Brooks v. Rock, No. 11-CV-1171 (GTS/ATB), 2014 WL 1292232, at *14 (N.D.N.Y. Mar. 28, 2014) (citing Bilan v. Davis, No. 11 Civ. 5509, 2013 WL 3940562, at *6 (S.D.N.Y. July 31, 2013)) (in the absence of allegations that the force used against him was intentional and wanton, the plaintiff's excessive force claim must fail) (Rept. & Recommendation), adopted, 2013 WL 4455408 (S.D.N.Y. Aug 20, 2013). Consequently, plaintiff's excessive force claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### C. Retaliation

Plaintiff claims that, "within days of complaints written repeatedly by plaintiff against DuBrey and Bola and one day after plaintiff received Timmons' memo," DuBrey and Bola falsely charged plaintiff on March 10, 2014 in retaliation for plaintiff's grievances. Compl. at 37; Dkt. No. 1-2 at 7. Plaintiff also alleges that DuBrey and Bola interfered with his medical treatment in retaliation for plaintiff's "many complaints against DuBrey." Compl. at 38.

*10 To state a claim of retaliation under the First Amendment, a plaintiff must allege facts plausibly suggesting the following: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendant's decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (citing Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001)). The

Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act." Dawes, 239 F.3d at 491, overruled on other grounds by Swierkiewicz v. Sorema N.A., 534 U.S. 506 (2002) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983)); Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988). To prevail on a retaliation claim, a plaintiff must first assert that the plaintiff's conduct was constitutionally protected and that this conduct was a "substantial factor" that caused the adverse action against plaintiff. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). A plaintiff can establish a causal connection that suggests retaliatory intent by showing that his protected activity was close in time to the complained-of adverse action. Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2001) (citations omitted) (the Court must exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases).

Mindful of the requirement to liberally construe pro se pleadings, see, e.g., Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008), the complaint alleges enough to warrant a responsive pleading from DuBrey and Bola with respect to the retaliation claim. In so ruling, the Court expresses no opinion as to whether plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### D. Due Process

Plaintiff claims that Lucia violated his Fourteenth Amendment Due Process rights during plaintiff's March 24, 2014 disciplinary hearing. Compl. at 39. Plaintiff contends that Lucia denied plaintiff the right to present documentary evidence and call witnesses. Id.

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004); Tellier v. Fields, 280 F.3d 69, 79-80 (2d Cir. 2000); Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998); Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996).

#### a. Liberty Interest

In *Sandin v. Conner,* 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that: (1) the State actually created a protected liberty interest in being free from segregation; and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement. *See Welch v. Bartlett,* 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz,* 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' ") (quoting *Sandin,* 515 U.S. at 484). When assessing the severity of the hardship imposed, a court should take into account both the duration and the conditions of the confinement, where appropriate. *See Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998). The Second Circuit generally takes the position that disciplinary confinement, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz,* 380 F.3d at 654; *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000).

**\*11** In order to state a viable cause of action for a violation of due process, plaintiff must plead facts to establish that he had a liberty interest in being free from confinement in the SHU. Here, plaintiff's sixty-day SHU confinement, without any facts suggesting that he suffered from atypical conditions or significant deprivations, does not create a protected liberty interest to trigger the protections afforded by the Due Process Clause. *See Edmonson v. Coughlin,* No. 95-CV-97,1996 WL 622626, at \*4-5 (W.D.N.Y. Oct. 4, 1996) ("disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not atypical or significant in relation to the ordinary incidents of prison life."); *see also Monroe v. Janes,* No. 06-CV-859 (FJS/DEP), 2008 WL 508905, at \*9 (N.D.N.Y. Feb. 21, 2008) (collecting cases) (sixty days in the SHU, without more, is not sufficient to create a liberty interest).

**b. Procedural Due Process**

Even assuming plaintiff could establish that he suffered a deprivation of a constitutional liberty interest, plaintiff has failed to allege any facts to suggest that he was denied due process in connection with his disciplinary hearing. The Fourteenth Amendment due process protections afforded a prison inmate do not equate to "the full panoply of rights due to a defendant in a criminal prosecution." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004). An inmate is entitled to "(a) written notice of the claimed violations ...; (b) disclosure [to the prisoner] of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a neutral and detached hearing body ...; and (f) a written statement by the fact finders as to the evidence relied on." *Wolff v. McDonald,* 418 U.S. 539, 559 (1974). The due process clause also requires that a hearing officer's determination be supported by "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if there is any evidence in the record that supports the disciplinary ruling." *Sira,* 380 F.3d at 69 (quoting *Friedl v. City of N.Y.,* 210 F.3d 79, 85 (2d Cir. 2000)). In the Second Circuit, the "some evidence" standard requires some "reliable evidence." *Luna v. Pico,* 356 F.3d 481, 488 (2d Cir. 2004).

Plaintiff claims that his witnesses were not called to testify and that Lucia denied him the right to produce evidence. Dkt. No. 1-2 at 11. The complaint is devoid of any facts establishing how the outcome of the hearing would have been different if these witnesses and evidence were produced. Plaintiff's conclusory allegations, without more, fail to state a cause of action. *See Lewis v. Murphy,* No. 12-CV-268 (NAM/CFH), 2014 WL 3729362, at \*13 (N.D.N.Y. July 25, 2014) (plaintiff failed to show how outcome of hearing would have been different had employee assistant interviewed witnesses). Plaintiff's Fourteenth Amendment claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**E. State Law Claims**

Plaintiff claims that Lucia's conduct during the disciplinary hearing violated New York Correction Law § 138(4). Compl. at 40. Violations of New York's Correction Law do not give rise to constitutional claims, however, violations of the Correction Law that deprive a plaintiff of his due process are protected by the Fourteenth Amendment. *See Richard v. Fischer,* No. 11-CV-6013, 38 F.Supp.3d 340, 360 (W.D.N.Y. Aug. 7, 2014). Of relevance here, plaintiff alleges that defendants violated Correction Law § 138 which governs institutional rules and regulations for inmates at correctional

facilities. Section 138(4) prohibits disciplining inmates who "mak[e] written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution."

**\*12** As presently plead, the complaint fails to state a cognizable cause of action against any defendant based upon New York State Correction Law § 138. *See Richard,* 38 F.Supp.3d at 361 (because the plaintiff has failed to adequately allege a due process violation, his Fourteenth Amendment claim based upon a violation of the New York Correction Law and internal prison policies was dismissed). Consequently, plaintiff's Fourteenth Amendment claim against Lucia based upon Correction Law § 138 is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

**F. Conspiracy**

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324 (2d Cir. 2002). "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy,* No. 07-CV-3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (quoting *Twombly,* 550 U.S. at 554).

Here, plaintiff does not assert any facts giving rise to a conspiracy, but instead makes only a vague statement that the defendants worked together to violate his rights. Plaintiff's conclusory allegations do not support a "plausible" conspiracy claim involving any of the defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be enough to raise a right to relief above the speculative level." *Dorsey v. Fisher,* No. 09-CV-1011 (GLS), 2009 WL 4985421, at *3 (N.D.N.Y. Dec. 15, 2009) (citations omitted).

Moreover, plaintiff's conspiracy claims are barred by the intra-corporate conspiracy doctrine. The doctrine states that "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Nassau Cnty.*

*Employee "L" v. Cnty. of Nassau,* 345 F. Supp. 2d 293, 304 (E.D.N.Y. 2004). The doctrine applies when officers and officials are working within the scope of their official duties. *Id.* The doctrine excludes conspiracy claims under § 1983 against DOCCS employees working within the scope of their employment. *Toliver v. Fischer,* No. 12-CV-0077 (MAD/ATB), 2015 WL 403133, at *8 (N.D.N.Y. Jan. 29, 2015).

As a result, the Court finds that plaintiff has failed to state a claim for conspiracy upon which relief may be granted and the claim is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

**VI. CONCLUSION**

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**. [10] The Clerk of the Court shall provide the Superintendent of the facility that plaintiff has designated as his current location with a copy of plaintiff's authorization form (Dkt. No. 3) and notify officials that plaintiff has filed this action and are required to pay the Northern District of New York the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

[10]  Although his IFP Application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**\*13 ORDERED** that the Clerk of the Court provide a copy of plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Eighth Amendment deliberate indifference claims; (2) Eighth Amendment conditions of confinement claims: (3) Eighth Amendment excessive force claims: (4) due process claims; (5) state law claims against Lucia; and (6) conspiracy claims [11]; and it is further

[11]  If plaintiff wishes to pursue one or more of the claims dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

2015 WL 13948917

Therefore, any amended complaint should set forth all the claims plaintiff wishes to pursue and identify all defendants responsible for those claims.

**ORDERED** that Lucia is **DISMISSED without prejudice** as a defendant; and it is further

**ORDERED**, that the Clerk shall issue a summons and forward it, along with copies of the complaint, to the United States Marshal for service upon the remaining defendants. The Clerk shall forward a copy of the Summons and complaint to the Office of the New York Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED**, that a response to the complaint be filed by defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York

13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2015 WL 13948917

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 7290107
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Damian R. TRAPANI, Plaintiff,

v.

Anthony J. ANNUCCI; John Colvin, Superintendent,
Five Points Corr. Facility; and Robert Morton,
Superintendent, Downstate Corr. Facility, Defendants.

9:21-CV-0681 (LEK/ML)
|
Signed June 21, 2022

**Attorneys and Law Firms**

DAMIAN R. TRAPANI, Plaintiff, Pro Se, Upstate
Correctional Facility, Post Office Box 2001, Malone, New
York 12953.

LETITIA A. JAMES, Attorney General for the State of
New York, RACHAEL OUIMET, ESQ., Assistant Attorney
General, Counsel for Defendants, The Capitol, Albany, New
York 12224.

<u>**REPORT and RECOMMENDATION**</u>

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** This matter has been referred to me for a Report
and Recommendation by the Honorable Lawrence E. Kahn,
Senior United States District Judge. Currently before the
Court, in this civil rights action filed by Damian R. Trapani
("Plaintiff") against Anthony J. Annucci, John Colvin, and
Robert Morton (collectively "Defendants"), is Defendants'
motion for summary judgment and dismissal pursuant to Fed.
R. Civ. P. 12(b)(6) and 56. (Dkt. No. 25.) For the reasons set
forth below, I recommend that Defendants' motion be granted
in part and denied in part.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**
At this procedural posture, the remaining claims from
Plaintiff's Amended Complaint based on his placement in
punitive segregation are (1) a claim of cruel and unusual
punishment pursuant to the Eighth Amendment; and (2)
a claim that Plaintiff's due process rights were violated

pursuant to the Fourteenth Amendment. (*See generally* Dkt.
No. 11; Dkt. No. 15.) Judge Kahn's Memorandum-Decision
and Order dated November 19, 2021, thoroughly outlines
Plaintiff's allegations and claims. (Dkt. No. 15 at 2-7.)

**B. Procedural History**
On January 31, 2022, in lieu of an answer, Defendants filed a
motion for summary judgment and dismissal pursuant to Fed.
R. Civ. P. 12(b)(6) and 56. (Dkt. No. 25.) Plaintiff's response
was due by February 22, 2022. (Dkt. No. 26.) On February
17, 2022, Plaintiff filed a letter requesting an extension of
the time for him to respond to Defendants' motion. (Dkt. No.
28.) On February 22, 2022, the undersigned granted Plaintiff's
request for an extension of time to respond to the motion,
Plaintiff's response was due by March 8, 2022. (Dkt. No.
29.) On March 21, 2022, the Court *sua sponte* extended the
deadline for Plaintiff to file a response to Defendants' motion
for summary judgment, until April 4, 2022. (Dkt. No. 31.) On
March 21, 2022, Plaintiff filed a response to the motion. (Dkt.
No. 32.) On March 30, 2022, Defendants filed a reply. (Dkt.
No. 33.)

**C. Statement of Undisputed Material Facts**
Unless otherwise noted, the following facts were asserted and
supported by Defendants in their Statement of Material Facts
and not denied by Plaintiff. (*Compare* Dkt. No. 25, Attach. 4
[Defs.' Statement of Material Facts], *with* Dkt. No. 32 [Pl.'s
Resp.].)

1. Plaintiff is and was at all relevant times, incarcerated in the
custody of the New York State Department of Corrections and
Community Supervision ("DOCCS").

2. DOCCS has an inmate grievance process ("IGP"),
established by Part 701 of Title 7 of the Official Compilation
of Codes, Rules and Regulations of the State of New York
("N.Y.C.R.R."), which involves three levels of review: (1)
a complaint to the Inmate Grievance Review Committee
("IGRC") at the individual facility, (2) review by the
Superintendent of the facility, and (3) appeal to the Central
Office Review Committee ("CORC").

3. CORC is the final appellate level of the IGP.

4. Plaintiff's claims in this action are proper subjects for a
grievance pursuant to the DOCC's IGP. [1]

[1]    Notwithstanding Plaintiff's objection, the Court deems the fact admitted because Plaintiff fails to include any citation to the record. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact ... is genuinely disputed must support the assertion by ... citing to particular parts of the record."); *see* *N.Y. Teamsters v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (upholding grant of summary judgment where the district court "reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a response to the statement of material facts not in dispute that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations"); *Jamison v. Metz*, 865 F. Supp. 2d 204, 207 n.1 (N.D.N.Y. 2011) (Suddaby, J.) ("[W]herever [the *pro se*] Plaintiff has [willfully] failed to cite record evidence in support of his denials of properly supported facts ... the Court has deemed such facts admitted to the extent that they are not clearly in dispute.").

**\*2**   5. Plaintiff did not file an appeal to CORC related to the claims in this action. [2]

[2]    *See*, *supra*, note 1.

**D. Parties' Briefing on Defendants' Motion for Summary Judgment**

**1. Defendants' Memorandum of Law**

Generally, in support of their motion for summary judgment, Defendants assert the following five arguments: (1) Plaintiff failed to exhaust his administrative remedies before commencing this action; (2) Plaintiff failed to state a claim with respect to his Eighth Amendment claim; (3) Plaintiff failed to state a claim with respect to his Fourteenth Amendment claim; (4) Plaintiff failed to allege the personal involvement of Defendants; and (5) in the alternative, Defendants are entitled to dismissal based on the doctrine of qualified immunity. (*See generally* Dkt. No. 25, Attach. 1 [Defs.' Mem. of Law].)

First, Defendants argue that the IGP was fully available to Plaintiff and—despite successfully appealing numerous other grievances to CORC while incarcerated at Five Points Correctional Facility—Plaintiff did not appeal any grievance to CORC regarding his claims in this action. (Dkt. No. 25,

Attach. 1 at 8-11.) Further, Defendants argue that Plaintiff alleges he filed a habeas petition regarding his confinement in DOCCS, but does not allege that he filed a grievance appeal related to his allegedly wrongful disciplinary confinement. (*Id.*) Defendants argue that because the time for Plaintiff to exhaust his claims has expired, the Amended Complaint should be dismissed with prejudice. (*Id.*)

Second, Defendants argue that Plaintiff's Eighth Amendment claim "must fail because he cites no authority for the novel—and irrational—proposition that an incarcerated individual serving a term of disciplinary confinement whose conviction is reversed but then takes a plea on the same indictment and returns to DOCCS custody need not finish his term of disciplinary confinement." (*Id.* at 12-15.) Further, Defendants argue that the conditions to which Plaintiff was subjected to while in disciplinary confinement do not support an Eighth Amendment cruel and unusual punishment claim. (*Id.*) Defendants argue that the conditions Plaintiff alleges he was subjected to in disciplinary confinement were typical and merely included fewer privileges compared to prisoners in the general population. (*Id.*) Moreover, Defendants argue that Plaintiff failed to allege facts plausibly suggesting that Defendants knew of and disregarded an excessive risk to his health and safety. (*Id.*) In addition, Defendants argue that Plaintiff's Eighth Amendment claim against Defendant Morton should be dismissed because Plaintiff was at Downstate Correctional Facility for "at most—several weeks" and temporary deprivations do not generally violate a prisoner's constitutional rights. (*Id.*)

Third, Defendants argue that Plaintiff's Fourteenth Amendment claim must fail because although Plaintiff's disciplinary confinement lasted approximately 175 days, and thus was of intermediate duration, Plaintiff's clear and specific allegations describe standard conditions. (*Id.* at 15-18.) More specifically, Defendants argue that Plaintiff failed to allege facts plausibly suggesting atypical hardship. (*Id.*)

**\*3**   Fourth, Defendants argue that Plaintiff failed to allege facts plausibly suggesting the personal involvement of Defendants in the constitutional violations. (*Id.* at 18-20.) More specifically, Defendants argue that Defendant Annucci's role as commissioner of DOCCS and the role of Defendants Morton and Colvin as superintendents of their respective facilities, cannot support Plaintiff's conditions of confinement claims. (*Id.*) Defendants argue that Plaintiff's hearsay allegation that he was "told" that Defendant Morton reviewed his continued disciplinary confinement after his

return from being resentenced, is insufficient to allege personal involvement. (*Id.*) In addition, Defendants argue that —aside from that vague hearsay assertion—Plaintiff does not allege that Defendants were specifically made aware of Plaintiff's concerns. (*Id.*)

Fifth, Defendants argue that, in the alternative, they are entitled to dismissal based on the doctrine of qualified immunity. (*Id.* at 20-22.) More specifically, Defendants argue that Plaintiff cites "no authority for his position that it is somehow improper or unlawful to have him continue the term of disciplinary confinement he was serving for the reversal of his conviction and subsequent resentencing." (*Id.*) Thus, Defendants argue that it was objectively reasonable for them to believe that Plaintiff's return to disciplinary confinement after his resentencing was lawful. (*Id.*)

### 2. Plaintiff's Opposition

Generally, in opposition to Defendants' motion for summary judgment, Plaintiff asserts the following three arguments: (1) Defendant's motion is premature and should be denied or stayed until discovery is complete; (2) once Plaintiff's conviction and sentence were overturned, any obligation to complete his punitive segregation sanction extinguished with the sentence, he was not afforded a hearing with respect to his punitive segregation confinement, and he was deprived of his medically prescribed boots and other property while in punitive confinement which resulted in atypical conditions of confinement; and (3) Defendants were personally involved in Plaintiff's wrongful confinement, which included their use of an invalid sentence and commitment order and disobeying a court order. (*See generally* Dkt. No. 32 at 12-16.) In addition, Plaintiff filed a declaration wherein he asserts that: (1) in June 2018, he filed an inmate grievance related to the issues in this action, which he appealed with the IGP at Downstate Correctional Facility; (2) in July 2018, he signed for a decision from "either Inmate Grievance Resolution Committee (IGRC), IGP Supervisor, or Superintendent, Defendant Robert Morton" denying his inmate grievance complaint as untimely and noting that it would "not be entertained further"; (3) each of the two grievances referred to by Defendants in their memorandum of law—titled "exams not performed" and "status not given on grievance"—related to the issues complained of in the Amended Complaint. (Dkt. No. 32 at 17-21.) Based on these assertions, Plaintiff argues that a genuine issue of material fact remains regarding (1) whether the language "will not be entertained further"

indicated that administrative remedies were unavailable to Plaintiff, and (2) whether Plaintiff's other grievances satisfied the exhaustion requirements. (*Id.*)

### 3. Defendants' Letter Reply [3]

[3]
    In the future, defense counsel is cautioned to comply with Local Rule 7.1(b)(1), which provides that "[a]ll memoranda of law shall contain a table of contents."

Generally, in further support of their motion for summary judgment, Defendants assert the following three arguments: (1) Plaintiff cannot rely on a claim that discovery has not taken place to avoid admitting that he did not file a CORC appeal about the subject claims because whether he filed a CORC appeal is squarely within his personal knowledge; (2) Plaintiff fails to allege facts plausibly suggesting an Eighth or Fourteenth Amendment claim because (a) his sentence and his period of disciplinary confinement are not viewed as equivalent under the law, (b) the allegation that Plaintiff did not have his medical boots does not constitute an unreasonable risk of serious damage to his health or the denial of minimum civilized measure of life's necessities to satisfy the objective prong of his Eighth Amendment claim, (c) Plaintiff fails to allege facts plausibly suggesting that Defendants knew of and disregarded an excessive risk to Plaintiff's health or safety to satisfy the subjective prong of his Eighth Amendment claim, and (d) Plaintiff fails to allege facts plausibly suggesting an atypical hardship to support his Fourteenth Amendment claim; and (3) Plaintiff's conclusory claim that DOCCS had a policy and Defendants should have been aware because they were supervisory officials is insufficient to show personal involvement. (Dkt. No. 33.)

## II. RELEVANT LEGAL STANDARDS

### A. Standard Governing A Motion For Summary Judgment

**\*4** Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [4] As for the materiality requirement, a dispute of fact is "material" if

it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[4] As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute—even if that non-movant is proceeding *pro se.*[5] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[6] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[7]

[5] *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 2009) (Suddaby, J.) (citing cases).

[6] *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[7] *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Grp., Inc.*, 140 F. Supp. 2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 56.1. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1(b) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[8] – even when the non-movant was proceeding *pro se.*[9]

[8] Among other things, Local Rule 56.1 (previously Local Rule 7.1(a)(3)) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1.

[9] *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases); *see also Prestopnik v. Whelan*, 253 F. Supp. 2d 369, 371 (N.D.N.Y. 2003) (Hurd, J.) (holding that the Court is not required to "perform an independent review of the record to find proof of a factual dispute.").

**\*5** Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[10] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at \*1, n.1

(N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

10      *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1(a)(3) (previously Local Rule 7.1(b)(3)); *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**B. Standard Governing Exhaustion of Administrative Remedies**

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016) ("The [PLRA] mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions."). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates " 'using all steps that the [government] agency holds out, and doing so properly' " (quoting *Woodford*, 548

U.S. at 90)). In New York State prisons, DOCCS has a well-established three-step IGP. 7 N.Y.C.R.R. § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

 **\*6**  Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g). If the grievant wishes to appeal the superintendent's response to CORC, he must do so within seven calendar days of receipt of that response. *Id.* § 701.8(h).

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly*

(so that the agency addresses the issues on the merits).") (quotations marks and citations omitted).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotation marks and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860. In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *Mena v. City of New York*, 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

**\*7** Because non-exhaustion is an affirmative defense, the defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. The plaintiff must then establish the IGP grievance procedure was unavailable to him under *Ross*. *Id.*

### C. Legal Standard Governing Motions To Dismiss For Failure To State A Claim

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds:

(1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp. 2d 204, 211, nn.15-16 (N.D.N.Y. 2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212, n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212, n.17 (citing Supreme Court cases) (emphasis added). [11]

11    *Accord, Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (Munson, J.); *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998); *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212, n.18 (citing Supreme Court cases); *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak*, 629 F. Supp. 2d at 213, n.22

2022 WL 7290107

(citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 1968-69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*8** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions

devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

However, "in a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (Sharpe, M.J.) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to " 'make reasonable allowances to protect *pro se* litigants' " from inadvertently forfeiting legal rights merely because they lack a legal education. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). As a result, *Twombly* and *Iqbal* notwithstanding, the court must continue to "construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests." *Weixel v. Bd. of Educ.*, 287 F.3d 139, 146 (2d Cir. 2002).

### III. ANALYSIS

After carefully considering the matter, I recommend that Defendants' motion be granted in part and denied in part.

#### A. Whether Plaintiff Failed to Exhaust His Administrative Remedies

I recommend that the Court deny Defendants' motion for summary judgment arguing that Plaintiff failed to exhaust his administrative remedies because there appears to be a genuine dispute of material fact whether (1) Plaintiff did, in fact, exhaust his administrative remedies, or (2) in the alternative, whether administrative remedies were unavailable to Plaintiff.

First, Plaintiff alleges that the two appeals to CORC, titled "status not given on grievance" and "exams not performed," "relate to events complained of in this action." (Dkt. No. 32 at 19.) [12] Construing all reasonable inferences in Plaintiff's favor, the Court is unable to determine whether Plaintiff's claims in this action were encompassed in those grievances and appeals. Thus, an issue of fact remains, at this juncture whether Plaintiff failed to exhaust his administrative remedies.

[12]       The Court notes that the grievances and respective appeals titled "status not given on grievance" and

"exams not performed," are not currently before the Court. (*See generally* docket sheet.)

Second, to the extent that Plaintiff failed to exhaust his administrative remedies, a genuine issue of fact remains for trial whether administrative remedies were unavailable to Plaintiff. Construing all reasonable inferences in Plaintiff's favor, a genuine issue of fact remains whether prison administrators thwarted Plaintiff from taking advantage of the grievance process through misrepresentation by stating that his grievance would "not be entertained further" despite Plaintiff's right to appeal.

 **\*9** As a result, I recommend that the Court conduct an exhaustion hearing pursuant to *Messa v. Goord*, 652 F.3d 305 (2d Cir. 2011) to determine whether Plaintiff properly exhausted his administrative remedies.

### B. Whether Plaintiff Sufficiently Stated a Claim for Cruel and Unusual Punishment Pursuant to the Eighth Amendment

The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981).

Prison conditions can constitute "cruel and unusual punishment" if prison officials act (or fail to act) with "deliberate indifference to a substantial risk of serious harm to a prisoner." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). A constitutional violation under these principles has both objective and subjective components. First, a prisoner must be incarcerated under conditions that, objectively, pose "a substantial risk of serious harm." *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer*, 511 U.S. at 834). Second, because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment," a prison official must possess "a 'sufficiently culpable state of mind,' " which "[i]n prison-conditions cases ... is one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)).

To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic human needs.' " *Jolly Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (citation omitted). "Although the Constitution does not mandate a comfortable prison setting, prisoners are entitled to 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.' " *Brown v. Doe*, 13-CV-8409, 2014 WL 5461815, at \*6 (S.D.N.Y. Oct. 28, 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

There is no "bright line test" to determine if a risk of serious harm is "substantial" for Eighth Amendment purposes. *Lewis, 944 F.3d* at 432. Rather, a court must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original); *see Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citing *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)) ("There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' "); *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Helling*, 509 U.S. at 35-36; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)) ("Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency."). "In other words," the Supreme Court has written, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

 **\*10** To satisfy the subjective element, "[t]o constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.' " *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)).

Thus, an Eighth Amendment claim based on conditions of confinement requires that the plaintiff demonstrate that official's conduct reflects "the deliberate infliction of punishment," and not just "an ordinary lack of due care for prisoner interests or safety." *Francis v. Fiacco*, 942 F.3d 126, 150 (2d Cir. 2019); *see Farmer*, 511 U.S. at 834-35 ("Deliberate indifference describes a state of mind more blameworthy than negligence."). While officials need not engage in "acts or omissions for the very purpose of causing harm or with knowledge that harm will result," they must at least "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 835, 837. In other words, they must act with a *mens rea* "consistent with

recklessness in the criminal law." *Id.* at 837. Under this standard, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* at 835; *see, e.g., Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result."). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot ... be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

I recommend that Plaintiff's Eighth Amendment conditions of confinement claim be dismissed because Plaintiff failed to allege facts plausibly suggesting the objective or subjective elements of his claim. [13]

[13]    However, I reject Defendants' argument that Plaintiff was obliged to—and thus, his Amended Complaint was insufficient because he failed to —provide "authority" to support his claim. *See Wynder v. McMahon*, 360 F.3d 73, 77 (2d Cir. 2004) (quoting *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997)) (quotation marks omitted) ("Rule 8's liberal pleading principles do not permit dismissal for failure in a complaint to cite a statute, or to cite the correct one.... Factual allegations alone are what matters.")

Even accepting Plaintiff's allegations as true—that Defendants placed him in punitive segregation, did not return the bulk of his personal belongings, and denied him his medically prescribed boots—the facts are insufficient to plausibly suggest that he was incarcerated under conditions that objectively posed a substantial risk of serious harm. *See Williams v. Gumbula*, 13-CV-1132, 2018 WL 1795547 (W.D.N.Y. Apr. 16, 2018) (concluding that the plaintiff's claim that he suffered inhumane conditions because correction officers refused to turn water on to his cell for nine days fails to support an Eighth Amendment claim); *Young v. Tryon*, 12-CV-6251, 2015 WL 309431, at *10 (W.D.N.Y. Jan. 23, 2015)*, report and recommendation adopted*, 2015 WL 554807 (W.D.N.Y. Feb. 11, 2015) (citing *Walker v. Schriro*, 11-CV-9299, 2013 WL 1234930, *13 (S.D.N.Y. 2013) (allegations that plaintiff was temporarily deprived of food, shower, linens, running water or bathroom were insufficient to state a claim)) (dismissing Eighth Amendment claims arising from temporary deprivations as a result of a

lockdown); *Miller v. Campell*, 804 F. Supp. 159, 162 (D. Kan. 1992) (finding that the "brief" suspension of water and electricity during a lockdown was not a serious deprivation of basic human needs). [14]

[14]    I also note that Defendants appear to conflate the standards for Plaintiff's due process claim with the standard for his conditions of confinement claim. (Dkt. No. 25, Attach. 1 at 14 [citing *Boyd v. Doe #1*, 18-CV-1333, 2019 WL 5287973, at *12 (N.D.N.Y. Oct. 18, 2019) (considering a due process claim and concluding that the plaintiff failed to allege facts plausibly suggesting the deprivation of a liberty interest because the alleged deprivation of privileges did not constitute a serious hardship)].)

**\*11** Although Plaintiff alleged that he was denied his medically prescribed boots while confined in punitive segregation, which inhibited his ability to properly exercise (Dkt. No. 11 at ¶ 65), the Second Circuit has "recognized that [only] some opportunity for exercise must be afforded to prisoners." *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see Alston v. Coughlin*, 668 F. Supp. 822, 837 (S.D.N.Y. 1987) ("Opportunities for exercise must be afforded to prisoners"); *Rhem v. Malcolm*, 371 F. Supp. 5894, 627 (S.D.N.Y. 1974) ("The right of a prisoner to reasonable physical exercise is fundamental" so that the "50 minute per week opportunity for exercise at MHD (even supplemented by other recreation programs) does not meet constitutional standards" for pretrial detainees), *aff'd*, 507 F.2d 333 (2d Cir. 1974); *Albro v. Onondaga*, 681 F. Supp. 991, 995 (N.D.N.Y. 1988) (Munson, C.J.) ("Detainees, even those [held] for only a short time, ought to be afforded at least 1 hour of exercise per day"). Plaintiff does not allege that he was denied the opportunity to exercise or that the opportunity was deficient in some way. (*See generally* Dkt. No. 11.) In fact, Plaintiff alleges that he was afforded recreational time each day while in punitive segregation. (Dkt. No. 11 at ¶ 64.)

Further, even assuming *arguendo*, that Plaintiff's allegations were sufficient to satisfy the objective prong of the Eighth Amendment, he fails to allege facts plausibly suggesting that Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety. Construing all reasonable inferences in Plaintiff's favor, he alleged that Defendants were responsible for a policy that resulted in his punitive segregation assignment. (Dkt. No. 11 at ¶¶ 55, 77, 83.) However, he does not allege facts plausibly suggesting that Defendants "were responsible for or personally involved

in the alleged unconstitutional conditions" that Plaintiff experienced in punitive segregation. *Rasheen v. Adner*, 356 F. Supp. 3d 222, 241 (N.D.N.Y. Jan. 28, 2019).

As a result, I recommend that Plaintiff's claim of cruel and unusual punishment related to his confinement in punitive segregation, pursuant to the Eighth Amendment, be dismissed for failure to state a claim upon which relief may be granted.

### C. Whether Plaintiff Sufficiently Stated a Claim that His Due Process Rights Were Violated Pursuant to the Fourteenth Amendment

"[T]o present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendants(s) deprived him of that interest as a result of insufficient process." *Giano v. Selsky*, 238 F.3d 223, 2235 (2d Cir. 2001).

"Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). When evaluating whether an inmate has suffered "atypical and significant hardship," courts must compare the conditions imposed upon that inmate with the conditions "endured by prisoners in [the] general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999). When evaluating the severity of an inmate's hardship, courts should consider both the duration and the conditions of confinement. *See Dawkins v. Gonyea*, 646 F. Supp. 2d 594, 606 (S.D.N.Y. 2009).

The Second Circuit has taken the position that restrictive confinement—like punitive segregation—without unusual conditions, for a period of up to 101 days, does not constitute an atypical hardship. *Ortiz*, 380 F.3d at 654-55. However, for periods that fall into the " 'intermediate duration' of between 101 and 305 days, 'development of a detailed record' regarding the conditions of confinement as compared to 'ordinary prison conditions' is required" to determine whether a prisoner's liberty interest was infringed. *Chavez v. Gutwein*, 20-CV-0342, 2022 WL 1487781, at *5 (S.D.N.Y. May 11, 2022) (quoting *Palmer v. Richards*, 364 F.3d 60, 64-65 (2d Cir. 2004)); *see Johnson v. Schiff*, 17-CV-8000, 2019 WL 4688542, at *22 (S.D.N.Y. Sept. 26, 2019) (declining to dismiss due process claim for failure to allege a liberty interest

where the plaintiff had been sentenced to 180 days in punitive segregation, because "development of a detailed record of the conditions ... [was] required."); *Koehl v. Bernstein*, 10-CV-3808, 2011 WL 2436817, at *7 (S.D.N.Y. June 17, 2011) (same with respect to a plaintiff who spent 120 days in SHU, and concluding that, on a motion to dismiss the court could not dismiss the plaintiff's due process claim "for failure to describe in detail the conditions of his confinement"), *report and recommendation adopted by*, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011).

**\*12** Based on the allegations contained in the Amended Complaint, Plaintiff spent approximately 175 days in punitive segregation. (Dkt. No. 11 at ¶ 76 [alleging that Plaintiff was "incarcerated and in punitive segregation, continuously, without interruption, from June 12, 2018[,] to December 2, 2018, total[ ]ing 171 days."].) Thus, Plaintiff's confinement to punitive segregation was an "intermediate duration," which requires the development of a detailed record regarding the conditions of confinement to determine whether Plaintiff's liberty interest was infringed.

The cases cited by Defendants in support of their motion are distinguishable and unavailing. First, Defendants cite to *Young v. Polizzi*, *Smith v. Costello*, and *Israel v. Brandt*, which were decided on a motions for summary judgment and thus, after there was a development of the record regarding the conditions of confinement that the plaintiff experienced. *Young v. Polizzi*, 16-CV-0660, 2018 WL 3949967, at *6 (N.D.N.Y. July 11, 2018) (Hummel, M.J.); *Smith v. Costello*, 15-CV-0401, 2017 WL 1155811, at *5-6 (N.D.N.Y. Mar. 3, 2017) (Stewart, M.J.); *Israel v. Bradt*, 228 F. Supp. 3d 237, 239 (W.D.N.Y. 2017). Second, Defendants cite to *Boyd v. Doe #1* and *Judd v. Guynup*, which related to the plaintiffs' restrictive confinement for periods of less than 101 days. *Boyd v. Doe #1*, 18-CV-1333, 2019 WL 5287973, at *12 (N.D.N.Y. Oct. 18, 2019) (McAvoy, J.); *Judd v. Guynup*, 12-CV-0058, 2012 WL 5472113, at *5-7 (N.D.N.Y. Oct. 17, 2012) (Treece, M.J.).

As a result, I recommend that the Court deny Defendants' motion to dismiss Plaintiff's due process claim pursuant to the Fourteenth Amendment for failure to state a claim upon which relief may be granted.

### D. Whether Plaintiff Sufficiently Alleged Defendants' Personal Involvement

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under

[section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

"It is well settled in [the Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotations omitted). In *Tangreti*, the Second Circuit recognized that, after *Ashcroft v. Iqbal*, there is "no special test for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Instead, a plaintiff "must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti*, 983 F.3d at 618.

Here, Plaintiff alleges that Defendants "created, authorized, maintained, permitted, and enforced a policy or procedure of not releasing ... inmates in punitive segregation, who ... had their sentences terminated due to their underlying criminal convictions and sentences being annulled and expunged for purposes of placing them back in punitive segregation if they return." (Dkt. No. 11 at ¶ 77.) In addition, Plaintiff alleges that "the matter regarding him being placed back in punitive segregation ... was taken all the way up to the superintendent ... to no avail." (*Id.* at ¶ 54.) Plaintiff alleged that he was informed by a DOCCS employee that it was "essentially up to the superintendent whether to place an inmate, upon returning from a court-ordered discharge, back in punitive segregation." (*Id.*)

**\*13** Given the special liberality afforded to *pro se* complaints, I find that Plaintiff has alleged facts plausibly suggesting the personal involvement of Defendants Colvin and Morton—both of whom were superintendents of the facilities where Plaintiff was confined to punitive segregation—sufficient to survive Defendants' motion to dismiss. I reject Defendants' argument that the Court should not consider Plaintiff's allegations that are based on hearsay. *See PDV USA, Inv. V. Interamerican Consulting Inc.*, 20-CV-3699, 2021 WL

2581569, at *8 (S.D.N.Y. June 22, 2021) ("[T]he fact that the news reports constitute hearsay [does not] warrant striking, because admissibility of an allegation is not a concern at the motion to dismiss stage."); *Campanella v. Cnty. of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012) ("Although, as pleaded, these allegations are based on hearsay, that does not bar the Court from considering them on a motion to dismiss."). As a result, I recommend that the Court deny Defendants' motion to dismiss to the extent that it argues that Plaintiff failed to allege facts plausibly suggesting the personal involvement of Defendants Colvin and Morton.

However, I find that the Amended Complaint fails to allege facts plausibly suggesting the personal involvement of Defendant Annucci. Plaintiff does not allege that Defendant Annucci was aware of or involved in any way with Plaintiff's punitive segregation assignment. As a result, I recommend that the Court grant Defendants' motion to dismiss Plaintiff's claims against Defendant Annucci for lack of personal involvement. *See Conklin v. Cnty. of Suffolk*, 859 F. Supp. 2d 415, 441-42 (E.D.N.Y. 2012) (quoting *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)) ("[T]he fact that [the defendant] 'was in a high position of authority is an insufficient basis for the imposition of personal liability.' ").

### E. Whether Defendants are Entitled to Qualified Immunity

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "affords government officials 'breathing room' to make reasonable—even if sometimes mistaken—decisions." *Distiso v. Cook*, 691 F.3d 226, 240 (2d Cir. 2012) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 553 (2012)). "The qualified immunity standard is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.' " *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) (quoting *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010)).

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (internal quotations and citations omitted). The Court has discretion to determine the order in which it will address the inquiries required when assessing

the applicability of qualified immunity. *See Johnson v. Perry,* 859 F.3d 156, 170 (2d Cir. 2017) (quoting *Pearson* 555 U.S. at 236).

A right is clearly established if, "at the time of the challenged conduct ... every 'reasonable official would have understood that what he is doing violates that right.' " *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). There is no requirement that a case have been decided which is directly on point, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft, 563 U.S. at 741.*

In addition, qualified immunity protects state actors when it was objectively reasonable for the state actor to believe that his conduct did not violate a clearly established right. *Manganiello v. City of N. Y.,* 612 F.3d 149, 165 (2d Cir. 2010). "If a reasonable officer might not have known for certain that the conduct was unlawful—then the officer is immune from liability." *Ziglar v. Abbasi,* 137 S. Ct. 1843, 1867 (2017). Therefore, the district court may first ask whether it was objectively reasonable for any of the defendants to believe their conduct was not unlawful at the time. *Simpson v. City of N. Y.,* 793 F.3d 259, 268 (2d Cir. 2015). Qualified immunity does not apply if, on an objective basis, it is obvious that no reasonably competent officer would have taken the actions of the alleged violation. *Malley v. Briggs,* 475 U.S. 335, 341 (1986). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes,* 138 S. Ct. 1148, 1152 (2018).

**\*14** "Although a defendant may assert the defense of qualified immunity in a motion to dismiss, the Second Circuit has held that it is very difficult for such a defense to succeed at the pleading stage." *Charles v. New York State DOCCS,* 07-CV-1274, 2009 WL 890548, at \*10 (N.D.N.Y. Mar. 31, 2009) (citing *McKenna v. Wright,* 386 F.3d 432, 436-37 (2d Cir. 2004)). "The defense must be based on facts appearing on the face of the complaint." *Charles,* 2009 WL 890548, at \*10 (citing *Benzman v. Whitman,* 523 F.3d 119, 125 (2d Cir. 2008)); *see Bernstein v. City of New York,* 06-CV-0895, 2007 WL 1573910, \*9 (S.D.N.Y. May 24, 2007) (quoting ("[b]ecause the qualified immunity defense necessarily involves a fact-specific inquiry, '[i]t is generally

premature to address the defense of qualified immunity in a motion to dismiss pursuant to Rule 12(b)(6).' ").

Here, whether Defendants can successfully assert the defense of qualified immunity depends, to a great extent, on the facts concerning Plaintiff's punitive segregation, what actions they took, and why they took those actions in light of surrounding circumstances. As a result, I find that Defendants' motion to dismiss on this ground is premature and recommend that it be denied. *Rivera v. Fischer,* 655 F. Supp. 2d 235, 239-40 (W.D.N.Y. 2009).

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment and to dismiss (Dkt. No. 25) be **GRANTED to the extent that** (1) Plaintiff's conditions of confinement claim pursuant to the Eighth Amendment be dismissed, and (2) all of Plaintiff's claims against Defendant Annucci be dismissed for failure to state a claim upon which relief may be granted; and **DENIED to the extent that** it sought (1) dismissal for failure to exhaust administrative remedies, and (2) dismissal of Plaintiff's due process claim pursuant to the Fourteenth Amendment against Defendants Morton and Colvin; and it is further respectfully

**ORDERED** that the Clerk of the Court shall provide Plaintiff with a copy of this Report and Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Slip Copy, 2022 WL 7290107

---

2022 WL 4008027
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Damian R. TRAPANI, Plaintiff,

v.

Anthony J. ANNUCCI, et al., Defendants.

9:21-CV-0681 (LEK/ML)
|
Signed September 1, 2022

**Attorneys and Law Firms**

Damian R. Trapani, Dannemora, NY, Pro Se.

Erik Boule Pinsonnault, Rachael Ouimet, New York State
Attorney General, Albany, NY, for Defendants Anthony J.
Annucci, John Colvin, Robert Morton.

**MEMORANDUM-DECISION AND ORDER**

LAWRENCE E. KAHN, United States District Judge

**I. INTRODUCTION**

 *1  Plaintiff Damian Trapani commenced this action pro
se on June 11, 2021. Dkt. No. 1. On September 27, 2021,
Plaintiff filed an amended complaint alleging violations under
42 U.S.C. § 1983 ("Section 1983") of his constitutional
rights at Downstate Correctional Facility ("Downstate")
and Five Points Correctional Facility ("Five Points") by
defendants Anthony J. Annucci, John Colvin, and Robert
Morton (collectively, "Defendants"). Dkt. No. 11 ("Amended
Complaint"). After initial review of the Amended Complaint,
this Court found two of Plaintiff's claims could proceed:
a claim arising under the Eighth Amendment's prohibition
against cruel and unusual punishment, and a claim for
violation of Plaintiff's Fourteenth Amendment due process
rights. See Dkt. No. 15 at 16-17.

On January 31, 2022, Defendants filed a motion for summary
judgment and dismissal pursuant to Fed. R. Civ. P 12(b)(6).
Dkt. No. 25 ("Motion"). Plaintiff's request for an extension
of time to respond to Defendants' Motion was granted on
February 22, 2022; Plaintiff's response was due by March
8, 2022. Dkt. No. 29. On March 21, 2022, the Court sua
sponte extended the deadline for Plaintiff to file a response to
Defendants' Motion to April 4, 2022. Dkt. No. 31. On March

21, 2022, Plaintiff filed a response to the Motion, Dkt. No. 32,
and on March 30, 2022, Defendants filed a reply. Dkt. No. 33.

Now before the Court is a report and recommendation
issued by the Honorable Miroslav Lovric, United States
Magistrate Judge, recommending that Defendants' Motion be
granted in part and denied in part. Dkt. No. 37 ("Report-
Recommendation"). For the reasons that follow, the Court
approves and adopts the Report-Recommendation in its
entirety.

**II. BACKGROUND**

**A. Factual Allegations**
Plaintiff's factual allegations are detailed in the Report-
Recommendation, familiarity with which is assumed. See
R&R at 3; see also Dkt. No. 15 at 2-7.

**B. The Report-Recommendation**
Judge Lovric found a genuine dispute of material fact
regarding whether (1) Plaintiff did, in fact, exhaust his
administrative remedies, or (2) in the alternative, whether
administrative remedies were unavailable to Plaintiff. R&R
at 17–18. Thus, Judge Lovric recommended denying
Defendant's motion for summary judgment which argued
that Plaintiff failed to exhaust his administrative remedies
before commencing this action. R&R at 18. To resolve the
dispute, Judge Lovric recommended that the Court conduct
an exhaustion hearing pursuant to Messa v. Goord, 652 F.3d
305 (2d Cir. 2011) to determine whether Plaintiff properly
exhausted his administrative remedies. Id.

Judge Lovric then addressed Plaintiff's cruel and unusual
punishment claim pursuant to the Eighth Amendment. R&R
at 18. Judge Lovric concluded that Plaintiff failed to
"allege facts plausibly suggesting the objective or subjective
elements of his claim." Id. at 21. Judge Lovric observed that
"the facts are insufficient to plausibly suggest that [Plaintiff]
was incarcerated under conditions that objectively posed
a substantial risk of serious harm." Id. Judge Lovric also
stated, "[Plaintiff] fails to allege facts plausibly suggesting
that Defendants knew of and disregarded an excessive
risk to Plaintiff's health and safety." Id. at 22. Thus,
Judge Lovric recommended dismissing Plaintiff's Eighth
Amendment cause of action for failure to state a claim upon
which relief may be granted. Id.

**\*2** Next, Judge Lovric addressed Plaintiff's Fourteenth Amendment due process claim. Id. at 23. Judge Lovric explained that the Second Circuit has indicated that restrictive confinement—like punitive segregation—without unusual conditions, for a period of up to 101 days, does not constitute an atypical hardship. See Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004); see also R&R at 23. Judge Lovric explained, however, that for periods which fall into the " 'intermediate duration' between 101 to 305 days, 'development of a detailed record' regarding the conditions of confinement as compared to 'ordinary prison conditions' is required" to determine whether a prisoner's liberty interest was infringed. Chavez v. Gutwein, 20-CV-0342, 2022 WL 1487781, at *5 (S.D.N.Y. May 11, 2022) (quoting Palmer v. Richards, 364 F.3d 60, 64-65 (2d Cir. 2004)); see R&R at 23-24. Judge Lovric found that "Plaintiff's confinement to punitive segregation was an 'intermediate duration,' which requires the development of a detailed record regarding the conditions of confinement to determine whether Plaintiff's liberty interest was infringed." R&R at 24. As a result, Judge Lovric recommended denying Defendants' motion to dismiss Plaintiff's due process claim.

Judge Lovric then addressed whether Defendants were personally involved in the alleged constitutional deprivations. Id. at 25. Judge Lovric determined that Plaintiff's Amended Complaint plausibly suggested personal involvement of Colvin and Morton—both superintendents of the facilities where Plaintiff was confined to punitive segregation—but failed to suggest personal involvement of Annucci. Id. at 25-26. Consequently, Judge Lovric recommended granting Defendants' motion to dismiss Plaintiff's claims against Annucci for lack of personal involvement but recommended denying Defendants' motion to dismiss with respect to Colvin and Morton. Id. at 27.

Finally, Judge Lovric addressed Defendants' qualified immunity defense. Id. at 27–29. Judge Lovric ultimately found Defendants' qualified immunity defense premature and recommended that it be denied. Id. at 29.

### III. STANDARD OF REVIEW

"Rule 72 of the Federal Rules of Civil Procedure and Title 28 United States Code Section 636 govern the review of decisions rendered by Magistrate Judges." A.V. by Versace, Inc. v. Gianni Versace, S.p.A., 191 F. Supp. 2d 404, 405 (S.D.N.Y. 2002); see also 28 U.S.C. § 636; Fed. R. Civ. P. 72. Review of decisions rendered by Magistrate Judges are also governed by the Local Rules. See L.R. 72.1. As 28 U.S.C. § 636 states:

Within fourteen days after being served with a copy [of the Magistrate Judge's report and recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of the court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings of recommendations made by the magistrate [judge]. The judge may also receive further evidence or recommit the matter to the magistrate [judge] with instructions.

28 U.S.C. § 636(b)(1). When written objections are filed and the district court conducts a de novo review, that "*de novo* determination does not require the Court to conduct a new hearing; rather, it mandates that the Court give fresh consideration to those issues to which specific objections have been made." A.V. by Versace, 191 F. Supp. 2d at 406 (emphasis in original); see also 12 Wright & Miller, Fed. Prac. & Proc. Civ. § 3070.2 (3rd ed.) (2022) ("[T]he judge to whom the objection is made must review the record and magistrate's recommendations, and must make a de novo determination of the facts and legal conclusions, receiving additional evidence and rehearing witnesses at his or her discretion. The district judge must not be a rubber stamp." (footnote omitted)).

"The district court may adopt those portions of a report and recommendation to which no timely objections have been made, provided no clear error is apparent from the face of the record." DiPilato v. 7-Eleven, Inc., 662 F. Supp. 2d 333, 339 (S.D.N.Y. 2009). "When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the [report and recommendation] strictly for clear error." New York City Dist. Couns. of Carpenters Pension Fund v. Forde, 341 F. Supp. 3d 334, 336 (S.D.N.Y. 2018) (quoting Molefe v. KLM Royal Dutch Airlines, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009)).

**\*3** "The objections of parties appearing *pro se* are 'generally accorded leniency' and should be construed 'to raise the strongest arguments that they suggest.' " DiPilato, 662 F. Supp. 2d at 340 (emphasis in original) (quoting Milano v. Astrue, No. 05-CV-6527, 2008 WL 4410131, at \*2 (S.D.N.Y. Sept. 26, 2008)). "Nonetheless, even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." DiPilato, 662 F. Supp. 2d at 340 (emphasis in original) (quoting Pinkney v. Progressive Home Health Servs., No. 06-CV-5023, 2008 WL 2811816, at \*1 (S.D.N.Y. July 21, 2008)).

## IV. DISCUSSION

After the Report-Recommendation was issued on June 21, 2022, see R&R, Plaintiff filed his Objections to the Report-Recommendation on July 21, 2022. [1] Dkt. No. 43. Plaintiff indicated that he "objects to the Report and Recommendation of the Magistrate Judge, recommending dismissal of his conditions-of-confinement claims pursuant to the Eighth Amendment, on account of [D]efendants unnecessarily placing Plaintiff back in punitive segregation, which inhibited his ability to exercise." Obj. at 3. Plaintiff concluded, "The fact [that] Plaintiff was placed back in punitive segregation alone, without any justification, is enough to be cruel and unusual punishment." Id. Thus, Plaintiff's objection focuses on Judge Lovric's recommendation to dismiss Plaintiff's Eighth Amendment cruel and unusual punishment cause of action for failure to state a claim upon which relief can be granted. As such, the Court will conduct a de novo review of this specific portion of the Report-Recommendation. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

[1]    Plaintiff's request for an extension of time to file his objections, Dkt. No. 40, was granted by this Court with a deadline set for July 26, 2022. Dkt. No. 42. Objections were filed in the Docket on July 27, 2022, Dkt. No. 43. However, Plaintiff's filing was timely under the prison mailbox rule, which holds that a pro se prisoner meets the filing deadline if he delivers the filing to prison officials within the time specified. Cf. Noble v. Kelly, 246 F.3d 93, 97 (2d Cir. 2001). Plaintiff dated his objections July 21, 2022, and July 22, 2022, and they were postmarked by July 25, 2022. Dkt. No. 42 at 3–6. "Assuming that the prison mailbox rule applies to objections made to a report and recommendation, the Court deems the objection timely." Yancey v. Robertson, No. 17-CV-0381, 2019 WL 315048, at \*1 (N.D.N.Y. Jan. 24, 2019). Thus, Plaintiff filed in a timely manner.

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, (2007)). A court must accept as true the factual allegations contained in a complaint and draw all inferences in favor of a plaintiff. See Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006). A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. Plausibility requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." Id. at 556.

**\*4** The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Where a court is unable to infer more than the mere possibility of the alleged misconduct based on the pleaded facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. See id, at 678–79.

Given Plaintiff's pro se status, the Court is obligated to construe the allegations in the Amended Complaint with the utmost leniency. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers"). Therefore, the Court must determine whether it should accept, reject, or modify the Magistrate Judge's recommendation to grant Defendants' motion to dismiss for failure to state a claim upon which relief can be granted with respect to Plaintiff's Eighth Amendment cruel and unusual punishment claim against Defendants.

The Eighth Amendment to the Constitution prohibits the infliction of "cruel and unusual punishments...." U.S. Const. amend. VIII. Prison conditions may become "cruel and unusual punishments" if prison officials act (or fail to act)

with "deliberate indifference to a substantial risk of serious harm to a prisoner." Farmer v. Brennan, 511 U.S. 825, 836 (1994). The standard of deliberate indifference includes both subjective and objective components." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

The objective element is met when "[C]onditions of confinement ... result in unquestioned and serious deprivations of basic human needs." Anderson v. Coughlin, 757 F.2d 33, 34–35 (2d. Cir. 1985) (internal quotations omitted). Although the Constitution does not mandate a comfortable prison setting, see Rhodes v. Chapman, 452 U.S. 337, 349 (1981), "[p]risoners are entitled to 'basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety.' " Helling v. McKinney, 509 U.S. 25, 32 (1993) (quoting DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 199–200 (1989)). Courts must "assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Helling, 509 U.S. at 25. "Ultimately, to establish the objective element of an Eight Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (quoting Helling, 509 U.S. at 35-36; Rhodes, 452 U.S. at 347).

To satisfy the subjective element, "the defendant 'must act with a sufficiently culpable state of mind.' " Chance, 143 F.3d at 702 (quoting Hathaway, 37 F.3d at 66). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " Chance, 143 F.3d at 702 (quoting Farmer, 511 U.S. at 837). "This mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006). Put another way, to satisfy the subjective element, defendants must act with a mens rea "consistent with recklessness in the criminal law." Farmer, 511 U.S. at 837.

**\*5** The Magistrate Judge found that "Even accepting Plaintiff's allegations as true—that Defendants placed him in punitive segregation, did not return the bulk of his personal belongings, and denied him his medically prescribed boots—the facts are insufficient to plausibly suggest that he was incarcerated under conditions that objectively posed a substantial risk of serious harm." R&R at 21. The Court agrees. Plaintiff contends that he was denied medically prescribed boots while he was confined in punitive segregation, which hindered his ability to properly exercise. Dkt. No. 11 at ¶ 65. But this alone is insufficient to satisfy the objective prong. The Second Circuit has indicated that "[only] some opportunity for exercise must be afforded to prisoners." Anderson, 757 F.2d at 35.

Here, Plaintiff does not allege that Defendants denied him the opportunity to exercise. To the contrary, Plaintiff concedes that he was "let outside cell each day for fresh air," and afforded recreational time. Dkt. No. 11 at ¶ 64. Moreover, Plaintiff's allegations are supported by mere conclusory statements including the contention that "[t]he fact [that] Plaintiff was placed back in punitive segregation alone, without any justification, is enough to be cruel and unusual punishment," and that "Defendants unnecessarily plac[ed] Plaintiff back in punitive segregation." Obj. at 2. [2]

[2]    Although the Court has already determined that Plaintiff's assertions fail the objective prong of his Eighth Amendment claim, Plaintiff's allegations are also insufficient to satisfy the subjective prong of his Eighth Amendment claim. Plaintiff does not show how Defendants knew of and disregarded an excessive risk to Plaintiff's health and safety. See generally Dkt. No. 11. When viewed in the light most favorable to Plaintiff, Plaintiff alleges that Defendants created a policy that resulted in his punitive segregation assignment, Dkt. No. 11 at ¶¶ 55, 77, 83, but he does not allege that Defendants "were responsible for or personally involved in the alleged unconstitutional conditions" Plaintiff experienced in punitive segregation. Rasheen v. Adner, 356 F. Supp. 3d 222, 241 (N.D.N.Y. Jan. 28, 2019). Indeed, Plaintiff "does not plead facts suggesting that the named defendants created or knew about the conditions." Id.

Plaintiff also requests leave to amend his Complaint. See Obj. at 3. However, to the extent Plaintiff wishes to file an amended complaint, he must file a motion to amend pursuant to Local Rule 15.1(a). [3]

[3]    "A party moving to amend a pleading pursuant to Fed. R. Civ. P. 14, 15, 19-22 must attach an unsigned copy of the proposed amended pleading

to its motion papers. Except if the Court otherwise orders, the proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects. A party shall not incorporate any portion of its prior pleading or exhibits thereto into the proposed amended pleading by reference. The motion must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading, either through the submission of a redline/strikeout version of the pleading sought to be amended or through other equivalent means." L.R. 15.1(a).

Lastly, Plaintiff requests that the Court impose sanctions on Defendants "for making false representations on the court." Obj. at 3. However, to the extent that Plaintiff wishes to file a motion for sanctions, he must follow the procedures described in Fed. R. Civ. P. 11(c)(2).

Neither party filed objections to the remaining portions of the Report-Recommendation by August 10, 2022, when they were due pursuant to Fed. R. Civ. P. 6(d) and 6(a)(1)(C). See generally Docket. Consequently, the Court reviews the rest of the Report-Recommendation for clear error and finds none. Therefore, the Court adopts the Report-Recommendation in its entirety.

## V. CONCLUSION

 **\*6** Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 37) is **APPROVED** and **ADOPTED** in its entirety; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment and to Dismiss (Dkt. No. 25) is **GRANTED** with regard to (1) Plaintiff's Eighth Amendment cruel and unusual punishment claim, and (2) all of Plaintiff's claims against Defendant Annucci; and **DENIED** to the extent that it sought (1) dismissal for failure to exhaust administrative remedies, (2) dismissal on the basis of qualified immunity; and (3) dismissal of Plaintiff's Fourteenth Amendment due process claim against Defendants Morton and Colvin; and it is further

**ORDERED**, that this matter is **REFERRED BACK** to Magistrate Judge Lovric to facilitate resolution of the genuine disputes of material fact surrounding Plaintiff's exhaustion of his administrative remedies, including an exhaustion hearing; and it is further

**ORDERED**, that the Clerk serve copies of Plaintiff's Amended Complaint, Defendants' Motion for Summary Judgment and to Dismiss, and the Docket on Plaintiff; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 4008027

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Loadholt v. Lape, Not Reported in F.Supp.2d (2011)

2011 WL 1135934

2011 WL 1135934
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald LOADHOLT, Plaintiff,
v.
William LAPE, Superintendent of Coxsackie
Corr. Facility; Dr. Miller, Facility Health Services
Director; K. Cavanaugh, Psychological Services
Unit Chief; McDermott, Lieutenant; Dr. Schlenger,
Dental Health Services; J. Smith, Deputy
Superintendent of Health Services, Defendants.

Civ. No. 9:09–CV–0658 (LEK/RFT).
|
March 3, 2011.

**Attorneys and Law Firms**

Ronald Loadholt, Hempstead, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Cathy Y. Sheehan, Esq., Richard Lombardo, Esq.,
Assistant Attorney Generals, of Counsel, Albany, NY, for
Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH E. TREECE, United States Magistrate Judge.

**\*1** *Pro se* Plaintiff Ronald Loadholt filed this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that the
Defendants violated his constitutional rights under the Eighth
and Fourteenth Amendments. Dkt. No. 9, Second Am.
Compl. Defendants bring a Motion to Dismiss the Complaint
pursuant to Federal Rule of Civil Procedure 12(b)(6), Dkt. No.
28, which Plaintiff opposes, Dkt. No. 36. For the reasons that
follow, we recommend that Defendants' Motion be **granted**
and Plantiff's Second Amended Complaint be dismissed in its
entirety.

### I. BACKGROUND

Plaintiff initiated this action on June 8, 2009, while an inmate
at Coxsackie Correctional Facility, with the filing of a civil
rights Complaint. *See* Dkt. No. 1. The Honorable Lawrence

E. Kahn, Senior United States District Judge, found that both
Plaintiff's Complaint and his subsequent Amended Complaint
(Dkt. No. 7) could not proceed as drafted, but permitted
Plaintiff, in light of his *pro se* status, the opportunity to amend
his pleadings to cure various deficiencies therein. *See* Dkt.
Nos. 6, Order, dated Aug. 12, 2009 & 8, Order, dated Sept.
29, 2009. In accordance with those Orders, Plaintiff filed his
Second Amended Complaint with this Court on October 10,
2009. Dkt. No. 9.

On a motion to dismiss, the allegations of the complaint
must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319,
322 (1972). In light of the terse, sparse, and vague claims in
Plaintiff's Second Amended Complaint, we now restate the
allegations in full and verbatim:

> defendant McDermott refuse to give Plaintiff hearing
> assistance Plaintiff is Learning disable and refuse OMH
> testment of Plaintiff mental illness Dates 10/20/08, 12/5/08,
> 10/23/08 causing Plaintiff to lose freedom

> defendant K cavanaugh no Psychological crisis treatment
> or suicide prevention when Plaintiff stop eat And drink lost
> alot of weight pacing not sleeping, or showering Date 12–
> 23–08 to 1–5–09 causing Plaintiff Mental condition to get
> even more bad coming close to dead phyical pain,

> defendant: Dr: Schlenger no dental services for tooth pain
> from 10–3–09 to 2–3–09 [1] wait at coxsaxie receive no
> dental services causing Plaintiff more pain and lost of tooth

[1]
> Without additional supporting facts or clarification,
> this Court is unsure whether Plaintiff means to
> claim the pertinent dates were from February 3,
> 2009 until October 3, 2009, and simply stated
> in reverse, or rather from October 3, 2008
> until February 3, 2009, and simply inserted a
> typographical error. Regardless, ambiguity on the
> stated dates does not change this Court's analysis.

> defendant: J SMITH refuse to remove Plaintiff from RMV
> and place (Plaintiff) in hospital after lose alot of weight
> to be force feeded Date 12–21–09 to 1–05–09 [2] causing
> mental and phyical pain

[2]
> *See supra* note 1.

> defendant: William Lape

not given Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and phyical pain

defendant Dr Miller allow mental ill patients to lose alot of weight 12–23–08 to 1–5–09 place plaintiff on 3 floor and not on flat 10–5–09–2–2–09 [3] not give better pain medical, cane, mattress, pillow, no medical accomodational better shoe's etc.

[3]    *See supra* note 1.

Second Am. Compl. at pp. 5–7.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183 (1984)).

**\*2** "Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at \*2 (N .D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d

Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1960 (citing *Twombly* ). [4] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. at 1950–51.

[4]    By its opinion in *Bell Atl. Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting *Conley,* 355 U.S. 41, 45– 46 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

With this standard in tow, we consider the plausibility of Plaintiff's Second Amended Complaint.

## B. Eighth Amendment

**\*3**  Plaintiff claims, albeit in a quite cursory manner, that the Defendants violated his constitutional rights under the Eighth Amendment by their deliberate indifference to his medical needs and by subjecting him to harsh and atypical prison conditions.

To state a claim under § 1983 for deprivation of medical treatment in violation of the Eighth Amendment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). Thus, "[t]he deliberate indifference standard embodies both an objective and a subjective prong" which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Under the subjective component, the plaintiff must demonstrate that the defendants acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin,* 37 F.3d at 66. This standard must be met for each claim against each individual Defendant in this action.

### 1. Defendant Cavanaugh

Plaintiff alleges that Defendant Cavanaugh did not provide "psychological crisis treatment or suicide prevention" after Plaintiff stopped eating, drinking, sleeping, or showering. Second Am. Compl. at p. 5. In accordance with the deliberate indifference standard, we will delve into Plaintiff's allegation to determine if this statement—Plaintiff's only mention of Defendant Cavanaugh—is enough to implicate both an objective substantial risk of serious harm and a sufficiently culpable state of mind.

"A serious medical condition must be 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Osacio v. Greene,* 2009 WL 3698382, at \*4 (N.D.N.Y. Nov. 2, 2009) (quoting *Hathaway v. Coughlin,* 37 F.3d at 66). "Factors that have been considered in determining whether a condition is serious include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Id.* (quoting *Chance v. Armstrong,* 143 F.3d at 702)

(other citations omitted). The "factors listed above, while not the only ones that might be considered, are without a doubt highly relevant to the inquiry into whether a given medical condition is a serious one." *Chance v. Armstrong,* 143 F.3d at 703.

Here, the question is whether the deprivation of psychological treatment or suicide prevention procedures triggers an objectively serious risk of harm within the context of the Eighth Amendment. Taking the Plaintiff's claims as true, it appears he had a need for mental health services that went unmet. This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied with suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious. *See, e.g., Allah v. Kemp,* 2010 WL 1036802, at \*6, n. 9 (N.D.N.Y. Feb. 25, 2010) (finding the failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet the "sufficiently serious" standard); *Hamilton v. Smith,* 2009 WL 3199531, at \*14 (N.D.N.Y. Jan. 13, 2009) (finding plaintiff's claimed history of suicidal thoughts sufficient to raise a question of fact as to serious medical need); *Covington v. Westchester Cnty. Dept. of Corrs.,* 2010 WL 572125, at \*6 (S.D.N.Y. Jan. 25, 2010) (citing cases where courts have found that depression with suicidal ideation, or severe anxiety attacks, are sufficiently severe conditions to meet the objective prong of deliberate indifference); *see also Zimmerman v. Burge,* 2009 WL 3111429, at \*8 (N.D.N.Y. Sept. 24, 2009) (reviewing published case law discussing whether depression either with or without suicidal ideation is a "sufficiently serious" medical condition). Therefore, Plaintiff's statement pertaining to Defendant Cavanaugh, though brief, is enough to satisfy the objective prong of the deliberate indifference standard.

**\*4**  Regarding the subjective component, however, Plaintiff does not allege that Defendant Cavanaugh denied him medical services with any ill state of mind, or even that Cavanaugh was aware of the substantial medical risk. An official acts with the requisite deliberate indifference when that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994).

Upon reading Plaintiff's Second Amended Complaint liberally, as well as his Opposition to Defendants' Motion to

Dismiss, Dkt. No. 36, we conclude that Plaintiff makes no allegation as to Cavanaugh's awareness of Plaintiff's serious health risk. Thus, while mental illness and corresponding suicidal tendencies left untreated can be sufficiently serious to reach an Eighth Amendment claim, there are no facts in Plaintiff's pleading to allow this court to infer, let alone find, that Defendant Cavanaugh possessed the culpable state of mind required to allege deliberate indifference to a medical need. Accordingly, we recommend Plaintiff's claim against Defendant Cavanaugh be **dismissed.**

### 2. Defendant Miller

Plaintiff additionally alleges Eighth Amendment violations against Defendant Miller, who, according to the best interpretation this Court can muster, violated Plaintiff's constitutional rights by allowing him to lose weight and by failing to give Plaintiff "better pain medica[tion], cane, mattress, pillow ... better shoes," and by placing Plaintiff on "3 floor and not on flat." Second Am. Compl. at p. 7.

This claim against Defendant Miller also fails to allege facts sufficient to survive Defendants' 12(b)(6) Motion to Dismiss. As with Defendant Cavanaugh, Plaintiff does not make any mention that Defendant Miller was aware of any serious risk to the Plaintiff, let alone that he acted with the requisite wantonness. Therefore, Plaintiff cannot claim Miller was deliberately indifferent to his medical needs.

Furthermore, to the extent that Plaintiff is claiming that the conditions of his confinement constituted cruel and unusual punishment in violation of the Eighth Amendment, this claim also falls short. In the context of an Eighth Amendment claim based on prison conditions, the prisoner must demonstrate that the deprivation is objectively sufficiently serious such that the plaintiff was "den[ied] the minimal civilized measure of life's necessities," and that the prison officials subjectively "knew of and disregarded an excessive risk to inmate health or safety." *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996) (internal citations omitted).

Turning to the objective analysis, Plaintiff's allegations do not trigger the conclusion that Plaintiff was denied the minimal civilized measure of life's necessities, as the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981), but instead only requires that inmates not be deprived of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety," *Helling v. McKinney,* 509 U.S. 25, 32 (1993) (citation omitted). In accord, courts in this Circuit have found the

deprivations of better pain medicine, a cane, a mattress, a pillow, or "better shoes," as the Plaintiff has alleged, do not meet, neither singularly nor collectively, the objective standard under the Eighth Amendment. [5] However, it is more complete to say that Plaintiff's failure to allege any facts indicating that Defendant Miller acted, or did not act, with a wanton state of mind, forecloses any colorable allegation that he was denied his constitutional rights under the Eighth Amendment regarding prison conditions. *See Vaughan v. Erno,* 8 F. App'x 145, 146–47 (2d Cir.2001) (finding complained conditions of confinement did not constitute an Eighth Amendment violation because plaintiff failed to show defendants acted with deliberate indifference, even assuming that he sufficiently alleged a serious harm); *Carr v. Canty,* 2011 WL 309667, at *2 (S.D.N.Y. Jan. 19, 2011) (finding a plaintiff did not satisfy the deliberate indifference requirement of an Eighth Amendment claim regarding conditions of confinement because defendants responded to complaints of a wet and slippery floor "albeit, not in the manner in which [plaintiff] preferred" and took action to cover the water); *Hughes v. Butt,* 2009 WL 3122952, at *10 (N.D.N.Y. Sept. 28, 2009) (concluding that a defendant, who the plaintiff did not allege to have any visual indication or awareness that plaintiff needed a cane, back brace, or knee brace, did not act deliberately indifferent towards plaintiff); *Savage v. Brue,* 2007 WL 3047110, at *9 (N.D.N.Y. Oct. 18, 2007) (finding a nurse, who refused pain medication to an inmate confined in a special housing unit for forty-eight (48) hours with no mattress and back and neck pain due to a recent injury and who advised the inmate that he would need to "adjust to it," to be possibly negligent in her care, but not deliberately indifferent). Therefore, we recommend Plaintiff's claim against Defendant Miller be **dismissed.**

[5]

    *See Brown v. Eagen,* 2009 WL 815724, at *9 (N.D.N.Y. Mar. 26, 2009) (stating that the prison officials have the broad discretion to determine the nature and character of the medical treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)); *Williams v. Perlman,* 2009 WL 1652193, at *6–7 (N.D.N.Y. Feb. 5, 2009) (finding a prisoner who specifically complained that his orthopedic shoes created "intense pain on [his] toes and arches" and caused him to develop painful callouses which needed to be "lanced from [his] feet" did not adequately suggest in his complaint that his foot, ankle, or arch condition

Loadholt v. Lape, Not Reported in F.Supp.2d (2011)

2011 WL 1135934

presented an issue of degeneration or extreme pain); *Borges v. McGinnis,* 2007 WL 1232227, at *4–6 (W.D .N.Y. Apr. 26, 2007)* (find that an inmate given only a paper gown, slippers, a thin mattress, and no blanket, while confined for three days in a room with an open window that reduced the temperature to approximately 50 degrees, failed to meet the objective element of an Eighth Amendment violation); *Bell v. Artuz,* 1999 WL 253607, at *3–4 (S.D.N.Y. Apr. 29, 1999)* (noting that no Eighth Amendment claim is implicated where prisoner alleges no pillows, a lack of space in double-occupancy cell, poor ventilation, asbestos on catwalk behind cells, no bacterial soap, and insufficient lighting); *Veloz v. New York,* 35 F.Supp.2d 305, 309 & 312 (S.D.N.Y.1999)* (stating prisoner's foot condition, which involved increasing pain and required surgery, was not sufficiently serious); *Alston v. Howard,* 925 F.Supp. 1034, 1040 (S.D.N.Y.1996)* (finding prisoner's ankle condition and resulting foot pain requiring the use of special footwear was not sufficiently serious).

### *3. Defendant Schlenger*

**\*5** Plaintiff also claims that Defendant Schlenger, presumably in his position as a doctor of dental health at Coxsackie, did not give Plaintiff "dental services for tooth pain from 10–3–09 to 2–3–09 ... causing Plaintiff more pain and los[s] of tooth." Second Am. Compl. at p. 6.

"Dental conditions, like other medical conditions, may be of varying severity." *Chance v. Armstrong,* 143 F.3d at 702. Thus, the constitutionality of a decision to leave a dental condition untreated will depend on the facts of the particular case. *Harrison v. Barkley,* 219 F.3d 132, 137–38 (2d Cir.2000). The Second Circuit has held, in the context of failing to treat a dental injury, that a "serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.' " *Id.* at 136 (finding that while a tooth cavity is not strictly a serious medical condition, it is a degenerative condition which "is likely to produce agony and to require more invasive and painful treatments" if left untreated) (quoting *Chance v. Armstrong,* 143 F.3d at 702).

However, Plaintiff does not allege any facts regarding any particular type of oral injury or condition that would aid

this Court in its 12(b)(6) inquiry, but rather only "tooth pain," which eventually led to the loss of the tooth. Plaintiff also alleges no facts to suggest that Defendant Schlenger or anyone else should have been aware of his tooth pain.[6] This claim against Defendant Schlenger is utterly bereft of factual allegations which would allow for the Court to deduce the plausibility of a cognizable cause of action, *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct.1937, 1949 & 1960 (2009), or which would permit a defendant "to have a fair understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery," *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). Thus, because this claim is without factual allegations setting forth that Defendant Schlenger violated Plaintiff's constitutional rights, we recommend that this claim be **dismissed.**

6    Curiously, in opposing Defendants' request for dismissal, Plaintiff fails to mention Defendant Schlenger or allegations of facts supporting his claim of tooth pain, though he references his various other claims. *See* Dkt. No. 36.

### *4. Defendant Smith*

Lastly, Plaintiff alleges that Defendant Smith, Deputy of Health Services, violated his rights under the Eighth Amendment by refusing to place him in a hospital after Plaintiff lost a lot of weight, resulting in "mental and physical pain." Second Am. Compl. at pp. 3 & 6.

In this case, unlike with Plaintiff's allegations against any of the previously considered Defendants, Plaintiff claims that "Smith refuse[d]" to act, which led to the alleged constitutional violation. As this Court is charged with the mandate of construing Plaintiff's claims leniently, we are willing to impute from the use of the word "refuse" enough to satisfy the wanton state of mind requirement of deliberate indifference. In order to "refuse" or decline to do something, one must necessarily be aware of the request or the issue, and subsequently choose not to act, implicating that Defendant Smith acted, or did not act, with a culpable mind set of more than mere negligence. Thus, Plaintiff has alleged enough, in this case, to satisfy the subjective prong of Eighth Amendment deliberate indifference.

**\*6** Regardless, Plaintiff's claim must fail, as he does not allege a sufficiently serious injury or risk of injury. He claims that Defendant Smith failed to place Plaintiff in a hospital due to Plaintiff's loss of weight. Plaintiff does not allege how much weight he lost, if that weight loss was dangerous to his

health, or why he lost the weight. [7] Notably, Plaintiff also does not state why hospitalization was warranted or necessary to remedy this weight loss, as opposed to another form of treatment. *See O'Connor v. McArdle,* 2006 WL 436091, at *5 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, that fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Therefore, there are no allegations in the pleading to "conclude that [P]laintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Evans v. Albany Cnty. Corr. Facility,* 2009 WL 1401645, at *10 (N.D.N.Y. May 14, 2009) (quoting *Bost v. Bockelmann,* 2007 WL 527320, at *8 (N.D.N.Y. Feb. 20, 2007)). Thus, while Plaintiff has alleged enough to satisfy the subjective prong of the Eighth Amendment deliberate indifference standard, his failure to allege a sufficiently serious medical condition means this claim should be **dismissed.**

[7]   The Court notes that Plaintiff mentions he "stop[ped] eat[ing] and drink[ing] lost alot [sic] of weight" in relation to a claim separate from his claim against Defendant Smith. Second Am. Compl. at p. 5.

### C. Due Process

While not explicitly stated in Plaintiff's pleadings, this Court concludes that, by liberally construing Plaintiff's Second Amended Complaint, some of his allegations concern a violation of his rights under the Due Process clause of the Fourteenth Amendment. Specifically, Plaintiff complains that Defendants Lape and McDermott acted in such a way that they violated his right to procedural due process. We will examine the claims against each Defendant *seriatim.*

#### 1. Defendant Lape

Plaintiff claims, in cursory fashion, that Defendant Lape, who Plaintiff describes as the "superintendent" of Coxsackie, did "not give[ ] Plaintiff hearing, or grievance or legal assistance from 10–20–08 to 2–3–09 causing mental and physical pain." Second. Am. Compl. at pp. 1 & 6.

It is well-settled that the personal involvement of a defendant is a prerequisite for the assessment of damages in a §

1983 action. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Furthermore, the doctrine of *respondeat superior* is inapplicable to § 1983 claims. *See Polk County v. Dodson,* 454 U .S. 312, 325 (1981) (internal citations omitted); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Thus, a defendant may not be liable for damages simply by virtue of holding a supervisory position, without more. *See, e.g., Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, the personal involvement of a supervisory defendant may be shown by evidence that:

> **\*7** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d at 873.

Plaintiff does not explain what Defendant Lape purportedly did to deny Plaintiff of assistance in any hearing or grievance process, nor suggest facts that Lape himself was involved in any way in any constitutional violation. Rather, Plaintiff appears to be bringing legal action against Lape due to his supervisory position only. Because the "proper focus is the [D]efendant's direct participation in, and connection to, the constitutional deprivation," *McClary v. Coughlin,* 87 F.Supp.2d 205, 215 (W.D .N.Y.2000), and because one cannot be liable solely from holding a supervisory position, we find Plaintiff's claim against Defendant Lape should be **dismissed** for lack of personal involvement.

#### 2. Defendant McDermott

Liberally construed, Plaintiff claims that Defendant McDermott refused to give Plaintiff "hearing assistance" or allow the Office of Mental Health to testify that Plaintiff is "learning disable[d]" and has a mental illness, which caused the Plaintiff to "lose freedom." Second Am. Compl. at p. 5.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must show that he possessed an actual liberty or property interest, and that he was deprived of that interest without sufficient process. *See Shakur v. Selsky,* 391 F.3d 106, 118 (2d Cir.2004). Inmates' liberty interests are typically derived from two sources: the Due Process Clause of the Fourteenth Amendment, and state statute or regulations. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners.' " *Id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)). With regard to State created liberty interests, the Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." 515 U.S. 472, 484 (1995).

Here, Plaintiff has not alleged enough facts to indicate a viable Due Process violation under the Constitution. He argues, in effect, that he did not receive a meaningful hearing because Defendant McDermott denied Plaintiff assistance in some unidentified hearing. The only liberty interest that Plaintiff alleged to have lost was the loss of freedom. *See* Second Am. Compl. at p. 5. Without specifics about the nature and conditions of the alleged loss of freedom, Plaintiff does not state an "atypical and significant hardship ... to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Shuler v. Brown,* 2009 WL 790973, at *7 (N.D.N.Y. Mar. 23, 2009) (quoting *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004)). The loss of freedom, inherent in the "ordinary incidents of prison life," *Sandin v. Conner,* 515 U.S. at 483–86, does not constitute, without alleging more, an atypical and significant hardship on an inmate. Nor has he shown a deprivation of liberty under the Due Process Clause. Furthermore, this statement is devoid of any factual allegation that this Court could examine to determine if the procedure provided by the State to Plaintiff was in fact insufficient, or what the deprivation exactly was. Plaintiff does not specify what

hearing or hearings he is referring to, or even what the hearings were regarding. Therefore, because Plaintiff's naked assertions do not rise to the pleading standards required to withstand a Motion to Dismiss under Rule 12(b) (6), we recommend that the claim against Defendant McDermott be **dismissed.**

### D. Americans with Disability Act

**\*8** In his Second Amended Complaint, Plaintiff states that he has a cause of action under the Americans with Disability Act ("ADA"). Second Am. Compl. at p. 7. This claim is not supported with any facts, nor the names of the parties it is purportedly directed. Besides previously stating, with relation to his claims against Defendant McDermott, that he suffers from some type of learning disability, Plaintiff does not specifically allege what disability he suffers from, nor what he was denied. Furthermore, Plaintiff does not allege under which Title of the ADA he is suing under. Thus, for the preceding reasons and because the Plaintiff states no facts, allegations, nor specific discussion of this claim, we find that to the extent that Plaintiff is attempting to assert a claim under the ADA against any individual Defendant, the claim should be **dismissed.**

### III. CONCLUSION

While this Court recognizes the Second Circuit's preference to provide *pro se* plaintiffs with leave to amend their pleadings prior to dismissal, Loadholt has already been afforded two opportunities to amend his Complaint.

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 28) be **GRANTED** and Plaintiff's Second Amended Complaint (Dkt. No. 9) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE***

2011 WL 1135934

***APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1135934

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 1114253

2011 WL 1114253
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.

Ronald LOADHOLT, Plaintiff,

v.

William LAPE, Superintendent of Coxsackie Correctional Facility; Dr. Miller, Facility Health Services Director; K. Cavanaugh, Psychological Services Unit Chief; McDermott, Lieutenant; Dr. Schlenger, Dental Health Services; J. Smith, Deputy Superintendent of Health Services, Defendant.

No. 9:09–CV–0658 (LEK/RFT).
|
March 25, 2011.

**Attorneys and Law Firms**

Ronald Loadholt, Hempstead, NY, pro se.

Cathy Y. Sheehan, Richard Lombardo, New York State Attorney General — Albany Office The Capitol, Albany, NY, for Defendant.

**ORDER**

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report–Recommendation filed on March 3, 2011, by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report–Rec. (Dkt. No. 38).

Within fourteen days after a party has been served with a copy of a Magistrate Judge's Report–Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Magistrate Judge Treece's Report–Recommendation. Furthermore, after examining the record, the Court has determined that the Report–Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report–Recommendation (Dkt. No. 38) is **APPROVED** and **ADOPTED;** and it is further

**ORDERED,** that Defendant's Motion to dismiss (Dkt. No. 28) is **GRANTED,** and Plaintiff's Second Amended Complaint (Dkt, No 9) is **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1114253

End of Document    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5439826
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

[1]    Plaintiff consistently signs his name as "Houston Douglas," however, Plaintiff's name is listed as "Douglas Houston" on the Department of Corrections and Community Supervision ("DOCCS") website, *available at* http://nysdocslookup.doccsny.gov (last viewed on August 28 2013, for DIN # 06–A–2860), Court's Case Management/Electronic Case Filing System as well as in all of Defendant's papers. Therefore, we refer to Plaintiff as "Douglas Houston."

Douglas HOUSTON, [1] Plaintiff,

v.

Lester N. WRIGHT, M.D., M.P.H., New York State Docs, Health Services, Doctor Johnson, Clinton Correctional Facility Health Services, John Doe, Nurse Assistant, Clinton Correctional Facility, Health Services, Defendants.

No. 9:10–CV–1009 (NAM/RFT).
|
Sept. 27, 2013.

**Attorneys and Law Firms**

Douglas Houston, Romulus, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Brian J. O'Donnell, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

### *ORDER*

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Randolph F. Treece, duly filed on the 29th day of August 2013. Following fourteen (14) days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's ReportRecommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its entirety.

2. The defendants' motion for summary judgment (Dkt. No. 52) is granted as to plaintiff's deliberate indifference claim against defendant Johnson, and denied as to plaintiff's conditions of confinement claim against defendant Johnson. Defendants Doe and Wright are dismissed from this action.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

**DOUGLAS HOUSTON,** [1]

[1]    Plaintiff consistently signs his name as "Houston Douglas," however, Plaintiff's name is listed as "Douglas Houston" on the Department of Corrections and Community Supervision ("DOCCS") website, *available at* http://nysdocslookup.doccsny.gov (last viewed on Aug. 28, 2013, for DIN # 06–A–2860), Court's Case Management/Electronic Case Filing System as well as in all of Defendants' papers. Therefore, we refer to Plaintiff as "Douglas Houston."

Plaintiff,

-v-

**LESTER N. WRIGHT,** *M.D., M.P.H., New York State DOCS, Health Services,* **DOCTOR JOHNSON,** *Clinton Correctional Facility Health Services,* **JOHN DOE,** *Nurse Assistant, Clinton Correctional Facility, Health Services,*

Defendants.

RANDOLPH F. TREECE, United States Magistrate Judge.

### *REPORT–RECOMMENDATION and ORDER*

*Pro se* Plaintiff Douglas Houston brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that Defendants

(1) were deliberately indifferent to his serious medical needs, and (2) subjected him to unconstitutional conditions of confinement. Dkt. No. 14, Am. Compl. Defendants move for Summary Judgment on the grounds that (1) Plaintiff does not have a sufficiently serious injury, (2) Defendants did not act with deliberate indifference, (3) Defendant Wright was not personally involved, (4) there is no evidence to support Plaintiff's claim that the facility was infested with cockroaches, and (5) Plaintiff failed to timely name and serve Defendant John Doe. Dkt. No. 52–14, Defs.' Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 62, Pl.'s Opp'n. [2] For the reasons that follow, we recommend that Defendants' Motion for Summary Judgment be **GRANTED in part and DENIED in part.**

[2]      Plaintiff's Opposition consists of a Statement Pursuant to Local Rule 7.1 (hereinafter "Pl.'s 7.1 Statement"), Plaintiff's Affidavit, Memorandum of Law, and several Exhibits. Dkt. No. 62.

### I. STANDARD OF REVIEW

Pursuant to FED.R.CIV.P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED.R.CIV.P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case.");

*Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### II. DISCUSSION

#### A. Summary of Facts

Except where noted, the following facts are uncontroverted.

Plaintiff's claims arise out of events that transpired while he was an inmate at Clinton Correctional Facility ("CCF"). *See* Dkt. No. 52–13, Douglas Houston Dep., dated Mar. 6, 2012, at p. 7. There are two medical clinics at CCF, the Main Infirmary Clinic and the Annex Clinic. *Id.* at pp. 10 & 58. Defendant Dr. Lester Wright was the Chief Medical Officer of the New York State Department of Corrections and Community Supervision ("DOCCS"), but is now retired. Dkt. No. 52–3, Vonda Johnson, M.D., Aff., dated Sep. 5, 2012, at ¶ 4. Defendant Dr. Vonda Johnson was the Facility Health Care

Services Director at CCF, as well as one of Plaintiff's treating physicians. *Id.* at ¶¶ 1 & 5.

**\*3** On July 16, 2007, Plaintiff reported to the Annex Clinic complaining of dizziness and blurred vision. Plaintiff's blood pressure (hereinafter "BP") was elevated (198/103) and he had missed his last two doses of Metfornin, a medication he had been taking since 2001 to control his Type II Diabetes. A nurse practitioner then phoned in a prescription for Amlodipine (generic for Norvasc), a blood pressure medication, which was administered to Plaintiff by Defendant John Doe (a.k.a. Paul Harriman),[3] a registered nurse. Plaintiff was instructed to have his blood pressure monitored while he awaited a follow-up visit with his healthcare provider, which was set for the following week. Houston Dep. at pp. 12–13, 21, 26–27, & 29–30; Johnson Aff. at ¶ 9, Ex. 1, Portions of Pl.'s Medical R. (hereinafter "MR") at p. 12, & Ex. 2, Defs.' Annotated MR (hereinafter "AMR"),[4] at 7/16/07 entry. On July 18, Plaintiff told a nurse practitioner that he was not taking the Norvasc/Amlodipine because he did not think he needed it, and denied having vision problems. Plaintiff was encouraged to take his medication and a request for an ophthalmology consultation was submitted. Johnson Aff. at ¶ 10; MR at pp. 12–13; AMR at 7/18/07 entry. On July 20, a nurse monitored Plaintiff's vital stats. MR at p. 11; AMR at 7/20/07 entry.

3    Plaintiff reveals in his Reply Statement Pursuant to Local Rule 7.1 that John Doe is also known as Paul Harriman. *See* Dkt. No 62, Pl.'s 7.1 Statement at ¶ S 12.

4    Dr. Johnson has annotated certain entries from the AMR which she believes are pertinent to Defendants' Motion, providing a typewritten translation of the handwritten entries in the AMR. Johnson Aff. at ¶ 6 & Ex. 2. The portions of Plaintiff's Ambulatory Health Record are docketed separately at Dkt. No. 52–4, while Dr. Johnsons's annotations are docketed at Dkt. No. 52–5.

On July 23, 2007, Plaintiff was admitted to the Infirmary Clinic complaining of dizziness, blurred vision, and double vision for the past week. Plaintiff's blood pressure was found to be elevated (190/99), an EKG was performed, and he was given Norvasc. MR at pp. 10–11; AMR at 1st & 2nd 7/23/07 entries. On July 24, 2007, Plaintiff saw Defendant Dr. Johnson for the first time. Plaintiff's BP was elevated (179/97), and Dr. Johnson noted that Plaintiff had the following symptoms:

"ptosis (a drooping eyelid) on the left side, ... a slow inward gaze and inward rotation of his eyes on a downward gaze." Johnson Aff. at ¶ 12. Dr. Johnson also noted that Plaintiff had just recently been started on BP medication and should be monitored. Plaintiff met with Dr. Johnson again on July 25. Dr. Johnson noted that Plaintiff's left eye had improved since the day before, but his hypertension was still poorly controlled. Dr. Johnson tentatively diagnosed third nerve palsy as the cause of Plaintiff's ptosis, increased Plaintiff's dose of Norvasc, and prescribed Glipizide for his Diabetes. *Id.* at ¶¶ 12 & 13; MR at pp. 87–88; AMR at 7/24/07 & 2nd 7/25/07 entries. On July 26, Plaintiff's BP and glucose levels were monitored throughout the day, and he reported that he was experiencing improvement in his left eye. MR at p. 85; AMR at 7/26/07 entries. On July 27, Plaintiff was provided with a thirty-day supply of Metformin, Glipizide, and Norvasc to administer himself in his cell, reminded of the importance of taking his medication, and discharged from the Infirmary Clinic. MR at pp. 8 & 83–84; AMR at 2nd 7/27/07 & 7/28/07 entries; *see also* Houston Dep. at pp. 18–20 (explaining self-carry procedure). Thereafter, on July 28, 30, 31, and August 1, and 2, Plaintiff's BP and blood sugar were checked by CCF medical personnel. MR at pp. 7 & 8; AMR at 7/28/07–8/2/07 entries.

**\*4** On August 7, 2007, Plaintiff told Dr. C. Ferrari, a non-defendant, that he was experiencing an adverse reaction to the BP medication. Dr. Ferrari's notes from that meeting state "on Norvasc ... and does not want to increase medication.... Claims all his meds are causing 'eye problems.' " MR. at p. 6; AMR at 8/7/07 entry. On August 10, 2007, Plaintiff had a specialty consultation with an ophthalmologist, who noted that Plaintiff was experiencing weakness in both eyes, ptosis on both sides, and weakness in his right hand and arm. The ophthalmologist recommended an emergency neurological consult. MR at pp. 6 & 29; AMR at 1st 8/10/07 entry. Plaintiff was then taken to the emergency room at Champlain Valley Physicians Hospital ("CVPH"), where a CT scan of his brain and a blood test were conducted. Plaintiff was diagnosed with "PROBABLE MYASTHENIA GRAVIS." Later that evening, Plaintiff was discharged from CVPH and readmitted to the Infirmary Clinic at CCF with an elevated BP (208/108). Clondine, an additional BP medication, was prescribed, and a neurological consult was recommended. MR at pp. 6, 69, & 81; AMR at 2nd—4th 8/10/07 entries.

Despite being cautioned by CCF medical staff, Plaintiff refused to take his BP medications on August 11, 12, and 13, because, *inter alia,* they were "hurting" him. MR at

pp. 69, 70, & 76; AMR at 8/11/07–8/13/07 entries. On August 14, at the Infirmary Clinic, Dr. Johnson reviewed reports from CVPH and wrote a referral for a consultation with a neurologist. She also "discussed hypertension with [Plaintiff] at length including possible side effects and adverse reactions to medication," decreased Plaintiff's prescription for hydrochlorothiazide, and restarted Plaintiff on Clonidine. Johnson Aff. at ¶ 19; MR at pp. 28, 67, & 71; AMR at 2nd 8/14/07 entry; *see also* Dkt. No. 62, Douglas Houston Aff., dated Nov. 26, 2012, at ¶ 17. Dr. Johnson saw Plaintiff in the Infirmary Clinic on August 15. She noted that Plaintiff's BP "was under better control since he had been taking clonidine and hydrochlorothiazide." Johnson Aff. at ¶ 21; MR at p. 71; AMR at 1st 8/15/07 entry. Dr. Johnson saw Plaintiff again on August 16, when he continued to complain of alternating weakness in his left and right eyelid as well as weakness in his arms. She noted that his hypertension was under "much better control on clonidine and hydrochlorothiazide," and his blood sugar was also under control; she then authorized his discharge to the Annex Clinic. MR at 77; AMR at 2nd 8/16/07 entry.

On August 18, 20, 21, 23, and 24, Plaintiff refused to take his BP medication because, *inter alia,* "[he] read all those side effects from the medication insert and [he has] all of them." MR at pp. 3–5; AMR at 8/18/07–8/24/07 entries. On August 24, Plaintiff fell while trying to get in his wheelchair and was taken to the Annex Clinic complaining of dizziness, muscle weakness, and an inability to sit up or stand. CCF medical staff noted that Plaintiff had a raised area on the back of his head and a superficial laceration; Dr. Johnson was called and she ordered that Plaintiff be taken by ambulance to CVPH's Emergency Room, where his injury was treated. MR at p. 2; AMR at 1st 8/24/07 entry. Plaintiff was later returned to the Infirmary Clinic, and on August 25, 2007, Dr. Johnson ordered that Plaintiff's vital signs be taken every four hours over the course of the day and then every shift thereafter. She also prescribed Metoprolol and Vasotec for Plaintiff's BP, Metformin for his Diabetes, and scheduled a neurology consultation. MR at p. 63; AMR at 1st 8/25/07 entry. That same day, Plaintiff urinated on his wall and claimed that he could not move; he also refused to take any BP medications stating that "my meds are what's making me sick[,] I need new meds." Dr. Johnson was called and ordered Vasotec be discontinued and Hydrochlorothiazide be started. MR at pp. 14 & 63; AMR at 2nd 8/25/07 entry; Johnson Aff at ¶ 25.

**\*5** On August 27, Plaintiff continued to complain of muscle weakness and refused to take his medications. MR at p. 64;

AMR at 1st and 2nd 8/27/07 entries. That same day Plaintiff was evaluated by a neurologist who recommended that Plaintiff be hospitalized at Albany Medical Center ("AMC") for a work-up. MR at p. 28; AMR at 3rd 8/27/07 entry. Plaintiff also fell while trying to get into his wheelchair and reopened the wound he incurred on August 24; his wound was cleaned and dressed at the Annex Clinic and he was then taken by ambulance to CVPH. MR at p. 2; AMR 4th–5th 8/27/07 entry. On August 28, Plaintiff was transferred to AMC where he had a neurology consultation. MR at p. 23. On or about September 4, 2007, Plaintiff was discharged from AMC, with a primary diagnosis of myasthenia gravis, and a secondary diagnosis of diabetes, hyperlipidemia, and hypertension; a regiment of drugs was prescribed including steroids for treatment of Plaintiff's myasthenia gravis. Dkt. No. 62–1, Pl.'s Opp'n, Ex. A, at pp. 123–24, AMC Discharge Summary. [5] When Dr. Johnson met with Plaintiff on September 6, she noted that he was still complaining of weakness in upper and lower extremities, that he "can stand with the aid of walker and take a few steps but extremely afraid of failing, getting stuck on toilet, w/o being able to get back up, etc." MR at p. 61. Dr. Johnson recommended that he continue on the prescription regimen prescribed by AMC for treatment of myasthenia gravis. On September 10, 2007, per Dr. Johnson's recommendation, Plaintiff was transferred to the Regional Medical Unit at Coxsackie Correctional Facility (hereinafter "Coxsackie RMU"). Johnson Aff. at ¶¶ 26–27; MR at p. 60, & 65; AMR at 9/6/07 entries.

[5]    Defendants note that they were only provided with one page of the two page Discharge Summary. AMR at 9/04/12 entry. However, Plaintiff provided both pages in his Exhibit. *See* Pl.'s Mem. of Law at p. 3.

According to Plaintiff, during the three visits he made to the Main Clinic between July 16, and August 27, he was placed in a cockroach infested infirmary, where he was unable to eat for a week [6] because the cockroaches got to his food before he could. Houston Aff. at pp. 57–59.

[6]    It is unclear whether Plaintiff was unable to eat for a week straight, or for a total of seven non-consecutive days. *See* Houston Dep. at pp. 57–59; Am. Compl. at ¶¶ 6 & 7.

**B. Eighth Amendment**

Construed liberally, Plaintiff's Amended Complaint alleges two Eighth Amendment violations against Defendant Johnson. One for deliberate medical indifference, and one for subjecting Plaintiff to unconstitutional conditions of confinement. Plaintiff claims that Defendant Johnson (1) delayed his medical treatment by ignoring his claims that the BP medication was causing him to experience severe muscle weakness and significant pain for thirty days while she focused her efforts on diagnosing him with myasthenia gravis; and (2) that he was treated in a cockroach infested Infirmary. Am. Compl. at ¶¶ 6 & 7; Houston Dep. at pp. 57–59; *see also* Dkt. No. 62, Pl.'s Mem. of Law at pp. 9–12. For the reasons that follow we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's deliberate indifference claim, and **DENIED** as to Plaintiff's conditions of confinement claim.

### i. Medical Claim

**\*6** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, 834–35 (1994); *Hathaway v. Coughlin ("Hathaway I"),* 37 F.3d 63, 66 (2d Cir.1994).

The seriousness element is an objective test. To determine whether the deprivation of care is sufficiently serious "entails two inquiries." *Salahuddin v. Goord,* 467 F.3d 263, 279 (2d Cir.2006) (citations omitted). First, courts must determine "whether the prisoner was actually deprived of adequate medical care." *Id* . Medical care is "adequate" where the care provided is a "reasonable" response in light of the "health risk" the inmate faces. *Id.* at pp. 279–280. The second inquiry requires a determination of "whether the inadequacy in medical care is sufficiently serious." *Id.* at p. 280. In cases where medical care is denied, courts focus on the seriousness of the underlying medical condition. *Id.* (citing *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). Some of the factors that determine whether a prisoner's medical condition

is serious include: "1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, 2) whether the medical condition significantly affects daily activities, and 3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (internal quotation marks and citations omitted) (noting that an inmate is not required to show "that he or she experiences pain that is at the limit of human ability to bear, nor [does the court] require a showing that his or her condition will degenerate into a life threatening one"). Whereas, the "seriousness inquiry is narrower" in cases where "the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment." *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Smith v. Carpenter,* 316 F.3d at 185)). In such cases, courts "focus[ ] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* In cases of delay the objective requirement requires a finding that the alleged delay in treatment put Plaintiff at a significant risk of harm. *Smith v. Carpenter,* 316 F.3d at 186. Determining whether the delay presents a sufficiently serious risk "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Id.* (citing *Helling, v. McKinney,* 509 U.S. 25, 32–33 (1993))

**\*7** The second element, deliberate indifference, is based on a subjective standard. To establish deliberate indifference a plaintiff must demonstrate that the defendant acted with a culpable mental state, such as criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03 (1991); *Hathaway I,* 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

To begin with, we note that it is unlikely that Plaintiff can satisfy the objective element of an Eighth Amendment delay of medical treatment claim. The record clearly demonstrates that Plaintiff received extensive medical care, including doctor visits, medication, constant checkups and monitoring by CCF medical staff, diagnostic testing such as blood work and a CT Scan, as well as specialty consultations with a neurologist and an ophthalmologist, and on multiple occasions, emergency medical care at outside hospitals. *See supra* Part II.A. Thus, we find that no rational juror could find that the care provided by any of the Defendants was unreasonable. *See Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that inmates be given medical attention that judges would wish to have for themselves."); *see also Harrington v. Mid–State Corr. Facility,* 2010 WL 3522520, at *11 (N.D.N.Y. May 21, 2010) (finding that "[r]eferring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions") (citation omitted); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 311–12 (S.D.N.Y.2001) (collecting cases to support a similar proposition). Moreover, notwithstanding Plaintiff's conclusory allegations to the contrary, there do not appear to be any significant delays or gaps in Plaintiff's treatment. As established above, Plaintiff received some sort of care nearly every day. *See supra* Part II.A. Thus, it does not appear that any delay in medical treatment occurred, let alone any that put Plaintiff at a serious risk of harm. *See Smith v. Carpenter,* 316 F.3d at 185–86. Moreover, even assuming, *arguendo,* that Plaintiff could establish the objective element of a delay of treatment claim, his claim would still fail because there is simply no evidence of deliberate indifference in the record before us.

 **\*8** Essentially, the only issue in dispute is whether the choice of medication, course of treatment and diagnosis pursued by Dr. Johnson were correct. Plaintiff claims that

> Defendant Doctor [J]ohnson and other medical personels [sic] ignored plaintiff['s] complaint of High Blood Pressure Medications [sic] side effects from AmlodipineNorvasc, Hydrochlorothiazide, Clonidine, and Glipizide, not only that they ignored plaintiff [complaint] of side effects from these medications, there were never any effort made to look into

plaintiff complaint. All their efforts was focus [ed] on getting a diagnosis for a disease name[d] Myasthenia Gravis, while the High Blood Pressure Medications Sulfuride Hydrochlorothiazide Amlodipine– Norvasc and Glipizide, with the adverse effects of the Alkaline Medication Clonidine Poisoning and Destroying plaintiff['s] body.

Pl.'s Mem. of Law in Opp'n at p. 9.

Whereas, Defendant Johnson states that "in [her] opinion to a reasonable degree of medical certainty, the plaintiff['']s ptosis, vision problems and muscular weakness were not the result of any medications that had been prescribed for him at Clinton Correctional Facility." Johnson Aff. at ¶ 19. Moreover, Defendant Johnson, as well as nearly every other medical professional who treated Plaintiff, believed that these symptoms were caused by a condition called myasthenia gravis. *Compare* Pl.'s 7.1 Statement at ¶ R 35, & Pl.'s Mem. of Law in Opp'n at pp. 2–4 & 9; *with* Johnson Aff. at ¶ 26, & MR at pp. 5, 68, 71, 81. Indeed, Plaintiff has even admitted that not a single medical professional that he spoke with at CCF, CVPH, or AMC indicated that his BP medication was the cause of his symptoms. Houston Dep. at pp. 61–62.

Here, it appears that Plaintiff has mistakenly characterized Dr. Johnson's alleged medical decision to pursue a diagnosis and treatment for myasthenia gravis rather than treat Plaintiff for an allergic or adverse reaction to blood pressure medication, as deliberate indifference. However, regardless of whether Dr. Johnson's course of treatment was correct or not, the dispute over the propriety of the course of treatment, diagnosis, or medication she chose to pursue is not actionable. It is clear that so long as the treatment provided is "adequate," a disagreement over the appropriate course of treatment does not state a claim under § 1983. *Chance v. Armstrong,* 143 F.3d at 703; *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d at 312 (noting that "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a section 1983 claim"). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when

the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008) (citing *Salahuddin v. Goord,* 467 F.3d at 280). As established *supra,* the near daily checkups Plaintiff received, as well as the facts that multiple diagnostic tests were performed and specialists were consulted, it is clear that Plaintiff's care was patently reasonable. *See Harrington v. Mid–State Corr. Facility,* 2010 WL 3522520, at *11 (N .D.N.Y. May 21, 2010) (finding that "[r]eferring for specialist care, explaining the specialist's findings, and referring for further diagnostic follow-up are all appropriate treatment actions") (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

**\*9** Likewise, although a delay in providing necessary medical care may in some cases constitute deliberate indifference, such a classification is typically reserved "for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a life-threatening and fast degenerating condition ... or delayed major surgery[.]" *Freeman v. Stack,* 2000 WL 1459782, at *6 (S.D.N.Y. Sep. 29, 2000) (quoting *Demata v. New York State Corr. Dep't of Health Servs.,* 198 F.3d 233 (2d Cir.1999); *see also Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir.2000) (a physician who "delay [s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference) (citations omitted). Significantly, here, Plaintiff did not need surgery, nor has he alleged that Dr. Johnson delayed his care as a form of punishment.[7] And, although Plaintiff's condition appears to have degenerated quickly, and may have been life threatening (to the extent that hypertension and diabetes are both potentially fatal conditions if left untreated), it is clear from the medical records that his condition was never ignored.

[7]    The Court is cognizant of Plaintiff's claim that between August 10 and 13, "medical staff refused to give plaintiff his diabetes medication because plaintiff refused to take [his BP medication]." Dkt. No. 62, Douglas Houston Aff. in Opp'n, dated Nov. 26, 2012, at ¶ 15. However, these allegations do not implicate Defendant Johnson in any way, other than tangentially through her position in the chain of command. Thus, because there is no evidence that Defendant Johnson was personally involved in these alleged denials, such a claim is not actionable against her. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (defendant may not be held liable simply because she holds a high position of authority) (citations omitted); *Richardson v. Goord,*

347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)).

Additionally, Plaintiff's claim is further undermined by the fact that he refused to consistently take the medications prescribed by Defendant Johnson and others (even despite his alleged adverse reaction to the medication). *See, e.g.,* MR at pp. 3–5, 12, 14, 69–70, & 76; AMR at 7/18/07, 8/11/07–8/13/07, & 8/18/07–8/24/07 entries. He cannot on the one hand refuse to take the medication that his doctor prescribes to him, and then on the other sue her because she did not relieve his symptoms to his satisfaction. *See Jones v. Smith,* 784 F.2d 149, 151–52 (2d Cir.1986) (affirming lower court ruling that a prisoner who declines medical treatment cannot establish an Eighth Amendment claim for medical deliberate indifference); *Mendoza v. Schult,* 2011 WL 4592381, at *5 (N.D.N.Y. Sept. 14, 2011) ("Plaintiff, who apparently disagreed with the clinical judgment of the medical staff, effectively took his treatment regimen into his own hands by unilaterally opting to discontinue the prescribed recommendations of health services .... [and could not] turn around and sue the medical professional for deliberate indifference whose judgment the prisoner has questioned and even defied.") (citing *Jones v. Smith* ); *Ramos v. Genovese,* 2013 WL 773731, at *13 (N.D.N.Y. Jan. 22, 2013).

Thus, we find that no genuine issue of material fact exists as to whether Defendant Johnson was deliberately indifferent towards Plaintiff's medical needs, and therefore we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to these claims.

*ii. Conditions of Confinement Claim*

Plaintiff claims that he while in the Infirmary Clinic his room was infested with cockroaches, which got into his food preventing him from eating for a week. Am. Compl. at ¶ 7; *see also* Houston Dep. at pp. 57–59. Defendants argue that this claim should be dismissed because there is no evidence to support such a claim. Defs.' Mem. of Law at p. 1.

**\*10** In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege that (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v.. Seiter,* 501 U.S. 294, 297–99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630–31 (2d Cir.1996)).

In *Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir.2002), the Second Circuit set out in detail the requirements that a plaintiff must prove in order to make out a claim that the conditions of his confinement violated the Eighth Amendment:

Under the Eighth Amendment, States must not deprive prisoners of their "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *Helling [v. McKinney ],* 509 U.S. [25,] 32 [1993] (citation and internal quotation marks omitted). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." *Id.* at 35. Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency. *Id.* at 35–36; *Rhodes [v. Chapman ],* 452 U.S. [337,] 347 [2002].

Concerning the "subjective" requirement, the Supreme Court has explained that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

*Phelps v. Kapnolas,* 308 F.3d at 185–86.

"Even if the conditions of confinement were found to be unreasonable as a matter of law, a plaintiff cannot survive summary judgment unless he can point to 'record evidence creating a genuine dispute' as to the facts regarding Defendants' culpable mental state ." *Summerville v. Faciuna,* 2009 WL 2426021, at *9 (W.D.N.Y. Aug. 6, 2009) (quoting *Salahuddin v. Goord,* 467 F.3d at 282).

It is axiomatic that the inability to eat for a period of one week is a deprivation of one of "life's basic necessities." Moreover, the "record evidence" at hand establishes a genuine issue of material fact as to whether Defendant Johnson was deliberately indifferent to Plaintiff's complaints that his room was infested with cockroaches. Essentially, Plaintiff claims that he told Defendant Johnson about the infestation, that another inmate assisted him in writing a greivance,[8] and that nothing was done about it. Houston Dep. at p. 57–59. Defendant Johnson claims that no such complaint was ever

made to her, and that there is no evidence of any similar complaint in Plaintiff's medical records. Johnson Aff. at ¶ 28.

[8]  During his deposition, Plaintiff was asked if he had filed a grievance about the roach situation, and he replied that he was too weak to write, but that "an inmate helped me, wrote the complaint that's in that file because I could not write. All I could do was sign it." Houston Dep. at p. 58. However, it is unclear whether this complaint was a formal grievance, and if so what "file" Plaintiff was referring to in his statement. However, affording Plaintiff every reasonable inference, we accept his claim that he filed a grievance regarding the roach situation at face value.

*11 Such he-said, she-said, arguments cannot be determined on summary judgment because they require the type of credibility assessment that has been specifically reserved to the trier of fact. *See Scott v. Coughlin,* 344 F.3d at 289. Therefore, we recommend that Defendants' Motion for Summary Judgment be **DENIED** as to this claim.

## C. Personal Involvement

Plaintiff claims that Defendant Dr. Wright, DOCCS Chief Medical Officer, is liable because "he effectively abdicated his general supervisory responsibilities to his subordinates." Am. Compl. at ¶¶ 6–7; *see also* Pl.'s Mem. of Law at pp. 7–8; Houston Dep. at pp. 59–61. Defendants argue that Dr. Wright should be dismissed from this action because Plaintiff has failed to allege that Defendant Wright was personally involved in any wrongdoing. Defs.' Mem. of Law at pp. 10–11. Because we agree with Defendants, we recommend that Defendant Wright be **DISMISSED.**

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's

own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority).

Because we have found no evidence of an Eighth Amendment deliberate medical indifference claim, we need not consider whether Defendant Wright was somehow personally involved in such a violation. *See supra* Part II.B(i). Moreover, Plaintiff has admitted that he has never met nor spoken with Dr. Wright, and that Plaintiff's claim is based entirely on Dr. Wright's position as Chief Medical Officer. Houston Dep. at pp. 8–9. Plaintiff claims that "Doctor Lester N. Wright is responsible for his subordinate['s] operations in the prison" and that "he was so unreasonably isolated after being informed of plaintiff['s] serious medical needs ... [that] he failed to remedy the wrong of his subordinates, that led to pain suffered by plaintiff from July 16, 2007, through the duration of plaintiff['s] pain and suffering." Pl.'s Mem. of Law at p. 1. Yet, Plaintiff has failed to show how Defendant Wright was aware of Plaintiff's claims that his infirmary room was infested with cockroaches. Plaintiff claims only that Defendant Wright was aware of his "medical problems through complaints and reports." Houston Dep. at pp. 8–9 * 33–34 (explaining that he wrote a letter to the "Superintendent of Administration" but not specifically to Wright). Therefore, because we find no triable issue of material fact exists regarding the personal involvement of Defendant Wright, we recommend that Defendants Motion for Summary Judgment be **GRANTED** as to Plaintiff's claims against him.

### D. Doe Defendant

**\*12** Plaintiff alleges that John Doe, a nurse assistant, "improperly diagnosed and dispensed medication to Plaintiff without adequate supervision." Am. Compl. at ¶ 6. Defendants argue that John Doe should be dismissed from this action because Plaintiff has never identified nor served him. Defs.' Mem. of Law at p. 2. Plaintiff argues that this is because the identity of Defendant Doe has been "kept concealed" from him by Defendants. Pl.'s Mem. in Opp'n at p. 2. However, as explained below, a review of the docket reveals that Defendants did indeed reveal the identity of John Doe during discovery.

In a Decision and Order, issued by the Honorable Norman A Mordue, United States District Judge, on May 16, 2011, Plaintiff was ordered to "take reasonable steps through discovery to ascertain the name of defendant 'John Doe– Nurse Assistant.' If plaintiff fails to ascertain his identity so as to permit the timely amendment of the complaint and service of process on this individual, this action will be dismissed as against the unnamed defendant." Dkt. No. 15, Mem. Dec. & Ord., dated May 16, 2011, at p. 2. In an apparent attempt to comply with that order Plaintiff requested, through interrogatories, that Defendants identify the nurse assistant that attended him on July 16, 2007. Dkt. No. 39, Pl.'s Interrog. Req., dated Nov. 30, 2011, at p. 7. On March 26, 2012, Plaintiff filed a Motion to Compel Defendants to answer those interrogatories, Dkt. No. 39, and on May 2, 2012, this Court ordered Defendants to provide the name of John Doe to Plaintiff, or provide Plaintiff with notice that they were unable to do so, Dkt. No. 44, Order at p. 2. Despite the fact that Plaintiff had several communications with this Court in between the issuance of that Order and the time that Plaintiff filed his Response to Defendants' Motion for Summary Judgment, he never re-raised the issue to the Court. *See* Dkt. Nos. 45, Lt., dated May 3, 2012, 49, Mot. to Appoint Counsel, 50, Lt., dated July 6, 2012, 54, Lt.-Mot., dated Sep. 11, 2012, 56, Mot. to Appoint Counsel, 59, Lt.Mot., dated Oct. 18, 2012, 60, Lt.-Mot., dated Oct. 29, 2012, & 61, Lt.- Mot., dated Nov. 13, 2012. Yet, in his 7.1 Statement, Plaintiff states that

> Plaintiff has never named John Doe ... who dispensed High Blood Pressure Medication to plaintiff on July 16, 2007, because defendants failed to

produce [ ] requested photograph of the medical staffs that work on July 16, 2007 in the Annex Clinic for a positive identification, therefore plaintiff can only name[ ] the medical staff produced to plaintiff by defendant through Discovery Production of Documents Paul Harriman–aka–John Doe.

Pl.'s 7.1 Statement at ¶ S 12.

Further review of Defendant's Exhibits reveal that Paul Harriman was indeed the nurse that attended Plaintiff on July 16, 2007. *See infra* Part II.A.; *see also* MR at p. 12; AMR at 7/16/07 entry. Thus, it would appear that Defendants complied with this Court's Order directing them to identify the John Doe. *Ergo,* any fault for the failure to timely name and serve Defendant Doe lies with Plaintiff.

**\*13** Under FED.R.CIV.P. 4(c)(1) and 4(m), the plaintiff is responsible for service of the summons and complaint for each defendant within 120 days of the filing of the complaint.[9] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id.* at 4(m). Here, Plaintiff had 120–days from March 28, 2011—the day he filed his Amended Complaint—or, until July 16, 2011, to timely name and serve the Doe Defendant. That deadline has long since passed, and as explained above, Plaintiff has failed to present any reasonable justification for his failure to identify and serve the Doe Defendant. Therefore, we recommend that Defendants' Motion for Summary Judgment be **GRANTED** as to this claim.

[9] Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L .R. 4.1(b)

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion for Summary Judgment (Dkt. No. 52) be **GRANTED** as to Plaintiff's deliberate indifference claim against Defendant Johnson, and **DENIED** as to Plaintiff's conditions of confinement claim against Defendant Johnson; and it is further

**RECOMMENDED,** that Defendants Doe and Wright be **DISMISSED** from this action; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

### *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL*

*PRECLUDE APPELLATE REVIEW. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir.1993)* (citing *Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir.1989)); see also 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72* & 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5439826

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2426021

2009 WL 2426021
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Anthony W. SUMMERVILLE, Plaintiff,
v.
Eileen FACIUNA, Joseph Tan,
and J. Berbary, Defendants.

No. 05–CV–6459 (CJS).
|
Aug. 6, 2009.

**Attorneys and Law Firms**

Anthony W. Summerville, Gouverneur, NY, pro se.

Gary M. Levine, A.A.G., New York State Office of the Attorney General, Rochester, NY, for Defendants.

DECISION and ORDER

CHARLES J. SIRAGUSA, District Judge.

**INTRODUCTION**

*1 **Siragusa, J.** This is an action by pro se Plaintiff, a prison inmate, brought under 42 U.S.C. § 1983, asserting Eighth Amendment claims of inadequate medical care and inadequate conditions of confinement. Now before the Court is Defendants' Motion for Summary Judgment. (Docket # 24.) For the reasons set forth below, Defendants' motion is granted.

**BACKGROUND**

Unless otherwise noted, the following are the undisputed facts of this case viewed in the light most favorable to Plaintiff. At all relevant times, Anthony Summerville ("Plaintiff") was a prison inmate in the custody of the New York State Department of Correctional Services ("DOCS"). (Am.Compl.¶ 2.) On September 7, 2005, Plaintiff filed a Complaint against four individuals who, at all relevant times, were employed by DOCS at Collins Correctional Facility ("Collins"): Superintendent J. Berbary ("Berbary"), Joseph

Tan, M.D. ("Tan"), Nurse Elieen Faciuna ("Fucina")[1], and Sergeant Polike ("Polike"). (Compl. ¶ 3; Am. Compl. ¶¶ 4–6.)

[1]     Counsel for Defendants informs the Court that the correct spelling is Eileen Fucina. (Defs.' Mem. 1.)

Around 1:40 a.m. on July 14, 2005, Plaintiff awoke in distress because of what felt like an insect inside his ear. (Am.Compl.¶ 1.) Plaintiff screamed in pain, and his cell-mate called for assistance. (Id.) Plaintiff spoke with a Sergeant, who directed two correction officers to escort Plaintiff to the bull pen until Nurse Fucina could see him. (Id.) When Nurse Fucina examined Plaintiff, she told him there was no bug in his ear and suggested that he had stuck something in his ear. (Am.Compl.¶ 4.) Plaintiff continued to experience pain and begged Nurse Fucina to flush the bug out of his ear. (Am.Compl.¶ 5.) Nurse Fucina refused and told the correction officers to escort Plaintiff back to his cell. (Id.)

Plaintiff refused to be put back in his cell. (Am.Compl.¶ 7.) According to Plaintiff, one of the correction officers told Nurse Fucina that he might really have a problem because he refused to go back in his cell. (Id.) The correction officer put Plaintiff in the bull pen until he could see a doctor at Erie County Medical Center ("ECMC") via teleconference ("Telemed"). (Id.) Before Plaintiff could consult with the doctor, he again begged Nurse Fucina to re-examine his ear because he felt dizzy, had trouble hearing, and felt severe pain. (Am.Compl.¶ 8.) Plaintiff alleges that Nurse Fucina accused him of faking his distress and refused to provide any assistance to Plaintiff. (Am.Compl.¶ 9.)

Nurse Fucina, however, states in her declaration that she examined Plaintiff's ear several times and made multiple attempts to get a consultation for Plaintiff. (Fucina Decl. ¶¶ 3–7, Ex. A.) Plaintiff's medical records show that Nurse Fucina observed and noted that his left ear drum was bulging and red. (Fucina Decl., Ex. A.) Furthermore, Plaintiff admits that Nurse Fucina examined his ear. (Pl.'s Dep. 15:18–19.) At 6:40 a.m., she gave Plaintiff Tylenol to alleviate the pain. (Fucina Decl. ¶ 6; Tan Decl., Ex. A.) Contrary to Plaintiff's assertions that Nurse Fucina did not consult other medical staff (Pl.'s Resp. ¶ 5), she notified the on-call physician, Dr. Bangsil, who ordered an ECMC consult via Telemed (Fucina Decl. ¶ 4; Tan Decl., Ex. A). Nurse Fucina made four attempts to connect with ECMC via Telemed. (Fucina Decl. ¶ 5 .)[2]

[2]     Plaintiff's medical records show that Nurse Fucina made requests for a video consultation through

2009 WL 2426021

Telemed at 4:20 a.m., 4:45 a.m., 5:30 a.m., and 6:15 a.m. (Pl.'s Resp., Attach. 2.)

*2 Nurse Fucina, though, was unable to connect with ECMC via Telemed. (*Id.*) Consequently, she notified the Nurse Administrator of the connection problem. (Fucina Decl. ¶ 7.) At 7:10 a.m., the Nurse Administrator obtained authorization for Plaintiff's transport to ECMC. (Fucina Decl., Ex. A.) The Patient Referral Form notes that the reason for referral was "c/o a bug flew in his L ear while sleeping & felt something inside ... bulging 'RED' tympanic membrane [ ] scant amount of bleeding & c/o muffled hearing from L ear. Denies any dizziness." (Tan Decl., Ex. A.)

The following represents Plaintiff's account of his visit to the ECMC emergency room ("ER"). (*See* Am. Compl.) Two doctors at ECMC looked in Plaintiff's ear and said they saw a bug. (Am.Compl.¶ 19.) One of the doctors attempted to flush it out but could not. (*Id.*) The doctor said if the ear had been irrigated promptly, it would not have swollen and trapped the bug inside. (*Id.*) Correction Officer Gill ("Gill") was present for Plaintiff's examination. (*Id.*) The doctor told Gill to report back to medical staff that he was unable to remove the bug due to the swelling and that Plaintiff should be sent to an ear, nose, and throat specialist ("ENT") if he continue to experience pain, dizziness, or loss of hearing. (Am.Compl.¶ 20.) The doctor gave Plaintiff an antibiotic to prevent infection of his ear. (Am.Compl.¶ 19.) The doctor also stated that any complaint of hearing loss warrants referral to an ear specialist within seventy-two hours. (Am.Compl.¶ 20.)

However, the ER physician's report, which was sent back to the prison, does not show any of the instructions Plaintiff claims were given. Rather the ER report states:

*Diagnosis:* Left Ear Pain

*Medications/Changes:* [illegible] Take As Directed

*Patient Instructions:* Please—Follow Up With Facility Doctor In 5 Days. Take Medication As Instructed—Return To ER For Any Concerns—Fever, Dizziness

(Pl.'s Resp., Attach. 2.)

Five days later, on July 19, 2005, Dr. Tan followed these instructions and reexamined Plaintiff's ear. (Pl.'s Resp., Attach. 2.) Plaintiff still complained that the bug in his ear impeded his hearing. (Am.Compl.¶ 23.) Plaintiff alleges that during this examination, Dr. Tan killed a fly and said, "look Summerville, the bug jumped out of your ear." (Am.Compl.¶

21.) Although Plaintiff also maintains that Dr. Tan refused Plaintiff's request to see an outside physician (Am.Compl.¶ 21), on that same day, July 19, 2005, Dr. Tan submitted a request for consultation form (Pl.'s Resp., Attach. 2). In the referral form, Dr. Tan noted that the reason for consultation was, "pain[f]ul mass growing left ext auditory canal causing conductive hearing loss ... initially, inmate thought it was a bug that went inside left ear [ ] no bug was recovered." (*Id.*)

On July 21, 2005, Dr. Tan's request for consultation was approved. (*Id.*) Before that consultation took place, Dr. Tan prescribed Plaintiff three different kinds of medication, and nurses checked his ear every day. (Am.Compl. ¶ 25.) The nurses always stated that they did not see anything in Plaintiff's ear. (*Id.*) On August 2, 2005, Plaintiff saw an ENT specialist, Dr. Beverly Prince ("Prince"), who removed a Japanese beetle from his ear, ordered a hearing test, and recommended a follow-up in two weeks. (Pl.'s Resp ., Attach. 2.) Further, Dr. Prince noted that she was not able to get a few of the beetle's appendages out of Plaintiff's ear. (*Id.*) In accordance with Dr. Prince's instructions, Dr. Tan immediately referred Plaintiff for a hearing test. (*Id.*) Plaintiff received a hearing test later that same day. (*Id.*) The doctor performing the hearing test noted, "unreliable audiogram L ear [ ] follow up w/ Dr. Prince as ordered." (*Id.*) [3]

[3]    The Court notes that Plaintiff had a prior ear exam on March 22, 2005 that showed his hearing to be within normal range. (Tan Decl. ¶ 4.)

*3 On August 3, 2005, the day after Plaintiff's outside consultation, Dr. Tan requested a follow-up consultation for Plaintiff, in accordance with Dr. Prince's orders. (*Id.*) On August 23, 2005, Plaintiff had his follow-up appointment with Dr. Prince. (Tan Decl., Ex. A.) In the report, Dr. Prince wrote:

*Physical Exam:* ... drum is somewhat swollen. There is a small remnant attached to the drum that I am not removing.

*Assessment and Plan:* The hearing test shows normal thresholds and they felt it was unreliable because there was blood. The plan is to let the remnant [of the Japanese beetle] sluff off. Keep the ear dry.

*Follow-up:* To see the patient back in one month.

(*Id.*) Again, Dr. Tan put in a referral request for Plaintiff to have another follow-up appointment with Dr. Prince. (*Id.*) However, this request was denied on the ground that facility staff could adequately monitor Plaintiff's condition.

2009 WL 2426021

(*Id.*) If Plaintiff's condition did not improve, then the review committee would reconsider a request for outside consultation. (*Id.*)

On October 28, 2005, Dr. Tan again requested a referral because Plaintiff continued to complain about his ear. (*Id.*) Dr. Tan wrote, "inmate still has foul smelling discharge from left ear in spite of [medications prescribed] 4 drops 4 times a day." (*Id.*) He also noted that Plaintiff "still c/o pain and inability to hear [ ] same soft tissue mass obstructing incompletely left ext auditory canal [ ] chronic otitis externa, soft tissue mass left ear .... " (*Id.*)

On or around November 9, 2005, Plaintiff was transferred to Wende Correctional Facility ("Wende"). (*Id.*) Per Dr. Tan's request, Plaintiff saw Dr. Prince on November 22, 2005, who reported:

> *History of Present Illness:* ... He is still complaining that he can't hear and has a foul smell and it hurts.
>
> *Physical Exam:* The ear exam is basically normal. The drum is intact. You can see that there was use of eardrops in the past.
>
> *Assessment and Plan:* The patient is to keep the ear absolutely dry and we are to get a hearing test. If the hearing test is normal, there is no more concern. As far as his otalgia I can't be sure what he is talking about.

(*Id.*) Following Dr. Prince's advice, a doctor at Wende requested a referral for Plaintiff to receive another hearing test. (*Id.*) On December 20, 2005, Plaintiff received another hearing test. (*Id.*) Although the results for his left ear were "inconsistent" and "unreliable" (Tan Decl., Ex. A), they fell within normal limits (Tan Decl. ¶ 15).

In addition to his inadequate medical treatment claim, Plaintiff alleges that his constant exposure to insects in his cell gives rise to conditions of confinement that violate the Eighth Amendment. (Am.Compl.¶¶ 27–37.) Specifically, he alleges that from March 2005 to November 2005, he was forced to inhabit an infested cell. (Am.Compl.¶ 28.) Plaintiff maintains that Superintendent Berbary had a responsibility to maintain sanitary conditions in Collins. (Am.Compl.¶ 27.) However, Plaintiff insists he never saw any indications that his cell or the correction officers' area was treated by an exterminator. (*Id.*) Further, Plaintiff states that if an exterminator treated his cell, he never received a mask to protect him from the fumes. (Am.Compl.¶ 28.) Plaintiff also alleges that the window

screens had large holes that allowed bugs to come into his cell. (Am.Compl.¶ 29.) He notes that bugs also came in through the cracks around the door and holes or cracks in the wall. (*Id.*)

**\*4** Defendant Berbary states that he responded to Plaintiff's complaints of insect infestation by having the cell exterminated and ordering a new window screen. (Berbary Decl. ¶¶ 5, 8.) According to the grievance that Plaintiff filed on July 14, 2005, the day the bug flew in Plaintiff's ear, he was housed in cell OS–B–1. (Pl.'s Resp., Attach. 2.) By July 19, 2005, Plaintiff had moved to cell OS–A2–36 because he listed that cell in a grievance filed on that date. [4] (*Id.*) On July 20, 2005, cell OS–A2–36 was sprayed by a professional exterminator. (Berbary Decl. ¶ 5.) Furthermore, on July 25, 2005, the Superintendent's Deputy sent Plaintiff a memo informing him that his cell had been exterminated. (Berbary Decl., Ex. B.)

[4] In Plaintiff's Response to Defendants' Motion for Summary Judgment, he states that he was moved to cell OS–A2–36 in August 2005. (Pl.'s Resp. 4.) However, Plaintiff's grievance and prison records show he was housed in cell OS–A2–36 on July 20, 2005, the date of the extermination. (Pl.'s Resp., Attach. 2; Berbary Decl. ¶ 5.)

On August 4, 2005, Plaintiff again wrote to the Superintendent complaining about the bugs in his cell. (Berbary Decl., Ex. C.) On August 8, 2005, Superintendent Berbary issued a memo ordering that a new screen be installed "ASAP" in cell 0S–A2–36. (Berbary Decl., Ex. D.) Plaintiff was sent a copy of this memo as well. (*Id.*) In his deposition, Plaintiff acknowledged that workmen came to cell OS–A2–36, inspected the screen, and determined it worked perfectly. (Pl.Dep.32:11–19.) Furthermore, Plaintiff agreed that the screen did not need to be fixed. (*Id.*)

By Order of December 5, 2005, the Court dismissed the claims against Sergeant Polike with prejudice. (Docket # 3.) In lieu of an answer, Defendants filed a motion to dismiss all claims against Berbary and the claims against Tan and Fucina in their official capacities. (Docket # 5.) On July 10, 2006, the Court dismissed the claims against the remaining Defendants in their official capacities, but not the claims against them in their individual capacities. (Docket # 7.) By leave of the Court, Plaintiff filed an Amended Complaint. (Am.Compl.) In the Amended Complaint, Plaintiff alleges that Superintendent Berbary negligently managed the prison (Am.Compl.¶ 4); Nurse Fucina delayed medical care and

misdiagnosed Plaintiff's ailment (Am.Compl.¶ 5); and Dr. Tan delayed treatment, misdiagnosed Plaintiff's problem, and treated him with deliberate indifference (Am.Compl.¶ 6).

On March 12, 2007, Defendants filed the subject motion for summary judgment. (Docket # 24.) Defendants maintain that Plaintiff's medical condition was not sufficiently serious because there is no medical evidence that it would result in death, degeneration, or extreme pain. (Defs.' Mem. 8.) Defendants also state that they were not deliberately indifferent because Plaintiff received sufficient medical treatment for all his complaints. (*Id.*) As to the conditions of confinement claim, Defendant Berbary maintains that all of Plaintiff's complaints were addressed "in an appropriate and timely fashion." (*Id.* at 11.) Furthermore, Defendants state that they were not aware of an excessive risk to Plaintiff's health or safety. (*Id.*) In any event, Defendants argue that they are entitled to qualified immunity. (*Id.* at 12.) Finally, Defendants note that Plaintiff cannot seek compensatory damages because he has not presented any evidence of physical injury as a result of Defendants' conduct. (*Id.*) Accordingly, they state that only nominal damages should be considered for any claims that survive summary judgment. (*Id.* at 15.)

**\*5** Plaintiff responded by stating that Defendants failed to properly diagnose his condition, caused a delay in his treatment, and failed to treat him in a professional manner. (Pl.'s Resp.) Further Plaintiff claims that Defendants' conduct was designed to cover up Nurse Fucina's initial mistake of not seeing the Japanese beetle in Plaintiff's ear. (Pl.'s Resp. 7.) Plaintiff again states that Defendants did not exterminate his cell and did not fix his screen. (Pl.'s Resp. 5.) However, even if Defendants did exterminate his cell, Plaintiff maintains that he was exposed to toxic chemicals because he never received a mask to protect him from the fumes. (*Id.*) Either way, he claims these conditions of confinement constitute cruel and unusual punishment. (*Id.*)

## ANALYSIS

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine

issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. See *Amaker v. Foley,* 274 F.3d 677 (2d Cir.2001). Where the non-moving party will bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

Once that burden has been met, the burden then shifts to the non-moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed.R.Civ.P. 56(e)(2); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Anderson,* 477 U.S. at 248–49; *Doe v. Conn. Dep't of Pub. Safety ex rel. Lee,* 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds, Conn. Dep't of Pub. Safety v. Doe,* 538 U.S. 1 (2003).

"Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment." *Conroy v. New York State Dep't of Corr. Servs.,* 333 F.3d 88, 94 (2d Cir.2003). Rather, evidentiary proof in admissible form is required. Fed.R.Civ.P. 56(e). "[W]here there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial and cannot defeat a motion for summary judgment." *Salahuddin v. Goord,* 467 F.3d 263, 281 (2d Cir.2006) (citing *Celotex,* 477 U.S. at 322–32).

**\*6** Since Plaintiff is proceeding pro se, the Court must construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Furthermore, because opposing a summary judgment motion can be complicated, either the district court or the moving party must supply a pro se litigant with notice of the requirements of Rule 56. *Irby v. New York City Transit Auth.,* 262 F.3d 412, 414 (2d Cir.2001). On October 16, 2007, the Court sent Plaintiff notice pursuant to *Irby.* (Docket # 39.)

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 262 of 380
Summerville v. Faciuna, Not Reported in F.Supp.2d (2009)
2009 WL 2426021

***Plaintiff's Inadequate Medical Treatment Claims***

The Supreme Court has noted that "the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat 'a prisoner's serious illness or injury' resulting in the infliction of unnecessary pain and suffering." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Estelle v. Gamble,* 429 U.S. 97, 105 (1976)). However, "mere negligence in diagnosis or treatment is insufficient to state a valid Eighth Amendment claim and [ ] 'medical malpractice does not become a constitutional violation merely because the victim is a prisoner.' " *Id.* (quoting *Estelle,* 429 U.S. at 105–06). There are two prongs to the test for determining whether inadequate medical care rises to the level of "deliberate indifference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). First, using an objective standard, the court must find that the alleged deprivation of care is "sufficiently serious." *Id.* Second, using a subjective standard, the court must find that the defendant acted with a "sufficiently culpable state of mind." *Id.*

The proper inquiry for the objective "sufficiently serious" test is (1) whether there was an actual deprivation of adequate medical care and (2) whether the inadequacy of the care is sufficiently serious. *Salahuddin,* 467 F.3d at 279–80. To prove that the inadequacy of care was sufficiently serious, the prisoner must show "that his medical need was 'a condition of urgency, one that may produce death, degeneration, or extreme pain.' " *Johnson v. Wright,* 412 F.3d 398, 403 (2d Cir.2005) (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998)). Furthermore, "only 'deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.' " *Salahuddin,* 467 F.3d at 279 (quoting *Wilson v. Seiter,* 501 U.S. 294, 298 (1991)). Prison officials "cannot be found liable under the Cruel and Unusual Punishments Clause," if they acted reasonably in response to the inmate's health concern. *Id.* (finding it unreasonable to postpone prisoner's Hepatitis C treatment for five months).

Under the second prong of the test for inadequate medical care, the court must determine whether the official acted with "deliberate indifference" to the prisoner's medical needs. *Chance,* 143 F.3d at 702. As the Supreme Court has explained, a prisoner cannot state a valid Eighth Amendment claim merely by alleging negligence in diagnosis or treatment. *Estelle,* 429 U.S. at 105–06. As the Court further noted, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for

commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan,* 511 U.S. 825, 838–40 (1994) (adopting criminal law standard of subjective recklessness to determine deliberate indifference under the Eighth Amendment).

*\*7* Generally, in cases involving delayed care, the Second Circuit has reserved a finding of deliberate indifference for extreme cases, such as: ignoring a life-threatening and fast-degenerating condition for three days, *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990); delaying care as a form of punishment, *Archer v. Dutcher,* 733 F.2d 14, 16–17 (2d Cir.1984); or delaying major surgery for over two years, *Hathaway v. Coughlin,* 841 F.2d 48, 50–51 (2d Cir.1988).

Defendants maintain that Plaintiff's condition was not sufficiently serious to meet the objective test under the Eighth Amendment. (Defs.' Mem. 8.) Even assuming, for the sake of this motion, that Plaintiff's condition was sufficiently serious, Plaintiff still has to show that he was denied adequate medical care and that the deprivation was sufficiently serious. *See Salahuddin,* 467 F.3d at 279–80 (noting that a "serious medical condition" is only one factor in determining whether the deprivation of care was sufficiently serious). Plaintiff cannot complain that he was completely denied treatment for his ear problem. Even though Tan and Fucina did not agree with Plaintiff's self-diagnosis, they agreed that there was something wrong with his ear. (*See* Fucina Decl. ¶ 3; Tan Decl., Ex. A.) The record clearly shows that Defendants did not ignore Plaintiff's complaints. (*See* Pl.'s Resp., Attach. 2; Tan Decl., Ex. A.) Indeed, they sent him to the emergency room and to see a specialist on several occasions. (Pl.'s Resp., Attach. 2; Tan Decl., Ex. A.) Plaintiff complains that Nurse Fucina and Dr. Tan should have seen the Japanese beetle in his ear. (Pl.'s Resp. ¶ 4.) However, the fact that they referred Plaintiff to outside physicians suggests that at most, they misdiagnosed his condition. Negligent misdiagnosis does not rise to the level of an Eighth Amendment violation. *See Estelle,* 429 U.S. at 105–06; *Smith,* 316 F.3d at 184.

Consequently, the only possible inadequacy of the care Plaintiff received was a delay in treatment or the denial of a second follow-up appointment. On July 14, 2005, Plaintiff awoke in distress around 1:40 a.m. (Am.Compl.¶ 1) but did not get to ECMC until close to 10 a.m. (Tan Decl., Ex. A). However, the record shows that during that time, Nurse Fucina actively tried to provide Plaintiff with adequate care. (*See* Fucina Decl.; Pl.'s Resp., Attach. 2.) Nurse Fucina made multiple attempts to follow the instructions of the on-

call physician to get an ECMC physician to consult with Plaintiff via Telemed. (Fucina Decl. ¶¶ 4–6.) When the Telemed attempts failed, Nurse Fucina contacted the Nurse Administrator, who arranged for Plaintiff to go directly to ECMC. (Fucina Decl. ¶ 7.) During this period from Plaintiff's initial complaint and the time he went to ECMC, Nurse Fucina examined his ear and provided him with medication to alleviate his pain. (Fucina Decl. ¶¶ 3, 6.) Furthermore, the delay of eight hours for Plaintiff to see a physician, hardly rises to the same level of seriousness as the delays in *Liscio* and *Hathaway*. *Liscio,* 901 F.2d at 277 (ignoring a life-threatening and fast-degenerating condition for three days); *Hathaway,* 841 F.2d at 50–51 (delaying major surgery for over two years).

 **\*8**  As to the effects of this delay in treatment, Plaintiff states that one of the ER doctors told him the delay resulted in swelling that trapped the bug inside Plaintiff's ear. (Am.Compl.¶ 19.) However, the ER doctor's report does not indicate that the bug still needed to be removed. (Tan Decl., Ex. A.) It merely states that Plaintiff was diagnosed with "left ear pain," and he should take his prescribed medications, follow up with the facility doctor in five days, and return to the ER with any concerns such as fever or dizziness. (*Id.*) Five days later, on July 19, 2005, Dr. Tan followed the ER doctor's instructions and re-examined Plaintiff. (*Id.*)

Despite Plaintiff's original allegation that he was denied access to an outside physician (Am.Compl.¶ 21), the record clearly shows that Plaintiff was referred for several outside consultations (Pl.'s Resp., Attach. 2; Tan Decl., Ex. A). After these consultations, the facility medical staff routinely followed the instructions of the outside physicians. [5] Plaintiff also complains of the delay in getting him to an outside specialist. (Am.Compl.¶ 25.) When Dr. Tan examined Plaintiff on July 19, 2005, he immediately put in a request for an outside consultation. (Tan Decl., Ex. A.) On July 21, 2005, the review committee approved Dr. Tan's request. (*Id.*) It's not clear from the record why Plaintiff did not get to see Dr. Prince until August 2, 2005. However, by Plaintiff's own admission, nurses checked his ear every day, and Dr. Tan prescribed him three kinds of medication for his ear problem. (Am.Compl.¶ 25.) A fourteen-day wait for outside consultation regarding a condition that was neither life-threatening nor fast-degenerating does not meet the sufficiently serious standard, especially when Plaintiff received treatment and monitoring throughout that period.

[5]  The only time Dr. Tan did not follow Dr. Prince's recommendation was when he preliminarily denied Plaintiff's second follow-up appointment. (Tan Decl., Ex. A.) As a result, Plaintiff did not have a second follow-up appointment with Dr. Prince. (*Id.*) Dr. Tan based this decision on the grounds that Plaintiff's condition had clinically improved and the follow-up was not medically necessary at that time. (Tan Decl. ¶ 12.) If Plaintiff's condition did not continue to improve, Dr. Tan would reconsider sending him for another outside consultation. (Tan Decl., Ex. A.)

Similarly, the denial of a second follow-up appointment with Dr. Prince does not meet the standard for a sufficiently serious deprivation of adequate medical care. In response to Defendants' motion, Plaintiff suggests that he should have been allowed this follow-up because there were still bug legs in his ear. (Pl.'s Resp. ¶¶ 12–13.) The record shows, though, that Dr. Tan followed Dr. Prince's recommendation to let the remnants of the beetle sluff off on their own. (Tan Decl., Ex. A.)

While a delay in care may sometimes meet the "sufficiently serious" standard, in this case it does not. *See Salahuddin,* 467 F.3d at 281. Even assuming that Plaintiff's medical condition was sufficiently serious, Plaintiff has failed to show that objectively, the delay in seeing outside physicians or the denial of a second follow-up appointment constitute a sufficiently serious deprivation of adequate medical care. Plaintiff may not have received the care he wished for and Defendants may have failed to correctly diagnose his problem, but they did not deny him medical treatment or access to outside medical care. When outside physicians gave their opinions and recommendations, Dr. Tan followed them.

 **\*9**  Moreover, Plaintiff fails to meet the subjective standard because he has not pointed to admissible evidence showing that Defendants deliberately disregarded a risk to Plaintiff's health. Indeed, far from disregarding Plaintiff's condition, Defendants sought second opinions when Plaintiff complained about his ear.

Therefore, given that Plaintiff has not met either the objective standard or the subjective standard under the Eighth Amendment, his claim for inadequate medical treatment fails.

***Plaintiff's Conditions of Confinement Claim***

To determine whether prison conditions violate the Eighth Amendment's prohibition on cruel and unusual punishment, the court must determine (1) whether the plaintiff "was 'denied the minimal civilized measure of life's necessities' " and (2) whether the defendant "acted with 'deliberate indifference' to his needs." *Channer v. Mitchell,* 43 F.3d 786, 788 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298–303). Deliberate indifference does not exist unless the official "knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that the substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. The charged official must act with reckless indifference, not merely negligence. *Salahuddin,* 467 F .3d at 280.

As the Supreme Court has noted, "[i]f the pain inflicted is not formally meted out *as punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." *Wilson,* 501 U.S. at 301. Even if the conditions of confinement were found to be unreasonable as a matter of law, a plaintiff cannot survive summary judgment unless he can point to "record evidence creating a genuine dispute" as to the facts regarding Defendants' culpable mental state. *Salahuddin,* 467 F.3d at 282.

Plaintiff filed two complaints with the Superintendent regarding bugs in his cell. (Pl.'s Resp., Attach. 2.) The record shows that the Superintendent responded to both of these complaints and informed Plaintiff of the action taken in both instances. (Berbary Decl. ¶¶ 5, 8.) After Plaintiff's first complaint, Superintendent Berbary directed his deputy to respond and Plaintiff's cell was sprayed by an exterminator. (Berbary Decl. ¶¶ 3–5, Ex. B.) When Plaintiff filed a second complaint of bugs in his cell, Superintendent Berbary ordered that his window screen be replaced. (Berbary Decl. ¶ 8, Ex. D.) As Plaintiff admits, the workmen determined that the screen was in perfect working order and did not need to be replaced. (Pl.Dep.32:11–19.) Throughout his papers, Plaintiff merely accuses Superintendent Berbary of acting negligently. (Am. Compl. ¶ 30; Pl.'s Resp. 5.) However, even assuming that Plaintiff did allege "deliberate indifference," Plaintiff has failed to point to any evidence suggesting that Defendant Berbary acted with reckless indifference to Plaintiff's health and safety by allowing him to be exposed to bugs.

**\*10** As to Plaintiff's claim that he may have been exposed to toxic chemicals, he fails to show that he was exposed to a serious risk of harm to his health or safety. *See Warren v. Keane,* 196 F.3d 330, 333 (2d Cir.1999) ( "Objectively, a plaintiff must show that he himself is being exposed to unreasonably high levels of [chemicals]."). Plaintiff does not point to any evidence showing what he was exposed to or what the potential risk of harm was. For the subjective element, he fails to allege that Berbary acted with deliberate indifference. (Am.Compl.¶ 4.) A defendant may be liable when the dangers of a toxic substance are well known, on the theory that a reasonable person would have known that exposure to toxic substances, such as second-hand smoke or asbestos, could violate the Eighth Amendment. *Warren v. Keane,* 196 F.3d at 333. Here Plaintiff has not presented any evidence that he was exposed to a substance that a reasonable person would know could cause harm. While Berbary acknowledges that Plaintiff's cell received treatment for insects, he maintains that he was not aware "of an excessive risk to [P]laintiff's health or safety." (Defs.' Mem. 11.) Defendants also note that there is no evidence to support an inference that a substantial risk of serious harm existed. (*Id.* at 11–12.) Plaintiff has failed to point to any evidence to support either that he was objectively exposed to a grave risk or that Berbary acted with a sufficiently culpable state of mind. Therefore, his Eighth Amendment claim regarding conditions of confinement also fails.

### Qualified Immunity

"If the facts as alleged would not amount to the violation of a constitutional right, the qualified-immunity inquiry is at an end, and summary judgment must be granted." *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006). Because the Court found no constitutional violation regarding Plaintiff's medical care and conditions of confinement, the Court need not address Defendants' qualified immunity claims.

### CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is granted as to Plaintiff's Eighth Amendment inadequate medical treatment claim and as to Plaintiff's Eighth Amendment conditions of confinement claim.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2426021

**Summerville v. Faciuna, Not Reported in F.Supp.2d (2009)**

2009 WL 2426021

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 600520
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Talib Abdul RAHMAN f/k/a Arthur Hall, Plaintiff pro se,
v.
Christopher ARTUZ, Lawrence Zwillinger,
and James Manion, Defendants.

No. 95 CIV 0272 MGC.
|
Aug. 10, 1999.

**Attorneys and Law Firms**

Talib Abdul Rahman, Attica Correctional Facility, Attica,
New York, Plaintiff, pro se.

Eliot Spitzer, Attorney General for the State of New York,
New York, New York, By: Michael Kennedy, Susan Odessky,
Assistant Attorneys General, for Defendants.

*OPINION*

CEDARBAUM, J.

 **\*1** Talib Abdul Rahman, a *pro se* state prisoner, sues
Christopher Artuz and Lawrence Zwillinger of Green Haven
Correctional Facility ("GHCF") under 42 U.S.C. § 1983
alleging that they violated his Eighth Amendment right
to be free from cruel and unusual punishment.[1] Rahman
contends that Artuz and Zwillinger demonstrated deliberate
indifference to his serious medical needs by failing to provide
treatment in the form of physical therapy and knee braces.
At the one-day bench trial, four witnesses testified: Lawrence
Zwillinger, the Regional Health Services Administrator of
GHCF; Christopher Artuz, the Superintendent of GHCF;
Doctor James Manion, the former Medical Director of
GHCF; and the plaintiff. After considering all the evidence,
observing the demeanor of the witnesses, and considering
the plausibility and credibility of the testimony, I conclude
that plaintiff has failed to bear his burden of proving his
claim against defendants by a preponderance of the credible
evidence.

[1] The claim against James Manion was dismissed on
summary judgment by opinion dated February 10,
1997.

*BACKGROUND*

Many of the facts are undisputed. Rahman had four knee
operations while in custody at GHCF. The first operation, on
September 2, 1992, was on his left knee. Subsequently, he
underwent three operations on his right knee, on December
7, 1992, December 30, 1992, and January 20, 1993. Some
of the surgeries were arthroscopic; the final surgery was
reconstructive. Rahman started wearing a brace on his left
knee immediately after his first operation. After the second
operation, he began wearing a Lenox Hill brace on his right
knee. The Lenox Hill brace is made with two metal rods to
keep the knee stable. Rahman experienced pain and swelling
of his knees after the surgeries.

Physical therapy for both of Rahman's knees was initiated on
June 2, 1993 and continued until May 9, 1994. During that
time, Rahman attended a total of twenty-two physical therapy
appointments and refused to attend on seven occasions.
During physical therapy, he was told to exercise his knees
on his own. The exercises performed during therapy sessions
included riding a stationary bicycle, using a stairmaster,
and extending his legs with weights. On January 11, 1994,
Zwillinger responded to a complaint by plaintiff about the
availability of physical therapy by stating, "You will continue
to receive treatments in therapy until you are discharged by
the therapist because in his opinion you have progressed to
the point the doctor wanted you to." (Pf.Ex. B–3). The May 9,
1994 physical therapy report states, "This is his last scheduled
RX. He has completed therapy. [Discharge] from [physical
therapy] effective today." (Dt.Ex. 4).

On April 30, 1994, Rahman was placed in the prison's Special
Housing Unit ("SHU") because of a disciplinary violation.
Confinement in the SHU involves being locked in one's cell
for twenty-three hours per day and being released for one hour
of exercise per day. Upon entering the SHU, Rahman's knee
braces were taken away from him. Shortly thereafter, on May
9, 1994, he attended his last physical therapy session. Rahman
remained in the SHU until February of 1995, when he was
transferred to Attica Correctional Facility.

 **\*2** On May 20, 1994, Dr. Baruch, the orthopedic surgeon
who performed all four of Rahman's knee operations, issued

a written recommendation that Rahman receive therapy and knee braces. Since Dr. Baruch is an outside specialist, his recommendations are not binding on the prison. An inmate's prison doctor is the only person with authority to order medical treatment for the inmate. Generally, the recommendations of the outside specialist are followed by the prison doctor. However, there are occasions on which the prison doctor rejects the recommendation of the consultative physician.

The knee braces were not returned to plaintiff for regular use while he was confined in the SHU, but he was given the braces when he requested them for a court appearance in August of 1994. Specifically, Rahman wrote to Artuz on August 1, 1994 requesting that he be permitted to wear his knee braces for an August court appearance. Artuz immediately forwarded Rahman's request to Zwillinger, who wrote back to Rahman that he had "a valid permit and need for the knee brace." Thereafter, Rahman was permitted to wear the braces to court.

Artuz made daily rounds to all parts of the prison to meet with inmates to listen to complaints. While in the SHU, Rahman complained to Artuz on a number of occasions during Artuz' rounds that he had not been provided the physical therapy and braces recommended by Dr. Baruch. He also wrote to both Artuz and Zwillinger requesting therapy and braces. Zwillinger is responsible for investigating and preparing responses to inmate medical complaints. He is an administrator, not a doctor. Neither Artuz nor Zwillinger has authority to order any medical treatment for inmates. Ordering medical treatment is solely the province of the prison doctors.

At issue is the extent to which Rahman needed the braces after April 30, 1994 and physical therapy after May 9, 1994 and why they were not provided to him at GHCF after those dates. I find that Rahman's testimony on those issues was not credible.

Artuz testified credibly that the braces would have been confiscated upon Rahman's entry into the SHU on April 30, 1994 because each brace had two metal rods. It was standard security procedure to remove all metal objects from prisoners during confinement in the SHU. The prison officials had security concerns that metal rods could be fashioned into weapons.

Regarding the physical therapy, Zwillinger testified that, based on his review of Rahman's file, no prison doctor ordered

physical therapy for him after May 9, 1994. Dr. Manion, the Medical Director of GHCR in 1994, testified credibly that the need for physical therapy following a series of knee operations (including a reconstructive surgery) is finite and generally does not exist more than sixteen months after the last surgery if the patient has at that point already participated in a physical therapy program.

Plaintiff expressed the belief that his transfer to Attica shows the vindictive intent of the defendants to punish him for filing grievances about the inadequate care he received for his knees. I did not find this testimony persuasive. First, plaintiff admitted on cross-examination that he himself had requested a transfer. Second, plaintiff's Exhibit Two contradicts his testimony that the facility to which he was transferred, Attica, was not advised of his medical problems. Finally, Artuz testified credibly that as soon as an inmate is sent to the SHU, a request for his transfer to another prison is filed, and Artuz does not have any control over when the transfer will occur or the facility to which the inmate will be sent.

 **\*3** Rahman also testified that the physical therapy for the period prior to May of 1994 was not begun until five months after his last operation. However, he did not present any evidence linking the defendants with the prison's decision to initiate his physical therapy in June of 1993 rather than an earlier date or any evidence that the timing of his physical therapy interfered with his recovery.

At trial, Rahman wore both his knee braces. He walked with an even gait, appeared to bend both knees naturally, and demonstrated no difficulty in standing or walking, or in changing position from sitting to standing, or standing to sitting.

*DISCUSSION*

The Eighth Amendment prohibits deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The standard for determining whether a medical need is serious is objective, but determining deliberate indifference to a medical need requires evaluation of the defendant's actual state of mind. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994).

Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation

only if those needs are serious. *Estelle,* 429 U.S. at 103–04; *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). A medical need is "serious" if it entails suffering that is inconsistent with "contemporary standards of decency." *Estelle,* 429 U.S. at 103; *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir.1996). As stated by the Second Circuit, the serious medical need standard contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain. *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998); *Hathaway,* 37 F.3d at 66 (citing *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt J., dissenting)). The mere fact that a prisoner has a preference for treatment different from that which he receives does not establish an Eighth Amendment violation. *Chance,* 143 F.3d at 703.

Rahman has not shown by a preponderance of the credible evidence that he had a serious medical need for physical therapy to continue after May 9, 1994. By May of 1994, Rahman had already received physical therapy for his knees over a period of ten months. Plaintiff did not present credible evidence that, after that ten-month period, the failure to provide him with additional physical therapy caused him or was likely to cause him injury or that it interfered with the healing process. The evidence indicates that it more likely than not that, by May of 1994, Rahman could adequately care for his knees by engaging in stretching and lifting motions on his own. Nor has plaintiff shown that deprivation of the braces caused extreme pain or degeneration of the condition of his knees. In short, there is no evidence that not having braces in the SHU and not receiving physical therapy provided by a physical therapist after May 9, 1994 would either cause injury to plaintiff's knees or interfere with their healing.

 **\*4** Moreover, Rahman failed to prove by a preponderance of the credible evidence that Artuz or Zwillinger showed deliberate indifference to his medical needs. It is undisputed that as a security measure the prison did not permit inmates in the SHU to possess any metal objects. There was a legitimate penological reason for not giving him his braces in the SHU. The fact that Rahman received four knee operations and ten months of physical therapy while at GHCF substantially undermines his claim of deliberate indifference. Furthermore, in his testimony, plaintiff volunteered that Superintendent Artuz made regular rounds of the prison and was responsive to prisoners' problems. Moreover, the defendants were not personally involved in prescribing medical care. They relied on the prison doctors to order whatever medical treatment was necessary. They had no reason to believe that the standard practice of removing plaintiff's braces while he was in the SHU would cause serious medical harm or that plaintiff required additional physical therapy after May 9, 1994.

I conclude that at trial plaintiff did not demonstrate that either Artuz or Zwillinger inflicted cruel and unusual punishments on him in violation of the Eighth Amendment.

*CONCLUSION*

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). The Clerk is directed to enter judgment for defendants Artuz and Zwillinger and against plaintiff.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 600520

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Ballard v. Lane,  S.D.N.Y.,  March 12, 2019

2018 WL 1586473
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Juel ROUNDTREE, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

15cv8198
|
Signed March 27, 2018
|
Filed 03/28/2018

**Attorneys and Law Firms**

Juel Roundtree, East Elmhurst, NY, pro se.

Agnetha Elizabeth Jacob, New York City Law Department, New York, NY, for Defendants.

OPINION & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

 **\*1**  Defendants City of New York, et al., move to dismiss Plaintiff Juel Roundtree's Amended Complaint for failure to state a claim under Rule 12(b)(6). For the reasons that follow, Defendants' motion is granted.

BACKGROUND

Plaintiff pro se Juel Roundtree brings this federal civil rights action stemming from his incarceration at the George R. Vierno Center on Rikers Island ("Rikers") from May 2015 to March 2016. The Amended Complaint ("Complaint") is not a model of clarity. [1] Rather, Roundtree's prolix pleading is replete with wide-ranging allegations of misconduct and systemic shortcomings at Rikers Island. At bottom, the Complaint consists of Fourteenth and Fourth Amendment violations spanning a variety of topics, including dangerous prison buses, arbitrary cell searches, inadequate medical care, spoiled food, lack of accommodations for disability,

unlawful video surveillance, and unauthorized use of voice biometrics, to name a few. Roundtree seeks relief from three discrete groups of defendants: (1) Corizon Health Inc. ("Corizon") and "Dr. Cherchever," a physician at Corizon; (2) the New York City Department of Correction ("DOC"), as well as Warden Augustus, Captain Ellis, Captain Conyers, and Officer McQuiller, corrections officers at DOC; and (3) the City of New York. (Complaint, ECF No. 48 ("Compl."), ¶¶ 10–16.) In analyzing the Complaint, this Court has grouped some of Roundtree's many grievances into several categories. This Court liberally construes and presumes as true all of the allegations in Roundtree's Complaint.

[1]     Roundtree appears to have bolstered his Complaint with three other documents. One such document, styled "Exhibits to be Included" (ECF No. 46), was filed on the same day as the Complaint, and therefore will be considered as part of the operative Complaint. Another, titled "Amended Complaint Placed in the Mail" (ECF No. 49) was filed on this Court's docket on January 24, 2017, but dated as of December 23, 2016, the same date on which the Complaint was filed. Therefore, this Court incorporates ECF No. 49 into the Complaint.

The third exhibit, called "Denial of Medical Treatment/Deliberate Lies by the Corrections Officer White #10886 and Harassment" (ECF No. 51), is dated February 24, 2017. This document was filed well past the amended pleading deadline of February 3, 2017 (Scheduling Order, ECF No. 44), and therefore is construed by this Court as an amendment to the Complaint. While Federal Rule of Civil Procedure 15 provides that amendment shall be given freely, when a scheduling order is already in place and sets a deadline for all amended pleadings, Rule 16(b)(4) only allows for modification of such schedule "for good cause" and with this Court's consent. After reviewing the contents of ECF No. 51, this Court concludes that there is no good cause to modify the amended pleading deadline. ECF No. 51 merely re-hashes a number of allegations already set forth in the Complaint, directs those allegations at a corrections officer who is not a defendant in this action, and lacks any meaningful basis from which good cause may be inferred. Accordingly, for purposes of this motion, this Court will consider only the Complaint and the pleadings entered as ECF Nos. 46 and 49.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 270 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

## DISCUSSION

I. <u>Standard</u>

**\*2** On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court must review the facts alleged in the complaint, including any documents attached as exhibits or incorporated by reference. Hayden v. Cty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999). In doing so, the court "must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff. To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint must allege enough facts to state a claim that is plausible on its face." Chris H. v. N.Y., 2017 WL 6514690, at \*2 (S.D.N.Y. Dec. 18, 2017) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"Where, as here, the complaint was filed <u>pro se</u>, it must be construed liberally to raise the strongest arguments it suggests. Nonetheless, a <u>pro se</u> complaint must state a plausible claim for relief." Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013) (alterations, citations, and internal quotation marks omitted).

II. <u>Fourteenth Amendment Claims</u>

Although Roundtree raises several constitutional violations, the assortment of conditions-of-confinement allegations in the Complaint essentially form the basis of a Fourteenth Amendment claim. "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. A pretrial detainee's claims are evaluated under the Due Process Cause because, pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) (citations omitted). The Constitution requires prison officials to "ensure that inmates receive adequate food, clothing, shelter and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994). Importantly, a pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted

prisoner." City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).

A pretrial detainee "may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." Darnell, 849 F.3d at 29. Thus, the plaintiff must satisfy two requirements to prove a claim—(1) an "objective" prong showing that the "challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process," and (2) a "subjective" prong, which is better classified as a "mens rea" prong showing that "the officer acted with at least deliberate indifference to the challenged conditions." Darnell, 849 F.3d at 29.

Under both the Eighth and Fourteenth Amendments, objective deprivation may be established if the plaintiff can show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." Darnell, 849 F.3d at 29. There is no static test to determine whether a deprivation is sufficiently serious. Rather, the "conditions themselves must be evaluated in light of contemporary standards of decency." Blissett v. Coughlin, 66 F.3d 551, 537 (2d Cir. 1995). Such conditions may be "aggregated to rise to the level of a constitutional violation, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need, such as food, warmth, or exercise." Walker, 717 F.3d at 125.

**\*3** Under the subjective prong, "a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment" exists if the pretrial detainee can prove that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate [a] risk" the defendant-official knew, or should have known. Darnell, 849 F.3d at 36. In other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively." Darnell, 849 F.3d at 36. This standard, however, does not mean that officials acting merely negligently will be held liable for constitutional violations. "[A]ny § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence." Darnell, 849 F.3d at 36.

A. <u>Transportation</u>

Roundtree complains that the buses transporting him to court were "filthy," "unsafe," and lacked "seatbelts, safety equip[ment], or emergency egress." (Compl. ¶ 20.)

2018 WL 1586473

Prison officials must "take reasonable measures to guarantee the safety of inmates in their custody," including transportation. Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996). But the Second Circuit has expressly held that "the failure of prison officials to provide inmates with seatbelts does not, without more, violate the Eighth or Fourteenth Amendments." Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012). And "two other Courts of Appeals have held that a municipality's decision not to provide prisoners with seatbelts does not violate prisoners' federal rights" because legitimate penological concerns outweigh the countervailing safety risks. Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 907 (8th Cir. 1999) ("[I]ndividuals transported in the wagon, even those who were handcuffed, could use the seatbelt as a weapon to harm an officer, other passengers being transported in the wagon, or even themselves."); Dexter v. Ford Motor Co., 92 Fed.Appx. 637, 641 (10th Cir. 2004) ("[A] failure to seatbelt a prisoner does not, of itself, expose an inmate to risks of constitutional dimension.").

Here, Roundtree does not specify the injuries he suffered from riding prison buses. He alleges in general terms that he was "thrown around, jostled, and banged ... causing pain, anxiety, distress." (Compl. ¶ 20.) But while those experiences are "unpleasant, [they] do[ ] not necessarily equate to a constitutional violation." Livigni v. Ortega, 2016 WL 6143351, at *2 (S.D.N.Y. Oct. 19, 2016); Hays v. City of N.Y., 2017 WL 782496, at *6 (S.D.N.Y. Feb. 28, 2017); Stevens v. City of N.Y., 2013 WL 81327, at *3 (S.D.N.Y. Jan. 8, 2013), aff'd, 541 Fed.Appx. 111 (2d Cir. 2013). Without alleging how the absence of seat belts, safety equipment, or emergency egress caused specific injuries, or that prison officials were aware of these conditions yet remained deliberately indifferent to them, Roundtree's allegations fall short of mounting a valid claim.

### B. Housing

#### i. Exposure to Gang Violence

Roundtree asserts that his safety was regularly jeopardized at Rikers. According to Roundtree, "slashings [at Rikers] occurred almost daily," with intra-gang fights arising in the intake and clinic areas that he frequently visited to receive medical care. (Compl. ¶ 21; see also Compl. ¶¶ 22–23.) But Roundtree does not allege that he was actually harmed by other inmates, or that the facility failed to protect him when

intra-prison skirmishes arose. When "violence at the hands of other inmates" is alleged, the "injury suffered by the plaintiff must be sufficiently serious." Wassmann v. Cty. of Ulster, N.Y., 528 Fed.Appx. 105, 106 (2d Cir. 2013) (citing Farmer, 511 U.S. at 833 (1994)). And though Roundtree must also allege that the responsible officials "acted with deliberate indifference to inmate health or safety," the Complaint is devoid of any specific allegations demonstrating that Defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that] [they] ... dr[ew] the inference." Farmer, 511 U.S. at 833; see also Barreto v. Cty. of Suffolk, 762 F. Supp. 2d 482, 492 (E.D.N.Y. 2010) (a constitutional violation plausibly alleged with facts that corrections officers "knew specifically" that certain inmates had a "record of previous attacks on inmates" and that they took "no action to segregate [plaintiff] from the general population" after being made aware of risk). The most that Roundtree alleges is that he was exposed to a general risk of injury. That alone is insufficient to state a claim.

#### ii. Accommodation of a Disability

**\*4** Roundtree complains about the "steel picnic style tables" in the housing areas, describing them as "small steel disks, that are too small, too low to the ground, and completely lack back support." (Compl. ¶ 26; ECF No. 46, at 1.[2]) These seats "put pressure on the pelvis, buttocks, and spine, and since being forced to sit on them, [his] left hip [was] irreparabl[y] damaged, and spine [showed] shifting and misalignment." (Compl. ¶ 26.) Further, his steel bed, with "inadequate yoga style mats supplied as mattresses," exacerbated what he claims were preexisting "knee pain, severe pain the groin, spine, and hips." (Compl. ¶ 26 see also Compl. ¶ 17(c) ("agitation of pre-existing injures (already on record with D.O.C.)")) And though Roundtree requested more bedding and alternative seating in the housing areas, Roundtree says those requests went unanswered.

[2]     Page citations to the ECF pleadings correlate to their PDF pagination.

"Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1999). A claim of constitutionally inadequate bedding, which this Court construes to include seating, may be sustained where: (1)

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 272 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

the plaintiff had a preexisting medical condition requiring a special bed to protect against serious damage to his future health; (2) he made that medical condition known to prison officials; (3) he requested a special bed to accommodate such medical condition; and (4) his request was denied by an official who knew of and disregarded an excessive risk to the plaintiff's health or safety. Boyd v. City of N.Y., 2012 WL 5914007, at *4 (S.D.N.Y. Sept. 18, 2012), report and recommendation adopted in relevant part, 2013 WL 452313 (S.D.N.Y. Feb. 6, 2013). The "Second Circuit has held that the adequacy of a mattress may, alone or in combination with other factors, constitute a condition that satisfies the objective prong of the conditions-of-confinement test if its inadequacy causes or threatens to cause sufficiently serious harm." Harris v. Moore, 2015 WL 10427865, at *3 (S.D.N.Y. Dec. 3, 2015).

Reading the Complaint in the light most favorable to the plaintiff, Roundtree has alleged that he had pre-existing physical conditions—knee, groin, spine, and hip pain—that were exacerbated by the lack of an adequate bed and mattress. He also developed new ailments, including "left hip damage" and "spine misalignment" caused by inadequate seating. Roundtree made these conditions known to the prison staff, explaining that his "inability to sleep, lay down, sit or stand for long without extreme pain and discomfort [went] completely ignored." (Compl. ¶ 26.) And though he made requests over several months for adequate bedding and seating to different officials within the prison system—including the disability rights coordinator—Defendants failed to act on them. (Compl. ¶ 26.)

Roundtree also has sufficiently alleged that a prison official acted with deliberate indifference knowing that "an inmate face[d] a substantial risk of serious harm and ... disregard[ed] that risk by failing to take reasonable measures to abate the harm." Hayes, 84 F.3d at 620. Based on the Complaint's allegations, Defendants "were actually aware of both the plaintiff's condition and the potential risk of harm that would result if the plaintiff were denied access to the mattress" and more adequate seating. Harris, 2015 WL 10427865, at *4. Indeed, Roundtree's requests "for extra mats, pillows, chairs and/or to be moved somewhere without these dangerous beds or tables" were ignored. (Compl. ¶ 26.) In July 2015, he "grieved these matters and was [ ] referred to clinic, and tried to appeal with no result." (Compl. ¶ 26.) And for six months, he sent "requests and complaints to 'Disability [R]ights [C]oordinator,' and various agencies and parties, which were almost completely ignored. The coordinator

completely ignored all correspondences," leaving Roundtree to "languish [and] suffer[ ] with no redress." (Compl. ¶ 26.)

**\*5** Roundtree finally received adequate seating after a "Dr. Rajan" answered his request for chairs, but he claims that corrections officers subsequently hid them. Since then, he claims that has had trouble re-acquiring the alternative seating. (ECF No. 46, at 7–8.) All of these incidents occurred after Defendants were put on notice of Roundtree's severe physical conditions through his repeated requests for accommodation. Based on their failure to respond, Roundtree suffered and/or exacerbated his injuries. "Due to the defendant's clear and persistent disregard for [Roundtree's] injury ... it is reasonable to infer deliberate indifference towards [his] preexisting injury." Harris, 2015 WL 10427865, at *4.

Nevertheless, though Roundtree has pled just enough in substance, none of his allegations identify which individuals were responsible. While he makes reference to individual corrections officers for other violations in his Complaint (e.g., harassment, privacy violations), he does not specify who at Rikers refused to provide him with adequate bedding or seating. For example, Roundtree says that his requests for accommodation were ignored by the "disability rights coordinator," but without more, this Court cannot sustain his claim. Further, Roundtree elaborates on his ordeal in ECF No. 46, alleging that after Dr. Rajan helped get him alternative chairs but that unnamed corrections officers would "steal them and hide them, simply to be malicious." (ECF No. 46 at 9.) Accordingly, this Court dismisses Roundtree's claim for inadequate bedding and seating but grants him leave to re-plead this particular claim and specifically identify the responsible parties.

### iii. Stairs and Elevators

Roundtree asserts that from February 2016 to March 2016, he was placed into housing area 15B and 15A, which were located six flights above ground. (Compl. ¶ 31.) Elsewhere in the Complaint, Roundtree says he was deprived of his cane and placed in a cell located on "the 2nd floor up a steep staircase" during an undefined period. (Compl. ¶ 24.) In each case, because of his physical limitations, he found it difficult to walk up and down the stairs. He claims that these barriers precluded him from "going to the clinic and/or receiving his integral medications," and that Officer Conyers denied him

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 273 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

use of the elevators as a means to further prevent his access to the clinic and law library. (Compl. ¶¶ 31–33.)

Roundtree's allegations regarding the hardship occasioned by walking six flights of stairs in his condition are conclusory and fail to state a claim. The Complaint provides no details about how he was injured or how his condition may have deteriorated. Roundtree also makes no assertion that his cane was prescribed by his doctors or that it was medically necessary. In any event, penological interests outweigh any medical necessity. Tellingly, Roundtree concedes that another non-defendant officer told him that he could use the elevator if he "chose to be strapped to a gurney." (ECF No. 46 at 6.)

The general damages Roundtree asserts—that he was "in such pain and emotional distress" that he "could not eat, sleep, or prepare for hearings, and trial"—fall woefully short of establishing a substantive due process violation. See Carbonell v. Goord, 2000 WL 760751, at *8 (S.D.N.Y. June 13, 2000) (plaintiff "informed C.O. Simon of the risk of his going down the stairs on crutches, and that C.O. Simon's response was one of impatience and aggression."); Gill v. Mooney, 824 F.2d 192, 195 (2d Cir. 1987) (guard forced inmate to use ladder knowing it was unsafe to do so).

#### iv. Officer Harassment, Chemical Sprays, and Torture

Roundtree asserts he was placed in "a housing unit (9B) that was one of the worst in the [building]" where there was a "known practice of vengeful retaliatory searches and attacks by correction staff, for acts committed by prior detainees who were already gone." (Compl. ¶¶ 22–23.) Specifically, corrections officers Danzig, McQuiller, and Conyers routinely ridiculed and harassed Roundtree, filed false reports against him, and prevented him from receiving medical care. (Compl. ¶¶ 35, 92.) The corrections officers routinely destroyed his property, confiscated his personal effects, and made life generally miserable for him. (Compl. ¶ 92.) Roundtree further contends that Defendants tortured him by turning off his cell lights for prolonged periods of time, banning the use of watches, and tampering with clocks, all for the purpose of depriving him of use of his sensory abilities. (Compl. ¶ 91.) Finally, Roundtree takes issue with the quality of Rikers food, claiming that on one occasion, he got so sick that he started vomiting "projectile sprays" and had "blood in his stool." (Compl. ¶ 30.) This Court addresses each category of misconduct in turn.

#### 1. Verbal Harassment

**\*6** Roundtree's allegations regarding ridicule and verbal harassment are insufficient to state a claim. Roundtree asserts that Defendants "have taken direct action to ridicule [him]," singled him out in cell searches and confiscations, "glare[d] at [him], and provoke[d] him, in an attempt to cause a confrontation," leading him to file "100s of complaints against [one of the Defendants] for stealing, harassment, and various [other] violations of people's rights incarcerated here in [Rikers]." (Compl. ¶ 35, 92.) Courts have consistently held that "the mere allegation of verbal abuse, however repugnant it may be, does not rise to the level of a constitutional violation and is not cognizable under" § 1983. Banks v. Cty. of Westchester, 168 F. Supp. 3d 682, 691 (S.D.N.Y. 2016); Webster v. Fischer, 694 F. Supp. 2d 163, 187 (N.D.N.Y. 2000); Zimmerman v. Seyfert, 2007 WL 2080517, at *28 (N.D.N.Y. July 19, 2007) ("Inmates have no constitutional right to be free from harassment" unless it rises to level of denying the inmate "minimal civilized measure of life's necessities.").

#### 2. Interference with Medical Care

Roundtree asserts that Officers Danzig, McQuiller, and Conyers "preclude[d] him from going to appointments, receiving medical care, or procuring necessary medical equipment, required for his healing, and maintaining his health, and well-being." (Compl. ¶ 35.) He also alleges that Officer Danzig lied to others that Roundtree "was refusing medical appointments, did not wish to see doctors, or get his medication over 30 different occasions," because she wanted to avoid working. (Compl. ¶ 35.)

These allegations are emblematic of the Complaint's general, conclusory statements. Roundtree may have been prevented from going to doctors' appointments or from receiving medical treatment, but he does not provide specific details. It is difficult for this Court to understand which doctor he was deprived of seeing, what kind of medication or medical equipment he needed, how being deprived of those things caused an injury, and what the specific injury was. Although "[n]on-medical personnel may engage in deliberate indifference if they intentionally deny or delay access to medical care", Jean v. Barber, 2011 WL 2975218, at *5 (N.D.N.Y. July 21, 2011), a plaintiff must "prove that [nonmedical] prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 274 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment." Hodge v. Coughlin, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994). Here, some of the Complaint's allegations belie the contention that Roundtree could not make it to appointments or receive adequate treatment—he did in fact see doctors and received treatment at clinics on other occasions. (See Compl. ¶¶ 19, 25, 34.) And though Roundtree paints a narrative in which he was routinely denied medication, he does not specify any adverse consequences to his health. Accordingly, this branch of Roundtree's Complaint is dismissed.

### 3. False Statements and Reports

Roundtree claims that Defendants "intentionally and deliberately with malice, gave false statements, and/or falsified public records, as well as, failed to file accurate or corrective statements, or failed to report the defendants who engaged in the misconduct." (Compl. ¶ 37.) "The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986); Jackson v. Johnson, 1990 WL 170412, at *4 (S.D.N.Y. Oct. 26, 1990) ("[P]laintiff's allegation concerning the falsification of the report fails to state a claim since, even assuming that the report was falsified, it does not appear that this caused plaintiff any harm let alone the deprivation of a constitutional right."). Indeed, Roundtree can only maintain an actionable claim against corrections officers for filing a false report if he "was disciplined without adequate due process as a result of the report" or the report "was issued in retaliation for exercising a constitutionally protected right." Richard v. Fischer, 38 F. Supp. 3d 340, 362 (W.D.N.Y. 2014). Roundtree alleges nothing of the sort because the Complaint is devoid of facts suggesting that he was wrongfully disciplined or that he was retaliated against for attempting to protect his constitutional rights.

### 4. Use of Chemical Sprays

 *7 Roundtree alleges that he was "exposed to chemical spray of others over 20 times, in which, [the] spray went directly in his mouth and eyes, but was never offered treatment (including 4/6/16), and even though officers were taken out on stretchers etc., no care whatsoever was given to detainees

or plaintiff, he was merely locked in cell, and ignored for hours, and sometimes locked in for 12 or more hours, up until days." (Compl. ¶ 93.) According to Roundtree, corrections officers are "paid for spraying detainees and brag about earning $140 to use chemical weapons on detainees." (Compl. ¶ 93.) Additionally, Roundtree was the victim of collateral sprays—that is, he was incidentally sprayed when the prison official sprayed another inmate. Roundtree claims that the use of chemical sprays were arbitrary, and even worse, that officials would not permit him and others to de-contaminate themselves afterward. (ECF No. 49 at 3–4.)

For excessive force claims brought under the Due Process Clause of the Fourteenth Amendment, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015). Roundtree has pled enough facts to show that the excessive force was sufficiently serious and that the corrections officers acted intentionally or recklessly failed to act with reasonable care. Though he does not expressly allege it, the Complaint says enough for this Court to infer that Roundtree had done nothing to warrant the use of a chemical spray. In some instances, he was an innocent bystander. See Velez v. McDonald, 2011 WL 1215442, at *4 (D. Conn. Mar. 27, 2011) ("[I]t can readily be inferred from his allegations that the amount of force used by Defendants far exceeded the need for that force, particularly in the absence of any defined threat or any attempt to temper the severity of Defendants' treatment of Velez."). Moreover, the allegations suggest that certain corrections officers engaged in this activity for sport, paying each other on occasion, and refusing to allow prisoners to de-contaminate themselves or receive medical treatment for injuries sustained from the sprays. (ECF No. 49 at 4.) Roundtree specifically alleges that certain excessive force incidents were captured on camera during specific time periods. This allegation is particularly helpful since discovery of any relevant footage will bear on the success of that claim.

As with Roundtree's bedding and seating allegations, however, this claim fails because Roundtree has not specified the culpable individuals. (See Compl. ¶ 92, ECF No. 49 at 2.) Roundtree seems to attribute the misconduct to a widespread, systemic problem within the Department of Corrections, but because "vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Radin v. Tun, 2015 WL 4645255, at *8 (E.D.N.Y. Aug. 4, 2015). This Court simply cannot

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 275 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

speculate as to how each prison official or corrections officer participated in injuring Roundtree. Accordingly, Defendants' motion to dismiss is granted without prejudice, with leave for Roundtree to re-plead this specific claim and name specific defendants.

### 5. Torture Claims

The claims pertaining to torture have no merit. "The allegations pertaining to Roundtree's cell lights and clock placement throughout the facility fall woefully short of the type of "unquestioned and serious deprivations of basic human needs," or deprivation of "the minimal civilized measure of life's necessities." Davidson v. Murray, 371 F. Supp. 2d 361, 370 (N.D.N.Y. 2005); Blyden, 186 F.3d at 263 ("Because society does not expect or intend prison conditions to be uncomfortable, only extreme deprivations are sufficient to sustain a conditions of confinement claim.").

### v. Food Quality

The Complaint's general allegations about food quality, preparation, and service fail to state a valid claim. Roundtree offers one specific incident in which his consumption of spoiled chicken caused him to vomit "projectile sprays and [find] blood in his stool." (Compl. ¶ 30.) Despite informing a corrections officer of his food poisoning, Roundtree says he was "left in his cell in a pool of vomit until the following day." (Compl. ¶ 30.)

**\*8** Prison officials are required to serve "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." Robles v. Coughlin, 725 F.2d 12, 15 (2d Cir. 1983). But the quality and preparation of the food must fall so short of basic standards that they pose an unreasonable risk of serious damage to Roundtree's health. See, e.g., White v. Olivar, 2012 WL 2878641, at \*2 (S.D.N.Y. July 12, 2012) (food contaminated with human hair and avian fecal matter could have posed substantial threat to plaintiff's health); Gray v. Metro. Detention Ctr., 2011 WL 2847430, at \*10 (E.D.N.Y. July 15, 2011) (meal containing glass caused lacerations to plaintiff's gums and mouth).

The Complaint fails to specify how preparation of food deviated from the standard course, or whether the food contained any unusual ingredients that would have posed a serious threat to Roundtree's health. As best this Court can determine, Roundtree's only specific claim is an unexceptional case of food poisoning, a condition to which even non-prisoners are susceptible. But a single incident of contaminated food does not rise to the level of a substantive due process violation. See Rieco v. Moran, 2015 WL 1898140, at \*1 (W.D. Pa. Apr. 24, 2015), aff'd, 633 Fed.Appx. 76 (3d Cir. 2015); Lohman v. King Cty. Jail, 2014 WL 4187150, at \*3 (W.D. Wash. July 1, 2014) ("[N]either isolated instances of food poisoning, temporary lapses in sanitation, nor occasional service of meals contaminated with foreign objects are sufficiently serious to rise to the level of a constitutional violation.").

Moreover, Roundtree's claim that he was denied proper medical attention fails on both an objective and subjective level. The sole incident of food poisoning did not pose an immediate danger to Roundtree's health, especially when contrasted against other cases in which courts have found serious violations pertaining to spoiled food. See Olivar, 2012 WL 2878641, at \*2; Gray, 2011 WL 2847430, at \*10. And though the Complaint alleges that Roundtree was sick and left alone in his cell until the next day, that allegation alone does not rise to the level of "criminal recklessness" or conduct amounting to something "more than ordinary lack of due care for the prisoner's interest or safety." Hudson v. City of N.Y., 2016 WL 3976399, at \*6 (S.D.N.Y. June 23, 2016). Accordingly, this component of Roundtree's Complaint is dismissed.

### C. Medical Care

#### i. Deprivation of Medical Diagnosis and Treatment at Corizon

##### 1. Medical

Roundtree's complaint alleges a broad spectrum of misconduct pertaining to his medical conditions, ranging from improper diagnosis, inadequate treatment, and undue delays in providing medical services and scheduling appointments. Roundtree's medical care and treatment allegations are salted throughout the Complaint, making it difficult to determine with greater precision what types of injuries he suffered, and the type of medical treatment he should have received.

To start, he alleges that in May 2015 until the present, Defendants—including Corizon Medical and Dr. Cherchever—deprived him of adequate pain management, but he does not specify the various ailments precipitating the need for such treatment. (Compl. ¶ 19.) He next asserts that after having his wife "call 3-1-1, to be produced to sick-call," he met with Dr. Cherchever, who "denied his knowledge of [his] medical condition, [even] though [he] saw it on the screen. After [he] notified [Dr. Cherchever], that he not only saw screen, but that his MRIs and x-rays were on file from Doshi Diagnostic and Lenox Hospital since 2013, [Cherchever] turned off computer and ended the visit abruptly." (Compl. ¶ 25.) This allegation is virtually incomprehensible. It is also not moored to a medical condition or incident, leaving this Court unable to discern what Dr. Cherchever had specifically refused to do and whether that refusal caused Roundtree any injuries.

**\*9** Roundtree provides slightly more clarity later in the Complaint with regard to his orthopedic problems. He alleges that he was "scheduled for orthopedic visits at 'west facility,' and Bellevue hosp[ital], but was given super low priority in total disregard for the pain and suffering he was experiencing." (Compl. ¶ 27.) Roundtree further asserts that in a "subsequent visit to 'West Facility,' an older (white-male) orthopedist, informed [him that] he needed to sit higher and wear knee braces, but he could not prescribe either as per a D.O.C. security policy." (Compl. ¶ 28.) After Roundtree requested knee and back braces, he claims that Defendants refused his request, leaving him susceptible to being "crippled for life." (Compl. ¶ 28.) In March 2016, Roundtree was "finally afforded [an] appt. with orthopedic Dr. at 'Bellevue Hosp.,' but Rikers put his appt. at such low priority he wasn't seen until 3, and 12 months later, even though it was known if condition was left untreated he might never walk normally again." (Compl. ¶ 34.)

Crediting these allegations as true, Roundtree's claim still fails. The Complaint does not clearly set forth his specific medical conditions, how the delay in getting him to an orthopedist caused his unspecified injuries, or how the prison's refusal to grant his request for knee or back braces (the latter of which was not recommended by Roundtree's orthopedist) contributed to an injury beyond the theoretical possibility that he might be crippled for life. Moreover, Roundtree insinuates that Defendants' denied his requests for medical equipment because of security concerns. (Compl. ¶ 34.) But that is a legitimate, penological reason to deny the use of medical equipment absent an urgent, countervailing

medical need. Rahman v. Artuz, 1999 WL 600520, at \*4 (S.D.N.Y. Aug. 10, 1999) ("There was a legitimate penological reason for not giving [plaintiff] his braces in the SHU.").

None of the allegations in the Complaint establish a compelling medical need; they merely state that the orthopedist expressed a sentiment that Roundtree should sit higher and wear a knee brace. Moreover, Roundtree does not allege that he suffered an actual injury because of his inability to obtain braces. Rahman, 1999 WL 600520, at \*3 ("Nor has plaintiff shown that deprivation of the braces caused extreme pain or degeneration of the condition of his knees."). The Complaint does not even assert that Roundtree suffered an injury substantially less severe in nature. Martinez v. Aycock-West, 164 F. Supp. 3d 502, 512 (S.D.N.Y. 2016) ("Plaintiff does not allege otherwise or that he suffered any permanent harm."). He merely states that he could have been crippled, but the alleged conditions he faced were not sufficiently serious enough to have posed a serious risk to his health.

Similarly, Roundtree furnishes a subset of medical care related allegations in the Complaint Exhibit, alleging general systemic problems about the medical clinic's approach to patient care. He casts general aspersions on the clinic staff, saying that they "seem not willing to work, and have 2 or 3 patients waiting up to 5 hours to be seen," and when they are finally seen, the clinicians "only want to address 2 issues or less." (ECF No. 46 at 15.) These allegations have nothing to do with Roundtree.

Finally, Roundtree takes aim at two individual physicians—Dr. Alan and Dr. San Jose—who allegedly wrote false reports and changed or refused Roundtree's medication, but these bare assertions fall short of stating a claim. One-sentence accusations against each doctor are insufficient to state a claim against either of them or establish liability against any of the entity defendants.

## 2. Dental Care

Roundtree separately alleges that in June 2015, he requested a dental visit "due to extreme pain," which went ignored until March 2016. (Compl. ¶ 29.) This allegation fails, however, because Roundtree has not alleged that he suffered any injuries resulting from the delay.

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

Further, Roundtree asserts that he had "2 wisdom teeth cutting into [his] cheek, a growth on [his] foot, and variety of other problems." (ECF No. 46 at 15.) Roundtree's allegations regarding his wisdom teeth meet the objective standard. At this stage, this Court must "assume that the pain that [Roundtree] suffered as a result of the delay in the provision of medication [or medical services] was sufficiently severe to ... cause[ ] him needless pain and suffering." Palms v. Quisling, 2007 WL 5404586, at *4 (W.D. Wisc. Jan. 12, 2007).

**\*10** But Roundtree cannot meet the subjective standard—that Defendants intentionally put him at a substantial risk of serious harm or that they were deliberately indifferent to that risk. Roundtree asserts that his requests for wisdom teeth treatment were ignored even after he made "over 20 complaints (3 today)" as of November 2015 (ECF No. 46 at 15), but that sole allegation does not suffice to make out deliberate indifference. "While dental pain and toothaches can be excruciatingly painful and proper dental care is an important part of overall health, short, intermittent delays in appointment times, absent any indication of serious infection or aggravation of the condition" cannot sustain a violation of due process rights. Fuller v. Hohensee, 2008 WL 4826261, at *11 (W.D.N.Y. 2008). Moreover, even if a defendant complains, delays in treatment do not rise to the level of deliberate indifference that is objectively unreasonable. Roundtree has not alleged an "outright refusal of any treatment for a degenerative condition that [ ] cause[d] acute infection and pain if left untreated and [ ] imposition of a seriously unreasonable condition on such treatment." Harrison v. Barkley, 219 F.3d 132, 138 (2d Cir. 2000) (emphasis original). While Roundtree may have complained repeatedly about his wisdom teeth, the Complaint fails to allege that Defendants expressly refused to treat him and that his requests for treatment were rejected for an invalid reason or to punish him.

### ii. Deprivation of Medical Care by Prison Staff

Finally, Roundtree makes an assortment of allegations regarding access to medical treatment. There are wide-ranging complaints about how the corrections officers would delay his appointments and impede his ability to obtain medical treatment. In a situation where "treatment is delayed, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone to determine whether the plaintiff has stated a claim for deliberate indifference to his medical needs." Cuffee v. City of N.Y., 2017 WL 1232737, at *9 (S.D.N.Y. Mar. 3, 2017) (emphasis original). The type of injuries resulting from delays in delivery of adequate medical care can range depending on how long that care is withheld. A "life-threatening and fast-degenerating condition for three days" may constitute deliberate indifference while "delayed major surgery for over two years" may also achieve the same. DeMeo v. Koenigsmann, 2015 WL 1283660, at *11 (S.D.N.Y. Mar. 20, 2015). Nevertheless, the pain that a plaintiff suffers from being deprived of medical care must be "evidently so extreme that" it leaves the plaintiff "in such a state [of pain], even for a short time, [and] presents a denial of the minimal civilized measure of life's necessities." Cuffee, 2017 WL 1232737, at *9.

The Complaint states that Officers Conyers, Danzig, and McQuiller precluded Roundtree "from going to appointments, receiving medical care, or procuring medical equipt., required for his healing, and maintaining health, and well-being." (Compl. ¶ 35.) Officer Danzig also apparently answered the phone and said that Roundtree "was refusing medical appointments, did not wish to see doctors, or get his medication" on "30 different occasions." (Compl. ¶ 35.) The other allegations strewn about the Complaint are as general and conclusory as those in Paragraph 35. Fatal to Roundtree's claim is that these allegations fail to specify how long he was deprived of treatment, and whether he faced a serious risk of harm. Like his medical care allegations against Corizon and Dr. Cherchever, Roundtree also fails to specify the medical conditions that worsened as a result of his inability to access medical care. Smith v. City of N.Y., 2016 WL 7471334, at *4 (S.D.N.Y. Dec. 28, 2016) (claim is insufficient if "delay in providing medical attention is neither the underlying cause of a plaintiff's condition nor contributed to worsening in the condition"). They merely reflect his frustration with the corrections officers' refusal to help him or to facilitate his receipt of medical care. And while medical care is necessary to maintain general health, healing, and well-being, the type of care that he was prevented from accessing was not tantamount to causing serious damage to his health. Darnell, 849 F.3d at 29.

### III. Fourth Amendment Claims

**\*11** The "Fourth Amendment protects individual privacy against certain kinds of governmental intrusion ... and it is well-established that its protections extend to prisoners." Holland v. City of N.Y., 197 F. Supp. 3d 529, 542 (S.D.N.Y. 2016). The Fourth Amendment prohibits only unreasonable searches. "The test of reasonableness under the Fourth

2018 WL 1586473

Amendment is not capable of precise definition or mechanical application" and each case "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell v. Wolfish, 441 U.S. 520, 558 (1979). "Courts must consider the scope of the particular intrusion, the manner in which the search is conducted, the justification for initiating it, and the place in which it is conducted." Green v. Martin, 224 F. Supp. 3d 154, 163 (D. Conn. 2016).

A. Cell Search

The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." Hudson v. Palmer, 468 U.S. 517, 526 (1984). In analyzing the claims of a pretrial detainee, if a search is conducted by a prison official, "established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether the security needs could justify it." United States v. Cohen, 796 F.2d 20, 24 (2d Cir. 1988). Accordingly, Roundtree's allegations that he was subject to "as many as 19 searches of the same housing area" in the span of a few days does not state a claim under the Fourth Amendment. Corley v. City of N.Y., 2017 WL 4357662, at *15 (S.D.N.Y. Sept. 28, 2017).

Nevertheless, Roundtree attempts to bolster his claim with specific allegations against Defendant Conyers: "Capt. Conyers has not only held [Roundtree] in the housing unit during searches to make sure she can harass [him]," but she also "told C.O.'s to destroy [his] medications, to confiscate [his] bibles, destroy [his] sketches, and legal work ... has had them steal commissary food ... [and] toss [his] cell." (Compl. ¶ 35.) The destruction of property in connection with a cell search is more appropriately assessed under the Fourteenth Amendment's due process clause. Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 325 (S.D.N.Y. 2006). "However, deprivation of property is not actionable under § 1983 if the state provides an adequate post-deprivation remedy and the deprivation was not the result of an established state practice." Wilkerson, 438 F. Supp. at 325. The "Second Circuit has held that New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates." Brooks v. Chappius, 450 F. Supp. 2d 220, 226–27 (W.D.N.Y. 2006) (citing Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996)). "New York State provides such

a remedy in Section 9 of the New York Court of Claims Act, which permits an inmate ... to pursue his claim for deprivation of property," and because Roundtree "has access to this remedy, he cannot state a claim for deprivation of property pursuant to 42 U.S.C. § 1983." Mateo v. Bristow, 2013 WL 3863865, at *6 (S.D.N.Y. July 16, 2013).

B. Strip Search

Nor do Roundtree's allegations that he was strip-searched give rise to a valid claim. The Second Circuit recognizes that inmates have a "limited right to bodily privacy," and a "strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body is a serious invasion of privacy." Harris v. Miller, 818 F.3d 49, 58 (2d Cir. 2016). Strip searches, by themselves, are considered reasonable security measures "even when probable cause for the searches [is] absent" so long as they arise from legitimate penological or security interests. Green, 224 F. Supp. 3d at 164. But a plaintiff may establish a valid Fourth Amendment violation if he sufficiently alleges that the searches did not serve a legitimate penological purpose and instead was "designed to intimidate, harass or punish." Davila v. Messier, 2014 WL 4638854, at *6 (D. Conn. Sept. 17, 2014); see also Wilkerson, 438 F. Supp. 2d at 323.

*12 Roundtree asserts that he was harassed with "sexually invasive strip searches, at one point 5 times in 24 hours." (Compl. ¶ 92.) Under the Second Circuit's rubric, the alleged sexual contact must be "objectively, sufficiently serious." Boddie v. Schnieder, 105 F.3d 857 (2d Cir. 1997) (citing Farmer, 511 U.S. at 834). Boddie held that a "small number of incidents in which [plaintiff] allegedly was verbally harassed, touched, and pressed against without his consent" was objectively, sufficiently serious or "cumulatively egregious in the harm they inflicted." 105 F.3d at 861. In contrast, Roundtree's bare assertions do not meet the "objectively, sufficiently serious" standard. Moreover, Roundtree's allegations do not establish that these strip searches were "undertaken maliciously or for the purposes of sexually abusing an inmate," rather than "in a good-faith effort to maintain or restore discipline." Crawford v. Cuomo, 796 F.3d 252, 258 (2d Cir. 2015).

C. Video Surveillance

The other privacy claims asserted in the Complaint fall within the ambit of the Fourth Amendment. This Court's review of Roundtree's claims pertaining to surveillance and biometric

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 279 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

data is informed by the Supreme Court's recognition that a "right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." Hudson, 468 U.S. at 527–28. Roundtree principally alleges that prison officials coerced him into submitting "individual voiceprint biometrics" and that they used hi-definition cameras installed in various areas of the facility to "record[ ] and transmit[ ] inamges in the 15B housing area showers, in the clinic treatment areas, and the strip search staging and search area that double[d] as a chapel." (Compl. ¶¶ 76, 80–81, 82.)

But for a prisoner to allege a valid Fourth Amendment violation, he must establish that he (1) "exhibited an actual, subjective expectation of bodily privacy," and (2) prison officials lacked "sufficient justification to intrude on the inmate's [F]ourth [A]mendment rights." Harris, 818 F.3d at 57. Roundtree's claim fails with respect to both elements. Aside from generally alleging that he had some privacy interest, Roundtree fails to counter the simple reality of prison life—that there is no expectation of privacy in showers, clinics, or other areas in which prison officials routinely monitor and search prisoners. This fact dovetails with Roundtree's failure to satisfy the second element—that prison officials have more than a sufficient justification because surveilling prisoners to ensure the security of the institution outweigh Roundtree's privacy interests. See Johnson v. Phelan, 69 F.3d 144, 147 (7th Cir. 1995) ("Cells and showers are designed so that guards can see in, to prevent violence and other offenses. Prisoners dress, undress, and bathe under watchful eyes. Guards roaming the corridors are bound to see naked prisoners."). And while the Fourth Amendment protects against "isolated instances of unreasonable searches by prison officials," Roundtree has done nothing to overcome the presumption that "overall considerations of institutional security outweigh a prisoner's claim to privacy in particular cases." United States v. Cohen, 796 F.2d 20, 22–23 (2d Cir. 1986).

#### D. Biometric Voiceprints

Roundtree's allegation that he was coerced into providing "voiceprint biometrics" fails to establish how he was harmed. He says the Department of Corrections deceived him into providing his voiceprint—which he characterizes as his intellectual property—under the guise of stopping "people from [stealing inmate phone PINs] and ... us[ing] [their] phone calls." (ECF No. 46, at 4.) Aside from Roundtree's unsubstantiated belief that his voiceprint has been used for

nefarious purposes, he fails to articulate any injury that he directly suffered. He merely seeks more information regarding the purposes of the voiceprint, and seeks to preempt a theoretical future injury by withdrawing his consent for authorities to use his voiceprint. "Although pretrial detainees may have some residual privacy interests that are protected by the Fourth Amendment, the maintenance of prison security and the preservation of institutional order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." United States v. Willoughby, 860 F.2d 15, 21 (2d Cir. 1988).

#### E. Drug Screening

**\*13** "A drug test constitutes a search within the meaning of the Fourth Amendment and, therefore, must be conducted in a reasonable manner." Mitchell v. Dep't of Corr., 2008 WL 744041, at *9 (S.D.N.Y. Feb. 20, 2008). In prison, an inmate's "right to be free from unreasonable searches is diminished once he or she steps through the prison door [and] [i]f the intrusion into one's privacy is found to be minimal ... and the expectation of privacy is minimal ... and there is a governmental reason advanced supporting a search ... then the search will not violate one's Fourth Amendment rights." Harris v. Keane, 962 F. Supp. 397, 407 (S.D.N.Y. 1997).

Roundtree says that on one occasion, prison officials without asking "in violation of HIPAA," gave him an "illegal drug screening." (Compl. ¶ 20.) The Complaint does not suggest that the drug screening was done with an intent to harass, obtusely alleging that it merely had the effect of "circumvent[ing] the law and plaintiff's constitutional rights when they did so and shared the records with any other party without first at least requesting consenting cooperation or even notifying the plaintiff the test was done." (Compl. ¶ 20.) But "as long as testing is not done with an intent to harass, a corrections officer may order an inmate to submit" to a drug test. Excell v. Woods, 2009 WL 3124424, at *27 (N.D.N.Y. Sept. 29, 2009); Rodriguez v. Coughlin, 795 F. Supp. 609 (W.D.N.Y. 1992) (two random drug tests within twelve-month period did not constitute constitutional violation). Accordingly, Roundtree's allegations concerning an illegal drug screening fail to state a claim.

#### IV. Municipal Liability

To establish a municipal liability claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3)

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 280 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1586473

a denial of a constitutional right." Torraco v. Port Auth. of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010). A plaintiff can establish an "official policy or custom by showing any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom of which policymakers must have been aware; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised deliberate indifference to the rights of the plaintiff and others encountering those subordinates." McLennon v. City of N.Y., 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not suffice if it tenders naked assertion[s] devoid of further factual enhancement." Green v. City of Mt. Vernon, 96 F. Supp. 3d 263, 301–02 (S.D.N.Y. 2015). To defeat a motion to dismiss a municipal liability claim, the plaintiff "must allege facts tending to support, at least circumstantially, an inference that ... a municipal policy or custom exists." Santos v. N.Y.C., 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012).

While this Court finds that Roundtree may be able to allege claims regarding inadequate bedding and seating and use of chemical spray, they do not impute liability to the City of New York. At best, they are isolated incidents that affected Roundtree. The Complaint's allegations regarding municipal liability are wholly conclusory.

Roundtree does not point to a formal policy officially endorsed by the municipality, nor does he allege that municipal officials—those imbued with decision making authority—implemented policies or took actions designed to deprive Roundtree of adequate bedding and seating or maliciously injuring him with chemical sprays.

*14 "[I]solated acts ... by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." Jones, 691 F.3d at 81. "[B]efore the actions of subordinate city employees can give rise to § 1983 liability, their [unlawful] practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials." Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 871 (2d Cir. 1992). Here, Roundtree simply attributes some of the retribution he endured to certain corrections

officers. But there is no allegation suggesting that supervisors or policymakers became aware of this alleged misconduct, or that they were willfully blind to it. Warden Augustus is named as a defendant, but Roundtree makes no allegations against him. Indeed, with respect to the inadequate bedding and seating allegations, Roundtree credits certain senior officials with assisting him: "I was fortunate a Dr. Rajan answered my request for chairs because had he not I would now probably no longer be able to walk." (ECF No. 46 at 8–9.) And but for the misconduct of some corrections officers who operated "behind Dep[uty] Robert's back to have the chairs taken away from me," the Complaint suggests that prison supervisors would not have deprived Roundtree of his seating. (ECF No. 46 at 8–9.)

Finally, there are no allegations that the City of New York failed to train its subordinates and was deliberately indifferent to the resulting misconduct. To show that the City was deliberately indifferent to the need to train its corrections officers, the Complaint must plausibly demonstrate that (1) a policymaker knew to a moral certainty that city employees will confront a particular situation; (2) the situation either presents the employee with a difficult choice of the sort of training or supervision will make less difficult or there is a history of employees mishandling the situation; and (3) the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights. Wray v. City of N.Y., 490 F.3d 189, 195–96 (2d Cir. 2007). Roundtree alleges nothing of the sort. Rather, the Complaint reads as though certain malfeasant actors at Rikers took it upon themselves to engage in misconduct designed to deprive Roundtree of his constitutional rights.

Accordingly, Roundtree's municipal liability claims are dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Roundtree's Complaint is granted. All of Roundtree's claims are dismissed with prejudice except for his claims relating to: (1) deprivation of adequate bedding and seating, and (2) excessive force through the use of chemical sprays. Roundtree may re-plead only those two claims. Specifically, he must identify the specific incidents and individuals involved in the alleged misconduct. If Roundtree chooses to file an amended complaint, he must do so in a single document by May 25, 2018.

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 281 of 380

Roundtree v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1586473

Over the past year, Roundtree has filed innumerable letters amplifying the allegations of his Complaint, raising entirely different theories of liability against the City and individuals, and generally complaining about his life in prison. Roundtree is directed to cease and desist inundating this Court with correspondence. Any amended complaint filed by May 25, 2018 will be the only allegations that this Court will consider.

The Clerk of Court is directed to mail a copy of this Opinion & Order to Roundtree's last known address memorialized in a letter to this Court dated February 15, 2018 (see ECF No. 77):

Juel Roundtree, #17A4980

Franklin Correctional Facility
62 Bare Hill Road
P.O. Box 10
Malone, New York 12953

The Clerk of Court is also directed to amend Roundtree's address information on the ECF docket to reflect the address listed above. The Clerk of Court is further directed to terminate the motion pending at ECF No. 52.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1586473

---

**End of Document**                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 3884369
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Wayne BARNES, Plaintiff,
v.
Lt. CRAFT; Sgt. J. O'Keefe; C.O. C. Hodges; and
G. Goord, Commissioner of the New York State
Department of Correctional Services, Defendants.

No. 9:04-CV-1269.
|
Aug. 18, 2008.

**Attorneys and Law Firms**

Wayne Barnes, Hackensack, NJ, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of
New York, Michael G. McCartin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### ORDER

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-
Recommendation by Magistrate Judge George H. Lowe, duly
filed on the 24th day of July, 2008. Following ten days from
the service thereof, the Clerk has sent me the file, including
any and all objections filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report-Recommendation, and no
objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby adopted in its
entirety.

2. The Defendants' motion for summary judgment (Dkt. No.
43) is granted.

3. The Clerk of the Court shall serve a copy of this Order upon
all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and
Recommendation by the Honorable Norman A. Mordue,
Chief United States District Judge, pursuant to 28 U.S.C.
§ 636(b) and Local Rule 72.3(c) of the Local Rules of
Practice for this Court. Wayne Barnes ("Plaintiff"), while
an inmate, commenced this *pro se* civil rights action on
November 1, 2004, against four employees of the New York
State Department of Correctional Services ("Defendants"),
pursuant to 42 U.S.C. § 1983. (Dkt. No. 9 [Plf.'s Am.
Compl.].) Generally, Plaintiff's Amended Complaint alleges
that Defendants violated his rights under the First, Eighth
and Fourteenth Amendments by confining him to the Special
Housing Unit ("S.H.U.") at Ulster Correctional Facility
("Ulster C.F.") between March 12, 2004, and March 17, 2004,
without providing him a hearing, in response to his refusal
to shave his full beard, for which he claims he possessed, at
the time, a valid exemption issued by the New York State
Department of Correctional Services ("DOCS") due to his
need to maintain the beard in order to engage in Rastafarian
spiritual practices. (*Id.*) Currently pending before the Court
is Defendants' motion for summary judgment pursuant to
Fed.R.Civ.P. 56. (Dkt. No. 43.) For the reasons that follow, I
recommend that Defendants' motion be granted.

### I. BACKGROUND

#### A. Plaintiff's Amended Complaint

Liberally construed, Plaintiff's Amended Complaint asserts
the following factual allegations, in pertinent part.

In late 2003, while Plaintiff was incarcerated in the New York
State Department of Correctional Services ("DOCS"), he
was "passing through" Ulster Correctional Facility ("Ulster
C.F."), wearing a full beard. [1] C.O. Hodes [2] stopped Plaintiff
and ordered him to shave his beard. [3] Plaintiff informed C.O.
Hodes that he had received a written permit from DOCS
exempting him from DOCS' rule that beards may be no more
than one inch in length (hereinafter "DOCS' one-inch beard
rule"). [4] C.O. Hodes called Wyoming C.F. (the correctional
facility at which Plaintiff was regularly housed, and which
was responsible for maintaining Plaintiff's records at the

time), and was informed that Plaintiff indeed had such a written exemption on file. [5] As a result, C.O. Hodes permitted Plaintiff to pass through Ulster C.F. without having to shave his beard. [6]

[1]   (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

[2]   I note that, although Plaintiff's Amended Complaint refers to this individual as "C.O. C. Hodges" (Dkt. No. 9), Defendants have previously identified this individual as "C.O. Hodes" (Dkt. No. 19, Part 2 at 1 [Defs.' Mem. of Law in Support of Motion to Dismiss] ), and Plaintiff has previously requested that the Court amend his Amended Complaint accordingly (Dkt. No. 22, at 10 [Plf.'s Mem. of Law in Opp. to Motion to Dismiss] ).

[3]   (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

[4]   (*Id.* at ¶ 7(a).)

[5]   (*Id.*)

[6]   (*Id.*)

**\*2**   Then, during the afternoon of March 12, 2004, while again passing through Ulster C.F., Plaintiff was again stopped by C.O. Hodes and ordered to shave his beard. [7] Plaintiff asked C.O. Hodes whether he did not remember Plaintiff from the previous time he had passed through Ulster C.F. [8] Plaintiff explained that he was the inmate who had received a written exemption from DOCS' one-inch beard rule. [9] C.O. Hodes responded that, at Ulster C.F., a permit does not matter and that if Plaintiff did not cut his beard he would have to go to the "box" until he cut it. [10] Despite having been given a copy of the written exemption (by an unidentified person at an unidentified point in time), and knowing that Plaintiff was exempt from DOCS' one-inch beard rule regarding beards, C.O. Hodes sought to incarcerate Plaintiff in the "box" at Ulster C.F. [11]

[7]   (*Id.* at ¶ 7(a) & Exs. 1, 2 [attaching "Administrative Segregation Recommendation" dated 3/12/04, and complaint letter from Plaintiff dated 4/13/04].)

[8]   (*Id.* at ¶ 7(a).)

[9]   (*Id.*)

[10]   (*Id.*)

[11]   (*Id.*)

Toward this end, C.O. Hodes called Sgt. O'Keefe and informed him that Plaintiff was refusing to cut his beard and claiming that he had an exemption on file due to the fact that he was a "practicing and registered Rastafarian." [12] Plaintiff informed Sgt. O'Keefe that previously, when Plaintiff had been passing through Ulster. C.F., C.O. Hodes had learned that Plaintiff did indeed have an exemption on file. [13] Plaintiff also informed Sgt. O'Keefe that the Ulster C.F. "Intake Draft" has a copy of the permit from DOCS in Albany, New York. [14] Sgt. O'Keefe responded that, at Ulster C.F., a permit from Albany holds no weight and that if Plaintiff continued to refuse to cut his beard he would be sent to Ulster C.F.'s Special Housing Unit ("S.H.U.") until he cut his beard, regardless of any such permit. [15]

[12]   (*Id.* at ¶ 7(b) & Ex. 2 [attaching complaint letter from Plaintiff dated 4/13/04].)

[13]   (*Id.* at ¶ 7(b).)

[14]   (*Id.* at ¶ 7(a), (b).)

[15]   (*Id.* at ¶ 7(b).)

As a result, at approximately 3:40 p.m. on March 12, 2004, Sgt. O'Keefe signed an "Administrative Segregation Recommendation," stating that the reason for his recommendation was that "[Plaintiff] refused to shave his beard to one inch during the incoming draft process. [Plaintiff] claims he has an exemption on file." [16] At some point thereafter, Lt. Craft signed the "Administrative Segregation Recommendation," authorizing Plaintiff's confinement in S.H.U. pending a hearing on the recommendation. [17] The bottom of the "Administrative Segregation Recommendation" form stated as follows:

[16]   (*Id.* at Ex. 1 [attaching "Administrative Segregation Recommendation" dated 3/12/04].)

[17]   (*Id.*)

**Notice to Inmate:** A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V. You will be entitled to call witnesses on your own behalf, provided that doing

so does not jeopardize institutional safety or correctional goals.

If restricted pending a hearing on this recommendation, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement. [18]

[18]    (*Id.*)

Between March 12, 2004, and March 17, 2004, Plaintiff remained in the Ulster C.F. S.H.U., during which time he was subjected to the following restrictive conditions, among others: the continuous confinement in his cell, the continuous isolation from the general prison population, the continuous denial of use of prison facilities (such as the libraries, gym, etc.), and sleep deprivation due to the 24-hour lighting in his cell and the loud noise of the air-conditioning system above his cell. [19]

[19]    (*Id.* at ¶¶ 5, 7 & Exs. 2, 4 [attaching complaint letter from Plaintiff dated 4/13/04, and a letter from Plaintiff dated 5/23/04].)

 **\*3**  On March 17, 2004, Plaintiff sent a letter of complaint to an unidentified person at Ulster C.F., complaining about the harsh conditions to which he was being subjected in S.H.U. [20] Plaintiff alleges that he sent this letter to "the hearing officer" (and/or perhaps to an unspecified lieutenant), [21] although he acknowledges that no hearing had yet been held. [22] Plaintiff never received a response to his letter. [23] However, on or about March 17, 2004, Plaintiff was released from S.H.U. and returned to Wyoming C.F. [24] No hearing was ever held. [25]

[20]    (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04].) I note that Plaintiff does not attach to his Amended Complaint a copy of this March 17, 2004, letter.

[21]    (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter to "the hearing officer (Lt./etc.)" and letter from Plaintiff dated 6/16/04 alleging that he sent the 4/17/04 letter to "the 'hearing officer' "].)

[22]    (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter "prior to a hearing"].)

[23]    (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 stating *inter alia* "I have yet to have ... a response from the hearing officer regarding this issue," and letter from Plaintiff dated 6/16/04 stating *inter alia* "I have never gotten a response from the hearing officer"].)

[24]    (*Id.* at Exs. 2, 4, 6 [attaching complaint letter from Plaintiff dated 4/13/04, letter from Plaintiff dated 5/23/04, and letter from Plaintiff dated 6/16/04].)

[25]    (*Id.* at ¶¶ 5, 7(c) & Ex. 4 [attaching letter from Plaintiff dated 5/23/04].)

Although Plaintiff's Amended Complaint references only the First Amendment (in asserting a retaliation claim), I liberally construe that pleading as attempting to raise an inadequate prison-conditions claim under the Eighth Amendment, and a procedural due process claim under the Fourteenth Amendment, given his special status as a *pro se* civil rights litigant, and given various of the statements made in his Amended Complaint and documents attached to that pleading. [26]

[26]    (*See, e.g., id.* at ¶ 5 & Ex. 4 [attaching his letter dated 5/23/04, complaining that there was "no hearing" with regard to his confinement in the Ulster C.F. S.H.U.]; *id.* at Exs. 2 & 4 [attaching his letters dated 4/13/04 and 5/23/04, complaining about the allegedly "harsh," "degrading" and "inhumane" conditions in the Ulster C.F. S.H.U.].)

**B. Defendants' Motion for Summary Judgment**
Defendants argue that the Court should grant their motion for summary judgment for six reasons: (1) Plaintiff's Fourteenth Amendment procedural due process claim should be dismissed because he has failed to establish that his six-day stay in administrative segregation created a sufficient liberty interest to give rise to such a claim; (2) Plaintiff's Eighth Amendment claim of inadequate prison conditions should be dismissed because he has failed to establish either that he experienced a sufficiently serious deprivation or that Defendants acted with a sufficiently culpable state of mind; (3) Plaintiff's First Amendment retaliation claim should be dismissed because he failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature; (4) in the alternative, Plaintiff's claims against Defendants Goord and Craft should be dismissed because Plaintiff has failed to establish that they were

2008 WL 3884369

personally involved in the constitutional violations alleged; (5) in the alternative, Plaintiff's claims against all Defendants should be dismissed because, based on the current record, they are protected from liability by the doctrine of qualified immunity, as a matter of law; and (6) in the alternative, Plaintiff's action should be dismissed under Local Rule 41.2(b) of the Local Rules of Practice for this Court because of Plaintiff's failure to keep the Court apprised of his current address. (Dkt. No. 43, Part 12 [Defs.' Mem. of Law].)

Plaintiff has opposed Defendants' motion. (Dkt. No. 48.)

## II. RELEVANT LEGAL STANDARD

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [27] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [28]

[27]  A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[28]  *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

**\*4** However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [29] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [30] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [31]

[29]  Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's]

pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

[30]  Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

[31]  *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

It should be noted that, where a non-movant fails to adequately oppose a properly supported factual assertion made in motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. [32] Moreover, to be sufficient to create a factual issue for purposes of a summary judgment motion, statements made in an affidavit or deposition testimony must (among other things) not be conclusory. [33] Such statements are conclusory if, for example, their assertions lack any supporting evidence or are too general. [34]

[32]  *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at \*12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at \*1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan*

v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); Prestopnik v. Whelan, 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

33  See Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); Patterson, 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; Applegate v. Top Assoc., 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

34  See, e.g., Bickerstaff v. Vassar Oil, 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; West-Fair Elec. Contractors v. Aetna Cas. & Sur., 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); Applegate, 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

## III. ANALYSIS

**A. Whether Plaintiff's Fourteenth Amendment Procedural Due Process Claim Should Be Dismissed Because He Has Failed to Establish that His Six-Day Stay in Administrative Segregation Created a**

**Sufficient Liberty Interest to Give Rise to Such a Claim**

In 1995, the Supreme Court held in Sandin v. Connor that liberty interests protected by the Fourteenth Amendment's Due Process Clause "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Defendants argue that the short duration of Plaintiff's stay in Administrative Segregation at Ulster C.F., coupled with the rather ordinary conditions of that segregated confinement, do not create a sufficient liberty interest to give rise to a Fourteenth Amendment procedural due process claim. (Dkt. No. 43, Part 12, at 2-6 [Defs.' Mem. of Law].)

Plaintiff responds with a three-part argument: (1) he possessed a protected liberty interest because he possessed a valid DOCS-issued beard exemption when he was placed in administrative segregation; (2) he need not show Sandin v. Connor' s "atypical and significant hardship" requirement because the injury that he experienced consisted of the retaliatory conduct itself; and (3) in any event, his stay in Administrative Segregation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" because (a) the conditions of his stay in Administrative Segregation were sufficiently harsh, and (b) those conditions were not "ordinary" to him since he was otherwise incarcerated in the general population of a medium-security correctional facility. (Dkt. No. 48, at 15-16 [Pages 14 and 15 of Plf.'s Response Mem. of Law].)

*5  With respect to Plaintiff's first argument, the fact that he possessed a DOCS-issued beard exemption does not create a protected liberty interest for purposes of a procedural due process claim. Lee v. Quillar, 04-CV-1203, 2007 U.S. Dist. LEXIS 50894, at *5-7, 2007 WL 2069942 (E.D.Cal. July 13, 2007) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge that he failed to cut his beard, even though charge contravened medical authorization permitting prisoner to wear beard), adopted by, 2007 U.S. Dist. LEXIS 61480, 2007 WL 2340235 (E.D.Cal. Aug. 16, 2007). [35] This is because, in 1995, the United States Supreme Court shifted a court's focus, when conducting a procedural due process analysis, from the language of the particular authority allegedly giving rise to the protected liberty interest alleged (e.g., a state law or regulation) to the nature of the deprivation alleged. Sandin v. Connor, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d

2008 WL 3884369

418 (1995). [36] Specifically, as stated earlier, in 1995, the Supreme Court held that a liberty interest protected by the Fourteenth Amendment's Due Process Clause will generally be limited to freedom from a restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84.

[35]    *See also Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 52797, at *2, 14-21, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge and conviction-even assuming disciplinary charge had been issued in contravention of medical permit-since deprivation following conviction did not result in an atypical and significant hardship).

[36]    *See also Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord, Watson v. City of N. Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Before continuing to Plaintiff's second argument, a few words are appropriate about any *substantive* due process claim he may be trying to assert in his Amended Complaint. [37] As an initial matter, I do not liberally construe Plaintiff's Amended Complaint (which essentially challenges the way DOCS' beard policy was implemented) as alleging a violation of his right to *substantive* due process. [38] Even if I were to so construe Plaintiff's Amended Complaint, I would have difficulty finding that the issuance of a DOCS' beard exemption (without the issuance of a court order) created such a right of substantive due process. *See Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 (S.D.N.Y. July 30, 1997) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment."). [39]

[37]    The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinnernon*

*v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-26 [internal quotations marks and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

[38]    Setting aside the lack of factual allegations in Plaintiff's Amended Complaint plausibly suggesting a substantive due process claim, I note that, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the ... Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392-94 [1989] ). Here, Plaintiff's failure-to-honor-his-beard-exemption claim is more appropriately analyzed as a First Amendment retaliation claim, an Eighth Amendment inadequate-prison-conditions claim, and/or a Fourteenth Amendment procedural due process claim. Thus, there is no need to analyze that claim as a Fourteenth Amendment substantive due process claim.

[39]    *Cf. Young v. Goord,* 192 F. App'x 31, 33 (2d Cir.2006) ("[I]t is at least reasonable to read Rule 110.32 [the DOCS regulation governing inmates' beard length, which permits DOCS-issued exemptions] *not* to create a substantive right to a religious exemption from the beard-length policy ....") [emphasis in original].

Furthermore, even if I were able to find that the issuance of a DOCS' beard exemption alone created such a right

of substantive due process, I would have difficulty finding evidence in the record that Defendants' actions were not simply "incorrect or ill-advised" but were "arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action). I note that prison beard-length policies generally appear to have a legitimate penological objective-whether it be to facilitate inmate identification, prevent hygiene problems, or minimize the need for contact between guards and the inmate during searches.[40] Here, the record indicates that accurate identification was one of the penological objectives of the beard-length policy in question.[41]

[40]  *Cf. Singh v. Goord,* 520 F.Supp.2d 487, 507 (S.D.N.Y.2007) ( "[N]umerous courts have held that Directive 4914's initial shave requirement serves a legitimate penological interest in maintaining prison security and a record of prisoners' appearances in case of escape.") [collecting cases].

[41]  (Dkt. No. 43, Part 5, at 2 [Ex. C to McCartin Decl., attaching Directive 4914, stating, "It is the purpose of this directive to ensure that inmate appearance will be regulated sufficiently to maintain accurate identification of each individual"].)

**\*6**  With respect to Plaintiff's second argument, I have found no cases suggesting that *Sandin'* s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of due process violations.[42]

[42]  *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation

claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at \*3-5 (E.D.Ark. Dec.7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at \*4-5 (W.D.Mich. Aug.28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

With regard to Plaintiff's third argument, the fact that the conditions of his Administrative Segregation were restrictive, and the fact that he "ordinarily" was incarcerated in the general population of a medium-security correctional facility, do not, in and of themselves, create a question of fact regarding whether his stay in Administrative Segregation, coupled with the conditions of that segregated confinement, gave rise to a Fourteenth Amendment claim. Rather, in determining whether Plaintiff's six-day stay in Administrative Segregation imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," the Court must determine what the conditions of that six-day Administrative Segregation were, as established by the record evidence, and then compare the imposition of those conditions for six days to "the ordinary incidents of prison life."

Here, Plaintiff has adduced at least *some* record evidence that, during the time in question, he experienced the following conditions of confinement. First, prior to entering his cell in S.H.U. on March 12, 2004, Plaintiff was strip searched and "handled very rigorously...." (Dkt. No. 43, Part 3, at 33-34 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) Plaintiff was told that, if he took his hands off the wall, he would "be beaten up[,] but not [in] those words." (*Id.* at 34.)

Second, during his confinement in Administrative Segregation, from March 12, 2004, to March 17, 2004, Plaintiff was alone in his cell, and he never left his cell.

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 289 of 380
Barnes v. Craft, Not Reported in F.Supp.2d (2008)
2008 WL 3884369

(Dkt. No. 43, Part 3, at 33, 36 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) He was locked in his cell twenty-four (24) hours a day for all six days he spent in Administrative Segregation. (*Id.* at 39.) In addition, Plaintiff did not participate in recreation period, nor was he afforded the opportunity to shower. (*Id.* at 38-39; *see also* Plf.'s Decl. in Opp., ¶ 25.)

Third, Plaintiff's cell in Administrative Segregation was approximately five feet by ten feet in size. (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) It contained one bed, one toilet, and no shower. (*Id.*) The lights were on in the cell twenty-four (24) hours a day. (*Id.* at 37.) What Plaintiff thinks was an "air-conditioning system" made a loud noise almost constantly that vibrated the cell. (*Id.*) While in the cell, Plaintiff was "deprived of sleep" and he felt "claustrophobic." (Plf.'s Decl. in Opp., ¶ 25.)

Fourth, although it was wintertime, the cell was "very hot" and "too hot." (Dkt. No. 43, Part 3, at 37 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) If the window was open, the cell would feel too cold to Plaintiff. (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) Plaintiff felt comfortable only when wearing just a t-shirt, although "it still would be too humid." (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

**\*7** Fifth, during his six-day stay in Administrative Segregation, Plaintiff "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.)

Sixth, and finally, during his confinement in Administrative Segregation, Plaintiff possessed his "State[-issued] green[ ] clothing]," received three meals a day, and was permitted to mail at least one letter. (Dkt. No. 43, Part 3, at 36, 38 [Exhibit A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 21.)

No record evidence exists that, during the six-day period at issue, Plaintiff was subjected to any substandard cell conditions (e .g., regarding bedding, cleanliness, etc.), or poor treatment (e.g., unwarranted searches, beatings, denial of meals, etc.), other than the previously described conditions and poor treatment. (*See* Plf.'s Decl. in Opp., ¶ 25; Dkt. No. 43, Part 3, at 39-40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Under these circumstances, I find that no record evidence exists that the duration and conditions of Plaintiff's stay in Administrative Segregation at Ulster C.F. created a protected liberty interest to give rise to a Fourteenth Amendment due process claim. Generally, the conditions experienced by Plaintiff in Administrative Segregation were the same as, or perhaps slightly more harsh than, the conditions ordinarily experienced in disciplinary confinement in a correctional facility within the New York State DOCS.[43] *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of SHU confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing 7 N.Y. Comp.Codes R. & Regs. §§ 304.1-304.14).

[43]   I note that, in his deposition, Plaintiff testified that he had "spoken to several prisoners of the treatment you get [in S.H.U. confinement]" and that he "was subject to ... that type of treatment." (Dkt. No. 43, Part 3, at 34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Finally, numerous courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in a Special Housing Unit ("S.H.U.") of *far* more than six (6) days, even where the conditions of confinement in the Special Housing Unit were, to varying degrees, more restrictive than those in the prison's general population. *See, e.g., Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and *somewhat more severe than those of general population*" did not rise to the level of atypicality) [emphasis added].[44] Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population[45] and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility.[46]

44    *See also Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

45    *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to

their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown' time even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

46    *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU- for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

**\*8** For all of these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment due process claim.

**B. Whether Plaintiff's Eighth Amendment Claim of Inadequate Prison Conditions Should Be Dismissed Because He Has Failed to Establish Either that He Experienced a Sufficiently Serious Deprivation or that Defendants Acted with a Sufficiently Culpable State of Mind**

Generally, to prevail on a claim of inadequate prison conditions, a plaintiff must demonstrate two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

To satisfy the seriousness requirement, a plaintiff must demonstrate that the conditions of his confinement deprived him of "the minimal civilized measure of life's necessities" or an "unquestioned and serious deprivation of basic human needs." *Farmer,* 511 U.S. at 834; *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). As the Supreme Court has rather famously observed, "[T]he Constitution does not mandate comfortable prisons," and "conditions [that] are restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 349.

To satisfy the deliberate-indifference requirement, a plaintiff must demonstrate that the defendants acted with a state of mind of "deliberate indifference to inmate health or safety...."[47] This means a state of mind "more blameworthy than negligence."[48] Rather, it means that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[49] In other words, "this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, leads to liability."[50]

[47]    *Farmer,* 511 U.S. at 834.

[48]    *Id.* at 835.

[49]    *Id.* at 837.

[50]    *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Farmer,* 511 U.S. at 841).

**1. Sufficient Seriousness**

Here, I find no record evidence that the conditions of Plaintiff's six-day stay in Administrative Segregation were *sufficiently serious* for purposes of the Eighth Amendment in that they deprived him of *the minimal civilized measure of life's necessities,* such as food, water, or a toilet. To the

contrary, Plaintiff testified in his deposition that his cell contained "the bare necessities." (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) For example, he testified that his cell was equipped with a toilet, a bed, lights, heat, an "air-conditioning system," and a window. (*Id.* at 35, 37-38.) In addition, he testified that he possessed a t-shirt and his "State[-issued] greens"; he received three meals a day; and he was able to mail a letter. (*Id.* at 36, 38; *see also* Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 21.)

**\*9** Granted, Plaintiff has adduced some evidence that, during the six-day time period, he was denied the opportunity to exercise outside, the ability to shower, and (when his window was open) a certain degree of warmth. (Dkt. No. 43, Part 3, at 35, 38-39 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.) However, these deprivations for six days were simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation. *See Trammel v. Keane,* 338 F.3d 155, 158-159, 164 (2d Cir.2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on [1] deprivation of all property except one pair of undershorts and [2] exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing-seventeen days-was not long enough); *Scot v. Merola,* 555 F.Supp. 230, 231-234 (S.D.N.Y.1983) (granting defendants' Rule 12[b][6] motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area without heat where windows were broken, and temperature dropped below fifty degrees).[51]

[51]    *See also Lock v. Clark,* 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at *1, 11-12, 1992 WL 559660 (N.D.Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted of being confined for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective component of his Eighth Amendment conditions claim, and they do not rise to the level of a constitutional violation."). (*See also* Dkt. No. 43, Part 12, at 8 [Defs.' Mem. of Law, citing cases].)

Furthermore, Plaintiff has adduced evidence that he "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp ., ¶ 25.) However, he has not adduced evidence that (1) he needed such attention or (2) he requested such attention. (*Id.*) As a result, he has adduced no evidence that,

during the time in question, either (1) medical attention was, to him, one of "life's necessities," or (2) he was *denied* such attention after requesting it. *Trammell,* 338 F.3d at 164 ("Although Trammell's requests to be taken from his cell for medical evaluation were not granted, the record shows that the defendants were mindful of, not indifferent to, his health and ensured that his basic 'health or safety' was not at risk.").

For these reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish that a deprivation that was sufficiently serious.

### 2. Deliberate Indifference

Because I have already found that an adequate ground exists upon which to recommend the dismissal of Plaintiff's Eighth Amendment claim of inadequate prison conditions, the Court need not analyze Defendants' alternative Eighth Amendment argument that Plaintiff has failed to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F. However, in the interest of thoroughness, I will briefly analyze that claim.

Defendants focus their argument on the fact that none of them had any control over, or even knew about, the allegedly inadequate conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation. (Dkt. No. 43, Part 12, at 7-9 [Defs.' Mem. of Law].)

**\*10** Plaintiff responds with a three-part argument: (1) Defendant Hodes acted with the requisite mental state because he knew on March 12, 2004, that Plaintiff had a DOCS-issued beard exemption (due to his previous encounter with Plaintiff in late 2003); (2) Defendants Craft and O'Keefe acted with the requisite mental state because they recklessly failed to take the easy step of checking if he had a beard exemption; and (3) each Defendant, after causing Plaintiff to be confined to Administrative Segregation, failed to "[ ]check [ ]" up on him there. (Dkt. No. 48, at 16-17 [Pages 15 and 16 of Plf.'s Response Mem. of Law].)

I can find no record evidence that any Defendant knew of the allegedly inadequate prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C.F. before they caused Plaintiff to be confined there. Furthermore, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to

administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

Plaintiff may have adduced some evidence that Defendants Hodes and O'Keefe turned a blind eye to the written exemption inside the top of his "draft bag" upon his arrival at Ulster C.F. on March 12, 2004. (Dkt. No. 43, Part 3, at 17-28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) However, that evidence does not constitute evidence that Defendants Hodes and O'Keefe possessed a reckless mental state with regard to the prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C.F.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F.

### C. Whether Plaintiff's First Amendment Retaliation Claim Should Be Dismissed Because He Failed to Establish that the Adverse Action Allegedly Taken Against Him Was Anything More than *De Minimis* in Nature

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken

against a prisoner by a prison official-
even those otherwise not rising to the
level of a constitutional violation-can
be characterized as a constitutionally
proscribed retaliatory act.

**\*11** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)
(citations omitted), *overruled on other grounds, Swierkiewicz
v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1
(2002).

To prevail on a First Amendment claim under 42 U.S.C.
§ 1983, a Plaintiff must prove by the preponderance of
the evidence that: (1) the speech or conduct at issue was
"protected"; (2) the defendants took "adverse action" against
the plaintiff-namely, action that would deter a similarly
situated individual of ordinary firmness from exercising his or
her constitutional rights; and (3) there was a causal connection
between the protected speech and the adverse action-in other
words, that the protected conduct was a "substantial or
motivating factor" in the defendants' decision to take action
against the plaintiff. *Mount Healthy City Sch. Bd. of
Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d
471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239
F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse
action taken for both proper and improper reasons may be
upheld if the action would have been taken based on the
proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79
(2d Cir.1996) [citations omitted].

Defendants focus their First Amendment argument on the
assertedly *de minimis* nature of the adverse action, the fact that
it was not accompanied by any threat of future such adverse
action, and the fact that Plaintiff subjectively expected that
the adverse action would be brief (at the time it was taken).
(Dkt. No. 43, Part 12, at 12-15 [Defs.' Mem. of Law].) In
response, Plaintiff focuses on, among other things, the nature
of the deprivations he unjustifiably experienced during his
confinement in Administrative Segregation. (Dkt. No. 48, at
18-19 [Pages 17 and 18 of Plf.'s Response Mem. of Law].)

In making their argument, Defendants attempt to distinguish
the facts of the current case from the facts of a Second
Circuit case finding that a question of fact existed as to the
*de minimis* nature of a nine-day keeplock confinement, *which
was accompanied by threat of future misbehavior reports. See
Gill v. Tuttle,* 93 F. App'x 301, 303 (2d Cir.2004). I agree
that this sort of additional adverse action by a defendant is

an adequate ground upon which to distinguish *Gill v. Tuttle*
and similar cases. [52] Granted, I have found some district
court cases (from within the Second Circuit) ruling that a
question of fact existed as to the *de minimis* nature of keeplock
confinements that do not appear to have been accompanied
by such additional adverse action. [53] However, the keeplock
confinements in those cases were somewhat longer than was
the keeplock confinement in this action.

52      *See, e.g., Keesh v. Goord,* 04-CV-0271, 2007
        WL 2903682, at \*10 (W.D.N.Y. Oct.1, 2007)
        (question of fact existed as to *de minimis* nature
        of Correction Officer Ekpe's keeplock confinement
        of plaintiff for one day, during which, according
        to the record evidence [specifically, Plf.'s Ex. 9],
        Correction Officer Ekpe "may have ... deprived
        [plaintiff] of meals") [citations omitted]; *see also
        Keesh v. Goord,* 04-CV-0271, Verified Complaint,
        ¶ "IV.W." (W.D.N.Y. filed Apr. 7, 2004) (swearing
        that Def. Ekpe and officials "refused to provide me
        with my meal").

53      *See, e.g., Auleta v. LaFrance,* 233 F.Supp.2d
        396, 402 (N.D.N.Y.2002) (Kahn, J.) ("At this
        stage of this action [i.e., the pleading stage],
        Plaintiff's claim that he was placed in keeplock
        for 7½ days is properly construed as alleging
        adverse action") [citations omitted]; *Bartley v.
        Collins,* 95-CV-10161, 2006 U.S. Dist. LEXIS
        28285, at \*22, 2006 WL 1289256 (S.D.N.Y.
        May 12, 2006) ("Collins's second misbehavior
        report against plaintiff did constitute adverse action
        because it caused plaintiff to be placed in keeplock
        confinement for ten days.") [citations omitted];
        *Wells v. Wade,* 96-CV-1627, 2000 WL 1239085,
        at \*4 (S.D.N.Y. Aug.31, 2000) ("[A] rational trier
        of fact could find that the filing of a frivolous
        misbehavior report that resulted in thirteen days
        of pre-hearing 'keeplock' confinement would be
        likely to chill a person of ordinary firmness from
        continuing to engage in activity protected by
        the First Amendment: namely, pursuing a prison
        grievance.") [internal quotations omitted].

I have also found some cases in which a plaintiff was taken
to a Special Housing Unit ("S.H.U."), as was Plaintiff in
the current action. [54] These cases suggest that, generally,
a *transfer* to a housing unit may be a type of adverse
action that is more than *de minimis.* [55] However, these cases

too appear to be somewhat distinguishable because they invariably involve a formal *transfer* (i.e., change in residence) to a Special Housing Unit for a long period of time. [56]

54      (*See* Dkt. No. 43, Part 11, ¶ 12 [Defs.' Rule 7.1 Statement, asserting that Plaintiff was "place[d] in administrative segregation status in the Special Housing Unit ... at Ulster Correctional Facility...."]; Dkt. No. 43, Part 9, ¶¶ 8, 10 [O'Keefe Decl., stating that "I was directed to have the plaintiff taken to SHU on administrative segregation status ..." and "plaintiff was placed in the SHU on March 12, 2004 ..."].)

55      *See Allah v. Poole,* 506 F.Supp.2d 174, 187 (W.D.N.Y.2007) ( "C]ourts have held that transfers to other facilities or housing units can satisfy the adverse-action requirement ....") [collecting cases]; *Chavis v. Struebel,* 317 F.Supp.2d 232, 238-39 (W.D.N.Y.2004) ("[T]ransferring an inmate to another housing unit or to a psychiatric facility ... satisfies the adverse action requirement.") [citations omitted].

56      *See, e.g., Walker v. Pataro,* 99-CV-4607, 2002 WL 664040, at *8-9 (S.D.N.Y. Apr.23, 2002) (question of fact exists as to *de minimis* nature of permanent transfer to different housing unit in general population, which resulted in loss of higher-paying prison job).

**\*12** Here, there was no long-term transfer to the Ulster C.F. S.H.U. Rather, Plaintiff was taken to the Ulster C.F. S.H.U. (during his transportation through Ulster C.F.) for what was intended to be, and what Plaintiff *understood* would be, a brief period of time. [57] There is no admissible record evidence that Defendants *knew* the duration of, or (allegedly) substandard conditions of, the confinement that Plaintiff would ultimately experience in the Ulster C.F. S.H.U. [58] Moreover, there is no admissible record evidence that Plaintiff ended up staying in S.H.U. for six days *because of* the acts of Defendants O'Keefe or Craft (or any Defendant). [59] Rather, the admissible record evidence suggests that the delay in Plaintiff's release from S.H.U. was caused by (1) the delay of the Inmate Records Coordinator in reviewing Plaintiff's file (presumably in DOCS' Central Files) to determine whether he was correctly stating that he had an exemption for his beard, and/or perhaps (2) Plaintiff's own delay in sending a letter to

his Administrative Segregation hearing officer regarding his release. [60]

57      (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing that "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed and it could be determined whether plaintiff was correctly stating that he had an exemption for his beard. The Inmate Records Coordinator was going to be the individual to check the records."]; Dkt. No. 43, Part 3, at 18, 22-23 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that, during the time in question, he was being "transported through Ulster [C.F.]" on his way back from "court appearances in New York City"]; Dkt. No. 43, Part 3, at 45 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter before March 17, 2004, "because I figure I would have been out of the box before this because they would have verified that I had a permit but apparently that didn't happen."].)

58      (Dkt. No. 43, Part 8, ¶¶ 7-11 [Craft Decl.]; Dkt. No. 43, Part 9, ¶¶ 8, 10-11 [O'Keefe Decl.]; Dkt. No. 43, Part 10, ¶¶ 10, 12-13 [Hodes Decl.]; Dkt. No. 43, Part 3, at 40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; *see also* Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 15 [stating, "Plaintiff posses[es] no information or knowledge" in response to Defendants' Rule 7.1 factual assertion that "[f]rom March 12, 2004 until March 17, 2004, none of [D]efendants w[as] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU"].) I note that the only role that Defendants O'Keefe and Craft played in Plaintiff's confinement to S.H.U. was in the initial decision to take Plaintiff to S.H.U.-Defendant O'Keefe recommending that Plaintiff be subject to Administrative Segregation, and Defendant Craft authorizing Plaintiff's pre-hearing confinement to Administrative Segregation. (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status...."]; Dkt. No. 9, at 18 [Ex. 1

to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., alleging that Def. Craft "failed to ... explain why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard...."]; Dkt. No. 43, Part 10, ¶ 10 [Hodes Decl., swearing, "I played no role in a decision to place plaintiff into administrative segregation in the Ulster SHU. That decision was made by others...."].)

59    (*See* Dkt. No. 43, Part 10, ¶ 12 [Hodes Decl., swearing, "Once plaintiff was placed in the SHU on March 12, 2004, I had no further contact with him."]; Dkt. No. 43, Part 9, ¶ 10 [O'Keefe Decl., swearing, "Once plaintiff was placed in the SHU on March 12, 2004, I had no further contact with him."]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl., swearing that, during Plaintiff's confinement to S.H.U., he had no involvement in the conditions of that confinement].)

60    (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "I was directed to have the plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed and it could be determined whether plaintiff was correctly stating that he had an exemption for his beard. The Inmate Records Coordinator was going to be the individual to check the records. ... ]; Dkt. No. 9, at 18 [Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft, indicating that Plaintiff would be "confined pending a determination on [the] recommendation," a hearing would "be conducted within 14 days of [the] recommendation," and that Plaintiff could "write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement"]; Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter before March 17, 2004, "because I figure I would have been out of the box before this because they would have verified that I had a permit but apparently that didn't happen. And, so, ... I wrote that letter

to [the Lieutenant or Hearing Officer who would be conducting his Administrative Segregation Hearing] and I gave it to the Officer for mailing."].)

As a result, I find some guidance in a case from the U.S. District Court for the Western District of New York that recently recognized the rather common-sense point of law that, when considering whether or not adverse action is *de minimis* for purposes of a First Amendment retaliation claim, it is appropriate for a court to focus on the adverse action *caused by the defendant or defendants in question* (rather than whatever bad things happened to the plaintiff following the taking of adverse action by the defendant or defendants). In *Coleman v. Sutton,* a prison doctor transferred a prisoner to the prison's infirmary, where-because of the prisoner's own refusal to stay in the infirmary-he was then transferred to the prison's Special Housing Unit. *Coleman v. Sutton,* 530 F.Supp.2d 451, 452-53 (W.D.N.Y.2008). The Western District held that the prisoner's transfer to S.H.U. was not sufficiently adverse to constitute adverse action (for purposes of the prisoner's First Amendment retaliation claim against the correctional officer) since that transfer was caused not by the correctional officer but by the plaintiff's own refusal to stay in the prison's infirmary. *Coleman,* 530 F.Supp.2d at 453.

Here, as in *Coleman,* while Plaintiff's *initial placement* in S.H.U. was caused by Defendants O'Keefe and Craft, Plaintiff's stay there *for six days* was caused not by those Defendants but by other events. Under the circumstances, I can find no record evidence that Plaintiff's being taken to S.H.U. pending the Ulster C.F. Inmate Records Coordinator's review of Plaintiff's file (to determine whether he was correctly stating that he had an exemption for his beard) was an action that was sufficiently adverse to deter a similarly situated individual of ordinary firmness from exercising his constitutional rights (i.e., by continuing to wear a beard of more than an inch in length as a tenet of his Rastafarian religion).

 **\*13** For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's First Amendment retaliation claim because he has failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature.

### D. Whether, in the Alternative, Plaintiff's Claims Against Defendants Goord and Craft Should Be Dismissed Because Plaintiff Has Failed to

2008 WL 3884369

### Establish that They Were Personally Involved in the Constitutional Violations Alleged

Because I have already concluded that no constitutional violations occurred in which any Defendant (including Defendants Goord and Craft) could have been personally involved, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against Defendants Goord and Craft be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged. However, in the interest of thoroughness, I will analyze that argument (and assume, for the sake of argument, that constitutional violations did occur in which they could have been personally involved).

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[61] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[62] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[63] In other words, supervisory officials may not be held liable merely because they held a position of authority.[64] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing or supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring.[65]

[61]   *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

[62]   *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

[63]   *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

[64]   *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

[65]   *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007) (setting forth five prongs); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (setting forth four prongs).

### 1. Defendant Goord

In their Rule 7.1 Statement, Defendants have asserted that "Defendant Goord was not personally involved in any of the actions that lead to the plaintiff's confinement in the Ulster Correctional Facility SHU from March 12, 2004 until March 17, 2004," supporting that assertion with a record citation. (Dkt. No. 43, Part 11, ¶ 23 [Defs.' Rule 7.1 Statement, citing pages 28-29 of Plaintiff's depo. trans.].) Setting aside the fact that Defendants' assertion is too much like a conclusion of law, I find that the deposition transcript to which they cite does not go so far as to say that Defendant Goord "was not personally involved" in the constitutional violations alleged. (Dkt. No. 43, Part 3, at 28-31 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

 **\*14**  Rather, fairly and reasonably read, Plaintiff's deposition transcript says that Defendant Goord's involvement was limited to the fact that (1) he had (presumably) created two conflicting rules and/or policies (i.e., a rule or policy requiring a prisoner to physically possess on his person his written beard-exemption during a prison transfer and a rule or policy prohibiting the prisoner from physically possessing property on their person during a prison transfer), and (2) he had (presumably) failed to property instruct or train his subordinates as to how to resolve that conflict without violating the prisoner's rights. (*Id.*) Clearly, this is meant to assert that Defendant Goord was personally involved through the third and fourth means of personal involvement described above-(1) the creation, or allowed continuance, of a policy or custom under which the violation occurred, and/or (2) gross negligence in the managing or supervising of subordinates who caused the violation.

2008 WL 3884369

However, Defendants are correct that Plaintiff's deposition testimony contains no evidence of any other of the five sorts of personal involvement described above-(1) direct participation in the alleged constitutional violation, (2) a failure to remedy the violation after being informed of it through a report or appeal, or (3) the exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. Therefore, having established this specific fact for purposes of their summary judgment motion, Defendants were entitled to have the fact either admitted by Plaintiff or denied by him with an accurate record citation. N.D.N.Y. L.R. 7.1(a)(3). Plaintiff denies the assertion. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 23.) However, the only "evidence" he cites in support of that denial are those portions of his Amended Complaint, Opposition to Defendants' Motion to Dismiss for Failure to State a Claim, and Objections to my previous Report-Recommendation, wherein he "charge[d]" Defendant Goord with "actions" and "inactions" causing Plaintiff's injuries. (Id.)

Such a general citation is not the "specific citation to the record where the factual issue arises" that is required by Local Rule 7.1(a)(3). As a result, the Court need not, and I recommend that it decline to, sua sponte sift through the 52 pages of Plaintiff's verified Objections to my previous Report-Recommendation in a quest for a specific factual assertion by Plaintiff that Defendant Goord was personally involved in one of the three ways described in the previous paragraph of this Report-Recommendation. (Among other things, the chance of Plaintiff having personal knowledge of such facts is extremely unlikely, in light of his other allegations.) Furthermore, Plaintiff's Opposition to Defendants' Motion to Dismiss does not constitute evidence because it was not verified. (Dkt.Nos.22.) Finally, his Amended Complaint generally may constitute evidence since it is verified. (Dkt. No. 9.) However, the portion of his Amended Complaint in which he refers to Defendant Goord (in a footnote in Paragraph "7.D.") is not sufficiently specific as to Defendant Goord's "actions and inactions" to constitute admissible evidence based on personal knowledge to successfully oppose a motion for summary judgment. See Fed.R.Civ.P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge ...."); see also, supra, notes 33-34 of this Report-Recommendation.

**\*15** As a result, Plaintiff has effectively admitted the narrowed fact described above-that there contains no record evidence that Defendant Goord (1) directly participated in

the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, or (3) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. I will turn, then, to Plaintiff's theory that Defendant Goord was personally involved because he (1) created, or allowed to continue, a policy or custom under which the violation occurred, and/or (2) was grossly negligent in the managing or supervising of subordinates who caused the violation.

Plaintiff points to no admissible record evidence of a *DOCS-wide* rule or policy, created or promulgated by Defendant Goord, prohibiting the prisoner from physically possessing property on their person during a prison transfer. (Dkt. No. 48, at 17-18 [Pages 16 and 17 of Plf.'s Response Mem. of Law].) Nor does Plaintiff point to any admissible record evidence of a DOCS-wide rule or policy, created or promulgated by Defendant Goord, requiring a prisoner to physically possess *on his person* his written beard-exemption during a prison transfer. (Id.) [66] Nor does Plaintiff point to any record evidence that Defendant Goord failed to properly instruct or train his subordinates as to how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights. (Id.) [67] The only "evidence" that Plaintiff has is (1) the fact of Defendant Goord's position as the "boss of Corrections," [68] and the (2) occurrence of the (presumed) violation in question. (Id.) This sort of liability (premised on the theory that a supervisor must have been liable because his subordinate did something wrong) is precisely the sort of *respondeat superior* liability that is not allowed under 42 U.S.C. § 1983.

[66]    I note that the written beard-exemption in question, issued by Deputy Commissioner Lucien J. Leclaire, Jr., on December 8, 2003, merely states, "This letter should be retained by you and will serve as your statewide beard and mustache exemption permit." (Dkt. No. 43, Part 6.)

[67]    For example, Plaintiff points to no admissible record evidence that incidents such as the one at issue in this action had previously occurred and been brought to Defendant Goord's attention, or that he had otherwise known of a need to instruct correctional officers on how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without

violating the prisoner's rights. In addition, I note that defense counsel asked Plaintiff in his deposition, "Do you have any evidence or reason to believe that Commissioner Goord instructs Officers not to walk ten feet away to check a draft bag to determine if the permit is available in that draft bag [as Plaintiff asserts it was in this circumstance]" (Dkt. No. 43, Part 3, at 30 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) In pertinent part, Plaintiff responded, "I don't know exactly what he instructs them...." (*Id.*)

68      (Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

### 2. Defendant Craft

In their Rule 7.1 Statement, Defendants have asserted the following facts, in pertinent part: (1) "[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft was not] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU"; (2) "[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft had no] interaction with [Plaintiff] while he was in the Ulster Correctional Facility SHU"; (3) "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 until March 17, 2004"; (4) "Plaintiff did not write to [D]efendant Craft requesting to be released from the Ulster Correctional Facility SHU until March 17, 2004"; (5) "Defendant Craft never received [P]laintiff's March 17, 2004 letter"; and (6) "[o]n the same morning that [P]laintiff wrote to [D]efendant Craft, [P]laintiff was in fact released from the Ulster Correctional Facility SHU and was transported back to Wyoming Correctional Facility." (Dkt. No. 43, Part 11, ¶¶ 14-15, 19-22 [Defs.' Rule 7.1 Statement].) Moreover, Defendants have supported each factual assertion with one or more accurate record citations. (*Id.*)[69]

69      In an apparent typographical error, I note that Defendants mistakenly cited Paragraphs 8 through 10, rather than Paragraph 11, of Defendant Craft's declaration in support of the first factual assertion listed above. (*See* Dkt. No. 43, Part 11, ¶ 15 [Defs.' Rule 7.1 Statement]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl .].)

**\*16** In his Rule 7.1 Response, Plaintiff states "[d]eny" with regard to each of the six factual assertions listed above. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶¶ 14-15, 19-22.) However, Plaintiff's assertions following each of these "denials" render

the denials ineffective for purposes of Local Rule 7.1(a)(3), which requires that, in order to successfully controvert a fact asserted in a Statement of Material Facts, the non-movant must, among other things, (1) "specifically controvert[ ]" the facts in question, and/or (2) "set forth a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 7.1(a) (3).

In particular, with regard to the first factual assertion, Plaintiff acknowledges that he "possesses no information or knowledge to respond [to that assertion]." (*Id.* at ¶ 15.) With regard to the second factual assertion, Plaintiff states only that Defendant *O'Keefe* spoke to an unidentified correction officer in the Ulster C.F. S.H.U. on March 12, 2004, and in any event Plaintiff provides no record citation in support of this assertion. (*Id.* at ¶ 14.) With regard to the third factual assertion, he effectively *admits* that assertion, stating, "Plaintiff never spoke to Defendant Craft." (*Id.* at ¶ 19.)[70] He also effectively admits the fourth factual assertion, stating that he did not write the letter in question until March 17, 2004. (*Id.* at ¶ 20.)[71] With regard to the fifth factual assertion, he again acknowledges that he "possesses no information or knowledge to respond [to that assertion]." (*Id.* at ¶ 21.)

70      Apparently, Plaintiff takes issue with only the word "until" in the factual assertion contained in Paragraph 19 of Defendants' Rule 7.1 Statement, which he interprets as implying that Plaintiff did in fact speak to Defendant Craft on March 17, 2004. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 19.) If so, I find that this controversy can be eliminated by simply construing Defendants' factual assertion as reading "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 *through* March 17, 2004," which is clearly the fact that Defendants are intending to assert. (*See* Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 43, Part 8, ¶¶ 8-10 [Craft Decl.] .)

71      Again, apparently, Plaintiff takes issue with only part of the factual assertion in question, asserting that he addressed the letter to the "Lt./Hearing Officer," and not to Defendant Craft. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 20.) If so, I find that he cites no record evidence controverting his deposition testimony that he *intended* the letter to go to Defendant Craft. (Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating, "I ... did write the Lieutenant

Craft. I don't ... think at the time I remembered his name. But Sergeant O'Keefe did mention ... Lieutenant Craft.... I don't think I wrote Lieutenant Craft specifically. But, I did write [the letter to the] Lieutenant because I knew it was a Lieutenant.".) In any event, I find that any factual dispute about this narrow issue is immaterial, since the crux of Defendants' factual assertion is clearly that Plaintiff did not write a letter to Defendant Craft requesting to be released from the S.H.U. until March 17, 2004, *if ever.*

Finally, with respect to the sixth factual assertion, Plaintiff appears to take issue with only part of the factual assertion in question, asserting that he was not transported back to *Wyoming Correctional Facility* but was "placed on a DOCS bus toward *Auburn Correctional Facility." (Id.* at ¶ 22 [emphasis added].) For the sake of brevity, I will set aside the evidentiary insufficiency of the documents on the docket to which Plaintiff cites in support of partial denial. (*Id.*) Rather, I find that the limited fact that Plaintiff is denying is immaterial to Defendants' motion and thus can be disregarded by the Court.

As a result, pursuant to Local Rule 7.1(a)(3), the following five facts are undisputed for purposes of Defendants' motion: (1) from March 12, 2004, until March 17, 2004, Defendant Craft was not responsible for the conditions of the Ulster C.F. S.H.U. while Plaintiff was in that S.H.U.; (2) from March 12, 2004, until March 17, 2004, Defendant Craft had no interaction with Plaintiff while he was in the Ulster C.F. S.H.U.; (3) Plaintiff never spoke to Defendant Craft from March 12, 2004, through March 17, 2004; (4) Plaintiff did not write to Defendant Craft requesting to be released from the Ulster C.F. S.H.U. until March 17, 2004, if ever; (5) Defendant Craft never received Plaintiff's March 17, 2004, letter; and (6) on the same morning that Plaintiff wrote his March 17, 2004, letter, Plaintiff was in fact released from the Ulster C.F. S.H.U.

**\*17** Based on these undisputed facts, and based on the lack of record evidence establishing any involvement of Defendant Craft in the conditions of confinement that Plaintiff experienced in the Ulster C .F. S.H.U., I find that no rational fact-finder could conclude that Defendant Craft was personally involved in the Eighth Amendment violation alleged by Plaintiff. [72] I make the same finding with regard to Plaintiff's Fourteenth Amendment due process claim because (even assuming Plaintiff possessed a right of procedural due process arising from his six-day confinement

in S.H.U.) he was afforded all the process that was due from Defendant Craft under the circumstances in that (1) no record evidence exists that Plaintiff did not properly receive notice of the Administrative Segregation Recommendation, [73] and (2) Plaintiff was entitled to a hearing only within *14 days* of Defendant O'Keefe's signing of the Administrative Segregation Recommendation on March 12, 2004. [74] However, I have trouble making the same finding with regard to Plaintiff's First Amendment retaliation claim, because record evidence exists that Defendant Craft was the individual who signed the Administrative Segregation Recommendation (submitted by Defendant O'Keefe on March 12, 2004) authorizing Plaintiff's confinement in S.H.U. pending a hearing to be conducted within 14 days of the recommendation. [75]

[72]   I note that, as I stated in Part III.B.2. of this Report-Recommendation, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

[73]   (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, containing paragraph at bottom labeled, **"Notice to Inmate"**] [emphasis in original]; *cf.* Dkt. No. 43, Part 3, at 27-28, 45 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating that, before Plf. was brought to the Ulster C.F. S.H.U., Def. Craft orally informed Plf. to write to Def. Craft if he "wanted to get out of the box or not go in the box"].)

[74]   (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, stating, in pertinent part, "A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V."]; Dkt. No. 43, Part 8, ¶ 3 [Craft Decl.].) *See also* 7 N.Y. Comp.Codes R. & Regs. § 301.4(a) ("This hearing [conducted pursuant to Part 254] shall be conducted with 14 days of an inmate's admission to administrative segregation, after issuance of an administrative segregation

recommendation made by the employee who ascertained the facts or circumstances.").

[75]      (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; *cf.* Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., asserting that Def. Craft "failed to ... see why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard...."]; Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status...."].)

For these reasons, I recommend, in the alternative, as follows: (1) that all of Plaintiff's claims against Defendant Goord be dismissed because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged; and (2) that only Plaintiff's Eighth and Fourteenth Amendment claims be dismissed against Defendant Craft because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged.

### E. Whether, in the Alternative, Plaintiff's Claims Against all Defendants Should be Dismissed Because, Based on the Current Record, They Are Protected from Liability by the Doctrine of Qualified Immunity, as a Matter of Law

Because I have already found that adequate grounds exist upon which to recommend the dismissal of Plaintiff's claims, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against all Defendants should be dismissed because, based on the current record, Defendants are protected from liability by the doctrine of qualified immunity, as a matter of law. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].) As a result, I do not analyze Defendants' argument other than to make one point.

In my Report-Recommendation of January 30, 2007, addressing Defendants' motion to dismiss for failure to state a claim, I stated, "I believe that a credible argument might be made by Defendants that the law [as to whether a DOCS-issued exemption from the one-inch beard rule was effective, or whether a court order was required] was not clearly

established [on March 12, 2004], giving rise to a qualified immunity defense." (Dkt. No. 24, at 31-32 & nn. 84-84.) As explained in that Report-Recommendation, I made that statement based on the case of *Young v. Goord,* in which the U.S. District Court for the Eastern District of New York traced the "alternat[ing]" law between November 16, 1993, and February 5, 2001, with regard to whether a DOCS "exemption" or a "court order" was necessary to excuse an inmate from the effects of DOCS' one-inch beard rule. *Young v. Goord,* 01-CV-0626, 2005 WL 562756, at *2-6 (E.D.N.Y. March 10, 2005), *aff'd,* 192 F. App'x 31 (2d Cir. Aug 2, 2006) (unpublished decision cited only to show case's subsequent history). In their argument regarding qualified immunity, Defendants have cited no case after *Young,* suggesting that the law continued to alternate after February 5, 2001. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].) [76] As a result, I have no reason to believe that that point of law was not clearly established by March 12, 2004.

[76]      Indeed, *Young* stated that the DOCS Directive issued on February 5, 2001, "remain[s] in force" as of the date of the decision, which was March 10, 2005. *Young,* 2005 WL 562756, at *6.

### F. Whether, in the Alternative, Plaintiff's Action Should Be Dismissed Under Local Rule 41.2(b) Because of His Failure to Keep the Court Apprised of His Current Address

**\*18** Defendants argue that, in the alternative, Plaintiff's action should be dismissed under Local Rule 41.2(b) because (1) he was released from DOCS' custody on November 13, 2007, (2) since November 13, 2007, and the date of Defendants' motion, January 23, 2008, Plaintiff had failed to notify the Court of his current address, and (3) this failure has caused the Court's mail to Plaintiff (specifically, the Court's receipt of Plaintiff's partial payment of the Court filing fee) to be returned as undeliverable on November 20, 2007. (Dkt. No. 43, Part 12, at 17-18 [Defs.' Mem. of Law; Dkt. No. 43, Part 11, ¶ 26 [Defs.' Rule 7.1 Statement].) Defendants are correct in the above recitation of events. Indeed, an additional mailing from the Court to Plaintiff was returned as undeliverable on January 7, 2008, due to Plaintiff's failure to promptly notify the Court of his change in address upon release from DOCS. (Dkt.Nos.42.)

However, on January 17, 2008, Plaintiff resurfaced in the Bergan County Jail in Hackensack, New Jersey, and by letter notified the Court of his change in address. (Dkt. No. 45.) In his letter, Plaintiff explained that, immediately

upon his release from DOCS, he was taken into custody by the Department of Homeland Security and "placed in [i]mmigration proceedings," wherein he was (allegedly) denied access to his legal work and materials necessary to write to the Court. (*Id.*) Plaintiff repeats these assertions in his sworn declaration in opposition to Defendants' motion. (Dkt. No. 48, Plf.'s Decl. in Opp., ¶¶ 2-4.) Defendants have submitted no reply to Plaintiff's response. In addition, I can find only minimal prejudice to the Court and Defendants due to Plaintiff's two-month delay, under the circumstances.

For these reasons, I find that Plaintiff's two-month failure to keep the Court notified of his current address is not an appropriate ground upon which to dismiss his Amended Complaint. Rather, Plaintiff's Amended Complaint should be dismissed for the reasons (and alternative reasons) discussed above in Parts III.A. through III.D. of this Report-Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 43) be *GRANTED*.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a) (2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance.** [77]

[77]    *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of*

*Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee* *also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 3884369

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

KeyCite Yellow Flag - Negative Treatment
Disagreement Recognized by   Curry v. Kerik,   S.D.N.Y.,   April 10, 2001

1998 WL 146688
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rufus GIBSON, Plaintiff,

v.

The City of New York; Warden Ortiz; Deputy
Warden Edwin Knight; Deputy Warden Clyton
Eastmond; John Doe Area Captains (of assigned
posts at times of violations of Block 5 South in Otis
Bantum Correctional Center CPSU); John Doe Captain
(Badge # 878); and John Doe Official, Defendants.

No. 96 CIV. 3409(DLC).
|
March 25, 1998.

**Attorneys and Law Firms**

Rufus Gibson, Pro Se, Fishkill Correctional Facility, Beacon.

Jeffrey Friedlander, Esq., Acting Corporation Counsel for
the City of New York, New York, By Renee Nebens, Esq.,
Assistant Corporation Counsel.

OPINION AND ORDER

COTE, District J.

 **\*1** On May 9, 1996, Rufus Gibson ("Gibson") filed this
action pursuant to Section 1983 claiming that the defendants
had violated his Fourteenth Amendment rights while he was
a pretrial detainee, by subjecting him to unconstitutional
conditions of confinement and by depriving him of due
process prior to a disciplinary confinement.[1] On May 9,
1996, Chief Judge Griesa, to whom this case was then
assigned, ordered Gibson to file an amended complaint within
sixty days with more specific information to show why he is
entitled to relief. On May 23, 1996, the plaintiff filed a slightly
more detailed complaint (the "First Amended Complaint"),
which was accepted by the Court as meeting the requirements
of the May 9, 1996 Order. On March 4, 1997, the defendants
filed a motion to dismiss the First Amended Complaint
for failure to state a claim.[2] At a March 7, 1997, pretrial

conference held on the record, the Court allowed the plaintiff
to either oppose that motion or further amend his complaint.
On April 7, 1997, the plaintiff filed a Second Amended
Complaint which contained more detail and which changed
the named defendants to those listed in the caption of this
Opinion and Order. The defendants now move to dismiss the
Second Amended Complaint for failure to state a claim and
the plaintiff moves for the entry of a default judgment against
defendant Robert Ortiz ("Ortiz").[3] For the reasons stated
below, the motion to dismiss is granted in part and denied in
part and the motion for entry of a default judgment is denied.

[1]   Gibson has since been convicted and transferred to
the custody of the New York State Department of
Corrections.

[2]   The motion to dismiss the First Amended
Complaint was made on behalf of defendants
named in that pleading: the New York
City Department of Correction Otis Bantum
Correctional Facility, Warden Ortiz, and Deputy
Warden Edwin Knight.

[3]   The instant motion was originally made solely on
behalf of the City of New York. After having
been served with the Second Amended Complaint
in July 1997, defendants Clyton Eastmond and
Edwin Knight joined in the motion. On September
23, 1997, the plaintiff moved to have a default
judgment entered against Robert Ortiz, who
had also been served in July 1997, but who
had not filed an answer. On October 7, 1997,
Assistant Corporation Counsel Renee Nebens filed
a declaration seeking to have Robert Ortiz join
in the instant motion. For the reasons described
elsewhere in this Opinion, the October 7 request is
granted.

Background

The Court takes as true the facts as alleged in the Second
Amended Complaint. Beginning on or about February
10, 1996, Gibson was confined in the Central Punitive
Segregation Unit ("CPSU")[4] at Rikers Island for a period
of ninety days after a disciplinary hearing.[5] For the first
thirty days of Gibson's CPSU confinement, he was housed
at the James A. Thomas Center ("JATC") even though
JATC "was ordered closed due to high levels of asbestos,

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 303 of 380

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

insect infestation and possibly lead paint" and "the general population inmates were moved to other buildings." On March 10, 1996, the CPSU was moved to the Otis Bantum Correctional Center ("OBCC"). While Gibson was housed in OBCC CPSU between March 10 and May 16, 1996, he was denied access to recreation on eight occasions (March 10, 11, and 14, April 3, 13, 20, and 22, and May 4), denied access to the law library on four occasions (March 27, 28, and 29, and April 10), denied access to a religious service on March 15, and required to choose between access to recreation and the law library on April 18 and between access to recreation and the barber shop on April 19. Gibson states that he reported each deprivation to defendants Deputy Warden Edwin Knight ("Knight") and Deputy Warden Clyton Eastmond ("Eastmond"), both of whom failed to intervene or prevent the recurrence of these deprivations. In addition, the plaintiff alleges that Ortiz was aware of the problems because Knight and Eastmond reported to him.

4    The defendants explain that the CPSU is the housing area at Rikers Island where inmates who have been disciplined for rules' infractions are housed.

5    The plaintiff does not say when his confinement in CPSU began or for what offense he was confined. The Court has inferred the date on which Gibson's confinement began from the other events for which the plaintiff provides dates.

**\*2** Gibson also states that the defendants were deliberately indifferent to his condition as an asthmatic. During a slashing incident in the law library, a John Doe Captain and a corrections officer used a chemical agent (mace) in an attempt to subdue another inmate. While Gibson was not involved in the fight, he was present in the law library at the time and the exposure to the chemical agent triggered an asthma attack. Gibson returned to his cell and used his inhaler to stop the attack. Gibson complains that he was not asked by prison officials if he wanted to see a doctor and was not taken to the prison infirmary.

Finally, Gibson claims that his due process rights were violated during the procedure which had led to his confinement in CPSU. On May 1, 1996, after an Article 78 proceeding, the infraction for which Gibson was confined in CPSU was dismissed due to a "late warden signature." Gibson, however, was not released from CPSU for another fifteen days, that is, until May 16, 1996, his regularly scheduled release date. Gibson daily asked John Doe Area

Captains and Knight why he was being held beyond his confinement date. These individuals told Gibson that they had checked and had not received an order for his release.

### Standard for Motion to Dismiss

A court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." ' *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Koenig,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the motion, the court must take "as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *Jackson Nat. Life Ins. v. Merrill Lynch & Co.* 32 F.3d 697, 699–700 (2d Cir.1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of a cause of action.

When a plaintiff is proceeding *pro se,* the court must liberally construe the complaint. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 860 (2d Cir.1997). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Baker v. Cuomo,* 58 F.3d 814, 818 (2d Cir.1995).

### Discussion

The plaintiff's allegations form the basis for claims (1) that the defendants subjected him to conditions of confinement which violated his constitutional rights, (2) that the defendants interfered with his constitutional right for access to the courts, and (3) that the defendants violated his due process rights in connection with the procedures leading to his confinement in CPSU. The Court considers each of these claims in turn.

### I. *Conditions of Confinement*

Since the plaintiff was a pretrial detainee at the time of the alleged deprivations, his claims regarding the conditions of his confinement are governed by the Due Process Clause of the Fourteenth Amendment. *See Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Under the Due Process Clause, the state may subject a pretrial detainee to restrictions that are inherent to confinement in a detention facility so long as those conditions do not amount to punishment. *See Bell,* 441 U.S. at 536–7. "Not every disability

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 304 of 380

Gibson v. City of New York, Not Reported in F.Supp. (1998)
1998 WL 146688

imposed during pretrial detention amounts to 'punishment' in the constitutional sense ...." *Id.* at 537. The Supreme Court has stated that the issue is whether " 'the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." ' *Block v. Rutherford,* 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (quoting *Bell,* 441 U.S. at 538).

**\*3** While the Supreme Court has not provided specific guidance for determining when a pretrial detainee's rights have been violated, it has held that a person's Due Process rights regarding the conditions of confinement under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (citations omitted). *See Bryant,* 923 F.2d at 983; *Hayes v. New York City Dept. of Corrections,* 91 Civ. 4333, 1995 WL 495633 at \*5 (S.D.N.Y. Aug.21, 1995). The Supreme Court has articulated a two part test for determining whether an inmate has suffered an injury of a violation of his Eighth Amendment rights. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, there is an objective component which,

> [f]or a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a *substantial risk of serious harm.*

*Id.* (emphasis supplied). Second, there is a subjective component requiring that the prison official have a "sufficiently culpable state of mind," to wit, be deliberately indifferent to the harmful conditions. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In *Farmer,* the Court rejected an objective test for a defendant's deliberate indifference, and held instead

> that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards an excessive risk to inmate health or safety;* the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837 (emphasis supplied).

1. *Denial of Access to Recreation*

Gibson states that he was denied access to recreation on eight occasions and forced to choose between recreation and the law library or the barber shop on two other occasions. When the dates are compared, it appears that he was deprived on only one occasion of the opportunity for recreation on consecutive days—March 10 and 11. [6] While it is well-established that inmates have a right to exercise, *see Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996), the deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to constitute punishment under the Fourteenth Amendment. *See, e.g., Anderson v. Coughlin,* 757 F.2d 35, 36 (2d Cir.1985) (an occasional day without exercise during inclement weather is not cruel and unusual punishment); *Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997) (collecting cases under Eighth Amendment).

[6]    Gibson does not specify which option he chose when he was forced to choose between recreation and the law library or the barber shop. If he chose to forgo recreation on both of these occasions, it is possible that there were also three consecutive days when he did not have recreation—April 18, 19 and 20. This three day deprivation, however, would have been partially the result of a choice made by the plaintiff rather than solely the result of the defendants' actions.

2. *Denial of Religious Service*

Gibson alleges that he was denied access to a religious service on one occasion. This single deprivation is insufficient to state a deprivation that amounts to punishment. *See, e.g., Giglieri v. New York City Dep't of Corrections,* 95 Civ. 6853, 1997 WL 419250 at \*3 (S.D.N.Y. July 25, 1997) (duration is one factor to consider in determining whether a deprivation or condition violates a pretrial detainee's Fourteenth Amendment rights). *But see Cruz v. Jackson,* 94 Civ. 2400, 1997 WL 45348 at \*7

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 305 of 380

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

(S.D.N.Y. Feb.5, 1997) (denial of access to religious services for fifteen day period sufficient to state a claim).

### 3. *Medical Claim*

**\*4** Gibson further claims that he was denied adequate medical care when a corrections officer used mace to subdue another inmate while Gibson was in the vicinity. Specifically, Gibson complains that no officer asked him if he wanted to go to the infirmary after Gibson suffered an asthma attack. Gibson's allegations fail to meet either component of the test for a violation of his constitutional rights. While asthma may in some circumstances constitute a serious condition, Gibson promptly controlled his asthma attack with his inhaler and does not state that he suffered any further harm. Moreover, since the asthma was promptly controlled, corrections officers were not deliberately indifferent to his medical needs by failing to ask him if he wanted to go to the infirmary.

### 4. *Conditions at JATC*

Gibson alleges that during the thirty days he was confined at JATC before the CPSU was transferred to OBCC he was exposed to asbestos, insect infestation and perhaps lead paint. Further, he alleges that the CPSU remained at JATC for thirty days after a court order had closed the facility and after general population inmates had been transferred to different facilities. Gibson's allegations are sufficient to state a claim. First, Gibson's allegations regarding the conditions at JATC, coupled with the duration of his confinement there and the alleged existence of a court order closing the facility, are sufficient to describe a substantial risk of serious harm. Second, liberally construing the complaint, Gibson implies that the defendants were deliberately indifferent to that substantial risk because it took thirty days for the defendants to move the CPSU after a court order had closed JATC and after the general population inmates had been transferred.

### II. *Denial of Access to the Law Library*

The plaintiff alleges that on four occasions he was denied access to the law library and on another occasion he was forced to choose between the law library and recreation.[7] The Court understands the plaintiff to be complaining of interference with his constitutionally protected right of access to the courts. In order to state a claim for denial of access to the courts, "a plaintiff must demonstrate that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.' " *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir.1997)

(quoting *Lewis v. Casey,* 518 U.S. 343, ——, 116 S.Ct. 2174, 2179, 2180, 135 L.Ed.2d 606 (1996)). The actual injury requirement derives from the doctrine of standing. *Id.* Here, Gibson has not alleged that he was hindered in his efforts to pursue a legal claim. Given that the plaintiff has amended his complaint twice—once after the defendants' first motion to dismiss specifically raised this issue—and that the denial of access occurred at most five times in a sixty day period, the Court finds that granting the plaintiff further leave to amend regarding this allegation would be futile.

7    The plaintiff does not state which option he chose on this occasion.

### III. *Due Process Violation*

**\*5** Gibson claims that his due process rights were violated in two ways. First, there were procedural irregularities in the process by which he was first confined in the CPSU.[8] Second, he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The Second Circuit has stated that

8    Gibson identifies the procedural irregularity as a "late warden signature," but indicates that he requires discovery to determine the exact irregularity which caused the disciplinary decision to be revoked through the Article 78 proceeding.

[d]etermining whether an inmate has received due process involves "a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law." *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (quoting *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996) (ellipses in original)). To show a protected liberty interest arising from state law, an inmate must show that the restraint imposes an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The relevant factors which a court must consider to determine if a hardship is "atypical and significant" include:

(1) the effect of disciplinary action on the length of prison confinement; (2) the extent to

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 306 of 380

Gibson v. City of New York, Not Reported in F.Supp. (1998)

1998 WL 146688

which the conditions of the disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary segregation imposed compared to discretionary confinement.

*Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). *See also Sealey,* 116 F.3d at 52; *Brooks v. Di Fasi,* 112 F.3d 46, 49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997).

The Court will address the third factor—the duration of Gibson's confinement—first. The defendants, citing *Young v. Hoffman,* 970 F.2d 1154, 1156 (2d Cir.1992), argue that Gibson's first due process claim fails since his state challenge cured any procedural defect. Thus, they argue, Gibson was improperly confined for at most fifteen days. The Second Circuit has held, however, that

[t]he rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the prison officials responsible for the due process deprivation must respond in damages, absent the successful interposition of a qualified immunity defense.

*Walker v. Bates,* 23 F.3d 652, 658–59 (2d Cir.1994).[9] Thus, the Court properly considers the full ninety days in determining whether Gibson was deprived of a liberty interest.

[9]  While the Second Circuit has not discussed the issue resolved in *Walker* since the Supreme Court's decision in *Sandin,* the Circuit has been faced with fact patterns which indicate that it adheres to the analysis in *Walker. See, e.g., Wright,* 132 F.3d at 135 (plaintiff's 288 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action for damages); *Brooks,* 112 F.3d at 48 (plaintiff's 180 day sentence overturned by Article

78 proceeding and then followed by Section 1983 action).

While ninety days may not always be a significant deprivation, the Court is unable to determine based on the record now presented whether the duration of Gibson's disciplinary segregation—for either the full ninety day or the shorter fifteen day period—is similar to discretionary confinement of pretrial detainees. Similarly, the Court has no basis to make a determination of whether the conditions of disciplinary confinement differ from routine prison conditions—the second factor for consideration. At present, the record is clear as to only one factor, that is, the first factor. Gibson has not claimed that his confinement in CPSU in any way altered the term of his prison confinement.

**\*6** Assuming that Gibson's confinement in the CPSU implicated a protected liberty interest, he has stated a claim for a violation of his due process rights on only one of his two theories. As articulated in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Due Process Clause requires that prisoners be provided with written notice at least 24 hours prior to the hearing of the alleged violation of the disciplinary rules, a written statement indicating what evidence the fact-finder at the hearing relied upon and the reason for the disciplinary action taken, and, if institutional safety requires the omission of certain evidence, a statement indicating the fact of such omission. *Id.* at 564–65. Gibson has not alleged that he was deprived of any of the procedures required under *Wolff* at the proceeding for which he was initially confined in the CPSU. Moreover, if the defendants had failed to follow any of these procedures, Gibson would be aware of the deficiency and would not require discovery to state a claim. Thus, Gibson has failed to state a claim on his first theory. As to Gibson's second theory—that he was confined to the CPSU for fifteen days after the Article 78 proceeding vacated his disciplinary sentence—further factual development of the factors described above is required to determine whether fifteen days of disciplinary confinement for a pretrial detainee imposes an "atypical and significant hardship."

IV. *Motion for a Default Judgment*

Default judgments are governed by Rule 55, Fed.R.Civ.P. Rule 55(a) provides for entry of a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Rule 55(a), Fed.R.Civ.P. A court "[f]or good cause shown may set aside an entry of default." Rule 55(c),

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 307 of 380
Gibson v. City of New York, Not Reported in F.Supp. (1998)
1998 WL 146688

Fed.R.Civ.P. Although Rule 55(c) applies on its face to setting aside defaults already entered, the same analysis should be employed in evaluating opposition to entry of a default. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 243 (2d Cir.1994). The Second Circuit has stated that

> [g]ood cause depends upon such factors as the willfulness of the default, the prejudice the adversary would incur were the default set aside [or should the Court decline to enter it], and the merits of the defense proffered.

*In re Chalasani,* 92 F.3d 1300, 1307 (2d Cir.1996). In addition, the Court must keep in mind the "oft-stated preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993).

Here, Gibson asks the Court to enter a default judgment against Ortiz. Gibson has not shown that the default by Ortiz was willful. Ortiz joined the other defendants in moving to dismiss the *First* Amended Complaint. Only after the plaintiff filed and served a Second Amended Complaint did Ortiz neglect initially to join the motion to dismiss the Second Amended Complaint. Additionally, Gibson has not shown that he would suffer any prejudice from the Court declining to enter the default judgment against Ortiz. Finally, Ortiz may be able to interpose a successful defense; Gibson has not alleged that Ortiz was personally involved in the claims that survive the motion to dismiss. *See Sealey,* 116 F.3d at 51. [10]

[10]    While the defendants included in their motion to dismiss the First Amended Complaint an argument based on the plaintiff's failure to allege personal involvement, they have not included such an argument in the instant motion.

### Conclusion

**\*7** The defendants' motion to dismiss is granted on all claims, except the plaintiff's claims that he was subjected to unconstitutional conditions of confinement while housed in the JATC CPSU for thirty days and that he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The plaintiff's motion for the entry of a default judgment against defendant Ortiz is denied.

SO ORDERED:

### All Citations

Not Reported in F.Supp., 1998 WL 146688

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 308 of 380
George v. McGinnis, Not Reported in F.Supp.2d (2008)
2008 WL 4412109

2008 WL 4412109
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Llewellyn GEORGE, Plaintiff,

v.

McGINNIS, et al., Defendants.

No. 05–CV–84(Sr).
|
Sept. 23, 2008.

West KeySummary

1    **Civil Rights** 🔑 Criminal law enforcement;
     prisons

     **Summary Judgment** 🔑 Prisons and jails

     The inmate was not entitled to summary
     judgment on his cruel and unusual punishment
     claim because a genuine issue of material fact
     existed as to whether prison staff acted with
     deliberate indifference. The inmate asserted that
     he was deprived cell clean up privileges for three
     days, haircut privileges for six days, showers for
     thirteen days and exercise for twenty three days.
     The inmate also asserted that he was denied toilet
     paper, toothpaste, a toothbrush and soap for sixty
     days. The privileges and items were withheld
     because the inmate had a shampoo bottle full of
     feces in his cell. U.S.C.A. Const. Amend. 8.

     6 Cases that cite this headnote

**Attorneys and Law Firms**

Llewellyn George, Vahalla, NY, pro se.

Delia Dianna Cadle, NYS Attorney General's Office, Buffalo,
NY, for Defendants.

**ORDER**

H. KENNETH SCHROEDER, JR., United States Magistrate
Judge.

***DECISION AND ORDER***

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have
consented to the assignment of this case to the undersigned
to conduct all proceedings in this case, including the entry of
final judgment. Dkt. # 17.

Plaintiff, proceeding *pro se,* commenced this suit pursuant
to 42 U.S.C. § 1983 alleging that during his incarceration at
the Southport Correctional Facility, he was deprived of his
rights pursuant to the Eighth and Fourteenth Amendments
to the United States Constitution when he was issued a
deprivation order denying him exercise, haircuts, showers,
cell cleaning supplies, soap, toothpaste, a toothbrush, toilet
paper and hot water for sixty days after a shampoo bottle
containing feces was discovered in his cell and when the
Commissioner's Hearing Officer ("CHO"), denied his request
for confidential testimony from his mental health social
worker during the course of a prison disciplinary hearing
regarding the discovery of that contraband. Dkt. # 1.

Currently before the Court is plaintiff's motion to compel
(Dkt.# 30); plaintiff's motion for summary judgment (Dkt.#
33); and defendants' motion for summary judgment. Dkt. #
34. For the following reasons, plaintiff's motion to compel
is granted in part and denied in part; plaintiff's motion for
summary judgment is denied; and defendant's motion for
summary judgment is granted in part and denied in part.

***BACKGROUND***

On November 20, 2004, during a random inspection
of plaintiff's cell, Corrections Officer ("CO"), P. Furney
discovered a shampoo container full of feces and served
plaintiff with an inmate misbehavior report charging him with
violating prison rule 118.22 (unhygienic act). Dkt. # 36, p.
10. Rule 118.22 of DOCS' Institutional Rules of Conduct
provides that:

> An inmate shall not commit an
> unhygienic act such as spitting,
> urinating or defecating on the floor or
> any other area; propelling urine, feces,

bodily fluids, water, or food; or storing urine, feces or bodily fluids.

7 N.Y.C.R.R. § 270.2. Upon the recommendation of Sergeant Casle, plaintiff was subjected to a cell shield order and deprivation order commencing November 20, 2004. Dkt. # 19, pp. 50 & 55. The deprivation order denied plaintiff exercise, haircuts, showers and cell clean-up privileges. Dkt. # 19, p. 55.

By letter dated November 21, 2004, plaintiff complained that subsequent to the cell search, he was transferred to a cell which was "filthy" with "dried up urine, dust, and other unidentified filth in the sink and toilet." Dkt. # 20, p. 23. Plaintiff also complained that the cell floor was disgusting. Dkt. # 20, p. 23. Plaintiff requested that he be provided with the proper materials to clean his cell, especially disinfectant to clean the sink and toilet. Dkt. # 23, p. 24. Plaintiff also questioned the shower and exercise deprivation order and his placement in a cell with a cell shield. Dkt. # 20, p. 23.

On November 22, 2004, the cell shield order was renewed until November 28, 2004 because plaintiff "had a shampoo bottle full of feces in his cell." Dkt. # 20, p. 39.

*2 By Memorandum dated November 23, 2004, Deputy Superintendent for Security Services, P. Chappius, Jr., advised plaintiff that he had decided to restore plaintiff's cell clean-up privileges effective that day and would continue to review his deprivation order on a daily basis. Dkt. # 20, p. 22.

The cell shield order was renewed from November 29, 2004 through December 5, 2004. Dkt. # 20, p. 40.

By letter dated November 30, 2004, plaintiff advised Deputy Superintendent Chappius that he had received his letter informing him that his cell clean-up privileges were being restored, but complained that "it's been seven days and I am still being denied cell cleaning supplies to clean up the stale urine and other filth in my cell." Dkt. # 1–2, p. 13.

Plaintiff's Tier III disciplinary hearing commenced on December 2, 2004. Dkt. # 36, p. 14. Superintendent McGinnis authorized Lt. Kerbein to conduct the hearing. Dkt. # 36, p. 14. Plaintiff did not deny that he possessed the shampoo container of feces in his cell. Dkt. # 20, p. 8. Rather, he explained that he was having difficulty with other inmates throwing feces, coffee and food in his cell and had discussed

the problem with his mental health social worker, Ms. Fuller, who spoke with prison security and advised plaintiff to write a letter to Sergeant Manos. Dkt. # 20, p. 9. Before he could do so, an inmate attempted to spray his cell and he grabbed the container from that inmate. Dkt. # 20, pp. 8–9. Plaintiff stated that he kept the bottle in his cell so that he would be able to prove that other inmates were throwing feces into his cell when he spoke to Sergeant Manos. Dkt. # 20, p. 10. He indicated that the container had been in his cell for two or three days before it was discovered by CO Furney. Dkt. # 20, p. 11.

Plaintiff requested Sergeant Manos and Mrs. Fuller as witnesses during his disciplinary hearing. Dkt. # 20, p. 9. Plaintiff advised Lt. Kerbein that he had informed Mrs. Fuller that he had grabbed the shampoo container of feces from the inmate who was attempting to spray his cell, but Mrs. Fuller was unable to comment on her conversation with plaintiff without a "confidential tape." Dkt. # 20, pp. 13–15. However, she did state that "if there was any type of security concern that I had that effected [sic] the security of this facility I would bring that to the Sergeant[']s attention." Dkt. # 20, p. 17. Plaintiff volunteered to sign a release waiving confidentiality of his conversations with Mrs. Fuller, but Lt. Kerbein determined that any discussion plaintiff may have had with Mrs. Fuller as to how or why he came to possess the shampoo container was irrelevant given that the very act of possessing a container filled with feces was a violation. Dkt. # 20, p. 18. Lt. Kerbein denied permission to call Sergeant Manos because he could not provide any direct testimony regarding the incident. Dkt. # 36, p. 13. Lt. Kerbein accepted plaintiff's testimony that other inmates had been "throwing" on him. Dkt. # 20, p. 9.

*3 Lt. Kerbein found plaintiff guilty of the violation based upon the discovery of the shampoo container of feces in his cell and plaintiff's admission that he possessed it. Dkt. # 20, p. 20. Lt. Kerbein imposed a penalty of six months in SHU, with 3 months suspended. Dkt. # 36, p. 7. Plaintiff's appeal of the decision was affirmed by Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, on January 27, 2005. Dkt. # 36, p. 16.

The cell shield order was continued from December 6, 2004 through December 12, 2004. Dkt. # 20, p. 41.

On December 10, 2004, plaintiff filed a grievance challenging the deprivation orders and cell shield order. Dkt. # 20, p. 30. Specifically, plaintiff complained:

> It's been nineteen days since I have been deprived of my exercise, showers, toiletries and cell cleaning supplies, and hot water in my cell. The cell stinks, because there is old urine all over the toilet, and I am behind a cell shield twenty-four hours a day, without any exercise or fresh air. This is definitely a health hazard ... and [I] am being denied medical treatment. The officers have a "full shield hatch" at their disposal, so there is no logical excuse for them to deprive me of toiletries and cell cleaning supplies. As for the deprivation order on my showers and exercise, every prisoner on Level One are kept in mechanical restraints, the entire period they are out of their cells. So there is no reasonable excuse for the staff to deprive me of my showers and exercise. Further, I have attempted more than once to wash up in the sink, but sink [sic] is too filthy and the water is too cold.

Dkt. # 20, p. 32.

The cell shield order was continued from December 13, 2004 through December 19, 2004. Dkt. # 20, p. 42.

The Inmate Grievance Resolution Committee ("IGRC"), denied plaintiff's grievance on December 14, 2004 on the ground that

> Deprivation orders authorized by the Deputy Superintendent for Security or his designee and reviewed by same on a daily basis. IGRC has no power to supersede the DSS in security matters.

Dkt. # 20, p. 31.

The cell shield order was discontinued on December 20, 2004. Dkt. # 20, p. 43.

Plaintiff appealed the IGRC's determination to the Superintendent, who denied plaintiff's request on December 21, 2004 on the ground that the deprivation orders were issued for legitimate security reasons as set forth in Directive 4933, section 305.2. Dkt. # 20, p. 34.

By letter dated December 23, 2004, plaintiff advised Captain Sheahan, the Acting Deputy Superintendent of Security, that

> Up to this current date, I am still being deprived of my showers, exercise, cell clean-up supplies, soap, toothpaste, toothbrush, and toilet paper. And the officers and area supervisors are still refusing to turn on the hot water in my cell. Apparently, the deprivation orders have not been discontinued, as you have stated. Please look into this matter.

Dkt. # 1–2, p. 5.

Plaintiff appealed the Superintendent's determination to the Central Office Review Committee ("CORC"), which denied plaintiff's appeal on February 16, 2005 and issued the following decision:

> *4 CORC notes that on 11/20/04 the grievant was placed on a deprivation order for exercise, showers, haircuts and cell clean up in accordance with Directive # 4933. Periodic reevaluations of the grievant's behavior resulted in the removal of the cell clean up deprivation on 11/22/04, haircuts on 11/26/04, showers on 12/3/04, and the discontinuation of the deprivation order on 12/13/04. During this time the grievant was seen seven times by medical staff to address his concerns.[1] The grievant was not deprived of water and toiletries as alleged.

1    Southport's medical grievance records indicate that plaintiff was seen by the block nurse on November 22, 2004; November 23, 2004; November 29, 2004; December 2, 2004; December 20, 2004 and refused sick call on November 30, 2004 and December 27, 2004. Dkt. # 30, p. 37.

Dkt. # 20, p. 27.

### *DISCUSSION AND ANALYSIS*

**Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

**Cruel and Unusual Punishment**

"The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." *Wilson v. Seiter,* 501 U.S. 294, 297–98, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), *quoting Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). In order to prevail on such a claim, the plaintiff must satisfy both an objective and subjective element.

To satisfy the objective element, the plaintiff must demonstrate that the conditions of his confinement resulted in "unquestioned and serious deprivations of basic human needs" or deprived the inmate of the "minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Deputy Superintendent Chappius declares that plaintiff was only deprived of cleaning supplies for three days, haircuts for six days, showers for thirteen days and exercise for twenty-three days, and specifically denies that plaintiff was deprived of soap, toothpaste, a toothbrush, toilet paper or hot water. Dkt. # 35, ¶¶ 13–14. Documentation from DOCS indicates that the clean-up privilege was restored on November 23, 2004; haircut privileges were restored on November 26, 2004; shower privileges were restored on December 3, 2004; and exercise privileges were restored on December 13, 2004. Dkt. # 19, pp. 55–58. Documentation from DOCS further indicates that the cell shield order was discontinued on December 20, 2004—thirty days from the discovery of the contraband. Dkt. # 19, p. 59. Such deprivations would not satisfy the objective element for an Eighth Amendment claim.

**\*5** However, plaintiff affirms that he was denied soap, showers, toilet paper, cell cleaning supplies, a toothbrush, toothpaste, exercise and running water for approximately sixty days. Dkt. # 1, p .8; Dkt. # 2; Dkt. # 33–2, ¶ 1. Plaintiff's contemporaneous complaints to prison officials are consistent with this affirmation. Dkt. # 1–2, pp. 5–23. The Court has no difficulty determining that plaintiff's description of his conditions of confinement, if proven, would meet the objective element for an Eighth Amendment claim. As this discrepancy demonstrates a genuine issue of material fact regarding the conditions of plaintiff's confinement following the discovery of contraband in plaintiff's cell, summary judgment is not appropriate on this ground.

To satisfy the subjective element in a claim challenging an inmate's conditions of confinement, the plaintiff must demonstrate that the defendant acted with a deliberate indifference to inmate health or safety. *Trammell v. Keane,* 338 F.3d 155, 162–63 (2d Cir.2003). A "prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Hathway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *quoting Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Id.* at 66, *citing Farmer,* 511 U.S.

George v. McGinnis, Not Reported in F.Supp.2d (2008)

2008 WL 4412109

at 835. The Court "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Farmer,* 511 U.S. at 842.

When the conditions complained of are the result of disciplinary measures imposed against an inmate, the "deliberate indifference standard must be applied in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns." *Trammell,* 338 F.3d at 163. Thus, the Court must ask whether a deprivation order "was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to [plaintiff's] health and safety." *Id.*

While the Court would have no difficulty determining that the denial of cell clean-up privileges for three days; haircut privileges for six days; showers for thirteen days; and exercise for twenty-three days was reasonably calculated to restore prison discipline and security in light of plaintiff's admission to possessing a container of feces in his cell, it could not justify withholding those items, as well as toilet paper, toothpaste, a toothbrush, or soap from plaintiff for sixty days, as plaintiff affirms. Accordingly, summary judgment is inappropriate with respect to the subjective element of plaintiff's Eighth Amendment claim as well.

**Qualified Immunity**

 **\*6** Defendants argue that they are entitled to qualified immunity because it was objectively reasonable for them to issue and implement the cell shield and deprivation orders. Dkt. # 37, pp. 14–15.

Government officials are " 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999), *quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

> The qualified immunity defense requires consideration of the clarity of the law establishing the right allegedly violated and whether a reasonable person, acting under the circumstances then confronting a defendant, would

have understood that the applicable law was being violated. These inquiries combine to form a standard that the Supreme Court has called "objective reasonableness," that is, whether it was objectively reasonable for a defendant to think that the challenged conduct did not violate the plaintiff's clearly established rights.

*Vega v. Miller,* 273 F.2d 460, 466 (2d Cir.2001) (internal citations omitted). Defendants are entitled to qualified immunity if (1) their actions did not violate clearly established law or (2) it was objectively reasonable for them to believe that their actions did not violate such law. *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999). It has been said that:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. at 640 (citations omitted). Thus, the doctrine of qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful. *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

In the instant case, the Court has no doubt that reasonable prison officials would understand that depriving an inmate of soap, showers, toilet paper, cell cleaning supplies, a toothbrush, toothpaste, exercise and running water for approximately sixty days, as plaintiff asserts, constitutes a violation of the Eighth Amendment. Accordingly, defendants are not entitled to qualified immunity on the current record.

**Denial of Due Process**

To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996). Defendants do not challenge plaintiff's liberty interest in this motion, but focus instead upon the process that was afforded to plaintiff. Accordingly, for purposes of this motion for summary judgment, the Court will assume that plaintiff has demonstrated a protected liberty interest in avoiding a penalty of six months in SHU, with 3 months suspended, and focus instead upon whether plaintiff received all the process he was due during his disciplinary hearing.

*Deprivation of Witnesses*
**\*7** Plaintiff argues that Lt. Kerbein obstructed plaintiff's attempts to present witnesses and mitigating evidence to establish that he had "snatched the bottle away from another prisoner" who was squirting feces into his cell and had sought assistance in addressing the situation with Mrs. Fuller, who recommended that he discuss the situation with Sergeant Manos, but that he was unable to do so before his cell was searched and the contraband discovered. Dkt. # 40, ¶ 5. Plaintiff complains that he provided this information to Sergeant Casle after the contraband was discovered, but Sergeant Casle failed to prepare a written report of their conversation. Dkt. # 40, ¶ 5.

Lt. Kerbein argues that his decision not to call Sergeant Manos as a witness and to limit Mrs. Fuller's testimony at the disciplinary hearing was justifiable and did not deprive plaintiff of the process required pursuant to the Fourteenth Amendment to the United States Constitution. Dkt. # 37, pp. 12–13.

In *Wolff v. McDonnell,* the Supreme Court of the United States determined that an

> inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals.

418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In reaching this conclusion, the Court recognized that

> Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence.

*Id.* In exercising that discretion, prison officials must be able to

> explain, in a limited manner, the reason why witnesses were not allowed to testify ... either by making the explanation a part of the "administrative record" in the disciplinary proceeding, or by presenting testimony in court if the deprivation of a "liberty" interest is challenged because of that claimed defect in the hearing. In other words, the prison officials may choose to explain their decision at the hearing, or they may choose to explain it "later."

*Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). A hearing officer may rationally exclude witnesses or documents when they would be irrelevant or unnecessary to a determination of the issues in the disciplinary hearing. *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999). The burden is on the prison official to demonstrate "the rationality of his position." *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990).

In the instant case, Lt. Kerbein denied Sergeant Manos as a witness because he had no direct knowledge of the incident and because Lt. Kerbein accepted plaintiff's representation that he was having problems with other inmates. Dkt. # 36, ¶ 10. Lt. Kerbein denied any further testimony from Mrs. Fuller

because he understood her testimony that she would have notified security if plaintiff had informed her of a security threat to contradict plaintiff's assertion that he had informed her that he possessed the container of feces. Dkt. # 36, ¶ 13. These are rational determinations, particularly in light of the narrow charge presented, *to wit,* storing feces, which plaintiff admitted. Dkt. # 20, p. 8.

**\*8** The Court notes that plaintiff did not request Sergeant Casle as a witness, but simply questioned the absence of a written report from him as to their conversation immediately following the discovery of the contraband. Even if plaintiff had requested Sergeant Casle as a witness, his testimony would not have contradicted plaintiff's admission to the facts necessary to convict him of the charge, *to wit,* storing feces. Accordingly, plaintiff was not deprived of his right to call witnesses in his defense at his disciplinary hearing.

### *Impartiality of Hearing Officer*

Plaintiff argues that Lt. Kerbein was not fair and impartial. Dkt. # 40, p. 8.

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at 570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, *inter alia,* does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *see Francis v. Coughlin,* 891 F.2d 43, 46 ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46.

There is nothing in the transcript of the administrative hearing to suggest that Lt. Kerbein was not impartial. Plaintiff

admitted that he stored a container of feces in his cell for approximately three days. Plaintiff's explanation as to why he possessed the container of feces does not negate Lt. Kerbein's determination that he committed an unhygienic act.

### *Selsky's Affirmance*

Since Lt. Kerbein afforded plaintiff all the process that he was due at the disciplinary hearing, Director Selsky's affirmance of that decision cannot be violative of plaintiff's constitutional rights. *See Hameed v. Mann,* 57 F.3d 217, 224 (2d Cir.1995) (Selsky entitled to dismissal of claims where plaintiff failed to establish constitutional violations at disciplinary hearing).

## Motion to Compel

### *Document Request No. 1*

Plaintiff seeks a photograph or sketch of a cell hatch, along with an explanation of the purpose of a cell hatch. Dkt. # 30, p. 5. Plaintiff argues that this information is relevant to demonstrate that it was unnecessary to deprive plaintiff of certain items because they could have been provided to him *via* the cell hatch. Dkt. # 30, p. 4; Dkt. # 40, p. 5. However, defendants have admitted that the cell hatch was available to serve plaintiff with toiletries, cell cleaning supplies, laundry services and mail, so there will be no need for plaintiff to establish that fact through documents. Dkt. # 18, No. 1. Accordingly, this aspect of plaintiff's motion to compel is denied.

### *Document Request No. 2*

**\*9** Plaintiff seeks copies of all grievances filed by other prisoners at Southport prior to November 20, 2004 concerning the same or similar deprivations. Dkt. # 30, p. 5. Defendants argue that this request is overbroad, unduly burdensome and neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Dkt. # 26, p. 3. Specifically, defendants argue that Southport is unable to sort grievances or complaints regarding deprivation orders from other grievances without reviewing each grievance individually. Dkt. # 26, p. 3.

Plaintiff argues that he will need to demonstrate that the deprivation order imposed upon him was extreme. Dkt. # 30, p. 4.

While the Court agrees that plaintiff's request is overbroad and unduly burdensome as written, Southport should be able to inform plaintiff as to the number of inmates subjected to deprivation orders; the justification for such orders; the type of deprivations imposed; and the length of the deprivations in order to provide plaintiff context as to the type and duration of deprivation orders prevalent at Southport, which may be relevant to a jury's assessment of whether the deprivations imposed upon plaintiff were consistent with the security threat presented. This request shall be limited to six-months prior to plaintiff's deprivation order. Defendants shall produce this information within sixty days of this Decision and Order.

*Interrogatory Nos. 1–3*

Plaintiff sought information as to whether plaintiff was served with any violations or misbehavior reports during the time period in which he was subject to the deprivation order. Dkt. # 30, p. 6. Plaintiff also asked whether he had a history of assault on prison staff or committing unhygienic acts prior to November 20, 2004. Dkt. # 30, p. 6. Defendants responded by producing a copy of plaintiff's disciplinary history. Dkt. # 27, pp. 5–8. This response is sufficient.

*CONCLUSION*

For the foregoing reasons, plaintiff's motion to compel (Dkt.# 30), is granted in part and denied in part; plaintiff's motion for summary judgment (Dkt.# 33), is denied; and defendants' motion for summary judgment (Dkt.# 34), is denied with respect to plaintiff's cause of action alleging cruel and unusual punishment and granted with respect to plaintiff's cause of action for denial of due process. As a result, the Clerk of the Court is directed to enter judgment in favor of defendants Kerbein and Selsky.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4412109

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Rogers v. Faucher, Not Reported in Fed. Supp. (2019)

2019 WL 1083690

2019 WL 1083690
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Wayne ROGERS, Plaintiff,

v.

Stephen FAUCHER, et al., Defendants.

PRISONER CASE NO. 3:18-cv-1809 (JCH)

|

Signed 03/07/2019

**Attorneys and Law Firms**

Wayne Rogers, Suffield, CT, pro se.


**RULING RE: MOTION TO AMEND COMPLAINT**

Janet C. Hall, United States District Judge

**\*1** On November 2, 2018, the plaintiff, Wayne Rogers ("Rogers"), an inmate currently confined at the Corrigan-Radgowski Correctional Center ("CRCI") in Uncasville, Connecticut, filed a complaint pro se pursuant to title 42, section 1983 of the United States Code against five Connecticut Department of Correction ("DOC") employees in their individual and official capacities: Warden Stephen Faucher, Deputy Warden Sharonda Carlos, Lieutenant Jon Ballaro, Lieutenant Kelly, and Correction Officer Bowers. Compl. (Doc. No. 1). Thereafter, on November 14, 2018, Rogers moved to amend his complaint to add one more defendant: Deputy Warden Ronald Cotta. Mot. to Amend Compl. (Doc. No. 7); Am. Compl. (Doc. No. 7-1) at 4. Rogers claimed that the six defendants violated his Eighth Amendment protection against cruel and unusual punishment and his Fourteenth Amendment right to due process by denying him a shower for five days, access to video surveillance footage, and protective custody. Am. Compl. at 9. He sought damages and injunctive relief. Id. at 10.

On January 2, 2019, this court dismissed with prejudice the Amended Complaint for failure to state a claim under either the Eighth or Fourteenth Amendments. Ruling Re: Mot. to Amend Compl. and Initial Review Order ("IRO") (Doc. No. 9) 6-9, 13. The court also ruled that, even if Rogers had stated a plausible constitutional claim, the Amended Complaint was subject to dismissal for failure to exhaust administrative remedies. Id. at 10-12.

On January 9, 2019, Rogers filed the instant motion to file a second amended complaint restating his claims under the Fifth and Fourteenth Amendments to the United States Constitution because, at the time of the alleged violation, he was a pretrial detainee and not a convicted prisoner. Mot. for Leave to File Second Am. Compl. ("Mot. to Amend") (Doc. No. 10). He attached a proposed second amended complaint, which alleges the same facts as the previous complaints, but restates his claims under the Fifth and Fourteenth Amendments rather than the Eighth Amendment. See id. at 10-11. Because the court dismissed the Amended Complaint with prejudice, the court will construe the instant Motion as a motion to reopen the case. Despite the restatement of the claims, however, the case should remain dismissed.

## I. STANDARD OF REVIEW

Pursuant to title 28 section 1915A of the United States Code, this court must review prisoner civil complaints and dismiss any portion of a complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, a complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. Bell Atlantic v. Twombly, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic, 550 U.S. at 570. Nevertheless, it is well-established that "[p]ro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.' " Sykes v. Bank of America, 723 F.3d 399, 403 (2d Cir. 2013) (quoting Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) ).

## II. FACTUAL ALLEGATIONS

**\*2** The facts from the Amended Complaint (Doc. No. 7-1) and the proposed Second Amended Complaint (Doc. No. 10) appear identical. Thus, the court incorporates the allegations as stated in its initial review order:

On October 13, 2018, a fight broke out in the E-Pod housing unit at CRCI causing the unit to be locked down. Am. Compl. at ¶ 1. Normal operations in the E-Pod unit permit only twelve cells to be opened at one time for recreation, and there are four separate recreation periods.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 317 of 380

Rogers v. Faucher, Not Reported in Fed. Supp. (2019)

2019 WL 1083690

Id. at ¶ 2. The fight occurred during the second recreation period. Id. at ¶ 3. Rogers is scheduled for the third recreation period, but his period was cancelled because of the fight, even though the threat had been eliminated. Id. As a result, Rogers was not permitted to take a shower. Id. at ¶ 4. The last shower he had taken before the cancellation of the recreation period was on October 12, 2018, at approximately 1:30 p.m. Id.

Between October 12 and October 15, no out-of-cell movement was permitted, and Rogers was, therefore, unable to take a shower. Id. at ¶ 5. He asked CRCI staff about whether he could shower but was told the decision to forbid out-of-cell movement came from supervisors. Id. at ¶ 6. Rogers also wrote requests to Lieutenant Kelly, Deputy Warden Carlos, and Warden Faucher about being denied a shower, but he did not receive any response. Id. at ¶¶ 7-8.

On October 17, Rogers spoke with Lieutenant Ballaro about being denied a shower, explaining that he had not been able to shower in over 72 hours. Id. at ¶ 10. Ballaro dismissed his complaint, stating that "gang members [were not] human; [they] were pieces of shit and get no rights." Id. Rogers wrote a second request to Kelly, Carlos, and Faucher but received no response. Id. at ¶ 11. A staff member told him that they were busy. Id. Rogers then filed a grievance to attempt to resolve the situation, but the grievance was returned without disposition for failure to file an Inmate Request. Id. at ¶ 12; Rogers' Ex. C (Doc. No. 7-1 at 14-15).

At around 8:00 p.m. on October 17, Rogers was permitted to shower after waiting for 124 hours (five days and four hours). Am. Compl. at ¶ 14. The next day, he was removed from the E-Pod unit and temporarily placed in a restrictive housing unit ("RHU") for safety reasons. Id. at ¶ 15.

On October 22, Rogers was removed from the RHU to "complete his [protective custody] package" and was brought to Lieutenant Kelly's office. Id. at ¶ 16. Rogers asked Kelly why he had not responded to his written requests regarding the shower issue. Id. Kelly told him that he would not get a response and that he should "drop the issue [because] it is what it is." Id. Rogers asked Kelly to elaborate, but Kelly told him, "If you want this [protective custody placement], you'll drop it." Id. Rogers did not inquire further about the issue. Id. at ¶ 17.

On October 23, Rogers spoke with Warden Faucher and asked him why he had not responded to his written requests. Id. at ¶ 18. Faucher told Rogers that "he makes the rules

and that's that" and instructed him to "drop the issue or [his] [protective custody placement] would be denied." Id.

On October 25, Rogers wrote to Officer Bowers, the Freedom of Information Liaison for CRCI, and requested that he preserve the video surveillance footage and log book entries from October 13 to October 17, 2018. Id. at ¶ 19; Rogers' Ex. D (Doc. No. 7-1 at 17). Bowers denied the request because it was overly broad and involved too many hours of footage for preservation. Rogers' Ex. D. Bowers informed Rogers that he may resubmit his request with more specificity as to what he seeks to preserve. Id. Bowers could not provide the requested log book entries because the disclosure of such documents is prohibited by section 1-210(b)(18)(G) of the Connecticut General Statutes. [1] Id. Rogers believes the denials were an attempt to "withhold and destroy evidence." Am. Compl. at ¶ 19.

*3 Since the denial of the showers, Rogers has written to the medical unit at CRCI three times with concerns of about constant burning and itching on his feet and in his genital area, which he attributes to the inability to shower. Id. at ¶ 20; Rogers' Exs. E and F (Doc No. 7-1 at 18-19). As of October 30, 2018, Rogers has not been evaluated by medical staff. Am. Compl. at ¶ 20. Rogers believes that the medical unit is purposely delaying his appointment until after his condition heals. Id. at ¶ 21.

On October 30, 2018, Rogers spoke with Carlos and Faucher again about the denial of the showers. Id. at ¶ 22. One of the defendants told him, "[I]t is what it is and it's over now. I suggest you drop it if you know what's good for you! We run this jail, not you!" Id. Rogers interpreted the response as a threat. Id. at ¶ 23.

On November 5, 2018, Rogers was escorted out of his cell to meet with Lieutenant Kelly. Id. at ¶ 24. Kelly told Rogers that his "[protective custody] package was a go and [that] it would be sent to ... Deputy Warden Cotta for approval...." Id. On November 13, 2018, Cotta performed a tour of Rogers' housing unit. Id. at ¶ 26. When Rogers inquired about his "[protective custody] package," Cotta told him that he "wasn't going anywhere. [I]n fact, [he] would stay here and get [his] ass whipped in B-Pod." Id. Shortly thereafter, other correction officers came to Rogers' cell and told him that he was being transferred to the B-Pod unit, but Rogers refused to leave. Id. at ¶¶ 27-28. As a result, Rogers was issued a disciplinary report for refusing housing. Id. at ¶ 28; Rogers' Ex. H (Doc. No. 7-1 at 22).

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 318 of 380
Rogers v. Faucher, Not Reported in Fed. Supp. (2019)
2019 WL 1083690

IRO at 2-6.

[1]  Section 1-210(b)(18)(G) of the Connecticut General Statutes provides:

> Nothing in the Freedom of Information Act shall be construed to require disclosure of ... [r]ecords, the disclosure of which the Commissioner of Correction ... has reasonable grounds to believe may result in a safety risk, including the risk of harm to any person or the risk of an escape from, or a disorder in, a correctional institution or facility under the supervision of the [DOC].... Such records shall include, but are not limited to ... [l]ogs or other documents that contain information on the movement or assignment of inmates or staff at correctional institutions or facilities....

## III. ANALYSIS

In his Amended Complaint, Rogers claimed that the denial of his ability to shower from October 12 to October 17, 2018 constituted cruel and unusual punishment under the Eighth Amendment. Am. Compl. at 9. He also claimed that Bowers' "attempts to tamper with ... and destroy evidence" by denying him access to surveillance footage and log book entries violated his right to procedural due process under the Fourteenth Amendment. Id. Finally, he claimed that "Cotta's denial of protective custody ... knowing the serious threat and past injuries sustained due to past and present threats constitutes deliberate indifference to safety, and the threat of bodily harm constitutes cruel [and] unusual punishment under the Eighth Amendment...." Id.

In his Second Amended Complaint, Rogers clarifies that, at the time of the alleged violations, he was a pretrial detainee. Mot. to Amend at 1. He now claims that the denial of showers and protective custody violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution. Id. at 10. His Fourteenth Amendment claim regarding the denial of access to surveillance footage and log book entries appears unchanged. See id. Thus, the Fourteenth Amendment procedural due process claim remains dismissed.

 **\*4** Furthermore, Rogers still has not shown that he properly exhausted his administrative remedies before commencing this action. As stated in the Initial Review Order, Rogers filed his first Inmate Request regarding the denial of showers during the lockdown period, just two days before filing his

administrative grievance and less than three weeks before filing his Complaint in this case. See IRO at 11-12. DOC Administrative Directive 9.6 requires that an inmate give officials fifteen business days to respond to an Inmate Request before filing a grievance. See id. at 12 (citing Shehan v. Erfe, No. 3:15-CV-1315 (MPS), 2017 WL 53691, at \*6 (D. Conn. Jan. 4, 2017) ). Thus, it is clear from the face of the Complaint, Amended Complaint, and Second Amended Complaint that Rogers did not properly exhaust his administrative remedies before commencing suit.

Moreover, even if Rogers had properly exhausted his administrative remedies, his Second Amended Complaint fails to state a claim upon which relief may be granted. To begin, Rogers cannot assert a claim under the Fifth Amendment because (1) the Fifth Amendment applies to the federal government, not to the states, see Dusenberry v. United States, 534 U.S. 161, 167 (2002); and (2) Rogers is not suing any federal government officials. Therefore, the only question this court must resolve for purposes of this ruling is whether Rogers can plausibly state a Fourteenth Amendment due process claim based on the denial of showers and protective custody in October 2018.

"Conditions of confinement claims of pretrial detainees 'are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment ... because [p]retrial detainees have not been convicted of a crime and thus may not be punished in any manner – neither cruelly and unusually nor otherwise.' " Sadowski v. Dyer, No. 3:18-CV-1074 (KAD), 2018 WL 4854626, at \*4 (D. Conn. Oct. 5, 2018) (quoting Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017) ). The detainee may state a section 1983 claim for unconstitutional conditions of confinement by showing that the officials "acted with deliberate indifference to the challenged conditions." Id. (quoting Darnell, 849 F.3d at 29). This showing consists of both an objective and subjective prong. Id.

Objectively, the pretrial detainee must allege that the challenged conditions were "sufficiently serious" – that is they "pose[d] an unreasonable risk of serious damage to his health...." Id. (quoting Darnell, 849 F.3d at 30). Significantly, the standard for establishing the objective prong of a deliberate indifference claim is the same regardless of whether the claim is brought by a pretrial detainee under the Fourteenth Amendment or by a convicted prisoner under the Eighth Amendment. See Darnell, 849 at 30 ("Under both the Eighth and Fourteenth Amendments, to establish an objective

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 319 of 380
Rogers v. Faucher, Not Reported in Fed. Supp. (2019)
2019 WL 1083690

deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health[.]") (internal quotation marks omitted); Molina v. Cty. of Westchester, No. 16 CV 3421 (VB), 2017 WL 1609021, at *2 (S.D.N.Y. Apr. 28, 2017) ("With respect to the first prong, the standard is the same whether the claim is brought by a convicted prisoner or a pretrial detainee[.]").

However, the legal standards for the subjective prong are different for convicted prisoners and pretrial detainees. To bring a claim under the Eighth Amendment, a convicted prisoner must allege that a defendant "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996). Thus, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998). In contrast, to satisfy the subjective prong of a deliberate indifference claim brought pursuant to the Fourteenth Amendment, a pretrial detainee need only allege that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell, 849 F.3d at 35.

 **5** In the Initial Review Order on Rogers's Amended Complaint, this court dismissed Rogers's Eighth Amendment claims for denial of showers and protective custody on the grounds that Rogers failed to allege a sufficiently serious deprivation, meaning that he failed to satisfy the objective prong of a deliberate indifference claim. See IRO at 7–9. Thus, notwithstanding the fact that Rogers's Second Amended Complaint now asserts these claims under the Fourteenth Amendment, as opposed to the Eighth Amendment, the claims fail on the same grounds because the standard for the objective prong is the same for claims brought under the Eighth Amendment and the Fourteenth Amendment.

In particular, courts in this Circuit have rejected claims based on even longer periods without the ability to shower because such claims do not show a "sufficiently serious" deprivation. See Crichlow v. Fischer, No. 9:17-CV-00194 (TJM/TWD), 2017 WL 6466556, at *15 (N.D.N.Y. Sept. 5, 2017) ("the denial of showers for as long as two weeks is not sufficiently serious to state a constitutional claim"); Cruz v. Jackson, No. 94-CIV-2600 (RWS), 1997 WL 45348, at *7 (S.D.N.Y. Feb. 5, 1997) (prisoner's allegation that he was deprived of shower for two weeks does not satisfy objective component of Eighth Amendment claim). Likewise, Rogers has not alleged that the denial of protective custody exposed him to any unsafe conditions or deprived him of any basic life necessities. See IRO at 8–9. Thus, because the court concludes that Rogers has failed to allege a sufficiently serious deprivation, his constitutional claim regarding the denial of showers and his constitutional claim regarding the denial of protective custody remain dismissed.

### ORDER

Rogers' Motion to Amend his Complaint (Doc. No. 10) is DENIED. The case remains dismissed. The Clerk is directed to enter judgment in favor of the defendants and close this case.

**SO ORDERED** this 7th day of March 2019 at New Haven, Connecticut.

### All Citations

Not Reported in Fed. Supp., 2019 WL 1083690

---

   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 320 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

2018 WL 5830840
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Jose GARCIA, Plaintiff
v.
UNIVERSITY OF CONNECTICUT
HEALTH CARE CENTER, et al., Defendant.

CASE NO. 3:16cv852(JCH)
|
Signed 11/07/2018

**Attorneys and Law Firms**

John H. Mutchler, Murtha Cullina LLP, Hartford, CT, Rachel Snow Kindseth, Murtha Cullina, New Haven, CT, for Plaintiff.

DeAnn S. Varunes, Attorney General's Office, Hartford, CT, for Defendant.

**AMENDED** [*] **RULING RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

[*]     The Ruling has been amended in response to the Joint Motion for Clarification filed by the parties, to correct the omission of Yerkes' name in the conclusion. See Joint Mot. for Clarification and/or Modification to Ruling (Doc. No. 90).

Janet C. Hall, United States District Judge

**\*1** The plaintiff, Jose Garcia ("Garcia"), is currently incarcerated at MacDougall-Walker Correctional Institution, in Suffield, Connecticut. He initiated this action by filing a pro se complaint pursuant to section 1983 of title 42 of the United States Code and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., against the University of Connecticut Health Care Center ("UCONN"), the Department of Corrections ("DOC"), Commissioner Scott Semple, Lieutenant Hurdle, Correctional Officers Genise, Gray, Parnisakul, Burritt, Ross, and Byars, Clinical Social Workers Marek and Bertulis, and Licensed Practical Nurse Yerkes. See Complaint ("Compl.") (Doc. No. 1) at 1–3. The Complaint includes allegations pertaining to Garcia's

placement on in-cell restraints on May 6, 2014, and his confinement on in-cell restraints until May 7, 2014. See id. at 6–9.

Before the court are the Motion for Summary Judgment (Doc. No. 38) and Supplemental Motion for Summary Judgment (Doc. No. 81) filed by defendants Hurdle, Gray, Parnisakul, Burritt, Ross, Byars, Marek, Bertulis, and Yerkes. For the reasons set forth below, the Motions are **GRANTED IN PART** and **DENIED IN PART**.

**I. BACKGROUND**

In its Initial Review Order on September 29, 2016, the court dismissed the ADA claims, the section 1983 claim of verbal harassment against Genise, the section 1983 claims against Semple, UCONN, and DOC pursuant to section 1915A(b)(1) of title 28 of the United States Code, and the claims for monetary damages against all defendants in their official capacities pursuant to section 1915A(b)(2) of title 28 of the United States Code. See Initial Review Order (Doc. No. 7). Thus, all claims against Genise, Semple, UCONN, and DOC have been dismissed.

Following the Initial Review Order, three of Garcia's claims were allowed to proceed: (1) an Eighth Amendment claim that defendants Gray, Marek, Bertulis, and Yerkes were deliberately indifferent to Garcia's mental health needs when they refused to prescribe him medication or treatment for his mental illness and instead punished him by placing him in restraints; (2) an Eighth Amendment claim that defendants Hurdle, Parnisakul, Burritt, Ross, and Byars were deliberately indifferent to Garcia's safety and health and subjected him to unconstitutional conditions of confinement when they facilitated his placement on in-cell restraints or applied the restraints in such a manner as to cause him pain and prevent him from standing upright or using the toilet; and (3) a First Amendment claim that defendants Hurdle, Parnisakul, Burritt, Ross, and Byars placed him on in-cell restraints for nine hours in retaliation for his statement that he planned to file a lawsuit against the mental health staff at GCI. Id. at 2–3, 9.

The defendants filed a Motion for Summary Judgment ("Defs. Mot. Summ. J.") (Doc. No. 38) on September 8, 2017. Garcia filed a Memorandum in Opposition ("Pl. First Mem. in Opp'n") (Doc. No 59) on January 9, 2018. In its Order for Further Briefing on June 11, 2018 (Doc. No. 69), the court concluded that, because Garcia was a pretrial detainee when the events at issue occurred, his claims of unconstitutional

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 321 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)
2018 WL 5830840

conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment. Doc. No. 69 at 8. The court therefore construed Garcia as asserting his deliberate indifference to medical needs and deliberate indifference to health and safety claims under the Fourteenth Amendment. The parties were asked to submit further briefing of the case under the Fourteenth Amendment standard. Id. On August 2, 2017, in response to the court's Order for Further Briefing, the defendants filed a Supplemental Motion for Summary Judgment ("Suppl. Mot. Summ. J.") (Doc. No. 81) and Supplemental Memorandum of Law in Support ("Defs. Suppl. Mem. in Supp.") (Doc. No. 81, Attach. 1). Garcia filed a Second Memorandum in Opposition ("Pl. Second Mem. in Opp'n") on September 7, 2018. See generally Pl. Second Mem. in Opp'n (Doc. No. 83). The defendants seek summary judgment on all remaining claims.

## II. STANDARD OF REVIEW

**\*2** On a motion for summary judgment, the moving party bears the burden of establishing the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010). If the moving party satisfies that burden, the nonmoving party must set forth specific facts demonstrating that there is 'a genuine issue for trial.' Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). A genuine issue exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor. See, e.g., Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, (1986) ).

The court's role at summary judgment "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact." O'Hara v. Nat. Union Fire Ins. Co. of Pittsburgh, 642 F.3d 110, 116 (2d Cir. 2011). Unsupported allegations do not create a material issue of fact and cannot overcome a properly supported motion for summary judgment. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Additionally, the evidence the court considers in ruling on a motion for summary judgment must be admissible evidence, or evidence that could be readily reduced to an admissible form at trial. See LaSalle Bank National Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 205 (2d Cir. 2005); Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.") (citation omitted).

## III. FACTS [1]

[1]    The relevant facts are undisputed unless otherwise indicated and are taken from the defendants' Local Rule 56(a)(1) Statement, the defendants' Supplemental Local Rule 56(a)(1) Statement, Garcia's Local Rule 56(a)(2) Statement, and Garcia's Supplemental Local Rule 56(a)(2) Statement, as well as supporting exhibits to those documents.

Garcia was an inmate at Garner Correctional Institution ("GCI") from April 8, 2013 through January 2, 2018. Defs. Suppl. L.R. 56(a) (Doc. No. 81-2) ¶ 4. On May 6 and May 7, 2014, Garcia was a pretrial detainee. Id. ¶ 1. On May 6, 2014, GCI staff attempted a "verbal intervention" with Garcia for the purpose of moving him from his cell in H Unit to a cell in F Unit, a Restrictive Housing Unit ("RHU") at GCI. Id. ¶¶ 6–7, 12; Pl. Suppl. L.R. 56(a) (Doc. No. 83-15) at 2 ¶ 7. GCI staff videotaped a portion of the verbal intervention and Garcia's subsequent transfer to F Unit. See DVD-GCI-V-14-274 (Doc. No. 38-14). [2]

[2]    The video begins with a recitation of the time as approximately 11:34 am, and is 38 minutes and 44 seconds in length. The video's audio quality varies, and it is not always possible to understand what staff or Garcia are saying.

At the time of the verbal intervention, Garcia was agitated about receiving a Disciplinary Report and about transfer to RHU following earlier harassment by a corrections officer. See Pl. Suppl. L.R. 56(a) at 10–11 ¶¶ 9–11. Garcia repeatedly refused to submit to handcuffs, and he became agitated over the course of the interaction with GCI staff. Id. at 11 ¶ 14. At one point, Garcia attempted to sharpen a toothbrush in his cell. Defs. Suppl. L.R. 56(a) ¶ 8; Pl. Suppl. L.R. 56(a) at 2 ¶ 8. An officer deployed a chemical agent into Garcia's cell to gain his compliance. See Defs. Suppl. L.R. 56(a) ¶ 9; Pl. Suppl. L.R. 56(a) at 2 ¶ 9. Garcia complied shortly thereafter and officers escorted Garcia to the RHU in F Unit. DVD-GCI-V-14-274 at 28:50, 38:00. [3]

[3]    Three video recordings were manually filed with the court: DVD-GCI-V-274, 276, and 279 (Doc. No. 38-14). Garcia relied on the first two of these videos in his briefing. The facts taken from the recordings are undisputed unless otherwise noted.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 322 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

**\*3** Ross responded to a request for assistance at F Unit at approximately 6:45 pm on May 6, 2014. See Defs. Suppl. L.R. 56(a) ¶ 31; Pl. Suppl. L.R. 56(a) at 3 ¶ 31. Ross observed that Garcia had covered his cell window with toilet paper. See Defs. Suppl. L.R. 56(a) ¶ 32; Pl. Suppl. L.R. 56(a) at 3 ¶ 32. Lieutenant Mitchell arrived at Garcia's cell in F Unit at approximately 6:45 pm, and officers began verbal intervention with Garcia in an attempt to get him to uncover his window and come to the trap door to be handcuffed. See Pl. First Mem. in Opp'n., Ex. 2 (Incident Reports) (Doc. No. 59-2) at 3. Ross was directed to place a plastic shield over the opening to the trap in Garcia's cell door to permit staff to view Garcia inside the cell. See Defs. Suppl. L.R. 56(a) ¶ 34; Pl. Suppl. L.R. 56(a) at 4 ¶ 34. During the next forty minutes, Marek, Bertulis, and Yerkes attempted to converse with Garcia through the trap in his cell door and to convince him to cuff up so that officers could remove from his cell. See DVD-GCI-V-14-276 (Doc. No. 38-14).

Marek recorded a clinical note indicating that she interacted with Garcia at his cell in F Unit on the evening of May 6, 2014. See Defs. Suppl. L.R. 56(a) ¶¶ 65–66; Pl. Suppl. L.R. 56(a) at 5 ¶¶ 65–66. Marek's notes indicate that Garcia was angry because he had received another disciplinary ticket and that Garcia threatened to cover his window again and hurt prison staff if they attempted to enter his cell. See Defs. Suppl. L.R. 56(a) ¶¶ 65–66; Pl. Suppl. L.R. 56(a) at 5 ¶ 66. Marek observed that Garcia was not in distress, that he reported no suicidal ideation or hallucinations, and that Garcia planned to speak to his primary social worker after he attended his court proceeding the following day. See Defs. Suppl. L.R. 56(a) ¶¶ 65–66; Pl. Suppl. L.R. 56(a) at 5 ¶ 66. Marek concluded that Garcia's mental health was not a mitigating factor in the issuance of a disciplinary report and that he could "continue with the RHU placement process." See Defs. Suppl. L.R. 56(a) ¶¶ 65–66; Pl. Suppl. L.R. 56(a) at 5 ¶ 66.

After speaking to Bertulis for a second time, Garcia submitted to handcuffs and was escorted to the restrictive housing unit. See Defs. Suppl. L.R. 56(a) ¶ 76; Pl. Suppl. L.R. 56(a) at 6 ¶ 76. Burritt and Byars escorted Garcia to a cubicle in F Unit. See Defs. Suppl. L.R. 56(a) ¶¶ 18, 54; Pl. Suppl. L.R. 56(a) at 3 ¶ 18, 4 ¶ 54. At one point during Garcia's confinement in the cubicle, Bertulis spoke to Garcia and said that "we will help you." See Pl. Suppl. L.R. 56(a) at 14 ¶ 29; DVD-GCI-V-14-276 at 39:35.

Officers then escorted Garcia from the cubicle to Cell 125 in F Unit. See Pl. Suppl. L.R. 56(a) at 14 ¶ 30. Garcia was then placed on in-cell restraints; LPN Yerkes checked the restraints but did not ask Garcia to stand. Id.

Garcia remained on in-cell restraints until 5:00 am on May 7, 2014. See Pl. Suppl. L.R. 56(a) at 15 ¶ 33. Officers Byars and Gray recorded their observations of Garcia on a restraint checklist. See Defs. Suppl. L.R. 56(a) ¶¶ 20, 27; Pl. Suppl. L.R. 56(a) at 3 ¶¶ 20, 27. Garcia generally remained calm and did not ask Gray to get him anything. See Defs. Suppl. L.R. 56(a) ¶¶ 27–28; Pl. Suppl. L.R. 56(a) at 3 ¶ 27. Around 5:00 am on May 7, 2014, Garcia was removed from Cell 125 for purposes of transporting him to court. See Pl. Suppl. L.R. 56(a) at 15 ¶ 33. While in the custody of court marshals, Garcia attempted to commit suicide by hanging. Id. at 15 ¶ 37.

## IV. DISCUSSION

### A. Exhaustion of Administrative Remedies

The defendants argue that Garcia failed to exhaust the administrative remedies available to him, as required by the Prison Litigation Reform Act ("PLRA"). Garcia argues that he fully exhausted his remedies as to all claims. The PLRA, section 1997e(a) of title 42 of the United States Code, requires that a prisoner exhaust all available administrative remedies before filing a lawsuit concerning prison conditions. 42 U.S.C. § 1997e(a). The PLRA applies to pre-trial detainees. See 42 U.S.C. § 1997e(h). Proper exhaustion includes complying with all procedural rules and filing deadlines as defined by the prison grievance system. See Woodford v. Ngo, 548 U.S. 81, 90–91 (2006). Thus, "untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirements." Ruggiero v. County of Orange, 467 F.3d 170, 176 (2d Cir. 2006).

**\*4** The Supreme Court has addressed three scenarios in which a prisoner's inability to use the administrative procedures officially adopted by a prison facility rendered the procedures "unavailable" for the purpose of determining PLRA exhaustion. These are (1) where the procedure is a "dead end" because officers are unable or consistently unwilling to provide any relief to aggrieved inmates; (2) where the requirements are so opaque or convoluted that an ordinary prisoner could not navigate them; and (3) when prison staff use threats, intimidation, or misrepresentation to stop an inmate from using the grievance process. See Ross v. Blake, 136 S. Ct. 1850, 1859–60 (2016).

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 323 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

Failure to exhaust administrative remedies pursuant to the PLRA is an affirmative defense. See Jones v. Bock, 549 U.S. 199, 216 (2007). The defendants have the burden to show there are no material issues of fact as to Garcia exhausting his claims prior to filing this action. See Johnston v. Maha, 460 Fed. App'x 11, 15 (2d Cir. 2012) ("The defendants have the burden of showing that there is no genuine issue of material fact as to exhaustion that would preclude summary judgment."). The court summarizes the framework for the DOC administrative remedies before addressing whether Garcia exhausted the remedies as to each of his claims.

### 1. DOC Administrative Remedies

The DOC's Inmate Administrative Remedies are set forth in Administrative Directive 9.6. See Defs. Suppl. Mot. Summ. J., Ex. 9, Attach. A ("AD 9.6") (Doc. No. 81-14). AD 9.6 became effective August 15, 2013, and was in effect during the time relevant to Garcia's claims. The type of remedy available to an inmate depends on the nature of the condition or decision at issue. The Inmate Grievance Procedure, section six of AD 9.6, is the designated administrative remedy for all matters not specifically identified in section 4, subsections A–I. See AD 9.6 § 4(A). Thus, claims regarding conditions of confinement, such as placement on in-cell restraints or the refusal to provide hygiene items are subject to the Inmate Grievance Procedure. If an inmate is seeking a remedy related to medical or mental health claims, he must comply with the requirements set forth in Administrative Directive 8.9, entitled Administrative Remedy for Health Services. See id. § 4(L).

The Inmate Grievance Procedures require that an inmate first attempt to resolve the matter informally. Id. § (6)(A). If verbal resolution is unsuccessful, the inmate must use a specific form to submit a written request. Id. § 6(A). A response to the written request must be made by DOC within fifteen business days. Id. If attempts to resolve the matter informally are unsuccessful or if the inmate did not receive a timely response, he may file a Level 1 Grievance. See id. § (6)(C).

A Level 1 grievance must be filed within thirty days of the date of the occurrence or discovery of the cause of the Grievance. See id. The Unit Administrator must respond in writing within thirty business days of receiving the grievance. See id. § (6)(I).

The inmate may appeal an unfavorable or untimely disposition of the Level 1 grievance to Level 2. See id. § (6)(G), (I). An inmate appealing an unfavorable disposition must file the Level 2 appeal within five days of the inmate's receipt of the Level 1 decision. See id. § (6)(K). An inmate appealing an untimely decision must file the Level 2 appeal no later than 65 days after the inmate filed the Level 1 grievance. See id. § (6)(M). Level 2 appeals by inmates housed in a Connecticut correctional facility are reviewed by the appropriate District Administrator. See id. § (6)(K). The District Administrator is required to respond to the Level 2 appeal within 30 business days of receipt of the appeal. Id.

**\*5** Level 3 appeals are restricted to challenges to department policy, the integrity of the grievance procedure, or untimely responses to Level 2 appeals. Id. § (6)(L). A Level 3 appeal of an unfavorable decision must be filed within five calendar days of the inmate's receipt of the decision. Id. A Level 3 appeal of an untimely disposition must be filed within 35 days of the filing of the Level 2 appeal. Id. § (6)(M). A Level 3 appeal is reviewed by the Commissioner of Correction or his or her designee. Id. § (6)(L). A response to a Level 3 appeal is due within thirty business days of the receipt of the appeal by the Commissioner or his or her designee. Id.

Administrative Directive 8.9, effective July 24, 2012, governs matters relating to the provision of health services to inmates. See Defs. Mot. Summ. J., Ex. 10 ("AD 8.9") (Doc. No. 38-12). There are two types of Health Services Review: (1) Diagnosis and Treatment, and (2) Review of an Administrative Issue. See id. § 9(A), (B). An inmate seeking review of a diagnosis or treatment issue must attempt to seek informal resolution prior to filing a formal request for a Health Services Review. See id. § 10. If an inmate is unsatisfied with the informal resolution of the complaint and seeks further review, he must file an Inmate Administrative Remedy Form seeking a Health Services Review of the diagnosis or treatment of his or her medical condition. See id. § 11. A response to a written request must be made within fifteen days of receipt of the request. See id.

If an informal resolution is unsuccessful, the Health Services Review Coordinator is required to schedule a Health Services Review Appointment with a medical provider as soon as possible. See id. § 11(A). If the medical provider concludes that the existing diagnosis or treatment was appropriate, the inmate is considered to have exhausted his health services review remedy. Id. If the medical provider reaches a different conclusion with regard to the appropriate diagnosis or course

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

of treatment for the inmate's condition, he or she may either provide the appropriate treatment or refer the case to the Utilization Review Committee for authorization of different treatment. See id. § 11(B).

### 2. First Amendment/Retaliation Claims

Garcia alleges that defendants Parnisakul, Burritt, Ross, and Byars placed him on in-cell restraints and that defendant Hurdle refused to give him soap and a cloth to clean himself after his removal from in-cell restraints in retaliation for informing Yerkes, Bertulis, and Marek that he was going to file a lawsuit against them for withholding his mental health medication from him. See Compl. at 7–8. Parnisakul, Burritt, Ross, Hurdle, and Byars argue that Garcia did not exhaust these claims of retaliatory conduct.

Both the defendants and Garcia have filed copies of a Level 1 Grievance and Level 2 Grievance Appeal related to the incidents that occurred on May 6, 2014 and May 7, 2014. See Defs. Suppl. Mot. Summ. J., Ex. 9, Attach. B (Doc. No. 81-14) at 21–23; Pl. First Mem. in Opp'n, Ex. 3 (Doc. No. 38-11). Garcia stated in the Grievance that, after being harassed by a corrections officer, an altercation with staff led to disciplinary sanctions and removal to the RHU. See Pl. First Mem. in Opp'n, Ex. 3 at 21. Garcia claimed he became distraught and irrational, leading to further sanctions. Id. Garcia claimed that staff placed him on in-cell restraints and left him in restraints overnight. Id. Garcia alleged that the process humiliated and dehumanized him, and that it was "clear retaliatory behavior" in response to his conduct. Id.

Garcia's Level 1 Grievance does not specify the actions for which he was retaliated against by GCI staff. Defendants argue that the Level 1 Grievance's "sole focus was with respect to custody's general use of a '3 point restraint' " and that the claims were unrelated to Garcia's allegations in the Complaint that his being restrained was in retaliation for stating he would pursue a lawsuit against mental health staff. Defendants' Memorandum in Support of Summary Judgment ("Defs. Mem. in Supp.") (Doc. No. 38-1) at 8. Garcia's position is that he adequately complained of the "decision to use '3 point' restraints on May 6, 2014 and the physical and psychological impact of that decision," and that "[l]ike the Grievance, the allegations of Plaintiff's complaint center on the events commencing on May 6, 2014 and the use of the in-cell restraints." Pl. Second Mem. in Opp'n at 12.

**\*6** One purpose of the PLRA is to afford inmates and corrections officials an opportunity to address complaints internally before engaging in federal litigation. See Woodford, 548 U.S. at 93–94. "In order to exhaust ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004). As such, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." Id. The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion. Jones v. Bock, 549 U.S. at 218.

The Grievance Form indicates that Garcia was to "[p]rovide any factual information that is applicable [to the Grievance], including any responses from staff." See Pl. Second Mem. in Opp'n, Ex. 11. Garcia's Grievance referenced his placement on in-cell restraints and that GCI staff left Garcia restrained overnight. It did not mention that he told Yerkes, Bertulis, and Marek that he would sue them for allegedly refusing to provide him with medication or that the decision by Parnisakul, Burritt, Ross, and Byars to place him on in-cell restraints was made in retaliation for his claim to file a future lawsuit against Yerkes, Bertulis, and Marek. The word "lawsuit" does not appear on the face of the Grievance, and the only reference to retaliation is a one-sentence claim that Garcia was placed in restraints in retaliation for his conduct. See Pl. Second Mem. in Opp'n, Ex. 11 at 3. Garcia does not state in the Grievance he filed that he was caused to urinate or defecate on himself, nor that he was unable to stand up or use the toilet, nor that he was prevented from cleaning himself before appearing in court.

The question before this court is not whether Garcia exhausted his available administrative remedies, but whether there is a material dispute of fact as to whether he did so. Viewing the evidence in the light most favorable to Garcia, however, the court concludes that there is no material issue of fact. Garcia's Grievance made no mention of his threatening to sue GCI, no mention of staff actions in response to such statements, and contained no details regarding an inability to use the toilet or any allegation that he urinated or defecated on himself as a result. Finally, Garcia made no mention of staff refusing him the opportunity or ability to clean himself before appearing in court.

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 325 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

The court concludes that, based on the undisputed facts, a reasonable jury could not find that the Level 1 Grievance filed on May 15, 2014, constituted an attempt to exhaust Garcia's retaliation claim against Parnisakul, Burritt, Ross, Byars, and Hurdle. [4] Parnisakul, Burritt, Ross, Byars, and Hurdle have met their burden of demonstrating that there are no issues of material fact in dispute with regard to the exhaustion of the retaliation claims against them and that they are entitled to judgment as a matter of law. The defendants' Motion for Summary Judgment is granted as to Garcia's retaliation claims for failure to exhaust.

[4]   Garcia argues in his Second Memorandum in Opposition that "[t]he undisputed facts demonstrate the exhaustion requirement has been met." See Pl. Second Mem. in Opp'n at 12. Garcia bases this argument on the fact that the Grievance Appeal Form contains an X marking the statement "You have exhausted the Department's Administrative Remedies. Appeal to Level 3 will not be answered." See id. However, the mark is not an indication that Garcia exhausted his administrative remedies as to all claims he might have raised. It shows only that Garcia was deemed to have exhausted his available remedies as to the claims for which the Grievance provided notice.

### 3. Deliberate Indifference to Mental Health Needs Claim

**\*7** Defendants further argue that Garcia failed to exhaust the available administrative remedies as related to his claim that Gray, Marek, Bertulis, and Yerkes were deliberately indifferent to his mental health needs because they failed to give Garcia medication and instead placed him in restraints. Defendants support this argument by pointing to the fact that "[Garcia's] medical file, which contains a section for filing grievances, does not contain any grievances regarding the alleged misconduct of the mental health staff on May 6, 2014." Defs. Suppl. Mem. in Supp. at 9. Garcia argues in response that defendants have failed to meet their burden of proof. See Pl. Second Mem. in Opp'n at 14.

As noted above, inmates seeking to file a grievance related to medical care or treatment, including mental health treatment, are required to follow the procedures outlined by Administrative Directive 8.9. See AD 9.6 § 4(L). Defendants' Local Rule 56(a) Statement of Facts states that copies of these grievances—called Health Services Reviews—are kept in the

inmate's medical record. See Defs. L.R. 56(a) ¶ 76. However, as Garcia correctly noted in opposition, defendants do not cite to authority or evidence for this claim. See Pl. Suppl. L.R. 56(a) at 8 ¶ 76. The defendants filed a copy of Administrative Directive 8.9 as an exhibit to their Motion for Summary Judgment. See Doc 38-12 ("AD 8.9"). AD 8.9 section 13(C) states that "[t]he health record of each inmate who has applied for a Review of a Diagnosis or Treatment shall contain a copy of the forms used in the Review, notations in the clinical record including a notation of 'HSR Administrative Remedy' appointment." AD 8.9 § 13(C). While the defendants did not cite to this authority, it supports their claim that Health Services Reviews are filed as part of inmate medical records.

Defendants also filed the Declaration of Magdalena Szczygiel, the Grievance Coordinator at GCI, see Defs. Suppl. Mot. Summ. J., Ex. 9 (Doc. 81-14) at 2, who asserts that she was not able to find any grievances filed by Garcia relating to medical care or diagnoses. See id. at 2–3. Szczygiel affirms that she has been the Grievance Coordinator at GCI since 2015, and that her position is "one of the Administrative Remedies Coordinator positions appointed by the Unit Administrator, as set forth in Administrative Directive 9.6." Id. at 2. Szczygiel further affirmed that she is the keeper of grievances filed by inmates at GCI. Id. at 3.

Garcia argues that Szczygiel does not attest to her authority over or knowledge of health services review requests filed pursuant to AD 8.9. See Pl. Second Mem. in Opp'n at 14. Szczygiel does not declare that she reviews or is the keeper of records for health services reviews, nor did she declare that she reviewed Garcia's medical file to determine whether he had filed medical or mental health grievances or health services requests pursuant to AD 8.9.

The defendants have not filed an affidavit or declaration of the individual at GCI who is responsible for processing medical/mental health grievances or health services requests pursuant to Administrative Directive 8.9, namely the Health Services Review Coordinator. While defendants filed a copy of at least some of Garcia's medical records under seal, they offer no evidence that the filed documents constitute Garcia's full and complete medical records. Thus, they have not shown that there is no material issue of fact as to the existence of mental health grievances or health services requests pertaining to the alleged failure of Gray, Yerkes, Bertulis, and Marek to provide Garcia with medication to treat his mental health conditions on May 6, 2014.

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 326 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)
2018 WL 5830840

The court concludes that Gray, Yerkes, Bertulis, and Marek have not met their burden of demonstrating that there are no issues of material fact in dispute with regard to the exhaustion of the mental health treatment claim. The Motion for Summary Judgment, on the ground that Garcia did not exhaust his available administrative remedies as to this claim, is therefore denied.

### 4. Deliberate Indifference to Health and Safety/ Unconstitutional Conditions of Confinement Claim

**\*8** Finally, defendants contend that Garcia failed to exhaust the available administrative remedies as to his claims (1) that defendants Ross, Burritt, Parnisakul, and Byars acted with deliberate indifference to Garcia's health and safety and subjected him to unconstitutional conditions of confinement when they placed him on in-cell restraints; and (2) that defendant Hurdle acted with deliberate indifference to Garcia's health and safety and subjected him to unconstitutional conditions of confinement when he refused to allow Garcia to clean himself before court. The court addresses the exhaustion of these claims separately.

The Level 1 Grievance filed by Garcia on May 15, 2014, includes a claim regarding his placement on in-cell restraints from May 6, 2014 to May 7, 2014, using handcuffs, leg shackles, and a tether chain connecting the handcuffs to the leg shackles. See Pl. First Mem. in Opp'n, Ex. 3 at 21. Garcia describes these restraints as three-point restraints in his Grievance. Id. Garcia argues that he was humiliated, and that the restraint process dehumanized him. Id. Garcia appealed the denial of this Grievance; the Level 2 reviewer checked the box indicating that Garcia had exhausted his administrative remedies as to the claim in the Level 1 Grievance. Id. at 23.

The Level 1 Grievance filed by Garcia on May 15, 2014, does not include an allegation about Garcia urinating and defecating on himself because he was unable to use the bathroom during his confinement on in-cell restraints. The Grievance clearly states that Garcia was put on in-cell restraints on May 6, 2014, was left in restraints overnight, and that this experience was humiliating and dehumanizing. Id. at 3. Garcia also stated in the Grievance that the conduct was unconstitutional, claiming that it amounted to "cruel and unusual punishment." Id.

The court concludes that Garcia's Grievance raises a genuine issue of material fact as to whether he exhausted his available administrative remedies as to his claim that defendants Ross, Burritt, Parnisakul, and Byars acted with deliberate indifference to his health and safety. The Motion for Summary Judgment is therefore denied on the ground that Garcia did not exhaust his available remedies prior to filing this action with regard to the Fourteenth Amendment claim that Byars, Burritt, Ross, and Parnisakul had applied the restraints in way that prevented him from standing upright or using the toilet.

However, the court reaches a different conclusion as to whether Garcia exhausted his administrative remedies as to his claim of deliberate indifference to health and safety against Hurdle. Garcia alleges that Hurdle was deliberately indifferent to his health and safety because he denied Garcia the opportunity to clean himself and remove dried urine and feces from his body before attending court. See Affidavit of Jose Garcia. (Doc. No. 83-2) ¶ 22. Garcia made no mention in his Level 1 Grievance of defecating or urinating on himself while on in-cell restraints. Nor did he make any mention of any GCI staff member refusing him the opportunity to clean himself before attending court. Absent even the barest allegation in his Grievance regarding his treatment by staff following removal of the in-cell restraints, the court concludes that there is no issue of material fact as to whether Garcia properly exhausted his available administrative remedies as to this claim. Defendants' Motion for Summary Judgment is therefore granted for failure to exhaust as to the claim that Hurdle acted with deliberate indifference to Garcia's health and safety, and subjected him to unconstitutional conditions of confinement.

**\*9** The court has concluded that there is no material issue of fact as to the exhaustion of Garcia's claims of First Amendment retaliation against Hurdle, Parnisakul, Burritt, Ross, and Byars. The court has concluded that there are material issues of fact as to exhaustion of Garcia's claims of Fourteenth Amendment deliberate indifference to mental health needs against Gray, Yerkes, Bertulis, and Marek, and of Fourteenth Amendment deliberate indifference as to Garcia's health and safety and subjection to unconstitutional conditions of confinement by Byars, Burritt, Ross, and Parnisakul. The court now addresses whether a material issue of fact exists as to the elements of each of the remaining claims.

### B. Fourteenth Amendment Claims of Deliberate Indifference

Garcia alleges that GCI staff acted with deliberate indifference to his mental health needs by "refusing to

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 327 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

prescribe Mr. Garcia medication or treatment for his mental illness and instead placing him in restraints as punishment." See Pl. Second Mem. in Opp'n at 1. Because Garcia was a pretrial detainee during the relevant time period, his claims are governed by the Due Process Clause of the Fourteenth Amendment. Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017).

To establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, a pretrial detainee must satisfy a two-pronged test: (1) an "objective prong" showing that the challenged conditions were sufficiently serious to constitute a constitutional deprivation, and (2) a "subjective prong," also called a "mens rea prong," showing that the defendant acted with deliberate indifference. Id. at 29. The test is the same regardless of what condition of confinement is challenged. See id. at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment.")

To satisfy the objective prong, a detainee must prove that the challenged conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, including mental health. See id. at 29. To satisfy the mens rea prong, the detainee must prove that the defendants acted with deliberate indifference, which in the context of a Fourteenth Amendment claim equates to objectively reckless behavior. See id. at 29, 35 (holding that "the subjective prong (or mens rea prong) of a deliberate indifference claim is defined objectively") (internal quotations omitted).

At summary judgment, the burden is on the defendants to show there is no material issue of disputed fact as to whether the plaintiff was objectively deprived of due process, or that the defendants did not act with deliberate indifference. The court first addresses Garcia's claims of deliberate indifference as to mental health needs before proceeding to his claims of deliberate indifference as to health and safety.

### 1. Deliberate Indifference to Mental Health Needs

Garcia alleges that Gray, Marek, Bertulis, and Yerkes acted with deliberate indifference to Garcia's mental health needs when they refused to address his requests for treatment in connection with his placement in restrictive housing. Pl. Second Mem. in Opp'n at 16. Defendants contend that there are no material issues of fact to support Garcia's claim that

the defendants acted with deliberate indifference to his health needs. Defs. Suppl. Mem. in Supp. at 14.

#### a. Objective Requirement

The objective requirement of a deliberate indifference of medical needs claim consists of two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). The second is "whether the inadequacy in medical care is sufficiently serious." Id. at 280. When an inmate's claim of deliberate indifference is based on a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Id. (citing Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir. 2003) ). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." Id.

*10 Here, the defendants conceded for the purpose of summary judgment that Garcia has been diagnosed with serious mental health disorders, and Garcia's medical record demonstrates that he suffered from chronic, severe mental health issues. See Pl. Second Mem. in Opp'n at 16. However, defendants contest that Garcia was deprived of medical care.

Defendants argue that there is no evidence that Garcia requested medicine.[5] They assert that the video recordings submitted to the court support this argument. See Def. Suppl. Mem. in Supp. at 13. They also argue that the medical defendants' clinical entries make no mention of Garcia making any requests for medication. Id.

5    Defendant Gray also argues that he had limited interaction with Garcia, and that his "only involvement with Garcia was to keep the trap door open so that superior staff could maintain contact with him." See Defs. Suppl. Mem. in Supp. at 12–13. As the Supreme Court has held, guards "intentionally denying or delaying access to medical care can constitute deliberate indifference to medical needs." See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976). Garcia swears that he repeatedly requested medication. A reasonable

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 328 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

inference is that a person standing at a cell door would hear such requests. Garcia's Affidavit, combined with Gray's admission that he was present at the cell door, raises a material issue of fact as to whether Gray was deliberately indifferent to Garcia's requests for medication.

Garcia claims that he made repeated requests for medication, and that these requests were ignored. Pl. Second Mem. in Opp'n at 17. In support of this claim, Garcia relies on (1) his Affidavit, and (2) a portion of a video recording submitted to this court. See id. Garcia also argues that, because the video recordings submitted to the court cover only a small portion of the total time relevant to Garcia's claims, they "do not provide a complete picture of the events, Mr. Garcia's requests for medication, and/or the medications that Mr. Garcia should have, but did not." Id. Garcia argues that the defendants' failure to provide him with medication led to his "desperate attempt to commit suicide by hanging," and that the attempted suicide shows that the defendants' actions posed a serious risk to Garcia's health. See id.

The defendants argue that "there is no apparent evidence that Garcia asked defendants Marek, Bertulis, and Yerkes for medicine." Id. However, "a party who moves for summary judgment on the ground that the nonmoving party has no evidence must affirmatively show the absence of evidence in the record." Celotex Corp. v. Catrett, 477 U.S. 317, 332 (1986). A nonmoving party may defeat a motion for summary judgment that rests on a lack of evidence by calling the court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party. Id. Once the nonmoving party has made such evidence clear to the court, "the moving party must ... attempt to demonstrate the inadequacy of this evidence." Id.

The word "medicine" is referenced at least once in the video recordings submitted to the court. DVD GCI-V-14-276 at 37:20. The reference is during a conversation between Garcia and Social Worker Bertulis. Id. at 37:20. Much of the conversation is difficult to understand because of background noise, but at one point in the video, Bertulis can be seen to listen to Garcia, and then ask Garcia, "What do you want?" Id. at 37:20. Following further conversation and a pause, Bertulis asks the fragmented question, "Like Medicine?" Id. at 37:20. Thereafter, Bertulis can be heard to say that she can help Garcia with some aspects of a request but not others. Id. at 38:00.

**\*11** Defendants did not address the contents of the video recordings, or explain why the mention of "medicine" was not sufficient to raise a question of fact as to Garcia's claim that he requested medication and was ignored. Garcia swore in his Affidavit that he made repeated requests for medicine, and the requests were ignored. See Affidavit of Jose Garcia (Doc. No. 83-2) ¶ 16. Garcia also notes that the video is only a recording of part of the interaction between him and GCI staff. See Pl. Second Mem. in Opp'n at 17 ("The videos only record a limited period of time (under 92 minutes total) relative to the hours during which the incidents occurred (more than 18 hours). Thus, the recordings do not provide a complete picture of the events, Mr. Garcia's requests for medication, and/or the medications that Mr. Garcia should have received, but did not."). The court concludes, based on the ambiguous video evidence, combined with the contested nature of the evidence presented by the defendants and Garcia, that there is a material issue of fact as to whether Garcia made requests for medication that were ignored.

b. Subjective Requirement

Defendants also argue that there is no material issue of disputed fact as to whether they acted with deliberate indifference to Garcia's mental health needs. The defendants again rest their Motion on the argument that Garcia has provided no evidence that the defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to [Garcia] even though these defendants knew or should have known that the condition posed an excessive risk to health or safety." Defs. Suppl. Mem. in Supp. at 14. Defendants argue that Garcia was placed in the RHU because he threatened staff earlier in the day. Id. at 13. Garcia was segregated from the officer that had antagonized him earlier in the day. Id. at 13–14. Finally, pursuant to policy, Garcia was placed on Behavioral Observation Status ("BOS") and was to be observed every 15 minutes. See id. at 14. The purpose of BOS is to mitigate an inmate's "maladaptive" behaviors while keeping the inmate and staff safe. See Pl. Suppl. L.R. 56(a) at 12 ¶ 18.

Garcia argued in response that GCI is a facility specifically used to house inmates with mental health issues, and that the defendants therefore should have known that Garcia had been diagnosed with mental health issues requiring medication and treatment. Pl. Second Mem. in Opp'n at 18. Moreover, Garcia argues that the behavior he exhibited during the relevant time should further have put defendants on notice as to his mental

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 329 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

health needs. Id. The defendants' burden is to show that there is no material issue of fact as to whether the defendants recklessly failed to act with reasonable care to mitigate the risk that the failure to provide medication posed to Garcia, even though the defendants knew, or should have known, that the failure to provide him medication posed an excessive risk to Garcia's health or safety. See Darnell, 849 F.3d at 29.

Defendants failed to show that there is no issue of material fact as to whether they acted with reckless disregard of an excessive risk to Garcia's health and safety. The court concludes that, based on Garcia's documented behavior during the time leading up to and including his placement in RHU, combined with Garcia's documented history of self-harm, and evidence he repeatedly requested medicine, a reasonable jury could find that the defendants recklessly disregarded an excessive risk to Garcia's health and safety when they ignored his requests for medication and instead placed Garcia on in-cell restraints.

The defendants' Motion for Summary Judgment is therefore denied as to Garcia's claim of deliberate indifference to mental health needs.

### 2. Deliberate Indifference to Health and Safety

Garcia alleges that defendants Hurdle, Ross, Burritt, Parnisakul, and Byars acted with deliberate indifference to a harmful condition and retaliated against Garcia by placing him on in-cell restraints that prevented him from standing fully upright or using the toilet. See Pl. Second Mem. in Opp'n at 19. The court already concluded that summary judgment is appropriate as to the deliberate indifference claim against defendant Hurdle because of Garcia's failure to exhaust administrative remedies. See, supra, at 17–18.

#### a. Objective Requirement

 **\*12**  The first prong of the deliberate indifference standard is whether there was an objective deprivation. To establish an objective deprivation, the inmate must prove that the challenged conditions, evaluated in light of contemporary standards of decency, alone or in combination pose an unreasonable risk of serious damage to his health. Darnell, 849 F.3d at 30. The Second Circuit has held that "the proper lens through which to analyze allegedly unconstitutional unsanitary conditions of confinement is with reference to their

severity and duration, not the detainee's resulting injury." Id. (citing Willey v. Kirkpatrick, 801 F.3d 51, 68, (2d Cir. 2015) ). There is no "bright-line durational requirement for a viable unsanitary-conditions claim." Willey, 801 F.3d 68. Nor is there a minimal level of unsanitary conditions required. See id.

Defendants argue in support of summary judgment that: (1) Garcia's behavior caused him to be placed in restrictive housing; (2) Garcia's placement in RHU was mandated by applicable Administrative Directives; and (3) there is "absolutely no evidence" that the defendants intentionally restrained Garcia in a manner that would prevent him from standing upright or using the toilet. See Defs. Suppl. Mem. in Supp. at 15. The defendants provide documentary evidence to support their argument, including (1) a video showing Garcia's gown was open in the rear, which suggests that he would be able to use the toilet (if he could reach it), see DVD-GCI-V-14-276 at 50:50; (2) restraint logs showing checks of Garcia's cell were conducted at 15 minute intervals, and that Gray saw Garcia pacing in the cell, see Defs. Suppl. Mot. Summ. J., Ex. 3, Attach. D (Restraint Checklist) (Doc. No. 81-9); (3) a sworn statement from Ross stating that the restraints were applied in a manner that would allow Garcia mobility, see id. at Ex. 4 (Decl. of Richard Ross) (Doc. No. 81-10) ¶¶ 20–24; and (4) a sworn statement from Hurdle that he observed no feces or urine on Garcia's body, see Defs. Mot. Summ. J., Ex. 8 (Decl. of George Hurdle) (Doc. No. 38-10) ¶ 15.

In response, Garcia argues first, that the manner in which he was chained was contrary to the requirements of applicable Administrative Directives, specifically AD 6.5, and that Byars, Ross, Parnisakul, and Burritt were all "personally involved" in the application of in-cell restraints on Garcia "and were in a position to recommend correction of the length of the tether chain." Pl. Second Mem. in Opp'n at 19. Garcia further argues that, when Yerkes checked the wrist and ankle cuffs, she failed to have Garcia stand to ensure that the chain length allowed Garcia to stand upright. Id. at 19–20. Garcia does not allege, nor does the evidence suggest that he suffered any physical injuries or harm due to his placement on in-cell restraints. Rather, he avers that he was humiliated because the restraints prevented him from standing upright or using the toilet. Pl. Second Mem. in Opp'n at 20.

The court's role at this stage of litigation is not to make findings of fact. Rather, it is to determine if a material issue of fact exists. The court concludes that the defendants failed to

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 330 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

meet their burden to show there is no material issue of fact as to whether Garcia suffered an objective deprivation. Garcia's sworn statement alone creates a genuine issue of material fact as to this question.

### b. Subjective Requirement

The court also concludes that there is a dispute of material fact as to whether the defendants acted with deliberate indifference to the risk to Garcia's health resulting from placing Garcia on in-cell restraints. The defendants argue that the decision was made to place Garcia on in-cell restraints to control Garcia's disruptive behavior and to maintain order in the facility. Defs. Suppl. Mem. in Supp. at 18. They provide ample documentary evidence of Garcia's behavior warranting placement on in-cell restraints on the day in question.

**\*13** The defendants do not contest that they were all present and involved in the process of placing Garcia on in-cell restraints, and defendants conceded that Yerkes failed to check if Garcia was able to stand after he was placed on in-cell restraints. See Defs. Mem. in Supp. at 14–15. However, the defendants contend that, even if this conduct was negligent, it was not reckless. Id. Defendants further argue that, "there is no evidence that [they] intentionally imposed the condition in which Garcia had been placed, nor is there any evidence that these defendants recklessly failed to act with reasonable care in the application of restraints...." Id. at 16.

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). The court concludes that the defendants have met their initial burden to show a lack of material issue of fact. The burden to show that an issue of fact exists therefore shifts to Garcia. See Scott v. Harris, 550 U.S. 372, 380 (2007) ("[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.")

Garcia responds by arguing that the defendants "acted with deliberate indifference to a harmful condition and retaliated against Garcia by placing him [on] in-cell restraints...." Pl. Second Mem. in Opp'n at 19. Garcia swore in his Affidavit that, after being placed on the in-cell restraints, he "could not stand fully erect or remove the safety gown to use the toilet,"

and that as a result, he urinated and defecated on himself. Affidavit of Jose Garcia (Doc. No. 83-2) ¶ 19. The defendants' admission that they assisted in the application of the in-cell restraints, the admission that LPN Yerkes failed to confirm Garcia's ability to stand erect, and Garcia's sworn statement that the manner in which he was restrained prevented him from standing upright or using the toilet, raise a material issue of fact as to whether the defendants recklessly failed to act with reasonable care in the application of the in-cell restraints. The defendants' Motion for Summary Judgment is therefore denied as to Garcia's claim that Ross, Burritt, Parnisakul, and Byars acted with deliberate indifference to a harmful condition.

### C. Qualified Immunity

Garcia's remaining claims are (1) the Fourteenth Amendment claim of deliberate indifference to mental health needs against Gray, Yerkes, Bertulis, and Marek, and (2) the Fourteenth Amendment claim of deliberate indifference to Garcia's health and safety against Ross, Burritt, Parnisakul, and Byars. The defendants argue that they are entitled to summary judgment on the basis of qualified immunity. Defendants briefed this issue in their First Memorandum in Support of the Motion for Summary Judgment (Doc. No. 38-1). See Defs. Mem. in Supp. at 22. While the defendants re-alleged in their supplemental filings that they were entitled to qualified immunity, see Defs. Suppl. Mem. in Supp. at 1, they did not provide any substantive briefing on this issue in their Supplemental Memorandum in Support. Nor did Garcia address the issue in his supplemental filings. The defendants' original argument in support of qualified immunity is sparse; while the defendants correctly state the legal standard, see Defs. Mem. in Supp. at 22–25, the factual examination is limited. See id. at 26.

In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first prong "asks whether the facts, taken in the light most favorable to the party asserting the injury ... show the officer's conduct violated a federal right[,] ... [and] [t]he second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." Raspardo v. Carlone, 770 F.3d 97, 113 (2d Cir. 2014) (alterations in original). The Supreme Court has held that a court may consider these two questions in either order and, if it determines that one prong is not satisfied, it need not reach the other. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). Defendant officials are therefore entitled to summary judgment when they can establish that there is no material

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 331 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

issue of fact as to either "(1) a constitutional right [being] violated or (2) the right was not [being] clearly established [at the time of the violation]." Raspardo, 770 F.3d at 113. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001).

**\*14** Even where a right is clearly established, a defendant official is entitled to qualified immunity if "it was objectively reasonable for the defendant to believe that his action did not violate such law." See Poe v. Leonard, 282 F.3d 123, 133 (2d Cir. 2002). An officer's actions are objectively reasonable if "officers of reasonable competence could disagree on the legality of the defendants' actions." Ford v. Moore, 237 F.3d 156, 162 (2d Cir. 2001). If the court determines the only conclusion a rational jury could reach is that reasonable officers at the time of the alleged constitutional violation would disagree about the legality of the defendants' conduct under the circumstances, summary judgment for the officers is appropriate. See Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).

Whether a defendant's conduct was objectively reasonable, that is, "whether a reasonable official in the defendant's position would reasonably believe his conduct did not violate a clearly established right," is a mixed question of law and fact. Outlaw v. City of Hartford, 884 F.3d 351, 367 (2d Cir. 2018). "Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual questions must be resolved by the factfinder." Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004) (citations omitted).

The court notes that, under Second Circuit law at the time of the alleged harm, courts analyzed pretrial detainee claims of deliberate indifference under the Eighth Amendment standard. See Caiazzo v. Koreman, 581 F.3d 63, 71 (2d Cir. 2009), overruled by Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017). To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety. Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013). To meet the subjective requirement, a plaintiff must prove that officers knew of, and disregarded, an excessive risk to health or safety. Id. Evidence that a risk was "obvious or otherwise must have been known to a defendant" may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk. Id. (citation omitted).

The court addresses whether the defendants are entitled to qualified immunity as to the remaining claims, the deliberate indifference to mental health needs claims and deliberate indifference to harmful conditions claims, separately.

a. Qualified Immunity from Claims of
Deliberate Indifference to Mental Health Needs

Gray, Yerkes, Bertulis, and Marek argue they are entitled to qualified immunity as to Garcia's claim of deliberate indifference to his mental health needs. The court first addresses whether the facts, viewed in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right. See Gilles v. Repicky, 511 F.3d 239, 244 (2d Cir. 2007) (quoting Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) ).

The Supreme Court has held that deliberate indifference to serious medical needs violates prisoners' constitutional rights, whether "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." See Estelle v. Gamble, 429 U.S. 97, 104–05 (1976). This right extends to the provision of mental health care. See Langley v. Coughlin, 888 F.2d 252, 254 (2d Cir. 1989). Garcia swore in his Affidavit that he repeatedly requested mental health medication, and that the defendants ignored his requests. See Affidavit of Jose Garcia (Doc. No. 83-2) ¶ 16. Defendants deny that Garcia made any requests.

**\*15** The court cannot resolve this dispute of fact at summary judgment. See Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (holding that in addressing a qualified immunity argument, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," and reiterating that "a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial") (internal quotations omitted). Viewing the facts in the light most favorable to Garcia, the court concludes that a rational

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 332 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

jury could find that the failure of the defendants to provide mental health medication, despite Garcia's repeated requests, violated Garcia's constitutional right to adequate mental health care.

The second prong of the qualified immunity analysis is whether the constitutional right was clearly established. The right to be free from deliberate indifference to one's serious medical needs has long been established since the United States Supreme Court's decision in Estelle v. Gamble, 429 U.S. at 104–05. And, as the court noted above, this right applies to mental health needs. This right was clearly established at the time of the alleged unconstitutional conduct. As the court has noted, however, even where a right was clearly established, a defendant would be entitled to qualified immunity if, at the time of the alleged acts, it would have been "objectively reasonable for the defendant to believe that his action did not violate such law." Poe v. Leonard, 282 F.3d at 133.

Defendants Yerkes, Marek, and Bertulis argue "it was objectively reasonable for the mental health nurses [LPN Yerkes, CSW Marek, and CSW Bertulis] to communicate with plaintiff regarding his mental state, but the administration of medication is beyond their authority." Defs. Mem. in Supp. at 26. Clearly, prescribing or ordering medication is the responsibility of a doctor. The defendants' argument, however, does not address the obligations of others, like prison guards and non-physicians, to seek to obtain medical treatment or medication from physicians when an inmate requests it and the circumstances support the request. See, supra, at 31. Further, the defendants make no argument as to why qualified immunity applies to Garcia's claim of indifference to mental health needs against Corrections Officer Gray, except for a blanket statement that it was objectively reasonable for the defendant corrections officers to follow prison procedure. See Defs. Mem. in Supp. at 26. That argument again misses the point: corrections officers have a duty to seek a physician's assistance in circumstances that call for medical treatment, including the procurement and administration of medication. See Estelle v. Gamble, 429 U.S. at 104–05 (holding that indifference to serious medical needs violates the Eighth Amendment "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed") (emphasis added). Moreover, the defendants offer no evidence or case law to support their argument. Accepting, for the purpose of summary judgment,

that Garcia requested medication and that Corrections Officer Gray, Nurse Yerkes, CSW Bertulis, and CSW Marek ignored Garcia's requests, the court concludes that, under the law at the time, no objectively reasonable corrections officer, nurse, or social worker would disagree that such inaction was a violation of Garcia's constitutional rights. Therefore, the defendants' Motion for Summary Judgment on the basis of qualified immunity as to Garcia's claim of deliberate indifference to mental health needs is denied.

### b. Qualified Immunity from Claims of Deliberate Indifference to Health and Safety

**\*16** Defendants Parnisakul, Burritt, Ross, and Byars argue that they are entitled to qualified immunity on Garcia's claim that they were deliberately indifferent to his health and safety and subjected him to unconstitutional conditions of confinement when they caused him to be placed on in-cell restraints in a manner that prevented him from standing upright and using the toilet. Defs. Mem. in Supp. at 26. The court first addresses whether the facts, viewed in the light most favorable to the plaintiff, show that the officers' conduct violated a constitutional right.

Garcia alleged that he was placed on in-cell restraints in a manner that prevented him from standing and from reaching or using the toilet. He affirmed that, as a result, he was unable to stand upright in his cell for nine hours, and that he was forced to urinate and defecate on himself. While prisoners do not have a constitutional right to comfortable prison conditions, they do have a right to be free from unnecessary and wanton infliction of pain. See Hope v. Pelzer, 536 U.S. 730, 737 (2002). Moreover, the Second Circuit has "long recognized that unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment." Walker v. Schult, 717 F.3d at 127 (2d Cir. 2013).

While the defendants claim that Garcia was seen pacing in his cell, see Defs. Suppl. Mot. Summ. J., Ex. 3, Attach. D (Restraint Checklist) (Doc. No. 81-9), and they deny that Garcia urinated or defecated on himself, the court, as noted "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014). Viewing the evidence in the light most favorable to Garcia, the court concludes that a rational jury could find that the defendants placed Garcia on in-cell restraints in a manner that prevented him from standing or relieving himself in a sanitary manner for nine hours. Such

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 333 of 380
Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)
2018 WL 5830840

conduct was sufficiently serious to constitute a constitutional deprivation at the time.

The second prong of the qualified immunity analysis is whether the right that the defendants allegedly violated was clearly established at the time of their conduct, that is, whether "the rights that plaintiff asserts were violated [were] clearly established in a particularized sense, so that a reasonable official would know that his actions violated plaintiff's rights." P.C. v. McLaughlin, 913 F.2d 1033, 1039 (2d Cir. 1990) (internal quotation omitted). Garcia claims that his placement on in-cell restraints in a manner that prevented him from standing was cruel and unusual punishment. As noted above, see, supra, at 34, clearly established law at the time of the incident provided that inmates had an Eighth Amendment right to be free from "unnecessary and wanton infliction of pain." Hope v. Pelzer, 536 U.S. at 737 (2002). Garcia also claims that his inability to reach the toilet, causing him to soil himself, constituted cruel and unusual punishment. The Second Circuit had clearly established that inmates could not be "denied the minimal civilized measure of life's necessities" at the time relevant to this case. See Walker v. Schult, 717 at 125. Thus, the right upon which his claim is based was clearly established at the time in question.

As noted above, even where a right is clearly established, a defendant will be entitled to qualified immunity if, at the time of the alleged acts, it would have been "objectively reasonable for the defendant to believe that his action did not violate such law." Poe v. Leonard, 282 F.3d at 133. In other words, the defendants are entitled to qualified immunity if reasonable officers at the time would disagree that the defendants' conduct violated Garcia's constitutional rights.

 *17  The first question is whether it was objectively reasonable for the officers to believe that Garcia's deprivation was not sufficiently serious to meet the objective element of an Eighth Amendment claim of deliberate indifference. At the time of the events in question, the Second Circuit had held that there was "no static test to determine whether a deprivation is sufficiently serious, [and that] the conditions themselves must be evaluated in light of contemporary standards of decency." Jabbar v. Fischer, 683 F.3d 54, 57 (2d Cir. 2012) (citing Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995) (alterations and quotations omitted) ). The Second Circuit had also held that "prisoners may not be deprived of their basic human needs," including food, clothing, shelter, and reasonable safety. See id. Garcia alleged that the defendants placed him on in-cell restraints in a manner

that prevented him from standing upright or using a toilet for nine hours, causing him to urinate and defecate on himself. The ability to stand and move sufficiently to relieve oneself in a sanitary manner is a basic human need, and denial of such ability overnight, causing an individual to urinate and defecate on themselves, constitutes a violation of society's general standards of decency. The court concludes that, if the jury credits Garcia's testimony, the alleged conditions would amount to a serious deprivation of basic needs sufficient to meet the first element of an Eighth Amendment claim of deliberate indifference.

The second question is whether defendants Parnisakul, Burritt, Ross, and Byars are entitled to qualified immunity because it was objectively reasonable for the defendants to believe that their conduct did not violate Garcia's Eighth Amendment right. As noted, to satisfy the subjective deliberate indifference element under the Eighth Amendment, a plaintiff must prove that officers knew of, and disregarded, an excessive risk to health or safety.

As evidence, Garcia points to admissions by defendants Byars, Ross, Parnisakul, and Burritt, that each of the defendants either assisted in placing Garcia on in-cell restraints, or secured Garcia while other staff members placed him on in-cell restraints. See Pl. Second Mem. in Opp'n at 19. Garcia argued that the corrections officers were therefore "personally involved in the application of the in-cell restraints and were in a position to recommend correction of the length of the tether chain." Pl. Second Mem. in Opp'n at 19. In his Affidavit, Garcia affirmed that he was "walked into cell F125 and placed in in-cell restraints," and that he "never stood up during or after the time that the in-cell restraints were being applied." See Affidavit of Jose Garcia (Doc. No. 83-2) ¶ 18. Garcia further affirmed that "[t]he video shows that LPN Yerkes checks the wrist and ankle cuffs without asking [Garcia] to stand." Id. (citing DVD-GCI-V-276). Viewing the evidence in the light most favorable to Garcia, and drawing all reasonable inferences in his favor, the court concludes that a rational jury could find that defendants Byars, Ross, Parnisakul, and Burritt were in the cell when Garcia was placed on in-cell restraints, that they assisted in his placement on in-cell restraints, and that they were present when LPN Yerkes checked the restraints and failed to have Garcia stand. The court further concludes that a rational jury could find that the defendants knew of and disregarded an excessive risk to Garcia's health and safety when they failed to ensure that Garcia was able to stand upright in his cell or reach the toilet, or that the risk to Garcia's health and safety was "obvious or

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 334 of 380

Garcia v. University of Connecticut Health Care Center, Not Reported in Fed. Supp. (2018)

2018 WL 5830840

otherwise must have been known to [the] defendants." Walker v. Schult, 717 F.3d at 125. Based on such a factual finding, this court could not conclude that reasonable officers at the time of the alleged constitutional violation would disagree about the legality of the defendants' conduct under the circumstances. To the extent that there are issues of disputed material fact as to what the defendants faced or perceived, including whether the defendants were able to perceive an obvious, excessive risk to Garcia's health and safety, that question of fact must be resolved by the jury before this court can determine, as a matter of law, "whether qualified immunity attaches on those facts." See Outlaw v. City of Hartford, 884 F.3d at 367 (emphasis in original).

**\*18** Because the court cannot conclude that the only conclusion a rational jury could reach is that reasonable officers would disagree as to whether the conduct of defendants Parnisakul, Burritt, Ross, and Byars violated a clearly established right under the law of this Circuit at the time of the alleged violation and, under the circumstances the defendants faced, summary judgment on qualified immunity is inappropriate. See Lennon v. Miller, 66 F.3d at 420 ("If any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment."). Thus, the defendants' Motion for Summary Judgment, as to Garcia's Fourteenth Amendment claims of deliberate indifference to health

and safety and subjection to unconstitutional conditions of confinement, is denied on the basis of qualified immunity.

## V. CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment (Doc. No. 38) and Supplemental Motion for Summary Judgment (Doc. No. 81) are granted in part and denied in part. Summary Judgment is **GRANTED** as to Garcia's Fourteenth Amendment claim of deliberate indifference to his health and safety and subjection to unconstitutional conditions of confinement by Hurdle based on failure to exhaust, and **DENIED** as to Garcia's Fourteenth Amendment claim of deliberate indifference to his health and safety and subjection to unconstitutional conditions of confinement by Parnisakul, Burritt, Ross, and Byars based on qualified immunity. Summary Judgment is **GRANTED** as to Garcia's First Amendment claim of retaliation by Hurdle, Parnisakul, Burritt, Ross, and Byars based on failure to exhaust. Summary Judgment is **DENIED** as to Garcia's Fourteenth Amendment Claim of deliberate indifference to his mental health needs by Gray, Marek, Bertulis, and Yerkes.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5830840

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Dunn v. DuBois,  S.D.N.Y.,  October 23, 2009

2004 WL 2914093

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

SOUTHWICK CLOTHING LLC as assignee
of certain assets of Grieco Bros., Inc.,
Richard Grieco and Sarah Grieco, Plaintiffs,

v.

GFT (USA) CORP. and Ronald Frasch, Defendants.

No. 99 CV 10452(GBD).

|

Dec. 15, 2004.

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1**  In an action for, *inter alia,* breach of contract and fraud, defendants GFT (USA) Corp. ("GFT") and Ronald Frasch moved for summary judgment dismissing plaintiffs' amended complaint. Plaintiffs cross-moved for leave to amend the caption of this case to reflect the parties' stipulation that the claims against Mr. Frasch are dismissed with prejudice. The cross-motion is granted. [1] The motion for summary judgment made by the remaining defendant GFT is also granted.

[1]      The parties entered into a stipulation providing that all claims against defendant Ronald Frasch are discontinued with prejudice, and he is no longer a party to the action. The stipulation further provided that plaintiffs' fourth and seventh causes of action are discontinued with prejudice.

The gravamen of the complaint is that GFT breached a December 4, 1998 letter agreement with plaintiff Grieco Bros., Inc. ("GBI"), [2] to establish a joint venture. Both GBI and GFT manufacture clothing, and each has a facility in Massachusetts. GBI was a family-owned business with most of its stock owned by plaintiff Richard Grieco, GBI's president, and a small amount of stock held by his daughter, plaintiff Sarah Grieco. [3]  Congress Financial Corporation ("Congress Financial") was GBI's primary lender and it

provided it with a line of credit that was secured by GBI's assets. Pursuant to Congress Financial's suggestion, GBI retained the services of Gordon Lewis, a principal for a "turnaround consulting firm." (Lewis Dep. at 6,8). His firm generally works with companies who are experiencing financial difficulties in an attempt to help restructure the "business and bring it back to profitability." (*Id.* at 8). Mr. Lewis recommended to Mr. Grieco that GBI be sold because, without a significant capital infusion, the company would continue to financially struggle.

[2]      GBI is dissolved, and certain of its assets were purchased by plaintiff Southwick Clothing LLC.

[3]      Of the twelve remaining causes of action, only one claim, for breach of fiduciary duty, is brought on behalf of plaintiffs Richard and Sarah Grieco individually.

In 1998, GFT was seeking additional manufacturing capacity, and began discussions with GBI to address both companies' needs. Early on in the negotiations, GFT advised GBI that any propose transaction would have to be approved by its corporate parents. [4]  GFT did not accept the offer to purchase GBI outright, but instead suggested the creation of a joint venture. The parties are in agreement that GFT's proposal included the following terms: GBI would contribute its manufacturing facility to a new company ("Newco") in exchange for 100% of the common stock of Newco; GBI employees would become Newco employees; GFT would pay GBI an up-front cash payment for a portion of Newco stock and operational control of Newco, with a call option to purchase the balance of the stock; GFT would make capital investments in Newco to modernize the manufacturing facility and retain its employees and provide working capital; and Newco would produce garments for a new marketing company owned by Mr. Grieco ("Grieco Corporation") for resale to Brooks Brothers. Plaintiffs contend that GFT's proposal also provided that GFT would assume all of GBI's debts including the unfunded pension liability. (Pls.' Rule 56.1 Statement ¶ 4). Negotiations ensued regarding the size of the up-front payment and the option price.

[4]      Pursuant to the parties' stipulation, plaintiffs withdrew all allegations in the amended complaint that state GFT failed to disclose to them that any transaction was subject to the approval by GFT's corporate parent.

2004 WL 2914093

GFT sent GBI a letter of intent, dated November 2, 1998, outlining the terms of the proposed joint venture. The letter of intent "was created in response to Congress Financial['s] request to [GBI] to obtain a written commitment from GFT." (Pls.' Mem. Opp'n Summ. J. at 15 (citing Lewis Decl. ¶ 12; R. Grieco Decl. ¶ 13; Nelson Decl. ¶ 9; Frasch Aff. ¶ 8)). The November 2nd letter of intent provided for an upfront payment of $1 million and an option price of $500,000. Additionally, it provided that Newco would assume the sinking fund liability associated with the employee pension fund. The November letter agreement was signed by Mr. Frasch, on behalf of GFT, and was transmitted to Mr. Grieco for his signature on behalf of GBI. Mr. Grieco did not execute the agreement.

**\*2** In defendant's Rule 56.1 Statement, GFT claims that GBI rejected that proposal. (Def.'s Rule 56.1 Statement ¶ 15). Plaintiffs contest this assertion claiming GBI "accepted all the terms of the November 2nd letter of intent with the exception that [GBI] objected to the price terms of $1,000,000.00 up front and a $500,000 .00 call option; those were not the terms which were agreed upon by the parties. Therefore [GBI] did not reject the November 2nd Letter of Intent." (Pls.' Rule 56.1 Statement ¶ 5). Plaintiffs' current position is, however, contrary to their attorney's [5] earlier statement at Mr. Grieco's deposition. When Mr. Grieco expressed, at his deposition, a lack of understanding of the terms of the November 2nd letter of intent, plaintiffs' counsel stated, "This is a proposal he rejected that was never signed." (R. Grieco Dep. at 118). Mr. Grieco was then asked why he rejected the proposal, and he merely indicated that the $1 million would be insufficient given his financial condition, and he once again expressed a lack of full comprehension as to the meaning of the proposed agreement. (Id. at 119). Gordon Lewis testified that, after reviewing the November 2nd document, he told Mr. Grieco that "certain things weren't acceptable ... the total consideration was not adequate, ... this deal just wasn't going to fly." (Lewis Dep. at 61). He contacted a GFT's representative "to discuss what they had put in writing was not adequate to get the deal done." (Id. at 62). He further informed GFT that $2 million was necessary to close the deal. (Id. at 63).

[5]    Plaintiffs' attorney, who was present at Mr. Grieco's deposition, is not the lawyer who represented GBI with regard to the joint venture proposal.

The parties conducted further negotiations, and ultimately reached agreement on a $2 million up-front payment and a $300,000 option price, which terms were incorporated in a December 4, 1998 letter of intent. This document provided that GFT would pay $2 million for 40% of Newco's common stock with an option to purchase the balance for $300,000, and that Newco would assume GBI's unfunded pension liability. The letter agreement also included a five year projection of monies the Grieco Corporation would generate from a purchase and sale agreement to be negotiated with Brooks Brothers. Specifically, GFT projected that the Grieco Corporation could pay Mr. Grieco a salary of $175,000 per year and generate pre-tax profits of $1.5 million during the following five years. The letter of intent further provided that GFT's obligation to proceed with the transaction would be subject to a number of specified conditions being satisfied including:

> "The negotiation, execution and delivery of definitive agreements in form and substance satisfactory to GFT and its counsel ..."

> > "[GFT] will have completed to its satisfaction a due diligence review of [GBI's business and financial records]."

> > "The formation by Richard Grieco of a new corporation (in which Newco and GFT will have no financial interest) to provide marketing services ("Grieco Corporation")."

**\*3** "The receipt of a tax and financial incentive package from the State of Massachusetts ..."

The letter of intent, which was signed by Mr. Frasch, concluded by instructing Mr. Grieco that if the instrument "accurately reflects [the parties'] understanding," he should "indicate [his] intent to proceed with the Transactions by signing ... this letter ... and returning it to [Mr. Frasch. The parties'] attorneys and accountants will then proceed to review [GBI's] legal and financial records and to draft definitive agreements to effectuate the Transactions." On December 4, 1998, Mr. Frasch sent Mr. Grieco two copies of the letter of

2004 WL 2914093

intent with a cover letter stating, "Enclosed are two copies of the final contract. Please sign both and return one to my office."

GBI's outside counsel [6] testified that, after speaking with Mr. Grieco and Mr. Lewis, he fine tuned the copy of the letter of intent provided to him to make it more accurate and complete. (Zimble Dep. at 20-21). Mr. Lewis testified that he had raised certain issues regarding the December 4th agreement with GBI's attorney expecting counsel to negotiate those points with GFT. (Lewis Dep. at 91-100). By letter dated December 9, 1998, GBI's lawyer submitted to GFT's outside counsel a "redlined document incorporating changes" to the December 4th instrument consistent with their discussions of the prior day. Counsel's letter listed additional issues that were not reflected "in the revised document." Some of the changes set forth in the redlined document and accompanying letter were: (1) Newco would not commit to charge Grieco Corporation a transfer price for the Brooks Brothers garments which would ensure that Grieco Corporation would be able to pay Mr. Grieco a salary of $175,000 per year and generate a pre-tax profit of $1.5 million; (2) GFT would guarantee payment of such salary and profit for that five year period in the event of either Brooks Brothers' breach of its purchase agreement with Grieco Corporation or an early termination of the relationship between GFT and GBI; (3) GFT would commit to exercise the call option within five years; and (4) GFT would eliminate as a condition to its obligation to proceed with the transactions the receipt of the tax and financial package. GBI's attorney ended his cover letter by requesting that he be notified as soon as GBI's counsel reviewed the redline document with GFT "so that our clients can execute this letter of intent this week."

[6]    Mr. Grieco testified that GBI's outside counsel also sat on the GBI board of directors until November of 1998. (R. Grieco Dep. at 8, 245).

Mr. Grieco's testified that he did not instruct either Mr. Lewis or GBI's attorney to seek substantive changes to the December 4th document, and he denied knowing counsel was attempting to negotiate changes to the agreement. (R. Grieco Dep. at 129, 243-44). Mr. Grieco testified that the attorney, and his law firm, was the only legal counsel representing GBI in connection with the proposed transaction (not the ancillary labor union issues), and that such representation spanned from December of 1998 through March of 1999, when negotiations ended. (Id. at 119-21). Although Mr. Grieco and Mr. Lewis contend, in their respective declarations in opposition to the motion, that neither one of them authorized GBI's counsel to

reject the deal, neither party asserts that the lawyer did not possess the requisite authority to submit a counteroffer on behalf of GBI. (R. Grieco Decl. ¶ 25; Lewis Decl. ¶ 21).

 *4  Mr. Grieco further testified that "it was a week or two or three or a month," after he received the December 4th agreement, that he signed it and then mailed it to Mr. Frasch. (R. Grieco Dep. at 125). He testified that in late 1998, he understood that in order to make the letter of intent a binding contract, he had to sign it. (Id. at 122). He explained that he did not perceive any urgency in executing and returning the letter of intent because he "assumed that we had a deal, it was signed by GFT and Ron Frasch, he called to congratulate me the next day, or whatever we were going forward with people making plans ..." (Id. at 128). In opposing the motion, Mr. Grieco maintains "[t]hat the fact that [he] cannot remember when [he] actually signed and mailed the letter of intent is an indication of how little the written agreement meant to [him]: it was Congress Financial who needed it." (R. Grieco Decl. ¶ 25). Mr. Grieco contends that he was relying on Mr. Frasch's word that they were partners, as well as witnessing the deal itself moving forward. (Id.). Although there is evidence in the record contradicting Mr. Grieco's claim that he executed and mailed the letter agreement, and GFT denies ever receiving an executed agreement, Mr. Grieco's factual assertions will be accepted as true for purposes of this motion as it has no bearing on the outcome of the motion. Thus, no factual issue exists in this regard.

On December 21, 1998, GBI's attorney sent a memorandum to GFT's counsel outlining "the remaining open issues on the GBI/GFT Letter of Intent." One of the issues was that the "Pension Fund liabilities must be assumed by Newco and Richard Grieco and GBI must be indemnified by Newco and GFT for the payment of these obligations ." In his affidavit, GFT's lawyer states that, in accordance with GFT's directions, he advised GBI's attorney that the changes regarding the Brooks Brothers agreement and the pension fund indemnification were unacceptable. (LaGueux Aff. ¶ 17). Prior to sending Mr. Grieco the December 4th letter of intent, GFT was aware that GBI was a party to an agreement with the Pension Benefit Guaranty Corporations ("PBGC"), a federal agency regulating pension funds, and that GBI had a large unfunded pension liability. (Deft.' Rule 56.1 Statement ¶¶ 24-25; Pls.' Rule 56.1 Statement ¶ 8; Forlenza Aff. Ex. C; R. Grieco Aff. Ex. 2). In an effort to resolve the open issues raised by GBI, GFT drafted a revised letter of intent which included a provision by which GFT would pay GBI $299,000 for an option to extend the call option if GFT had not

exercised the call after five years. In late December of 1998, GFT sent copies of this revised letter of intent to its corporate parent seeking its approval.

GFT continued on parallel tracks. It continued negotiations with GBI (and seeking approval from its corporate parent), while simultaneously conducting due diligence and putting in place a joint-venture implementation plan. GFT engaged Ernst & Young ("E & Y") to perform due diligence. Following up on a December 30, 1998 meeting with E & Y, GFT noted in a January 4, 1999 memo that "prior to signing a final purchase agreement," GFT had to resolve various "open points," including: "Pension Issues-confirm and completely understand the unfunded pension plan liability." GFT's counsel was to handle a pension fund evaluation. On January 13, 1999, GFT's attorney spoke with GBI's employee benefit counsel who explained his understanding of the PBGC agreement and its impact on the proposed transaction. GBT's lawyer's notes of this conversation conclude with the statement, "Can't insulate this just to Newco." On January 21, 1999, GFT's counsel met with GFT management and expressed the complexity of the pension plan liability issue. GFT concluded that it had "to establish a new strategy for the acquisition ... based on the pension fund liability which [GFT] clearly cannot absorb." Mr. Grieco testified that at a January 25, 1999 meeting, attended by Frasch, Grieco, Lewis, GFT's attorney, and others, Mr. Frasch stated that if the pension liability problem could not be resolved, the deal would have to be restructured. (R. Grieco Dep. at 184; *see also,* Deft.' Rule 56.1 Statement ¶ 37; Pls.' Rule 56.1 Statement ¶ 15).

**\*5** Over the next several weeks, GFT and GBI attempted to reach agreement on a restructured deal, specifically a proposed manufacturing and supply agreement. Mr. Grieco testified that on February 25, 1999, Mr. Frasch informed him that "everything was on track" and that instead of sending the agreement to the parent company to be "rubber stamped," he was personally going to Italy to have the parent company approve it. (R. Grieco Dep. at 194-95). GFT's internal documents, dated February of 1999, reveal that GFT was concerned that the newest proposal exposed GFT to the risk that GBI, newly modernized at GFT's expense, might be subsequently sold to an entity that would not honor the parties' agreement. (Frasch Aff. Ex. R). On March 9, 1999, GFT's parent corporation indicated that the GBI "project has not been approved." Mr. Frasch alleges that the reason given by the parent company for its decision was the unfunded pension liability issue, as well as recent developments alleviating GFT's need for additional manufacturing capacity. (Frasch

Aff. ¶ 36). Mr. Frasch immediately notified Mr. Grieco that the requisite approval was not obtained, and negotiations ceased.

Mr. Grieco testified that he believed Mr. Frasch acted in good faith in trying to devise a different approach and conclude the deal. (R. Grieco Dep. at 186-87). His opinion changed only because he was never given an explanation when he asked Mr. Frasch why the deal fell through. (*Id.* at 187). However, he further testified that Mr. Frasch called him to tell him that the transaction would not be consummated because the corporate parent did not wish to proceed. (*Id.*). Mr. Grieco's explained that his belief regarding the lack of good faith negotiations was based on his speculation that the pension fund liability was not the true issue precluding the finalization of the deal. (*Id.* at 188). He did not know whether the fault lied with Mr. Frasch or the parent company, but noted that Mr. Frasch "may have had all the right intentions." (*Id.*).

The following month after GFT ended negotiations, GBI was acquired by the Bayer Company. (*Id.* at 31). As part of that deal, a new company was formed, plaintiff Southwick Clothing LLC, which took over the business that GBI previously performed. (*Id.* at 31-32). Mr. Grieco serves as president of Southwick Clothing LLC, and he receives the same compensation as he earned when he was president of GBI. (*Id.* at 42).

## SUMMARY JUDGMENT STANDARD

Summary judgment, pursuant to Rule 56, is warranted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists if, based on the record as a whole, a reasonable trier of fact could return a verdict for the non-moving parties. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). The Court must view the record in the light most favorable to the non-movants by resolving all ambiguities and drawing all reasonable inferences in their favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Anderson,* 477 U.S. at 255; *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995). The burden to show that there are no genuine issues of fact rests with the party seeking summary judgment. *Anderson,* 477 U.S. at 256; *Tomka,* 66 F.3d at 1304. Nevertheless, the parties opposing the motion bears the ultimate burden of proof to demonstrate that there is some evidence which would create a genuine issue of material fact. *Twin Laboratories, Inc. v. Weider Health &*

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 339 of 380
Southwick Clothing LLC v. GFT (USA) Corp., Not Reported in F.Supp.2d (2004)
2004 WL 2914093

*Fitness,* 900 F.2d 566, 568 (2d Cir.1990). The non-movants cannot meet this burden by simply relying on mere conclusory allegations, speculation or conjecture. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986).

BREACH OF CONTRACT CLAIM

**\*6** The first cause of action is for breach of contract. The amended complaint states that "[o]n or about December 4, 1998, Grieco Bros., Inc. received the final version of the contract," and that "[t]he terms of the contract dated December 4, 1998 (the 'Joint Venture Agreement') were those agreed by the parties prior to November 1998 ..." (Am.Compl.¶¶ 32, 33). It further alleges that "[a] valid and enforceable contract ... was formed on or about December 4, 1998" and that "Grieco Bros., Inc. never agreed to vary the terms of the Joint Venture Agreement." (Am.Compl.¶¶ 46, 59). Moreover, plaintiffs allege that "Grieco Bros., Inc. and GFT USA were joint venturers." (Am.Compl.¶ 64). At the initial pretrial conference, when this action was pending before another judge, plaintiffs' counsel represented that "There was a signed document with a cover letter from the president of the defendant company saying here is the final contract, executed by all parties, which sells my client's business ... to the defendant." (Tr. at 2). The lawyer explained "that the main dispute with the case is about whether the document in question constituted a binding contract or constituted simply a letter of intent, ... [as the defense] refer[s] to it as." (*Id.* at 3).

In opposing summary judgment, plaintiffs attempt to re-plead this cause of action by claiming the existence of other written or oral agreements, and contending that the agreement at issue, whichever one that may be, was not a joint venture agreement but rather a preliminary agreement to negotiate in good faith toward achieving a final joint venture contract. Plaintiffs note that GFT and GBI cooperated extensively with each other between August of 1998 through March of 1999. Plaintiffs, therefore, argue that "[w]hether a valid and enforceable contract came to exist between them at any point in that seven month period, through the execution of written agreements, or oral agreements or modifications or through the course of conduct of the parties, is an issue of fact which precludes summary judgment ..." (Pls.' Mem. Opp'n Summ. J. at 8). [7]

[7]     At oral argument, plaintiffs' attorney represented that beginning in October of 1998, there was a verbal agreement between the parties, and counsel made no reference to the existence of any agreement prior to October. (Tr. at 77).

Plaintiffs expressly identified, in the amended complaint, that the December 4th letter of intent was the contract at issue, and described that contract as a joint venture agreement. Those factual allegations are judicial admissions that bind plaintiffs throughout the course of the litigation. *Official Comm. of the Unsecured Creditors of Colortile, Inc. v. Cooper & Lybrand, LLP.,* 322 F.3d 147, 167 (2d Cir.2003) (citations omitted); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528 (2d Cir.1985). Plaintiffs cannot survive a summary judgment motion by contradicting their own pleadings in an effort to raise a genuine issue of fact. *Bellefonte,* 757 F.2d at 528-29. A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered in resolving the motion. *See, Heletsi v. Lufthansa German Airlines, Inc.,* 2001 WL 1646518, at \*1 n. 1 (E.D.N.Y. Dec. 18, 2001). Knowledge as to which written document or oral agreement constitutes the parties' contract, as well as the nature of that contract, does not lie exclusively within the hands of the defendant. Plaintiffs possess personal knowledge of such information. Thus, plaintiffs are precluded from now alleging the existence of other written and oral binding contracts. *See, Peckham Materials Corp. v. Raima Corp.,* 1995 WL 422158 (S.D.N.Y. July 18, 1995). Similarly, since the amended complaint is silent as to the existence of a preliminary agreement or the breach of any duty to negotiate in good faith, such a claim is not properly before the Court. *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145 F.3d 543, 549 n. 5 (2d Cir.1998); *Rappaport v. Buske,* 2000 WL 1224828, at \*5 n. 6 (S.D.N.Y. Aug. 29, 2000).

**\*7** Hence, the inquiry is limited to whether a genuine issue of fact exists as to whether the December 4th letter of intent constitutes a binding joint venture agreement. It is not necessary to determine whether the laws of New York or Massachusetts are applicable in resolving the motion with regard to the breach of contract cause of action. The parties rely exclusively on New York law, and there is no claim that Massachusetts law differs in any appreciable manner. [8]

[8]     Plaintiffs acknowledge that most of the overall legal issues raised herein are black letter law

2004 WL 2914093

and that the law of both jurisdictions have near identical standards and apply very similar tests. Where Massachusetts and New York law differ, however, plaintiffs contend that they are entitled to the benefit of those differences. (Pls.' Mem. Opp'n Summ. J. at 7). Despite seeking any beneficial difference that may exist, plaintiffs' counsel acknowledged, at oral argument, that Massachusetts law applies to all the causes of action with the exception of the breach of contract claim. Since plaintiffs contend that the contract is binding and the since the agreement contains a New York choice of law provision, plaintiffs maintain New York law is applicable to the contract claim. (Tr. at 102-103). In their opposition papers, plaintiffs rely exclusively on Massachusetts law with regard to their other claims. The Court finds that the remaining causes of action are conduct-regulating tort claims in which Massachusetts has the greatest interest as this is where plaintiffs' injuries allegedly occurred, as well as where most of the acts and omissions giving rise to the lawsuit happened. *Klaxton Co. v. Stemcor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *Cooney v. Osgood Mach., Inc.,* 595 N.Y.S.2d 919, 922 (N.Y.1993); *Istim, Inc. v. Chemical Bank,* 575 N.Y.S.2d 796, 798 (N.Y.1991); *Schultz v. Boy Scouts of America, Inc.,* 491 N.Y.S.2d 90, 94 (N.Y.1985). Accordingly, other than the breach of contract claim, Massachusetts law governs the resolution of this lawsuit.

In order for a contract to be binding, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. *Express Indus. and Terminal Corp. v. New York State Dept. of Transp.,* 693 N.Y.S.2d 857, 860 (N.Y.1999); *Cobble Hill Nursing Home v. Henry and Warren Corp.,* 548 N.Y.S.2d 920, 923 (N.Y.1989). "Generally, courts look to basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Express Indus. and Terminal Corp.,* 693 N.Y.S.2d at 860. Absent an offer, acceptance, consideration, mutual assent and the intent to be bound, a contract is unenforceable. *Register.Com. Inc. v. Verio, Inc.,* 356 F.3d 393, 427-28 (2d Cir.2004) (citations omitted).

To be deemed valid, an acceptance must be "clear, unambiguous and unequivocal," and the acceptance must comply with the terms of the offer. *Krumme v. Westpoint Stevens Inc.,* 143 F.3d 71, 83 (2d Cir.1998) (quoting *King v. King,* 617 N.Y.S.2d 593, 594 (N.Y.App.Div.1994); *see also, Alentino, Ltd. v. Chenson Enterprises, Inc.,* 938 F.2d 26 (2d Cir.1991) (quoting *Roer v. Cross County Med. Center Corp.,* 441 N.Y.S.2d 844, 845 (N.Y.App.Div.1981). A counteroffer which modifies the offer constitutes an absolute rejection of that offer. *Krumme,* 143 F.3d at 83 (quoting *Poel v. Brunswick-Balke-Collender Co. of New York,* 110 N.E. 619, 622 (1915); *see also, Kleinberg v. Ambassador Assoc.,* 480 N.Y.S.2d 210, 211 (N.Y.App.Div.1984), *aff'd,* 485 N.Y.S.2d 748 (N.Y.1984). If the acceptance is even slightly at variance with the terms of the offer, it constitutes a rejection and termination of the initially offered terms. *Homayouni v. Paribas,* 660 N.Y.S.2d 413, 414 (N.Y.App.Div.1997) (citations omitted). The original party, however, may be deemed to have accepted the counteroffer by his or her subsequent performance under the contract. *See, Ladau v. Hillier Group, Inc.,* 2004 WL 691520, at *4 (S.D.N.Y. Mar. 31, 2004) (citing *Int'l Paper Co. v. Suwyn,* 966 F.Supp. 246, 254 (S.D.N.Y.1997)).

Four days after the letter agreement was sent to Mr. Grieco, GBI's attorney advised GFT's counsel that he sought, on behalf of his client, changes to the proposed agreement. The following day, GBI's counsel submitted a revised draft of the agreement incorporating those change and set forth a separate list of additional issues in his cover letter. Thus, GBI's counsel proffered a counteroffer on behalf of GBI, thereby rejecting the original offer. *See, Metro. Steel Indus., Inc. v. Citnalta Constr. Corp .,* 754 N.Y.S.2d 278, 279 (N.Y.App.Div.2003) (citation omitted). GBI's counsel's understanding that no binding agreement was in effect can be gleaned from his request, in his cover letter, that GFT review the redline document so that GBI and GFT could execute the revised letter of intent within the week.

 **\*8** A rejection of an offer renders the offer a nullity provided, however, that the person who rejected the offer was vested with the authority to accept it. Absent such authority, the rejection is of no legal consequence. *Tradeways Inc. v. Chrysler Corp.,* 342 F.2d 350, 354 (2d Cir.1965). Although Mr. Grieco and Mr. Lewis indicate that they never instructed GBI's counsel to withdraw from the deal, neither of them claimed that the lawyer did not have the requisite authority to negotiate the December 4th proposal and to submit a revised agreement with material changes. Both Mr. Grieco and GBI's counsel testified that counsel was representing GBI with regard to the proposed transaction with GFT prior to the

letter agreement being sent to Mr. Grieco and for sometime thereafter. Thus, the attorney was cloaked with both actual and apparent authority to act on behalf of the corporation. GBI's counsel's communication with GFT's attorney four days after the letter agreement was sent, as well as his submission of the revised document the following day, constituted a counteroffer thereby nullifying the existence of the offer. Moreover, the record does not indicate that GFT accepted the terms of the counteroffer. Rather, the parties continued negotiating the deal for months thereafter during which time additional proposed agreements were drafted.

Mr. Grieco testified that he signed and mailed the agreement as early as one week after he received the agreement and as late as one month after receipt. The letter agreement, as well as Mr. Frasch's cover letter, indicated that the exclusive means by which to accept the offer was for Mr. Grieco to sign and return it. It did not provide for a particular delivery method as to how the agreement was to be returned. Under such circumstances, acceptance becomes effective when mailed regardless of whether it was ever received by GFT. *See, Wester v. Casein Co. of America,* 100 N.E. 488, 490 (N.Y.1912) ("[T]he contract springs into existence at the time of such mailing ..."); *see also, Morton's of Chicago/Great Neck LCC v. Crab House, Inc.,* 746 N.Y.S.2d 317, 319 (N.Y.App.Div.2002) (citations omitted). An offeree who has not yet signed the agreement rejects it by making a counteroffer. *See, Strassburg v. Ricotta,* 480 N.Y.S.2d 649, 650 (N.Y.App.Div.1984). Accordingly, Mr. Grieco's purported execution of the letter agreement, after the counteroffer was already made, could not give rise to a binding agreement. *See, Scheck v. Francis,* 311 N.Y .S.2d 841, 843 (N.Y.1970).

Furthermore, it is of no import that Mr. Frasch, in his cover letter, referred to the December 4th letter of intent as a final contract. The letter agreement clearly and unequivocally provided a number of conditions precedent that had to be satisfied in order to give rise to GFT's obligation to proceed with the joint venture transaction. "There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *See, Teachers Ins. and Annuity Ass'n of America v. Tribune, Co.,* 670 F.Supp. 491, 499 (S.D.N.Y.1987). There is no evidence to suggest that Mr. Grieco was misled to believe that the letter of intent constituted a final joint venture agreement. Mr. Grieco himself acknowledges that the letter agreement meant very

little to him as it was drafted in response to the request of GBI's primary lender. Mr. Grieco maintains that he "had Ronald Frasch's word that we were partners and the evidence of my own eyes that the deal was going forward and more than that I didn't need." (R. Grieco Decl. ¶ 25). Hence, Mr. Grieco did not consider the December 4th letter of intent as an instrument binding the parties to the joint venture agreement. Rather, he placed his trust on Mr. Frasch's oral representations in conjunction with his own observations. Such a position further vitiates against a finding that there was a meeting of the minds as to the terms of the December 4th letter agreement. Additionally, reliance on oral representations that GBI and GFT were partners cannot give rise to a binding joint venture agreement. The purported agreement contains provisions that could not be performed within one year, and hence the Statute of Fraud would render any oral agreement unenforceable. N.Y. GEN. OBLIG. Law § 5-701(1) (McKinney Supp.2004); *Chromalloy American Corp. v. Universal Housing Sys. of America,* 495 F.Supp. 544, 550-51 (S.D.N.Y. July 15, 1980), *aff'd,* 697 F.2d 289 (2d Cir.1982); *RTC Prop., Inc. v. Bio Resources, Ltd.,* 744 N.Y.S.2d 173 (N.Y.App.Div.2002).

**\*9** Furthermore, the fact that there was performance by the parties, which Mr. Grieco claims to have witnessed, did not create a binding contract. *See, Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 2004 WL 691680, at \*18 (S.D.N.Y. Mar. 31, 2004). "A party may make some partial performance merely to further the likelihood of consummation of a transaction it considers advantageous." *See, Tribune Co.,* 670 F.Supp. at 502. Since the December 4th letter of intent clearly indicates GFT's intent not to be bound until the negotiation, execution and delivery of a final agreement, no binding contract exists until those events occur. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984) (citation omitted); *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968). "[I]f either party communicates an intent not to be bound until he [or she] achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985) (citation omitted). Given the existence of an explicit intent not to be bound, GFT is not obliged to proceed with the transaction even if there was considerable partial performance. *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72-73 (2d Cir.1989). Furthermore, plaintiffs admit that during the negotiations, from June of 1998 through March of 1999, "[GBI] and its representatives were informed that *any* transaction with GFT

subject to approval by GFT's corporate parent." (Pls.' Response to Defts.' First Request for Admission ¶ (A)(1) (emphasis added)). No approval was obtained to enter into a final joint venture agreement. Given the existence of unsatisfied condition precedents, GFT owes no further duties to GBI with regard to the formation of a joint venture.

In light of the foregoing, the breach of contract cause of action is dismissed.

BREACH OF FIDUCIARY DUTY CLAIMS

The second cause of action is brought on behalf of GBI alleging GFT breached its fiduciary duty owing to GBI "in their inducement of and breach of the Joint Venture Agreement." (Am.Compl.¶ 65). The third cause of action is brought on behalf of Richard and Sarah Grieco claiming that, under Massachusetts law, GFT breached a fiduciary duty owing to them as shareholders by GFT's "inducement of and breach of the Joint Venture Agreement and in [GFT's] use of the assets of [GBI] which was acquired and used by the joint venture ." (Am.Compl.¶ 71). Both of these claim allege that GFT owed a fiduciary duty to GBI "[b]y reason of their status as joint venturers" "and or by reason of the confidential nature of the relationship between the parties." (Am.Compl.¶¶ 64, 70). Although the amended complaint sets forth only two grounds for the finding of a fiduciary relationship, *i.e.,* the parties status as joint venturers and their confidential relationship, plaintiffs now asserts a third alternative basis, *i.e.,* "the parties' obligation to negotiate in good faith the remaining terms of their binding preliminary commitment and not to refuse to proceed on grounds not contained therein." (Pls.' Mem. Opp'n Summ. J. at 22). As previously noted, plaintiffs cannot rely on an unpled theory of recovery as a means of defeating summary judgment and, in any event, the record does not indicate that GFT failed to negotiate in good faith.

 **\*10** Parties who are joint venturers, or who share a fiduciary or confidential relationship, owe a duty of good faith, utmost loyalty and fair dealing to each other. *Petricca Dev. Ltd., P'ship v. Pioneer Dev. Co.,* 214 F.3d 216, 220 (1 st Cir.2000) (citations omitted); *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.,* 944 F.Supp. 986, 995 (D.Mass.1996) (citations omitted); *Halloran v. Ferrara,* 782 N.E.2d 1136, 2003 WL 272083, at \*3 (Mass.App.Ct. Feb. 10, 2003) (citing 5 Scott & Fratchers, Trusts § 495 (4 th ed.1989)). In *Shain Inv. Co., Inc. v. Cohen,* 443 N.E.2d 126

(Mass.App.Ct.1982), the Court set forth the following factors to consider in determining whether a joint venture exists: "(1) an agreement by the parties manifesting their intention to associate for joint profit not amounting to a partnership or a corporation; (2) a contribution of money, property, effort, knowledge, skill, or other assets to a common undertaking; (3) a joint property interest in all or parts of the subject matter of the venture; (4) a right to participate in the control or management of the enterprise; (5) an expectation of profit; (6) a right to share in profits; (7) an express or implied duty to share in losses; and (8) a limitation to a single undertaking (or possibly a small number of enterprises)." *Shain,* 443 N.E.2d at 130 (citations omitted). The mere fact that the parties anticipated a joint venture would eventually be created is insufficient, under these circumstances, to meet the *Shain* criterion. Here, GFT never exercised any meaningful control over GBI's operations. Moreover, the specified conditions precedent to the formation of the joint venture were not satisfied. Therefore, no joint venture came into existence thereby precluding a fiduciary duty from arising therefrom. *See, Petricca,* 214 F.3d 216, *supra.*

Nor did the parties confidential relationship give rise to a fiduciary relationship. In the commercial context, the First Circuit explained in *Indus. Gen. Corp. v. Sequoia Pacific Sys. Corp.,* 44 F.3d 40 (1 st Cir.1995):

> Massachusetts courts have stated that, through business transactions conducted at arm's length generally do not give rise to fiduciary relationships, such a relationship can develop where one party reposes its confidence in another. Importantly, however, courts have repeatedly cautioned that the plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature. In determining whether such a transformation has taken place, courts look to the defendant's knowledge of plaintiff's reliance and consider the relation of the parties, the plaintiff's business capacity contrasted with that of the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated

transactions wherein defendant has specialized knowledge. *Indus. Gen. Corp.,* 44 F.3d at 44 (internal quotation marks and citations omitted).

**\*11** The attempt by GBI and GFT to form a joint venture was an arm's length business relationship, not a fiduciary one. The companies were both represented by counsel and their representatives were experienced business persons. Additionally, even though GBI shared confidential information with GFT, its competitor, a fiduciary obligation is not imposed upon GFT unless GFT betrayed GBI's trust and confidence in order to secure a benefit for itself. *Geo Knight & Co., Inc. v. Watson Wyatt & Co.,* 170 F.3d 210, 215 (1 st Cir.1999); *Sentinel Prod. Corp. v. Mobil Chemical Co.,* 2001 WL 92272 (D.Mass. Jan. 17, 2001). Plaintiffs fails to identify, nor does the record disclose, any confidential information that GFT used inappropriately in an effort to obtain a personal benefit.

Accordingly, the second and third causes of action are dismissed.

## FRAUD CLAIMS

The sixth cause of action is for fraud based on GFT's failure to advise GBI that GFT regarded the contract "as contingent upon ... or subject to some [ ] unstated condition or event," such as the existence of the unfunded pension liability. (Am.Compl.¶ 89). The eighth and ninth causes of action are for constructive fraud. In essence, these two claims allege that while GFT and GBI shared a confidential and fiduciary relationship or were joint venturers, GFT knowingly made material misstatements that the final terms of the contract were agreed upon and repeatedly failed to disclose the contingent nature of the contract.

To state a cause of action for fraud by deceit, plaintiffs must demonstrate that defendant made a false statement of a material fact, with knowledge of its falsity, for the purpose of inducing plaintiffs to act thereon, and that plaintiffs relied upon the representation as true to their detriment. *Bond Leather Co., Inc. v. Q.T. Shoe Mfg. Co., Inc.,* 764 F.2d 928, 935 (1 st Cir.1985) (quoting *Metro. Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1 st Cir.1984)); *Murtha v. Rockwell,* 782 N.E.2d 556, 2003 WL 215023, at \*2 (Mass.App.Ct. Jan.

31, 2003) (quoting *Ravosa v. Zais,* 661 N.E.2d 111, 116 (Mass.App.Ct.1996)); *Rood v. Newberg,* 718 N.E.2d 886, 892 (Mass.App.Ct.1999). Fraud by omission, however, requires a showing of both concealment of material fact and the existence of a duty to disclose. *Sahin v. Sahin,* 758 N.E.2d 132, 138 n. 9 (Mass.2001) (citing *Roadmaster Indus., Inc. v. Columbia Mfg. Co.,* 893 F.Supp. 1162, 1179 (D.Mass.1995)). A duty to disclose may exist where defendant has a fiduciary relationship with plaintiff or a similar relationship of trust and confidence that requires disclosure. *Roadmaster,* 893 F.Supp. at 1179; *Rood,* 718 N.E.2d at 892 (quoting Restatement (Second) of Torts § 551(2)(a)).

Constructive fraud does not require a showing that the speaker have actual knowledge of the falsity of the statement in order to impose liability. A constructive fraud is defined as the "damaging reliance by a party on an erroneous, though not purposeful, representation of fact by another who, with reasonable effort, might have obtained and communicated precise and accurate information." *Bernstein v. Gramercy Mills, Inc.,* 452 N.E.2d 231, 236 (Mass.App.Ct.1983) (citing *National Acad. of Sciences v. Cambridge Trust Co.,* 346 N.E.2d 879, 883 (Mass.1976); Restatement (Second) of Torts § 552 (1976)). With regard to an actual misstatement of fact, the parties need not be in a fiduciary relationship. *Kozdras v. Land/Vest Prop., Inc.,* 413 N.E.2d 1105 (Mass.1980). However, an omission of fact can constitute constructive fraud only if a fiduciary relationship exists. *Geo. Knight,* 170 F.3d at 215; *Bernstein,* 452 N.E.2d at 236 (citation omitted).

**\*12** Since GFT did not owe a fiduciary duty to GBI, the sixth and ninth causes of action, for failure to disclose the contingent nature of the agreement, are not legally viable. Additionally, these claims, as well as the eighth cause of action for misrepresenting that the parties had agreed to the terms of the final contract, are not supported by the evidence. The record is bereft of any evidence that GFT concealed material information or made material misstatements which reasonably led GBI to believe that a binding agreement existed or that the parties were in agreement as to the terms of a final contract. The proposed letter of intent indicates that GFT's obligation to proceed with the transaction was contingent upon it completion, to its satisfaction, of a due diligence review of GBI's legal and financial affairs. Notwithstanding plaintiffs' contentions to the contrary, the assumption of the unfunded pension liability is not excluded from the specified due diligence contingency merely because the proposed agreement states that Newco would assume such liability. The due diligence review revealed that GFT might be

Southwick Clothing LLC v. GFT (USA) Corp., Not Reported in F.Supp.2d (2004)

2004 WL 2914093

held personally responsible for the pension fund liability. No evidence was adduced suggesting that GFT had knowledge that such a risk existed prior to Mr. Frasch's execution of the December 4th draft agreement. Although the letter of intent did not indicate that obtaining approval of GFT's parent company was a condition precedent to GFT's execution of a final contract, plaintiffs acknowledge they were aware of such a condition. The parent company failed to provide the requisite approval to execute a final joint venture contract, and it is immaterial whether that was due to the pension fund liability or some other reason. Since GBI knew of GFT's need for approval from its parent company, it was unreasonable to place any reliance on alleged misstatements that such approval was a mere formality. *Boyle v. Int'l Truck and Engine Corp.,* 369 F.3d 9, 15 (1st Cir.2004). The parties' extensive negotiations and their attempts at redrafting an acceptable agreement renders reliance, on any alleged misstatements, unreasonable. *See, Krock v. Lipsay,* 97 F.3d 640, 646-47 (2d Cir.1996); *Damon v. Sun Co., Inc.,* 87 F.3d 1467, 1480 (1st Cir.1996).

The sixth, eighth, and ninth causes of action are, therefore, dismissed.

## NEGLIGENT MISREPRESENTATION AND TORTIOUS INTERFERENCE CLAIMS

The fifth and thirteenth causes of action are for fraud and negligent misrepresentation, respectively. Both claims are premised on GFT allegedly insisting that GBI exercise its opt-out clause, in a contract it had with clothing designer Joseph Abboud ("JA"), as a condition to GFT signing the agreement. Plaintiffs allege that GBI was assured that GFT would not obtain JA's business, but that GFT fraudulently concealed its true purpose which was to acquire the license for itself, which GFT was successful in doing.

The tenth cause of action asserts a claim for tortious interference with prospective business relations. The complaint states that by GFT insisting that GBI terminate the JA contract and by GFT fraudulently assuring Brooks Brothers that GBI's contractual obligations would be performed by the joint venture, GFT tortiously interfered with GBI's prospective manufacturing contracts with regard to these retailers.

**\*13** The degree of culpability plaintiff must demonstrate to establish a claim for negligent misrepresentation is less than that needed to prove fraud. *Cummings v. HPG Int'l, Inc.,* 244 F.3d 16, 24-25 (1st Cir.2001). To constitute a fraudulent misstatement, the speaker must know of the falsity of the statement at the time of its utterance. *Id.* at 23. " '[M]ere negligence in discovering the falsity before making the representation is not sufficient for an action in tort for deceit, but it is enough for an action in negligence." ' *Id.* at 23 (quoting 37 J. Nolan & L. Sartorio, Massachusetts Practice § 143 at 240-41 (2d ed.1989)). To prove a negligent misrepresentation claim, a plaintiff must establish "that the defendant: (1) in the course of its business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing or resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) that it failed to exercise reasonable care or competence in obtaining or communicating the information." *Id.* at 24 (citations omitted); *see also, Rodowicz v. Massachusetts Mut. Life Ins. Co.,* 279 F.3d 36, 42 (1st Cir.2002); *Nota Constr. Corp. v. Keyes Assoc., Inc.,* 694 N.E.2d 401, 405 (Mass.App.Ct.1998); *Fox v. F & J Gattozzi Corp.,* 672 N.E.2d 547, 551 (Mass.App.Ct.1996). Both fraudulent and negligent misrepresentation claims require a showing of plaintiff's reliance on the alleged misrepresentation. *See, Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 577 F.Supp. 1281, 1287 (D.Mass.1983). That reliance must be reasonable. *Sand v. Ridefilm Corp.,* 212 F.3d 657, 664 (1st Cir.2000) (citations omitted); *Krock,* 97 F.3d at 646-47; *Damon,* 87 F.3d at 1480.

In order to state a cause of action for tortious interference with prospective business relations, a plaintiff must establish "the existence of a business relationship or contemplated contract of economic benefit; (2) defendant's knowledge of such relationship; (3) the defendant's intentional and improper interference with that relationship; and (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct." *See, Mass Cash Register, Inc. v. Comtrex Sys. Corp.,* 901 F.Supp. 404, 421 (D.Mass.1995) (citations omitted). Although a showing of malice is not required, proof of intentional interference will not alone suffice. *Logan Equip. Corp. v. Simon Aerials, Inc.,* 736 F.Supp. 1188, 1198-99 (D.Mass.1990); *United Truck Leasing Corp. v. Geltman,* 551 N.E.2d 20, 23 (Mass.1990). Rather, defendant's interference must be wrongful involving improper means or motives. *United Truck Leasing Corp.,* 551 N.E.2d at 23-24. It is not sufficient to establish defendant's interference was improper merely by showing that it was motivated by its own financial gain. *Trent Partners and Assoc., Inc. v. Digital Equip.*

*Corp.,* 120 F.Supp.2d 84, 112-13 (D.Mass.1999); *Vakil v. Anesthesiology Assoc. of Taunton, Inc.,* 744 N.E.2d 651, 657 (Mass.App.Ct.2001) (citations omitted).

**\*14** The record fails to disclose any evidence that GFT required GBI to terminate the JA contract; that GBI relied on GFT's alleged misstatements regarding that license; or that GFT interfered with GBI's relationship with JA or Brooks Brothers. At Mr. Grieco's deposition, he testified that toward the beginning of GBI and GFT's negotiations, he was asked by a GFT employee, who also happens to be Mr. Grieco's first cousin, whether Mr. Grieco was willing to "drop the [JA] license" and that the employee expressed his personal opinion that it might negatively affect the joint venture transaction. (R. Grieco Dep. at 99-100; R. Grieco Decl. ¶ 9). Mr. Grieco also testified that another GFT employee inquired as to whether Mr. Grieco would object if the JA line was not part of the deal. (R. Grieco Dep. at 73, 102-103). Mr. Grieco testified that he had no additional conversations with any other GFT representatives requesting that the JA line be dropped. (R. Grieco Dep. at 196). Mr. Grieco further noted that from the inception of the JA contract until GBI opted-out of the agreement, it was not a profitable contract for GBI. (*Id.* at 196). Mr. Lewis testified that he suggested to Mr. Grieco that he try to renegotiate the JA license because that license, like the Brooks Brothers business, was not profitable. (Lewis Dep. at 25, 143-44).

By letter dated March 3, 1999, Mr. Grieco terminated GBI's license with JA stating as follows:

> Back in November ... we indicated to you that I was not comfortable to go forward with our license due to the enormous amounts of losses we were experiencing and expect to continue to experience. I expressed to you, at that time, that we should prepare for this eventuality ... \* \* \* The purpose of this letter is to formally advise you in writing and confirm what I expressed to you back in November; due to sales and bookings falling below the threshold amounts, I am electing to terminate this agreement ... (Abboud Aff. Ex. A).

As early as November of 1998, the only reason GBI gave to JA for the termination of their contract was the losses GBI was suffering in performing its contractual obligations. GBI's intention to opt-out of the contract, therefore, existed prior to GFT signing the December 4th letter agreement. Plaintiffs' contend that it terminated the JA contract because GFT required GBI to do so as a condition to GFT's signing of the agreement. Such a claim cannot, however, be reconciled with the fact that GBI did not exercise the opt-out clause until three months after GFT signed the agreement. In January of 1999, GBI was informed that the joint venture deal would have to be restructured and the parties spent the next few weeks attempting to reach a new agreement. Despite the fact that GBI knew that the parties were in the midst of negotiations and had not been able to devise an acceptable alternative proposal, Mr. Grieco chose this point in time to exercise the opt-out provision in the JA contract. The letter to JA is dated six days prior to the date when GFT advised GBI that it was no longer willing to pursue a business venture with GBI. The evidence fails to support plaintiffs' contention that GBI's reliance on GFT's alleged representations was the cause for GBI to exercise the opt-out provision.

**\*15** Furthermore, no evidentiary support can be found in the record that GFT improperly interfered with GBI's prospective business relations with JA or Brooks Brothers.

## PROMISSORY AND EQUITABLE ESTOPPEL CLAIMS

The eleventh and twelfth causes of action are for promissory and equitable [9] estoppel, respectively. These claims are generally based on GFT's alleged promises or representations that (1) the final terms of the contract were agreed upon; (2) GFT would not manufacture apparel for JA if GBI exercised its opt-out clause; (3) the joint venture agreement was valid and enforceable; and (4) the joint venture would perform GBI's contractual obligations owing to Brooks Brothers.

[9]     It should be noted that plaintiffs did not address their equitable estoppel cause of action in their memorandum opposing summary judgment.

To state a claim of promissory estoppel, a plaintiff must establish that an unambiguous promise was made and that the party to whom the promise was made reasonably relied on that promise. *Neuhoff v. Marvin Lumber and Cedar Co.,* 370 F.3d 197 (1st Cir.2004); *Rhode Island Hosp. Trust Nat'l Bank v. Varadian,* 647 N.E.2d 1174, 1178

2004 WL 2914093

(Mass.1995) (quoting *Pappas Indus. Parks, Inc. v. Psarros,* 511 N.E.2d 621, 623 (Mass.App.Ct.1987)). A promissory estoppel claim is the equivalent of a contract claim except the element of consideration is absent. *Neuhoff,* 370 F.3d at 203-204. To recover for promissory estoppel, "requires no more than a promise upon which the promisee could reasonably have placed reliance; and attention is to be focused upon the reasonableness of that reliance." *Loranger Constr. Corp. v. E.F. Hauserman Co.,* 374 N.E.2d 306, 310-11 (Mass.App.Ct.1978), *aff'd,* 384 N.E.2d 176 (Mass.1978). The doctrines of equitable and promissory estoppel primarily differ in that recovery under equitable estoppel is for reliance upon misrepresentations of past or present facts whereas promissory estoppel concerns reliance on statements of future intent. *Id.* at 308-309. The elements of an equitable estoppel claim are "(1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) and detriment to such person as a consequence of the act or omission." *Boylston Development Group v. 22 Boylston St. Corp.,* 591 N.E.2d 157, 163 (Mass.1992) (quoting *Celluci v. Sun Oil Co.,* 320 N.E.2d 919, 923 (Mass.App.Ct.1974), *aff'd,* 331 N.E.2d 813 (Mass.1975)). It is appropriate to employ the doctrine of equitable estoppel where to do so will prevent results that are contrary to good conscience and fair dealings, and no showing of defendant's deceit, bad faith, or actual fraud is required. *Edwards v. Sullivan & Cogliano Companies, Inc.,* 2002 WL 441968, at *2-3 (Mass.App.Div. Mar. 15, 2002).

As previously discussed, no unequivocal promises or representations were made regarding the matters upon which these causes of action are based. Even had they been made, GBI's reliance on them would be unreasonable, given the complex commercial venture at issue and the fact that the purported representations and/or promises contradicted the written language of the December 4th letter of intent. *McMahon v. Digital Equip. Corp.,* 162 F.3d 38, 39 (1st Cir.1998); *Sands,* 212 F.3d at 664-65; *Trifiro v. New York Life Ins. Co.,* 845 F.2d 30, 33 (1st Cir.1988); *Rhode Island Hospital Trust Nat'l Bank,* 647 N.E.2d at 1179.

**\*16** Accordingly neither the promissory or equitable estoppel claims cannot withstand GFT's motion to dismiss.

## UNFAIR TRADE PRACTICE CLAIM

The final cause of action is for violation of Chapter 93A of the Massachusetts Unfair Trade Practice Act. This claim is premised solely on an alleged February 25, 1999 conversation wherein Mr. Frasch "never mentioned" to Mr. Grieco that the purported contract between GBI and GFT was "contingent upon ... any [ ] event." (Am.Compl.¶ 133). GFT argues that claim is defective because prior to the date of the subject conversation, GFT advised GBI that it was not going to proceed with the joint venture proposal because of the pension fund liability risk. Additionally, GFT maintains that the undisputed record demonstrates that there was no agreed upon contract, letter of intent or even oral agreement.

To state a cause of action under § 2, plaintiff must allege an unfair or deceptive act or practice that was committed by defendant in the conduct of any trade or commerce, and that the act or practice caused plaintiff to sustain injury. *See, Swenson v. Yellow Transp., Inc.,* 317 F.Supp.2d 51, 54 (D.Mass.2004). An unfair or deceptive act requires a showing of "rascality." Such a showing is particularly difficult to make in a case involving an arm's-length transaction between sophisticated business entities. *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp., Co.,* 72 F.3d 190, 200 (1st Cir.1995). To rise to the requisite level of rascality, the subject conduct must be of such a nature that " 'would raise an eyebrow of someone inured to the rough and tumble of the world of commence.' " *Quaker State Oil Refining Corp. v. Garrity Oil Co., Inc.,* 884 F.2d 1510, 1513 (1st Cir.1989) (quoting *Levings v. Forbes & Wallace, Inc.,* 396 N.E.2d 149, 153 (Mass.1979)). To do so, it must be established that the objectionable act "falls 'within at least a penumbra of some common-law, statutory, or other established concept of fairness,' or was 'immoral, unethical, oppressive or unscrupulous, and resulted in substantial injury to competitors or other business [persons]." ' *Id.* (quoting *PMP Assocs., Inc. v. Globe Newspapers, C.G.,,* 321 N.E.2d 915, 917 (1975)).

Plaintiffs' claim is premised entirely on Mr. Frasch's alleged failure to inform plaintiffs that the purported contract between the parties was contingent upon the occurrence of some event. As previously noted, plaintiffs were advised that the consummation of the deal between the parties hinged on several conditions being satisfied. Defendant's conduct, in not reiterating this known circumstance to plaintiffs, does not rise to the level of rascality necessary to make out a cause of action

for violation of Chapter 93A of the Massachusetts Unfair Trade Practice Act.

Additionally, although not raised by defendant, this cause of action is defective for a much more basic reason. The instant case does not fall within the purview of Chapter 93A or the Regulation of Business Practices for Consumer Protection. Chapter 93A prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ... unlawful." MASS. GEN. LAWS. ANN. Ch. 93A § 2(a) (West 1997). It is a consumer protection law intended to protect unfair and deceptive practices in business, not unfair practices in general. *See, L.B. Corp. v. Schweitzer-Mauduit Int'l, Inc.,* 121 F.Supp.2d 147, 152 (D.Mass.2000). The statute is inapplicable to transactions that are principally private in nature and where the undertaking is not in the ordinary course of business or trade. *KPS & Assoc., Inc. v. Designs by FMC, Inc.,* 38 F.3d 1, 23 (1 st Cir.2003) (quoting *Linkage Corp. v. Trustees of Boston Univ.,* 679 N.E.2d 191, 207 n .33 (Mass.1997)); *Office One, Inc. v. Lopez,* 769 N.E.2d 749 (Mass.2002); *Zimmerman v. Bogoff,* 524 N.E.2d 849. 856 (Mass.1988). The association between GBI and GFT in the interest of forming a business venture together is not the kind of commercial transaction regulated by the statute. *Petricca,* 214 F.3d at 224; *Szalla v. Locke,* 657 N.E.2d 1267, 1270 (Mass.1995).

**\*17**  Accordingly, this cause of action is incognizable.

CONCLUSION

Plaintiffs' motion to amend the caption to remove Ronald Frasch as a named defendant is granted. The motion of the remaining defendant, GFT (USA) Corp., for summary judgment dismissing the amended complaint is also granted.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 2914093

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 348 of 380

2018 WL 4762981
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Conell BROGDON, Plaintiff,

v.

The CITY OF NEW YORK, Department of Corrections,
Kings County District Attorneys Office, ADA Lisa
Berk, Unknown DOC Officers, John Doe_# 1, 2, 3
(The Name John Doe Being Fictitious, as the True
Name(s) is/are Presently Unknown), Defendants.

16-cv-8076(LAK)(RWL)
|
Signed 08/08/2018

**Attorneys and Law Firms**

Lawrence James Fredalla, The Law Office of Lawrence J.
Fredalla, New York, NY, for Plaintiff.

Joseph Peter Zangrilli, New York City Law Department, New
York, NY, for Defendants.

**REPORT AND RECOMMENDATION**

ROBERT W. LEHRBURGER, United States Magistrate
Judge

**\*1**  TO THE HONORABLE LEWIS A. KAPLAN, United
States District Judge:
Conell Brogdon brings this action against Lisa Berk, the City
of New York ("City"), the New York City Department of
Correction ("DOC"), the Kings County District Attorney's
Office ("KCDAO"), and three John Doe DOC officers
pursuant to 42 U.S.C. § 1983. Brogdon alleges that
Defendants violated his constitutional rights by unlawfully
placing him in administrative lockdown, strip searching him,
and depriving him of access to his attorney and due process.
Defendants have moved for summary judgment on all of
Brogdon's claims. For the reasons that follow, I recommend
that Defendants' motion for summary judgment be granted.

Background

This case arises out of a shooting on June 3, 2014, at Big
Boy Deli, located at 1452 Nostrand Avenue in Brooklyn,

New York. Assistant District Attorney ("ADA") Lisa Berk
learned of the shooting on June 10, 2014, when the police
provided Berk with video surveillance footage from various
angles in and around Big Boy Deli. [1] When Berk reviewed
the footage, she observed the Plaintiff, Connell Brogdon, grab
the victim's chain and apparently hand a gun to an individual
named Malik Campbell, who then shot the victim. [2] Upon
further investigation, Berk claims that she determined that
Brogdon was then "the top ranking member" of two gangs
and authorized Brogdon's arrest on June 18, 2014. [3]

[1]     Affirmation of ADA Lisa Berk dated January
        2, 2018 ("Berk Aff."), attached as Ex. A to
        Declaration of Joseph Zangrilli dated January
        3, 2018 ("Zangrilli Decl."), ¶¶ 1–3; Defendants'
        Local Rule 56.1 Statement of Undisputed Material
        Facts ("Def. 56.1") ¶ 3. Brogdon's 56.1 Statement
        contains admissions, denials, and "unknowns"
        but does not cite to any record evidence to
        support any denial. As discussed below, the Court
        may disregard Brogdon's unsupported assertions,
        unknowns and denials and determine the asserted
        fact to be undisputed if supported by admissible
        evidence. Brogdon's counsel has submitted two
        affirmations, which the Court has taken into
        account to the extent they reflect the attorney's
        personal knowledge.

[2]     Berk Aff. ¶ 4; Def. 56.1 ¶ 5.

[3]     Berk Aff. ¶¶ 5-6.

The same day, Brogdon was interviewed by a detective and
admitted that he was present at the Big Boy Deli at the
time of the shooting. [4] Brogdon was subsequently placed
under arrest. [5] The following day, a criminal complaint was
issued charging Brogdon with a number of offenses, including
attempted murder and attempted robbery. [6] In the complaint,
the attesting police detective recited evidence supporting the
charges, including the video surveillance tape and Brogdon's
handing of a gun to Campbell after grabbing the victim's
chain. [7] A grand jury subsequently indicted Brogdon for
attempted murder, assault, attempted robbery, and criminal
possession of a weapon. [8] The indictment expressly charged
Brogdon with attempting to forcibly steal the victim's chain. [9]

[4]     Def. 56.1 ¶ 6; June 18, 2014 Videotaped Interview
        of Conell Brogdon by Detective Matthew Walker

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 349 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

("Interview Video"), attached as Ex. C to Zangrilli
Deck, at 9:45:30 P.M.

5      Def. 56.1 ¶ 7.

6      Criminal Complaint in *The People of the State
of New York v. Conell Brogdon*, 2014KNO45842
("Criminal Complaint"), attached as Ex. D to
Zangrilli Decl.

7      Criminal Complaint at 1–2.

8      Indictment in *The People of the State of New York v.
Conell Brogdon*, 2014KNO45842 ("Indictment"),
attached as Ex. E to Zangrilli Decl. at 3-6.

9      Indictment at 5.

**\*2** Following his indictment, Brogdon was incarcerated
on Rikers Island pending trial. [10] While Brogdon was
incarcerated there, Berk received a recording of a telephone
call made by Rushawn Palmer, a fellow inmate and suspected
gang affiliate of Brogdon, to an individual outside the prison
named Calik Brooks. [11] During that call, Palmer gave the
phone to another individual, who conversed with Brooks. [12]
Brooks stated that he needed to know the victim's name and
to go to the hospital and "put the pressure on," to which the
second individual responded, "You know I'm going to write
you." [13] Berk identified Brogdon as the second individual on
the call when she heard him discussing his August 18, 2014
court date, and upon further investigation, found that Brogdon
and Brooks were friends on Facebook. [14]

10      Def. 56.1 ¶ 11; Inmate Movement History Log,
attached as Ex. F to Zangrilli Decl.

11      Def. 56.1 ¶ 12.

12      Berk Aff. ¶ 18; Def. 56.1 ¶ 13; Rikers Island
Telephone Recording, attached as Ex. G to
Zangrilli Decl.

13      Berk Aff. ¶¶ 12–20; Def. 56.1 ¶ 13.

14      Berk Aff. ¶¶ 17, 20. Brogdon does not actually deny
that he was the individual on the phone; rather he
states that there is no proof it was actually him. Pl.
56.1 ¶¶ 13-14. Nor has he submitted an affirmation
or any other evidence indicating that the voice was
not his.

Berk compared the Rikers Island visitation logs for Brogdon
and Campbell, and found that both men were visited by two
individuals named Venice Mcintosh and Celia Paul on June
22, 2014. [15] Berk believed the two women were working
to pass information between Brogdon and Campbell, and
that, based on the phone recording, Brogdon had instructed
Brooks to threaten the victim testifying against him. [16]
"Given the serious nature of the charges, the strength of
the case relating to the high quality surveillance video,
the potential punishment plaintiff faced if convicted, and
the fact that he had already used his privileges to effect
plans to intimidate the People's witnesses from testifying
against him," Berk determined Brogdon should be placed
in administrative lockdown to prevent him from further
endangering the victim and threatening the government's
ability to present evidence. [17]

15      Def. 56.1 ¶ 16; Rikers Island Visitation Logs,
attached as Ex. I to Zangrilli Decl. at 1.

16      Berk Aff. ¶¶ 22–24.

17      Berk Aff. ¶ 24.

On July 23, 2014, Berk submitted an *ex-parte* application
to place Brogdon in administrative lockdown. [18] Berk
submitted a signed affirmation in support of this application
(the "Lockdown Application"), setting forth the reasons
warranting administrative lockdown. [19] Among other things,
Berk stated that the video of the shooting showed Brogdon
grabbing the victim's chain before handing a gun to Campbell,
and that Brogdon used the jail phones at Rikers to discuss
threatening the victim. [20] In doing so, Berk extensively
quoted the tape recording of Brogdon's phone call. [21] In an
order dated July 23, 2014, the Honorable Michael Brennan,
Kings County New York Supreme Court Justice, instructed
that Brogdon should be prevented "by any means, including
23-hour administrative lockdown, if necessary, from making
telephone calls" with the exception of his lawyer at the time,
Ben Zeaman. [22] The order also provided that Brogdon would
"have no communication with other inmates, visitation rights
or communication with anyone by telephone or letters," in
effect, requiring solitary confinement. [23]

18      Def. 56.1 ¶ 19.

19 Affirmation of Lisa Berk dated July 23, 2014 ("Lockdown Application"), attached as part of Ex. J to Zangrilli Decl.

20 Lockdown Application ¶¶ 5. 13-14, 20.

21 Lockdown Application ¶¶ 13-14.

22 Order dated July 23, 2014 ("Lockdown Order"), attached as part of Ex. J to Zangrilli Decl., at 1.

23 Lockdown Order at 2.

**\*3** On August 18, 2014, Lawrence Fredella, Esquire appeared as newly retained counsel for Brogdon.[24] During an October 9, 2014 conference, Fredella, asked the court to amend the lockdown order to list him as counsel.[25] This was the first such request to be made on the record.[26] On October 28, 2014, the Honorable Martin P. Murphy, Kings County New York Supreme Court Justice, amended the lockdown order so that Brogdon was permitted contact with Fredella.[27] During a third hearing on November 25, 2014, Fredella argued that he still could not contact Brogdon.[28] On that same day, Justice Murphy again ordered that the lockdown order be amended to include Fredella's contact information.[29]

24 Transcript dated August 18, 2014 ("August Tr."), attached as Ex. H to Zangrilli Decl. at 1.

25 Transcript dated October 9, 2014 ("October Tr."), attached as Ex. K to Zangrilli Decl., at 4.

26 During the October 9 conference, Fredella represented that he asked the court to amend the order on August 18, but no such request appears on the record. *See* August Tr.; October 9, 2014 Tr. at 4. Fredella claims that the request was made during an untranscribed bench conference during the August hearing. Berk did not appear at the August hearing; the People were represented by ADA Caroline Campomanes. August Tr. at 1.

27 Order dated October 28, 2014, attached as Ex. L to Zangrilli Decl. at 1.

28 Transcript dated November 25, 2014 ("November Tr.") attached as Ex. M to Zangrilli Decl., at 3-4, 6.

29 November Tr. at 7.

On April 21, 2016, Brogdon pled guilty to attempted murder in the second degree and to attempted criminal possession of a weapon in the second degree.[30] On October 15, 2016, he filed this action, alleging that Defendants improperly placed him in administrative lockdown for almost a year, and that "this was done to torture [Brogdon] to force him to suffer and force him into psychological counseling."[31] Brogdon asserts claims against Berk for unconstitutional conditions of confinement, deprivation of intimate association, illegal or improper strip search, malicious abuse of process, deprivation of due process, conspiracy, and failure to intercede.[32] Brogdon also contends he was deprived of his right to communicate with counsel as a result of the administrative lockdown and delays in gaining access for his replacement counsel, Fredella.[33] On January 3, 2018, Defendants moved for summary judgment.[34]

30 Def. 56.1 ¶ 28.

31 Complaint dated October 15, 2014 ("Compl.") ¶ 25.

32 In his complaint, Brogdon alleges that he was denied his constitutional right to fair proceedings, which could have been construed as a claim for a denial of fair trial. Complaint ¶¶ 56-62. However, Brogdon explicitly states that he did not bring a claim for denial of fair trial. Plaintiff's Memorandum of Law ("Pl. Mem.") at 20. He also states that he is not alleging that he lost property. (Pl. Mem. at 17.) Accordingly, these claims have been abandoned. *See Simon v. City of New York*, No. 14 Civ. 8391, 2015 WL 4092389, at \*2 (S.D.N.Y. July 6, 2015); *Ross v. Correct Care Solutions LLC*, No. 11 Civ. 8542, 2013 WL 5018838, at \*1 n. 1 (S.D.N.Y. Sept. 13, 2013).

33 Pl. Mem. at 8.

34 Notice of Motion for Summary Judgment dated January 3, 2018.

Underlying all of Brogdon's claims is his allegation that Berk perjured herself in the affirmation submitted in support of the administrative lockdown application.[35] Brogdon argues that Berk lied when she represented that Brogdon can be seen in the crime scene video grabbing the victim's chain.[36] Additionally, Brogdon argues that Berk could not reliably have determined whether it was Brogdon's voice on the Rikers

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 351 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

Island audio recording or the meaning of the dialogue on the recording.[37] Brogdon argues that Berk's alleged lie and unreliable affirmation render his administrative lockdown unconstitutional and that Berk's perjury leaves her without immunity.[38]

| [35] | *See, e.g.*, Compl. ¶¶ 25-27; Pl. Mem. at 2, 3. |
|------|---|
| [36] | Pl. Mem. at 5-6. |
| [37] | Pl. Mem. at 5. |
| [38] | Pl. Mem. at 4, 5, 8. |

**\*4** Defendants maintain that the record shows uncontrovertibly that Berk did not commit perjury[39] and is protected by absolute immunity.[39] And, even if Berk had lied, Defendants argue that she would still be entitled to absolute immunity based on her prosecutorial role.[40] Defendants also argue that, putting immunity aside, all of Brogdon's claims fail on the merits and that Brogdon's opposition is built on nothing more than conclusory, unsupported statements that are insufficient to withstand summary judgment.[41] Defendants are correct.

| [39] | Defendants' Motion for Summary Judgment ("Def. Mem.") at 9. |
|------|---|
| [40] | Def. Mem. at 10. |
| [41] | Def. Mem. at 11–20. |

## Legal Standards

A. Summary Judgment Standards

To obtain summary judgment under Rule 56 of the Federal Rules of Civil Procedure, a movant must show that there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, courts view the evidence in the light most favorable to the non-moving party and draw all factual inferences in the nonmoving party's favor. *Id.* However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48 (emphasis omitted).

Reliance upon conclusory statements or mere allegations is not sufficient to defeat summary judgment. *Geyer v. Choinski*, 262 F. App'x 318, 318 (2d Cir. 2008); *see also Neal v. Wilson*, No. 15 Civ. 2822, 2017 WL 4129635, at *6 (S.D.N.Y. Sept. 15, 2017) (granting summary judgment where plaintiff provided no evidence "except conclusory assertions" that he was "indicted with misleading testimony"); *Alaimo v. Board of Education of the Tri-Valley Central School District*, 650 F. Supp. 2d 289, 292 (S.D.N.Y. 2009) ("At the summary judgment stage, failure to substantiate bare allegations is fatal") Instead, the non-movant must show "that there is some evidence which would create a genuine issue of material fact." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) ).

The moving party may demonstrate the absence of a genuine issue of material fact "in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (quoting *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988) ). However, "[t]he mere assertion by a defendant moving for summary judgment that the plaintiff 'has not produced any evidence' to support an essential element of the plaintiff's claim does not satisfy the burden that Rule 56(a) imposes ... unless defendant also shows that plaintiff was obligated by discovery demand or court order to produce the evidence or that he voluntarily undertook to make the showing." *Id.* at 115 (quoting 10A Fed. Prac. & Proc. Civ. § 2727.1 at 491–92).

Under Rule 56, a party asserting that a fact cannot be, or, is genuinely disputed "must support the assertion by" either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The Rule further provides that the Court need only consider the cited materials, although it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). This district's local rules require the parties to submit enumerated statements of undisputed and disputed material facts. Local Rule 56.1(a)-(b). Consistent with Rule 56(c) "[e]ach statement by the movant or opponent ... including each statement controverting any statement of material fact,

2018 WL 4762981

must be followed by citation to evidence which would be admissible." Local Rule 56.1(d).

**\*5** When a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court has a number of options at its disposal, including "consider[ing] the fact undisputed for purposes of the motion" and "grant[ing] summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e). Courts have not been shy in applying these dictates. *See Perelli v. Taylor*, 113 F. App'x 421, 422 (2d Cir. 2004) (plaintiff's unsupported and conclusory assertions in statement were "insufficient to raise a triable issue of fact"); *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (noting that "district courts in the Southern and Eastern Districts of New York have interpreted current Local Rule 56.1 to provide that where there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the [c]ourt is free to disregard the assertion"); *Creighton v. City of New York*, No. 12 Civ. 7454, 2017 WL 636415, at \*48 (S.D.N.Y. Feb. 14, 2017) (court deemed admitted any of defendants' 56.1 statements that plaintiff did not specifically deny "with citations to supporting evidence") (internal citations omitted).

This case is a prime instance where a party, Brogdon, has failed to meet the requirements of Fed. R. Civ. P. 56 and Local Rule 56.1. Brogdon did submit a Rule 56.1 Statement setting forth admissions, denials and "unknowns" to the assertions made in Defendants' Rule 56.1 Statement. But whereas Defendants supported each of their assertions with citation to the record, Brogdon did not cite to any supporting citations in the record other than the surveillance video and a single transcript. In light of these deficiencies, the Court is free to deem Defendants' Rule 56.1 Statement undisputed pursuant to Fed. Rule Civ. P. 56(c) and Local Rule 56.1(e). Nonetheless, the Court has conducted a review of the record and considered Brogdon's admissible evidence in making its determinations.

### B. Section 1983 Standards

To state a cause of action under § 1983, "a plaintiff must allege that some person acting under color of state law deprived him of a federal right." *Ahlers v. Rabinowitz*, 684 F.3d 53, 60-61 (2d Cir. 2012) (quoting *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986) ). Because § 1983 does not provide its own substantive right, plaintiffs must identify the federally protected right which was allegedly violated.

*See Gonzaga University v. Doe*, 536 U.S. 273, 285 (2002) (plaintiffs cannot simply claim a violation of § 1983, because § 1983 "by itself does not protect anyone against anything") (quoting *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617 (1979) ). Accordingly, the plaintiff must show that (1) the defendant acted under color of state law and that (2) as a result of the defendant's actions, the plaintiff suffered a denial of federal statutory rights, or constitutional rights or privileges. *Fierro v. New York City Department of Education*, 994 F. Supp. 2d 581, 590 (S.D.N.Y. 2014) (internal quotation marks omitted). Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying right. *Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 405 (1997) (quoting *Daniels v. Williams*, 474 U.S. 327, 330 (1986) ).

---

Discussion

The discussion below first addresses the issue of whether Berk is protected by absolute immunity. The Court finds that she is and that there is no genuine dispute as to whether or not she lied. The discussion next turns to Brogdon's various constitutional claims and concludes that each of them is without merit as a matter of law. The discussion concludes with Brogdon's arguments for municipal liability and failure to train, which fail as a matter of law.

### A. ADA Berk's Absolute Immunity

1. Absolute Immunity Protects Prosecutorial Misconduct
Prosecutors are absolutely immune from § 1983 liability for prosecutorial acts that are "intimately associated with the judicial phase of the criminal process." [42] *Barr v. Abrams*, 810 F.2d 358, 360-61 (2d Cir. 1987) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976) ). Absolute immunity attaches to conduct in court, as well as conduct "preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler*, 424 U.S. at 431 n. 33. Determining whether particular acts are protected by absolute immunity is based on application of a "functional" approach, "looking to the function being performed rather than to the office or identity of the defendants." *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995). The test is an objective one that considers "whether a reasonable prosecutor would view the acts challenged by the complaint as reasonably within the functions of a prosecutor." *Giraldo v. Kessler*, 694 F.3d 161,

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 353 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

166 (2d Cir. 2012). A prosecutor claiming immunity bears the burden of showing that the particular immunity claimed applies. *Id.* at 165 (citing *Burns v. Reed,* 500 U.S. 478, 486-87 (1991) ).

[42]     Prosecutors cannot avail themselves of absolute immunity if they act in clear absence of their jurisdiction. *Barr,* 810 F.2d at 361. That exception does not apply in this case, and Brogdon has not argued otherwise.

**\*6** Absolute immunity attaches to a wide range of activity, including malicious prosecutorial misconduct. *See, e.g., McDonough v. Smith,* ──── F.3d ────, ────, 2018 WL 3672942, at \*6 n. 15 (2d Cir. Aug. 3, 2018) (absolute immunity for malicious prosecution claim, including fabrication of evidence); *Giraldo,* 694 F.3d at 167 (absolute immunity for claim prosecutor participated in conspiracy to manufacture false statements); *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir. 1994) ("absolute immunity protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation ... associated with his function as an advocate ... [including] conspiring to present false evidence at a criminal trial"). In explaining the rationale for absolute immunity, the Second Circuit has stated that although prosecutorial misconduct may be "disturbing," it is outweighed by the "greater societal goal in protecting the judicial process by preventing perpetual suits against prosecutors for the performance of their duties." *Dory,* 25 F.3d at 83 (citing *Imbler,* 424 U.S. at 426-28).

Conduct "intimately associated" with the judicial phase of the criminal process includes initiation of a prosecution and presentation of the government's case. *Barr,* 810 F.2d at 361. Examples of such conduct includes plea bargaining, *Kent v. Cardone,* 404 F. App'x 540, 543 (2d Cir. 2011), and communicating with police officers regarding the "collection and evaluation of evidence" in connection with submitting a case to a grand jury. *Lavin v. Thornton,* 959 F. Supp. 181, 188-89 (S.D.N.Y. 1997). In contrast, absolute immunity does not apply "where the prosecutors act in an 'investigative' or 'administrative' capacity." *Barr,* 810 F.2d at 361 (quoting *Taylor v. Kavanagh,* 640 F.2d 450, 452 (2d Cir. 1981) ). Rather than being protected by absolute immunity, these type of acts are protected by qualified immunity, which shields government employees from liability as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [43] *Buckley v. Fitzsimmons,* 509 U.S. 259, 268

(1993); (quoting *Harlow v. Fitzgerald,* 457 U.S. 818 (1982) ). Examples of conduct that only received qualified immunity include a prosecutor's advice to police concerning whether a suspect should be arrested, *Buckley,* 509 U.S. at 273-74; investigation of charges of child abuse and removal of child from parental custody, *Robinson v. Via,* 821 F.2d 913, 918-20 (2d Cir. 1987); and the recording of meetings and strategy for obtaining incriminating evidence on a suspect, *Jackson v. Seewald,* No. 11 Civ. 5826, 2013 WL 149341, at \*8 (S.D.N.Y. Jan. 14, 2013).

[43]     As discussed below, the undisputed facts establish that Berk did not violate Brogdon's constitutional rights. Accordingly, even if Berk's conduct was deemed outside the bounds of absolute immunity, she still would have immunity with regards to all of Brogdon's claims based on qualified immunity because she did not violate a clearly established right. *See, e.g., Higazy v. Templeton,* 505 F.3d 161, 179 (2d Cir. 2007) (prosecutor qualifiedly immune for questioning material witness, because "[the Second Circuit] know[s] of no court ... that has held that a material witness has a Sixth Amendment right to counsel before charges have been filed"); *Salim v. City of New York,* No. 15 Civ. 8521, 2016 WL 7489083, at \*6 (S.D.N.Y. Dec. 22, 2016) (officers had qualified immunity because "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law") (quoting *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir. 1997) (emphasis in original) ).

### 2. Absolute Immunity Applies To Berk's Lockdown Application

The question here is whether Berk's submission of the Lockdown Application was an act "intimately associated with the judicial phase of the criminal process" or instead an act falling into the type of activity not protected by absolute immunity. The Supreme Court looked at a somewhat similar set of facts in *Kalina v. Fletcher,* 522 U.S. 118 (1997). In that case, the Court held that a motion for an arrest warrant and the activities with the preparation and filing of that motion fell within "the traditional functions of an advocate" and therefore were protected by absolute immunity. *Kalina,* 522 U.S. at 118, 129. The court expressed concern that "any lesser degree of immunity" for such functions could interfere

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 354 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

with a prosecutor's independent judgment and "impair the judicial process itself." *Id.* at 127 (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986) ).

**\*7** In contrast, the Court found that the same prosecutor was not absolutely immune for her false factual statements as an affiant in support of the application for an arrest warrant. Unlike the drafting or filing of an arrest warrant, "[t]estifying about facts is the function of the witness, not of the lawyer." *Id.* at 119. As the source of the sworn statements supporting the application, the prosecutor was performing the function of a complaining witness rather than a prosecutor. *Id.* at 130–131.

A court in this district recently held that a prosecutor was entitled to absolute immunity with respect to submitting a sworn affidavit in support of an order to show cause resulting in the 60-day involuntary confinement of a patient with tuberculosis. *M.C. v. County of Westchester, New York*, No. 16 Civ. 3013, 2018 WL 1275435, at \*6 (S.D.N.Y. Mar. 6, 2018). The plaintiff alleged that the affidavits submitted by the prosecutor were rife with false statements and likened his case to *Kalina*, arguing that the prosecutor could not be absolutely immune with respect to his own sworn affidavit. In granting the prosecutor's motion to dismiss, however, the district court found *Kalina* inapposite because the prosecutor's statements merely "contextualize[d]" the order sought, and plaintiff failed to point to any false statement in the prosecutor's affidavit.[44] *Id.* at \*6.

[44]     The Court denied absolute immunity to non-prosecutor witnesses who supplied affidavits providing the allegedly false statements. 2018 WL 1275435, at \*6.

There is an argument to be made that in submitting a factual affirmation to support the administrative lockdown application, Berk's conduct was more like the role of a complaining witness, as in *Kalina*, rather than a prosecutor pursuing a case based on factual affidavits supplied by others, as in *M.C.* Berk's affirmation was the only evidence submitted in support of the Lockdown Application, and the affirmation supplied the underlying facts justifying the Lockdown Order.

That said, there are important distinctions from *Kalina* that warrant application of absolute immunity. To start, Berk did not submit her affirmation as a complaining witness to initiate an arrest. Brogdon already had been arrested, indicted and incarcerated pending trial. A grand jury had found probable

cause that Brogdon committed the acts with which he was charged, including forcibly attempting to steal the victim's chain – the same fact about which Berk allegedly lied in her Lockdown Application. And a judge had found reason to detain Brogdon prior to trial.

Berk instead submitted her affirmation for the post-indictment purpose of preventing Brogdon from threatening the key witness (the victim) and interfering with the government's ability to present important evidence. Berk's function in submitting the Lockdown Application was that of marshalling and preserving evidence for trial, which comfortably falls within the realm of acts that are intimately involved with the judicial process. *See, e.g., Schnitter v. City of Rochester*, 556 F. App'x 5, 7 (2d Cir. 2014) (absolute immunity for failing to disclose exculpatory evidence, "because deciding what disclosure to make is part of a prosecutor's role as an advocate, and constitutes a core prosecutorial function"); *Flager v. Trainor*, 663 F.3d 543 (2d Cir. 2011) (absolute immunity for making allegedly false statements in support of a material witness order and warrant because it was an act "intimately associated" with presenting the State's case).

**\*8** Further, Brogdon's allegations focus on Berk's description of the video of the crime and the audio recording of Brogdon's jailhouse phone call.[45] Berk's description of the video, however, is contextual background for the events that comprise the substance of the Lockdown Application; that is, what happened during Brogdon's pretrial incarceration.[46] Whether or not Berk accurately described Brogdon as the person who grabbed the victim's chain has no bearing on whether Brogdon orchestrated witness intimidation from prison. As for the audio recording, Berk quotes extensively from the exchange between Brogdon and Palmer, letting the language speak for itself.[47]

[45]     *See, e.g.*, Pl. 56.1 at ¶ 13.

[46]     In summing up the reasons justifying the lockdown order, Berk does refer back to the video tape to demonstrate the strength of the case against Brogdon. Lockdown Application ¶ 20. But, as noted, a grand jury already had found probable cause to believe that Brogdon committed the crimes of which he was accused.

[47]     Lockdown Application ¶¶ 13-14. Brogdon's Rule 56.1 Statement also claims that Berk lied "on several occasions" about Brogdon's wife, Celia

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

Paul, being "intricately involved" in helping to intimidate witnesses. Pl. Rule 56.1 ¶ 29. The Lockdown Application, however, at one point merely refers to Paul as having visited both Brogdon and Campbell at Rikers. (Lockdown Application ¶ 18.) Although suggestive of the idea that Paul acted as a conduit of information to and from Brogdon, the Lockdown Application does not otherwise refer to Paul.

In short, Berk's specific statements alleged to be false were not made in an administrative or investigative capacity, but rather as part of her prosecutorial role to prevent an indicted felon from compromising material evidence and harming a material witness. Put another way, Berk's statements were made to prevent the obstruction of a prosecution already under way and were closely associated with her prosecutorial function. Accordingly, her statements are protected by absolute immunity.

3. Undisputed Evidence Confirms That Berk Did Not Lie

Absolute immunity also applies because the undisputed evidence shows that Berk did not lie in the Lockdown Application. See *M.C.*, 2018 WL 1275435, at *6 (applying absolute immunity where plaintiff could not identify a falsehood in prosecutor's affidavit). Berk has confirmed the truth of what she set forth in the Lockdown Application by way of her sworn Affidavit in support of the present motion. [48] As explained above, there was nothing false or misleading about Berk's statements about the audio recording; her statements quoted directly from the recording (which Brogdon does not contest), and she provided information (also uncontested by Brogdon) corroborating her basis for stating that Brogdon was the voice on the recording. While Brogdon argues that it is "not clear" whose voice is heard on the recording, he presents no evidence that the voice is that of anyone else.

[48]  Berk Aff. ¶¶ 2-25.

Similarly, Berk's statements that the video of the crime depicts Brogdon grabbing the victim's chain and handing a gun to Campbell are indisputably established as true. The Affidavit from Berk submitted in support of the instant motion confirms that the video depicted Brogdon doing exactly what she described in the Lockdown Application. [49] In this regard, Berk's Affidavit is highly reliable given that it reflects Berk's current understanding after gaining further familiarity with

Brogdon's appearance, not merely her understanding at the time she submitted the Lockdown Application.

[49]  Berk Aff. ¶ 4.

Additionally, the video of the crime clearly depicts an individual reach to the neck of the victim and pull the victim's chain. Seconds later, the victim clenches his throat and then readjusts the chain. [50] A separate video of Brogdon being interviewed by a detective shortly after his arrest clearly shows Brogdon. [51] The suspect being interviewed and the person grabbing the chain appear one and the same, and Brogdon has presented no evidence to the contrary. Indeed, as explained earlier, Brogdon has not cited any facts in the record to support his claim other than referring to the video itself. Based on the evidence in the record, no reasonable juror could conclude that the person in the video who grabbed the victim's chain was not Brogdon and, therefore, no reasonable juror could conclude that Berk lied in her Lockdown Application. [52] See *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party, such as a relevant videotape whose accuracy is unchallenged, should be credited by the court on such a motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party"); *Lin v. City of New York*, No. 14 Civ. 9994, 2016 WL 7439362, at *11 (S.D.N.Y. Dec. 21,2016) (no reasonable juror could find excessive force where video of plaintiff's arrest "unavoidably shows that ... handcuffing proceeded routinely and the officers used a reasonable and unremarkable amount of force").

[50]  See Video Surveillance Footage, attached as Ex. B to Zangrilli Decl., at approximately 4:28:30 A.M.

[51]  Interview Video.

[52]  The video footage also depicts the moment when Campbell comes into possession of the gun he used to shoot the victim. (Video Surveillance Footage at approximately 4:28:55 A.M.) Campbell (who is distinctly taller with red pants, red shirt, and a black hat) walks over to Brogdon (who is shorter with a white t-shirt and black shorts) and the two make eye contact and gesture to one another. Campbell leans into Brogdon. Seconds later, Campbell pushes the victim and then shoots him. The video thus does not directly show the gun being transferred from Brogdon to Campbell. But, based on the evidence

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

in the record, no reasonable juror could conclude that it was not reasonable for Berk to make that inference from the video. All the more so, since the grand jury already had found probable cause that Brogdon supplied the gun to Campbell.

**\*9** Accordingly, Berk is entitled to summary judgment based on absolute immunity. But even if she were not, none of Brogdon's constitutional claims against Berk can survive summary judgment as discussed in the sections that follow.

## B. Solitary Confinement Claims

Brogdon asserts three constitutional violations related to his solitary confinement. First, that his solitary confinement during pretrial detention was unjustified and unduly long. Second, that the physical conditions of confinement imperiled his health in violation of the Fourteenth Amendment. Third, that solitary confinement deprived him of his right to intimate association under the First Amendment.[53] Each of these claims is deficient.

[53]    Brogdon has not specifically asserted this claim as a First Amendment claim, but he has argued that deprivation of his ability to communicate with his wife was a violation of his constitutional rights. Pl. Mem. at 6, 9, 11, 15.

### 1. Solitary Confinement

#### a. Legal Standard

The Fourteenth Amendment provides, in relevant part, that no "State [shall] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Liberty interests protected by the Fourteenth Amendment may arise from two sources - the Due Process Clause itself and the laws of the States."[54] *Hewitt v. Helms*, 459 U.S. 460, 466 (1983). Under the Due Process Clause, the conditions of pretrial detention are constitutional unless they amount to punishment of the detainee. *See Bell v. Wolfish*, 441 U.S. 520, 535-37 (1979). As explained by the Supreme Court, the plaintiff must show that the contested conditions were "imposed for the purpose of punishment" and that the challenged conditions are not merely "an incident of some other legitimate governmental purpose." *Id.* at 538.

[54]    State law is not at issue here.

Solitary confinement of a detainee is not a per se constitutional deprivation. *See DeLeon v. Rockland County Correctional Facility*, No. 10 Civ. 7536, 2013 WL 1195623, at *3 (S.D.N.Y. March 22, 2013) (citing *Wolfish*, 441 U.S. at 538-39). That is because solitary confinement can be "reasonably related to legitimate penological interests." *Basciano v. Martinez*, No. 07 CV 421, 2007 WL 2119908, at *8 (E.D.N.Y. May 25, 2007) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987) ). As a result, courts reject claims by pretrial detainees subjected to solitary confinement when the confinement is related to a legitimate government purpose other than punishment. *See, e.g., United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (national security concerns justified solitary confinement because detainee could communicate details of an active al Qaeda investigation); *Basciano*, 2007 WL 2119908, at *8 (detainee's written "hit list" of five people's names and his capacity to carry out their murders through organized crime presented a "significant security risk" and justified imposition of solitary confinement); *McFadden v. Solfaro*, Nos. 95 Civ. 1148, 95 Civ. 3790, 1998 WL 199923, at *8-9 (S.D.N.Y. April 23, 1998) (detainee's disciplinary infractions and classification as a "maximum security, high escape risk" justified solitary confinement in the interest of maintaining security and order). As illustrated by *McFadden* and *Basciano*, protecting the safety of individuals at risk is a legitimate government interest justifying solitary confinement.

#### b. Analysis

**\*10** The only purported due process deficiencies Brogdon has identified in connection with his solitary confinement are (1) Berk's Lockdown Application and (2) the length of the administrative lockdown period – nearly a year, from August 2014 through July 16, 2015.[55] As already established above, Berk's Lockdown Application was truthful and constitutionally sound. Defendants have put forth evidence that the Lockdown Order was reasonably related to a valid correctional objective: security and safety of a material witness. Brogdon has not provided any evidence to the contrary. Instead, he offers only conjecture as to Berk's motive without any supporting facts, and the record reveals no facts supporting that inference.[56]

[55]    Pl. Mem. at 13-14. The record shows that Brogdon was in administrative lockdown at a minimum, from August 2014 through May 2015.

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 357 of 380

*See* Transcript dated May 18, 2015 ("May Tr.") attached as Ex. 4 to Pl. Mem., at 2-3; August Tr. Brogdon asserts, however that he was in administrative lockdown through July 16, 2015. Defendants have not contended otherwise. For purposes of this analysis, the Court will assume that Brogdon was in administrative lockdown from August 2014 through July 16, 2015.

[56]     Pl. Mem. at 18.

As to the length of Brogdon's confinement, courts have found solitary confinement lasting for periods of up to or even more than a year to be permissible. *See, e.g., El-Hage,* 213 F.3d at 81 (fifteen months); *Hunter v. City of New York,* No. 10 Civ. 3532, 2015 WL 5697218, at *1 (S.D.N.Y. Sept. 28, 2015) (eleven months); *Brown v. Doe,* No. 13 Civ. 8409, 2014 WL 5461815, at *7 (S.D.N.Y. Oct. 28, 2014) (fifteen months).

Of course, there are cases where similar or shorter lengths of solitary confinement were handed out as punishment and found to be unconstitutional. *See, e.g., DeLeon,* 2013 WL 1195623, at *4 (seven month period of confinement "on its face ... smacks of punishment") (quoting *Covino v. Vermont Department of Corrections,* 933 F.2d 128, 130 (2d Cir. 1991) ); *United States v. Bout,* 860 F. Supp. 2d 303, 308 (S.D.N.Y. 2012) (more than fourteen months). In each of these cases, however, there was an absence of evidence showing a "legitimate governmental purpose" for the length of confinement. *DeLeon,* 2013 WL 1195623, at *4 (quoting *Wolfish,* 441 U.S. at 538-39); *see also Parson v. York,* No. 16 CV 167, 2017 WL 1076536, at *5 (N.D.N.Y. Feb. 28, 2017) (denying defendants' motion to dismiss where there was nothing in the record indicating why the administrative segregation lasted nine months). In contrast, the Defendants here have shown a legitimate, non-punitive purpose sufficient to justify a lengthy period of administrative lockdown.

### 2. Physical Conditions of Confinement

#### a. Legal Standard

To prevail on a § 1983 claim for unconstitutional conditions of confinement, a detainee must prove both objective and subjective elements: "(1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's necessities,' and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety." [57] *Gaston*

*v. Coughlin,* 249 F.3d 156, 164 (2d Cir. 2001) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) ).

[57]     For pretrial detainees like Brogdon, a claim for unconstitutional conditions of confinement arises under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Darnell,* 849 F.3d at 29.

To establish an objective deprivation, the plaintiff " 'must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness.' " *Darnell,* 849 F.3d at 30 (first quoting *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir. 2013), then quoting *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir. 1972) ). There is no "static test" to determine whether a deprivation is sufficiently serious; instead, courts must evaluate conditions "in light of contemporary standards of decency." *Id.* at 30 (quoting *Blissett v. Coughlin,* 66 F.3d 531, 537 (2d Cir. 1995) ).

**\*11**  To satisfy the subjective or "*mens rea*" prong of a conditions of confinement claim, a pretrial detainee must allege that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell,* 849 F.3d at 35. This prong can be satisfied even when the defendant is not subjectively aware that their acts or omissions "subjected the pretrial detainee to a substantial risk of harm." *Id.*

#### b. Analysis

Brogdon argues he was unconstitutionally deprived of food, water, sanitation, and communication, which led to mental anguish, depression, and insomnia. [58] More specifically, he argues he was fed irregularly, remained in a small cell with an intermittently non-working toilet, and was denied consistent access to outside recreation. [59]

[58]     Brogdon claims that suffered from depression and suicidal thoughts as a result of his confinement. The denial of treatment for an inmate's mental

Case 9:21-cv-00986-MAD-TWD   Document 32   Filed 08/07/23   Page 358 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

health care needs may give rise to a conditions of confinement claim. *See, e.g., Kelsey v. City of New York*, 306 Fed. App'x 700, 702 (2d Cir. 2009). Here, however, Brogdon states that he was treated for his mental health issues and does not argue that there were any deficiencies in his treatment. (Pl. Mem. at 1 ("[Brogdon] suffered mental health issues, depression for which he was treated for in 2015"). Accordingly, these allegations do not state a viable claim.

59    Pl. Mem. at 14-15.

Deprivation of these fundamental needs can be sufficiently serious to satisfy the objective prong of the *Farmer* test. But Brogdon's deprivation contentions are nothing more than conclusory allegations unsupported by any evidence. Conclusory statements of this nature cannot withstand summary judgment. *See Geyer*, 262 F. App'x at 318; *Neal*, 2017 WL 4129635, at *6; *Alaimo*, 650 F. Supp. 2d at 292. Moreover, his allegations do not even allege the extent of deprivation that otherwise would be actionable. For instance, Brogdon does not argue that he was not fed sufficiently to maintain adequate nutrition, as is required to meet this prong. *See, e.g., Corley v. City of New York*, No. 14 Civ. 3202, 2017 WL 4357662, at *14 (S.D.N.Y. Sept. 28, 2017) (no claim for deprivation of kosher meals, because plaintiff did not allege "a complete denial of food" or that the food provided was "inedible"); *Little v. Municipal Corporation*, 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014) (prong not met where plaintiff only alleged "isolated" withholding of food rather than a deprivation of the "measure of food necessary to maintain health"). Similarly, Brogdon claims, without any supporting evidence, that his toilet failed to work only when officials briefly cut off water when inmates would flood their cells, and that he would not have drinking water "until the next day." [60] These allegations are also deficient. *See, e.g., Thomas v. Demeo*, No. 15 Civ. 9559, 2017 WL 3726759, at *6 (S.D.N.Y. Aug. 28, 2017) (no claim for unsanitary cell conditions, since plaintiff did not allege details showing "the duration and the severity of [his] experience being exposed to unsanitary conditions") (quoting *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) ).

60    Pl. Mem. at 15.

Brogdon also argues that he was denied outdoor recreation. However, Brogdon has not argued that he was denied the opportunity to exercise, a sufficiently serious deprivation of which could fulfill the objective prong. Courts have "found

no violation where the inmate has an opportunity for exercise, either in or outside of his cell" since there is no constitutional right to outdoor recreation. *Little*, 51 F. Supp. 3d at 489 (quoting *Shakur v. Sieminski*, No. 07–CV–1239, 2009 WL 2151174, at *4 (D. Conn. July 15, 2009) ); *see also Huggins v. Schriro*, No. 14 Civ. 6468, 2015 WL 7345750, at *6 (S.D.N.Y. Nov. 19, 2015), *report and recommendation adopted*, 2016 WL 680822 (S.D.N.Y. Feb. 18, 2016) (dismissing claim where plaintiff had not alleged that he could not exercise in his cell).

**\*12**  As set forth above, there is no record evidence that Brogdon was deprived of basic needs to an actionable degree. Accordingly, Brogdon's conditions of confinement claim cannot withstand summary judgment.

### 3. Right of Intimate Association

#### a. Legal Standard

"A prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection." *Banks v. Argo*, No. 11 Civ. 4222, 2012 WL 4471585, at *5 (S.D.N.Y. Sept. 25, 2012) (quoting *Morgan v. LaVallee*, 526 F.2d 221, 225 (2d Cir. 1975) ). However, the right of intimate association "is among the rights least compatible with incarceration," which, by definition, requires confinement. *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Although incarcerated prisoners retain some limited right of intimate association, the Supreme Court has upheld restrictions on inmates' visitation rights so long as the restrictions bear a "rational relation to legitimate penological interests," chief among them, security. *Id.* at 132. Furthermore, "[p]risoners do not have an absolute right to make phone calls." *Banks*, 2012 WL 4471585, at *5 (alteration in original) (quoting *Fair v. Weiburg*, No. 02 Civ. 9218, 2006 WL 2801999, at *7 (S.D.N.Y. _Sept. 28, 2006) ). In prisoner challenges to restrictions on visitation rights, the burden is "not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at 132.

#### b. Analysis

That Brogdon was denied contact with anyone other than his attorney (and corrections officers) is undisputed. However, officials may restrict an inmate's right to visitation and

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 359 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

communication "if the restrictions employed are reasonably related to legitimate penological interests - namely security." *Patterson v. Ponte*, No. 16 Civ. 3156, 2017 WL 1194489, at *5 (S.D.N.Y. March 30, 2017), *report and recommendation adopted*, 2017 WL 1405753 (S.D.N.Y. April 17, 2017). As explained above, Defendants have shown that they had a legitimate interest in restricting Brogdon's access to communication to prevent harm to a material witness. Brogdon has not submitted or cited any record evidence to the contrary.

C. Illegal or Improper Strip Search

1. Legal Standard

Correctional officers have wide latitude when searching detainees. *See Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 328 (2012) ("correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities"). A regulation impinging on an inmate's constitutional rights must be upheld "if it is reasonably related to legitimate penological interests." *Id.* (quoting *Turner*, 482 U.S. at 89). In determining reasonableness, courts must give deference "to the officials in charge of a jail unless there is 'substantial evidence' demonstrating their response to a situation is exaggerated." *Pritchard v. County of Erie*, Nos. 04-CV-534-A, 06-CV-291-A, 2018 WL 1036165, at *4 (W.D.N.Y. Feb. 23, 2018) (quoting *Florence*, 566 U.S. at 330) (internal citations omitted).

In *Florence*, the Supreme Court upheld blanket policies of conducting visual body cavity searches on new inmates, even for misdemeanor arrestees, where there was no reason to suspect that the arrestee would have contraband. 566 U.S. at 322-323. However, the Court in *Florence* did not "foreclose the possibility" of an exception to this rule, for example, for detainees who might not have contact with other detainees. *Id.* at 338-40 (Roberts, C.J., concurring).

2. Analysis

**\*13** Brogdon claims that, "[d]espite having no reason to believe [he] might have hidden contraband on his person or up his rectum, [he] was forced to stand completely naked, in full view to passersby of every gender ... while officers inspected him." [61] Brogdon has not indicated when or where the alleged strip search took place. But he does argue that the search "was a direct result of his being placed in solitary confinement,"

and consequently, that Berk's alleged lies are what caused the strip search. [62]

61     Pl. Mem. at 17.

62     Pl. Mem. at 18.

As an initial matter, and as set forth earlier, the record evidence indisputably shows that Berk did not lie in the Lockdown Application. Accordingly, the premise of Brogdon's strip search claim – that the strip search was triggered by Berk's alleged constitutional violation – falls away. *Brown v. Graham*, 470 F. App'x 11, 14 (2d Cir. 2012) (claim failed because there was "no record evidence that the [strip] search was anything other than a routine procedure justified by the state's legitimate interest in maintaining prisoner safety and prison security.") On that basis alone, summary judgment on this claim is warranted.

Furthermore, in determining the reasonableness of a search, the Supreme Court generally defers to prison officials, because "determining whether a policy is reasonably related to security interests is peculiarly within the province and professional expertise of corrections officials." *Paulin v. Figlia*, 916 F. Supp. 2d 524, 532 (S.D.N.Y. 2013) (quoting *Florence*, 566 U.S. at 328). To overcome this deference, Brogdon would need to show "substantial evidence in the record to indicate that the officials have exaggerated their response to these [security] considerations." *Id.* (quoting *Florence*, 566 U.S. at 328). Brogdon has not cited any evidence, or even alleged any facts, to overcome the deference due to corrections officials.

Even putting aside the verity of Berk's Lockdown Application, Brogdon has not disputed that he was a suspected gang member arrested for a violent felony, making it unlikely that he would be exempt from any sort of strip search, whether at the time of his arrest or upon being placed in administrative lockdown. *See Dodge v. County of Orange*, 282 F. Supp. 2d 41, 48 (S.D.N.Y. 2003) ("Jail officials rightly view gang affiliation as a serious security risk ... Gang members are often more violent, dangerous, and manipulative than other inmates.") Accordingly, Brogdon's strip search claim cannot survive summary judgment.

D. Malicious Abuse of Process

1. Legal Standard

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 360 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

Courts look to state law for the elements of a § 1983 claim for malicious abuse of process. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Under New York law, a plaintiff must show that the defendant "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside legitimate ends of process." *Id.* To survive summary judgment on a malicious abuse of process claim, the plaintiff must present "evidence of a collateral objective that drove defendants to pervert the regularly issued process ... to the accomplishment of an improper purpose." *Rhodes v. United States*, 519 F. App'x 703, 706 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Dean v. Kochendorfer*, 237 N.Y. 384, 390, 143 N.E. 229 (1924) ). Additionally, a finding of probable cause will negate a claim of malicious abuse of process. *Sforza v. City of New York*, No. 07 Civ. 6122, 2009 WL 857496, at *17 (S.D.N.Y. March 31, 2009).

2. Analysis

**\*14** Like his other claims, Brogdon's malicious process claim stems from his allegations that Berk lied in the Lockdown Application. In furtherance of his claim, Brogdon speculates that Berk lied in order to "to force a plea in the case" or perhaps "for other motives that are not readily seen by Plaintiff at this time." [63] Once again, Brogdon's claim cannot survive summary judgment because the indisputable evidence demonstrates that Berk did not lie and that she submitted the Lockdown Application to prevent Brogdon from interfering with key evidence in the government's prosecution of the case against him. The record does not contain evidence related to any potentially ulterior motive.

63    Pl. Mem. at 18.

Accordingly, Defendants have shown that no reasonable juror could conclude that Brogdon satisfied either the second or third requisite elements of his claim. *See, e.g., Kanciper v. Lato*, 718 F. App'x 24, 28 (2d Cir. 2017) (plaintiff required to provide evidence that the prosecutor was perverting the criminal process to achieve an end other than a criminal conviction); *Savino v. City of New York*, 331 F.3d 63, 78 (2d Cir. 2003) (abuse of process claim failed because plaintiff only alleged that defendants were seeking to retaliate and showed no evidence of an "aim[ ] to achieve a collateral purpose beyond or in addition to his criminal prosecution"); *Vincent v. Winski*, No. 14 Civ. 7744, 2018 WL 1441370, at *13 (S.D.N.Y. March 22, 2018) (plaintiff's conclusory allegations

did not show that defendants prosecuted him in order to discourage his participation in Occupy Wall Street protests).

E. Denial of Right to Counsel

Brogdon claims that he was denied his constitutional right of access to counsel for a period of approximately six months between September 2014 and February 2015. [64] The argument is premised on assertions of Brogdon's counsel, Fredella, that Berk prevented Brogdon from speaking with Fredella by failing to timely have Fredella added as a permitted contact in the Lockdown Order. [65]

64    Pl. Mem. at 16, 19.

65    Pl. Mem. at 8, 19.

1. Legal Standard

"An inmate's right to counsel to assist in his defense during a criminal prosecution implicates both the due process right of access to the courts and the Sixth Amendment right to counsel." *Alster v. Goord*, 745 F. Supp. 2d 317, 340 (S.D.N.Y. 2010) (quoting *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) ). The right to access the courts is grounded in the guarantees of the First, Fifth, and Fourteenth Amendments and can be satisfied through appointment of counsel. *Bourdon v. Loughren*, 386 F.3d 88, 92-94 (2d Cir. 2004). Pursuant to this right, inmates must "must have a *reasonable* opportunity to seek and receive the assistance of attorneys." *Alster*, 745 F. Supp. 2d at 340-41 (emphasis and alteration in the original) (quoting *Procunier v. Martinez*, 416 U.S. 396, 419 (1974) ). Similarly, a pretrial detainee's Sixth Amendment rights are infringed upon when prison regulations "unjustifiably obstruct" the detainee's access to counsel. *Benjamin*, 264 F.3d at 187 (quoting *Procunier*, 416 U.S. at 419). These restrictions must be evaluated "in light of the central objective of prison administration, safeguarding institutional security." *Id.* (quoting *Wolfish*, 551 U.S. at 547).

To establish a violation of the right of access to the courts, a plaintiff who is represented by counsel must show that he "did not have the *capability* of bringing his challenges before the courts." *Hayes v. County of Sullivan*, 853 F. Supp. 2d 400, 437 (S.D.N.Y. 2012) (emphasis in original) (quoting *Bourdon*, 386 F. 3d at 98). By contrast, a prisoner asserting a violation of the Sixth Amendment, need not allege that he suffered actually injury as a result of this interference. *Benjamin*, 264 F.3d at 187. As recognized by the Supreme Court, "to deprive a person of counsel during the period prior to trial may be

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 361 of 380

**Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)**

2018 WL 4762981

more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985).

**\*15** For any constitutional claim brought pursuant to § 1983," a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity." *Warren v. Pataki*, 823 F.3d 125, 136 (2d Cir. 2016) (quoting *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) ). Personal involvement requires "direct participation in the alleged violation." *Patterson*, 375 F.3d at 229.

  2. <u>Analysis</u>
Under the standard set forth by the Second Circuit, Brogdon's claim for denial of access to the courts does not hold up. He has not alleged that he was unable to defend himself in court. Indeed, the record is replete with evidence of his legal challenges, and therefore any claims brought pursuant to this right cannot survive. [66] *See Osgood v. Amato*, No. 12 CV 565, 2013 WL 3777189, at \*7 (N.D.N.Y. July 17, 2013) (dismissing access claim where plaintiff did not make any contentions about "his ability to present his defense or how his criminal action proceeded, or failed to proceed").

[66]    Additionally, Brogdon appears to claim denial of access for the theft of "legal documents that were necessary to his case." Pl. Mem. at 17. Brogdon has not provided any evidence of these documents, identified any individuals involved, or even stated whether they were related to his criminal case or a different action. At the summary judgment stage, these bare allegations are insufficient. *See Geyer*, 262 F. App'x at 318; *Neal*, 2017 WL 4129635, at \*6; *Alaimo*, 650 F. Supp. 2d at 292.

As to Brogdon's Sixth Amendment claim, it is clear from the court records that for some period of months from September 2014 through at least November 24, 2014, Brogdon was denied access to his counsel, Fredella. [67] While this theoretically could be sufficient for a Sixth Amendment claim if supported by admissible evidence, *see Basciano*, 2007 WL 2119908 (finding a deprivation of the right to counsel where attorney non-contact rule "substantially impaired counsel's ability to review ... documents with their client"), Brogdon has put forth no evidence of any individual Defendant's personal involvement, as required by the Second Circuit.

[67]    Brogdon argues, but does not provide evidence, that Fredella attempted to contact him by videoconference on the following dates: September 10, 2014, October 7, 2014, November 13, 2014, December 11, and 23, 2014, and January 5, and 7, 2014. Pl. Mem. at 2.

The record indisputably demonstrates Berk's lack of involvement in Brogdon's alleged lack of access to his counsel. To the contrary, the record shows that Berk made efforts to provide access. Fredella first appeared in Brogdon's case on August 18, 2014, replacing Brogdon's prior attorney. [68] The Lockdown Order issued on July 23, 2014, prior to Fredella's appearance. For Fredella to be authorized to contact Brogdon, it needed to be amended. Fredella requested the court to amend the Lockdown Order for the first time on the record on October 9, 2014. [69] During the same October hearing, Fredella represented that he previously asked the court to amend the order on August 18, but the August transcript does not confirm his assertion. [70] Brogdon claims that Fredella's request was made during a bench conference. The record shows that Caroline Campomanes represented the prosecution at both the August 18th and the October 9th hearings, and that Berk was not present. [71] Therefore, even assuming Fredella did ask for the order to be amended on August 18, there is no evidence to show Berk was even aware of Fredella's request.

[68]    Def. 56.1 ¶ 21.

[69]    October Tr. at 4.

[70]    October Tr. at 4. *See* August Tr.

[71]    *See* August Tr. at 1; October Tr. at 1; Berk Aff. ¶ 28.

**\*16** Per Fredella's request, Berk submitted an amended application to the court on October 28, 2014. [72] As attested to by Berk with no evidence submitted to the contrary, once the court issued the amended order permitting Brogdon to speak with Fredella, she forwarded it to DOC. [73] Fredella again raised the issue with the court on November 25, 2014, claiming that the order had not been amended. [74] Although the order had already been amended by the court, Berk submitted a second application, which the court approved and Berk forwarded to DOC. [75]

[72]    Def. 56.1 ¶ 24.

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 362 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

73     Berk. Aff. ¶ 30.

74     November Tr. at 7.

75     November Tr. at 7-8. Brogdon appears to argue that he was denied access to counsel even after this second amended order – from after the November 25, 2014, hearing until February 2015. Pl. Mem. at 19. No evidence supports this claim. To the contrary, the transcript of the February 4, 2015 hearing shows that Fredella did not claim that Brogdon was unable to communicate with counsel or state that the lockdown order required further amendment. Transcript dated February 4, 2015 ("February Tr."), attached as part of Ex. 3 to Pl. Mem., at 2-5. Accordingly, the Court gives no credence to this allegation.

Brogdon disputes some of the facts as represented by Defendants, but, as before, provides no relevant citations to support his denials. [76] For example, his 56.1 Statement denies that at an in-person meeting with Berk two weeks before the November 25, 2014 court appearance, Fredella failed to mention that DOC had not yet implemented the modified order. [77] Brogdon's denial is then followed by another accusation of perjury: "This is a false statement made by ADA Berk to protect herself from liability." [78] But the transcript from the November 25 court hearing shows that Fredella admitted that he did not bring the issue of the amended order up in an earlier conversation with Berk because Fredella "was not aware it was not implemented at that time." [79]

76     *See* Pl. 56.1 ¶¶ 22-27. Brogdon contends that DOC phone records "clearly show no phone calls to his counsel." Pl. Mem. at 8. But Brogdon only cites "visitation logs" from June 10, 2014 to August 8, 2014. Brogdon Visitation Logs, attached as Ex. 2 to Pl. Mem. Those logs do not appear to have any information pertaining to telecommunications. And, in any event, the logs are for a time period that precedes the time period that Brogdon contends he did not have access to counsel.

77     Pl. 56. ¶ 26.

78     Pl. 56.1 ¶ 26.

79     November Tr. at 3-5. Berk agrees that Fredella did bring up the issue with her, but only immediately

prior to the November 25, 2014 court appearance. Berk Aff. ¶ 32. That is what led to Berk's submitting the second application to modify the lockdown order. Berk Aff. ¶ 32.

In short, there is no basis to accept Brogdon's unsupported denial, and every reason to accept Defendants' characterization of the record. No reasonable juror could find otherwise. *See* Local Rule 56.1(e); *see also, e.g., Mitchell v. Metropolitan Transit Authority Capital Construction Corp.*, No. 16 Civ. 3534, 2018 WL 3442895, at *1 n.1 (S.D.N.Y. July 17, 2018) ("Where a fact stated in either party's Rule 56.1 Statement is supported by evidence and denied with merely a conclusory statement by the other party, the Court finds such facts to be true."); *Macias v. Barrier Free Living, Inc.*, No. 16 Civ. 1735, 2018 WL 1603566, at *2 n. 7 (S.D.N.Y. March 28, 2018) (court disregarded denial of movant's statements "[w]herever [nonmovant] had denied [movant's] statements or added additional facts without citations to admissible evidence," and, upon ensuring movant's statements were supported by evidence, "deemed them admitted.")

**\*17** Brogdon's denials and unsupported assertions are not evidence that Berk did anything to interfere with or prevent Fredella from obtaining a modified order containing his name in place of prior counsel. Instead, the record indisputably shows that after being informed of Brogdon's lack of access to counsel, Berk twice facilitated amending the lockdown order and forwarded the executed order to DOC in each instance. Accordingly, Brogdon has failed to establish Berk's personal involvement, and Berk is entitled to summary judgment on this claim. Moreover, Brogdon has not identified any other individuals involved, and for the reasons discussed below, his denial of counsel claims against the City, KCDAO, and DOC also do not survive.

## F. Failure to Intercede

### 1. Legal Standard

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). An officer is liable for the preventable harm caused by his failure to intercede if that officer "observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Id.* (internal citations omitted). Further, the officer must have

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 363 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

had a realistic opportunity to intervene to prevent the harm from occurring. *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988).

#### 2. Analysis

Brogdon asserts the third category of failure to intercede: that officers from the City of New York observed violations of his constitutional rights and did not intervene to protect him. As discussed above, Defendants have successfully shown that they did not violate Brogdon's constitutional rights and there is no genuine issue of material fact regarding the underlying constitutional claims. As a result, Brogdon's failure to intercede claim necessarily fails. *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 566 (S.D.N.Y. 2010) ("[O]n a defendant's motion for summary judgment, if there is no genuine issue of material fact regarding whether a constitutional violation occurred, a court must grant summary judgment on a claim that the defendant officers failed to intercede in the alleged constitutional violation"). Further, Brogdon has not offered any evidence supporting any element of his failure to intercede claim; instead, Brogdon only argues in conclusory fashion that "DOC officers watched as these violations occurred to Plaintiff on a daily basis and did nothing to stop these egregious acts." [80] Reliance upon mere allegations, however, is not sufficient to defeat summary judgment. *Geyer*, 262 F. App'x at 318; *Neal*, 2017 WL 4129635, at *6; *Alaimo*, 650 F. Supp. 2d at 292. Accordingly, Brogdon's failure to intercede claim fails.

[80]     Pl. Mem. at 23.

#### G. Conspiracy Claims

To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. *Deskovic v. City of Peekskill*, 894 F. Supp. 2d 443, 465 (S.D.N.Y. 2012) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) ). Brogdon cannot satisfy either the second or third elements as Defendants have successfully shown that they did not violate Brogdon's constitutional rights. *See Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) ("Because neither of the underlying section 1983 causes of action can be established, the claim for conspiracy also fails.")

Additionally, there is no record evidence supporting the existence of an agreement to violate Brogdon's

constitutional rights. Once again, Brogdon resorts to unsupported conclusory statements, arguing that he "has pled a sufficient [c]onspiracy by stating that the Defendant officers [fulfilled the conspiracy elements]." [81] Defendants' motion is not a motion to dismiss for failure to plead a claim; rather, it is one for summary judgment based on evidence on the record. Conclusory statements, unsupported with no citation to the record, cannot sustain Brogdon's claim. *See Geyer*, 262 F. App'x at 318. Accordingly, no genuine issue of material fact exists that would warrant denying summary judgment on Brogdon's conspiracy claim.

[81]     Pl. Mem. at 19.

#### H. Municipal Liability

#### 1. Legal Standard

**\*18**  Brogdon's remaining claims are against the City of New York. [82] Municipalities can be held liable under § 1983 for constitutional violations caused by "action[s] pursuant to official municipal policy of some nature." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978). "Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted from a custom or policy of the municipality." *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013). Municipalities may be liable even where the plaintiff does not sue the individual tortfeasors and proceeds solely against the municipality. *Id.*

[82]     Brogdon also named DOC and KCDAO as Defendants. However, they are non-suable entities, and any suits against them instead must be brought against the City of New York or the District Attorney. *See Powell v. State of New York*, No. 15 CV 3733, 2015 WL 7756108, at *2 (E.D.N.Y. Nov. 30, 2015); *Adams v. Galletta*, 966 F. Supp. 210, 212 (S.D.N.Y. 1997). Brogdon also sued several John Doe officers. While naming a fictitious defendant is permissible when a plaintiff has not yet discovered the identity of the party, *see, e.g., Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 388 (1971), "fictitious parties must eventually be dismissed if discovery does not yield their identities." *Tardif v. City of New York*, No. 13 Civ. 4056, 2017

Case 9:21-cv-00986-MAD-TWD Document 32 Filed 08/07/23 Page 364 of 380

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4762981

WL 1079979, at *5 (S.D.N.Y. March 22, 2017), *adopting on reconsideration in part*, 2017 WL 3634612 (S.D.N.Y. Aug. 23, 2017); *Keesh v. Artuz*, No. 97 Civ. 8417, 2008 WL 3166654, at *2 (S.D.N.Y. Aug. 6, 2008) ("Even after discovery, plaintiff has failed to identify the 'John Doe' and 'Jane Doe' defendants. Accordingly, the complaint against them must be dismissed.") Discovery in this case concluded on October 13, 2017, and Brogdon has not identified any of the unnamed officers. Accordingly, the claims against the unnamed officers cannot proceed.

A failure to train or supervise employees about citizens' constitutional rights can constitute an official government policy, but only if it amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) ). To demonstrate that a failure to train constitutes "deliberate indifference," a plaintiff must satisfy three elements: (1) that a policymaker knows to a "moral certainty" that employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d. Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992) ). "In addition, at the summary judgment stage, plaintiffs must identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) ).

2. <u>Analysis</u>

Brogdon asserts both a policy-based claim and a failure to train claim against the City of New York, arguing that the City should be held liable for the alleged constitutional violations. As discussed above, however, Brogdon's constitutional claims fail as a matter of law. As a consequence, his claims against the City must fail as well. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (a district court's decision to enter summary judgment for municipal defendants without addressing their municipal liability was

"entirely correct," because the district court "properly found no underlying constitutional violation").

**\*19** Moreover, the only alleged policy Brogdon has even referenced is the City's use of solitary confinement. Yet there is no evidence in the record that would demonstrate the existence of a specific policy or custom relating to the municipality's use of solitary confinement or administrative lockdown. Brogdon's argument, based on lawsuits from years ago, that the City and DOC have a "long pattern of this type of abuse" to employ solitary confinement frequently and excessively is, yet again, the type of conjectural and conclusory assertion that is insufficient to withstand summary judgment. [83] Consequently, there is no claim for municipal liability. *See Cuevas v. City of New York*, No. 07 Civ. 4169, 2009 WL 4773033, at *3-4 (S.D.N.Y. Dec. 7, 2009) (dismissing allegation "[b]aldly asserting that [p]laintiff's injuries are the result of the City's policies" where plaintiff failed to show "what the policy is or how that policy subjected [p]laintiff to suffer the denial of a constitutional right").

[83]  Sur-Reply Affirmation in Opposition to Defendant's Motion for Summary Judgment ¶ 2; Pl. Mem. at 20-22.

Brogdon's failure to train claim fails for the same reason. For example, Brogdon defends his claim of "deliberate indifference" merely by generically listing the required elements and baldly stating "[t]hese requirements are all fulfilled here in our case." [84] He does not identify any specific training deficiencies and therefore his claim must fail as a matter of law. There is no record evidence by which a reasonable juror could find the City of New York liable for failure to train or for customs or policies it has sanctioned.

[84]  Pl. Mem. at 23.

<u>Conclusion</u>

For the reasons discussed above, I recommend that Defendants' motion for summary judgment be GRANTED. Pursuant to 28 U.S.C. § 636 (b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the Chambers of the Honorable Lewis A. Kaplan, Room 2240, 500 Pearl Street, New York, New York 10007, and to the

**Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)**

2018 WL 4762981

chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4762981

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Brogdon v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4757947

2018 WL 4757947
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Conell BROGDON, Plaintiff,

v.

The CITY OF NEW YORK, et al., Defendants.

16-cv-8076 (LAK)
|
Signed 09/30/2018
|
Filed 10/01/2018

**Attorneys and Law Firms**

Lawrence James Fredella, The Law Office of Lawrence J. Fredalla, New York, NY, for Plaintiff.

Joseph Peter Zangrilli, New York City Law Department, New York, NY, for Defendants.

**ORDER**

Lewis A. Kaplan, United States District Judge

**\*1** Plaintiff objects to the report and recommendation of Magistrate Judge Robert Lehrburger, which recommended that defendants' motion for summary judgment dismissing the complaint be granted. To the extent that plaintiff objects, without specificity, to the entirety of the report and recommendation, the objections are overruled substantially for the reason stated at page 2 of defendants' response. To the extent that he makes specific objections, we review de novo. 28 U.S.C. § 636(b)(1)(A); *Shah v. Helen Hayes Hospital*, 252 Fed. Appx. 364 (2d Cir. 2007). Finding no error, the specific objections are overruled and the motion for summary judgment granted.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4757947

---

**End of Document**                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 367 of 380
Huggins v. Schriro, Not Reported in Fed. Supp. (2015)
2015 WL 7345750

2015 WL 7345750
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diral HUGGINS, Plaintiff,
v.
Commissioner Dora SCHRIRO &
Warden Carlton Newton, Defendants.

14–CV–6468 (GBD) (JLC)
|
Signed November 19, 2015

**Attorneys and Law Firms**

Diral Huggins, Auburn, NY, pro se.

Evan Robert Schnittman, New York City Law Department,
New York, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

JAMES L. COTT, United States Magistrate Judge.

**\*1 To The Honorable George B. Daniels, United States
District Judge:**

Plaintiff Diral Huggins, proceeding *pro se,* brings this
action pursuant to 42 U.S.C. § 1983. He alleges that
Defendants Dora B. Schriro, as the Commissioner of New
York City's Department of Correction, and Carlton Newton,
as the Warden of the Anna M. Kross Center ("AMKC")
on Rikers Island, (collectively "Defendants"), violated his
constitutional rights during the period of his detention at
the AMKC. Defendants have moved to dismiss Huggins'
Amended Complaint pursuant to Rule 12(b)(6) of the Federal
Rules of Civil Procedure. For the reasons set forth below, I
recommend that the Court dismiss the Amended Complaint
with prejudice.

### I. *BACKGROUND*

**A. Factual Background**
At the time of the alleged violations of his constitutional
rights, [1] Huggins was incarcerated at the AMKC on Rikers
Island. *See* Amended Complaint ("Am.Compl."), at 2 (Dkt.
No. 10). Huggins alleges that Defendants deprived him of

his constitutional rights under the Fifth, Seventh, Eighth, and
Fourteenth Amendments. [2] *Id.* at 3.

[1]     Huggins states that he was arrested on October 1,
        2013, and that the alleged constitutional violations
        occurred "[t]hroughout the months of October
        2013 up until April 2014," and "from September
        2014 up until April 2015." Am. Compl. at 2.
        Huggins also identifies "September 2015 up until
        November 2015" as a period of violation, *see
        id.,* but the Court will not consider this period
        as it occurs after the date of Huggins' Amended
        Complaint.

[2]     While Huggins does not elaborate as to which
        claims he believes are protected by which
        amendments, the Court analyzes his claims under
        the First, Eighth, and Fourteenth Amendments.
        Though the Court reads his Amended Complaint
        liberally, it does not identify any claims that could
        be construed as arising under the Fifth or Seventh
        Amendments.

Specifically, Huggins contends that (1) the sneakers issued
by the correctional facility were too thin and slippery, and
this prevented him from participating in outdoor recreation
during winter months; (2) during the same period, he
was consistently served "cold or lukewarm" food; (3) the
condition of his cell did not meet heating requirements and he
was deprived of sufficient blankets; (4) such conditions—lack
of exercise and exposure to cold—exacerbated his asthma
and caused his health to decline generally; (5) visitation with
his family was limited; (6) his access to the law library was
restricted; and (7) his usage of the telephone was limited. *Id.*
at 3, 6.

**B. Procedural History**
Huggins filed his Complaint on August 12, 2014, alleging
various injuries resulting from the "locked down" periods
during his incarceration at AMKC. (Dkt. No. 1). However,
because Huggins did not specify how he was personally
harmed by the lockdown, he was directed to amend his
complaint. (Dkt. No. 5). On April 9, 2015, Huggins filed
an Amended Complaint in which he asserted the claims
identified above. On July 21, 2015, Defendants moved to
dismiss the Amended Complaint pursuant to Rule 12(b)(6)
of the Federal Rules of Civil Procedure on the grounds that
Huggins (1) failed to exhaust his administrative remedies
as required by the Prison Litigation Reform Act of 1995

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 368 of 380

2015 WL 7345750

("PLRA"), 42 U.S.C. § 1997e; (2) failed to sufficiently allege the personal involvement of Defendants in the purported violations of his constitutional rights; and (3) failed to state a claim upon which relief could be granted. Defendants' Motion to Dismiss ("Def.Mem.") (Dkt. No. 22). Huggins opposed this motion on September 29, 2015. Plaintiffs Opposition to Motion to Dismiss ("Pl.Mem.") (Dkt. No. 29).[3] Defendants replied in further support of their motion on October 8, 2015. Defendant's Reply Memorandum ("Def.Reply") (Dkt. No. 31). This motion is before me pursuant to the order of reference dated May 7, 2015. (Dkt. No. 14).

[3]     Due to the non-consecutive pagination of this document, the Court's citations refer to the page as generated by the electronic docketing system.

## II. *DISCUSSION*

### A. Standard of Review

 **\*2**  On a Rule 12(b)(6) motion to dismiss, the Court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Nwozuzu v. United States,* No. 14–CV–8589 (LGS), 2015 WL 4865772, at * 3 (S.D.N.Y. Aug. 12, 2015) ("On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the non-moving party.") However, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged ... Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

While *pro se* complaints must also contain sufficient factual allegations to meet the plausibility standard, *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013), district courts should look proactively for such content by reading *pro se* complaints with "special solicitude" and interpreting them to raise the "strongest [claims] that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam) (internal quotation omitted). Even so, a district court should still dismiss a *pro se* complaint if it "fail[s] to meet minimum pleading requirements." *Kinsey v. Bloomberg,* No.

12–CV–8936 (PAE)(JCF), 2014 WL 630670, at *3 (S.D.N.Y. Feb. 18, 2014).

### B. Exhaustion of Administrative Remedies

As a threshold matter, the PLRA prohibits a prisoner from bringing Section 1983 claims "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[C]ourts 'should be careful to look at the applicable set of grievance procedures' " within a prisoner's correctional facility at the time the grievance arose to determine the availability of administrative remedies. *Taylor v. New York State Dep't of Corr.,* No. 03–CV–1929 (PKC), 2004 WL 2979910, at *6 (S.D.N.Y. Dec. 22, 2004) (quoting *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004)).

Here, the applicable administrative procedure is the Inmate Grievance and Request Program ("IGRP"), a four-step administrative review and appeals system for prisoner grievances within the New York City Department of Correction.[4] The PLRA "requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009) (quoting *Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (emphasis in original)).

[4]     The IGRP requires prisoners to: (1) file a complaint with the IGRP for informal resolution within ten days of the alleged violation; (2) if unsatisfied with the disposition or a disposition has not been reached in a timely manner, request a hearing with the Inmate Grievance Resolution Committee ("IGRC") within five days of the disposition; (3) appeal to the commanding officer of the facility, who must render a decision within five working days; and (4) if the inmate is still unsatisfied with the disposition, appeal to the DOC Central Office Review Committee ("CORC"), which must issue a recommendation within 15 working days. *See* N.Y.C. Dep't of Corr., Directive: Inmate Grievance and Request Program, No. 3376 (effective date Sept. 12, 2012), http://www.nyc.gov/html/doc/downloads/pdf/Directive_3376_Inmate_Grievance_Request_Program.pdf (last visited November 18, 2015); *see also Williams v. Ramos,* No. 13–CV–826 (VB), 2015 WL 864888, at *2 (S.D.N.Y. Feb. 9, 2015).

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 369 of 380

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

2015 WL 7345750

**\*3** The Supreme Court has clarified, however, that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216 (2007). It cautioned that courts should not impose a heightened pleading requirement that does not exist in the PLRA, particularly because "when Congress meant to depart from the usual procedural requirements, it did so expressly." *Id.* at 216. Rather, failure to exhaust administrative remedies is an affirmative defense that defendants must raise. *Id.*

Although a motion for summary judgment is normally the proper vehicle to address a plaintiff's failure to exhaust, " '[a]n affirmative defense may be raised by a [Rule 12(b)(6) motion to dismiss], without resort to summary judgment procedure, if the defense appears on the face of the complaint.' " *Rodriguez v. Warden, Metropolitan Corr. Fac.,* No. 13–CV–3643 (PAC) (SN), 2015 WL 857817, at \*8 (S.D.N.Y. Feb. 27, 2015) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74–75 (2d Cir.1998)). Because prisoners are not required to plead compliance with prison grievance procedures in their complaints, courts in this Circuit have denied motions to dismiss based on exhaustion where ambiguity exists as to whether a plaintiff exhausted his administrative remedies. Where a prisoner indicates that he has taken *some* steps toward exhaustion, district courts will normally not infer from his silence that he failed to take the remaining steps that full exhaustion would require. *See, e.g., Rodriguez,* 2015 WL 857817 at \*3–4; *Randolph v. N.Y.C. Dep't of Corr.,* No. 05–CV–8820 (GEL)(MHD), 2007 WL 2660282, at \*8 (S.D.N.Y. Sept. 7, 2007) ("[Plaintiff's] failure to mention some of the required steps cannot be deemed to establish a failure to exhaust; rather, it simply leaves ambiguity as to the extent of his exhaustion efforts."), *adopted by* Order dated Sept. 22, 2007 (Dkt. No. 45).

Accordingly, "a *pro se* plaintiff's pleading references to various efforts that he has made to bring alleged prison violations to the attention of the prison authorities cannot be treated as tantamount to an admission that he had not exhausted his remedies." *Wesley v. Muhammad,* No. 05–CV–5833 (GEL)(MHD), 2008 WL 123812, at \*3 (S.D.N.Y. Jan. 10, 2008), *adopted by* 2008 WL 236974 (S.D.N.Y. Jan. 28, 2008). *But see Ghee v. Warden Ramos,* No. 13–CV–632 (RWS), 2013 WL 7018543, at \*1–2 (S.D.N.Y. Dec. 4, 2013) (dismissing prisoner's complaint for failure to exhaust where he did not respond to question regarding appeal efforts and failed to allege "further actions taken ... to appeal his initial grievance or comply with the remaining requirements under the IGRP"); *Antrobus v. Warden of GRVC,* No. 11–

CV–5128 (JMF), 2012 WL 1900542, at \*3 (S.D.N.Y. May 25, 2012) (treating prisoner's nonresponsive answer regarding his appeal efforts as "a concession that he did not attempt to appeal the decision at all").

Here, Huggins alleges in his Amended Complaint that he received "no answer" to his initial grievance. Further, in response to the inquiry asking him to describe "all efforts to appeal to the highest level of the grievance process," Huggins writes that "[t]here was no decision unless no answer is a decision." Am. Compl. at 4. While this response does not suggest that Huggins has taken all steps in the administrative process, it is also not a concession that he has failed to take these steps. "It is therefore only clear from [Plaintiff]'s allegations that he initiated the IGRP grievance process and that, at the time of filing his complaint, he had not received a response." *Groenow v. Williams,* No. 13–CV–3961 (PAC) (JLC), 2014 WL 941276, at \*4 (S.D.N.Y. Mar. 11, 2014), *adopted by* Order dated July 15, 2014 (Dkt. No. 21); *see Randolph,* 2007 WL 2660282 at \*7 (declining to dismiss complaint where prisoner alleged that he filed grievance and received no response because "at no point does [prisoner] state that he failed to follow all the required grievance procedures"). Although "[t]he complaint may lack specifics as to how the plaintiff grieved his claim, that is not a valid basis for dismissal under *Jones* [*v. Bock* ]." *Johnson v. Westchester Cnty. Dep't of Corr. Med. Dep't,* No. 10–CV–6309 (JGK), 2011 WL 2946168, at \*2 (S.D.N.Y. July 19, 2011) (declining to dismiss prisoner's complaint where he alleged only that he had "filed a complaint within the office of the warden").

**\*4** Accordingly, given the ambiguous answers provided in the Amended Complaint as well as the lack of any other information from Defendants regarding Huggins' exhaustion of the grievance process, the Court concludes that failure to exhaust the administrative process does not constitute a basis for dismissal at this time.

**C. The Requirement of Personal Involvement**

To establish a defendant's individual liability pursuant to Section 1983, a plaintiff must plead each defendant's personal involvement in the alleged constitutional violations. *See, e.g., Liner v. Fischer,* No. 11–CV–6711 (PAC)(JLC), 2013 WL 3168660, at \*7 (S.D.N.Y. June 24, 2013) (citing *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) and *Iqbal,* 556 U.S. at 676), *adopted by* 2013 WL 4405539 (S.D.N.Y. Aug. 7, 2013); *see also Grullon v. City of New Haven,* 720 F.3d 133, 138–39 (2d Cir.2013). This requirement can be satisfied by

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 370 of 380

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

2015 WL 7345750

demonstrating that the defendant: (1) participated directly in the alleged constitutional violation; (2) failed to remedy a wrong after learning of it; (3) created a policy or custom under which the violation occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in supervising subordinates who committed the alleged violation; or (5) was deliberately indifferent to ongoing unconstitutional acts. *Id.* at 138–39 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); *see Liner,* 2013 WL 3168660 at *7.

### 1. *Receipt of a grievance is insufficient to establish personal involvement*

Other than in the caption (and in the section of the form complaint where the plaintiff is asked to list the defendants), Huggins does not mention either Defendant by name in the Amended Complaint. Huggins refers to Defendant Newton for the first time in his Opposition to the Motion to Dismiss, alleging that he is personally liable because he "failed to remedy the wrong" after "being informed of the violation through a report or appeal." Pl. Mem. at 8. The only basis Huggins has for Newton knowing of this "wrong" comes from his review of "grievances at the highest level in the facility." *Id.*

However, courts "have repeatedly held that receipt of letters or grievances is insufficient to impute personal involvement. Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison officials could name the supervisor as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the supervisor." *Acevedo v. Fischer,* No. 12–CV–6866 (RA), 2014 WL 5015470, at *16 (S.D.N.Y. Sept. 29, 2014) (citing *Harris v. Fischer,* No. 11–CV–6260 (CM)(JLC), 2014 WL 3859242, at *3 (S.D.N.Y. Aug. 1, 2014)); *see also Ramrattan v. Fischer,* No. 13–CV–6890 (KPF), 2015 WL 3604242, at *11 (S.D.N.Y. June 9, 2015) (providing the names and titles of defendants, claiming that they are in the chain-of-command in the prison hierarchy, and that these individuals receive and review letters and grievances is insufficient to allege personal involvement); *Ciaprazi v. Fischer,* No. 13–CV–4967 (VEC)(FM), 2015 WL 1315676, at *2–3 (S.D.N.Y. Mar. 24, 2015) (Defendant Commissioner's receipt of letter and his brief response did not prove he was "aware" of alleged constitutional violations).

As to Commissioner Schriro, Huggins does not specify the nature or extent of Schriro's involvement at all. In fact, neither the Amended Complaint nor his Opposition to the Motion to Dismiss even mentions Commissioner Schriro. *See Harris,* 2014 WL 3859242 at *3 (dismissing claims against defendants where they are named in the caption, but are not otherwise mentioned in the complaint) (citing *Dove v. Fordham University,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999)).

### 2. *Monell Liability*

**\*5** Alternatively, Huggins alleges that Defendants "created [a] policy or custom" that resulted in the violation of his constitutional rights. Pl. Mem. at 16. Pursuant to *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1978), "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven,* 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell,* 436 U.S. at 690–91).

However, Huggins' *Monell* claim fails in a critical respect. As the Court discusses below, Huggins fails to plead a constitutional violation by an individual Defendant. Without an underlying violation, there can be no *Monell* liability. *See, e.g., Jones v. City of New York,* No. 14–CV–0826 (CBA)(RLM), 2015 WL 502227, at *9 (E.D.N.Y. Feb. 4, 2015) ("Plaintiff's failure to plead adequately a constitutional violation by an individual defendant renders her *Monell* claims moot.").

For all these reasons, the Court concludes that Huggins has failed to allege the personal involvement of the two named Defendants. This is fatal to the viability of his Amended Complaint.

### D. Conditions of Confinement Claims
Though the Court recommends dismissal of Huggins claims for failing to allege the personal involvement of the named Defendants, even if he had, his allegations fail to state a cognizable claim.

Huggins argues that his conditions of confinement amounted to a violation of the Eighth Amendment's protections against cruel and unusual punishment. [5] To establish such a violation, an inmate must satisfy both "a subjective component, which focuses on the defendant's motive for his conduct, and an objective component, which focuses on the conduct's effect." *Edwards v. Horn,* No. 10–CV6194 (RJS)(JLC), 2012 WL 760172, at *11 (S.D.N.Y. Mar. 8, 2012) (citing *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009)); *see Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Subjectively, the defendant must have acted with a "sufficiently culpable

2015 WL 7345750

state of mind," and objectively the "alleged deprivation must be sufficiently serious ... that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Id.* at 553 (internal citation and quotation omitted). Therefore, "[u]nder the 'deliberate indifference' standard, prison officials violate the Eighth Amendment only if they know of and disregard an excessive risk to inmate health and safety and do not reasonably respond to that risk." *Gamble v. City of New York ex rel. NYC Dep't of Corr.,* No. 04–CV–10203 (TPG), 2009 WL 3097239, at *4 (S.D.N.Y. Sept. 25, 2009) (citing *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (internal quotations omitted)).

5    Because Huggins was a pre-trial detainee when the alleged violations occurred, *see* Pl. Mem. at 9, his conditions of confinement claims are presumed to have been brought under the Fourteenth Amendment. However, the deliberate indifference analysis under the Fourteenth and Eighth Amendments are identical. *See Cano v. City of New York,* No. 13–CV–3341 (WFK)(VVP), 2015 WL 4865993, at *3 (E.D.N.Y. Aug. 13, 2015) ("[T]he analysis is the same under the Fourteenth and Eighth Amendments.") (citing *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009)).

6    "To meet the subjective element, the inmate must show that the defendant acted with more than mere negligence." *Corley v. City of New York,* No. 14–CV–3202 (GHW), 2015 WL 5729985, at *10 (S.D.N.Y. Sept. 30, 2015) (internal quotation omitted).

### 1. *Subjective Element*

**\*6** As to Defendant Newton's subjective state of mind, Huggins suggests that he was on notice, and thus had actual knowledge of the constitutional violations, because the warden "reviews grievances at the highest level in the facility." Pl. Mem. at 8. For the same reasons that receipt of grievances or letters fails to establish personal involvement, it is insufficient to satisfy the deliberate indifference standard for a conditions of confinement claim. *See, e.g., Rivera v. Bloomberg,* No. 11–CV–4325 (PGG), 2012 WL 3655830, at *6 (S.D.N.Y. Aug. 27, 2012) ("[A] prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official exhibited deliberate indifference by failing to act on information indicating that the violation was occurring.") (internal quotation omitted). As to Defendant Schriro, as previously noted, Huggins never

mentions her in his pleadings or motion papers, thus providing no basis for the Court to evaluate her state of mind. Therefore, Huggins allegations do not satisfy the subjective element as to either Defendant.

### 2. *Objective Element*

Even if Huggins could demonstrate that Defendants acted with a culpable state of mind, his allegations nonetheless fail to rise to the level of an Eighth Amendment violation because they do not amount to an "unquestioned and serious [deprivation] of basic human needs or a denial of the minimal civilized measure of life's necessities." *Williams v. Carbello,* 666 F.Supp.2d 373, 378 (S.D.N.Y.2009) (internal quotations and citations omitted). *See Wilson v. Seiter,* 501 U.S. 294, 298 (1991) ("The Constitution ... does not mandate comfortable prisons and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.") (internal quotation omitted); *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (same).

Huggins alleges that (1) the sneakers issued by the correctional facility are too thin and slippery, [7] and that this prevented him from participating in outdoor recreation during winter months; (2) during the same period, he was consistently served "cold or lukewarm" food; (3) the condition of his cell did not meet heating requirements and he was deprived of sufficient blankets; and (4) his visitation privileges were improperly limited. *See* Am. Compl. at 2. As the Court details below, Huggins' claims do not rise to the level of an Eighth Amendment violation.

7    Courts in this Circuit have "consistently found that pain and other problems resulting from being forced to wear institutional footwear are not 'sufficiently serious' to satisfy the objective prong of the deliberate indifference standard." *Simmons v. Cripps,* No. 12–CV–1061 (PAC)(DCF), 2013 WL 1290268, at *16 (S.D.N.Y. Feb. 15, 2013) (citations omitted), *adopted by* 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013). Here, rather than alleging that the shoes at issue caused him to suffer serious physical injury, Huggins alleges that the shoes prevented him from participating in any outdoor recreation, which led to worsening of his asthma and a general decline of his health.

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

2015 WL 7345750

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 372 of 380

#### a. Inability to Exercise

"While courts have found that denial of all opportunity to exercise violates an inmate's constitutional rights, they have found no violation where the inmate has an opportunity for exercise, either in or outside of his cell," *Shakur v. Sieminski,* No. 07–CV–1239 (CFD), 2009 WL 2151174, at *4 (D.Conn. July 15, 2009) (citing *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996)), and that "[s]poradic infringement of the right to exercise does not rise to the level of a constitutional deprivation." *Gamble,* 2009 WL 3097239 at *5 (citations omitted).

Here, Huggins does not claim that he was denied the right to exercise. Instead, he alleges that his shoes made it uncomfortable to exercise during cold weather, and that he could not exercise in his cell because it was too small. *See* Am. Compl. at 2–3; Pl. Mem. at 5. However, Huggins does not have a right to outdoor exercise. Therefore, even if the lack of adequate footwear did prevent him from going outside, this does not rise to the level of a constitutional violation. *See Shakur,* 2009 WL 2151174, at *4. Additionally, Huggins does not set forth sufficient facts for the Court to draw a reasonable inference that he could not exercise in his cell. For example, there is no indication that his cell was any smaller than that of other inmates or that there were special circumstances peculiar to him that required more space for exercise. Further, he does not allege how often he was unable to exercise outdoors due to inclement weather. *See Gamble,* 2009 WL 3097239 at *5 (inability to exercise during inclement weather only seven times during a 21–month period did not amount to a constitutional violation).

**\*7** Therefore, the Court concludes that Huggins fails to state a claim that the limitations on his ability to exercise rise to the level of a constitutional violation.

#### b. Cold or Lukewarm Food

The Constitution requires prisoners be served " 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.' " *Williams v. Ramos,* No. 13–CV–826 (VB), 2013 WL 7017674, at *6 (S.D.N.Y. Dec. 23, 2013) (quoting *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983)). Huggins does not allege that the food served was nutritionally inadequate, but only that it was

cold or lukewarm, which does not amount to a constitutional violation. *See, e.g., Fisher v. Dep't of Corr.,* No. 92–CV–6037 (LAP), 1995 WL 608379, at *5 (S.D.N.Y. Oct. 16, 1995) (food sometimes served cold does not rise to the level of constitutional violation). Accordingly, the Court recommends that this claim be dismissed.

#### c. Heating and Blanket

While it is "well settled that exposing prisoners to extreme temperatures ... may violate the Eighth Amendment," *Walker v. Schult,* 717 F.3d 119, 126 (2d Cir.2013), Huggins does not claim that his cell was without heat, exposing him to unreasonable temperatures for an extended period, or that he was not issued a blanket during this period. *See Wilson,* 501 U.S. at 304 (stating that a low cell temperature at night combined with a failure to issue blankets might violate the Eighth Amendment); *see also Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (subfreezing temperatures for three months with ice forming in toilet were sufficient to raise issues of fact for jury, even where prison officials gave inmate extra blanket).

Here, Huggins only claims that "the cell did not conform to the heating requirements" and that inconsistency of heating "required more than ... one blanket." Am. Compl. at 3. There is no indication that his cell was exposed to exceptionally cold temperatures for an extended period of time. Further, Huggins admits he was issued the standard blanket, but objects to the failure to provide additional ones. *Id.* Accordingly, the Court concludes that Huggins does not allege sufficient facts for the Court to draw the inference that his cell was cold enough to rise to the level of a constitutional violation.[8]

[8]  In his Opposition to the Motion to Dismiss, Huggins claims that the "heating condition of the [c]ell was nonfunctioning" and "the cell heating system and/or housing unit did not work properly." Pl. Mem. at 5. Without any additional factual context, the Court interprets this phrasing to be a restatement of his claim in the Amended Complaint. There is nothing in the Opposition to the Motion to Dismiss to indicate that the heating system not working properly resulted in sufficiently cold temperatures for an extended period of time to rise to the level of a constitutional violation.

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

2015 WL 7345750

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 373 of 380

#### d. *Worsening of Asthma and General Health*

While each of the above alleged deprivations, on its own, does not amount to an Eighth Amendment violation, Huggins further suggests that the conditions, in combination, as applied to him who has asthma, amount to a constitutional violation. However, "[b]eing an asthmatic (a person susceptible to asthma attacks) is not a condition, in Eighth Amendment parlance, that is severe or 'sufficiently serious' " to underlie a constitutional violation. *Patterson v. Lilley,* No. 02–CV–6056 (NRB), 2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003). *See Youngblood v. Artus,* No. 10–CV–00752 (MAD)(DRH), 2011 WL 6337774, at *7 (N.D.N.Y. Dec. 19, 2011) ("Plaintiff's asthma condition itself does not qualify as a serious medical need for the purposes of a section 1983 claim."); *Sulkowska v. City of New York,* 129 F.Supp.2d 274, 292 (S.D.N.Y.2001) (failure to provide asthma medication insufficient to state cause of action). Therefore, even assuming all of the alleged conditions have collectively worsened his asthma, the alleged deprivation does not state a viable Eighth Amendment claim.

#### e. *Visitation Privileges*

**\*8** Huggins also claims that "visits with [his] wife and family were cancelled/shortened." Pl. Mem. at 5; *see also* Am. Compl. at 3. However, "[t]he denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence' and therefore is not independently protected by the Due Process Clause." *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 461 (1989) (quoting *Hewitt v. Helms,* 459 U.S. 460, 468 (1983)).

Huggins has "failed to demonstrate that his claim about deprivation of visitation with family during his time [while incarcerated] objectively denied him the minimal civilized measures of life's necessities." *Delgado v. Dembar,* No. 13–CV191 (KBF), 2014 WL 4792068, at *4 (S.D.N.Y. Sept. 24, 2014) (internal quotation omitted); *see Hernandez v. Lindsay,* No. 08–CV–1495 (SJF), 2011 WL 3163078, at *6 (E.D.N.Y. July 22, 2011) ("[L]oss of ... visitation privileges for ten (10) months [is] not objectively serious."). In fact, Huggins indicates that his visitations were affected due to "incidents" in the prison, which only further supports his failure to state a claim. *See* Pl. Mem. at 5. "[T]he Court is required to grant 'wide-ranging deference' to prison administrators 'in the adoption and execution of policies and practices that

in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " [9] *Marrero v. Weir,* No. 13–CV–0028 (RNC), 2014 WL 4799228, at *6 (D.Conn. Sept. 26, 2014) (quoting *Bell v. Wolfish,* 441 U.S. 520, 547 (1979)).

[9]    Though Huggins alleges that these "lockdowns" preventing his visits resulted from incidents that "did not [a]ffect the entire jail or its security," the Court must grant wide deference to a prison administrator's determination that an incident in one area of the jail necessitates lockdown measures be taken in another area as well. Am. Compl. at 3.

Accordingly, the Court recommends dismissal of this claim.

### E. Law Library and Telephone Usage
In addition to his conditions of confinement claims, Huggins alleges two other constitutional violations, both arising under the First Amendment, which the Court addresses below.

#### 1. *Law Library*
The Supreme Court has recognized that an inmate does not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). Rather, a prison facility must ensure that its inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 825 (1977)). [10] Additionally, for a defendant's conduct to violate an inmate's right of access to the courts, it must cause "actual injury" or "materially prejudice[ ]" the inmate. *Salvatierra v. Connolly,* No. 09–CV–3722 (SHS)(DF), 2010 WL 5480756, at *21 (S.D.N.Y. Sept. 1, 2010) (internal citation and quotation omitted), *adopted by* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

[10]    A claim alleging lack of access to the courts arises under the First Amendment. *See, e.g., Martinez v. Healey,* No. 14–CV–302 (NSR), 2014 WL 5090056, at *2 (S.D.N.Y. Oct. 10, 2014).

Therefore, it is insufficient to merely state, without further elaboration, that he was "[f]requently [ ] denied [access to law library], [a]ffecting right to Court." Pl. Mem. at 5; *see also* Am. Compl. at 3. Because Huggins does not state any facts to imply he suffered injury or prejudice, this claim should be dismissed.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 374 of 380

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)
2015 WL 7345750

### 2. *Telephone Calls*

**\*9** Lastly, Huggins makes a passing reference that he was denied "phone[ ] usage."[11] *Id.* at 6. However, "[p]hone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world." *Henry v. Davis,* No. 10–CV–7575 (PAC)(JLC), 2011 WL 3295986, at \*2 (S.D.N.Y. Aug. 1, 2011) (collecting cases), *adopted by* 2011 WL 5006831 (S.D.N.Y. Oct. 20, 2011). Because inmates "have no right to unlimited telephone calls," *Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1998) (citation omitted), a constitutional violation only exists if the inmate was stripped of alternate methods of communication. *See, e.g., Paulino v. Menifee,* No. 00–CV–5719 (RCC)(KNF), 2001 WL 243207, at \*2 (S.D.N.Y. Mar. 9, 2001) (refusing to issue injunction restoring phone privileges where inmate did not allege that alternate means of communication were inadequate).

[11] " 'A prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection.' " *Banks v. Argo,* No. 11–CV–4222 (LAP), 2012 WL 4471585, at \*5 (S.D.N.Y. Sept. 25 2012) (quoting *Morgan v. LaVallee,* 526 F.2d 221, 225 (2d Cir.1975)).

Here, Huggins does not allege that he was deprived of alternative methods of communication. Accordingly, Huggins has failed to demonstrate that restrictions on his telephone usage deprived him of a constitutional right. Therefore, the Court recommends dismissal of this claim.

### F. Leave to Amend

The Court would ordinarily recommend that a *pro se* plaintiff be given leave to amend his complaint to replead all factually insufficient claims. *See, e.g., JCG v. Ercole,* No. 11–CV–6844 (CM)(JLC), 2014 WL 1630815, at \*34–35 (S.D.N.Y. Apr. 24, 2014), *adopted by* No. ll–CV–6844 (CM)(JLC), 2014 WL 2769120 (S.D.N.Y. June 18, 2014) (citing *Grullon,* 720 F.3d at 139) (district court generally should not dismiss *pro se* complaint without granting at least one opportunity to replead factually insufficient claims). Here, however, Huggins has already had the opportunity to amend his complaint once. *See* Dkt. Nos. 5, 10. Additionally, the Court has liberally construed Huggins' Opposition to the Motion to Dismiss in such a way that it effectively amounts to another pleading. *See Lang v. New York City Health and Hosps. Corp.,* No. 12–CV–5523 (WHP), 2013 WL 4774751, at \*4 (S.D.N.Y. Sept. 5, 2013) ("[C]ourts have construed allegations in *pro se* oppositions as motions to amend in view of the duty to construe *pro se* filings liberally.") (citing *Santiago v. Pressley,* No. 10–CV–4797 (PAE), 2011 WL 6748386, at \*5 (S.D.N.Y. Dec. 23, 2011)). Accordingly, because Huggins has now had two opportunities to amend his complaint and any further attempt would be futile for the various reasons set forth in this Report, he should not be granted leave to further amend his Complaint. *See, e.g., Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Where a proposed amendment would be futile, leave to amend need not be given."); *Best v. City of New York,* No. 12–CV–7874 (RJS)(SN), 2014 WL 163899, at \*3 (S.D.N.Y. Jan. 15, 2014) (denying leave to amend where plaintiff had already been given two opportunities to do so, and noting that "the Court can only afford [Plaintiff] so many bites at the apple.").

### III. *CONCLUSION*

For the foregoing reasons, I recommend that the Court dismiss the Amended Complaint with prejudice.

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Daniels.

**\*10** **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 375 of 380

2015 WL 7345750

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7345750

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 376 of 380

Huggins v. Schriro, Not Reported in Fed. Supp. (2016)
2016 WL 680822

2016 WL 680822
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diral HUGGINS, Plaintiff,

v.

Commissioner Dora SCHRIRO &
Warden Carlton Newton, Defendants.

14-cv-06468(GBD)(JLC)
|
Signed February 18, 2016

**Attorneys and Law Firms**

Diral Huggins, Auburn, NY, pro se.

Evan Robert Schnittman, New York City Law Department,
New York, NY, for Defendants.

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, District Judge:

 **\*1** On August 12, 2014, Plaintiff Diral Huggins, proceeding
*pro se*, commenced this action under 42 U.S.C. § 1983.
(Complaint, (ECF No. 1).) The case was first assigned to
another judge in this district, and, on November 4, 2014,
finding that Huggins's Complaint had failed to satisfy the
standards articulated in the Federal Rules of Civil Procedure,
the judge ordered Huggins to amend his Complaint within
sixty days to include the information necessary to state a
claim. (*See* Order, (ECF No. 5), at 2, 6-7.) Huggins was then
granted two additional extensions, (*see* ECF Nos. 7, 9), and
on April 9, 2015 he timely filed his Amended Complaint,
(*see* Amended Complaint, (ECF No. 10)). The case was then
reassigned to this Court, and on May 7, 2015, referred to
Magistrate Judge Cott. (Order of Reference to a Magistrate
Judge, (ECF No. 14).)

In his Complaint, Huggins alleged that Defendants Dora
Schriro, Commissioner of New York City's Department
of Correction, and Carlton Newton, Warden of the Anna
M. Kross Center ("AMKC"), violated his constitutional
rights under the Fifth, Seventh, Eighth, and Fourteenth
Amendments. Specifically, Huggins alleged his rights were
violated because:

(1) the sneakers issued by the
correctional facility were too thin
and slippery, and this prevented
him from participating in outdoor
recreation during winter months; (2)
during the same time period, he
was consistently served "cold or
lukewarm" food; (3) the condition
of his cell did not meet heating
requirements and he was deprived
of sufficient blankets; (4) such
conditions—lack of exercise and
exposure to cold—exacerbated his
asthma and caused his health to
decline generally; (5) visitation with
his family was limited; (6) his
access to the law library was
restricted; and (7) his usage of the
telephone was limited.

(Report & Recommendation ("Report"), (ECF No. 33), at
2-3.) [1]

[1]      The Court has reviewed Huggins's filings and has
        determined that the Report accurately summarized
        Huggins's allegations.

On July 21, 2015, the Defendants filed a motion to dismiss
pursuant to Rule 12(b)(6), Fed. R. Civ. P., arguing that
Huggins (1) failed to exhaust his administrative remedies, as
required by the Prison Litigation Reform Act of 1995, (2)
failed to sufficiently plead defendants' personal involvement
in the purported violations of his constitutional rights, and
(3) failed to state a cause of action. (Memorandum of Law
in Support of Defendants' Motion to Dismiss the Amended
Complaint, (ECF No. 22), at 10.) Huggins opposed this
motion on September 29, 2015, (Plaintiffs Reply Memoranda
[sic] of Law ("Huggins Reply"), (ECF No. 29)), and the
Defendants replied on October 8, 2015, (Reply Memorandum
of Law in Support of Defendants' Motion to Dismiss the
Amended Complaint, (ECF No. 31) at 1).

On November 19, 2015, Magistrate Judge Cott issued a
Report and Recommendation addressing the Defendants'
motion to dismiss. (Report at 1, 22.) The Report rejected
the Defendants' argument that the record demonstrated that

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 377 of 380

Huggins v. Schriro, Not Reported in Fed. Supp. (2016)

2016 WL 680822

Huggins had failed to exhaust his administrative remedies. (*Id.* at 9.) Nevertheless, it recommended that the Defendants' motion to dismiss be granted because: (1) Huggins had not pleaded either Defendants' personal involvement in the purported constitutional violations, an element that must be pleaded and eventually proven to succeed on a Section 1983 claim against individual defendants, [2] (*id.* at 9-11); and (2) neither Huggins's allegations regarding the conditions of his confinement nor those pertaining to his law library and telephone usage rose to the level of constitutional violations, (*id.* at 12-21). Finally, acknowledging that courts typically grant *pro se* plaintiffs an opportunity to amend their complaints to replead factually insufficient claims, the Report concluded that granting Huggins the right to again amend his Complaint was not warranted given that he had already formally amended once, and because the court had liberally construed the brief Huggins had filed in opposition to the Defendants' motion to dismiss so that it effectively amounted to another pleading. (*Id.* at 21-22.) Based on these circumstances, the court concluded that any further amendment would be futile, and recommended that Huggins's action be dismissed with prejudice. (*Id.* at 21-22.)

[2]     *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006); *see Liner v. Fischer*, 2013 WL 3168660, at *7 (S.D.N.Y. June 24, 2013) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

**\*2**  The Report notified the parties that failure to file an objection within fourteen days would result in a waiver of objections and would preclude appellate review. (*Id.* at 23.) Huggins timely filed objections to the Report, pursuant to Rule 72 of the Federal Rules of Civil Procedure. [3] ("Plaintiffs Response to Defendants [sic] Report And/Or Recommendation Motion To Dismiss, Amended Complaint ("Objections"), (ECF No. 36).)

[3]     Huggins was served with a copy of the Report on November 23, 2015. (*See* attachment to this Memorandum Decision and Order ("Attachment") at 1; Letter, (ECF No. 36), at 15).) On November 30, 2015, Huggins submitted a letter requesting that the Court extend the time to file his objections to January 5, 2016. (Attachment at 3.) The Court granted the request. (Order Granting Motion for Extension of Time, (ECF No. 28)). Huggins submitted his objections to prison authorities on January 4, 2016, one day before the extension was set to expire. (Objections Affidavit of Service (ECF No. 36 at 14)). On January 5, 2016, Huggins submitted a letter requesting that the Court accept his objections as timely filed because he had not received a copy of the order granting his extension request. (Letter at 15.) The Court accepts Huggins's objections as timely filed and considers them herein.

## STANDARD OF REVIEW

Courts "may accept, reject, or modify, in whole or in part, the findings and recommendations" set forth within a magistrate judge's report. 28 U.S.C. 636(b)(1); Fed. R. Civ. P. 72(b) (3). Courts must review *de novo* the portions of a magistrate judge's report to which a party properly objects. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). Improper objections, such as those "that are 'merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers], will not suffice to invoke *de novo* review.'" *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (quoting *Vega v. Artuz*, 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002)) (alteration in *Phillips*). Likewise, conclusory or general objections are also reviewed only for clear error. *Id.* An error is clear when courts, "upon review of the entire record, [the court is] left with the definite and firm conviction that a mistake has been committed." *Brown v. Cunningham*, 2015 WL 3536615, at *4 (S.D.N.Y. June 4, 2015) (citing *United States v. Snow*, 462 F.3d 55, 72 (2d Cir. 2006)).

It is worth noting that Rule 72(b)(2) states that a party may file *"specific* written objections to the proposed findings and recommendations" of a magistrate judge. Fed. R. Civ. P. (Emphasis added). The rule limits objections to specific findings and recommendations to effectuate the increase injudicial efficiency that the statute providing for the assignment of cases to magistrates was designed to bring about. *See McCarthy v. Manson*, 554 F. Supp. 1275, 1286 (D. Conn. 1982), *affd*, 714 F.2d 234 (2d Cir. 1983). In short, Rule 72 is not meant to provide litigants with another bite at the apple.

## HUGGINS'S OBJECTIONS ARE OVERRULED

Huggins appears to object to the Report's finding that he has not adequately alleged that the Defendants were personally

**Huggins v. Schriro, Not Reported in Fed. Supp. (2016)**

2016 WL 680822

involved in the alleged constitutional violations by asserting that the Defendants were generally aware of the conditions giving rise to his injuries through the grievance procedure and failed to take action. (Objections at ¶ 23.) Huggins raised this argument in his initial pleadings. (Huggins Reply at 8.) The Report correctly determined that filing a grievance is insufficient to establish personal involvement of prison officials in an alleged violation of a constitutional right under Section 1983. (Report at 9-10.) Accordingly, Huggins's objection on this ground is overruled.

**\*3** Huggins newly asserts that the Defendants negligently supervised their employees and failed to adequately train them, which led to the alleged deprivation of his constitutional rights. (Objections at ¶¶ 4, 8, 15, 29.) Although the Second Circuit has not settled whether a supervisor may be held individually liable where he exhibits gross negligence for constitutional violations inflicted by subordinates, *see Raspardo v. Carlone*, 110 F.3d 97, 116-17 (2d Cir. 2014), Huggins has not set forth any facts to support his allegation of negligence (let alone gross negligence). Even if Huggins had set forth sufficient facts to establish the Defendants' personal involvement, those allegations would have been insufficient to warrant the rejection or modification of any portion of the Report because it properly determined that Huggins had failed to establish an underlying cognizable claim.

The remainder of Huggins's objections are not objections at all, but instead allege new injuries to support his claims that the conditions of his confinement violated his constitutional rights. For instance, Huggins alleges that he slipped and fell upon stepping out of the shower because the Defendants had not provided adequate shower mats. (*Id.* at ¶¶ 12, 5, 13.)

This Court has reviewed the new allegations set forth in Huggins's latest filing to ensure that the Report's recommendation to dismiss the action with prejudice would not preclude Huggins from obtaining relief for an arguably meritorious claim asserting the denial or infringement of a constitutional right. Like the allegations raised in his previous filings, however, none of the allegations raised in his most recent filing rise to the level of an Eight Amendment violation because they do not establish an "unquestioned and serious [deprivation] of basic human needs or a denial of the minimal civilized measure of life's necessities." *Williams v. Carbello*, 666 F. Supp. 2d 373, 378 (S.D.N.Y. 2009) (internal quotations and citations omitted). [4]

[4]     In his objections, Huggins also attempted to modify the amount of damages sought from approximately $1,000,000 to $5,000,000. (*Compare* Amended Complaint at 5; Plaintiff's Reply Memoranda of Law, (ECF No. 29), at 7, *with* Objections at ¶¶ 21, 30, 35.)

Huggins's objections are OVERRULED. The Report is adopted in its entirety. Huggins's Amended Complaint is DISMISSED WITH PREJUDICE. The Clerk of Court is directed to close the motion docketed at ECF No. 21.

SO ORDERED.

Attachment

UNITED STATE DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DIRAL HUGGINS,
                    Plaintiff,

          v.

COMMISSIONER, DORA SCHRIRO, and
WARDEN, CARLTON NEWTON,
                    Defendants.

REQUEST FOR EXTENSION TO FILE OBJECTION TO THE DEFENDANT'S RECOMMENDATION AND MOTION.

14-CV-6468 (GBD)(JLC)

HON: GEORGE B. DANIELS

TO: JAMES L. COTT, UNITED STATES MAGISTRATE JUDGE:
TO: THE HON: GEORGE B. DANIELS

PLEASE BE ADVISED, that I am the above-named Plaintiff, in the above entitled Action, pursuant to 42 U.S.C. 1983. And with all due respect, to the Court and parties to this Action.

On or about November 23, 2015, I received A copy of the defendant's Report and Recommendation

Case 9:21-cv-00986-MAD-TWD    Document 32    Filed 08/07/23    Page 379 of 380

Huggins v. Schriro, Not Reported in Fed. Supp. (2016)
2016 WL 680822

(2)

Asking that the Court dismiss my Amended Complaint with prejudice, for which I respectfully object to Wholeheartedly.

In addition, I Furthermore wish to request the Court's permission for a timely Extension for me to diligently and adequately respond to the defendant's Report and Recommendation.

Plaintiff, Diral Huggins, hereby respectfully Asks for the Court and defendant's indulgence As a result of his incarceration and Lack of Access to the Facility's Law Library, where plaintiff can Acquire the required Legal Assistance Necessary to serve an Adequate and/or sufficient response to

(3)

Defendant's report and recommendation.

Furthermore, Plaintiff, Diral Huggins, Asks this Court, to take into greater Considerations, that the Facility-Officials at his place of Confinement, has Shut-down All Facility Access to the Facility Law Library, As a direct result of thanksgiving day holiday. And in Lieu of, the Court's rules pursuant to 28 U.S.C. 636(b)(1) and Rule 72(b) of the Federal Rules of Civil procedure, granting plaintiff Fourteen (14) Days to File my objections and reply.

Plaintiff, Diral Huggins, requests for January 5th, 2016, to serve his objections, because facility Officials, Also Shuts-down all Facility Activities For

(4)

The Month of December/2015, For Two-weeks For Security Searches and/or purposes.

WHEREFORE, Plaintiff respectfully prays, that the Court grants the herein requested Extension of time and any other relief, this Court deems just and Equitable Under the herein Circumstances.

Date: Nov, 30, 2015

Respectfully Yours:

Diral Huggins # 15-A-0064
AUBURN, CORR. FACILITY
135 STATE St., BOX 618
AUBURN, New York 13024

CC: James L. Cott
Magistrate Judge

Hon. GEORGE B. DANIELS
SOUTHERN DISTRICT OF N.Y.

EVAN SCHNITTMAN, ESQ.
DEFENDANTS ATTORNEY.

AFFIDAVIT OF SERVICE

State of New York )
County of Cayuga ) ss.:

I, Diral Huggins, declare under the penalty of perjury, that..

On the below notary date, I served an Exact Same Copy of the Attached Notice of Motion, requesting an Extension of time to serve my objections upon the below parties:

1). The Clerk of the Court
Magistrate Judge: James L. Cott
Hon. George B. DANIELS
United States District Court
Southern District of New York
500 Pearl St., Room - 1360
New York, N.Y. 10007-1581

2). Evan SCHNITTMAN, Esq.
Corporation Counsel
Defendants Attorney
The City of New York
100 Church Street
New York, N.Y. 10007

SWORN TO BEFORE ME ON 30
Day of November 2015

NOTARY PUBLIC
JEFFREY A CAYA
Notary Public, State of New York
No. 01CA4321328
Qualified in Cayuga County
Commission Expires June 15, 20___

Respectfully Yours:

Diral Huggins # 15-A-0064
AUBURN, CORR. FACILITY
135 STATE St., Box 618
AUBURN, N.Y. 13024

**All Citations**

Not Reported in Fed. Supp., 2016 WL 680822

**Huggins v. Schriro, Not Reported in Fed. Supp. (2016)**

2016 WL 680822

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---